UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

**DAWN WOOTEN,**

     *Plaintiff,*

**v.**                             Case No.

                                 **BIVENS ACTION**

                                 **JURY TRIAL DEMANDED**

**LASALLE CORRECTIONS,
LASALLE MANAGEMENT COMPANY,
L.L.C, LASALLE SOUTHEAST, LLC,
IRWIN COUNTY DETENTION CENTER,**
and **DAVID PAULK,** an individual,

     *Defendants.*

---

## COMPLAINT IN EQUITY FOR FIRST AMENDMENT RETALIATION

### I.  INTRODUCTION

1.     Plaintiff Dawn Wooten files this Complaint alleging discrimination in Defendants' refusal to return her to active service after a reprimand, and in Defendants' constructive termination of her with retaliatory intent, both of which are actionable under the First Amendment of the U.S. Constitution.  This discrimination was in retaliation for Plaintiff Wooten's direct statements to the news media and for her indirectly causing news media coverage of her disclosures of Defendants' wrongdoing, and by the private immigration detention industry more broadly, to Congress and non-profit advocacy groups.  Until this retaliation, Plaintiff had served on full-time shifts as a Licensed Practical Nurse (LPN) at the Department of Homeland Security (DHS) Immigration and Customs Enforcement's (ICE) facility, the Irwin County Detention Center (ICDC), 132 Cotton Drive, Ocilla, Georgia 31774, within this judicial district.

2.      The Defendants, LaSalle Corrections, LaSalle Management Company, LLC, LaSalle Southeast, LLC, and ICDC, operated the ICDC facility under a contract with DHS to detain up to 1,200 ICE detainees.  Defendant David Paulk was the warden of the facility during the relevant time period.

3.      The physical property and facility are owned by Irwin County, Georgia and leased by DHS. Plaintiff disclosed numerous acts and omissions constituting contractor misconduct of public concern against immigration detainees. Her protected speech was made to the news media. Because detention of immigrants under the Immigration and Nationality Act, 8 U.S.C. § 1101 et seq. is the exclusive province of the federal government, Defendants' misconduct toward both detainees and staff under its DHS contract was committed under color of law.

4.      Plaintiff alleges that after she was reprimanded and demoted to non-shift, part-time service in July 2020, she filed disclosures of detainee abuse with the OIG, and in September 2020 after never having been given a single hour of work, became a detainee rights activist publicly advocating for the legal rights of detainees to be free from Defendants' misconduct, abuse and unlawful treatment, and against systemic abuses nationwide by private immigration detention contractors.  After December 31, 2020 passed still without having been given a single hour to work, Plaintiff concluded she had likely been constructively discharged, despite still being listed as an employee in Defendants' official records.

5.      Plaintiff increased her public advocacy for detainee rights urging legislative and executive corrective actions against the Defendants and the industry of which they are part. Defendants refused to return Plaintiff to active service to perform work under advertised job openings for nursing positions for which she was uniquely qualified.  This refusal was in retaliation for her media and legislative advocacy.

## II.  JURISDICTION

6.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.  Plaintiff primarily seeks only equitable relief ordering that Defendants return her to active full-time shift service in her job category.

7.      Plaintiff alternatively seeks declaratory relief under 28 U.S.C. § 2201 by entering a declaratory judgment that the Defendants must allow employees like Plaintiff to communicate freely with the media and Congress about matters of public concern that may not constitute contract violations, when doing so would not unduly interfere with contract performance.

8.      Plaintiff alternatively seeks judicial review pursuant to 5 U.S.C. § 706 of Defendants' arbitrary, capricious, and unlawful decisions in not returning Plaintiff to active service.  Plaintiff further seeks an order finding that Defendants, in exercising the authority of the DHS, acted as a federal "agency" subject to judicial review under 5 U.S.C. § 701(a)(b)(1), to wit, "[f]or the purpose of this chapter 'agency' means each authority of the Government of the United States, whether or not it is within or subject to review by another agency".

9.      This action is also brought for monetary damages pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

10.      This is not an action based upon, under the jurisdiction of, nor presenting any federal question under 41 U.S.C. § 4712.

## III.  EXHAUSTION OF ADMINISTRATIVE REMEDIES AND TOLLING

11.       There is no exhaustion requirement for direct constitutional claims under the First Amendment.  DHS does not administratively adjudicate 41 U.S.C. § 4712 retaliation complaints under the First Amendment for contractor employees or former employees based on retaliation against them for communicating matters of public concern to the news media, or for reporting

wrongdoing against detainees to Congress where such wrongdoing is not redressable under the § 4712 severity thresholds, or for reporting systemic wrongdoing within the detention industry.

12.    Prior to the filing of this action, Plaintiff filed an administrative complaint for violation of her employee rights with the DHS OIG under 41 U.S.C. § 4712(c)(2).  That statute provides a limited cause of action for employees who report "gross mismanagement", "gross waste", "substantial and specific danger to public health or safety", "abuse of authority" or "violation of law, rule, or regulation related to a Federal contract".  Disclosures to Congress of mismanagement or waste that do not rise to the "gross" level, or diminutions of public health and safety that do not meet the threshold of "substantial and specific danger" are not protected under this statute.

13.    41 U.S.C. § 4712 also does not protect: (A) an "abuse of authority" unless it is "arbitrary and capricious" and "inconsistent" with "successful performance of a contract"; and or (B) a "violation of law" not "related" to the contract or which fails to meet the threshold of "genuine infractions of law".  Additionally, (C) reports to Congress of violations of international human rights conventions and norms prohibiting abuse of women are not covered, nor are reports of Eighth Amendment violations.

14.    No reports to the news media or non-profit organizations of mismanagement, waste of funds, abuse of authority, health dangers or violations of law are protected by § 4712, no matter how serious or cruel.

15.    As to her claims under 5 U.S.C. § 706, Plaintiff administratively exhausted her statutory claims by filing disclosures of Defendants' wrongdoing with the DHS, including a complaint of retaliation under 41 U.S.C. § 4712 with the DHS OIG on September 8, 2020.

16.     On January 3, 2022, the OIG issued findings on some of Plaintiff's citizen disclosures of wrongdoing against detainees that were unrelated to her retaliation claim. DHS has issued no decisions or order in response to her retaliation complaint, which has been supplemented through ongoing communications with the OIG.

17.     On September 8, 2020, Plaintiff's counsel notified Defendants via letter, addressed and sent by email to Warden David Paulk and Mr. Ryan Horvath, Director of Legal Affairs and Risk Management for LaSalle Corrections, that Plaintiff had filed a whistleblower complaint with the DHS OIG alleging "violations of laws, rules and regulations, as well as on-going danger to public health and safety, due to mismanagement of COVID-19 issues and other significant matters," and noted that Plaintiff had shared her concerns with management.

18.     On September 14, 2020, Project South, along with three other immigration justice organizations, filed a complaint against Defendants with DHS OIG and DHS Office of Civil Rights and Civil Liberties over the treatment of detainees by the Defendants at ICDC and other facilities, and regarding the detention industry more broadly.   This complaint incorporated references to Plaintiff's September 8, 2020 whistleblower retaliation complaint.

19.     On November 9, 2020, Plaintiff assisted and supported the filing of a civil rights lawsuit by detainees against the Defendants LaSalle Southeast LLC and David Paulk in the case of  *Yanira Yesenia Oldaker v. Giles*, No. 7:20-CV-00224 (WLS) (M.D. Ga. Dec. 22, 2020). Plaintiff has been identified by name in that litigation (from the complaint forward) as a substantial source of allegations against these Defendants, who have been served and entered appearances.

20.     Plaintiff has further caused Defendants to be notified on a continuing basis, up to the date of the filing of this action, of her claims against them through media coverage of her

public statements, statements to Congress, and associational activities with non-profit activist groups such as Project South.

## IV. PARTIES

21.    Plaintiff is a citizen of the United States and resident of the State of Georgia. She is an African American woman.  Her disclosures to the media and to Congress were made as a U.S. citizen who is concerned with wrongdoing against undocumented immigrants who are predominantly people of color like her, and against undocumented immigrant women, who are marginalized like Plaintiff.

22.    Plaintiff has been an LPN since 2009.  Her first employment as an LPN was at the ICDC for LaSalle Corrections, 132 Cotton Drive, Ocilla, GA 31774. Since her first period of employment at ICDC beginning in 2010, Plaintiff has had periods of employment elsewhere, but Plaintiff has been rehired by Defendants at ICDC three times, most recently in October 2019.

23.    Following a reprimand on July 2, 2020, although Plaintiff purportedly remained employed, she was relegated to non-shift, on-call status without assignment of any hours by Defendants from July 2, 2020, until being constructively discharged on December 31, 2020. Even since this date, Defendants have issued official letters verifying Plaintiff's continuing employment.

24.    Defendants are LaSalle Corrections, LaSalle Management Company, LLC, and LaSalle Southeast, LLC, which owns and/or manages 18 correctional centers in Louisiana, Texas, and Georgia, including ICDC which is managed by LaSalle agent, Warden David Paulk. LaSalle Corrections is an established developer and operator of correctional centers throughout the United States.

25.    Defendants LaSalle Corrections, LaSalle Management Company, LLC, and/or LaSalle Southeast, LLC acted as an agency of the federal government under 5 U.S.C. §

701(a)(b)(1) by exercising the authority of a federal "agency", and their actions against Plaintiff are subject to judicial review under 5 U.S.C. § 706.

26.     ICDC is a detention facility owned by Irwin County and operated by Defendants LaSalle Corrections, a private contractor. ICDC was operated in part under contract with ICE for immigrant detention until September 2021.

27.     David Paulk was at all times material to this complaint an employee of LaSalle Corrections, and the warden of ICDC. He made the decision to reprimand Plaintiff on July 2, 2020, to give her no work hours thereafter, and/or to constructively discharge her as of December 31, 2020, or as of such later date as the facts indicate.

28.     Under color of law and in service of a public function, Defendant LaSalle Corrections has been providing corrections services to federal, state, county, and municipal law enforcement agencies for more than 20 years. According to the LaSalle Corrections website, its "range of facility solutions include design, construction, and operations management, along with inmate services that cover security, education, rehabilitation, and healthcare."

29.     On July 13, 2020, eleven days after Plaintiff's reprimand for disclosing Defendants' dangerous COVID-19 practices, Rodney Cooper, Executive Director of LaSalle Corrections, submitted testimony to the Subcommittee on Border Security, Facilitation, and Operations of the Committee on Homeland Security of the House of Representatives stating as follows:

> Since the onset of reports of COVID-19, LaSalle Corrections has been tracking the outbreak, regularly updating infection prevention and control protocols, and issuing guidance. We implemented our pandemic contingency plan in response to COVID-19 that includes screening, testing, appropriate treatment, prevention, education, and infection control measures. After thorough review and consultation of existing plans, we formulated revisions to our strategic plans to include a COVID-19 response plan. Our company's strategic planning ensures for continuity of operations and a sustainable health care delivery system.

## V.  STATEMENT OF GENERAL FACTS

### A.  <u>Background Facts</u>

30.    During the period following her October 2019 rehire at ICDC, Plaintiff had been employed fulltime, working approximately 36-40 hours per week, including regular shifts from 6:00 am to 6:00 pm, six times in every two-week pay period.

31.    Plaintiff's most recent direct supervisor at ICDC was the Health Services Administrator ("HSA"), Ms. Lakisha Brown. Ms. Brown reported to Deputy Warden Frank Albright, who reported to Warden David Paulk. Prior to HSA Brown, Plaintiff's direct supervisor was HSA Ms. Marion Cole.

32.    The Immigration and Nationality Act (INA) is the primary statute governing immigration into the United States. DHS has the authority to detain noncitizens, *inter alia*, under 8 U.S.C. § 1158 "Asylum", § 1181 "Admission of immigrants," § 1182 "Inadmissible aliens," and § 1183 "Admission of aliens on giving bond or undertaking."

33.    Since the September 11, 2001 attacks on the United States, immigration detention has been rapidly evolving and the INS was abolished by statute and DHS was established and vested with the authority to administer and enforce immigration laws. Over the next decade, there was a significant increase in the number of people detained due to a quota ultimately requiring the maintenance of 34,000 beds for immigration detention, which in turn drove an expansion of contracts with existing private sector correctional and detention facilities to provide space to meet that quota.

34.    Private prison corporations have played an increasingly dominant role in immigration detention in the United States.  In 2015, 72% of immigration detention beds were

located in facilities run by for-profit prison corporations under ICE contracts.

35.    For years, detained immigrants at ICDC have reported human rights abuses
including lack of medical and mental health care, due process violations, unsanitary living
conditions, and more, as reported in "Imprisoned Justice: Inside Two Georgia Immigrant
Detention Centers" (2017, Center for Immigrants' Rights Clinic, Penn State Law), an update to
the Center's 2012 report, "Prisoners of Profit." Detained immigrants have reported not being
able to see a medical professional for several weeks despite submitting multiple sick call
requests, not receiving life dependent medication consistently, and not receiving proper or
medically appropriate care in relation to the nature and seriousness of the medical concern,
even if they are able to see a medical professional.

36.    A 2017 DHS Office of Professional Responsibility investigation also found that
ICDC medical exam rooms did not meet ICE detention standards. The report found: "In the
medical examination rooms, floors and patient examination tables were dirty and dust was
observed on horizontal surfaces. Waste containers were overfilled and in need of cleaning."
DHS, Office of Detention Oversight Compliance Inspection Enforcement and Removal
Operations ERO Atlanta Field Office, Irwin County Detention Center, Ocilla, Georgia 31772,
p.6 (March 7-9, 2017).

37.    On May 20, 2021, the Secretary of DHS instructed ICE to "as soon as possible"
sever its contracts with ICDC, which was under federal investigation following Plaintiff's
whistleblower disclosures to DHS OIG and Congress, and to preserve evidence for ongoing
investigations. Secretary Mayorkas noted in announcing his decision to end the contract at
ICDC, as well as at the Bristol County Sheriff's Office in Louisiana, also under federal
investigation, that "we will not tolerate the mistreatment of individuals in civil immigration

detention or substandard conditions of detention."

38.     Secretary Mayorkas was quoted in the May 20, 2021 DHS press release as stating, "We have an obligation to make lasting improvements to our civil immigration detention system. This marks an important first step to realizing that goal. DHS detention facilities and the treatment of individuals in those facilities will be held to our health and safety standards. Where we discover they fall short, we will continue to take action as we are doing today."

39.     Thus, despite the publicly available reports set forth above in paragraphs 35 and 36, the inhumane conditions of detainees continued into 2020, and Plaintiff's disclosures to the news media and Congress about the Defendants, the detention industry, and DHS prompted public concern and legislative action.

**B.  CDC Disease Control and Hygiene Standards and Guidelines**

40.     ICE has developed and disseminated its own standards and guidelines for hygiene, cleanliness, and sanitation for detention facilities like ICDC, which are described as ICE's Performance- Based National Detention Standards ("PBNDS"), as revised in 2016. ICE also issued guidelines to its private detention facilities like ICDC to comply with relevant hygiene, cleanliness, and sanitation standards established by U.S. Centers for Disease Control and Prevention (CDC).

41.     ICE has not designated the CDC or PBNDS standards and guidelines referenced above or below as "laws, rules or regulations related to a federal contract", nor as binding contract terms.  *See* ICE Detention Standards, November 9, 2021, https://www.ice.gov/factsheets/facilities-pbnds.

42.    The CDC has very specific standards regarding Personal Protective Equipment ("PPE"), including "Ensur[ing] that sufficient stocks of hygiene supplies, cleaning supplies, PPE, and medical supplies (consistent with the healthcare capabilities of the facility) are on hand and available, and have a plan in place to restock as needed if COVID-19 transmission occurs." PPE of all kinds always was in very short supply at ICDC. Plaintiff observed that some things, such as gowns and face shields, were rarely if ever provided.

43.    In March 2020, the CDC established detailed standards for social-distancing, medical isolation, and quarantining of detainees and staff to address the spread of COVID-19, all of which Plaintiff observed were routinely ignored. For example, at the beginning of the pandemic, the CDC required detention facilities to:

a)  Implement social distancing strategies to increase the physical space between incarcerated/ detained persons (ideally 6 feet between all individuals, regardless of the presence of symptoms).

b)  Have staff maintain a distance of 6 feet or more from an individual with respiratory symptoms while interviewing, escorting, or interacting in other ways.

c)  As soon as an individual [detainee] develops symptoms of COVID-19, they should wear a face mask (if it does not restrict breathing) and should be immediately placed under medical isolation in a separate environment from other individuals.

d)  Keep the individual's movement outside the medical isolation space to an absolute minimum.

e)  Provide medical care to cases inside the medical isolation space.

f)  Serve meals to cases inside the medical isolation space.

g)  Exclude the individual from all group activities.

h)  Assign the isolated individual a dedicated bathroom when possible.

i)  Ensure that the individual is wearing a face mask at all times when outside of the medical isolation space, and whenever another individual enters. Provide clean masks as needed. Masks should be changed at least daily, and when visibly soiled or wet.

j)  Facilities should make every possible effort to place suspected and confirmed COVID-19 cases under medical isolation individually. Each isolated individual should be assigned their own housing space and bathroom where possible. Cohorting should only be practiced if there are no other available options.

k)  If cohorting is necessary: Only individuals who are laboratory confirmed COVID-19 cases should be placed under medical isolation as a cohort. Do not cohort confirmed cases with suspected cases or case contacts.

l)  Incarcerated/detained persons who are close contacts of a confirmed or suspected COVID-19 case (whether the case is another incarcerated/detained person, staff member, or visitor) should be placed under quarantine for 14 days.

44.    Plaintiff also observed that ICDC failed to meet the following ICE detention standards for sanitation that applied even before the COVID-19 pandemic hit the U.S., which required that:

a)  All horizontal surfaces shall be damp-dusted daily with an approved germicidal solution used according to the manufacturer's directions.

b)  Windows, window frames and windowsills shall be cleaned on a weekly schedule.

c)  Furniture and fixtures shall be cleaned daily.

d)  Floors shall be mopped daily and when soiled, using the double-bucket mopping technique and with a hospital disinfectant-detergent solution mixed according to the manufacturer's directions.

e)  A clean mop head shall be used each time the floors are mopped.

f)  Cubicle curtains shall be laundered monthly or during terminal cleaning following treatment of an infectious patient.

45.    According to the CDC in its 2020 guidelines for detention facilities, "[e]ven if COVID-19 cases have not yet been identified inside the facility or in the surrounding community, begin implementing intensified cleaning and disinfecting procedures according to the recommendations below. These measures may prevent spread of COVID-19 if introduced." This required detention facilities like ICDC to meet the following standards, which Plaintiff observed ICDC never met:

a) Several times per day, clean and disinfect surfaces and objects that are frequently touched, especially in common areas. Such surfaces may include objects/surfaces not ordinarily cleaned daily (e.g., doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment, kiosks, and telephones).

b) Staff should clean shared equipment several times per day and on a conclusion of use basis (e.g., radios, service weapons, keys, handcuffs).

c) Use household cleaners and EPA-registered disinfectants effective against the virus that causes COVID-19 as appropriate for the surface, following label instructions. This may require lifting restrictions on undiluted disinfectants.

d) Ensure adequate supplies to support intensified cleaning and disinfection practices, and have a plan in place to restock rapidly if needed.

## C. Defendants Ignored the Right of Detainees to Protection From COVID-19

46.    In March 2020, detainees in Unit C at ICDC began to report they and their dormmates were experiencing well-recognized symptoms of COVID-19, such as fevers and sore throats. These detainees thus repeatedly requested to be tested for the disease. Plaintiff's supervisor, Health Services Administrator HSA Brown, and ICDC Director of Nursing ("DON"), Ms. Shanise Bell, routinely rejected these requests. When Plaintiff questioned DON Bell and HSA Brown about these denials of COVID-19 testing for detainees exhibiting symptoms, they claimed that detainees sought testing because they wanted attention, and that detainees were requesting tests as a pretext to get out of their cells.

47.    In June 2020, ICDC received two rapid response COVID-19 testing machines. These machines would produce COVID-19 testing results in eight minutes. Plaintiff understood the machines were to be used for testing the detainees, but Plaintiff saw the machines in use only twice, once to test an ICDC employee and once for a detainee.

48.    When Plaintiff asked HSA Brown if nurses would be trained to use the testing machines, HSA Brown said they would not be trained because the machines were $14,000.00 each, she did not want employees testing each other, and for that reason only DON Bell and

HSA Brown would be trained to use the machines. HSA Brown then proceeded to lock the testing machines and supplies in her office.

49.     From March through July 2020, rather than order a COVID-19 test for detainees seeking medical attention for a fever, HSA Brown instructed ICDC medical staff to prescribe a seven-day course of over-the-counter cold medication to those detainees. Plaintiff questioned HSA Brown about this practice with DON Bell present, and HSA Brown insisted that the detainees only had colds because of the cold temperature in their cells and did not need to be tested for COVID-19.

50.     From October 2019 through July 2020, Plaintiff observed ICDC medical staff shredding detainees' written requests for exams or treatment and otherwise denying medical care by falsely documenting or reporting exams as performed that actually had not been performed. During May and July 2020, Plaintiff reported this to HSA Brown, who took no action but told her, "One day they will be caught [shredding the exam requests]."

51.     From October 2019 through July 2020, ICDC failed to maintain hygiene, cleanliness, and sanitation standards for medical exam rooms and equipment.

52.     For example, Plaintiff observed exam room tables and floors that were rarely cleaned, wiped down, or mopped, and certainly not to ICE or CDC standards. There was often blood on the floor that had not been cleaned up. On one occasion Plaintiff showed HSA Brown blood that was left on the floor. HSA Brown commented that it was not acceptable but that as adults, all staff should know how to clean up after themselves. Plaintiff asked whether HSA Brown would correct the employee who left the blood, and HSA Brown said that she was not there to "babysit" anyone.

53.     ICE and the CDC also require minimum standards of personal hygiene for all detainees, such as providing them with personal bars of soap, and providing female detainees with menstrual hygiene products. Plaintiff observed that Defendants failed to comply with these standards. When Plaintiff asked HSA Brown about ICE detainees receiving soap and menstrual hygiene products, HSA Brown said she did not have any control over distribution of those products.

54.     From March through July 2020, Plaintiff observed that Defendants constantly failed to provide or unreasonably delayed the provision of adequate quantities of PPE to detainees and lower-level staff like Plaintiff.

55.     Plaintiff observed highly effective PPE, such as N-95 face masks, being reserved for high-ranking staff (who rarely had contact with the detainees and staff most likely to be exposed to COVID-19), while the most at-risk individuals were given only inferior paper or cloth masks and were not given new masks to replace old or broken ones. From March through early June 2020, there were no face shields or gowns provided.

56.     Detainees were rarely, if ever, given even paper facemasks (like surgical masks) even when they pleaded for them. For this reason, some detainees were forced to buy socks from the commissary to tie around their noses and mouths and substitute facemasks.

57.     In April 2020, Plaintiff asked HSA Cole why medical employees were wearing surgical masks and leadership was wearing N-95 masks, and HSA Cole said that Warden Paulk had only provided surgical masks to the medical unit. At Plaintiff's prompting, HSA Cole asked Warden Paulk for N-95 masks for medical employees, and HSA Cole became aware that Warden Paulk had dozens of N-95 masks locked in his office. Thereafter, the medical unit received N-95 masks, though medical employees were given only one N-95 mask in April and were told they

needed to maintain that mask. HSA Cole instructed employees that if they wanted a new mask, they had to purchase that themselves.

58.     On one occasion in June 2020, Plaintiff handed N-95 masks to two other nurses and an officer after theirs had frayed and were significantly damaged from use, and HSA Brown chastised Plaintiff saying it was not Plaintiff's responsibility to distribute masks. After that, HSA Brown locked the N-95 masks in her office.

59.     The CDC also required that staff and detainees be trained to correctly don, doff, and dispose of PPE. ICDC never trained anyone about how to put on, take off, and dispose of PPE. When Plaintiff asked HSA Brown to instruct staff about PPE usage around detainees contagious with COVID-19, HSA Brown replied that knowledge of PPE was a "fundamental" of nursing school and that all medical staff should already know how to use it. However, new nurses indicated that they were not familiar with proper guidelines.

60.     The CDC required regular temperature checks for COVID-19, with the frequency of temperature checks depending on the circumstances: immediately after detainees arrive and before they are brought into the general detainee population, once a day for staff as they arrive for work, twice a day for quarantined detainees, and daily in housing units where COVID-19 cases have been identified. Defendants performed temperature checks on new detainees and staff entering the facility, but they rarely performed other checks with the frequency the CDC required.

61.     Defendants did not train medical or other facility staff about the proper use of handheld temperature guns, though as a trained nurse, Plaintiff knew how to use and clean the temperature guns. Officers at the entrance of the detention center regularly misused the guns, routinely pressing them against the forehead of staff entering the facility, rather than holding

them 6-12" away from the forehead as necessary, and rarely, if ever, cleaned or sanitized the guns. Plaintiff observed an officer falsify her incorrect temperature reading upon her entry to the facility.

62.    Plaintiff asked HSA Brown why there was not a nurse who knew how to properly use the temperature guns at the entrance to the facility. HSA Brown stated that was not her responsibility.

63.    From March through July 2020, Defendants adopted inadequate social-distancing policies. Defendants' leadership failed to encourage and enforce the CDC's social distancing recommendations. Defendants reprimanded staff for practicing social distancing. On various dates from March through May 2020, HSA Cole, and later in May and June 2020, Plaintiff's supervisor and HSA Brown, verbally reprimanded Plaintiff for warning other staff to adhere to CDC-recommended distancing guidelines and to use extra precautions when working with someone who has tested positive for COVID-19.  For example, from March through July 2020, Plaintiff observed Defendants unreasonably refuse to isolate from the general population both detainees who had tested positive for COVID-19 and those who were COVID-19-symptomatic.

64.    From March through June 2020, Defendants routinely failed to inform detainees and staff which persons among the detainee population had tested positive for COVID-19. In June 2020, Plaintiff had substantial contact with several detainees that, unbeknownst to her, were suspected of having COVID-19 and had submitted COVID-19 test samples. HSA Brown did not tell Plaintiff that the detainees were suspected of having COVID-19 and that they had submitted samples. Plaintiff therefore entered the room without proper PPE, though HSA Brown wore an N-95 mask while interacting with them. Later Plaintiff learned that the three detainees had in fact tested positive when she received paperwork with the positive test results. When Plaintiff

questioned HSA Brown about her failure to inform Plaintiff of the suspected COVID-19

infection, particularly given Plaintiff's health concerns, HSA Brown indicated she did not want

to cause alarm.

65.     Around April 2020, Plaintiff observed HSA Brown shred approximately 45 covid

test results. HSA Brown told Plaintiff that the papers were copies of tests. However, when

Plaintiff used a list of individuals whose tests had been shredded to cross check their files, she

observed that the test results were not in the detainees' files.

66.     The CDC also had standards regarding detainee transfers because of COVID at all

institutions. The CDC guidelines stated that detention facilities must "restrict transfers of

incarcerated/detained persons to and from other jurisdictions and facilities unless necessary for

medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, or

to prevent overcrowding" and "suspend all transfers of incarcerated/detained persons to and from

other jurisdictions and facilities (including work release where relevant), unless necessary for

medical evaluation, medical isolation/quarantine, care, extenuating security concerns, or to

prevent overcrowding."

### D.   Defendants Violated Detainee Human Rights in Performing Invasive Gynecological Procedures Without Informed Consent

67.     Multiple immigrant women expressed concerns to Plaintiff that they had

undergone invasive gynecological procedures off-site to which they did not knowingly consent

and did not fully understand why the procedures had been performed, and asked Plaintiff for

information about the procedures. Plaintiff confirmed by reviewing the charts of the immigrant

women that indeed high rates of gynecological procedures were being performed by an outside

medical provider on detained women at ICDC.

68.     Plaintiff raised the concerns about the high rates of gynecological procedures

performed on immigrant women detainees without their understanding or consent with a fellow

nurse and DON Bell. Both expressed awareness of the gynecological procedures, and a fellow

nurse, in front of DON Bell, explicitly instructed Plaintiff "not to touch that."

## VI.  FIRST AMENDMENT PROTECTED ACTIVITY WITH NEWS MEDIA AND CONGRESS

69.    After Plaintiff filed her September 8, 2020 OIG complaint, she engaged in

further protected activity.  A Google search of her name demonstrates the reach of her

advocacy to the New York Times, Washington Post, The Guardian, USA Today, Wall Street

Journal, The Intercept, New Yorker, Harpers, ABC News, BBC News, Business Insider, CBS

News, CNN, Forbes, FOX News, MSNBC, The Hill, C-Span and in providing Congressional

testimony.

70.    Beginning on September 17, 2020, and continuing to the date of filing this action,

Plaintiff contacted both chambers of Congress disclosing Defendants' wrongdoing, and urging

investigation into the wrongdoing by Defendants, the private detention industry, and the

oversight practices of DHS.  Plaintiff's whistleblower disclosures spurred multiple agency and

Congressional investigations which have been continuing to the date of filing this action.

71.    The following entities engaged in or claimed to be engaged in the review

described in the preceding paragraph by the DHS OIG Disclosure Unit; the Department of

Justice; the Senate Homeland Security and Governmental Affairs Committee Permanent

Subcommittee on Investigations; the Senate Committee on the Judiciary, the House of

Representatives Homeland Security Committee; the House Oversight and Reform Committee,

the House Subcommittee on Border Security, Facilitation; the Congressional Hispanic Caucus,

and many individual members of Congress.

## VII.  FIRST AMENDMENT RETALIATION

72.     On or about July 2, 2020, Plaintiff objected to a reprimand to ICDC Warden

Paulk. Plaintiff emphasized her ten-year history of employment at ICDC and her record of solid

performance and attendance. Warden Paulk expressed anger and frustration at her objections,

using racially offensive language. Effective immediately, he increased the adverse action from

reprimand to removal from the regularly scheduled shift roster such that Plaintiff was no longer

to be a fulltime LPN, but instead would be "PRN," or called for work only as needed.  This

meant that Plaintiff no longer had a regular shift, and that the PRN status was to be used

pretextually as a vehicle to refuse active service and work hours to Plaintiff.

73.     After being removed from the regularly scheduled shift roster, Plaintiff waited to

be called as a PRN to perform work at ICDC. At first, Defendants changed Plaintiff's schedule

with days' notice. On or about September 3, 2020, Plaintiff notified Defendants of her

availability for work, including for hours in October 2020.

74.     Having thereafter still received no work assignments and following extensive

news media reporting of her post-OIG complaint protected activity, Plaintiff decided that as of

December 31, 2020, she was probably not going to be called back to work at ICDC. This

constituted the date of her constructive discharge, or such later date as the facts may indicate.

75.     While Plaintiff was on-call status, Defendant posted open full-time as well as

PRN LPN positions, and did not assign her any hours or return her to active service to fill this

unmet need. At no time including up to the date of the filing of this complaint did Defendants

inform Plaintiff that she was on a suspended or involuntary leave status, or that she has been

terminated from employment.

**CLAIM FOR RELIEF:**
**VIOLATION OF PLAINTIFF'S SPEECH AND ASSOCIATION RIGHTS**
**UNDER THE FIRSTAMENDENT**

76.      All of the above paragraphs are incorporated here by reference.

77.      In engaging in the media disclosures and media activities described above, and in concert with other activists and organizations who were not employees of Defendants, and in providing support and assistance in the case of *Yanira Yesenia Oldaker v. Giles*, No. 7:20-CV-00224 (WLS) (M.D. Ga. Dec. 22, 2020), Plaintiff was acting as a citizen and marginalized woman of color in exercising her speech and associational rights guaranteed to her by the First Amendment of the U.S. Constitution.

78.      Neither the Defendants nor DHS have created, maintained, nor disclosed the existence of any protected and effective whistleblower reporting channels for use by former employees or employees not in active service to the Defendants or to other immigration detention contractors.

79.      Disclosures directly and indirectly to the news media and non-profit advocacy groups of wrongdoing against detainees, and against former employees or employees not in active service by the Defendants, and/or by the private detention industry more systemically, is the only effective way for citizens to raise matters of public concern about that industry and its contractor, and/or about DHS oversight of them.

80.      Defendants are subject to direct Constitutional claims because they exercise a role in an area within the exclusive authority of the Federal Government and in conjunction with DHS components charged with responsibility for immigration. The courts have deemed incarceration companies including LaSalle as "Federal actors".

81.      Defendants, acting under color of Federal authority, violated Plaintiff's First

Amendment rights of speech and association. As such, Plaintiff may redress her First

Amendment claims for equitable and declaratory relief under 28 U.S.C. § 1331 and 2201, and 5

U.S.C. § 706.

82.    Defendants, acting under color of Federal authority, caused Plaintiff to suffer

monetary damages as a result of violating her First Amendment rights. As such, Plaintiff may

redress her First Amendment claims for money damages under 28 U.S.C. § 1331 and *Bivens v.*

*Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

83.    41 U.S.C. § 4712(c)(2) does not provide a meaningful or adequate remedy for

retaliation based upon the media disclosures and advocacy engaged in by Plaintiff.

84.    Georgia does not recognize any wrongful discharge tort claim available to

Plaintiff.

85.    Defendants' actions showed willful misconduct, malice, fraud, wantonness,

oppression, or that entire want of care which would raise the presumption of conscious

indifference to consequences within the meaning of the Official Code of Georgia Annotated

(O.C.G.A.) § 51-12-5.1(b).

### VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court award her the following:

a. Injunctive relief by ordering her return to active service and employment with

Defendants at the same or similar position she held before the reprisal;

b.  Declaratory relief by entering a declaratory judgment that the Defendants must

allow employees, including Plaintiff upon return to service, to communicate freely with the

media and Congress about matters of public concerns when doing so would not unduly

interfere with business operations.

c.  Judicial review relief by finding unenforceable Defendants' arbitrary, capricious, and unlawful decisions in not returning Plaintiff to active service;

d.   If return to service is not ordered, then front pay for a period of at least five years;

e. Under her Bivens claim only, back pay for all lost wages and benefits, including lost bonuses;

f. Under her Bivens claim only, economic damages for injury to Plaintiff's career, professional reputation, and earning capacity, in an amount to be determined at hearing;

g. Under her Bivens claim only, non-economic damages for mental and emotional distress, embarrassment and humiliation, in an amount to be determined at hearing;

h. Under her Bivens claim only, punitive damages; and

i. All other relief that may be available from law and equity, including her costs and attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A).

Plaintiff demands a jury trial.

Respectfully Submitted,

/s/ John P. Batson

_____
John P. Batson (Ga. Bar No. 042150)
The Law Office of John P. Batson
P.O. Box 3248
Augusta, GA 30914-3248
(706) 722-8191
jpbatson@aol.com

Thad M. Guyer (Oregon # 821443)
Stephani L. Ayers (Wash # #31610)
Pro Hac Vice Pending
T.M. Guyer and Ayers & Friends, PC
116 Mistletoe Street
Medford, OR 97501
thadg@whistleblower.org

(206) 954-1293 (mobile)

John A. Kolar (D.C. Bar No. 292953)
Pro Hac Vice Pending
Government Accountability Project
1612 K Street, N.W., Suite 1100
Washington, D.C. 20006
(202) 926-3311
JackK@whistleblower.org

Attorneys for Plaintiff