**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**VALDOSTA DIVISION**

**DAWN WOOTEN,**

      *Plaintiff,*

**v.**                             Case No. 7:22-cv-00148-WLS


                                 **JURY TRIAL DEMANDED**

**LASALLE MANAGEMENT COMPANY,**
**L.L.C, LASALLE SOUTHEAST, LLC,**
and **DAVID PAULK,** an individual,

      *Defendants*
_____

## SECOND AMENDED COMPLAINT FOR FIRST AMENDMENT AND STATUTORY RETALIATION

### I. INTRODUCTION

1.     Plaintiff Dawn Wooten alleges discrimination in refusing to return her to active service after a reprimand, and in constructively terminating her with retaliatory intent, both of which are actionable under the First Amendment of the U.S. Constitution and 41 U.S.C. § 4712. This discrimination was in retaliation for her direct statements to the new media, and for indirectly causing news media coverage of her disclosures of wrongdoing by Defendants, and by the private immigration detention industry more broadly, to Congress and non-profit advocacy groups. Until this retaliation, Plaintiff had served on full time shifts as a Licensed Practical Nurse (LPN) at the Department of Homeland Security (DHS) Immigration and Customs Enforcement's (ICE) facility, the Irwin County Detention Center (ICDC), 132 Cotton Drive, Ocilla, Georgia 31774, within this judicial district.

2.     The Defendants, LaSalle Management Company, LLC, and LaSalle Southeast,

LLC, operated the ICDC facility under a contract with DHS to detain up to 1,200 ICE detainees. Defendant David Paulk was the warden of the facility during the relevant time period.

3.      The physical property and facility are owned by Irwin County, Georgia and leased by DHS. Plaintiff disclosed numerous acts and omissions constituting contractor misconduct of public concern against immigration detainees. Her protected speech was made to the news media. Because detention of immigrants under the Immigration and Nationality Act, 8 USC § 1101 et seq. is the exclusive province of the federal government, Defendants' misconduct toward both detainees and staff under its DHS contract was committed under color of law.

4.      Plaintiff alleges that after she was reprimanded and demoted to non-shift, part-time service in July 2020 she filed disclosures of detainee abuse with the OIG, and in September 2020 after never having been given a single hour of work, became a detainee rights activist publicly advocating for the legal rights of detainees to be free from Defendants' misconduct, abuse and unlawful treatment, and against systemic abuses nationwide by private immigration detention contractors.  After December 31, 2020 passed still without having been given a single hour to work, Plaintiff concluded she had likely been constructively discharged, despite still being listed as an employee in Defendants' official records.

5.      Plaintiff increased her public advocacy for detainee rights urging legislative and executive corrective actions against the Defendants and the industry of which they are part. Defendants refused to return Plaintiff to active service to perform work under advertised job openings for nursing positions for which she was uniquely qualified.  This refusal was in retaliation for her media and legislative advocacy.

## II.  JURISDICTION

6.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.  Under her First Amendment claim, Plaintiff primarily seeks only equitable relief ordering that

Defendants return her to active full-time shift service in her job category. Under her 41 U.S.C. § 4712 claim, she additionally seeks damages.

7.      Plaintiff alternatively to her First Amendment claim seeks declaratory relief under 28 U.S.C. § 2201 by entering a declaratory judgment that the Defendants must allow employees like Plaintiff to communicate freely with the media and Congress about matters of public concern that may not constitute contract violations when doing so would not unduly interfere with contract performance.

8.      This action is also brought for monetary damages against the Defendant Paulk pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

9.      This is an action based upon, under the jurisdiction of, and presenting federal questions under 41 U.S.C. § 4712.

### III.   EXHAUSTION OF ADMINISTRATIVE REMEDIES AND TOLLING

10.      There is no exhaustion requirement for direct constitutional claims under the First Amendment. DHS does not administratively adjudicate 41 U.S.C. § 4712 retaliation complaints under the First Amendment for contractor employees or former employees based on retaliation against them for communicating matters of public concern to the news media, or for reporting wrongdoing against detainees to Congress where such wrongdoing is not redressable under the § 4712 severity thresholds, or for reporting systemic wrongdoing within the detention industry.

11.      Prior to the filing of this 41 U.S.C. § 4712 claim, on September 8, 2020 Plaintiff filed an administrative complaint, supplemented that complaint, and an amended administrative complaint on December 12, 2022, for violation of her employee rights with the DHS OIG under 41 U.S.C. § 4712(c)(2). That statute provides a limited cause of action for employees who report "gross mismanagement", "gross waste", "substantial and specific danger to public health

or safety", "abuse of authority" or "violation of law, rule, or regulation related to a Federal contract". Disclosures to Congress of mismanagement or waste that do not rise to the "gross" level, or diminutions of public health and safety that do not meet the threshold of "substantial and specific danger" are not protected under this statute.".

12. Also unprotected under § 4712 are an (A) "abuse of authority" unless it is "arbitrary and capricious" and "inconsistent" with "successful performance of a contract"; and (B) unprotected is "violation of law" not "related" to the contract or which fails to meet the threshold of "genuine infractions of law". Additionally, (C) reports to Congress of violations of international human rights conventions and norms prohibiting abuse of women are not covered, nor are reports of Eighth Amendment violations.

13. No reports to the news media or non-profit organizations of mismanagement, waste of funds, abuse of authority, health dangers or violations of law are protected by § 4712, no matter how serious or cruel.

14. On September 8, 2020, Plaintiff's counsel notified Defendants via letter, addressed and sent by email to Warden David Paulk and Mr. Ryan Horvath, Director of Legal Affairs and Risk Management for LaSalle Corrections, that Plaintiff had filed a whistleblower complaint with the DHS OIG alleging "violations of laws, rules and regulations, as well as on-going danger to public health and safety, due to mismanagement of COVID-19 issues and other significant matters," and noted that Plaintiff had shared her concerns with management.

15. On September 14, 2020, Project South along with three other immigration justice organizations filed a complaint against Defendants with DHS OIG and DHS Office of Civil Rights and Civil Liberties over the treatment of detainees by the Defendants at ICDC and other

facilities, and regarding the detention industry more broadly. This complaint incorporated references to Plaintiff's September 8, 2020 whistleblower retaliation complaint.

16. On November 9, 2020, Plaintiff assisted and supported the filing a civil rights lawsuit by detainees against the Defendants LaSalle Southeast LLC and David Paulk in the case of *Yanira Yesenia Oldaker v. Giles*, No. 7:20-CV-00224 (WLS) (M.D. Ga. Dec. 22, 2020). Plaintiff has been identified by name in that litigation (from the complaint forward) as a substantial source of allegations against these Defendants, who have been served and entered appearances.

17. On January 3, 2022, the OIG issued findings on some of Plaintiff's citizen disclosures of wrongdoing against detainees that were unrelated to her retaliation claim. DHS has issued no decisions or order in response to her retaliation complaint, which has been supplemented through ongoing communications with the OIG.

18. 9. On August 9, 2022, the investigation of Plaintiff's case (W2023683) was referred to a new Alternative Dispute Resolution (ADR) program established by the DHS OIG. Through her counsel Plaintiff agreed to pause the DHS OIG investigation into her complaint and grant another 180-day extension on December 13, 2022. The last such extension, which lapsed on August 29, 2022, but was sought on December 6, 2022, expired on February 25, 2023.

19. On December 20, 2022, Plaintiff filed an amended complaint with DHS OIG.

20. **Effective August 14, 2023,** the OHS OIG Whistleblower Protection Division (WPD), gave written notice that "the conditions for exhaustion of administrative remedies have been met in this case, and that the Plaintiff may remove the allegations to the appropriate U.S. district court".

## IV. PARTIES

21. Plaintiff is a citizen of the United States and resident of the State of Georgia. She

is an African American woman.  Her disclosures to the media and to Congress were made as a U.S. citizen who is concerned with wrongdoing against undocumented immigrants who are predominantly people of color like her, and against undocumented immigrant women, who are marginalized like Plaintiff.

22.     Plaintiff has been an LPN since 2009.  Her first employment as an LPN was at the ICDC for LaSalle Corrections, 132 Cotton Drive, Ocilla, GA 31774. Since her first period of employment at ICDC beginning in 2010, Plaintiff has had periods of employment elsewhere, but Plaintiff has been rehired by Defendants at ICDC three times, most recently in October 2019.

23.     Following a reprimand on July 2, 2020, although Plaintiff purportedly remained employed, she was relegated to non-shift, on-call status without assignment of any hours by Defendants from July 2nd until being constructively discharged on December 31, 2020.  Even since this date, Defendants have issued official letters verifying Plaintiff's continuing employment.

24.     Defendants LaSalle Management Company, LLC, and LaSalle Southeast, LLC, ("LaSalle") which owns and/or manages 18 correctional centers in Louisiana, Texas, and Georgia, including ICDC which is managed by LaSalle agent, Warden David Paulk.  LaSalle is an established developer and operator of correctional centers throughout the United States.

25.     ICDC is a detention facility owned by Irwin County and operated by Defendants LaSalle Corrections, a private contractor. ICDC was operated in part under contract with ICE for immigrant detention until September 2021.

26.     David Paulk was at all times material to this complaint an employee of LaSalle Corrections, and the warden of ICDC. He made the decision to reprimand Plaintiff on July 2, 2020, to give her no work hours thereafter, and/or to constructively discharge her as of

December 31, 2020, or as of such later date as the facts indicate.

27.     Under color of law and in service of a public function, LaSalle has been providing corrections services to federal, state, county and municipal law enforcement agencies, for more than 20 years. According to the LaSalle Corrections website, its "range of facility solutions include design, construction, and operations management, along with inmate services that cover security, education, rehabilitation, and healthcare."

28.     On July 13, 2020, 11 days after Plaintiff's reprimand for disclosing Defendants' dangerous COVID-19 practices, Rodney Cooper, Executive Director of LaSalle Corrections, submitted testimony to the Subcommittee on Border Security, Facilitation, and Operations of the Committee on Homeland Security of the House of Representatives stating as follows:

> Since the onset of reports of COVID-19, LaSalle Corrections has been tracking the outbreak, regularly updating infection prevention and control protocols, and issuing guidance. We implemented our pandemic contingency plan in response to COVID-19 that includes screening, testing, appropriate treatment, prevention, education, and infection control measures. After thorough review and consultation of existing plans, we formulated revisions to our strategic plans to include a COVID-19 response plan. Our company's strategic planning ensures for continuity of operations and a sustainable health care delivery system.

## V. STATEMENT OF GENERAL FACTS

### A. **Background Facts**

29.     During the period following her October 2019 rehire at ICDC, Plaintiff had been employed fulltime, working approximately 36-40 hours per week, including regular shifts from 6:00 am to 6:00 pm, six times in every two-week pay period.

30.     Plaintiff's most recent direct supervisor at ICDC was the Health Services Administrator ("HSA"), Ms. Lakisha Brown. Ms. Brown reported to Deputy Warden Frank Albright, who reported to Warden David Paulk. Prior to HSA Brown, Plaintiff's direct supervisor was HSA Ms. Marion Cole.

31.     The Immigration and Nationality Act (INA) is the primary statute governing immigration into the United States. DHS has the authority to detain noncitizens, *inter alia*, under 8 U.S.C. § 1158 "Asylum", § 1181 "Admission of immigrants," § 1182 "Inadmissible aliens," and § 1183 "Admission of aliens on giving bond or undertaking."

32.     Since the September 11, 2001 attacks on the United States, immigration detention has been rapidly evolving and the INS was abolished by statute and DHS was established and vested with the authority to administer and enforce immigration laws. Over the next decade, there was a significant increase in the number of people detained due to a quota ultimately requiring the maintenance of 34,000 beds for immigration detention, which in turn drove an expansion of contracts with existing private sector correctional and detention facilities to provide space to meet that quota.

33.     Private prison corporations have played an increasingly dominant role in immigration detention in the United States. In 2015, 72% of immigration detention beds were located in facilities run by for-profit prison corporations under ICE contracts.

34.     For years, detained immigrants at ICDC have reported human rights abuses including lack of medical and mental health care, due process violations, unsanitary living conditions and more as reported in "Imprisoned Justice: Inside Two Georgia Immigrant Detention Centers" (2017, Center for Immigrants' Rights Clinic, Penn State Law), an update to the Center's 2012 report, "Prisoners of Profit." Detained immigrants have reported not being able to see a medical professional for several weeks despite submitting multiple sick call requests, not receiving life dependent medication consistently, and not receiving proper or medically appropriate care in relation to the nature and seriousness of the medical concern, even if they are able to see a medical professional.

35.     A 2017 DHS Office of Professional Responsibility investigation also found that ICDC medical exam rooms did not meet ICE detention standards. The report found: "In the medical examination rooms, floors and patient examination tables were dirty and dust was observed on horizontal surfaces. Waste containers were overfilled and in need of cleaning." DHS, Office of Detention Oversight Compliance Inspection Enforcement and Removal Operations ERO Atlanta Field Office, Irwin County Detention Center Ocilla, Georgia 31772, p.6 (March 7-9, 2017).

36.     On May 20, 2021, the Secretary of DHS instructed ICE to "as soon as possible" sever its contracts with ICDC, which was under federal investigation following Plaintiff's whistleblower disclosures to DHS OIG and Congress, and to preserve evidence for ongoing investigations. Secretary Mayorkas noted in announcing his decision to end the contract at ICDC, as well as at the Bristol County Sherriff's Office in Louisiana, also under federal investigation, that "we will not tolerate the mistreatment of individuals in civil immigration detention or substandard conditions of detention."

37.     Secretary Mayorkas was quoted in the May 20, 2021 DHS press release as stating, "We have an obligation to make lasting improvements to our civil immigration detention system. This marks an important first step to realizing that goal. DHS detention facilities and the treatment of individuals in those facilities will be held to our health and safety standards. Where we discover they fall short, we will continue to take action as we are doing today."

38.     Thus, despite the publicly available reports set forth above in paragraphs 35 and 36, the inhumane conditions of detainees continued into 2020, and Plaintiff's disclosures to the news media and Congress about the Defendants, the detention industry, and DHS prompted

public concern and legislative action.

**B. CDC Disease Control and Hygiene Standards and Guidelines**

39.     ICE has developed and disseminated its own standards and guidelines for hygiene, cleanliness, and sanitation for detention facilities like ICDC, which are described as ICE's Performance- Based National Detention Standards ("PBNDS"), as revised in 2016. ICE also issued guidelines to its private detention facilities like ICDC to comply with relevant hygiene, cleanliness, and sanitation standards established by U.S. Centers for Disease Control and Prevention (CDC).

40.     ICE has not designated the CDC or PBNDS standards and guidelines referenced above or below as "laws, rules or regulations related to a federal contract", nor as binding contract terms. *See* ICE Detention Standards, November 9, 2021 https://www.ice.gov/factsheets/facilities-pbnds.

41.     The CDC has very specific standards regarding Personal Protective Equipment ("PPE"), including "Ensur[ing] that sufficient stocks of hygiene supplies, cleaning supplies, PPE, and medical supplies (consistent with the healthcare capabilities of the facility) are on hand and available, and have a plan in place to restock as needed if COVID-19 transmission occurs." PPE of all kinds always was in very short supply at ICDC. Plaintiff observed that some things, such as gowns and face shields, were rarely if ever provided.

42.     In March 2020, the CDC established detailed standards for social-distancing, medical isolation, and quarantining of detainees and staff to address the spread of COVID-19, all of which Plaintiff observed were routinely ignored. For example, at the beginning of the pandemic, the CDC required detention facilities to:

a)  Implement social distancing strategies to increase the physical space between incarcerated/ detained persons (ideally 6 feet between all individuals, regardless of the presence of symptoms).

b) Have staff maintain a distance of 6 feet or more from an individual with respiratory symptoms while interviewing, escorting, or interacting in other ways.

c) As soon as an individual [detainee] develops symptoms of COVID-19, they should wear a face mask (if it does not restrict breathing) and should be immediately placed under medical isolation in a separate environment from other individuals.

d) Keep the individual's movement outside the medical isolation space to an absolute minimum.

e) Provide medical care to cases inside the medical isolation space.

f) Serve meals to cases inside the medical isolation space.

g) Exclude the individual from all group activities.

h) Assign the isolated individual a dedicated bathroom when possible.

i) Ensure that the individual is wearing a face mask at all times when outside of the medical isolation space, and whenever another individual enters. Provide clean masks as needed. Masks should be changed at least daily, and when visibly soiled or wet.

j) Facilities should make every possible effort to place suspected and confirmed COVID-19 cases under medical isolation individually. Each isolated individual should be assigned their own housing space and bathroom where possible. Cohorting should only be practiced if there are no other available options.

k) If cohorting is necessary: Only individuals who are laboratory confirmed COVID-19 cases should be placed under medical isolation as a cohort. Do not cohort confirmed cases with suspected cases or case contacts.

l) Incarcerated/detained persons who are close contacts of a confirmed or suspected COVID-19 case (whether the case is another incarcerated/detained person, staff member, or visitor) should be placed under quarantine for 14 days.

43. Plaintiff also observed that ICDC failed to meet the following ICE detention standards for sanitation that applied even before the COVID-19 pandemic hit the U.S., which required that:

a) All horizontal surfaces shall be damp-dusted daily with an approved germicidal solution used according to the manufacturer's directions.

b) Windows, window frames and windowsills shall be cleaned on a weekly schedule.

c) Furniture and fixtures shall be cleaned daily.

d) Floors shall be mopped daily and when soiled, using the double-bucket mopping technique and with a hospital disinfectant-detergent solution mixed according to the manufacturer's directions.

e) A clean mop head shall be used each time the floors are mopped.

f) Cubicle curtains shall be laundered monthly or during terminal cleaning following treatment of an infectious patient.

44.    According to the CDC in its 2020 guidelines for detention facilities, "[e]ven if COVID-19 cases have not yet been identified inside the facility or in the surrounding community, begin implementing intensified cleaning and disinfecting procedures according to the recommendations below. These measures may prevent spread of COVID-19 if introduced." This required detention facilities like ICDC to meet the following standards, which Plaintiff observed ICDC never met:

a) Several times per day, clean and disinfect surfaces and objects that are frequently touched, especially in common areas. Such surfaces may include objects/surfaces not ordinarily cleaned daily (e.g., doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment, kiosks, and telephones).

b) Staff should clean shared equipment several times per day and on a conclusion of use basis (e.g., radios, service weapons, keys, handcuffs).

c) Use household cleaners and EPA-registered disinfectants effective against the virus that causes COVID-19 as appropriate for the surface, following label instructions. This may require lifting restrictions on undiluted disinfectants.

d) Ensure adequate supplies to support intensified cleaning and disinfection practices, and have a plan in place to restock rapidly if needed.

## C. Management Supervisory Practices

45.    Warden Paulk was aware of all the violations and complaints by staff reported to HSA Brown, and Director of Nursing Bell.   DHS and ICDC policies required that all such reports by patient care staff had to be documented.  These reports were then discussed at regular team and management meetings. Warden Paulk had a reputation as a hands-on and on-the-floor

administrator who was going to find out about anything wrong in his chain of command.  Brown ad Bell did not hide anything from him, including reports from staff members.

## VI.   PRE-DEMOTION PROTECTED ACTIVITY

### A.  <u>Plaintiff Objected that Defendants Ignored the Right of Detainees to Protection From COVID-19</u>

46.     In March 2020, detainees in Unit C at ICDC began to report they and their dormmates were experiencing well-recognized symptoms of COVID-19, such as fevers and sore throats. These detainees thus repeatedly requested to be tested for the disease. Plaintiff's supervisor, Health Services Administrator HSA Brown, and ICDC Director of Nursing ("DON"), Ms. Shanise Bell, routinely rejected these requests. When Plaintiff questioned DON Bell and HSA Brown about these denials of COVID-19 testing for detainees exhibiting symptoms, they claimed that detainees sought testing because they wanted attention, and that detainees were requesting tests as a pretext to get out of their cells.

47.     In June 2020, ICDC received two rapid response COVID-19 testing machines. These machines would produce COVID-19 testing results in eight minutes. Plaintiff understood the machines were to be used for testing the detainees, but Plaintiff saw the machines in use only twice, once to test an ICDC employee and once for a detainee.

48.     When Plaintiff asked HSA Brown if nurses would be trained to use the testing machines, HSA Brown said they would not be trained because the machines were $14,000.00 each, she did not want employees testing each other, and for that reason only DON Bell and HSA Brown would be trained to use the machines. HSA Brown then proceeded to lock the testing machines and supplies in her office.

49.     From March through July 2020, rather than order a COVID-19 test for detainees seeking medical attention for a fever, HSA Brown instructed ICDC medical staff to prescribe a

seven-day course of over-the-counter cold medication to those detainees. Plaintiff questioned HSA Brown about this practice with DON Bell present, and HSA Brown insisted that the detainees only had colds because of the cold temperature in their cells and did not need to be tested for COVID-19.

50.     From October 2019 through July 2020, Plaintiff observed ICDC medical staff shredding detainees' written requests for exams or treatment and otherwise denying medical care by falsely documenting or reporting exams as performed that actually had not been performed. During May and July 2020, Plaintiff reported this to HSA Brown, who took no action but told her, "One day they will be caught [shredding the exam requests]."

51.     From October 2019 through July 2020, ICDC failed to maintain hygiene, cleanliness, and sanitation standards for medical exam rooms and equipment.

52.     For example, Plaintiff observed exam room tables and floors that were rarely cleaned, wiped down, or mopped, and certainly not to ICE or CDC standards. There was often blood on the floor that had not been cleaned up. On one occasion Plaintiff showed HSA Brown blood that was left on the floor. HSA Brown commented that it was not acceptable but that as adults, all staff should know how to clean up after themselves. Plaintiff asked whether HSA Brown would correct the employee who left the blood, and HSA Brown said that she was not there to "babysit" anyone.

53.     ICE and the CDC also require minimum standards of personal hygiene for all detainees, such as providing them with personal bars of soap, and providing female detainees with menstrual hygiene products. Plaintiff observed that Defendants failed to comply with these standards. When Plaintiff asked HSA Brown about ICE detainees receiving soap and menstrual

hygiene products, HSA Brown said she did not have any control over distribution of those products.

54.     From March through July 2020, Plaintiff observed that Defendants constantly failed to provide or unreasonably delayed the provision of adequate quantities of PPE to detainees and lower-level staff like Plaintiff.

55.     Plaintiff observed highly effective PPE, such as N-95 face masks, being reserved for high-ranking staff (who rarely had contact with the detainees and staff most likely to be exposed to COVID-19), while the most at-risk individuals were given only inferior paper or cloth masks and were never given new masks to replace old or broken ones. From March through early June 2020, there were no face shields or gowns provided.

56.     Detainees were rarely, if ever, given even paper facemasks (like surgical masks) even when they pleaded for them. For this reason, some detainees were forced to buy socks from the commissary to tie around their noses and mouths and substitute facemasks.

57.     In April 2020, Plaintiff asked HSA Cole why medical employees were wearing surgical masks and leadership was wearing N-95 masks, and HSA Cole said that Warden Paulk had only provided surgical masks to the medical unit. At Plaintiff's prompting, HSA Cole asked Warden Paulk for N-95 masks for medical employees, and HSA Cole became aware that Warden Paulk had dozens of N-95 masks locked in his office. Thereafter, the medical unit received N-95 masks, though medical employees were given only one N-95 mask in April and were told they needed to maintain that mask. HSA Cole instructed employees that if they wanted a new mask, they had to purchase that themselves.

58.     On one occasion in June 2020, Plaintiff handed N-95 masks to two other nurses and an officer after theirs had frayed and were significantly damaged from use, and HSA Brown

chastised Plaintiff saying it was not Plaintiff's responsibility to distribute masks. After that, HSA Brown locked the N-95 masks in her office.

59.     The CDC also required that staff and detainees be trained to correctly don, doff, and dispose of PPE. ICDC never trained anyone about how to put on, take off, and dispose of PPE. When Plaintiff asked HSA Brown to instruct staff about PPE usage around detainees contagious with COVID-19, HSA Brown replied that knowledge of PPE was a "fundamental" of nursing school and that all medical staff should already know how to use it. However, new nurses indicated that they were not familiar with proper guidelines.

60.     The CDC required regular temperature checks for COVID-19, with the frequency of temperature checks depending on the circumstances: immediately after detainees arrive and before they are brought into the general detainee population, once a day for staff as they arrive for work, twice a day for quarantined detainees, and daily in housing units where COVID-19 cases have been identified. Defendants performed temperature checks on new detainees and staff entering the facility, but they rarely performed other checks with the frequency the CDC required.

61.     Defendants did not train medical or other facility staff about the proper use of handheld temperature guns, though as a trained nurse, Plaintiff knew how to use and clean the temperature guns. Officers at the entrance of the detention center regularly misused the guns, routinely pressing them against the forehead of staff entering the facility, rather than holding them 6-12" away from the forehead as necessary, and rarely, if ever, cleaned or sanitized the guns. Plaintiff observed an officer falsify her incorrect temperature reading upon her entry to the facility.

62.     Plaintiff asked HSA Brown why there was not a nurse who knew how to properly use the temperature guns at the entrance to the facility. HSA Brown stated that was not her responsibility.

63.     From March through July 2020, Defendants adopted inadequate social-distancing policies. Defendants' leadership failed to encourage and enforce the CDC's social distancing recommendations. Defendants reprimanded staff for practicing social distancing. On various dates from March through May 2020, HSA Cole, and later in May and June 2020, Plaintiff's supervisor and HSA Brown, verbally reprimanded Plaintiff for warning other staff to adhere to CDC-recommended distancing guidelines and to use extra precautions when working with someone who has tested positive for COVID-19.  For example, from March through July 2020, Plaintiff observed Defendants unreasonably refuse to isolate from the general population both detainees who had tested positive for COVID-19 and those who were COVID-19-symptomatic.

64.     From March through June 2020, Defendants routinely failed to inform detainees and staff which persons among the detainee population had tested positive for COVID-19. In June 2020, Plaintiff had substantial contact with several detainees that, unbeknownst to her, were suspected of having COVID-19 and had submitted COVID-19 test samples. HSA Brown did not tell Plaintiff that the detainees were suspected of having COVID-19 and that they had submitted samples. Plaintiff therefore entered the room without proper PPE, though HSA Brown wore an N-95 mask while interacting with them. Later Plaintiff learned that the three detainees had in fact tested positive when she received paperwork with the positive test results. When Plaintiff questioned HSA Brown about her failure to inform Plaintiff of the suspected COVID-19 infection, particularly given Plaintiff's health concerns, HSA Brown indicated she did not want to cause alarm.

65.     Around April 2020, Plaintiff observed HSA Brown shred approximately 45 covid test results. HSA Brown told Plaintiff that the papers were copies of tests. However, when Plaintiff used a list of individuals whose tests had been shredded to cross check their files, she observed that the test results were not in the detainees' files.

66.     The CDC also had standards regarding detainee transfers because of COVID at all institutions. The CDC guidelines stated that detention facilities must "restrict transfers of incarcerated/detained persons to and from other jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, or to prevent overcrowding" and "suspend all transfers of incarcerated/detained persons to and from other jurisdictions and facilities (including work release where relevant), unless necessary for medical evaluation, medical isolation/quarantine, care, extenuating security concerns, or to prevent overcrowding."

**B. Plaintiff Objected that ICDC Ignored Right of Staff to Protection From COVID-19**

67.     Plaintiff raised concerns that ICDC employees are expected to come into work even if they have COVID-19 symptoms and are awaiting test results. The HSA instructed medical staff to come into work while they were waiting to be tested, waiting for their test results, and even if they tested positive, stating that "we can work symptomatic and work positive as long as we had a mask on."   When staff arrive to work, they fill out a screening document that asks them if they have any COVID-19 symptoms. The document expressly states:

> If there are any 'yes' answers to any questions above and/or if the temperature is equal to or greater than 100.4 degrees Fahrenheit, medical staff will be notified and the individual will not be allowed access to the facility and will be advised to seek medical attention.

68.     However, even when employees document that they do have symptoms, they are still made to work. For example, Plaintiff filled out the form on June 22, 2020 where she answered "yes" to having symptoms of COVID-19. On the screening document, she checked that she has muscle or body aches, headaches, and diarrhea; all three are symptomatic of COVID-19. Despite answering "yes," Plaintiff was still cleared to work that day. At least thirteen officers tested positive for COVID-19. In addition, the form asked for documentation of the employee's temperature. However, a defective thermometer was often used. Not all of the forms were placed in staff medical files as required.

69.     Plaintiff raised concerns that neither staff nor detained immigrants were informed of who has tested positive. When she tried to warn officers who are about to be in contact with a detained individual with COVID-19 so that they use proper precautions, she was reprimanded that warning other staff about cases was not her job. ICDC purposefully failed to disclose the truth about individuals who tested positive for COVID-19. Plaintiff complained that the HSA and other upper lever nurses have withheld information about detained individuals testing positive for COVID-19. Assertions that a detainee did not have COVID-19 were made without factual basis even when they were suspected of being positive. This practice enabled ICDC to conceal infection rates, reduce absenteeism, and avoid public disclosure of accurate information.

70.     Plaintiff complained that ICDC instructed medical staff, such as she, to come into work while they were waiting to be tested, waiting for their test results, and even if they tested positive, stating that staff should work symptomatic and work positive as long as masked.

**C. Plaintiff Objected that Defendants Violated Detainee Human Rights in Performing Invasive Gynecological Procedures Without Informed Consent**

71.     Multiple immigrant women expressed concerns to Plaintiff that they had undergone invasive gynecological procedures off-site to which they did not knowingly consent and did not fully understand why the procedures had been performed, and asked Plaintiff for information about the procedures. Plaintiff confirmed by reviewing the charts of the immigrant women that indeed high rates of gynecological procedures were being performed by an outside medical provider on detained women at ICDC.

72.     Plaintiff raised the concerns about the high rates of gynecological procedures performed on immigrant women detainees without their understanding or consent with a fellow nurse and DON Bell. Both expressed awareness of the gynecological procedures, and a fellow nurse, in front of DON Bell, explicitly instructed Plaintiff "not to touch that."

**D. Plaintiff Objected that LaSalle Obstructed Use of Detainee Grievance Channels**

73.     LaSalle's contract with DHS required the creation, maintenance, operation and review of reporting channels whereby detainees could raise and document concerns and grievances regarding the conditions of detention.  While detainees could readily articulate grievances regarding food, recreation, outside communications and overcrowding, they were less able to articulate grievances regarding healthcare generally, and even less able to address their rights under CDC and DHS Covid-19 protocols.

74.     Under PBNDS section  6.2 "Grievance System" (revised December 2016), paras. 9-10, ICDC was required to assist detainees with language and other special needs in preparing and pursuing grievances related to housing, nutrition, abuse or medical care.  Under Section V, written procedures were required to ensure all medical grievances are received by the administrative health authority within 24 hours or the next business day, with a response

from medical staff within five working days.  These procedures were required to be communicated to detainees in a language or manner they can understand. ICDC was required to provide each detainee, upon admittance, a copy of the detainee handbook and local supplement (see also standard "6.1 Detainee Handbook").

75.     The primary "expectation" of the required grievance procedure is that "to the greatest extent possible, complaints and grievances shall be handled orally and informally by staff in their daily interaction with detainees".  Staff are required to be trained to afford detainees the "opportunity to expediently resolve his/her cause for complaint before resorting to the more time-consuming written formal procedure". ICDC was required to "make every effort to resolve a detainee's complaint or grievance at the lowest level possible, in an orderly and timely manner". ICDC was required to provide assistance "if a detainee cannot properly communicate their concern."

76.     Plaintiff reported that detainees had language and other barriers in articulating medical grievances, and the ICDC was failing to address these barriers.  Plaintiff disclosed that sometimes when employees spoke out against violations of staff and/or detainee healthcare rights, they were reprimanded or ignored. Plaintiff witnessed staff be reprimanded for doing so.

## E.   Plaintiff Objected that LaSalle Destroyed and Fabricated Medical Request Forms

77.     Plaintiff reported that it was common practice for the sick call nurse to shred medical request forms from detained immigrants who were requesting to go to the medical unit. The sick call nurse sometimes fabricated records such as vital signs without ever seeing the individual requesting medical help. In order to make a sick call request, detained immigrants fill out a blue form and put it in a box on the wall in their unit that is picked up by a nurse at night. Detained immigrants can also fill out an electronic request on the Telmate tablet in their

unit. Ms. Wooten reported that Irwin encouraged detained immigrants to fill out the handwritten request claiming that ICDC will get to the complaint quicker. However, when detained immigrants fill out the blue handwritten request, shredding removes the record as an electronic request cannot.

78.    Plaintiff reported that medical staff would fabricate vital signs indicating that the nurse saw the patient and prescribed medicine. This led to disposition of follow-up requests by staff stating that the immigrant needs to take his medication and that he had been refusing his medication.

## VII.    POST-DEMOTION PROTECTED ACTIVITY

79.    After Plaintiff was demoted on July 2, 2020, but before she was constructively discharged on December 31, 2020, she engaged in further protected activity.

80.    On September 8, 2020, she filed her OIG complaint which was served upon LaSalle Corrections.

81.    Also on September 8, 2020, Plaintiff's counsel notified Defendants via letter, addressed and sent by email to Warden David Paulk and Mr. Ryan Horvath, Director of Legal Affairs and Risk Management for LaSalle Corrections, that Plaintiff had filed a whistleblower complaint with the Department of Homeland Security Office of Inspector General alleging "violations of laws, rules and regulations, as well as on-going danger to public health and safety, due to mismanagement of COVID-19 issues and other significant matters," and noted that Plaintiff had shared her concerns with management.

82.    After the filing of her original complaint with the DHS Office of Inspector General (OIG), Plaintiff also caused to be made the above protected disclosures to the DHS Office of Civil Rights and Civil Liberties, the ICE Atlanta Field Office, the Warden of the Irwin

County Detention Center.

83.     Following her letter to both chambers of Congress on September 17, 2020, additional information was sought from Plaintiff by the following:  the House of Representatives Homeland Security Committee, the House Oversight and Reform Committee, Rep. Bennie Thompson (D-Miss.), Rep. Carolyn Maloney (D-N.Y.), Rep. Kathleen Rice (D-N.Y.), Rep. Jamie Raskin (D-Md.), U.S. Senator Jeff Merkley (D-OR) and Senator Kyrsten Sinema (D-AZ).

84.     This post-demotion protected activity was widely covered in the news media including MSNBC, NPR, CBS, Prison Legal News, Los Angeles Times, Business Insider, and FoxNews.

## VIII.   ADVERSE ACTIONS

85.     Plaintiff was prevented by her chain of command rules from sharing her concerns directly with Warden Paulk. HR Director Joan Whitley told her  to bring my concerns to HSA Brown, and to trust that they would passed on to the warden.  Warden Paulk sometimes issued memoranda on the issues Plaintiff raised. Unfortunately, there was usually a spin to them that sounded like denying the problems, coverup strategies as to how long the problems had been around, and creating the false appearance of compliance during inspections.

86.     On Monday, June 22, 2020, Plaintiff was off work to obtain a COVID-19 test prior to receiving a medically prescribed blood transfusion for her  sickle-cell condition. At that time, Plaintiff was exhibiting symptoms indicating a potential COVID-19 infection, such as muscle ache, fatigue, and shortness of breath.

87.     Plaintiff expected to quarantine while awaiting the COVID-19 test results, and her physician, Dr. Margaret Richardson Nixon told Plaintiff that it would be a violation of CDC guidelines if Plaintiff returned to work at ICDC while she was symptomatic without a negative test result. Nevertheless, over her protests ICDC required her to return to work and Plaintiff

worked Tuesday, June 23 and Thursday, June 25, 2020. Plaintiff was scheduled to be off on Friday, Saturday, and Sunday, June 26-28, 2020.

88.     Plaintiff discussed her health with her supervisor, Ms. Brown. on Thursday evening, June 25, 2020, and told her Plaintiff expected to receive her test results on Monday, June 29, 2020. An ICDC Human Resources staff-person, Ms. Joan Whitley, then called Plaintiff and instructed her that Plaintiff must report in "sick" each day even though ICDC understood Plaintiff was in quarantine while awaiting the test results. Plaintiff then spoke again with Ms. Brown, who assured her that because ICDC was fully informed of her situation and her doctor's orders it made no sense for her to burden herself and ICDC staff by reporting in sick every day.

89.     On Monday, June 29, 2020, Plaintiff received her negative COVID-19 test results and reported them via phone to Ms. Whitley that same day.

90.     Plaintiff returned to work on her next scheduled work-day, Wednesday, July 1, 2020.

91.     On the following day, Thursday, July 2, 2020, Plaintiff was summoned by Deputy Warden Frank Albright. Plaintiff was presented with a written reprimand for not reporting to work or reporting in sick on Saturday, June 27, 2020. Ms. Shanise Bell was the charging official, Ms. Brown was the investigator, and ICDC Deputy Warden Albright was the reprimanding authority. Ms. Brown falsely indicated on the reprimand form and during the reprimand proceedings that she had informed Plaintiff that she would have to "call in each day."

92.     On or about July 2, 2020, Plaintiff objected to the reprimand to ICDC Warden David Paulk. Plaintiff emphasized her ten-year history of employment at ICDC and her record of solid performance and attendance. Warden Paulk expressed anger and frustration at her objections. Effective immediately increase the adverse action from reprimand to demotion such

that Plaintiff was no longer to be a fulltime LPN, but instead would be "PRN" or as needed. This meant that her hours were severely curtailed and Plaintiff no longer had a regular shift.

93.    Warden Paulk cited the rule that if employees get tested for COVID-19 they "are required to call out each day of their absence *unless they have submitted a physician's note* with specific dates of absence." (Emphasis added). Plaintiff had, in fact, submitted two doctor's notes on June 22nd that explicitly stated she was excused from working until she was asymptomatic and until her COVID-19 test results came back. Plaintiff later noted that the doctor's notes she submitted to her supervisor were never formally added to her medical records.

94.    After the demotion, Plaintiff waited to be called as a PRN to perform work at ICDC. After sixty days of not being called, she decided to legally challenge the reprimand and demotion by filing her OIG complaint on September 8, 2020.

95.    Having thereafter still received no work assignments, and following very large scale public disclosures of her post-demotion protected, Plaintiff decided that as of December 31, 2020 she was probably was not going to be called back to work at ICDC. This constituted a constructive discharge.

96.    Prior to July 2, 2020, Plaintiff had never received a written reprimand at ICDC. Prior to that date, Plaintiff had never been demoted at ICDC. Prior to December 31, 2020, Plaintiff had never been actually or constructively discharged by ICDC.

### IX.  FIRST AMENDMENT PROTECTED ACTIVITY WITH NEWS MEDIA AND CONGRESS

97.    After Plaintiff filed her September 8, 2020 OIG complaint, she engaged in further protected activity. A Google search of her name demonstrates the reach of her advocacy to the New York Times, Washington Post, The Guardian, USA Today, Wall Street

Journal, The Intercept, New Yorker, Harpers, ABC News, BBC News, Business Insider, CBS News, CNN, Forbes, FOX News, MSNBC, The Hill, C-Span and in providing Congressional testimony.

98.    Beginning on September 17, 2020 and continuing to the date of filing this action, Plaintiff contacted both chambers of Congress disclosing Defendants' wrongdoing, and urging investigation into the wrongdoing by Defendants, the private detention industry, and the oversight practices of DHS.  Plaintiff's whistleblower disclosures spurred multiple agency and Congressional investigations which have been continuing to the date of filing this action.

99.    The following entities engaged in or claimed to be engaged in the review described in the preceding paragraph by the DHS OIG Disclosure Unit; the Department of Justice; the Senate Homeland Security and Governmental Affairs Committee Permanent Subcommittee on Investigations; the Senate Committee on the Judiciary, the House of Representatives Homeland Security Committee; the House Oversight and Reform Committee, the House Subcommittee on Border Security, Facilitation; the Congressional Hispanic Caucus, and many individual members of Congress.

## X.   FIRST AMENDMENT RETALIATION

100.    On or about July 2, 2020, Plaintiff objected to a reprimand to ICDC Warden Paulk. Plaintiff emphasized her ten-year history of employment at ICDC and her record of solid performance and attendance. Warden Paulk expressed anger and frustration at her objections using racially offensive language. Effective immediately he increased the adverse action from reprimand to removal from the regularly scheduled shift roster such that Plaintiff was no longer to be a fulltime LPN, but instead would be "PRN," or called for work only as needed.  This meant that Plaintiff no longer had a regular shift, and that the PRN status was to be used pretextually as a vehicle to refuse active service and work hours to Plaintiff.

101.     After being removed from the regularly scheduled shift roster, Plaintiff waited to be called as a PRN to perform work at ICDC. At first, Defendants changed Plaintiff's schedule with days' notice. On or about September 3, 2020, Plaintiff notified Defendants of her availability for work including for hours in October 2020.

102.     Having thereafter still received no work assignments and following extensive news media reporting of her post-OIG complaint protected activity, Plaintiff decided that as of December 31, 2020 she was probably not going to be called back to work at ICDC. This constituted the date of her constructive discharge, or such later date as the facts may indicate.

103.     While Plaintiff was on-call status, Defendant posted open full-time as well as PRN LPN positions and did not assign her any hours or return her to active service to fill this unmet need. At no time including up to the date of the filing of this complaint did Defendants inform Plaintiff that she was on a suspended or involuntary leave status, or that she has been terminated from employment.

### FIRST CLAIM FOR RELIEF:
### VIOLATION OF PLAINTIFF'S SPEECH AND ASSOCIATION RIGHTS
### UNDER THE FIRST AMENDMENT

104.     All of the above paragraphs are incorporated here by reference.

105.     In engaging in the media disclosures and media activities described above, and in concert with other activists and organizations who were not employees of Defendants, and in providing support and assistance in the case of *Yanira Yesenia Oldaker v. Giles*, No. 7:20-CV-00224 (WLS) (M.D. Ga. Dec. 22, 2020), Plaintiff was acting as a citizen and marginalized woman of color in exercising her speech and associational rights guaranteed to her by the First Amendment of the U.S. Constitution.

106.     Neither the Defendants nor DHS have created, maintained nor disclosed the

existence of any protected and effective whistleblower reporting channels for use by former employees or employees not in active service to the Defendants or to other immigration detention contractors.

107.    Disclosures directly and indirectly to the news media and non-profit advocacy groups of wrongdoing against detainees, and against former employees or employees not in active service by the Defendants, and/or by the private detention industry more systemically, is the only effective way for citizens to raise matters of public concern about that industry and its contractor, and/or about DHS oversight of them.

108.    Defendants are subject to direct Constitutional claims because they exercise a role in an area within the exclusive authority of the Federal Government and in conjunction with DHS components charged with responsibility for immigration. The courts have deemed incarceration companies including LaSalle as "Federal actors".

109.    Defendants, acting under color of Federal authority, violated Plaintiff's First Amendment rights of speech and association. As such, Plaintiff may redress her First Amendment claims for equitable and declaratory relief under 28 U.S.C. § 1331 and 2201, and 5 USC § 706.

110.    Defendant Paulk, acting under color of Federal authority, caused Plaintiff to suffer monetary damages as a result of violating her First Amendment rights. As such, Plaintiff may redress her First Amendment claims for money damages against Defendant Paulk under 28 U.S.C. § 1331 and *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

111.    41 U.S.C. § 4712(c)(2) does not provide a meaningful or adequate remedy for retaliation based upon the media disclosures and advocacy engaged in by Plaintiff.

112.     Georgia does not recognize any wrongful discharge tort claim available to Plaintiff.

113.     Defendants' actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences within the meaning of the Official Code of Georgia Annotated (O.C.G.A.) § 51-12-5.1(b).

## SECOND CLAIM FOR RELIEF: VIOLATION OF STATUTORY CONTRACTOR WHISTLEBLOWER RIGHTS UNDER 41 U.S.C. § 4712

114.     All of the above paragraphs are incorporated here by reference.

115.     The federal government is authorized to control who may enter the U.S. and who may be removed through deportation.  This power is not specifically granted by the Constitution. Nevertheless, the Supreme Court has recognized a broad plenary power that gives the federal government control over immigration issues.

116.     The inspection by immigration officers, expedited removal of inadmissible arriving noncitizens, and the referral of noncitizens for hearing are detailed in 8 U.S.C. § 1225. Non-citizens who are subject to expedited removal are held in mandatory detention until removal.

117.     The apprehension and detention of noncitizens is addressed in 8 U.S.C § 1226. These provisions state that the Attorney General has the authority to arrest, detain, parole, and release on bond of at least $1,500 a noncitizen who is awaiting a court decision regarding his or her removal.

118.     Plaintiff disclosed that ICDC violated ICE's Performance-Based National Detention Standards (PBNDS) and CDC COVID-19 guidelines for correctional facility

operations, hygiene protocol, and prevention practices for both detainees and staff. Therefore, LaSalle corrections violated the terms of the DHS contract, and the rules that are apart thereof.

119.    These contract non-compliances constituted gross mismanagement and gross waste of federal funds because detention of immigrants in a safe and healthy environment is the core mission of the DHS contract.  LaSalle Correction's misconduct, acts and omissions disrupted and undermined that core mission.

120.    These contract non-compliances in failing to property process detainee and staff healthcare requests and grievances, constituted abuse of authority of the detention power conferred upon LaSalle Corrections by DHS.

121.    The CDC Interim Guidance on Management of Coronavirus Disease in Correctional and Detention Facilities provides guiding principles for healthcare and non-healthcare administrators of detention facilities to reduce the transmission of COVID-19. The guidelines require individuals with confirmed COVID-19 be individually quarantined and advocate against the "cohorting" method unless "there are no other available options."  LaSalle Corrections violated these requirements.

122.    PBNDS standard 4.3 establishes detention standards for medical care, requires facilities to comply with plans implemented by federal, state, or local authorities addressing specific public health issues including communicable disease reporting requirements.  This includes CDC COVID-19 management guidelines. LaSalle Corrections violated these requirements.

123.    Under 41 U.S.C. § 4712(c)(6), the burdens of proof of 5 U.S.C. § 1221(e) are controlling in a judicial proceeding to determine whether discrimination prohibited under § 4712 has occurred. Under section 1221(e) of Title 5, Plaintiff must show by preponderant evidence

that her protected disclosure was a contributing factor in the Defendant's personnel action. Plaintiff's disclosures are protected because a disinterested observer with knowledge of the essential facts known to and readily ascertainable to her could reasonably conclude that Defendant's actions evidenced violations of law, mismanagement, waste, abuse, or imminent danger to staff and detainees. 5 U.S.C. § 2302(b).

124.    Plaintiff's allegations above demonstrate that she had a right to protection as both a whistleblower and perceived whistleblower for her protected activity. That protected activity was a contributing factor in the adverse action against her because the official taking the adverse actions knew of her protected activity and the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure or protected activity was a contributing factor in the personnel action. 5 U.S.C. § 1221(e).

125.    Plaintiff had a reasonable belief that her disclosures to Defendant evinced gross mismanagement of a federal contract or grant, a gross waste of federal funds, an abuse of authority relating to a federal contract or grant, or a violation of law, rule, or regulation related to a federal contract, and were thus protected disclosures under 41 U.S.C. § 4712(a)(1).

126.    The reasonableness of Plaintiff's belief that she was disclosing evidence of gross mismanagement of a federal contract or grant, a gross waste of federal funds, an abuse of authority relating to a federal contract or grant, or a violation of law, rule, or regulation related to a federal contract, was supported by her years of professional experience at ICDC.

127.    Plaintiff's disclosures were made to covered persons and bodies specified in 41 U.S.C. § 4712(a)(2), including an Inspector General, a federal employee responsible for the contract oversight or management, and a management official or other employee of the

contractor with responsibility to investigate, discover, or address misconduct, and members and committees of Congress.

128.     Contrary to Defendant's standard protocol when making a change to an employee's hours, Defendants LaSalle Corrections and Warden Paulk informed Plaintiff that rather than being assigned normal and regular shifts, she would be assigned work only as needed. Defendants' decision to require such an on-call status, but with no change in assigned healthcare duties or responsibilities, was a discriminatory adverse employment action as enumerated in 41 U.S.C. § 4712(a)(1), which defines prohibited reprisals broadly to include "discharged, demoted, or otherwise discriminated against".

129.     While Plaintiff was on-call status, Defendant posted open full-time LPN positions and did not assign her any hours.

130.     At no time did Defendants inform Plaintiff that she was on a suspended status or terminated from employment. However, by December 31, 2020 Defendants still had not assigned any work hours to her, Plaintiff concluded that she probably was never going to be assigned any work.  As a matter of law, she had been constructively terminated from employment. Constructive termination is a discriminatory adverse employment action under 41 U.S.C. § 4712(a)(1).

## XI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court award her the following:

a. Injunctive relief by ordering her return to active service and employment with Defendants at the same or similar position she held before the reprisal;

b.  Declaratory relief by entering a declaratory judgment that the Defendants must allow employees, including Plaintiff upon return to service, to communicate freely with the

media and Congress about matters of public concerns when doing so would not unduly interfere with business operations.

c. Upon reinstatement, an injunction directing Defendants to remediate the hostile work environment, harassment, and intimidation to which it subjected Plaintiff;

e. Under 41 U.S.C. § 4712, back pay for all lost wages and benefits, including lost bonuses;

f. Under 41 U.S.C. § 4712, economic damages for injury to Plaintiff's career, professional reputation, and earning capacity, in an amount to be determined at hearing;

g. Under 41 U.S.C. § 4712, non-economic damages for mental and emotional distress, embarrassment and humiliation, in an amount to be determined at hearing;

h. Expungement of written warnings, reprimands, negative performance appraisals, and other derogatory information and references which have been placed in Plaintiff's personnel file;

i. Posting of a notice to Defendants' employees indicating that Defendants have been ordered to comply with 41 U.S.C. § 4712 and to make appropriate restitution to Plaintiff;

j. Reasonable costs and attorney's fees, together with the cost of expert witnesses under 41 U.S.C. § 4712(c)(1)(C);

k. Under 41 U.S.C. § 4712, Defendants should be ordered to provide a neutral employment reference, to include dates of employment, job title, and final wage rate, to all potential employers regarding Plaintiff in the event reinstatement is not ordered;

l. Under 41 U.S.C. § 4712, if return to service is not ordered, then front pay for a period of at least five years;

m. Under her Bivens claim only, back pay for all lost wages and benefits, including lost bonuses;

n. Under her Bivens claim only, economic damages for injury to Plaintiff's career, professional reputation, and earning capacity, in an amount to be determined at hearing;

o. Under her Bivens claim only, non-economic damages for mental and emotional distress, embarrassment and humiliation, in an amount to be determined at hearing;

p. Under her Bivens claim only, punitive damages; and

q. All other relief that may be available from law and equity, including her costs and attorney's fees under the 41 U.S.C. § 4712.

Plaintiff demands a jury trial.

Respectfully Submitted,

/s/ Thad M. Guyer

_____

Thad M. Guyer (Oregon # 821443)
Pro Hac Vice
T.M. Guyer and Ayers & Friends, PC
116 Mistletoe Street
Medford, OR 97501
thadg@whistleblower.org
(206) 954-1293 (mobile)

John P. Batson (Ga. Bar No. 042150)
The Law Office of John P. Batson
P.O. Box 3248
Augusta, GA 30914-3248
(706) 722-8191
jpbatson@aol.com

Attorneys for Plaintiff