# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# VALDOSTA DIVISION

| | |
|---|---|
| DAWN WOOTEN, | : |
| | : |
| Plaintiff, | : |
| v. | : CASE NO.: 7:22-CV-000148 (WLS) |
| | : |
| LA SALLE CORRECTIONS, *et al.*, | : |
| | : |
| Defendants. | : |
| | : |

## ORDER

Before the Court are Defendant LaSalle Management Company, LLC's ("Defendant LaSalle Management") Motion to Dismiss Pursuant to Rule 12(b)(2) and Rule 12(b)(6) (Doc. 56); and Defendant LaSalle Southeast, LLC ("Defendant LaSalle SE") and Defendant David Paulk's ("Defendant Warden Paulk") Rule 12(b)(6) Motion to Dismiss (Doc. 57). For the reasons discussed below, Defendant LaSalle SE, and Defendant Warden Paulk's Rule 12(b)(6) Motion to Dismiss (Doc. 57), and Defendant LaSalle Management's Rule 12(b)(6) Motion to Dismiss are **GRANTED-IN-PART** and **DENIED-IN-PART**. However, as to Defendant LaSalle Management's Rule 12(b)(2) Motion (Doc. 56), the Court will allow limited jurisdictional discovery so the Court can make a meaningful ruling on the Motion, and therefore, defers ruling on that Motion until the conclusion of limited discovery.

## I.   PROCEDURAL BACKGROUND

On December 29, 2022, Plaintiff Dawn Wooten ("Plaintiff") filed the above-captioned action. (Doc. 1). The operative complaint, the Second Amended Complaint ("SAC") (Doc. 55), was filed on November 16, 2023. The SAC alleges two (2) causes of action. Count I alleges a violation of Plaintiff's First Amendment rights to free speech and association. (Doc. 55 ¶¶ 104–13), seeking equitable relief, and damages under *Bivens*.[1] Count II alleges a Whistleblower Retaliation claim under 41 U.S.C. § 4712, seeking equitable relief and damages.

---

[1] *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

(*Id.* ¶¶ 114–30). Plaintiff also seeks to recover attorneys' fees and costs under 41 U.S.C. § 4712. (*Id.* at 32–33).

On December 8, 2023, Defendant LaSalle and Defendant Warden Paulk filed a Motion to Dismiss pursuant to Rule 12(b)(6). (Doc. 57). Defendant LaSalle Management joins the arguments for dismissal asserted under Rule 12(b)(6) in Defendant LaSalle SE and Defendant Warden Paulk's Motion to Dismiss. (Doc. 56 ¶ 9). Plaintiff filed a Response (Doc. 65) on February 5, 2024, and Defendant LaSalle SE and Defendant Warden Paulk filed a Reply (Doc. 70) on March 4, 2024.

Defendant LaSalle Management, specially appearing to contest the Court's exercise of personal jurisdiction, filed a Motion to Dismiss pursuant to Rule 12(b)(2) on December 8, 2023. Plaintiff filed a Response (Doc. 64) on February 5, 2024. In her Response, Plaintiff moves the Court to allow limited jurisdictional discovery for purposes of Defendant LaSalle Management's Rule 12(b)(2) Motion and to hold an evidentiary hearing on that Motion. Defendant LaSalle Management filed a Reply (Doc. 69) on March 4, 2024.

All the Parties' respective briefs have been submitted and Defendants' Motions (Docs. 56 & 57) are ripe for ruling.

## II. DEFENDANT LASALLE MANAGEMENT'S 12(b)(2) MOTION TO DISMISS

Defendant LaSalle Management moves under Rule 12(b)(2) to dismiss all claims against it, contending that the Court lacks personal jurisdiction over it. (Doc. 56 at 1). Although Plaintiff makes arguments in opposition to Defendant LaSalle Management's Rule 12(b)(2) Motion, Plaintiff also moves the Court to allow limited jurisdictional discovery "regarding the factual assertions in [Defendant LaSalle Management's] motion, its relationship to the LaSalle Corrections family, to ICDC facility staff and management, and its federal and other contracts . . . to house detainees." (*See* Doc. 64 at 18). Plaintiff also moves for an evidentiary hearing regarding the same. (*Id.*)

"Resolution of a pretrial motion that turns on findings of fact—for example, a motion to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2)—may require some limited discovery before a meaningful ruling can be made." *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1367 (11th Cir. 1997). The Court finds that such limited discovery is

warranted for three reasons. First, as Plaintiff points out, LaSalle Management and its associated/affiliated family of companies are privately held, with little publicly available information. (Doc. 64 at 18). Second, it is evident from the Parties' briefing that there is a significant evidentiary asymmetry between Plaintiff and Defendant LaSalle Management, an advantage Defendant LaSalle Management seeks to press by asking the Court not to consider any evidence Plaintiff offers in support of the Court's jurisdiction. (*See* Doc. 69). And third, to the extent that the Court might accept Plaintiff's evidence, there are significant disputes of fact between Defendant LaSalle Management and Plaintiff.

For these reasons, and in the interest of fairness, the Court will allow limited jurisdictional discovery so it can make a meaningful ruling on Defendant LaSalle Management's 12(b)(2) Motion to Dismiss. Plaintiff's motion to allow limited jurisdictional discovery is, therefore, **GRANTED**. The Court will allow limited discovery regarding the factual assertions in Defendant LaSalle Management's 12(b)(2) Motion to Dismiss (Doc. 56); the extent of Defendant LaSalle's relationship to other LaSalle Corrections entities, ICDC facility staff, and ICDC management; and Defendant LaSalle Management's contracts to house detainees. Defendant LaSalle Management and Plaintiff will each be allowed four (4) depositions, ten (10) interrogatories, and ten (10) requests for admission. The deadlines for such discovery will be as follows:

(1) Limited jurisdictional discovery with respect to Defendant LaSalle Management's 12(b)(2) Motion shall be completed no later than **Monday, December 16, 2024**.

(2) Defendant LaSalle Management shall submit a supplemental brief in support of their 12(b)(2) Motion no later than **Wednesday, January 15, 2025**. Plaintiff's Supplemental Response shall be submitted no later than **Wednesday, February 5, 2025**. Defendant LaSalle Management may submit a Reply to Plaintiff's Supplemental Response, if they wish to, no later than **Wednesday, February 19, 2024**. Thereafter, the Court will rule on Defendant LaSalle Management's 12(b)(2) Motion.

Additionally, the Court sees no need, at this time, for an evidentiary hearing on Defendant LaSalle Management's 12(b)(2) Motion. Accordingly, Plaintiff's Motion for an Evidentiary hearing is **DENIED-WITHOUT-PREJUDICE**.

### III.   DEFENDANTS' 12(b)(6) MOTIONS TO DISMISS

All Defendants move to dismiss Plaintiff's claims under Rule 12(b)(6), contending that Plaintiff has failed to state a claim upon which the Court may grant relief. (Docs. 56 & 57); *see* Fed. R. Civ. P. 12(b)(6). For the reasons discussed below Defendants' Motions are **GRANTED-IN-PART** and **DENIED-IN-PART**.

#### A.   Standard of Review

Fed. R. of Civ. P. 12(b)(6) permits a party to assert by motion the defense of failure to state a claim upon which relief can be granted. A motion to dismiss a plaintiff's complaint under Rule 12(b)(6) should not be granted unless the plaintiff fails to plead enough facts to state a claim for relief that is plausible, and not merely just conceivable, on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Dismissal for failure to state a claim is proper if the factual allegations are not 'enough to raise a right to relief above the speculative level.'" *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1291 (11th Cir. 2010) (quoting *Rivell v. Priv. Health Care Sys., Inc.*, 520 F.3d 1308, 1309 (11th Cir. 2008)). "Stated differently, the factual allegations in the complaint must 'possess enough heft' to set forth 'a plausible entitlement to relief.'" *Edwards*, 602 F.3d at 1291 (quoting *Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1282 (11th Cir. 2007)). The plausibility standard "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of the defendant's liability. *Twombly*, 550 U.S. at 556. Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice"; rather, a complaint must make plausible, factual assertions that allow the Court to draw the required connections from the alleged harm and the requested relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).[2]

The Court must conduct its analysis "accepting the allegations in the complaint as true and construing them in the light most favorable to the [p]laintiff." *Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003). In evaluating the sufficiency of a plaintiff's pleadings the Court must "make reasonable inferences in [p]laintiff's favor, 'but [is] not required to draw plaintiff's

---

[2] Plaintiff spills considerable ink in her brief arguing that *Iqbal* and *Twombly* were wrongly decided. Those cases, however, have prescribed the standards for pleading in federal court for nearly 15 years, and this District Court declines to revisit such well-established precedent. Plaintiff's argument about the appropriateness of *Iqbal* and *Twombly* thus adds nothing to Plaintiff's motion.

4

inference.'" *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009) (quoting *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir. 2005)), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012). The Supreme Court instructs that while on a motion to dismiss "a court must accept as true all of the allegations contained in a complaint," this principle "is inapplicable to legal conclusions," which "must be supported by factual allegations." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 555), for the proposition that courts "are not bound to accept as true a legal conclusion couched as a factual allegation" in a complaint.[3]

### B. Factual Background

From October 2018 to July 2020, Plaintiff was employed as a full-time licensed practical nurse at Irwin County Detention Center ("ICDC"), a detention facility in Ocilla, Georgia. (Doc. 55 ¶¶ 22, 29).[4] While working at ICDC, Plaintiff became concerned about the conditions at the facility and reported these concerns to her supervisors and the ICDC Director of Nursing. (*Id.* ¶¶ 46–78). Shortly after reporting to ICDC management, Plaintiff was demoted from a full-time nurse to an "as-needed" position. (*Id.* ¶¶ 85–96). After not receiving work for nearly three months, Plaintiff disclosed her concerns about conditions at ICDC to various government oversight bodies, legislators, and national news media. (*Id.* ¶¶ 79–84). Plaintiff alleges that, as a result of these disclosures, she was constructively discharged in December 2020. (*Id.* ¶¶ 95–96).

ICDC is a detention facility owned by Irwin County and operated by Defendant LaSalle SE and overseen by Defendant Warden Paulk. (Doc. 55 ¶ 24). Defendant LaSalle SE is a private company which operates correctional centers in Louisiana, Texas, and Georgia.

---

[3] Defendants make a passing argument that the SAC is a "shotgun pleading" based on the somewhat vague way that Plaintiff refers to Defendants as a whole, without referring to which specific entity or person is responsible for which claim. (*See* Doc. 57-1 at 6–7). However, "the unifying characteristic of all types of shotgun pleadings is that they fail to . . . give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015). Here, the Court finds that the SAC gives Defendants adequate notice of the claims against them and the grounds upon which those claims rest. The Court thus finds Defendants' argument that the SAC is an impermissible shotgun pleading, unpersuasive.

[4] The facts contained herein, consistent with the standard of review for motions to dismiss, are derived from Plaintiff's Complaint, accepted as true, and construed in the light most favorable to Plaintiff. *Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003).

(*Id.* ¶ 24). Defendant LaSalle SE operated ICDC, in part, under a contract with the Department of Homeland Security ("DHS") to hold immigration detainees on behalf of Immigrations and Customs Enforcement ("ICE"). (*Id.* ¶¶ 2, 24–25).

Since 2010, Plaintiff was employed intermittently at ICDC and was most recently rehired in October 2019. (Doc. 55 ¶ 22). Plaintiff was rehired as a full-time employee, working approximately 36–40 hours per week until her demotion in July 2020. (*Id.* ¶¶ 30, 92–96). It appears that, beginning around March 2020, while employed full time at ICDC, Plaintiff became increasingly concerned that ICDC was failing to adequately protect detainees and staff at the facility. (*See id.* ¶¶ 79–84). She objected to these practices, which she alleges violated the Performance Based National Detention Standards ("PBNDS") and Center for Disease Control ("CDC") COVID-19 guidelines for correctional facilities. (*See id.* ¶¶ 46–78, 118). Her concerns chiefly fall into four categories. (*See id.*)

First, Plaintiff objected because ICDC allegedly failed to take adequate steps to protect detainees from COVID-19. (Doc. 55 ¶¶ 46–66). For example, Plaintiff observed detainees with symptoms such as sore throats and fevers who asked to be tested for COVID-19, but staff refused to test them. (Doc. 55 ¶ 47). Plaintiff complained to her supervisor, Health Services Administrator Lakisha Brown ("HSA Brown"), and Director of Nursing, Shanise Bell ("DON Bell"), about these refusals. (*Id.* ¶ 46). But they dismissed her concerns, responding that the detainees sought testing "because they wanted attention," and "as a pretext to get out of their cells." (*Id.*) Plaintiff also observed inadequate cleaning standards in patient exam rooms, which she reported to HSA Brown, who appeared unconcerned. (*See id.* ¶¶ 51–52).

Second, Plaintiff objected because ICDC allegedly failed to take adequate steps to protect staff from COVID-19. For example, the most effective Personal Protective Equipment, such as N-95 facemasks, was reserved for high-ranking staff, rather than the staff most likely to be exposed to COVID-19. (*See* Doc. 55 ¶ 55). Plaintiff confronted HSA Cole, another supervisor, about this disparity in April 2020 which prompted a change in policy. (*Id.* ¶ 57). Going forward, medical employees were issued masks, though they were limited to a single N-95 mask, and were informed that if they wanted a new one, they would have to purchase it themselves. (*Id.* ¶ 57).

Third, Plaintiff objected because ICDC allegedly "[v]iolated [d]etainee [h]uman [r]ights in [p]erforming [i]nvasive [g]ynecological [p]rocedures [w]ithout [i]nformed [c]onsent[.]" (Doc. 55 at 20). Plaintiff learned about the alleged mistreatment directly from detainees. (*Id.* ¶ 71). She then confirmed her suspicions by investigating those detainees' medical records. (*Id.*) Plaintiff reported her findings to DON Bell, who allowed an unnamed nurse to instruct Plaintiff "not to touch that." (*See id.* ¶ 72). This alleged mistreatment is the subject of the related lawsuit, *Oldaker v. Giles et al.*, No. 7:20-cv-224, (M.D. Ga. 2020), in which a putative class of plaintiffs allege that an outside medical provider performed unnecessary gynecological procedures on at least fifteen immigrant women detained at ICDC without their informed consent.

Fourth, Plaintiff objected because ICDC allegedly prevented detainees from articulating healthcare concerns through grievance procedures. (Doc. 55 ¶¶ 73–76). For example, Plaintiff "reported that detainees had language and other barriers in articulating medical grievances, and [ICDC] was failing to address these barriers." (*Id.* ¶ 76). However, it is unclear with whom Plaintiff lodged her objections about these procedures. (*See id.* ¶¶ 73–76).

Plaintiff, apparently frustrated with the response of her supervisors and ICDC management, sometimes took matters into her own hands. (*See* Doc. 55 ¶¶ 58, 63). For example, in June 2020, after observing that several staff had damaged facemasks, Plaintiff distributed masks to those employees herself. (*Id.* ¶ 58). HSA Brown "chastised" Plaintiff for distributing these masks. (*Id.*) Thereafter, the N-95 masks were locked in HSA Brown's office. (*Id.*) When Plaintiff felt that "Defendants' leadership failed to encourage and enforce the [CDC] social distancing recommendations[,]" she began "warning" other staff to comply with those recommendations. (*Id.* ¶ 53). These warnings resulted in a number of verbal reprimands from Plaintiff's supervisors. (*Id.* ¶¶ 63, 69).

On June 22, 2020, Plaintiff experienced COVID-19 symptoms and was tested for the virus. (Doc. 55 ¶ 86). However, "over her protests[,] ICDC required her to return to work and Plaintiff worked Tuesday, June 23 and Thursday June 25, 2020." (*Id.* ¶ 87). On the evening of June 25, 2020, Plaintiff "discussed her health" with HSA Brown, and relayed that she expected to receive her COVID-19 test results that Monday, June 29. (*Id.* ¶ 88). Shortly afterwards, an ICDC Human Resources employee, Joan Whitley, called Plaintiff and instructed her to "report

7

in 'sick' each day." (*Id.*) When Plaintiff spoke again to HSA Brown, however, HSA Brown commented to Plaintiff that "it made no sense for her to burden herself and ICDC staff by reporting in sick every day." (*Id.*)

Instead of reporting in sick as instructed, Plaintiff contacted Ms. Whitley on Monday, June 29, 2020, to report that her COVID-19 test had returned negative. (*See* Doc. 55 ¶ 89). When Plaintiff returned to work, on Thursday, July 2, 2020, Deputy Warden Frank Albright presented her with "a written reprimand for not reporting to work or reporting in sick[.]" (*Id.* ¶¶ 90–91). Plaintiff alleges that HSA Brown "falsely indicated on the reprimand form and during the reprimand proceedings that she had informed Plaintiff that she would have to 'call in each day.'" (*Id.* ¶ 91). This was Plaintiff's first written reprimand as an ICDC employee. (*Id.* ¶ 96).

Shortly thereafter, Plaintiff objected to the reprimand to Defendant Warden Paulk in person. (Doc. 55 ¶ 92). In response, Defendant Warden Paulk "expressed anger and frustration at her objections[,] using racially offensive language[.]" (Doc. 55 ¶¶ 92, 100). He increased "the adverse action from reprimand to demotion" by changing Plaintiff's job status from a full-time nurse to an "as-needed" position. (*Id.*) Functionally, this meant Plaintiff's hours would be severely curtailed, and she would no longer work regular shifts. (*Id.*)

After Plaintiff was removed from regular shifts, she waited to be called for as-needed shifts. (Doc. 55 ¶ 100). By early September 2020, Plaintiff had still not been assigned any hours. (*Id.* ¶ 101). She therefore "notified Defendants of her availability for work including for hours in October 2020." (*Id.*) Having received no work assignments by September 8, 2020, "[Plaintiff] decided to legally challenge the reprimand and demotion by filing [an Office of Inspector General ("OIG")] complaint . . . ." (*Id.* ¶ 94). The OIG Complaint alleged "violations of laws, rules and regulations, as well as on-going danger to public health and safety, due to mismanagement of COVID-19 issues and other significant matters[.]" (*Id.* ¶ 14) (internal quotations removed). Plaintiff also disclosed the contents of her OIG Complaint to the DHS Office of Civil Rights and Civil Liberties; and the ICE Atlanta Field Office. (*Id.* ¶ 82).

On September 17, 2020, Plaintiff sent a letter to both chambers of Congress, (Doc. 55 ¶ 83), "disclosing Defendants' wrongdoing, and urging investigation into the wrongdoing by Defendants [and] the private detention industry" as well as "the oversight

8

practices of DHS." (*Id.* ¶ 98). Plaintiff also began to engage in "advocacy" to national news outlets, which resulted in significant coverage of her activities by major newspapers and TV networks. (*Id.* ¶ 97).

After her OIG Complaint, ICDC did not assign Plaintiff any additional hours. (*See* Doc. 55 ¶¶ 102–03). Although it is unclear how Plaintiff picked the date alleged, she "decided that as of December 31, 2020, she was probably not going to be called back to work at ICDC. This constituted the date of her constructive discharge . . . ." (*Id.* ¶ 102). As of the filing of the instant action, Plaintiff remained an employee of Defendants. (*Id.* ¶ 4).

### C. First Amendment Claim

Defendants move to dismiss Plaintiff's claim against them under the First Amendment, at Count 1, contending that claim fails as a matter of law. (Doc. 57-1 at 7–16). At Count 1, Plaintiff alleges that Defendants, acting under color of federal law, violated her First Amendment rights to freedom of speech and association, seeking equitable relief against Defendants LaSalle SE and LaSalle Management, and damages against Defendant Warden Paulk under *Bivens*. (Doc. 55 ¶¶ 100–13). Plaintiff alleges that her objections to ICDC conditions to her supervisors and ICDC management and post-demotion advocacy were First Amendment protected activity, and that her demotion on July 2, 2020, and constructive discharge were impermissible retaliation for that activity.

The First Amendment prohibits government officials from retaliating against individuals who engage in protected speech. *Bell v. Sheriff of Broward Cnty.*, 6 F.4th 1374, 1377 (11th Cir. 2021) (citing *Nieves v. Bartlett*, 587 U.S. 391, 398–99 (2019)). Generally, to state a claim for First Amendment retaliation, a plaintiff must sufficiently allege that "(1) [she] engaged in protected speech; (2) the defendant's conduct adversely affected the protected speech; and (3) a causal connection exists between the speech and the defendant's retaliatory actions." *Bailey v. Wheeler*, 843 F.3d 473, 480–81 (11th Cir. 2016) (citing *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008); *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005)). The Free Speech Clause, however, constrains only governmental abridgement of speech. *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 808 (2019). The First Amendment therefore does not furnish a remedy when a purely private actor retaliates against a speaker. *See id.* Put simply,

"[w]ithout governmental action there can be no First Amendment violation." *United Egg Producers v. Standard Brands, Inc.*, 44 F.3d 940, 942–43 (11th Cir. 1995).

Plaintiff alleges that Defendants, even though they are private actors, are nonetheless subject to her constitutional claims because they are "federal actors." (Doc. 55 ¶ 107). A private party may be a government actor only in three "limited circumstances . . . (i) when the private entity performs a traditional, exclusive public function," the public function test; "(ii) when the government compels the private entity to take a particular action," the state compulsion test; or "(iii) when the government acts jointly with the private entity," the nexus/joint action test. *Halleck*, 587 U.S. at 890; *Rayburn ex rel. Rayburn v. Hogue*, 241 F.3d 1341, 1347–48 (11th Cir. 2001) (citing *Nat'l Broad. Co. v. Commc'ns Workers of Am.*, 860 F.2d 1022, 1026–27 (11th Cir. 1988)). The Court construes the SAC as pleading that Defendants were state actors by virtue of the public function test and the nexus/joint action test.

### 1. Public Function Test

Under the public function test, a private actor that performs a "traditional, exclusive public function[,]" may be considered a government actor, and therefore liable to private citizens for infringement of First Amendment rights. *See Halleck*, 587 U.S. at 809 (citing *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352–54 (1974)). Plaintiff argues that Defendants, as alleged, perform a public function because "the detention of immigrants pending deportation proceedings is an exclusive power of the federal government." (Doc. 65 at 12–13). Simply alleging that an entity performs a public function, however, is not enough, alone, to plead state action. *See Carlin Commc'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1358 (11th Cir. 1986) (citing *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)) ("In order to establish state action the plaintiff must show that the state is responsible for the specific conduct of which he complains."). Instead, a plaintiff must sufficiently plead that the private entity violated her constitutional rights while exercising the specific public function in question, *see Am. Mfrs. Mut. Ins. v. Sullivan*, 526 U.S. 40, 51 (1999), which "requires careful attention to the gravamen of the plaintiff's complaint." *Blum*, 457 U.S. at 1004. Such a requirement ensures that private actors are constitutionally liable only for conduct that is "fairly attributable" to the government. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982).

10

Here, the exclusivity of the federal immigration power has little bearing on the Court's inquiry, when Defendants' alleged First Amendment violations concern the supervision and discipline of an employee. (*See* Doc. 55 ¶¶ 100–13). The inquiry thus becomes whether such personnel matters have been performed "traditionally *and* exclusively" by the government. *See Halleck*, 587 U.S. at 809 (citing *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982); *Jackson*, 419 U.S. at 352–53; *Evans v. Newton*, 382 U.S. 296, 300 (1966)). Although governments traditionally perform many functions, "very few" have been exclusively reserved to the government. *See Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 157 (1978); *Halleck*, 587 U.S. at 809.

Plaintiff does not argue that the personnel actions in question are traditional and exclusive public functions, and the Court can find no authority which supports such a finding. To the contrary, other courts in this Circuit have found that, administrative and personnel actions, even when conducted by private actors performing public functions, "are exactly the type of decisions that do not satisfy the public function analysis." *Campbell v. Civ. Air Patrol*, 131 F. Supp. 2d 1303, 1310–13 (M.D. Ala. 2001) (finding that a private corporation which conducted noncombat missions for the Air Force was not performing a public function when it terminated plaintiffs without notice); *see Allocco v. City of Coral Gables*, 221 F. Supp. 2d 1317, 1374 (S.D. Fla. 2002) (finding campus police force was not performing a public function when disciplining officers for speech), *aff'd* 88 F. App'x 380 (11th Cir. 2003). Upon the Court's review and consideration and as found by other courts, the Court finds that Defendants, as alleged, were not performing a traditional and exclusive public function. Plaintiff, therefore, has not sufficiently pleaded that Defendants were state actors under the public function test.

### 2. Nexus/joint action test

Under the nexus/joint action test, a plaintiff may establish government action when the government has "so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in the enterprise." *Harvey*, 949 F.2d at 1131 (citing *Nat'l Broad. Co.*, 860 F.2d at 1026). As an initial matter, the Court is skeptical that Plaintiff alleges government action through the nexus/joint action test at all, given that her Response argues only that the public function test applies. (*See* Doc. 56 at 12–15). However, the SAC alleges that "Defendants are subject to direct Constitutional claims because they exercise a role in an area withim the exclusive authority of the Federal Government and in conjunction with

11

DHS components charged with responsibility for immigration"—suggesting that constitutional liability might flow from joint action between Defendants and the federal government. (Doc. 55 ¶ 108).

To satisfy the nexus/joint action test, a plaintiff must first sufficiently allege that the governmental entity and the private party were "intertwined in a symbiotic relationship." *See Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1278–79 (11th Cir. 2003). Plaintiff does so. She alleges significant joint action between DHS and Defendants in the performance of a contract to hold immigration detainees. (*See* Doc. 55 ¶ 2) ("[Defendants] operated the ICDC facility under a contract with DHS to detain up to 1,200 ICE detainees."); (*id.* ¶ 39) ("ICE has developed its own standards and guidelines for hygiene, cleanliness, and sanitation for detention facilities like ICDC[.]"); (*id.* ¶ 73) ("La Salle's contract with DHS required the creation, maintenance, operation and review of reporting channels[.]").

The analysis of the nexus/joint action test, however, does not cease once a symbiotic relationship has been alleged. *See Pinellas*, 344 F.3d at 1277. Plaintiff must also allege a "nexus between the State and the challenged action of the regulated entity[.]" *Id.* (quoting *Blum*, 457 U.S. at 1004); *Jackson*, 419 U.S. at 345. In other words, just as with the public function test, the symbiotic relationship alleged "must involve the 'specific conduct of which the plaintiff complains.'" *Pinellas*, 344 F.3d at 1278 (quoting *Raburn*, 241 F.3d at 1348). Here, the symbiotic relationship Plaintiff alleges involves the administration of a facility to hold immigration detainees. (*See* Doc. 55 ¶¶ 2, 39, 73). Yet, as noted, Defendants' alleged First Amendment violations concern the supervision and discipline of an employee by a private entity. (*See* Doc. 55 ¶¶ 100–13). Indeed, Plaintiff alleges no facts from which the Court can reasonably infer that DHS or ICE exercised any influence, or had any involvement, in the personnel practices at ICDC. (*See generally* Doc. 55). The alleged symbiotic relationship therefore lacks any meaningful nexus to the constitutional torts Plaintiff asserts. As such, Plaintiff has not sufficiently pleaded that Defendants were government actors, with respect to the employer actions she complains of, under the nexus/joint action test.

### 3. Conclusion: First Amendment

In sum, Plaintiff has failed to sufficiently plead that Defendants were federal actors, and therefore subject to her constitutional claims, under either theory asserted.[5] Plaintiff has thus failed to state a claim against Defendants for violations of the First Amendment. Accordingly, Defendants' 12(b)(6) motions to dismiss Plaintiff's claim under the First Amendment, at Count 1, are **GRANTED**.[6] As a result, Plaintiff's First Amendment claim is **DISMISSED-WITH-PREJUDICE** as to all Defendants.[7]

### D. Section 4712 Claim

Defendants move to dismiss Plaintiff's claim under 41 U.S.C. § 4712, at Count 2, contending that claim fails as a matter of law. (Doc. 57-1 at 17–18). Section 4712 prohibits government contractors from "retaliating against their employees for reporting evidence of misconduct in certain circumstances." *Fuerst v. Hous. Auth. of City of Atlanta*, 38 F.4th 860, 869 (11th Cir. 2022) (citing 41 U.S.C. § 4712). Under § 4712,

> An employee of a contractor . . . may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing to [a covered person or body] information that the employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract.

41 U.S.C. § 4712(a).

Section 4712 adopts the legal burdens of proof from the Whistleblower Protection Act of 1989 ("WPA"), at 5 U.S.C. § 1221(e)(1). *See* 41 U.S.C. § 4712(c)(6). As a result, to state a claim under § 4712 a plaintiff must sufficiently allege that she (1) made a protected disclosure, (2) to a person specified in the statute, (3) she suffered a reprisal for making the disclosure, and (4) the disclosure was a "contributing factor" in the personnel action taken against her.

---

[5] To be clear, the Court finds that the SAC cannot be reasonably construed as alleging state action by virtue of the state compulsion test.
[6] This includes Plaintiff's claim for equitable relief and for damages under *Bivens*.
[7] Because the Court has resolved Defendants' 12(b)(6) Motion to Dismiss Plaintiff's First Amendment claims on state action grounds, it need not reach the merits of Defendants' other arguments for dismissal of Count I.

*DuPage Reg'l Off. of Educ. v. U.S. Dep't of Educ.*, 58 F.4th 326, 350 (7th Cir. 2023) (citing 5 U.S.C. § 1221(e)).

Plaintiff alleges that Defendants' noncompliance with ICE's PBNDS and CDC COVID-19 guidelines constituted "gross mismanagement and gross waste of federal funds[.]" (Doc. 55 ¶¶ 118–19). And this non-compliance, and obstruction of grievance procedures, constituted an "abuse of authority[.]" (*Id.* ¶ 120). Thus, when Plaintiff reported these concerns to ICDC management, federal officials, and members of Congress, she was protected by § 4712 from retaliation. (*Id.* ¶ 127). To best respond to Defendants' arguments, the Court will discuss Plaintiff's pre-demotion and post-demotion disclosures separately.

### 1. Post-Demotion Disclosures

The Parties do not dispute that Plaintiff's demotion in July 2020 is a personnel action covered by § 4712. (*See* Docs. 57 & 65). But at that time, Plaintiff's only disclosures had been within ICDC. (*See* Doc. 55 ¶¶ 46–78). All other disclosures Plaintiff relies upon occurred, at the earliest, three months after she was demoted, starting with her OIG Complaint on September 8, 2020. (*See id.* ¶¶ 79–84). Defendants contend that, to the extent Plaintiff relies on post-demotion disclosures as a reprisal under § 4712, her claim should be dismissed because she has not sufficiently alleged a "discharge, demotion, or discrimination." (Doc. 57-1 at 17).

Defendants invite the Court, without citation to authority, to require that Plaintiff plead a constructive discharge to sufficiently allege § 4712 retaliation for her post-demotion disclosures. (*See* Doc. 57). Although certain claims, such as Plaintiff's First Amendment retaliation claim, impose strict requirements to plead retaliatory constructive discharge, *see Akins v. Fulton Cnty.*, 420 F.3d 1293, 1302 (11th Cir. 2005), the Court is unpersuaded that such requirements apply in the § 4712 context. Section 4712 merely requires that a plaintiff was "discharged, demoted, or otherwise discriminated against[,]" for a protected disclosure. 41 U.S.C. § 4712(a). Although a constructive discharge might well qualify as a "discharge[,]" the residual clause, "otherwise discriminated against[,]" is broad enough to render pleading a constructive discharge unnecessary. *See id.* The Court, therefore, declines Defendants' invitation to partially dismiss Plaintiff's § 4712 claim merely for her failure to plead a constructive discharge, as defined in other contexts.

The relevant inquiry is whether Plaintiff has sufficiently alleged that Defendants "otherwise discriminated against" her for her post-demotion disclosures. "Statutory interpretation starts, and ideally ends, with the text." *See Fuerst*, 38 F.4th at 872 (citing *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004)). Section 4712 does not define "otherwise discriminated against[.]" But as the Supreme Court explained in the context of the analogous Sarbanes-Oxley whistleblower protections, "in any other manner discriminate against an employee[,]" means to "'intentionally treat a person worse because of' a protected characteristic." *See Murray v. UBS Sec., LLC*, 601 U.S. 23, 34 (2024) (quoting *Bostock v. Clayton Cnty.*, 590 U.S. 644, 658 (2020)).[8] The Court finds that definition applicable here, and therefore construes "otherwise discriminated against[,]" by its plain meaning, to cover intentional conduct by an employer that treats a disclosing employee worse because of her disclosure.

The Eleventh Circuit also instructs that, when interpreting undefined terms in § 4712, courts may look to the anti-retaliation provision of the Whistleblower Protection Act of 1989 ("WPA"), 5 U.S.C. § 2302(b)(8), because the text of the WPA anti-retaliation provision mirrors the text of § 4712. *Fuerst*, 38 F.4th at 872. The WPA, as relevant to § 4712, prohibits federal employers from taking or refusing to take retaliatory "personnel action" in response to similar disclosures to § 4712. 5 U.S.C. § 2302(b)(8). But unlike § 4712, the WPA specifically defines "personnel action" to include eleven types of actions, along with a residual clause that covers "any other significant change in duties, responsibilities, or working conditions[.]" *Id.* § 2302(a)(2). The Court, therefore, adopts the specific residual clause definition found in the WPA, and finds that § 4712 requires a significant change in duties, responsibilities, or working conditions to qualify as an impermissible reprisal. Accordingly, in light of the plain text of § 4712, as informed by the WPA, to sufficiently plead reprisal under § 4712, a plaintiff must, at least, allege intentional conduct which resulted in a significant adverse change in duties, responsibilities, or working conditions.

Defendants argue that after Plaintiff's demotion, she alleges no adverse action that could qualify as a reprisal under § 4712. (Doc. 57-1 at 17). To the extent that Plaintiff's sole allegation about constructive discharge is not enough to sufficiently plead reprisal, the Court

---

[8] Like § 4712, the Sarbanes-Oxley whistleblower provisions also adopt the burden of proof from 5 U.S.C. § 1221(e).

15

agrees with Defendants. (*See* Doc. 55 ¶ 95) ("Having thereafter still received no work assignments and following very large scale public disclosures of her post-demotion protected [sic], . . . Plaintiff decided that as of December 31, 2020, she was probably not going to be called back to work at ICDC. This constituted a constructive discharge."). Such an allegation falls well short of plausibly alleging intentional conduct on behalf of Defendants. *See Iqbal*, 556 U.S. at 678–79.

The Court, however, rejects Defendants' narrow reading of the SAC which leaves only two allegations that could possibly qualify as reprisals under § 4712. A fair reading reveals that Defendants' ongoing refusal to assign Plaintiff hours permits the reasonable inference that Defendants intentionally denied her hours as a result of her post-demotion disclosures. (Doc. 55 ¶¶ 101, 102). For instance, on September 3, 2020, Plaintiff notified Defendants of her availability for work in October 2020. (*Id.* ¶ 101). Yet throughout October 2020, Defendants assigned her no work. (*Id.* ¶ 102). During the period following her demotion, Defendants posted multiple full-time and on-call LPN positions at ICDC—suggesting that their need for nursing staff was, at most, undiminished. (*Id.*) Taken together with the timing of her protected disclosures, Defendants' failure to assign hours to Plaintiff, despite ICDC's manifest need for nursing staff during the same period, allow the Court to reasonably infer that Defendants intentionally declined to assign Plaintiff hours as a reprisal for her disclosures. The Court finds this sufficient to allege reprisal under § 4712.

Additionally, it appears that, by allowing Plaintiff to occupy a nominal position at ICDC to this day while effectively ceasing to employ her, Defendants may have deliberately attempted to frustrate Plaintiff's ability to allege reprisal. (*See* Doc. 55 ¶ 23) ("[A]lthough Plaintiff purportedly remained employed, she was relegated to non-shift, on-call status without assignment of any hours by Defendants[.]"); (*id.* ¶ 103) ("At no time up to the filing of this complaint did Defendants inform Plaintiff she was on suspended or involuntary leave status, or that she has been terminated from employment."). In so doing, Defendants have denied Plaintiff a meaningful opportunity to discover the exact date when Defendants, in fact, decided to effectively terminate her. Defendants now seek to capitalize, again, on an informational asymmetry of their own making: now pointing to Plaintiff's lack of knowledge of the exact date of her termination as grounds for dismissal of part of her claim. It is clear, in any event,

that the date of Plaintiff's effective termination will likely become apparent in discovery, and the Court is unwilling to dismiss Plaintiff's plausible allegations of reprisal based solely on her failure to know that exact date when Defendants, as alleged, may have frustrated her ability to do so. In other words, the Court finds Plaintiff's allegations "raise a reasonable expectation that discovery will reveal evidence" of the date she was effectively terminated. *See Twombly*, 550 U.S. at 556.

As such, the Court finds that Plaintiff has sufficiently alleged "discharge, demotion, or discrimination" within the meaning of § 4712.

### 2. Pre-Demotion Disclosures

Turning to Plaintiff's pre-demotion disclosures, Defendants argue that Plaintiff has failed to sufficiently plead that her disclosures were protected by § 4712 because (a) the people Plaintiff disclosed to were not covered by § 4712, and (b) she has not sufficiently alleged that her disclosures were a contributing factor in her demotion. The Court will address each argument in turn.

#### a. Disclosure to a Person Covered by § 4712

Defendants contend that Plaintiff has failed to sufficiently plead that her pre-demotion disclosures were made to a person covered by § 4712. (Doc. 57-1 at 17–18). As relevant to Plaintiff's pre-demotion disclosures, § 4712 protects disclosures to "a management official or other employee . . . who has the responsibility to investigate, discover, or address misconduct." 41 U.S.C. § 4712(a)(2)(G).

Here, the Court finds that Plaintiff has sufficiently alleged that her disclosures were made to covered individuals. In the period leading up to her demotion, Plaintiff alleges a number of specific encounters with her direct supervisors, during which she directly reported serious concerns about the practices at ICDC or questioned practices she felt were improper. (*See e.g.*, Doc. 55 ¶ 50) ("Plaintiff observed ICDC medical staff shredding detainees' written requests for exams or treatment and otherwise denying medical care by falsely documenting or reporting exams as performed that actually had not been performed. During May and July 2020, Plaintiff reported this to HSA Brown, who took no action."); (*id.* ¶ 52) ("Plaintiff showed HSA Brown blood that was left on the floor [of patient exam rooms]. HSA Brown commented that it was not acceptable but that as adults, all staff should know how to clean up after

17

themselves."); (*id.* ¶ 62) ("Plaintiff asked HSA Brown why there was not a nurse who knew how to properly use the temperature guns at the entrance to the facility."). The Court finds that the title of "Health Services Administrator[,]" HSA Brown and HSA Cole's role as Plaintiff's direct supervisor, (*id.* ¶ 30), and the role that HSA Brown played as "investigator" in Plaintiff's written reprimand, (*see id.* ¶ 91), permit the reasonable inference that HSA Brown and HSA Cole, as alleged, were employees "who ha[d] the responsibility to investigate, discover, or address misconduct[.]"[9]

Additionally, Plaintiff brought her concerns to the Director of Nursing, DON Bell. (Doc. 55 ¶ 72) ("Plaintiff raised the concerns about the high rates of gynecological procedures performed on immigrant women detainees without their understanding or consent with a fellow nurse and DON Bell. Both expressed awareness of the gynecological procedures, and a fellow nurse, in front of DON Bell, explicitly instructed Plaintiff 'not to touch that.'"); (*id.* ¶ 49) ("Plaintiff questioned HSA Brown about [the practice of giving cold medicine to detainees who presented with a fever] with DON Bell present, and HSA Brown insisted that the detainees only had colds because of the cold temperatures in their cells and did not need to be tested for COVID-19."). Therefore, Plaintiff, as alleged, disclosed her concerns more than once to a nurse with significant management authority. From this, the Court can reasonably infer that DON Bell was a "management official[,]" or at least, an "other employee . . . who ha[d] the responsibility to investigate, discover, or address misconduct." *See* 41 U.S.C. § 4712.

As a whole, therefore, the Court finds that Plaintiff has sufficiently alleged that she made her pre-demotion disclosures to "a management official or other employee . . . with the responsibility to investigate, discover, or address misconduct[,]" within the meaning of § 4712. Although Defendants may be able to establish at summary judgment that HSA Brown, HSA Cole, or DON Bell were not covered employees, Plaintiff has alleged enough fact to raise "a

---

[9] There is a "dearth of case authority" addressing which employees are covered by § 4712. *Foosaner v. Crown Castle USA, Inc.*, No. 1:22-CV-521, 2023 WL 5435605, at *4 n. 4 (E.D. Va. Aug. 23, 2023), and the Parties have cited none. However, the Court is persuaded by the example set by the Eastern District of Virgina; that titles of employees, and acts of investigation by those employees, may support a reasonable inference that those employees "ha[d] the responsibility to investigate, discover, or address misconduct[.] *See id.*

18

reasonable expectation that discovery will reveal evidence" of Defendants' liability. *See Twombly*, 550 U.S. at 556. Therefore, Plaintiff has sufficiently pleaded that her pre-demotion disclosures were made to persons covered by § 4712.

### b. Contributing factor

Next, Defendants contend that Plaintiff has failed to sufficiently allege that her pre-demotion disclosures were a "contributing factor" in her demotion. (Doc. 57-1 at 17–18). Section 4712, as noted, adopts the burdens of proof found in the WPA. *See* 42 U.S.C. § 4712. Under the WPA, a plaintiff may show that a disclosure was a "contributing factor" in a personnel action using circumstantial evidence, such as evidence that "(A) the official taking the personnel action knew of the disclosure; and (B) the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure . . . was a contributing factor in the personnel action"—the knowledge/timing test. *Kewley v. Dep't of Health & Hum. Servs.*, 153 F.3d 1357, 1361–62 (Fed. Cir. 1998) (emphasis omitted) (citing 5 U.S.C. § 1221(e)(1)); *DuPage*, 58 F.4th at 351. Under the knowledge/timing test, the Court finds that Plaintiff has sufficiently alleged that her disclosures were a contributing factor in her demotion.

As to the knowledge prong, Plaintiff alleges specific facts from which the Court can reasonably infer that Defendant Warden Paulk had knowledge of her disclosures. (Doc. 55 ¶ 45) ("Warden Paulk was aware of all the violations and complaints by staff reported to HSA Brown, and Director of Nursing Bell."); (*id.* ¶ 85) ("Warden Paulk sometimes issued memoranda on the issues Plaintiff raised."); (*id.*) ("Warden Paulk had a reputation as a hands-on and on-the-floor administrator who was going to find out about anything wrong in his chain of command. Brown ad [sic] Bell did not hide anything from him, including reports from staff members."). The Court thus finds that Plaintiff has sufficiently alleged that Defendant Warden Paulk knew of her disclosures.

As to the timing prong, Plaintiff alleges specific facts that she was demoted, within a period of time that a reasonable person could conclude that her pre-demotion disclosures were a contributing factor. As alleged, Plaintiff was demoted on July 2, 2020, (Doc. 55 ¶ 92), and her alleged disclosures occurred in the three-month period prior to her July 2, 2020, demotion. (*See e.g.*, Doc. 55 ¶ 50) ("During May and July 2020, Plaintiff reported [her observations of

ICDC medical staff shredding written requests for exams or treatment] to HSA Brown, who took no action . . . ."); (*id.* ¶ 57) ("In April 2020, Plaintiff asked HSA Cole why medical employees were wearing surgical masks and leadership was wearing N-95 masks[.]"); (*id.* ¶ 65) ("Around April 2020, Plaintiff observed HSA Brown shred approximately 45 [COVID-19] test results. HSA Brown told Plaintiff that the papers were copies of tests. [But when Plaintiff checked the patient files] she observed that the test results were not in detainees' files."). There were thus four months, at most, between Plaintiff's alleged disclosures and her demotion. From this, the Court finds that a jury could reasonably find that Plaintiff's disclosures were a contributing factor to her demotion. The Court thus finds that Plaintiff has sufficiently alleged that her disclosures were a contributing factor in her demotion.

### 3. Conclusion: Section 4712

In sum, with respect to Plaintiff's claim under 41 U.S.C. § 4712, the Court finds (1) that Plaintiff has sufficiently alleged that she suffered a reprisal within the meaning of § 4712 after her post-demotion disclosures, (2) she has sufficiently alleged that she made her pre-demotion disclosures to a person covered by § 4712, and (3) she has sufficiently alleged that her pre-demotion statements were a "contributing factor" in her demotion. Defendants' motion to dismiss Plaintiff's § 4712 claim is, therefore, **DENIED**.

### E. Conclusion: Defendants' Rule 12(b)(6) Motion

Based on the foregoing reasons in Section III, Defendants' motions to dismiss (Docs. 57) under Rule 12(b)(6) are **GRANTED-IN-PART** and **DENIED-IN-PART**. As a result, Plaintiff's First Amendment Claim, at Count 1, is **DISMISSED-WITH-PREJUDICE** as to all Defendants. Therefore, the only claim that remains in the action is Plaintiff's claim under 41 U.S.C. § 4712, at Count 2.

**SO ORDERED**, this 10th day of September 2023.

/s/ W. Louis Sands
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**