**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**VALDOSTA DIVISION**

**DAWN WOOTEN,**

Plaintiff,

v. CIVIL NO. 7:22-cv-00148-WLS

**LASALLE MANAGEMENT COMPANY, L.L.C,** et al

Defendants.

---

# CORRECTED SUPPLEMENTAL RESPONSE IN OPPOSITION TO DEFENDANT LASALLE MANAGEMENT COMPANY, L.L.C.'S MOTION TO DISMISS PURSUANT TO RULE 12(b)(2) AND RULE 12(b)(6)

---

## I. INTRODUCTION

LaSalle Management is not a mere administrative support entity, as it has claimed. Instead, LaSalle Management exercises extensive control over LaSalle Southeast and ICDC, performing critical business functions such as payroll processing, HR management, and financial oversight—all of which directly impacted Plaintiff and other employees at the facility. Testimony from key LaSalle representatives—including William McConnell, Rodney Cooper, and Dr. Pamela Hearn—demonstrates that LaSalle Management operates as a central decision-making authority for ICDC and other LaSalle-branded entities. Courts have consistently held that corporations with financial, managerial, and operational ties to in-state entities meet this standard. Moreover, under the alter ego doctrine, jurisdiction may be exercised over a nonresident parent company when it exerts functional control over a subsidiary operating in the forum state.

For purposes of personal jurisdiction over one or more of a group of companies with common ownership and joint management, the key legal principle is the "alter ego" theory. Companies that don't function distinctly, especially shell companies, do not receive distinct jurisdictional protection. This theory allows for personal jurisdiction if the controlling, parent or subsidiary company exerts so much control over the other companies that the collection of companies do not exist as separate entities but are one and the same for jurisdictional purposes. The following factors are considered: sharing the same employees and corporate officers, engaging in the same business enterprise, having the same address and phone lines, using the same assets, completing the same jobs, not maintaining separate books, tax returns, and financial statements, and exerting control over the daily affairs of another corporation. See, *Singh v. Daimler*, AG, 902 F.Supp.2d 974 (2012).

Common ownership alone may be insufficient to establish individual company jurisdiction under the alter ego theory, but when combined with a unity of interest and ownership such that the separate corporate personalities of the entities no longer exist, then failure to disregard their separate identities would result in fraud or injustice. *In re Packaged Seafood Products Antitrust Litigation*, 338 F.Supp.3d 1118 (2018). For example, in *In re Chocolate Confectionary Antitrust Litigation*, the court found sufficient control to exercise personal jurisdiction over British companies based on their vertical management of subsidiaries, conscription of subsidiary employees for group-wide management functions, and control over daily functions to the exclusion of subsidiary boards of directors. 674 F. Supp. 2d 580 (2009).

Here, the record unequivocally establishes that LaSalle Management and LaSalle Southeast do not operate as distinct entities, but as a single, unified enterprise.

## II. FACTUAL BACKGROUND

Plaintiff Dawn Wooten was employed by "LaSalle Corrections" and/or LaSalle Management" according to Guyer Decl. Ex. 1 (Georgia unemployment records) and Guyer Decl. Ex. 2 (LaSalle Management employment validation).

While LaSalle Management contends that it has no ownership stake in LaSalle Southeast, *a company that appears to exist only on paper*, evidence gathered in discovery underscores the interconnected nature of the LaSalle-branded entities, including shared financial operations and leadership oversight that extended beyond state lines.

### A. <u>Pamela Hearn, MD</u>

Dr. Hearn, the defendants claim, is employed through CorrectMed, providing "support and guidance" to multiple LaSalle facilities. Hearn Dep. 13:1-4. While she initially stated that CorrectMed is her employer, she later asserted that she is the Medical Director for LaSalle. Compare Hearn Dep. 13:5-7 with Hearn Dep. 16:14-17. Dr. Hearn does not know which entity actually pays her salary. Hearn Dep. 14:1-3. She understands that LaSalle has multiple headquarters, including Texas and Ruston, Louisiana, but does not clarify how authority is divided among them. Hearn Dep. 14:22-25; 15:6-10. Dr. Hearn admits that while she reports to Rodney Cooper, she does not know which company he works for—even though he hired her, oversees her work, and functionally serves as her boss. Hearn Dep. 15:23-25; 16:1-10; 16:18-25; 17:1-6.

As part of her responsibilities, Dr. Hearn reviews audit reports, assists in medical equipment acquisitions, and oversees clinical operations. Hearn Dep. 19:11-15. However, she acknowledges that she manages a team including a Director of Clinical Services, Director of Credentialing, IT specialist, Quality Assurance Manager, Auditing Manager, and Special Projects Coordinator, while simultaneously conceding that she does not know who pays them or which LaSalle entity

they officially work for. Hearn Dep. 20-21. Notably, Dr. Hearn herself hired most of these employees, but cannot identify on behalf of which entity she did so. Hearn Dep. 22:1-7. She does not to know her official title or which entity employed her. Compare Hearn Dep. 23:5-7 with Hearn Dep. 23:11-13, 23:20-21. Nonetheless, one fact remains undisputed: Dr. Hearn has overseen medical operations at ICDC since 2020, a fact she confirmed three times. Hearn Dep. 24:2-12; 25:1-7.

Dr. Hearn confirmed that LaSalle is controlled by a corporate management team—a point she previously emphasized in her statement to Congress. Hearn Dep. 31:21-25. She further testified that "LaSalle" bears responsibility for the health and well-being of detainees and sets policies governing access to and administration of medical care at ICDC. Hearn Dep. 32:4-23. However, she could not specify which LaSalle entity holds decision-making authority or to which entity members of this corporate management team belong. Hearn Dep. 33:19-23. She points out that William McConnell—the founder and controlling interest holder overseeing LaSalle Management—participates in these meetings. Hearn Dep. 33:19-23.

**B. <u>Rodney Cooper</u>**

The deposition of Rodney Cooper further underscores the intertwined and indistinguishable nature of LaSalle entities, reinforcing Plaintiff's alter ego jurisdictional argument against LaSalle Management. Cooper's testimony exposes contradictions and corporate obfuscation, particularly regarding LaSalle Management's oversight, financial structure, and operational entanglement with LaSalle Southeast. At the outset of his deposition, Cooper struggled to provide a consistent description of LaSalle Southwest Corrections, the entity he ostensibly works for. When first asked about LaSalle Southwest's role, he described it as managing "some jails and prisons… throughout several states." Cooper Dep. 7:23; 8:1-3. However, when pressed on the number of states in which LaSalle Southwest operates, Cooper contradicted himself, claiming instead that

LaSalle Southwest operates only in Texas. Cooper Dep. 8:4-5. Yet, when asked where he performs his duties, Cooper again changed his response, admitting that he mentors and advises regional staff beyond Texas, including in Louisiana and "areas outside of Louisiana." Cooper Dep. 8:11-12; 9:3-5, 9:12-15.

This inconsistency mirrors the broader pattern of confusion and obfuscation among LaSalle entities, which blur distinctions between operations, making it impossible to determine the corporate boundaries that LaSalle Management claims to exist. Further demonstrating LaSalle Management's direct influence over its so-called independent entities, Cooper initially insisted that he doesn't "really report to anybody." Cooper Dep. 10:3-5, 10:10-11. However, he later admitted that he was hired by William McConnell and Pat Temple and that McConnell has the authority to fire him. Cooper Dep. 10:15-20, 11:22-25. Cooper's lack of knowledge regarding financial and corporate structures further demonstrates LaSalle's deliberate efforts to obscure its internal relationships: Cooper regularly works with accountants but does not know who employs them. Cooper Dep. 12:13-25; 13:1-8; McConnell attends internal meetings at will, where he interacts with accountants, payroll, HR staff, and Cooper himself. Cooper Dep. 13:15-20; 14:4-6; and Cooper "assumes" that McConnell sets his salary, but is ultimately unsure. Cooper Dep. 14:8-12.

Despite this intentionally opaque structure, Cooper acknowledges that LaSalle Management provides "back-office support" to both LaSalle Southwest and LaSalle Southeast. Cooper Dep. 15:8-14. When asked whether LaSalle Management has a director, Cooper's answer further underscores the entanglement of LaSalle entities—he incorrectly asserts that he himself is the Executive Director of LaSalle Management. Cooper Dep. 15:15-25; 16:1-4. This misstatement by a high-ranking LaSalle official illustrates the absence of meaningful separation between

LaSalle's various corporate entities. Cooper admitted to traveling to Louisiana, Arizona, and Georgia in his role. Cooper Dep. 17:5-18. His presence in Georgia is critical for jurisdiction, as it contradicts LaSalle Management's assertion that it has no operational ties to Georgia. Cooper directly contradicts the company's claims that LaSalle Southeast and LaSalle Management are separate entities. Discussing the hiring process at Irwin County Detention Center (ICDC) in Ocilla, Georgia, Cooper confirmed that Jay Eason, a LaSalle Southwest employee, hired the warden of ICDC—a facility allegedly run by LaSalle Southeast. Cooper Dep. 20:2. When asked why hiring duties crossed organizational lines, Cooper provided a telling admission: "It's still – it's LaSalle." Cooper Dep. 20:2.

### C. William McConnell

The deposition of William McConnell provides the clearest evidence yet that LaSalle Management, LaSalle Southeast, and other LaSalle-branded entities are not independent corporations but rather a single, intertwined business network deliberately structured to obscure liability. McConnell's testimony is riddled with contradictions, vague responses, and admissions of corporate opacity, all of which undermine LaSalle Management's argument that it lacks control over LaSalle Southeast and the Irwin County Detention Center (ICDC). McConnell first describes "LaSalle Corrections" as merely a "sort of trademark" rather than a specific legal entity, further reinforcing the lack of meaningful corporate separation among LaSalle-branded entities. McConnell Dep. 8:2-3. He traces LaSalle's origins to BAS Construction, a family-owned construction firm that transitioned into building prisons in 1995 and now generates $20 million in annual revenue. McConnell Dep. 8:23-24; 10:9-12; 11:1-3. While McConnell initially claims that BAS and LaSalle entities are "totally separate," he simultaneously admits that BAS has built multiple LaSalle facilities. McConnell Dep. 12:16-19; 13:1-6.

The corporate confusion deepens when McConnell attempts to explain the formation of the first LaSalle-branded entity. Initially, he claims to have created “Bayou Correctional, LLC” to manage a facility built by BAS. However, he then contradicts himself, stating that “LaSalle Correctional Center, LLC” was the first LaSalle-named entity. McConnell Dep. 13:24-25; 14:1-3. Pressed further, McConnell struggles to distinguish between these entities, stating:

> We have facilities with all sorts of names, and some of them have LaSalle in them, and some of them don’t… but if you just ask me in general how many facilities that we have… it’s probably around 16 right now maybe.

McConnell Dep. 14:20-25; 15:1-5. This deliberate ambiguity supports Plaintiff’s argument that LaSalle Management, LaSalle Southeast, and other LaSalle-branded companies are not separate at all, but merely different names for the same business operation.

McConnell acknowledges that LaSalle Management “provides support for… almost every facility in some fashion” and serves as a “back office” to these companies. McConnell Dep. 15:11-17. This back-office support includes payroll, insurance, and HR services for “every one of the companies… involved in our operation.” McConnell Dep. 15:18-25. Notably, McConnell gave his deposition from the LaSalle Management office, reinforcing that it is the administrative hub for all LaSalle-branded entities. McConnell Dep. 15:16-17. When asked who owns LaSalle Management, McConnell first claims he doesn’t know, stating only that it is owned by “a couple LLCs” that “we’ve changed the names of” due to “estate planning.” McConnell Dep. 16:1-15. When pressed further, he admits he does not even know if it is two LLCs and that he “cannot name them.” McConnell Dep. 16:17-20.

Despite his professed ignorance of LaSalle Management’s ownership, McConnell is somehow aware that ownership is divided 50/50 between his family and the Temple family. McConnell Dep. 18:1-6. However, the ownership has been further fragmented into “all sorts of legal entities” structured in such a way that “some of it literally probably goes to the kids.”

McConnell Dep. 18:1-13. He further admits: "It's pretty complicated… it may sound strange but I can't answer the question." McConnell Dep. 18:1-13. McConnell himself is uncertain whether he owns anything, stating: "I'm not even sure if I have anything I could sell… because the lawyers have made it pretty restrictive." McConnell Dep. 18:14-21.

McConnell's testimony demonstrates the deliberate obfuscation of corporate ownership and control, designed to shield LaSalle Management from liability while it continues to exert influence over its subsidiaries. His lack of knowledge extends even to LaSalle Management's leadership: He does not know if LaSalle Management has directors. McConnell Dep. 19:21-24; He does not know if LaSalle Management has a CEO, a president, or an executive director. McConnell Dep. 20:3-12; and he instead claims that decision-making is conducted by "all of the family members that are active in the operation of the company," including himself and four other family members. McConnell Dep. 21:15-22.

The corporate structure is so opaque that even its leadership does not understand it. When asked who Rodney Cooper works for, McConnell struggled to answer:

> "I'm not -- he works -- I'm not sure who -- where he gets his -- where he gets his work -- where he gets his check from. I think it's LaSalle -- no, maybe just Southwest Correction. He works out of Huntsville, Texas."

McConnell Dep. 22:12-17.

## I. LAW AND ARGUMENT

### A. Burden of Proof and Legal Standard

Whether a court may assert specific personal jurisdiction over a defendant depends on an affiliation between the forum and the underlying controversy. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). A plaintiff bears the initial burden of establishing a prima facie case of personal jurisdiction over a nonresident defendant. *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009). If the defendant persuasively

refutes jurisdiction, the burden shifts back to the plaintiff to substantiate jurisdictional allegations with its own competent evidence. *Santiago-Cruz v. Dignity Health Med. Found.*, 2024 U.S. Dist. LEXIS 58095, *3-4. Where there are conflicts in the evidence, the court makes all reasonable inferences in favor of the plaintiff. *Diamond Crystal Brands, Inc. v. Food Movers Int'l*, 593 F.3d 1249, 1257 (11th Cir. 2010); *Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir. 2002). Where the named corporation can't even articulate what it is and who controls it, the burden never shifts back to the Plaintiff.

In *Diamond Crystal Brands, Inc. v. Food Movers Int'l*, 593 F.3d 1249 (11th Cir. 2010), the Eleventh Circuit held that a nonresident defendant transacted business in Georgia where it placed orders into the state, paid money into the state, and coordinated with third parties in Georgia. *Id.* at 1264-1265. The court expressly rejected the argument that, because third-party customers picked up the goods, the defendant was not availing itself of the forum. *Id.* at 1265. Similarly, *Gold Kist, Inc. v. Baskin-Robbins Ice Cream Co.*, 623 F.2d 375, 380 (5th Cir. 1980), found that designating parties in Georgia to receive goods supported the exercise of personal jurisdiction.

Due process requires that the defendant has minimum contacts with the forum state and that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985). If a group of shell companies or indistinct family companies operate in hidden, confusing or unknown manner, then there is no due process violation is hauling them into a state like Georgia where they get paid. Due process is not a shield for appearing in court where the McConnells and their trade name "LaSalle Corrections" control and profit from business corporations. Everyone agrees

that LaSalle Management has the money and pays the payroll. There are it for jurisdictional purposes. He who controls the money controls the operations.

LaSalle has consistently conducted business in Georgia, though, due to the highly convoluted structuring of its management, it is difficult to assess exactly which acts were undertaken by which LaSalle actor. Cooper has travelled to the ICDC on four separate occasions and tries to make sure he can make it to "everywhere once a year" Cooper Dep. at 26:2-13. Cooper claims that he doesn't make such visits "to try to tell the warden what to do," but is there instead to express appreciation of "the hard work everybody does" on behalf of LaSalle. Cooper Dep. 18:8-13.

Cooper and/or McConnell demoted ICDC Warden Paulk.At the time of the deposition, Cooper noted that Warden Paulk still works at the ICDC, but has been replaced by Willie Thomas as Senior Warden. Cooper Dep. 26:14-27:10. Paulk was demoted after a conversation with Jay Eason, because there were "just a lot of things going on there and a lot of pressure on his time." Cooper Dep. 27:11-19. Cooper was relayed this info because he is "the one that provides . . . mentoring to help [ICDC Staff] get their job done . . . [and] provide that experience and expertise to the warden." Cooper Dep. at 28:6-9. In the initial stages of his Deposition, Cooper revealed that he provides "mentorship services" Jay Eason, who he identified as a regional staff member for LaSalle Southwest in charge of "the areas outside of Louisiana". Cooper Dep. at 8:23-9:24. However, Cooper soon changed his story, revealing that Eason exercises hiring and firing power over the wardens of ICDC on behalf of LaSalle Southeast. Cooper Dep. 18:14-25; *See also* Supp. Mem. in Supp. of Def. LaSalle Mgmt. Co., L.L.C.'s Mot. to Dismiss Pursuant to Rule 12(b)(2) & Rule 12(b)(6), 7, Wooten v. LaSalle Corrs., No. 7:22-CV-000148 (M.D. Ga. Valdosta Div.) ("LaSalle MTD Mem.") (Admitting that "Jay Eason, also

employed by LaSalle Southwest Corrections, provides guidance to the facilities outside of Louisiana, including the ICDC facility").

Another clear example is LaSalle Management's exercise of back-office control over the various regional LaSalle entities. McConnell, in his deposition, admitted that LaSalle Management "provides support for… almost every facility in some fashion", particularly back-office, executive functions, such as payroll, HR, and insurance, for "for every one of the [LaSalle] companies... involved in our operation." McConnell Dep. 15:11-25.

## III. THE FOUNDING OF THE LASALLE CORRECTIONS LOOSE ENTITIES

The LaSalle group of entities began with BAS (or "Billy, Ann, Susan" after McConnell and his sisters) Construction, a firm that transitioned into constructing prison facilities in around 1995, and which McConnel has since grown into a business that intakes 20 million dollars per year in revenue. McConnell Dep. 8:23-24; 10:9-12; 11:1-3. Though initially a sole proprietorship, BAS incorporated itself five years after McConnell, his sister Ann Temple, and Ann's Husband began to take control of operations. McConnell Dep. 10:22-25; 11:3-5; 12:1-3. The first entity legally bearing the LaSalle name came into being after BAS constructed a prison facility in LaSalle, naming the corporation in charge of the facility LaSalle Correctional Center LLC. McConnell Dep. 13:24-25; 14:1-3. Following the construction of a facility in LaSalle Parish, LaSalle Correction Center, LLC "was the name of that [LaSalle] facility". McConnell Dep. McConnell Dep. 14:5-9. Recently, McConnell has begun to pass the torch to his son, Wesley, who wields substantial "influence in the decisions made [in accounting]." McConnell Dep. 20:19-21:4.

McConnell, despite being a principal figure in LaSalle's ownership structure, failed to demonstrate any clear delineation of authority within the LaSalle entities. When asked who owns and controls LaSalle Management, McConnell stated that he was unsure of the exact ownership

and that the entity was structured for "estate planning" purposes. McConnell Dep. 16:1-15. Most significantly, despite his role as a founding member of the LaSalle operation, McConnell does not know if LaSalle Management has directors, a CEO, a president of the board, or an executive director, stating instead that it operates "more of a team." McConnell Dep. 20:3-12.

McConnell's display of confusion on this matter is so great, that despite having hired Rondey Cooper (who runs either LaSalle Southwest Corrections, LaSalle Management, or both,) McConnell claims not to know which LaSalle entity he hired Cooper to work for. Cooper Dep. 10:14-15; McConnell Dep. 22:15-22. McConnell has not even made this clear to Cooper himself, who does not seem to know which entity he works. *Compare* Cooper Dep. 7:16-22 (Cooper claiming that he works for LaSalle Southwest) *with* Cooper Dep. 15:3-16:9 (Cooper first claiming that he only "believe[s]" that LaSalle Management exists, and then promptly claiming to be its executive director).

McConnell's claims that he lacks knowledge on these matters are dubious. Both Dr. Hearn and Cooper described in their depositions how McConnell attends staff meetings across LaSalle entities at will and regularly engages in key executive discussions. Cooper Dep. 13:15-20; 14:4-6; Hearn Dep. 35:25-36:16. McConnell is unaware as to who exercises legal authority over LaSalle Management, but says that the family in general "listen[s] to [Rodney Cooper] with a high level of appreciation" with regards to operational policies. McConnell Dep. 24:21-25; 25:1-5. When asked to clarify who may actually exercise legal authority over LaSalle management, McConnell repeatedly refused to answer. McConnell Dep. 25:12-26:22. Even the Defendants are unable to clearly describe how executive authority is asserted over the LaSalle entities, describing McConnell's role as being "a member of the team responsible for authority over LaSalle Management." LaSalle MTD Mem., at 9. McConnell's efforts to obfuscate the

structure of the LaSalle entities has left purported executives clueless as to the role they play in the LaSalle web of companies. As a result, other executives, like Rodney Cooper, float between entities, because, in Cooper's words: "It's still – it's LaSalle." (Cooper Dep. 20:2)

## IV. NONE OF THE PRINCIPALS KNOW WHICH ENTITY DOES WHAT

Cooper admitted that while he played a key role in hiring Dr. Hearn, he could not definitively state which entity officially employed her. When asked about the reporting structure within LaSalle Management, he was unable to clearly delineate who held executive decision-making authority over the company. *See* Cooper Dep. 10:3-5,10-11; 10:15-20, 11:22-25 (insisting that he doesn't "really report to anybody," despite acknowledging that McConnell has the capacity to fire him). Cooper does not know who his own accountants are employed by. Cooper Dep. 12:13-25, 13:1-8. Though defendant claims that Rodney cooper "is not an employee of LaSalle management", Cooper's deposition directly rebuts this. *Compare* LaSalle MTD Mem., at 13 with Cooper Dep at 15:15-17. When asked about LaSalle Management's organizational structure, Cooper testified as follows:

> Q. And does LaSalle Management have a director?
> A. I'm the executive director that supervises those people in this Ruston office that do that back-office support.
> . . .
> Q. Are you the director of LaSalle Management?
> A. I'm the executive director that oversees the people that provide that support.

Cooper Dep. 15:15-25, 16:1-4.

Dr. Hearn's testimony shares this uncertain sentiment, confirming the lack of executive distinction between the LaSalle entities. Dr. Hearn knows that Cooper's title is Executive Director, and has seen him around the office, but does not understand which company he works for. Hearn Dep. 15:23-25; Hearn Dep. 16:1-10. Dr. Hearn hired and continues to oversee a variety of operational directors, but doesn't know which entity she hired them for, or which who

provides the money for their employment. Hearn Dep. 20-21; 22:1-7. Hearn's understanding is that "LaSalle is led by a corporate management team." Hearn Dep. 31:21-25. However, Dr. Hearn does not recognize any distinction between LaSalle entities in their management by this corporate management team. Hearn Dep. 33:19-23.

Crucially, Dr. Hearn's testimony reveals that this amorphous corporate management team takes ultimately responsible over "the health and well-being of those entrusted to [its] care", controlling the policies administered in service of this goal. Hearn Dep. 32:5-23. Defendants attempt to frame Hearn as the Medical Director of CorrectMed, who was merely "acting as a medical consultant for LaSalle Southeast". LaSalle MTD Mem. at 5, 14. This simply not true. Dr. Hearn herself claimed in her deposition that she "work[s] for LaSalle . . . as their . . . Medical Director". Hearn Dep. 16:11-17. Likewise, though defendants claim that Hearn "had no role in hiring or training staff at any particular LaSalle facility, including at the ICDC facility in Ocilla, GA", this is flatly contradicted by Hearn's testimony that she has overseen the ICDC since 2020, hiring numerous support staff, and providing "mentorship" to IDCD employees. LaSalle MTD Mem., at 5; Hearn Dep. at 17-18; 20-21; 24:2-12; 25:1-7.

## V. NONE OF THE DEPONENTS WERE ABLE TO IDENTIFY THE DEGREE TO WHICH THE LASALLE ENTITIES HAVE FINANCIAL INDEPENDENCE, AND THE STRUCTURE OF THE ENTITIES IS DESIGNED TO BENEFIT THE INTERESTS OF THE MCCONNELL ESTATE.

The depositions reveal a pervasive lack of clarity regarding the financial independence of LaSalle's various entities. None of the deponents could confidently identify how salaries are paid, who exercises financial control, or how finances are divided between the LaSalle entities. Rodney Cooper, the Executive Director of LaSalle Management, displayed uncertainty regarding his own salary structure. While he assumes that McConnell sets his salary, he ultimately admitted that he was unsure of this fact. Cooper Dep. 14:8-12. Similarly, Dr. Hearn, who serves in a

leadership role overseeing medical operations across LaSalle facilities, stated that she does not know which entity pays her salary. Hearn Dep. 14:1-3. This confusion extends to those working under her, as Hearn, despite personally hiring several employees, testified that she does not know which LaSalle entity employs them or provides the funds for their salaries. Hearn Dep. 20-22.

McConnell's deposition further exemplified the lack of financial independence surrounding the entities. McConnell first claimed that he did not know who owned LaSalle Management, asserting that ownership was split among "a couple LLCs," but when pressed, he admitted that he was unsure if even two LLCs were involved, stating that he could not name them. McConnell Dep. 16:1-20. Despite this, McConnell acknowledged that the LaSalle assets are divided half-and-half between his family and the Temple family, but the ownership has been deliberately obfuscated to facilitate rival estate planning interests. McConnell Dep. 16:1-15. Furthermore, he admitted that he does not know the financial ownership structure of LaSalle Southwest or LaSalle Southeast but "thinks" they are owned 50/50 between the McConnell and Temple families. McConnell Dep. 23:15-25; 24:1.

This intermingling of financial assets is so severe that McConnell is unsure whether he personally holds any sellable stake in LaSalle due to legal structuring that has made it "pretty restrictive." McConnell Dep. 18:14-21. Importantly, the financial assets of the LaSalle entities appear to be interchangeable, with McConnell referring to their ownership collectively:

> "we have facilities with all sorts of names, and some of them have LaSalle in them, and some of them don't… but if you just ask me in general how many facilities that we have… it's probably around 16 right now maybe"

McConnell Dep. 14:20-25; 15:1-5. Ultimately, this structure leaves the location of key LaSalle assets and profit unknowable, especially since entities like LaSalle southeast operate in an undercapitalized state paying their bills directly from existing contract fees. Cooper Dep. 21:18-23.

## VI. NONE OF THE LASALLE ENTITIES HAVE PROPERLY MAINTAINED THE CORPORATE FORM, AND ACCORDINGLY SHOULD BE TREATED AS A SINGLE "LASALLE CORRECTIONS" ENTITY.

Jurisdictional discovery has revealed that the LaSalle entities operate not as separate corporations, but as an amorphous, and indiscernible web of overlapping authority and financial capacity. While some evidence indicates that LaSalle Management provides what might be deemed this web's "nerve-center", the mix of ignorance and willful obstinance exhibited by deponents makes identifying the exact dispersion of assets and control impossible to identify at this stage. This much is clear: LaSalle is deliberately designed to shield McConnell and other stakeholders from liability through a blatant disregard of the corporate form. Accordingly, each LaSalle entity should be regarded as an Alter-Ego of each other, and jointly subject to personal jurisdiction in the State of Georgia.

Courts have "consistently acknowledged that it is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be subject to personal jurisdiction in that court when the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court". *See RMS Titanic, Inc. v. Zaller*, 978 F. Supp. 2d 1275, 1301-1302 (N.D. Ga. 2013) (quoting *Patin v. Thoroughbred Power Boats*, 294 F.3d 640, 653 (5th Cir. 2002)); *CHIS, LLC v. Liberty Mut. Holding Co.*, 2015 U.S. Dist. LEXIS 90175, *6-7 (M.D. Ga. 2015). Traditionally, two or more entities are alter egos of each other when the subsidiary is a mere instrumentality of the parent; and adhering to corporate separateness would promote injustice or fraud. *Conley v. Bostic*, 1993 U.S. Dist. LEXIS 20260, *42 (N.D. Ga. 1993), and *Ralls Corp. v. Huerfano River Wind, LLC*, 27 F. Supp. 3d 1303, 1328 (N.D. Ga. 2014). Corporations may be deemed alter egos even lacking a formal parent-subsidiary, or sibling relationship. *See Kinney Shoe Corp. v. Polan*, 939 F.2d 209, at 213*; See also*, *Cobra 4*

*Enterprises v. Powell-Newman*, 336 Ga. App. 609, at 613 (Describing how an owner who has created multiple legally distinct corporations for the express purpose of protecting his assets may be held personally liable for the actions of those corporations).

To determine whether two or more entities serve as alter egos, courts assess the following criterion: (1) that the stockholders' disregard of the corporate entity made it a mere instrumentality for the transaction of their own affairs; (2) that there is such a unity of interest and ownership that the separate personalities of the corporation and the owners no longer exist; and (3) that to adhere to the doctrine of corporate entity would promote injustice or protect fraud." *Functional Prods. Trading, S.A. v. JITC, LLC*, No. 1:12-CV-355-WSD, 2014 U.S. Dist. LEXIS 102775, at *25-26 (N.D. Ga. 2014) (quoting *Derbyshire v. United Builders Supplies, Inc.*, 392 S.E.2d 37, 40 (Ga. Ct. App. 1990)). *See also Wm. Passalacqua Builders v. Resnick Developers S.*, 933 F.2d 131, 139 (2nd Cir. 1991) (Providing a more detailed ten factor test for piercing the veil of a shell corporation, and noting that an "infinite variety of situations that might warrant disregarding the corporate form").

The organizational and operational strategies of the McConnell and Temple families, in their management of the LaSalle entities, have fundamentally disregarded the corporate form. LaSalle operates as a singular "private institution[.]" Hearn Dep. Ex. 1, 6-7 ("Ultimately, private institutions such as LaSalle are partners with the Immigration and Customs Enforcement agency and, as such, strive to provide excellence in the medical management of the detainees under their care"). The LaSalle group is "led by a Corporate Management Team . . . providing safe, secure, and humane surroundings for. . . the communities in which [they] operate, such as Irwin County, Georgia." Hearn Dep. Ex. 1, 2. This management team governs LaSalle through "longstanding, family-based values" and allegedly "*believes* that detainees should be afforded all reasonable

opportunity to make informed decisions regarding their health care." Hearn Dep. Ex. 1, 5 (emphasis added). Accordingly, LaSalle as a whole has a "policy to provide detainees with access to a grievance system that protects their rights and ensures fair review of their grievances, including those related to medical care." Hearn Dep. Ex. 1, 5.

## VII. AN AMORPHOUS "MANAGEMENT TEAM" IS RESPONSIBLE FOR THE HUMAN RIGHTS OF DETAINEES AT THEIR FACILITY IN GEORGIA—THEY MUST BE ACCOUNTABLE

This management strategy placed Covid Policy in the hands of LaSalle's central management team. Hearn Dep. Ex. 1, 2 ("It is LaSalle's policy to ensure that all detainees have access to appropriate and necessary medical care…"). During the pandemic, LaSalle integrated a uniform set of policies across its various entities, applying the same policy "for everybody everywhere." Cooper Dep. 28:21-22. This included helping the wardens to interpret ICE and U.S. Marshal guidelines during the pandemic. Cooper Dep. at 29:10-17. As part of this management strategy, Dr. Hearn began overseeing the ICDC in January of 2020, and visited in February or March of 2020, "to provide guidance to the medical staff" right before the Covid lockdowns. Hearn Dep. at 24:2-6; 34:4-7; Cooper Dep. at 30:10-11. Hearn takes full ownership over the medical operations of the ICDC, stating in front of congress that: "[She was] responsible for the medical operations and deployment of health resources to support a number of medical facilities, including the Irwin County Detention Center's Medical Department." Hearn Dep. *at 24:25-25:7.*

In fulfilling these duties, Dr. Hearn relies on her "years of experience in corrections [and] strong insights into the field of correctional medicine" to "give advice" and "attention" to staff and reviewing audit reports. Hearn Dep. 17:16-20; 19:4-5. Hearn "communicate[d] with ICE to establish clinical policy, procedures, and protocols, and analyze audit results to ensure patient care meets the expected standards." Hearn Dep. Ex. 2, 1. During her employment Dr. Hearn has

attended meetings with McConnell monthly. Hearn Dep. at 36. Hearn also collaborated with Cooper, who hired her, to "make sure that medical [was] getting the guidance and mentoring and direction and support that they would need." Cooper Dep. at 30:21-22; 31:4-18.

## VIII. CONCLUSION

Because LaSalle has failed to provide transparency regarding the separation of financial operations, corporate ownership, and asset management, treating the LaSalle entities as distinct would promote injustice. Accordingly, this Court should reject LaSalle Management's attempt to evade liability by exploiting the complexity of its own corporate structure and deny the Motion to Dismiss.

Respectfully submitted on February 10, 2025.

/s/ Thad M. Guyer
________________________________
Thad M. Guyer (pro hac vice)
T.M. Guyer and Ayers & Friends, PC
116 Mistletoe Street
Medford, OR 97501
(206) 954-1293
thad@guyerayers.com/tmguyer@tmguyer.com

and

John P. Batson (Ga. Bar No. 042150)
The Law Office of John P. Batson
P.O. Box 3248
Augusta, GA 30914-3248
(706) 722-8191
jpbatson@aol.com

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I certify that on February 10, 2025, I electronically filed the foregoing **CORRECTED SUPPLEMENTAL BRIEFING IN OPPOSITION TO MOTION TO DISMISS** with the Clerk of Court using the CM/ECF system, which will send notice of filing and a copy of same to ALL COUNSEL ON RECORD.

/s/ Thad M. Guyer
________________________________
Thad M. Guyer