## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA
## VALDOSTA DIVISION

**DAWN WOOTEN,**

    Plaintiff,

v.

**CIVIL ACTION NO. 7:22-cv-00148-WLS**

**LASALLE MANAGEMENT COMPANY, L.L.C, LASALLE SOUTHEAST, LLC,** and **DAVID PAULK**, an individual,

    Defendants.

_____

### MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants LaSalle Southeast, LLC ("LaSalle") and David Paulk (collectively, "Defendants") respectfully submit this memorandum in support of their motion for summary judgment.

### FACTUAL BACKGROUND

#### *Plaintiff's Employment with LaSalle*

Plaintiff began her third and most recent stint of employment as an LPN at the Irwin County Detention Center (ICDC) in October of 2019. Ex. 1 at 69:10-12. Prior to her most recent stint, Plaintiff worked on PRN status at ICDC in 2016. Ex. 1 at 71:19-72:8, 145:7-19. Plaintiff was aware of and familiar with the requirements of LaSalle's employee grievance procedure. Ex. 1 at 81:10-82:18; Ex. 1-7. Plaintiff was aware of LaSalle's General Rules of Conduct and tardiness, absenteeism, and no-call/no-show policies. Ex. 1 at 160:25-161:19; Ex. 1-16. Plaintiff was familiar with LaSalle's no-call, no-show policy set forth in the employee handbook and standalone no-call, no-show policies, which she acknowledged on three separate occasions. Ex. 1 at 161:20-164:8; Ex. 1-17; Ex. 1-18; Ex. 1-19; Ex. 1-20.

1

*Plaintiff's Alleged Complaints Prior to Her Change in Status to PRN*

Plaintiff alleges that she complained verbally about issues such as blood on the floors of the ICDC medical facility, sour mops, and other related issues, but she did not make these complaints in writing, and could not provide specific details about what complaints were made to whom and when and acknowledged that these issues were *her* responsibility to address. Ex. 1 at 111:3-114:16. Plaintiff alleges that she reported a lack of COVID-19 testing of detainees in late March or April of 2020, but she was unaware of the precise timing of the alleged complaint and unaware of whether a provider order was required to test detainees for COVID-19. Ex. 1 241:10-244:16.

Plaintiff alleges that she reported shredding of COVID-19 test results by Health Services Administrator Lakeysia Brown after Ms. Brown had already made copies of the records in question. Ex. 1 at 244:17-245:7, 256:9-15. There are multiple legitimate reasons to shred medical records, including once the record has been digitized, or if a facility had duplicate copies of the same record, and ICDC medical staff regularly shredded records that were captured elsewhere in paper or electronically. Ex. 2 at 51:8-52:1. Plaintiff alleges she reported that detainees were subjected to medical procedures without providing informed consent, but she could not identify a single detainee whose chart she reviewed that lacked informed consent for any procedure, and Plaintiff did not have access to the *hospital* records where procedures were actually performed. Ex. 1 at 275:9-277:13.

*Plaintiff's Attendance Issues and Change in Status to PRN*

Although she denies seeing letters of correction documenting her tardiness, Plaintiff acknowledges LaSalle's contemporaneous time records demonstrating that she was late for her scheduled shifts on June 9, 2020; June 14, 2020; June 17, 2020; and June 18, 2020. *See* Ex. 1 at

2

165:5-171:6; 1-22; 1-23; 1-24; 1-25; 1-26. On June 22, 2020, Plaintiff stopped going to work for her scheduled shifts because she received a test for COVID-19, a test which ultimately displayed a negative result. Ex. 1 at 120:14-123:1. During the time she was out awaiting her COVID-19 test results, Human Resources Manager Joan Whitley informed Plaintiff that she needed to follow LaSalle's No Call-No Show Policy and call her supervisor every morning to inform her supervisor if she would be absent. Ex. 1 at 128:24-129:24, 133:11-134:7. Plaintiff did not call in or attend work the following week, allegedly because Ms. Brown told her she did not need to in an undocumented conversation. Ex. 1 at 135:25-136:137:1, 142:1-5, 186:11-193:14; Ex. 1-29; Ex. 1-30; Ex. 1-31; Ex. 1-32.

On July 2, 2020, Plaintiff's employment status was changed from full-time to PRN. Ex. 1 at 149:11-13. Warden David Paulk had the ultimate authority to terminate and issue discipline up to termination, and decisions about termination were made in consultation with Regional Director James McCormick. Ex. 3 at 23:9-24:10; Ex. 5 at 32:1-6. Warden Paulk made the decision to change Plaintiff's status from full-time to PRN, in consultation with Mr. McCormick who agreed with and supported the decision. Ex. 3 at 28:1-16; Ex. 5 at 59:21-60:5; Ex. 6, ¶ 2. Warden Paulk made the decision to change Plaintiff's status from full-time to PRN based on her attendance issues. Ex. 5 at 60:6-61:9; Ex. 6, ¶ 3. Although termination was warranted based on Plaintiff's attendance history, Warden Paulk and Mr. McCormick instead decided to place her on PRN status in hopes of continuing to use her nursing skills and ability to cover shifts. Ex. 3 at 29:12-30:4; Ex. 5 at 61:10-18.

At the time Mr. McCormick participated in the decision to change Plaintiff's status from full-time to PRN, he was unaware of any of her alleged complaints. Ex. 4 at 17:23-18:5. At the time Warden Paulk made the decision to change Plaintiff's status from full-time to PRN, he was

3

unaware of any of her alleged complaints regarding COVID-19-related procedures or alleged improper medical procedures performed on female detainees. Ex. 5 at 59:9-12, 61:19-22, 65:20-66:9; Ex. 6, ¶¶ 4-8. Due to the necessity of ensuring that nursing shifts were covered in the height of a global pandemic, Warden Paulk would have made the same decision to change Plaintiff's status from full-time to PRN based on her attendance issues even if he *had* known about her alleged complaints. Ex. 6, ¶¶ 9-10.

On July 3, 2020, after her change in status from full-time to PRN, Plaintiff submitted a handwritten grievance to LaSalle. Ex. 1 at 117:17-118:5; Ex. 1-11. Plaintiff's July 3, 2020 grievance concerned the change to PRN status but made no mention of any alleged concerns or prior complaints related to COVID-19 policies or procedures at ICDC or related to allegedly unauthorized medical procedures. Ex. 1 at 119:17-120:17, 123:18-25; Ex. 1-11. Instead, Plaintiff's grievance focused on alleged friendships and familiar relationships between other members of staff and supervision of the nursing unit at ICDC. Ex. 1 at 124:8-125:12; Ex. 1-11; Ex. 2 at 40:10-25, 44:18-45:18.

Before her change in status from full-time to PRN, Plaintiff removed three detainees' medical records from ICDC despite knowledge that such actions violated the detainees' HIPAA rights and without permission from the detainees whose medical records she removed from the premises. Ex. 1 at 97:14-99:25, 253:24-255:5. Warden Paulk would have immediately terminated Plaintiff's employment had he learned at the time that she removed detainee medical records from the facility without authorization. Ex. 6, ¶ 11.

### *Plaintiff Refuses to Work as PRN Employee*

After LaSalle transitioned Ms. Wooten from a full-time position to a PRN position, she did not apply for any subsequent full-time positions despite seeing openings for full-time positions.

4

Ex. 1 at 42:20-43:7; Ex. 2 at 54:25-55:6. LaSalle does not offer open positions to internal candidates unless those candidates apply for the open positions and complete an interview process. Ex. 2 at 32:8-19, 33:25-34:10. LaSalle repeatedly attempted to schedule Plaintiff for PRN shifts, and Plaintiff repeatedly refused to provide availability or accept the work offered, ultimately leading LaSalle to no longer attempt to schedule her. Ex. 2 at 27:11-29:8, 35:18-36:10.

On July 22, 2020, after Plaintiff's transition from full-time to PRN, LaSalle attempted to schedule Plaintiff for nearly full-time shifts throughout late July and early August of 2020. Ex. 1 at 194:13-196:24; Ex. 1-33; Ex. 1-34. Plaintiff originally confirmed availability to work on July 24, 25, and 26, 2020, before stating she was unavailable after unrelated modifications to her proposed schedule. Ex. 1 at 200:18-211:20. On August 5, 2020, Ms. Bell emailed Plaintiff asking for her availability for the month of September; Plaintiff did not respond to this email. Ex. 1 at 230:5-24; Ex. 1-40. On August 13, 2020, Ms. Bell emailed Plaintiff offering shifts throughout late August and reminding Plaintiff to provide her availability to work during the month of September. Ex. 1 at 213:21-214:14; Ex. 1-37. On August 14, 2020, Ms. Bell emailed Plaintiff offering shifts available in September, and Plaintiff did not respond to inform Ms. Bell of her availability. Ex. 1 at 217:14-220:10; Ex. 1-38.

Throughout her time as a PRN employee, Plaintiff never provided available dates to work in response to LaSalle's repeated requests. Ex. 1 at 225:16-228:21; Ex. 1-39. Plaintiff never provided available dates to work in October, November, or December of 2020, despite remaining on PRN status. Ex. 1 at 238:23-239:3.

### Plaintiff's OIG Complaint and "Hiding" in Atlanta

On September 8, 2020, Plaintiff executed a verified declaration outlining her alleged complaints against ICDC/Defendants. Ex. 1 at 105:1-106:1; Ex. 1-10. Prior to Plaintiff's

#111931074v3

September 8, 2020 complaint, LaSalle management had no knowledge of any complaints by Plaintiff related to COVID-19 violations, PPE deficiencies, and/or detainee medical treatment. Ex. 2 at 36:19-37:3. Just after making her September 2020 complaint, for the end of 2020 into 2021, Plaintiff resided in a series of hotels in Atlanta for nine months with her four children. Ex. 1 at 32:6-24; 33:10-23; 34:6-35:1. The drive to the ICDC facility from Atlanta was approximately three hours each way, and Ms. Wooten was living with four children, one of whom is disabled. Ex. 1 at 39:7-16. During her time living in Atlanta, Plaintiff did not apply to any nursing jobs and was living "in hiding." Ex. 1 at 55:9-23.

**LAW AND ARGUMENT**

### I.    Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Frederick v. Phillips*, No. 25-63, 2026 U.S. Dist. LEXIS 97948, at *2 (M.D. Ga. May 4, 2026) (quoting F.R.C.P. 56(a)). "Summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.*, at *3 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). "A genuine  issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a **reasonable jury** to return a verdict in its favor." *Id.* (quoting *Grimes v. Miami Dade Cnty.*, 552 F. App'x 902, 904 (11th Cir. 2014) (other quotation omitted)) (emphasis added).

An issue of fact is "material" is it is a "legal element of the claim under the applicable substantive law which might affect the outcome of the case"; it is "genuine" if "the record taken

6

as a whole could lead a **rational trier of fact** to find for the nonmoving party." *Id.* (quotations

omitted, emphasis added). The movant bears the initial burden to show there is no genuine issue

of material fact by presenting evidence of such or by "demonstrating that the nonmoving party has

failed to present evidence in support of an element of its case on which it bears the ultimate burden

of proof." *Id.*, at *3-4.

To avoid summary judgment, the nonmoving party must "do more than simply show that

there is some metaphysical doubt as to the material facts." *Id.* (quoting *Matsushita Elec. Indus.

Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

## II.    The Court Should Grant Summary Judgment on Plaintiff's Remaining Claim under Section 4712.

Plaintiff's remaining claim arises under the National Defense Authorization Act (NDAA)

whistleblower protection provisions, 41 U.S.C. § 4712 ("Section 4712"). The NDAA "protects

employees of federal 'contractor[s], subcontractor[s], grantee[s], [and] subgrantee[s] or personal

services contractor[s]' from their employers' retaliation for disclosing information that the

employee **reasonably believes** to be evidence of gross mismanagement of a federal contract or

grant, an abuse of authority related to a federal contract or grant, or a violation of a law, rule, or

regulation pertaining to a federal contract or grant." *Fuerst v. Hous. Auth. of the City of Atlanta*,

38 F.4th 860, 863 (11th Cir. 2022) (quoting 41 U.S.C. § 4712(a)(1)) (emphasis added).

The elements of a claim under the NDAA are as follows:

> For an employee to be protected, the NDAA requires (**1**) the employee to
> reasonably believe he was disclosing evidence of gross mismanagement of a
> Federal contract or grant, a gross waste of Federal funds, an abuse of authority
> relating to a Federal contract or grant, a substantial and specific danger to public
> health or safety, or a violation of law, rule, or regulation related to a Federal
> contract…or grant[,] (**2**) the employee made his protected disclosure to a required
> person, defined as a management official or other employee of the contractor…who
> has the responsibility to investigate, discover, or address misconduct, and (**3**) the
> protected disclosure was a contributing factor to an adverse personnel action.

7

*Pritchard v. Metro. Wash. Airports Auth.*, No. 18-1432, 2019 U.S. Dist. LEXIS 191525, at *36-37 (E.D. Va. Nov. 4, 2019) (quotations omitted, emphasis added).

Even if the employee meets the burden of establishing the three elements of the claim, the employer may establish a defense by presenting "clear and convincing evidence that it would have taken the same personnel action in the absence of such disclosure." *Id.*, at *37 (quoting 5 U.S.C. § 1221(e)(2)). The NDAA mirrors and adopts the standards of the Whistleblower Protection Act of 1989 (WPA), and "caselaw interpreting the WPA provides analytical guidance." *Fuerst*, 38 F.4th at 872.

Here, Plaintiff's claims involve two sets of alleged protected activity: (1) complaints made to Ms. Brown and/or Ms. Bell regarding detainee medical treatment, COVID-19 policies and compliance at ICDC, and use of personnel protective equipment at ICDC prior to her July 2, 2020 change in status from full-time to PRN; and (2) her September 8, 2020 complaint to the OIG. Defendants address each category of alleged protected activity in turn, and summary judgment is warranted as to each. Further, summary judgment is warranted on the claim in its entirety based on clear and convincing evidence that Defendants would have terminated Ms. Wooten's employment *prior to* her change in status to PRN had they learned that she admitted violating HIPAA by absconding with patient medical records.

### A.  Plaintiff's Allegations Prior To Her Change in Status to PRN

To the extent Plaintiff's claim is based on her alleged protected activity prior to her change in status to PRN, it cannot survive summary judgment because there is no genuine issue of material fact that (1) Plaintiff did not **reasonably believe** she was disclosing evidence of any of the categories of conduct enumerated in the NDAA, and (2) Plaintiff cannot establish that her alleged protected activity was a **contributing factor** in the decision to transition her to PRN, and even if

8

#111931074v3

it was, there is clear and convincing evidence that LaSalle and Warden Paulk would have taken the same personnel action regardless of whether Plaintiff made any such complaints.

### *Reasonable Belief of Evidence of Wrongdoing*

Plaintiff cannot establish that she had a reasonable belief that she was disclosing evidence of wrongdoing as set forth in the NDAA. The Eleventh Circuit has adopted the Federal Circuit's definitions of "reasonable belief" under the WPA in the context of NDAA claims. *See Fuerst*, 38 F.4th at 872-73. To determine whether there is "reasonable belief":

> The proper test is…[whether] a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee reasonably conclude[s] that the actions of the government evidence gross mismanagement[.] A purely subjective perspective of an employee is not sufficient even if shared by other employees.

*Id.* at 873 (quoting *Lachance v. White*, 174 F.3d 1378, 1381 (Fed. Cir. 1999)). "[D]ebatable differences of opinion concerning policy matters are not protected disclosures." *Id.* (quoting *White v. Dep't of Air Force*, 391 F.3d 1377, 1382 (Fed. Cir. 2004)). "Congress limited whistleblower protection to disclosures about particularly egregious conduct, not run-of-the-mill policy disputes between managers and employees." *Id.*

"In sum, section 4712(a) thus asks whether an employee has an **objectively reasonable belief** that the disclosed information evidenced 'such serious errors…that a conclusion…[of] err[or] is not debatable among' objectively reasonable persons with knowledge of essential facts." *Id.* (quoting *White*, 391 F.3d at 1382)) (emphasis added). Additionally, the WPA, and by extension the NDAA, is not "a weapon in arguments over policy or a shield for insubordinate conduct." *Lockhart v. DOD*, No. 24-11177, 2025 U.S. App. LEXIS 8775, at *6 (11th Cir. Apr. 14, 2025) (quoting *Lachance*, 174 F.3d at 1381). Instead, the WPA, and by extension the NDAA, "was intended to protect employees who disclose 'genuine violations of law, not to encourage

9

employees to report minor or inadvertent miscues.'" *Id.* (quoting *Herman v. Dep't of Justice*, 193 F.3d 1375, 1382 (Fed. Cir. 1999)).

To establish a reasonable belief, Plaintiff must articulate specific complaints she reasonably believed constituted the presentation of evidence of "gross mismanagement," "gross waste of Federal funds," "abuse of authority," a "substantial and specific danger to public health or safety," or a "violation of law, rule, or regulation related to a Federal contract." In terms of her conduct prior to her change in status, she cannot do so.

*First*, with respect to Plaintiff's alleged complaints regarding the cleanliness of the facility, blood spilled on the floors, and the mops being used to clean the medical facility, Plaintiff acknowledged that it was *her responsibility* as an LPN to address and remedy these issues. Plaintiff complaining, to the extent she did, about having to do her job is not an objectively reasonable belief of "gross mismanagement" or any of the other enumerated protected complaints under the NDAA. This is, at best, a disagreement between an employee and management over completion of a required task that is not protected conduct.

*Second*, on Plaintiff's complaint about the alleged shredding of medical records, again, Plaintiff has no evidence that she took any efforts to confirm those records were actually improperly destroyed. On the contrary, Plaintiff acknowledged that Ms. Brown retained additional copies of the records that were allegedly shredded in her backpack and stated that she did not independently reconstruct the shredded documents or examine the electronic records to determine whether the results had been digitized. Dr. Hearn testified that there are a variety of legitimate (and even necessary) reasons to shred duplicate copies of medical records. No reasonable disinterested observer could conclude that merely observing her supervisor shredding records constitutes evidence of gross mismanagement, an abuse of power, or a violation of law.

#111931074v3

*Third*, perhaps least reasonable were Plaintiff's baseless complaints regarding Dr. Mahendra Amin and alleged unnecessary gynecological procedures. Plaintiff alleges that she reported Dr. Amin was performing medical procedures without informed consent, but she acknowledged that those procedures were done in a hospital, and that she did not review any hospital records to determine whether Dr. Amin obtained informed consent. She also alleged that Dr. Amin was performing unnecessary medical procedures, but she acknowledged that she is not a physician and is not qualified to opine on the necessity of a medical procedure.

One federal district court in Georgia has examined these allegations in close detail, granting Dr. Amin's motion for summary judgment, in part, against NBC Universal for defamation based on NBC's airing of Plaintiff's baseless, unreasonable allegations (following her transition to PRN). *See Amin v. NBCUniversal Media, LLC*, No. 21-56, 2024 U.S. Dist. LEXIS 112755, at *47-56 (S.D. Ga. June 26, 2024) (holding that many of Plaintiff's statements regarding medical procedures at ICDC are "statements of fact" that "have been proved false").

*Fourth*, The only contemporaneous evidence regarding Plaintiff's grievance surrounding her change in status to PRN strongly supports that she did not have any reasonable belief there was evidence of wrongdoing protected by the NDAA. After Plaintiff was informed of the decision to change her status to PRN, Plaintiff submitted a handwritten July 3, 2020 grievance letter, formally outlining why she believed LaSalle made this decision. The grievance letter contains lengthy diatribes against HSA Brown and Nurse Bell, alleging their interpersonal relationship led to favoritism and unsound personnel decisions. *At no point in that grievance* did Plaintiff allege violations of COVID-19 guidelines, issues with detainee medical treatment, or any of the other issues raised in her September 8 complaint drafted after she retained counsel. Despite her clear knowledge of LaSalle's grievance procedures, she submitted no formal internal grievance

regarding her alleged complaints prior to her change in status.

Given the lack of contemporaneous evidence of *any* of her alleged complaints and in the face of clear evidence that her grievance with Ms. Brown and Ms. Bell was of a purely personal nature, no reasonable jury could conclude that Plaintiff reasonably believed she had disclosed evidence protected by the NDAA.

All in all, Plaintiff cannot articulate a specific complaint with any reasonable belief in her reports, and summary judgment is appropriate on this basis alone with respect to Plaintiff's claim related to her activities prior to her change in status from full-time to PRN.

### *Contributing Factor Analysis*

Even if Plaintiff can establish that she did, in fact, make protected disclosures, she cannot establish that such disclosures were a contributing factor in Defendants' decision to change her status to PRN. To establish that her alleged protected disclosures were a "contributing factor" in the decision to change her employment status, Plaintiff must present evidence that "(A) the official taking the personnel action knew of the disclosure; and (B) the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure…was a contributing factor in the personnel action." *Kewley v. Dep't of Health & Hum. Servs.*, 153 F.3d 1357, 1361-62 (Fed. Cir. 1998).

At the 12(b)(6) stage, the Court concluded, based on Plaintiff's allegations in the Complaint that were taken as true at the time, that Plaintiff sufficiently alleged knowledge of Warden Paulk, the ultimate decision maker, regarding her alleged disclosures. However, discovery has revealed that Plaintiff cannot create a genuine issue of fact as to whether Warden Paulk had knowledge of any of her alleged complaints. Warden Paulk testified in no uncertain terms that he was unaware of *any* complaints by Plaintiff prior to her change in employment status and did not learn of any

#111931074v3

complaints by Plaintiff on any issues until her July 3, 2020 letter. Ex. 5, ¶¶ 7-8.

Following the Court's ruling at the 12(b)(6) stage, Defendants issued a targeted interrogatory in an attempt to ascertain Plaintiff's basis for imputing knowledge of her alleged disclosures on Warden Paulk:

> **INTERROGATORY NO. 7:** Please describe all facts which support your statement that Defendant David Paulk "was aware of all the violations and complaints by staff," as alleged in Paragraph 45 of your Second Amended Complaint, and which specific complaints you made of which he was aware.

> **RESPONSE NO. 7:** Plaintiff objects to this Interrogatory as overbroad, disproportionate, and potentially chilling to whistleblower activity. Subject to these objections and after reasonable inquiry, Plaintiff responses as follows:

> - Chain of Command: Complaints to HSA Brown and DON Bell were required to be documented and forwarded to Warden Paulk; DHS/ICDC policy required written reports discussed at management meetings he attended. (SAC ¶45)
> - Management Style: Paulk was known as a hands-on administrator who kept informed about facility operations. Brown and Bell did not conceal staff concerns from him. (SAC ¶45)
> - Memoranda: Paulk issued memoranda on issues Plaintiff raised, minimizing problems but confirming his awareness. These created a "false appearance of compliance" during inspections. (SAC ¶85)
> - PPE Control: Pailk personally controlled N-95 mask distribution, keeping supplies in his office. When HSA Cole requested masks in April 2020, it confirmed Paulk's knowledge of shortages raised by Plaintiff. (SAC ¶57)
> - Direct Reprimand (July 2, 2020): Plaintiff confronted Paulk about a reprimand while awaiting COVID-19 test results, Paulk escalated discipline to demotion, reflecting awareness of her prior complaints. (SAC ¶92, 100)
> - Retaliatory Actions: Paulk decided to issue a reprimand, demote Plaintiff to PRN, assign no hours, and effectively terminate her employment. These actions show his knowledge of her disclosures. (SAC ¶26; Court Order 9/10/24 at 19)
> - HR Confirmation: HR Director Joan Whitley told Plaintiff to route complaints to HSA Brown, ensuring Paulk's awareness. (SAC ¶85)
> - Court Recognition: The Court has already held that Plaintiff's allegations permit the inference that Paulk knew of her disclosures. (Order 9/10/24 at 19)
> (2024 to Jan. 2025) (not retained after 120 probationary period). [sic]

> Specific complaints Paulk was aware of include: inadequate testing, insufficient PPE, improper sanitation, failure to isolate COVID-positive detainees,

13

shredding/falsification of medical records, lack of informed consent for gynecological procedures, and lack of staff training on COVID-19 protocols.

Ex. 7[1] at 8-9.

None of these assertions is competent summary judgment evidence to create a genuine issue of material fact as to Warden Paulk's knowledge.

*First*, that HSA Brown and DON Bell were required to pass along complaints to Warden Paulk (even if true) is not evidence that they actually did. Plaintiff can cite no testimony from either former staff member that she informed Warden Paulk of any complaints from Plaintiff. This is merely speculation. *See Fitzgibbon v. Fulton Cty.*, 842 Fed. Appx. 385, 389 (11th Cir. 2021) ("All reasonable inferences arising from the undisputed facts should be made in favor of the nonmovant, but an inference based on speculation and conjecture is not reasonable.") (quotation omitted); *Pouyeh v. Pub. Health Trust of Jackson Health Sys.*, No. 16-23582, 2023 U.S. Dist. LEXIS 130173, at *26 (S.D. Fla. July 27, 2023) (quoting *Gen. Longshore v. Pate Stevedore Co.*, No. 91-30292, 1993 U.S. Dist. LEXIS 18638 (N.D. Fla. Dec. 30, 1993), *aff'd* 41 F.3d 668 (11th Cir. 1994)) ("A party's mere "belief" and/or speculation is not based on personal knowledge and is not competent summary judgment evidence.").

*Second*, Warden Paulk's managerial reputation, along with Ms. Brown's and Ms. Bell's, is not evidence that Warden Paulk had any evidence of specific complaints. Again, this is purely speculation.

*Third*, Plaintiff cannot cite to any memoranda or other evidence demonstrating that Warden Paulk was aware of her complaints. Of course, Warden Paulk, like any other manager of *any* business in the height of the pandemic in 2020, undoubtedly provided information to his staff about

---

[1] Attached as **Exhibit 7** is a true and correct copy of Plaintiff's Interrogatory Answers.

14

the evolving requirements of CDC compliance and COVID-19 guidelines. This is simply not evidence of Warden Paulk's knowledge of Plaintiff's alleged complaints.

*Fourth*, Even assuming Plaintiff's unverified hearsay assertion that HSA Cole asked Warden Paulk for masks is true, that is not evidence that HSA Cole told Warden Paulk that *Plaintiff* raised an issue regarding the use of masks.

*Fifth*, Plaintiff's points regarding "direct reprimand" and "retaliatory actions" put the cart before the horse. They assume that merely because Plaintiff was transitioned to a PRN role, Warden Paulk must have known she engaged in protected activity, essentially confusing two distinct elements of her claims. Plaintiff must present specific record evidence that would allow a reasonable jury to conclude that Warden Paulk had knowledge of her complaints when he made the decision to change her status to PRN.

*Sixth*, Plaintiff's hearsay allegations regarding what Ms. Whitley told her, again, are nothing more than mere speculation as to whether any complaint was actually routed to Warden Paulk. It is worth noting that Plaintiff did not depose Ms. Whitley, Ms. Brown, or Ms. Bell in this litigation, likely knowing full-well that their testimony would not support her position.

*Seventh*, the fact that the Court held that Plaintiff's *allegations* were sufficient to support the knowledge prong of the contributing factor test at the 12(b)(6) stage is *not* summary judgment evidence under Rule 56 that can serve as *evidence* that Warden Paulk actually had such knowledge.

*Finally*, in her verified interrogatory answers, Plaintiff does *not* allege that she ever directly informed Warden Paulk of any of her complaints. This is true and consistent with Warden Paulk's own testimony. However, in her deposition, after repeated questioning, Plaintiff contradicted her own sworn testimony, alleging for the first time — after several years of this case pending — that she brought complaints to Warden Paulk directly before her employment was changed to PRN.

15

#111931074v3

But Plaintiff cannot create a fact question by directly contradicting her own prior sworn testimony. *See Israel v. John Crane, Inc.*, 601 F. Supp. 3d 1259, 1269-70 (M.D. Fla. 2022) (quoting *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 861 (7th Cir. 1985)) ("But if the Court were to allow unexplained contradictions between interrogatory responses and deposition testimony, 'the very purpose of the summary judgment motion—to weed out unfounded claims, specious denials, and sham defenses—would be severely undercut.'"); *Burwick v. Pilkerton*, 700 Fed. Appx. 214, 217 (4th Cir. 2017) (quoting *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984)) ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.")

Taken together, Plaintiff can present no competent evidence that Warden Paulk was aware of any protected disclosures prior to his decision to change her status to PRN. Coupled with Warden Paulk and Mr. McCormick's clear testimony that, when they made the decision to change Plaintiff's employment status, they were unaware of *any* complaints from her, no reasonable jury could conclude that Plaintiff's protected disclosures were a contributing factor in the decision to change her employment status. The sheer lack of evidence of knowledge on the part of Warden Paulk or Mr. McCormick requires summary judgment on Plaintiff's claim to the extent it relates to her change in status to PRN and alleged protected activity prior to it.

Further, even if Plaintiff can establish that she engaged in protected activity and such activity was a contributing factor in Defendants' decision to change her to PRN status, Defendants present clear and convincing evidence that such actions would have been taken regardless of whether Plaintiff engaged in protected activity. Warden Paulk testified as to the difficulties in obtaining nursing shift coverage at the height of the pandemic. Given Plaintiff's reported attendance issues and the need to have supervisors cover shifts she was missing, Defendants would

16

have taken the same personnel action to transition her to PRN status and find full-time coverage during the pandemic regardless of whether she engaged in protected activity.

### B. Plaintiff's Allegations Following her Change in Status to PRN

Two months after she transitioned to a PRN role, Plaintiff submitted a complaint to the DHS Office of the Inspector General on September 8, 2020. For the purposes of this motion, Defendants do not dispute that that complaint constituted protected activity under the DNAA. However, Plaintiff cannot establish that she experienced any additional adverse employment action following that complaint, and even if she could, she cannot establish that her complaint was a contributing factor in any such action.

Indisputable record evidence clearly establishes that, on multiple occasions once Plaintiff became a PRN employee, Ms. Brown and Ms. Bell reached out to Plaintiff to attempt to schedule nursing shifts, and Plaintiff refused to provide available dates to work, reneged on agreed shifts, and was downright non-responsive. No reasonable jury could conclude that Plaintiff was actually interested in working at ICDC as a PRN employee. In essence, Plaintiff voluntarily resigned her employment following her change in status. Under LaSalle's policy, of which Plaintiff was well aware, PRN employees were required to provide their availability to be considered for scheduled shifts as needed. Not only did Plaintiff fail to do so, she did not apply to *any* of the full-time positions that were posted when she was a PRN employee.

Defendants anticipate that Plaintiff will attempt to create a fact question by citing to her testimony of a conspiracy theory in which Ms. Bell, after emailing Plaintiff requesting her availability, would call Plaintiff and inform her that the shifts were not actually available. However, Plaintiff conceded that she never documented any of these alleged calls in writing, such as in response to Ms. Bell's repeated emails attempting to bring Plaintiff back to work. Additionally,

17

Plaintiff testified that she failed to preserve her phone records that would potentially demonstrate the veracity of these calls, even though she was well aware that there was already a dispute between herself and Defendants and had already retained counsel at the time.

Plaintiff's spoliation of evidence aside, there is no genuine issue of fact that, following her change in status to PRN, LaSalle personnel continuously attempted to have Plaintiff work additional shifts at ICDC, and Plaintiff continuously refused. Plaintiff's conspiracy theory regarding calls immediately following those emails is insufficient to create a question of fact under which a reasonable jury could conclude Defendants took steps to terminate Plaintiff's employment or otherwise change her employment status with LaSalle. *See Gillespie v. Lt. S. Young*, No. 122-128, 2024 U.S. Dist. LEXIS 21642, at \*21-22 (S.D. Ga. Feb. 7, 2024) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *Baxter v. Brejo*, No. 18-20605, 2020 U.S. Dist. LEXIS 45546, at \*7-10 (S.D. Fla. Mar. 12, 2020) ("[T]he Court concludes that Plaintiff's irreconcilable, uncorroborated, and inherently incredible deposition testimony, made during active litigation, is nothing more than a sham, and so insubstantial in any event, that it cannot establish a genuine dispute of material fact.").

Further, Plaintiff's deposition testimony regarding the alleged calls from Ms. Bell again contradicts her sworn testimony in her interrogatory responses, in which she never alleged any calls from Ms. Bell directing her not to report her available dates to work. Instead, Plaintiff stated in response to interrogatory responses that she *did* provide available dates to work in October of 2020, before acknowledging in her deposition that was untrue and admitting that she never responded to LaSalle's repeated emails. *See* Ex. 7, Answers to Interrogatories 5 and 13. Once

18

again, Plaintiff's implausible theories around this case have shifted each time clear documentation undercut her past statements. Plaintiff's claims should not survive summary judgment based solely on her shifting explanations inconsistent with her prior testimony and clear documentary evidence, the authenticity of which is not in dispute.

Moreover, even if Plaintiff can establish that she was terminated (or constructively terminated) following her September 8, 2020 complaint, she cannot create a genuine issue of fact as to whether the complaint was a contributing factor in her termination. LaSalle, through Dr. Hearn, succinctly summarized why LaSalle stopped reaching out to Plaintiff to schedule shifts when she refused to provide her availability:

Q. …[W]hat is the corporation's position on whether the non-assignment of any hours to Ms. Wooten for six consecutive months was a corporate level decision or made solely at the facility level?

[objection omitted]

A. The units are staffed onsite by the local director of nurses and the HSA assisting as needed. PRN nurses are – you can think of a babysitter. If you have a list and you have children and you have babysitters; and you have five babysitters on your list but one you call is never able to come, can't meet your needs, but another comes at a moment's notice, is able to fill your needs multiple days on a schedule … you're going to make one phone call, and you're going to get your needs met. ….

Ex. 2 at 29:20-30:14. In other words, LaSalle could not be reasonably expected to continue seeking available dates from Plaintiff, month after month, when Plaintiff clearly demonstrated she had no intention of picking up shifts, and LaSalle would have made that decision with or without any engagement in protected activity.

Further, Plaintiff's testimony regarding her actions following her September 8, 2020 complaint underscore the fact that no reasonable jury could conclude she had any intention of returning to work at ICDC. Plaintiff testified that she was "whisked away" to Atlanta into "hiding," with her four children whose homeschooling she had to supervise. It was simply impossible that

19

she return to work shifts at ICDC on an as-needed basis following her move to Atlanta, despite her demonstrably false testimony that she would have commuted six hours round trip to work a shift while her "bodyguards" supervised her four children. Additionally, Plaintiff testified that she did not apply to *any* nursing positions while living in Atlanta, which would include hundreds of hospitals and nursing facilities far closer to her than ICDC. Again, the Court need not credit this blatantly incredible testimony, even at the summary judgment stage. *See Christian v. Wells Fargo Bank, N.A.*, No. 25-60237, 2026 U.S. Dist. LEXIS 130441, at *7 (S.D. Fla. June 11, 2026) (quoting *Adams v. City of Ormond Beach*, 514 Fed. Appx. 952, 955 (11th Cir. 2013)) (holding that a court may reject a plaintiff's self-serving testimony at the summary judgment stage when it is "blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law…").

### C. Plaintiff's Admitted HIPAA Violation

Finally, summary judgment on all aspects of the claim is appropriate for an independent reason—Warden Paulk would have terminated Plaintiff's employment immediately, regardless of any alleged protected activity, upon learning that she admittedly violated HIPAA by removing detainee medical records from the facility without authorization from the patients. This admission undercuts any argument that Plaintiff can make regarding the nature of her termination. Such a decision would have been made regardless of whether Plaintiff engaged in any protected disclosures.

### CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant summary judgment and dismiss Plaintiff's remaining claim under Section 4712 of the NDAA with prejudice at Plaintiff's sole cost.

#111931074v3

Respectfully submitted,

*/s/P.J. Kee*
David J. Forestner (GA Bar No. 269177)
dforestner@joneswalker.com
Deirdre C. McGlinchey (LA Bar No. 24167)
Admitted *\*pro hac*
Jacob J. Pritt (LA Bar No. 38872)
Admitted *\*pro hac*
jpritt@joneswalker.com
PJ Kee (LA Bar No. 34860)
Admitted *\*pro hac*
pkee@joneswalker.com
JONES WALKER LLP
201 St. Charles Ave., Suite 5100
New Orleans, LA 70170-5100
Telephone: 504-582-8000

## CERTIFICATE OF SERVICE

I hereby certify that on this June 29, 2026, a true and correct copy of the foregoing has been served by CM/ECF electronic filing.

*/s/P.J. Kee*

21

#111931074v3