30(b)(6) Pamela Hearn
April 20, 2026

**EXHIBIT 2**

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF GEORGIA

VALDOSTA DIVISION


Civil Action No. 7:22-cv-00148-WLS


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DAWN WOOTEN,

                    Plaintiffs

v.

LASALLE SOUTHEAST, LLC, and DAVID

PAULK, an individual,

                    Defendants.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*




              30(b)(6) DEPOSITION OF:  LASALLE SOUTHEAST, LLC

              BY:  DR. PAMELA HEARN, CORPORATE REPRESENTATIVE

                     APPEARING REMOTELY FROM

                     New Orleans, Louisiana

                April 20, 2026        1:04  p.m.


By Daniel Kramer

Guardian

APPEARING REMOTELY FROM LANCASTER COUNTY, PENNSYLVANIA

30(b)(6) Pamela Hearn
April 20, 2026

Page 2

REMOTE APPEARANCES:

Representing the Plaintiff:

        T.M. GUYER AND AYERS & FRIENDS, PC
        116 Mistletoe Street
        Medford, OR 97501
        BY:  THAD M. GUYER, ESQ.
        202.417.3910   stephani@guyerayers.com

Representing the Defendants:

        JONES WALKER LLP
        201 St. Charles Avenue, Suite 5100
        New Orleans, LA 70170
        BY:  JACOB PRITT, ESQ.
        504.582.8643   jpritt@joneswalker.com

In attendance:

        Wendall Hilker, Notary Public

        Stephani Ayers, Government Accountability Project

        Kristin Berg, Government Accountability Project

        Diana Christian, Government Accountability Project

        Marianne Fichtel, Government Accountability Project

        Jared Guyer, Government Accountability Project

        Dawn Wooten, Plaintiff

        P.J. Kee, Jones Walker LLP

30(b)(6) Pamela Hearn
April 20, 2026

Page 27

McCormick.

MR. T. GUYER:  Thank you very much.  I really appreciate that.  So you said -- so I basically go all the way and start again at 13; is that right?

MR. PRITT:  Yes.

MR. T. GUYER:  Okay.

MR. PRITT:  And so everything we haven't already covered with Dr. Hearn in Topic 3, Mr. McCormick will be able to answer.

MR. T. GUYER:  All right.  Thank you very much.

Q.    **Okey-dokey.  Okay, 13:  As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 5, what is the corporation's official explanation for the failure or refusal to assign any work hours to plaintiff from July 2, 2020, through December 31 of 2020, notwithstanding her PRN status and availability?**

MR. PRITT:  Object to the form.  You can answer.

A.    The nurses who schedule the shifts for a unit -- typically, it's the director of nurses who may have some assistance with the health services administrator, referred to as the HSA.  The HSA is overseeing all medical care, but the DON's responsibility is to get the shift staff there to do the work needed for the unit for the day and night.

So whenever we have vacancies, whenever we have

30(b)(6) Pamela Hearn
April 20, 2026

Page 28

shift vacancies, that is, the DON reaches out.  There are nurses who are full-time nurses who like to work extra shifts, are willing to work extra shifts, and sometimes they pick up those shifts.  At times they're unable to do so, and then the PRN nurses may pick up extra shifts.

I believe shifts were offered to Nurse Wooten, and there was some delay in response; and there were some changes in schedules, and that e-mail trail appeared to go back and forth.  But there were shifts that were offered, but the -- Nurse Wooten was not available to perform the duties that we needed at the particular date and time we needed those duties performed.

Q.    Okay.  And the documentation you're referring to on that are e-mails that are in the record?

A.    Yes.

Q.    Okay.  Thanks.  14:  As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 5, what documentation or communications exist reflecting the basis for the non-assignment of any hours to Ms. Wooten from July through December 2020?  And I assume the answer, again, is the e-mail as you previously referenced.

A.    There were offers made, but the e-mails showed the unavailability of Nurse Wooten.

Q.    Okay.  Thanks.  All right.  Question 15:  As

30(b)(6) Pamela Hearn
April 20, 2026

Page 29

to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 5, who were the individuals responsible for all LPN and nursing staff scheduling decisions during the period July through December 2020?

A. That would be your director of nurses, Shanise, and your HSA, L.A.K. Brown -- Shanise Bell and L.A.K. Brown.

Q. Okay. Thank you. Sixteen: As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 5, is three shifts in six months the corporation's definition of an active PRN employee who is ready, willing and able to work?

A. We do not have any limitations on the amount of shifts that have to be worked for a nurse to be PRN. There is no limitation and there is no expectation. They work a certain number of shifts over a certain period of time.

Q. Thank you. Going on to Question 17: As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 5, what is the corporation's position on whether the non-assignment of any hours to Ms. Wooten for six consecutive months was a corporate-level decision or made solely at the facility

30(b)(6) Pamela Hearn
April 20, 2026

Page 30

level?

MR. PRITT:  Object to the form.  You can answer.

A.    The units are staffed onsite by the local director of nurses and the HSA assisting as needed.  PRN nurses are -- you can think of a babysitter.  If you have a list and you have children and you have babysitters; and you have five babysitters on your list but one you call is never able to come, can't meet your needs, but another comes at a moment's notice, is able to fill your needs multiple days on a schedule; you typically call the person that -- you're going to make one phone call, and you're going to get your needs met.  That's just an example of how that works with nurses.  You want -- your full-time nurses get first choice, and then your PRNs get second choice.

Q.    Okay.

A.    Then you have agency nurses who may be involved, and we have travel nurses also that may be involved as well.

Q.    Okay.  And the people who are making these decisions, again, that's Shanise Bell -- were, at least in this timeframe, Lakisha Brown and Joan Whitley?

A.    Joan Whitley was HR, but Joan Whitley would not staff the unit shift level.  She would not staff at that level.  She would not know what shift was available what time.  That would be, you know, within the leadership

30(b)(6) Pamela Hearn
April 20, 2026

Page 32

A.     Go ahead.

Q.     Okay.  Were you -- I'm sorry, I interrupted you again.  You said, "We filled"; was that the end of it?

A.     Yes, we filled four nursing positions for the LPN --

Q.     Okay.

A.     -- status.

Q.     Okay.  Thank you.  So is that to say that in this time period, July 2nd through December 31st of 2020, the nursing staff never reached out to people that they were familiar with or working with and would say, "Hey, would you be interested in some job postings?  We'd sure like to have you on board."  Is that to say you don't do that kind of recruiting?

A.     We don't offer positions.  If someone is interested in a position, they have to apply for the position.  We have to have applicants for those positions. We don't just give positions to people, you know, onsite. They have to apply for those positions.

Q.     Okay.  Thank you for that.  So is that to say, then, that -- I take it that the -- with respect to your Shanise Bell and Lakisha Brown, if they knew that there was a posted position and they liked somebody, it's okay for them to suggest, "Hey, we have posted positions.  Maybe you would like to apply."  There's nothing wrong with that,

30(b)(6) Pamela Hearn
April 20, 2026

Page 33

right?

MR. PRITT:  And I'll just object to the form here, Thad, as to -- just to get this on the record.  Ms. Brown and Ms. Bell, they are no longer employed by LaSalle.  So Dr. Hearn was not able to speak to them in preparation for this deposition.  So just to the extent, as a 30(b)(6) rep, I don't think she could really speak to their actions or motivations other than what is reflected in the documents.  But subject to that, you can answer, Dr. Hearn.

A.    I can't say what Shanise Bell or L.A.K. Brown did.

Q.    Okay.  Well, let's take you, for example. Certainly, of course, you'll correct me if I'm wrong, that if there's -- if you know good people that you think would be good for a posted position, you -- for example, there's nothing barring you, is there, from giving people a heads up, "Hey, you might want to apply for this position"?

MR. PRITT:  Object to the form: Beyond the scope of the topics.  You can answer.

A.    As a professional, I recommend nursing staff; physicians make applications to our company sporadically, whether we have a position or not.  Because one day we may have a position come up, so that's the way I work, personally.

Q.    Okay.  Thank you, Doctor.  All righty.  Then,

30(b)(6) Pamela Hearn
April 20, 2026

Page 34

19:   As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 6, why was an existing, fully credentialed LPN not offered, assigned or considered for any available hours or positions while LaSalle Southeast was actively advertising for LPN positions at ICDC during those same months?

MR. PRITT:  Object to the form.  You can answer.

Q.    I take it's the same answer as before.

A.    Correct.  Applicants must apply.  They go through HR to apply for positions.

Q.    All right.  Thank you.  All righty.  Question 20:  As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 6, who were the individuals responsible for those LPN job postings and hiring decisions during July through December 2020?

A.    The job postings are placed by the HR director and the applicants come in to the HR director.  The applicants are shared with the DON and/or HSA, and they are interviewed via the DON or HSA.  Once an interview process goes forward and the applicant seems to be a good fit and they are offered a position, it goes back to HR to go through the background check and all the security components of what HR has to do to be able to work in a correctional facility.

30(b)(6) Pamela Hearn
April 20, 2026

Page 35

Q.   Okay.  And so just to put names in, in this July through December 2020, who would the names of those individuals be back then?

A.   Joan -- I forgot Joan's last name right now. Joan was the head of HR, and the DON was Shanise Bell and HSA was L.A.K. Brown.

Q.   Okay.  And then Joan -- it's okay with me if somebody helps you out.

MR. T. GUYER:  Do you know the answer -- the last name, Jacob?

MR. PRITT:  Is that Joan Whitley, that I heard?

THE WITNESS:  It is Joan Whitley.  I can't believe I could not remember her name, so thank you.

Q.   Okay.

A.   It is Joan Whitley.

Q.   Okay.

A.   It's on e-mails and whatnot.

Q.   All right.  That counts as one of your lifelines.  Okay.  All right.  Question 21:  As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 6, what is the corporation's official explanation for posting open LPN positions while simultaneously assigning zero hours to an existing trained LPN who remained on payroll as a PRN?

MR. PRITT:  Object to the form.  You can answer.

30(b)(6) Pamela Hearn
April 20, 2026

Page 36

A.     The positions -- or the shift positions that would be open would be offered to full-time staff, offered to PRNs.  However, the PRNs had no obligation to say "yes" to the positions, and there was no obligation from the medical department to offer every PRN every shift.  They're not guaranteed a shift.  It may be there are no shifts available.  But according to my review of the e-mails, it appeared that Nurse Wooten had no available time where she actually agreed to and showed up to work at a mutually agreed upon time.

Q.     Okay.  Question 22:  As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 6, were any of the LPN positions posted from July through December 2020 ultimately filled by new hires rather than by reassigning hours to Ms. Wooten?

A.     The applicants were reviewed, and there were new applicants who were hired.

Q.     All right.  Thank you.  So Question 23A:  As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 7, what is LaSalle Southeast's corporate knowledge of plaintiff's whistleblower disclosures to HSA Lakisha Brown regarding COVID-19 violations, PPE deficiencies and/or detainee medical treatment?

30(b)(6) Pamela Hearn
April 20, 2026

Page 37

A.    Until the September 8th OIG complaint, I had no knowledge -- the company had no knowledge of any complaints of the above.

Q.    Okay.  And then do you recall if anyone tried, after receiving the -- Ms. Wooten's complaint, did anybody from LaSalle Southeast attempt to interview Lakisha Brown regarding her knowledge of that -- those complaints -- whistleblower disclosures by Ms. Wooten?  Do you know?

MR. PRITT:  And, Dr. Hearn, to the extent that you're aware of any conversations with Ms. Brown involving in-house counsel, involving my colleague, Deirdre McGlinchey or other outside counsel, I'll instruct you not to answer as that portion of any investigation would be privileged or done in anticipation of litigation.  If you're aware of any interviews with Ms. Brown -- and this will be the same objection for the next couple of questions as well, Thad, but with any of those folks that were not involving counsel, then you can answer.

MR. T. GUYER:  Gotcha.

Q.    I think you probably understand that.  So, essentially, let me put it this way, is -- I don't want to know what the legal department did or your outside lawyers if they were trying to conduct interviews with Brown and the others.  So put the lawyers out of this.  So all I want to know is:  Are you aware of anybody other than the

30(b)(6) Pamela Hearn
April 20, 2026

Page 40

Shanise Bell.

Q.      And what did she tell you?

A.      That she had no knowledge of the claims made in the September 6th whistleblower --

Q.      Okay.

A.      -- report.

Q.      And I take it you did not document that either?

A.      I did not.

Q.      Okay.  24, we're moving along here:  As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 7, what is the corporation's position on the July 10, 2020, grievance and the nine-page handwritten statement Ms. Wooten provided to HR?

A.      Upon reading the grievance, it appeared to be more of a personal conflict between Ms. Wooten and the leadership in -- within the medical department.  There was no --

Q.      Okay.  Thank you.

A.      -- documentation of any of the complaints regarding COVID, regarding improper medical treatment of detainees at the facility.  There was no complaint of poor conditions of cleanliness, and -- none of that was in that nine-page document.  I believe it was nine pages.

30(b)(6) Pamela Hearn
April 20, 2026

Page 44

Let's try again.

Q.     Sure.  Sure, sure.  Okay.  So here's the --
I'll read the question again, 26:  As to the official
testimony of the defendant, LaSalle Southeast, with you as
its representative, referring to Topic 7, what
investigation, if any, was done to determine if Ms. Wooten
had been subjected to retaliation for her protected
disclosures?

So I just want to know -- you saw that she said,
"I've been retaliated against."  Other than lawyers, are
you aware of anybody investigating the merits or lack
thereof of her claim that she was retaliated against?  And
if you don't know, you can just say you don't know.

A.     I'm just struggling with what I know now,
which is through my involvement with the legal side of
this.  So I can't give you a good, clear answer,
unfortunately.

Q.     Okay.  Thank you.  And Question 27:  As to the
official testimony of the defendant, LaSalle Southeast,
with you as its representative, referring to Topic 7, why
do the corporation's discovery responses state it was
unaware of any complaints by Ms. Wooten before September 8,
2020, when she had already provided a detailed grievance on
July 10th of 2020?

A.     I think if you look back at the question that

30(b)(6) Pamela Hearn
April 20, 2026

Page 45

was posed, and this is legal speak and I may use the wrong answer -- I mean, the wrong verbiage, but there was -- there were the questions that were sent to LaSalle to answer, and the answers back from LaSalle.  I'm not sure what you all call that in legal speak, but interrogatories, possibly?  So --

Q.    I think so.

A.    Okay.  So when I reviewed those, it looked like the question related to the improper care -- healthcare delivered to ICE detainees.  It looked like there were -- it was related to poor conditions at the facility, and it looked like it was related to COVID.  And so when you ask the questions, the question of -- was considering those things.  The grievance per Ms. Wooten did not say anything about those three topics.  It was merely about her supervisors and the issues that she was having regarding her write-ups and whatnot.  It had nothing to do with those three topics.

Q.    Okay.  Thank you.  Question 28:  **As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 8, what were LaSalle Southeast's official policies, written standards, training programs and/or directives governing staff illness protocols, quarantine and daily call-in requirements at ICDC from March 2020 through September**

30(b)(6) Pamela Hearn
April 20, 2026

Page 51

Q.    Okay.  Thank you.  Not recent, though, I take it?

A.    Not recent, no.

Q.    Okay.

A.    I would guess somewhere in the 2021, '22, '23.

Q.    Okay.

A.    That's as close as I can guess.

Q.    Yep.  I got you.  Okay.  So Question 35:  As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 9, what facts are known to LaSalle Southeast regarding allegations that medical request forms or COVID-19 test results were shredded or destroyed by ICDC staff during the relevant period, including the shredding of 45 COVID test results by Lakisha Brown?

A.    The knowledge of this claim was known to LaSalle after the September the 8th OIG complaint.  And when I listened to the deposition from Ms. Wooten last week, that was the first anyone at LaSalle had ever heard about 45 records being destroyed by Ms. Brown.  Now, we do have an electronic health record system at ICDC, and with such, there are reasons to destroy or shred medical information once it's been scanned into the EHR.  Sometimes you get duplicate copies.  There are various legitimate reasons that you may need to be shredding documentation if

30(b)(6) Pamela Hearn
April 20, 2026

Page 52

it's captured elsewhere.

Q.    Okay.  But I take it that you would actually have no way of knowing -- if there were shredded documents by Lakisha Brown, you would have no way of knowing whether she or someone else had already entered them electronically, correct?

MR. PRITT:  Object to the form.  You can answer.

A.    Okay.  Try that again for me.

Q.    Yeah.  I take it that if Lakisha Brown was destroying these COVID documents, 45 of them, you actually would have no way of knowing if she had first or someone else had uploaded them into the electronic system, correct -- right?  You would have no way of knowing, correct?

MR. PRITT:  Same objection.

A.    At this point I would have no documentation --

Q.    Okay.

A.    -- of such other than an interview with Ms. Brown.

Q.    Right.  And is Ms. Brown -- is she the -- she's deceased?

A.    No.  No.  Not to my knowledge.  Certainly hope not --

Q.    Who's the --

A.    -- I believe she's alive and well.

Q.    Who's the one who's deceased?

30(b)(6) Pamela Hearn
April 20, 2026

Page 54

A change of her status from PRN to be no longer employed. When, if ever, did that decision -- be made, or was it made?

A.   That decision was not made to terminate --

Q.   Okay.

A.   Ms. --

Q.   Okay.

A.   -- Wooten.

Q.   So to your knowledge, Ms. Wooten has not been terminated?

A.   To my knowledge, yes.

Q.   All right.  Thank you.

A.   She has not been terminated.

Q.   Thank you very much.  All right.  So question 38:  As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 10, what facts are known to LaSalle Southeast regarding its failure to return plaintiff to active service following her PRN designation?  In other words, why didn't you ever just call her back?

MR. PRITT:  Object to the form.  You can answer.

A.   She did not apply to come back to the facility as a full-time LPN.  There was no application sent to HR for another position.

Q.   Thank you.  Question 39:  As to the official

30(b)(6) Pamela Hearn
April 20, 2026

Page 55

testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 10, what action, if any, was taken or considered to reinstate plaintiff to full-time or regular shift status after July 2nd of 2020?

A.    Nurse Wooten never applied for any additional positions after July the 2nd.

Q.    All right.  Thank you.  So question 40A:  As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 10 and your prior sworn Senate testimony on November 15th of 2022 that you oversaw medical care at Irwin County Detention Center since January 2020, what is the corporation's position on whether any corporate-level review or approval occurred before the series of letters of correction issued at the facility level in June of 2020?

A.    The letters of correction were at the local level, and they were not involving corporate in June -- the June documents.

Q.    Thank you.  And 40B is -- and this is going to be pretty much the same format, but as to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 10 and your prior sworn Senate PSI testimony on November 15, 2022, that you oversaw medical care at Irwin County Detention Center since January 2020, what is the corporation's position on whether

**30(b)(6) Pamela Hearn**
**April 20, 2026**

Page 58

C E R T I F I C A T E

I, Daniel Kramer, do hereby certify that Pamela Hearn, the witness whose testimony is hereinbefore set forth, was duly sworn remotely on April 20, 2026.

The oath was administered by Wendall Hilker, a Notary Public commissioned in the State of Louisiana.

I further certify that the foregoing transcript is a true and accurate record of the testimony provided, to the best of my knowledge and ability.

I further certify that I am not a relative or employee of any of the parties to this action, nor a relative or employee of counsel for any of the parties, nor am I financially interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 21st day of April, 2026.

Daniel S. Kramer

Guardian

AAERT CDR