**Paulk, David**
**April 29, 2026**

EXHIBIT
**5**

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF GEORGIA

VALDOSTA DIVISION

Civil Action No. 7:22-cv-00148-WLS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DAWN WOOTEN,

Plaintiff,

v.

LASALLE SOUTHEAST, LLC, and

DAVID PAULK, an individual,

Defendants.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEPOSITION OF:  DAVID PAULK

APPEARING REMOTELY FROM

Atlanta, Georgia

April 29, 2026    10:38 a.m.

By Ellen Muir

Senior Guardian

APPEARING REMOTELY FROM PLYMOUTH COUNTY, MASSACHUSETTS

**Paulk, David**
**April 29, 2026**

Page 2

REMOTE APPEARANCES:

Representing the Plaintiff:
T.M. GUYER AND AYERS & FRIENDS, PC
116 Mistletoe Street
Medford, OR 97501
BY:  THAD M. GUYER, ESQ.
202.417.3910   thad@guyerayers.com

Representing the Defendants:
JONES WALKER LLP
201 St. Charles Avenue, Suite 5100
New Orleans, LA 70170
BY:  P.J. KEE, ESQ.
504.582.8643   pkee@joneswalker.com

In attendance:

Dawn Wooten, Plaintiff
Tamar Gunby, Georgia Notary Public (out at 10:42 a.m.)
Stephani Ayers, GAP
Kristin Berg, GAP
Diana Christian, GAP
Marianne Fichtel, GAP
Jared Guyer, GAP
Marjorie Markovic, GAP
Jasmine Yunus, GAP
Jacob Pritt, Jones Walker, LLP

Page 4

EXHIBITS CONTINUED:

| EXHIBIT: | DESCRIPTION: | PAGE: |
|---|---|---|
| 37. | Internal memorandum regarding Leave procedures | 17 |
| 38. | Employee absence documentation | 17 |
| 39. | Internal e-mail correspondence dated June 2020 | 18 |
| 40. | Georgia Department of Labor Determination | 19 |
| 42. | Employee correspondence dated June 27-28, 2020 | 19 |
| 43. | Employee investigation reports | 20 |
| 49. | Consolidated Amended Habeas Petition, Oldaker v. Giles, No. 7:20-cv-00224-WLS-MSH (M.D. Ga. Dec. 21, 2020) (excerpted) | 21 |
| 50. | Transcript of video recording posted April 13, 2020, with English translation | 21 |
| 51. | Interview transcript dated June 8, 2021 | 22 |
| 52. | Paulk, Moncus Deposition exhibits, Doc 114, 130 pages | 26 |

(Exhibits were electronically marked by the Guardian and attached withe the transcript)

Page 3

INDEX

WITNESS:    David Paulk

| EXAMINATION BY: | PAGE: |
|---|---|
| Mr. Guyer | 7 |

| EXHIBIT: | DESCRIPTION: | PAGE: |
|---|---|---|
| 1. | Internal e-mail correspondence dated June 12, 2020 | 9 |
| 2. | Employee disciplinary form (06/27/2020) | 9 |
| 3. | Internal e-mail correspondence dated July 10, 2020 | 11 |
| 4. | Internal e-mail correspondence dated September 9, 2020 | 12 |
| 6. | Internal e-mail correspondence dated July 6, 2020 | 13 |
| 7. | Employee time records, 2020 | 13 |
| 9. | Defendant's responses to Rule 36 Requests | 13 |
| 10. | Physician documentation (06/22/2020) | 14 |
| 14. | Employee investigation report | 14 |
| 34. | Employment confirmation correspondence dated July 17, 2020 | 15 |
| 35. | Employee disciplinary record dated June 28, 2020 | 15 |
| 36. | Employee disciplinary record dated June 27, 2020 | 16 |

Page 5

THE GUARDIAN:  We are now on the record.  This is the deposition of David Paulk, appearing from Atlanta, Georgia, taken on April 29, 2026, at 10:38 a.m., in the matter of Dawn Wooten v. LaSalle, Southeast, LLC, and David Paulk, an individual.  Will each attorney please state your name, firm and whom you are representing.

MR. T. GUYER:  All righty.  My name is Thad Guyer, and I represent the plaintiff, Ms. Wooten.  And with me here today, I have Staff Attorney Marianne Fichtel, and I have Attorney Diana Christian.  I have Attorney Stephani Ayers.  I have Ms. Wooten here with us.  I have paralegal Kristin Berg, and I have legal assistant Jared Guyer.  And I have legal assistant Maria [sic] Markovic, and I think that's it.  If I missed anybody, speak up.

THE GUARDIAN:  Okay.  Attorney Kee?

MR. KEE:  And on behalf of defendant, P.J. Kee, and participating as well is Jacob Pritt.

THE GUARDIAN:  Okay.  And is there any individuals present in the room with any participant that is not on camera?  I have to ask that, sorry.

MR. KEE:  No.

MR. T. GUYER:  Yeah.  Oh, right.  I gotcha.  Sorry about that.

THE GUARDIAN:  Okay.  If any individuals do enter, I ask that they pause the proceeding so they could be

**Paulk, David**
**April 29, 2026**

Page 30

payroll was being processed through agreement between LaSalle Southeast and Irwin County, and other than that, I, you know, I still speak to the sheriff almost on a three or four-times weekly basis.

Q.   Absolutely.  He's the elected official and the highest official in law enforcement in the county, correct?

A.   That's what it appears.

Q.   Okay. Exactly.  Thanks.  And when -- did you work at the Irwin County Detention Center before the management of it was turned over to LaSalle Southeast?

A.   Yes.

Q.   Okay.  And at that time, were you working for another contractor or were you a public employee?

A.   It was through another contract source, Irwin County Detention Center, Terry O'Brien.  It was a group that the county had gotten into a bond deal with --

Q.   All right.

A.   -- and it stayed that way up until the time that that changed.

Q.   Thanks.  And then, prior to that contract, at any time in the past were you a public employee of Irwin County?

A.   Never had a public job in my life, sir.

Q.   All right.  And do you receive any kind of retirement benefits that the State of Georgia or the County

Page 31

of Irwin provides to public employees?

A.   No, sir.  I opted not to participate in the county program initially when it was made available to me.

Q.   All right.  Well, let's go to the year of 2019, because that's -- our relevant time frame for this case is pretty much going to be 2019 to 2021.  And our big focus will be on 2020, which you can tell from all the documents, is when Nurse Wooten was put on PRN status. Okay?  Are you -- do you recall that time, that general time frame, December 2020?

A.   Generally, yes.

Q.   Okay.  All right.  So you were the warden in 2020; is that correct?

A.   That's correct.

Q.   And what are the duties of -- what were the duties of a warden in 2020?

A.   Overall review and management of the operation, including internal, external and transportation, and any issues with outside agencies or government agencies.

Q.   All right.  And who did you report to in 2020?

A.   I had full discretion on pretty much everything.  I did run a lot of questions through Mr. James McCormick, to make sure that I had somebody to sort of field my decisions through.

Page 32

Q.   All right.  And when it came to the problems with the attendance of Nurse Wooten, did you run those issues through with Mr. McCormick?

A.   At the end result when I made a determination, I ran it by him to see if he would -- was in agreement that it would be the right thing to do.

Q.   Okay.  And then, do you know Dr. Pamela Hearn?

A.   I'm familiar with her.

Q.   And do you recall if you ever had any discussions with Pamela Hearn, M.D., about Dawn Wooten?

A.   I didn't personally have any communications.

Q.   Okay.  All right.  And then, do you have any military background?

A.   None, sir.

Q.   And then with respect to Mr. Albright, how long have you known him?

A.   I met Mr. Albright when he came to work with us through the duration there, so I've had no communication with him since he left.

Q.   And why did he leave?

A.   Contract with Immigration was pulled, and we reduced staff.

Q.   All right.  And for how many months or years did you work with him at Irwin County Detention Center?

A.   I would have to go back and check his file to

Page 33

see, sir.  I don't --

Q.   More or less than one year?

A.   More than a year.

Q.   Okay.  More or less than five years?

A.   Less than five.

Q.   Okay.  Great.  And what were his job duties in the 2020 time frame?

A.   His job duties were handling issues with anything to do with security in the facility, security issues, disciplinaries, investigations, whatever needed to be done.

Q.   All right.  And I take it -- was he a direct report to you?

A.   Yes.

Q.   And was -- did his job include just essentially doing whatever task you delegated to him?

A.   He had a basic outline of responsibilities, and then if I issued or assigned a special project, then he would do that.

Q.   All right.  Thanks.  And do you recall if you ever assigned to him either a normal duty or a special duty on a project regarding Dawn Wooten?

A.   No, it was within his normal range of duties to deal with HR and any issues up to the point where a decision had to be made on continued employment.

9 (Pages 30 to 33)

**Paulk, David**
**April 29, 2026**

Page 58

saying, "I'd like to sit down with you or have a phone call with you and talk about what you know about the allegations that these women made in the video? Not Albright, not anybody else, you. We want to talk to you." Do you recall that happening?

A. I talked to the SDDO there. She was in control. She -- that individual was tied to the AFOD in the Atlanta field office, and our communication went through that thread.

Q. All right. And do you recall ever seeing any written report or notes of that meeting that you had with them -- with her?

A. No. I don't -- I believe it was verbal. And then, whatever communication she had, that would be on their end.

Q. All right. Thanks. All right. Then the same question about the lawsuit. When the Oldaker lawsuit came to your attention, do you recall whether or not anybody from immigration said, "We want to talk to you"?

A. When that was received, it was turned over to legal. Immediately upon reception of something like that, we start preserving documents, doing everything that needs to be done. ICE legal got involved with it and our legal got involved with it. And then, if I was updated, it was on a random basis.

Page 59

Q. Thanks. Were there any requirements having to do with document retention that forbade the shredding of medical records?

A. Technically, it's not good custom to -- it's not a good custom to shred any records. Okay.

Q. And did anybody --

A. We prefer either shredding or burning if they're marked for that.

Q. And do you recall anybody coming to you and raising an issue or a concern over some document shredding that was going on while Nurse Wooten was there?

A. Not while she was there, no, sir.

Q. Okay. Do you recall after she was there?

A. I heard some rumblings about it, but no.

Q. And did you investigate those rumblings?

A. I turned that over to the individuals that were running the department, and Dr. McMahan.

Q. And who were those people?

A. I think that was Brown, and she probably incorporated Bill into the investigation.

Q. Okay. Thank you. Now, one of the -- at some point, you yourself made a decision to demote Nurse Wooten; is that correct?

A. That's correct.

Q. And did you obtain recommendations or

Page 60

information from anybody before you took that decision?

A. I made the determination. Once I made the determination, I filtered it back through Mr. James McCormick to get his input to see if he felt like I was in line with what would be proper.

Q. All right. I got that part of it. That's on the approval end. But kind of as you've described it here, what Nurse Wooten's attendance was, that's not something that you determined -- you relied on somebody to tell you about her attendance, correct?

A. Well, that's the reporting process up through the system, yes.

Q. Okay. And who brought that to your attention? Was it Ms. Brown?

A. Frank Albright initially when it got to be problematic.

Q. Okay. At any point did Ms. Brown give you any input regarding Nurse Wooten's attendance or performance prior to you deciding to demote her?

A. Prior to, it was alleged call-off issues. It was not -- you know, no call, no show. That type of thing that, you know, I'd heard mentioned. Again, that was all processed through the HSA, through the deputy warden until it was compiled.

Q. And who was the HSA in June and July of 2020?

Page 61

A. That's still Brown.

Q. Okay. All right. And did you, at any point, ask Ms. Brown for her recommendation on what should be done with Nurse Wooten?

A. I don't recall asking for her recommendation on what to be done.

Q. Okay.

A. I recall having a discussion with her regarding the issues created.

Q. Okay. And do you recall having asked Deputy Warden Albright what his opinion was as to what the appropriate discipline would be?

A. I think we did have a conversation about that.

Q. And do you recall what his recommendation was?

A. His indication to me, if I recall correctly, was that -- with the way things had transpired, that it was a terminable offense, and after thought, we made the decision not to go that route.

Q. And did you have any direct interactions with Nurse Wooten?

A. Other than passing in the hallway speaking, no.

Q. Okay.

MR. KEE: Hey, Thad, we've been going about an hour and a half. I just -- whenever you get a chance, I'd like

16 (Pages 58 to 61)

**Paulk, David**
**April 29, 2026**

Page 62

to just take a quick bathroom break, if you don't mind.

MR. T. GUYER: I certainly do not mind.

MR. KEE: I don't mean to interrupt you.

MR. T. GUYER: All right. No, no. I know. This is actually a good time for us to go into our breakout room for, oh, let's say ten minutes. Okay?

MR. KEE: Okay. Perfect.

MR. T. GUYER: I'm near the end. I'm near the end.

MR. KEE: Okay. All right. Thank you, Thad.

MR. T. GUYER: All right. Thank you.

THE GUARDIAN: I'll take us off the record. The time is 11:58 a.m., and we are off the record.

(Off the record)

THE GUARDIAN: The time is 12:14 p.m., and we are back on the record.

Q. Great. Just a few little follow-ups here. The first is: Is Major Battle still around?

A. Actually, just -- she actually just went to work with us again --

Q. No kidding?

A. -- in a different setting.

Q. And how long had she been gone?

A. Several years.

Page 63

Q. Wow. So do you recall what she's doing now for you guys?

A. We've got her as a -- what's termed a CPO for immigration. It is a position that assists the DOs and works with the detainees population to make sure that they're getting what they need -- if they're, you know, if they got issues, you know, they'll report it to ICE, if ICE hadn't already got it done or don't already know about it. If it's medical, they'll go to medical and follow up with it. Sort of like a case manager.

Q. Okay. And how long ago was it that you said she came back?

A. I got her back less than two months ago.

Q. Less than one month ago?

A. About two months ago.

Q. Two months ago. Okay. Sounds good. All right. Did any staff at ICDC in 2020 come down with COVID, that you recall?

A. Yes. Yeah --

Q. Yeah?

A. -- multiple staff come down with COVID.

Q. Okay. And did any management come down with COVID?

A. I had COVID, so --

Q. Okay.

Page 64

A. Marion Cole wound up -- part of her final diagnosis was COVID, although she had tested clear two weeks prior to that.

Q. Wow. Okay. Do you recall if you guys got some COVID testing machines there in 2020?

A. We did.

Q. And do you recall whether or not they were -- if there was a delay in putting them in operation or if they ever went into operation?

A. There was a slight delay in getting all the documentation with Immigration, who provided the machines. And then it was determined by medical that the result was unreliable. The rapid test was not accurate, so they went with a PVR test, which is the nostril test where they go into the sinus cavity and get it there.

Q. And so what happened with those machines?

A. I think they were returned to ICE at one -- at some point.

Q. All right. And then do you recall learning that there was some sort of a U.S. Senate investigation into the ICDC?

A. I do.

Q. And were you interviewed as part of that investigation?

A. Yes, sir.

Page 65

Q. And who do you recall having interviewed you?

A. I was deposed, but I was -- I had to sit with the Office of Inspector General staff. I sat with IHC staff. I sat with -- well, there was a deposition -- federal deposition that I went through online.

Q. And did they ask you questions about Nurse Wooten?

A. No. I do not recall any questions regarding Nurse Wooten.

Q. Okay. Thank you. Did they ask you questions about Dr. Amin?

A. If they did, it was just to identify that he was a authorized provider. I don't recall any in-depth questions about Dr. Amin.

Q. Okay. Did they ask you questions about COVID-19 prevention and protocols?

A. Significant questions.

Q. Okay. Was that the focus of the interviews?

A. To my best recollection, it was, sir.

Q. Okay. Thank you. Now, you said that there was no discussions about Nurse Wooten at the Monday meetings. At what meetings, if any, was there discussions about Nurse Wooten?

A. Impromptu conversations over, you know, a long period of time about various employees. I mean, it might

17 (Pages 62 to 65)

**Paulk, David**
**April 29, 2026**

Page 66

be somebody in security -- with a security person or whatever the case may be; but, I think, there had been some, you know, comments made back when Marion was still there, just sort of off the cuff, just comments -- just in passing.

Q. All right. Okay. Thank you. Do you recall any specific meeting with anyone regarding Nurse Wooten?

A. Other than the process, the final process through the HR, no, sir.

Q. Okay. Thanks.

A. The whistleblower status basically made it hands-off. I mean, the priority was to preserve documents and protect, you know, the identity and the person. I mean, that was, you know, that was priority.

Q. All right. And that -- you're referring to Nurse Wooten?

A. Correct.

Q. Okay. Thank you. All righty. And then, did you -- were you at any -- at some point there was an interruption in the contract and ICDC was no longer taking care of detainees. I understand you're now taking care of them again; is that correct?

A. That's correct.

Q. And what is your understanding as to why the contract to taking care of detainees was interrupted at

Page 67

some point?

A. It was political in nature.

Q. And what do you understand the politics to have been?

A. The politics were that your NGO groups were closely associated with certain senators in the area. And it was not just Irwin Detention Center or the Southeast; it was any private prison group or private management group, that they wanted to take out, simply because under the rules as they were written, ICE could not house these detainees anywhere else except local, you know, local jails which had no capacity, or in a ICE-owned and managed facility.

We were the easiest target, primarily because we were the smaller of the three big ones, or associated with the smaller to three big ones. And, you know, some of these other groups have lobbyists and, you know, we did not, and the NGO groups worked with Ossoff and worked with Warnock and, I mean, it's just -- it was obvious as we went through the process that it was sort of a targeted attack.

Q. Who were the big groups?

A. GO and Core City.

Q. All right.

A. Billion buck -- billion-dollar groups. Plus, we housed, I think, at one point nationwide about 4 percent

Page 68

of the female population. So we were housing for North Carolina, South Carolina and Georgia. And the female population is where they put the priority so far as the NGO groups, Project South and the SPLC, for the attorney visits and the other issues. This is what they focused on and this is where they, you know, came up with the case that they presented. So once they left -- once the females were gone, they evacuated the building down from us and went to Stewart Detention Center where they moved to.

Q. Is that candy you're eating?

A. Breath mints. I smoke cigarettes. And I left my wife alone, and she knows where the money's at, and I go to work.

Q. You've been at it a long time, huh?

A. I been at it a long time.

Q. Well, anyway, talking with you was really great. And I very much appreciate really just how amazingly candid you seem to be on these things. And -- but -- so, I'm sorry to say I don't have any more questions. I hope that doesn't disappoint you too badly. But it's possible, I still hope -- the hope is that P.J. Kee has questions for him.

MR. KEE: No, I've got nothing.

MR. T. GUYER: P.J.

THE GUARDIAN: Okay. Before I take us off the

Page 69

record, I'm going to take orders if everybody's all set.

MR. T. GUYER: We want one. We want one.

THE GUARDIAN: Okay. So, Attorney Guyer, would you like the original certified transcript? Yes.

MR. T. GUYER: Yeah. That sounds good.

THE GUARDIAN: Okay. Attorney Kee, would you like a copy?

MR. KEE: Yes, a copy would be good.

THE GUARDIAN: Okay. And if you -- I'll take us off the record, but if you could stay on, I have some questions.

MR. KEE: Sure.

THE GUARDIAN: The time is 12:24 p.m., and we are off the record.

(The Deposition was concluded)

18 (Pages 66 to 69)

**Paulk, David**
**April 29, 2026**

Page 70

CERTIFICATE

I, ELLEN M. MUIR, do hereby certify that DAVID PAULK, the witness whose testimony is hereinbefore set forth, was duly sworn remotely on April 29, 2026.

The oath was administered by Tamar Gunby, a Notary Public commissioned in the State of Georgia.

I further certify that the foregoing transcript is a true and accurate record of the testimony provided, to the best of my knowledge and ability.

I further certify that I am not a relative or employee of any of the parties to this action, nor a relative or employee of counsel for any of the parties, nor am I financially interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 30th day of April, 2026.

Ellen M. Muir,
Senior Guardian
Certified Deposition
Reporter (CDR)

19 (Page 70)