**IN THE UNITED STATES DISTRICT COURT**

**FOR THE MIDDLE DISTRICT OF GEORGIA**

**VALDOSTA DIVISION**

| | | |
|---|---|---|
| DAWN WOOTEN,<br>Plaintiff, | : | |
| v. | : | CASE NO.: 7:22-CV-00148 (WLS) |
| LASALLE SOUTHEAST LLC, et al.<br>Defendants. | : | |

**<u>PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiff Dawn Wooten respectfully submits this response in opposition to the Motion for Summary Judgment filed by Defendants LaSalle Southeast, LLC ("LaSalle") and David Paulk ("Warden Paulk") (collectively "Defendants"). Because the record is riddled with genuine disputes of material fact on every element of Plaintiff's sole remaining claim under 41 U.S.C. § 4712, and because Defendants cannot carry their heavy "clear and convincing evidence" burden as a matter of law, the motion should be denied. Defendants' summary-judgment exhibits are cited as "Ex. 1" through "Ex. 7" (ECF 131); Plaintiff's exhibits are cited as "Pl. Ex. 1" through "Pl. Ex. 19" and are identified in the accompanying Index of Exhibits.

## <u>FACTUAL BACKGROUND</u>

This is a whistleblower-retaliation case, not an attendance case. Dawn Wooten was a Licensed Practical Nurse (LPN) at the Irwin County Detention Center ("ICDC"), a federal immigration-detention facility operated under contract. Doc. 53-1 at 1, 2; Doc. 131-9 at 5. Over the spring and summer of 2020, she reported, internally and up the chain of command, a series of grave safety and legal failures: denial of COVID-19 testing, rationing and hoarding of N-95 masks, the shredding of dozens of detainee medical records, failure to meet sanitation standards and gynecological procedures performed on detainees

without informed consent. Doc. 53-1 at 12, 13; Pl. Ex. 2, Wooten Dep. 60:1–16, 101:20–21, 236:18–19, 251:9–17, 258:16–18; Pl. Ex. 3, Wooten Dep., *Amin v. NBCUniversal* 84:21–25, 189:8–13; Pl. Ex. 1 ¶ 8. Within weeks of those disclosures, LaSalle—which had gone eight months without issuing her a single reprimand—generated four backdated letters of correction in a single day, stripped her of her full-time status, and then withheld every shift for six months while hiring four outside LPNs to do the work she was available to perform. Pl. Ex. 4, Hearn 30(b)(6) Dep. 22:15–17, 32:4–7, 36:13–18; Pl. Ex. 8 (LaSalle_00560, 00563, 00566, 00569); Pl. Ex. 9 (LaSalle_00383); Pl. Ex. 1 ¶¶ 3, 41.

Defendants ask this Court to resolve that story in their favor on summary judgment. They cannot. Section 4712 imposes only a "light" burden on Plaintiff to show her disclosures were a "contributing factor," and then shifts the burden of persuasion to Defendants to prove by clear and convincing evidence that they would have taken the identical actions anyway. 41 U.S.C. § 4712(c)(6); 5 U.S.C. § 1221(e). On this record—where the decision makers' knowledge, the timing, the sudden paper trail, and the simultaneous outside hiring are all sharply disputed—a reasonable jury could readily find for Plaintiff. Summary judgment must be denied.

## I. STATEMENT OF DISPUTED MATERIAL FACTS

### *Plaintiff's Employment and Absence of Prior Discipline*

Wooten was employed as a full-time LPN at ICDC from October 2019 until her July 2, 2020 reclassification. Doc. 53-1 at 6; Doc. 131-9 at 5; Pl. Ex. 1 ¶ 3. LaSalle's Rule 30(b)(6) designee admitted that LaSalle has "no documentation to indicate there were any written write-ups on Nurse Wooten" for the eight months preceding June 2020, and that prior interactions "were verbal counseling and not designated as reprimands." Pl. Ex. 4, Hearn 30(b)(6) Dep. 22:15–17, 23:12–14.

### *Plaintiff's Protected Disclosures*

Between March and June 2020, Wooten repeatedly reported serious safety and legal violations to her supervisors—HSA Lakisha Brown, DON Shanise Bell, and Supervisor Marion Cole—and to Warden Paulk directly:

- **COVID-19 testing and PPE.** Wooten reported the denial of COVID-19 testing and the withholding of N-95 masks between March and July 2020. Doc. 53-1 at 13–14; Pl. Ex. 2, Wooten Dep. 251:9–17; Doc. 131-9 at 6–7; Pl. Ex. 1 ¶¶ 10, 15–16. She confronted Warden Paulk directly about mask holding: "You have over 900 masks up here. Why don't we have these masks?" Pl. Ex. 2, Wooten Dep. 251:9–10. Paulk responded that she "didn't have a right to question his authority." Pl. Ex. 2, Wooten Dep. 251:16–17; Pl. Ex. 1 ¶ 16. Paulk denies the exchange occurred —a direct credibility conflict. Pl. Ex. 7, Paulk Dep. 49:1–6.
- **Sanitation/biohazards.** Wooten complained to Cole, Brown, and Bell about "[b]lood on the floor; dirty, nasty mops," telling them, "you can't leave blood on the floor just every day." Pl. Ex. 2, Wooten Dep. 101:20–21, 102:8–9; Pl. Ex. 1 ¶ 9.
- **Shredding of medical records.** Wooten personally witnessed HSA Brown "shredding over 45 medical records," and reported to Warden Paulk "that one of the nurses was shredding the documentation for the patients' treatment forms." Pl. Ex. 2, Wooten Dep. 236:18–19, 258:16–18. She testified Paulk "knew they were shredding the documents." Pl. Ex. 2, Wooten Dep. 258:8. Paulk conceded "it's not a good custom to shred any records." Pl. Ex. 7, Paulk Dep. 59:4–5.
- **Non-consensual gynecological procedures.** Wooten reported that a detainee underwent an invasive gynecological procedure to which she didn't give consent and raised the concern with Supervisor Cole—who told her to "mind [her] damn business." Pl. Ex. 2, Wooten Dep. 60:1–16, 72:13–18; Pl. Ex. 1 ¶ 20. She swore she also raised gynecological concerns directly with Warden Paulk "around June" 2020. Pl. Ex. 3, Wooten Dep., *Amin v. NBCUniversal* 188:22–189:13; Pl. Ex. 1 ¶ 22.

***Chain of Command and Decision Maker Knowledge***

LaSalle's own designee testified that a supervisor who receives a safety concern is obligated to pass it up the chain of command, and that Warden Paulk holds "total responsibility" at ICDC. Pl. Ex. 6, McCormick Dep. 15:2–6; Pl. Ex. 5, McCormick 30(b)(6) Dep. 13:24–25. HR Director Joan Whitley confirmed to Wooten in April 2020 that complaints routed through HSA Brown would be "passed to

Warden Paulk." Doc. 131-9 at 13. Wooten's interrogatory responses asserted—months before her depositions—that Paulk knew of her disclosures through management meetings, chain-of-command routing, **and** a direct encounter. Doc. 131-9 at 9–10, 13.

***Sudden, Same-Day Paper Trail***

After eight months without discipline, LaSalle executed four separate Letters of Correction for June 9, 14, 17, and 18 tardiness—all drafted and dated the same day, June 22, 2020. Pl. Ex. 8 (LaSalle_00560, 00563, 00566, 00569)*; see* Pl. Ex. 4, Hearn 30(b)(6) Dep. 22:15–23; Pl. Ex. 1 ¶ 35. Counseling forms first drafted for her late-June absences were crossed out and escalated. Pl. Ex. 10 (LaSalle_00388, 00400). On July 1, 2020—one day before the reclassification—Warden Paulk issued a new memo requiring employees to call out each day of absence. Pl. Ex. 11 (LaSalle_00246). Wooten had a doctor's note excusing her absence, and HSA Brown told her daily call-ins were "unnecessary," even as HR later treated her absence as a violation. Doc. 131-9 at 11–12; Pl. Ex. 1 ¶¶ 28, 30, 33.

***Plaintiff's PRN Reclassification***

A handwritten note dated July 2, 2020 states: "Nurse Wooten is going PRN per Warden Paulk." Pl. Ex. 9 (LaSalle_00383). Paulk testified "I made the determination" to reclassify her, "filtered . . . back through Mr. James McCormick." Pl. Ex. 7, Paulk Dep. 60:2–5. LaSalle admits Paulk made the decision, approved by McCormick, and attributes it solely to "attendance-related issues" and "reliability." LaSalle Responses to Plaintiff's First Set of Interrogatories at 4, 6. McCormick's designee admitted the corporate reason for converting termination into PRN status was "the dynamics of COVID and shortage of nurses"—i.e., LaSalle wanted her nursing skills. Pl. Ex. 5, McCormick 30(b)(6) Dep. 29:23–30:4.

***Plaintiff's Post-Demotion "Lockout" and Defendants' Simultaneous Outside Hiring***

Although PRN nurses are "not guaranteed a shift," Wooten testified that management played a game of offering shifts by email and then retracting them by phone. Pl. Ex. 4, Hearn 30(b)(6) Dep. 36:5–6; Pl. Ex. 2, Wooten Dep. 186:1–12, 194:23–24; Pl. Ex. 1 ¶ 41. Her contemporaneous emails protest exactly that practice: "When the days were sent out on Tuesday that was an offer. Then another totally different offer was sent [at] the close of business the next day." Pl. Ex. 12 (LaSalle_00604); *see Pl. Ex. 12*

*(LaSalle_00601, 00124)*. Meanwhile, LaSalle **states** it posted LPN openings on Indeed on August 3, 2020 and October 23, 2020 and its designee admitted LaSalle filled four outside LPN positions between July and December 2020 rather than assigning shifts to Wooten. LaSalle Resp. to RFA No. 7 at 5 (lack-of-knowledge response under Fed. R. Civ. P. 36(a)(4)); Pl. Ex. 4, Hearn 30(b)(6) Dep. 32:4–7, 36:14–18.

***Plaintiff's OIG Complaint and Defendants' Gag Order***

LaSalle admits it received notice of Wooten's OIG whistleblower complaint on or about September 8, 2020. LaSalle Interrog. Response Nos. 6, 9 at 8, 11; Doc. 89 at ¶ 20. On September 14, 2020, Warden Paulk emailed McCormick confirming the "whistle blower" issue and directing that "the information is not to be discussed with any other staff." Pl. Ex. 13 (LaSalle_00612). After the OIG complaint, Dr. Hearn interviewed Brown and Bell but admittedly "did not document in writing" those interviews and generated no report of her findings. Pl. Ex. 4, Hearn 30(b)(6) Dep. 39:1, 40:7–9, 42:20–22.

***Plaintiff's Relocation***

Defendants argue that Plaintiff could not have intended to work because she was "whisked" away to Atlanta into "hiding" to protect her family and supervise her children's homeschooling. Pl. Ex. 2, Wooten Dep. 29:16–25, 50:12–17, 80:14–81:2. They characterize her testimony that she would have commuted six hours round-trip to work her shifts at ICDC as "blatantly incredible testimony" that the "Court need not credit." Doc. 131-2 at 20.

Plaintiff testified, however, that she remained willing and available to meet her PRN scheduling commitments via commuting because she needed the work. Pl. Ex. 2, Wooten Dep. 221:14–16; Pl. Ex. 1 ¶ 43. Defendants' insistence that such a commute is logistically impossible is a factual argument meant for a jury, not a basis for summary judgment.

## II. LAW AND ARGUMENT

### A. Standard of Review

Summary judgment is proper only where "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). On a defendant's motion, the court must view all evidence and draw all reasonable inferences in the light most favorable to the plaintiff. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255

(1986). Critically, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* Where, as here, the record contains direct conflicts between the sworn testimony of the plaintiff and the defense's witnesses, those conflicts must be resolved by a jury. That principle carries special force under § 4712, where the moving Defendants bear the ultimate burden of persuasion by clear and convincing evidence. 41 U.S.C. § 4712(c)(6) (directing adjudicators to apply 5 U.S.C. § 1221(e)); *see DuPage Reg'l Off. of Educ. v. U.S. Dep't of Educ.*, 58 F.4th 326, 334 (7th Cir. 2023).

**B. Section 4712 imposes a light "contributing factor" burden on Plaintiff and shifts the burden of persuasion to Defendants to prove the "same decision" by clear and convincing evidence.**

Section 4712 supplies the governing framework: it incorporates the burden-shifting scheme of the Whistleblower Protection Act of 1989 (WPA). 41 U.S.C. § 4712(c)(6); 5 U.S.C. § 1221(e). Under that statutory framework, Plaintiff need only show that (1) she made a protected disclosure; (2) she suffered an adverse personnel action; and (3) the disclosure was a "contributing factor" to that action. See *Pritchard v. Metro. Wash. Airports Auth.*, No. 1:18-cv-1432, 2019 U.S. Dist. LEXIS 191525, at *36–37 (E.D. Va. Nov. 4, 2019). Once she does, the burden of persuasion shifts to the employer to prove "by clear and convincing evidence that it would have taken the same personnel action in the absence of such disclosure." 5 U.S.C. § 1221(e)(2). See generally *Pritchard*, 2019 U.S. Dist. LEXIS 191525 (demonstrating the burden shifting to the employer).

The "contributing factor" standard is deliberately "broad and forgiving." *Lockheed Martin Corp. v. Admin. Rev. Bd., U.S. Dep't of Lab.*, 717 F.3d 1121, 1136 (10th Cir. 2013). A disclosure qualifies if it "tends to affect in any way the outcome of the decision." *Id.* (quoting *Klopfenstein v. PCC Flow Techs. Holdings, Inc.*, No. 04-149, 2006 WL 3246904, at *13 (Admin. Rev. Bd. May 31, 2006)). Plaintiff need not show her disclosures were a "'significant,' 'motivating,' 'substantial,' or 'predominant' factor." *Lockheed*, 717 F.3d at 1136 (quoting *Klopfenstein*, 2006 WL 3246904, at *13). Courts applying § 4712 confirm this is "not . . . a high hurdle" and may be met through circumstantial knowledge-plus-timing evidence. *DuPage*, 58 F.4th at 351. Because § 4712 is a remedial statute whose "primary purpose . . . is to

protect whistleblowers from reprisal," its framework must not be diluted with a stricter Title VII gloss. *Jacobs Project Mgmt. Co. v. U.S. Dep't of the Interior*, 64 F.4th 123, 129 (3d Cir. 2023).

The practical consequence is decisive here: if Plaintiff's protected activity contributed even in part to the adverse actions, the motion must be denied unless Defendants prove—by clear and convincing evidence, on an undisputed record—that they would have taken the identical actions anyway. 5 U.S.C. § 1221(e)(2). They cannot make that showing as a matter of law, as demonstrated below.

**C. Plaintiff's disclosures were protected because a disinterested observer could reasonably believe they evidenced substantial dangers to health and safety and violations of law.**

Defendants argue Plaintiff's reports were mere policy disagreements or job-performance complaints. Doc. 131-2 at 10. The governing test asks only whether a "disinterested observer" could reasonably believe the disclosed conduct evidenced gross mismanagement or a "substantial and specific danger to public health or safety." *Fuerst v. Hous. Auth. of the City of Atlanta*, 38 F.4th 860, 869 (11th Cir. 2022) (quoting 41 U.S.C. § 4712(a)(1)). "Reasonable belief" does not require proof of an actual violation. *Beacom v. Oracle Am., Inc.*, 825 F.3d 376, 380 (8th Cir. 2016).

Each disclosure clears this bar:

- **COVID-19 testing and PPE.** Reporting the denial of COVID-19 testing and the hoarding of N-95 masks during a pandemic at a congregate federal detention facility is not a debatable difference of opinion concerning policy; it is an objective, specific danger to health and safety. Pl. Ex. 2, Wooten Dep. 251:9–10; Doc. 131-9 at 5–6; Pl. Ex. 1 ¶¶ 10, 16.
- **Shredding of medical records.** A reasonable observer could believe the destruction of 45 detainee medical records evidenced a violation of law and mismanagement—especially where Warden Paulk himself conceded "it's not a good custom to shred any records." Pl. Ex. 2, Wooten Dep. 236:18–19; Pl. Ex. 7, Paulk Dep. 59:4–5. Defendants' claim that Brown had "copies" is unverified and, at most, creates a fact question. Doc. 131-2 at 2, 10. Defendants' theory that Wooten reported the shredding only after Brown had already made copies is squarely refuted by Plaintiff's own sworn testimony. Doc. 131-3 at 244:17–245:7, 256:9–15. Wooten testified that the

very reason she raised the shredding concern was that she had confirmed the records had not been scanned into the patients' electronic charts—meaning no copies existed: "Those records weren't scanned in . . . Whenever you go to their file to look for it, it wasn't present. She was shredding them." Pl. Ex. 2, Wooten Dep. 238:2–10. She verified the absence of any digitized copy by "open[ing] the patient's chart" to see whether the documents "had been scanned in." Pl. Ex. 2, Wooten Dep. 242:16–20, 243:13–16; Pl. Ex. 1 ¶ 17. As she explained, if the shredded documents were mere duplicates, "[t]hey should have already been on the chart." Pl. Ex. 2, Wooten Dep. 246:1–4.

- **Non-consensual gynecological procedures.** A nurse's report that detainees underwent invasive procedures without informed consent plainly concerns a substantial danger to health and a potential legal violation. Pl. Ex. 2, Wooten Dep. 60:1–16, 72:13–18. That ICDC—not the detainees—directed patients to the outside physician underscores the contract nexus. Pl. Ex. 6, McCormick Dep. 7:6–13. Defendants contend that Plaintiff "could not identify a single detainee whose chart she reviewed that lacked informed consent" and lacked access to the hospital records where the procedures were performed. Doc. 131-2 at 2. The argument mischaracterizes both the record and the nature of Plaintiff's disclosures. The medical records Plaintiff did access at ICDC identified the procedures performed on the detainees she spoke with; the women would come to her with their "A numbers," and she would "look up their procedure . . . take it back, tell them what procedure they had," which "became a daily occurrence." Pl. Ex. 2, Wooten Dep. 67:7–11; Pl. Ex. 1 ¶¶ 20, 21. When she told the detainees what procedure their records reflected, they told her they had not consented to it. Pl. Ex. 2, Wooten Dep. 60:12–16; Pl. Ex. 1 ¶ 21. That Plaintiff could not, at a deposition taken roughly six years after the events, recite the detainees' legal names is immaterial: the detainees identified themselves by their "A numbers," not their first and last names, and it was by those numbers that she looked up their charts. Pl. Ex. 2, Wooten Dep. 67:7–11; *see* Pl. Ex. 2, Wooten Dep. 254:22–255:4. Any inability to recall specific names years later goes to the weight of her testimony, not its admissibility, and cannot support summary

judgment. Plaintiff's disclosures are, moreover, powerfully corroborated by two independent investigations. The United States Senate Permanent Subcommittee on Investigations found "repeated failures to secure informed consent for off-site medical procedures performed on ICDC detainees" and concluded that female detainees "appear to have been subjected to excessive, invasive, and often unnecessary gynecological procedures." *Medical Mistreatment of Women in ICE Detention*, Staff Report, S. Permanent Subcomm. on Investigations, Comm. on Homeland Sec. & Governmental Affairs, at 3 (Nov. 15, 2022) (Pl. Ex. 17); *see Medical Mistreatment of Women in ICE Detention*, Staff Report, S. Permanent Subcomm. on Investigations, Comm. on Homeland Sec. & Governmental Affairs, at 12 (Nov. 15, 2022) (documenting a lack of informed consent and a patient handed a tablet "to sign with no explanation."). The *Oldaker v. Giles* complaint—litigation brought by ICDC detainees—provides detailed, plaintiff-specific allegations consistent with Ms. Wooten's disclosures, including unnecessary surgeries, lack of informed consent, missing or incomplete medical records, women told a hysterectomy was planned, reproductive harm consistent with sterilization, the absence of interpreters, women signing forms they could not read, women crying out and asking the physician to stop, officers witnessing procedures without intervening, and women told they needed hysterectomies without medical justification. *Oldaker v. Giles*, Proposed Am. Compl. ¶¶ 65, 76, 184, 193, 233, 273, 293, 313, 317, 345, 448, 450, 519, 564, 576 (Pl. Ex. 18). That complaint also alleges retaliatory deportations, retaliatory transfers, interference with legal counsel, ICE's knowledge of Dr. Amin's prior DOJ investigation, and systemic medical neglect at ICDC. *Id.* ¶¶ 77, 99, 103, 114, 118, 131, 167, 350, 472. Finally, the *Oldaker* complaint refers to a separate, independent medical investigation—distinct from the Senate Subcommittee report—that further corroborates Nurse Wooten's disclosures. *Id.* at ¶¶ 95–96. In October 2020, a team including Physicians for Human Rights, the National Immigration Project of the National Lawyers Guild, Project South, and independent medical experts "reviewed over 3,200 pages of medical records for 19 women detained at ICDC . . . and provided their report to Congress." *Id.* at ¶ 112. The medical team's

report described an "alarming pattern" of medical abuse, including "multiple unnecessary gynecological procedures and surgeries without informed consent." *Id.* at ¶ 113. These findings directly corroborate Ms. Wooten's disclosures and, at a minimum, establish a genuine dispute of material fact.

Defendants' reliance on the handwritten grievance is misplaced. That the grievance addressed workplace favoritism does not negate the separate, earlier disclosures documented above. Pl. Ex. 2, Wooten Dep. 106:2–22, 113:5–11; Pl. Ex. 4, Hearn 30(b)(6) Dep. 40:16–25, 45:14–18. A single later document cannot, as a matter of law, erase months of sworn, record-supported disclosures; at most it presents a jury question about the scope of Plaintiff's complaints.

**D. Genuine disputes of material fact exist on the "contributing factor" element because a reasonable jury could find the decision makers knew of Plaintiff's disclosures.**

Defendants' central argument is that Warden Paulk and McCormick were ignorant of the disclosures. Doc. 131-2 at 3–4. The record does not permit that finding as a matter of law:

- **Chain-of-command mandate.** LaSalle's designee testified supervisors are obligated to pass safety concerns up the chain of command, and Paulk bears "total responsibility" for ICDC. Pl. Ex. 6, McCormick Dep. 15:2–6; Pl. Ex. 5, McCormick 30(b)(6) Dep. 13:24–25. HR confirmed complaints routed through Brown would reach Paulk. Doc. 131-9 at 13; Pl. Ex. 1 ¶ 7.
- **Direct disclosures to Paulk.** Wooten testified she confronted Paulk about the hoarded masks, reported the shredding to him, and raised gynecological concerns with him "around June 2020." Pl. Ex. 2, Wooten Dep. 251:9–17, 258:8, 258:16–18; Pl. Ex. 3, Wooten Dep., Amin v. NBCUniversal 188:22–189:13. Paulk's denials create textbook credibility disputes for the jury. *See* Pl. Ex. 7, Paulk Dep. 38:24–39:5, 49:6.
- **Temporal proximity.** The disclosures immediately preceded the June paper trail and July 2 reclassification. Pl. Ex. 8 (LaSalle_00560, 00563, 00566, 00569); Pl. Ex. 9 (LaSalle_00383). Close temporal proximity between disclosure and adverse action, together with the surrounding evidence, supports a contributing-factor inference. *Brungart v. BellSouth Telecomms., Inc.*, 231

F.3d 791, 799 (11th Cir. 2000); *see Rackley v. Constellis, LLC*, 22-CV-4066 (GHW) (RWL), 2024 WL 3498718, at *33 (S.D.N.Y. June 17, 2024) (§ 4712; adverse action days after disclosure supported jury finding of contributing factor), *report and recommendation adopted* as modified on other grounds, No. 1:22-cv-04066 (S.D.N.Y. Aug. 14, 2024).

Defendants' "sham" affidavit argument fails on its own terms. The doctrine bars only *unexplained* contradictions between a witness's own prior sworn statements and later testimony. *See Israel v. Advance Auto Parts, Inc.*, 601 F. Supp. 3d 1259, 1270 (M.D. Fla. 2022). There is no contradiction here: Wooten's interrogatory responses asserted Paulk's knowledge through management meetings, chain-of-command routing, **and** a direct encounter—*before* her deposition. Doc. 131-9 at 9–10, 13. Her deposition testimony describing direct complaints is fully consistent with, not contradictory to, that sworn account. *See* Pl. Ex. 2, Wooten Dep. 60:1–16, 101:20–21, 102:8–9, 236:18–19, 251:9–17, 258:16–18. At worst, any tension is for the jury to weigh, not for the Court to resolve on summary judgment.

Defendants advance eight discrete arguments contending that Plaintiff has failed to produce competent evidence imputing knowledge of her disclosures to Warden Paulk. Each is factually and legally deficient and, at most, presents a jury question:

- **The operational chain of command and mandatory reporting.** Defendants dismiss ICDC's reporting protocols as "speculation," but the existence of a formal policy requiring health-services staff to document and escalate compliance grievances to the Warden is a concrete institutional fact from which a jury may infer that managers followed mandatory reporting lines—particularly as to high-stakes issues like PPE shortages, record destruction, and medical irregularities. Doc. 131-2 at 14. LaSalle's designee confirmed that supervisors must pass safety concerns up the chain and that Paulk bears "total responsibility." Pl. Ex. 6, McCormick Dep. 15:2–6; Pl. Ex. 5, McCormick 30(b)(6) Dep. 13:24–25. Because all reasonable inferences must be drawn in Plaintiff's favor, it is Defendants' denial of policy compliance—not Plaintiff's reliance on the chain of command—that is speculative. *See Anderson*, 477 U.S. at 255.

- **Hands-on management and operational oversight.** Courts may consider an executive's operational management style and proximity to daily facility crises in evaluating whether knowledge can be circumstantially inferred. *See Brungart*, 231 F.3d at 799 (a decision-maker's knowledge of protected activity may be established through circumstantial evidence). Here, Paulk testified that he exercised "full discretion on pretty much everything" at ICDC and retained "[o]verall review and management of the operation." Pl. Ex. 7, Paulk Dep. 31:17–23. Coupled with the severity of the disclosed crises—biohazards, COVID-19 protocol failures, and unnecessary gynecological procedures—a jury could infer that a hands-on warden was briefed on these vulnerabilities. Wooten testified that when she confronted her supervisor Lakisha Brown in May or June 2020 about why detainees did not know what procedures they had undergone, Brown responded, "[g]irl, he getting that money." Pl. Ex. 3, Wooten Dep., Amin v. NBCUniversal 65:17–21 (Sept. 30, 2023); Pl. Ex. 1 ¶ 21.
- **Contemporaneous memoranda tracking the disclosed issues.** The precise overlap between the localized grievances Plaintiff raised and the sudden, highly specific directives Paulk issued shortly thereafter creates a triable issue as to whether those memoranda were post-hoc efforts to project a false appearance of compliance. Paulk's suggestion that he operated in an informational vacuum in spring 2020 is contradicted by his own testimony that he was aware of the April 2020 YouTube video recorded inside ICDC by detainees exposing COVID-19 and facility conditions. Pl. Ex. 7, Paulk Dep. 21:18–24, 40:14–21, 57:1–12. When Plaintiff confronted Paulk only weeks later about these same systemic failures, she stepped into an active damage-control effort, not a routine meeting. Pl. Ex. 2, Wooten Dep. 258:1–20, 259:19–260:8.
- **Control over mask and PPE distribution.** Plaintiff testified that Paulk kept a large supply of masks and that she confronted him directly: "You have over 900 masks up here. Why don't we have these masks?" Pl. Ex. 2, Wooten Dep. 251:9–10; Pl. Ex. 1 ¶ 16. Paulk admitted he "had mask on hands before the outbreak" and that "[t]here were questions upon the distribution of masks," while denying the specific exchange—a textbook credibility dispute for the jury that

confirms the very shortage Plaintiff complained of was being addressed at the Warden's desk. Pl. Ex. 7, Paulk Dep. 48:25, 49:1–6, 49:11–13.

- **Direct escalation of discipline during the July 2, 2020 confrontation.** The immediate escalation from a localized reprimand to a full demotion to PRN status—occurring in the immediate wake of Plaintiff's direct confrontation with Paulk while she awaited COVID-19 test results—is powerful circumstantial evidence that the decision-maker was reacting to a vocal whistleblower, not merely applying an attendance policy. Pl. Ex. 9 (LaSalle_00383), Pl. Ex. 2, Wooten Dep. 110:15–21, 179:16–17.
- **HR directives routing complaints to HSA Brown.** HR Director Joan Whitley's instruction that complaints be funneled through HSA Brown is a non-hearsay statement of a party-opponent's agent under Fed. R. Evid. 801(d)(2)(D), and it is a critical link in the knowledge chain: Plaintiff followed the authorized institutional channel, providing an objective basis for a jury to conclude the information reached Paulk's office. Doc. 131-9 at 13.
- **Sufficiency of the knowledge inference.** While Plaintiff must point to record evidence at the summary judgment stage, discovery has now substantiated the factual predicates underlying the Court's earlier analysis—the strict reporting policies, the specific localized memoranda, and Paulk's personal control over PPE—supplying the evidentiary foundation needed to sustain the knowledge inference before a jury.
- **Direct verbal complaints to Warden Paulk before the demotion.** Defendants invoke the "sham" affidavit doctrine to discard Plaintiff's testimony about direct June 2020 complaints to Paulk. That doctrine bars only clear, unexplained contradictions; it does not apply where deposition testimony expands upon or clarifies a continuous timeline already set forth in the pleadings and interrogatory responses. *See Tippens v. Celotex Corp.*, 805 F.2d 949, 953–54 (11th Cir. 1986); *Israel*, 601 F. Supp. 3d at 1270. In Interrogatory Response No. 7, Plaintiff identified Paulk's direct reprimand and her direct confrontation with him. Doc. 131-9 at 9–10. And in her contemporaneous Senate interview, Plaintiff gave a detailed account of raising her concerns

directly to Paulk—with HSA Brown present—in June 2020, after which Paulk "walked off." Pl. Ex. 3, Wooten Dep., Amin v. NBCUniversal 188:22–25, 189:1–20 (Sept. 30, 2023). She likewise recounted Paulk's response when she questioned the loss of her full-time status: "Because you thought you had the right to challenge authority in this place. You're gonna be PRN from this day forward, effectively today. I'm done with the conversation." Wooten HSGAC Interview Tr. at 42 (Pl. Ex. 16). This consistent, sworn account creates a classic credibility dispute reserved for the jury.

**E. The reclassification to PRN and the six-month withholding of shifts are materially adverse actions.**

An action is adverse under § 4712 if it "would dissuade a reasonable employee from" making protected disclosures. *Tolman v. Brownsville Indep. Sch. Dist.*, No. 1:24-CV-099, 2026 U.S. Dist. LEXIS 105470, at *22 (S.D. Tex. May 13, 2026). Stripping Wooten of guaranteed full-time status and then assigning her zero hours for six months easily qualifies. *See* Pl. Ex. 2, Wooten Dep. 37:22–24; Pl. Ex. 10 (LaSalle_00130); Pl. Ex. 1 ¶¶ 41, 45. Defendants' own designee admitted the company valued her skills and converted a recommended termination into PRN status specifically to retain those skills—yet then gave her no work at all while hiring four outside LPNs. Pl. Ex. 5, McCormick 30(b)(6) Dep. 29:23–30:4; Pl. Ex. 4, Hearn 30(b)(6) Dep. 32:4–7, 36:14–18. The adverse action element is, at minimum, a jury question.

**F. Defendants cannot meet the "clear and convincing" same-decision burden because their attendance rationale is genuinely disputed and bears the hallmarks of pretext.**

Even if Plaintiff's light burden were the end of the inquiry, Defendants would still have to prove by clear and convincing evidence that they would have reclassified Wooten regardless of her disclosures. *See Carr v. Soc. Sec. Admin.*, 185 F.3d 1318, 1323 (Fed. Cir. 1999) (outlining three-factor evidentiary test to evaluate validity of an employer's independent clear and convincing evidence defense). The record forecloses that showing:

- **The eight-month silence.** LaSalle documented no written discipline for eight months, then generated four Letters of Correction in a single day (June 22, 2020). Pl. Ex. 4, Hearn 30(b)(6) Dep. 22:15–23; Pl. Ex. 8 (LaSalle_00560, 00563, 00566, 00569); Pl. Ex. 1 ¶¶ 4, 35. A sudden, retroactive paper trail assembled on one day is classic evidence of pretext, not clear-and-convincing proof of an independent decision.
- **The newly minted policy.** Warden Paulk issued the daily call-out requirement on July 1, 2020—the day before the reclassification. Pl. Ex. 11 (LaSalle_00246). Wooten had a doctor's excuse, and HSA Brown told her daily calls were "unnecessary," even as HR treated the absence as a violation. Doc. 131-9 at 11–12; Pl. Ex. 1 ¶¶ 28, 30, 33. These conflicts defeat any claim of an undisputed, independent basis.
- **The simultaneous outside hiring.** LaSalle's discovery response states that LPN positions were advertised on Indeed on August 3 and October 23, 2020 and filled four LPN positions with outside applicants between July and December 2020—all while assigning Wooten zero hours. LaSalle Resp. to RFA No. 7 at 5; Pl. Ex. 4, Hearn 30(b)(6) Dep. 32:4–7, 36:14–18. An employer that genuinely demoted an employee only to secure reliable coverage does not simultaneously refuse to use an available, willing nurse while hiring strangers to do her job.

"Clear and convincing evidence" is an exacting standard, and it cannot be satisfied where the employer's core factual premises are themselves disputed. This element alone requires denial of the motion.

**G. The post-OIG "lockout" independently presents a triable § 4712 claim.**

Defendants concede the September 8, 2020 OIG complaint was protected activity. Doc. 131-2 at 17. They nonetheless argue the ensuing zero-hours result was Plaintiff's own doing. *Id.* But under § 4712, Plaintiff may carry her contributing-factor burden—and defeat the same-decision defense—with circumstantial evidence of knowledge, timing, and inconsistent explanations. *DuPage*, 58 F.4th at 351. The circumstantial record here is compelling: (1) Warden Paulk's September 14, 2020 gag order upon learning of the whistleblower complaint; (2) the admitted Indeed postings and four outside hires while

Wooten received no shifts; (3) the documented "offer-and-retract" practice reflected in Wooten's contemporaneous protest emails; and (4) Dr. Hearn's failure to document her post-OIG interviews of Brown and Bell or to generate any findings—a striking evidentiary gap for a company claiming a clean investigation. Pl. Ex. 13 (LaSalle_00612); LaSalle Resp. to RFA No. 7 at 5; Pl. Ex. 4, Hearn 30(b)(6) Dep. 32:4–7, 36:14–18; Pl. Ex. 12 (LaSalle_00124, 00601, 00604); Pl. Ex. 4, Hearn 30(b)(6) Dep. 39:1, 40:7–9, 42:20–22.

Defendants' "babysitter" analogy and their reliance on Plaintiff's relocation do not carry the day. Doc. 131-2 at 19–20. Whether Wooten declined particular shifts, and why, is precisely the kind of disputed, credibility-laden question reserved for the jury. *See Anderson*, 477 U.S. at 255.

**H. The totality of the circumstantial record confirms retaliation and defeats Defendants' clear-and-convincing same-decision defense.**

Defendants' motion argues that their documented paper trail forecloses Plaintiff's claim as a matter of law. See generally Doc. 131-2. Section 4712 requires more: once Plaintiff carries her light contributing-factor burden, the burden of persuasion shifts to Defendants to prove by clear and convincing evidence that they would have taken the same actions absent her disclosures. 41 U.S.C. § 4712(c)(6); 5 U.S.C. § 1221(e). The whole circumstantial record bears on both showings. *DuPage*, 58 F.4th at 351. Viewed as a whole, that record defeats summary judgment:

- **The sudden shift to "shotgun" discipline.** After a spotless record, Plaintiff was subjected to four rapid-fire write-ups within weeks of confronting Paulk and her supervisors about biohazards and systemic failures. Pl. Ex. 8 (LaSalle_00560, 00563, 00566, 00569); Pl. Ex. 4, Hearn 30(b)(6) Dep. 22:15–23.
- **The smoke-screen email.** On June 12, 2020—shortly after Plaintiff confronted Paulk—he initiated an email chain over a trivial scheduling matter (whether Plaintiff requested one or two days off for her daughter's graduation). Pl. Ex. 15; Pl. Ex. 1 ¶ 34.
- **The manufactured paper trail.** In that email, Paulk stated that if attendance issues were documented, further disciplinary action would follow; yet Plaintiff had no prior written

reprimands and her timecards for March–June show consistent clock-ins. Pl. Ex. 14; Pl. Ex. 8; Pl. Ex. 1 ¶¶ 4, 34. Only after the June 12 directive did subordinates generate the "Letters of Correction."

- **The structural deviation.** Paulk copied Regional Director James McCormick—who oversaw eight facilities and did not handle localized PRN scheduling—on a minor scheduling email, from which a jury could infer a signal to corporate leadership that Paulk was "handling" a whistleblower. Pl. Ex. 15.
- **Institutional and metric pressures.** McCormick's individual and Rule 30(b)(6) testimony reflects the extreme institutional pressure under which corporate management operated amid the DHS/ICE/Irwin County contract chain and looming congressional oversight—circumstantial evidence of a motive to silence a vocal whistleblower. Pl. Ex. 5, McCormick 30(b)(6) Dep. 29:23–30:4.
- **The "offer-then-retract" countermands.** Plaintiff testified that management emailed shift availability while simultaneously calling to countermand it; the absence of corroborating phone logs goes to the weight of her testimony, not its admissibility. Pl. Ex. 2, Wooten Dep. 186:1–12, 194:23–24; Pl. Ex. 12 (LaSalle_00601, 00604).
- **Parallel external hiring.** While claiming it needed Plaintiff to cover shifts, LaSalle's discovery response states that LPN positions were advertised on Indeed, and its Rule 30(b)(6) designee testified that four outside LPN positions were filled between July and December 2020. LaSalle Resp. to RFA No. 7 at 5; Pl. Ex. 4, Hearn 30(b)(6) Dep. 32:4–7, 36:14–18.

The stark contrast between Plaintiff's flawless prior record, the sudden shotgun write-ups, the corporate pressure admitted by Regional Director McCormick, and the parallel Indeed listings would permit a reasonable jury to find that Plaintiff's disclosures contributed to Defendants' actions—and precludes any clear-and-convincing showing that Defendants would have acted identically anyway. Summary judgment must be denied.

**I. Defendants' after-acquired "HIPAA" theory does not support summary judgment.**

Defendants contend Warden Paulk "would have" terminated Wooten had he known she retained detainee records. Doc. 131-2 at 8. This argument fails twice over. **First**, after-acquired evidence is not a complete liability defense; at most it may limit remedies. *See generally McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352 (1995) (discussing after-acquired evidence). The separate § 4712 same-action defense is governed by its statutory clear-and-convincing standard. **Second**, a whistleblower's preservation of records to substantiate reports of legal violations is intertwined with protected activity itself; Plaintiff invoked HIPAA and retaliation concerns as the basis for handling those materials. *See* Doc. 131-9 at 10–11. A 'would-have-fired-her' hypothetical, unmoored from any contemporaneous decision, is the antithesis of clear and convincing proof and cannot be resolved for Defendants on this record.

Independently, Plaintiff's retention of records was itself intertwined with her protected activity. Wooten testified that she kept the documents—including the COVID-19 test results—as evidence because she "needed proof that they actually had COVID inside of the facility," given that management "w[as] saying that they didn't have COVID." Pl. Ex. 2, Wooten Dep. 227:16–20; Pl. Ex. 1 ¶ 55. As she explained, "I was being discharged, demoted. Nobody was taking me seriously. My supervisors were saying, 'Hey, shred this document.' . . . At some point, I was going to need proof. This is my proof." Pl. Ex. 2, Wooten Dep. 232:6–11. This testimony permits a jury to consider whether Defendants' asserted basis for termination is independent of the conduct underlying Plaintiff's protected disclosures.

**J. Summary judgment is improper.**

Defendants frame Warden Paulk as the sole decision maker who acted without knowledge of any protected activity. Because the record contains direct, sworn testimony that Wooten complained to Paulk personally about the masks, the shredding, and the gynecological procedures, and because LaSalle admits Paulk made the reclassification decision, the same genuine dispute that defeats LaSalle's motion defeats Paulk's. Pl. Ex. 2, Wooten Dep. 251:9–17, 258:8, 258:16–18; Pl. Ex. 3, Wooten Dep., Amin v. NBCUniversal 189:8–13; LaSalle Interrog. Response No. 2 at 4–5; Pl. Ex. 9 (LaSalle_00383). His credibility contest with Plaintiff cannot be resolved on summary judgment.

## III. CONCLUSION

Genuine disputes of material fact permeate every element of Plaintiff's § 4712 claim—the protected nature of her disclosures, the decision makers' knowledge, causation, the adverse actions, and above all Defendants' inability to prove the "same decision" by clear and convincing evidence. These are quintessential jury questions. Plaintiff respectfully requests that the Court **deny** Defendants' Motion for Summary Judgment in its entirety.

Respectfully submitted this 27th day of July, 2026.

/s/ Thad M. Guyer

Thad M. Guyer [Bar No. ______]

T.M. Guyer and Friends, PC

[Street Address]

[City, State ZIP]

Tel: (206) 535-2395

Email: thad@guyerayers.com

Diana Christian [pro hac vice / Bar No. ______]

Government Accountability Project

Email: DianaC@whistleblower.org

Counsel for Plaintiff Dawn Wooten

**CERTIFICATE OF SERVICE**

I hereby certify that on this 27th day of July, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing to all counsel of record.

/s/ Thad M. Guyer

Thad M. Guyer