**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**VALDOSTA DIVISION**

| | | |
|---|---|---|
| DAWN WOOTEN, | : | |
| Plaintiff, | : | |
| v. | : | CASE NO.: 7:22-CV-00148 (WLS) |
| LASALLE SOUTHEAST LLC, et al. | : | |
| Defendants. | : | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS AND PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS**

Defendants' summary-judgment exhibits are cited as "Ex. 1" through "Ex. 7" (ECF 131); Plaintiff's exhibits are cited as "Pl. Ex. 1" through "Pl. Ex. 19" and are identified in the accompanying Index of Exhibits.

## I. RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS

1. Plaintiff began her third and most recent stint of employment at the Irwin County Detention Center (ICDC) in October of 2019. Ex. 1 at 69:10-12; Pl. Ex. 1 ¶ 3.

   - **UNDISPUTED.** Plaintiff began her third and most recent stint of employment at the Irwin County Detention Center (ICDC) in October of 2019. Ex. 1 at 69:10-12.

**2.** Prior to her most recent stint, Plaintiff worked on PRN status at ICDC in 2016. Ex. 1 at 71:19-72:8, 145:7-19.

   - **UNDISPUTED.** Prior to her most recent stint, Plaintiff worked on PRN status at ICDC in 2016. Ex. 1 at 71:19-72:8, 145:7-19.

3. As of July 2020, Plaintiff was aware of and familiar with the requirements of LaSalle's employee grievance procedure. Ex. 1 at 81:10-82:18; Ex. 1-7.

   - **UNDISPUTED but immaterial.** Plaintiff's knowledge of the grievance procedure is immaterial to whether she engaged in protected disclosures under

41 U.S.C. § 4712 or whether Defendants retaliated against her for those disclosures. Ex. 1 at 81:10-82:18; Ex. 1-7.

4. Plaintiff alleges that she complained verbally about issues such as blood on the floors of the ICDC medical facility, sour mops, and other related issues, but she did not make these complaints in writing, and could not provide specific details about what complaints were made to whom and when and acknowledged that these issues were her responsibility to address. Ex. 1 at 111:3-114:16

    - **DISPUTED.** Plaintiff gave specific testimony that she complained about blood and dirty mops to Marion Cole, Lakisha Brown, and Shanise Bell; reported the detainee's account of a procedure without informed consent to Cole; and witnessed Brown shredding approximately forty-five treatment records that were not present in the electronic charts. Pl. Ex. 2, Wooten Dep. 66:7–67:16, 110:1–11, 111:10–112:4, 242:17–243:4, 256:3–7, 257:15–25; Pl. Ex. 1 ¶¶ 6, 9, 17, 20. Her verified interrogatory responses also state that Warden Paulk personally controlled N-95 distribution, and she testified that she went to Paulk for masks. Doc. 131-9 at 9–10; Pl. Ex. 2, Wooten Dep. 277:21–24; Pl. Ex. 1 ¶ 16.

5. Plaintiff alleges that she reported a lack of COVID-19 testing of detainees in late March or April of 2020, but she was unaware of the precise timing of the alleged complaint and unaware of whether a provider order was required to test detainees for COVID-19. Ex. 1 at 241:10-244:16.

    - **UNDISPUTED** that Plaintiff reported concerns about COVID-19 testing in spring 2020. Plaintiff disputes the legal significance Defendants assign to her inability to recall every date or technical detail. Ex. 1 at 241:10–244:16; Doc. 131-9 at 5–7.

6. Plaintiff alleges that she reported shredding of COVID-19 test results by Health Services Administrator Lakisha Brown after Ms. Brown had already made copies of the records in question. Ex. 1 at 244:17-245:7, 256:9-15.

   - **DISPUTED.** Plaintiff testified that she saw Brown shredding approximately forty-five COVID-19 treatment records and that the records were not present in the patients' electronic charts. Pl. Ex. 2, Wooten Dep. 242:17–243:4, 256:3–7, 257:15–25; Pl. Ex. 1 ¶ 17. Whether the documents were originals or duplicates is therefore disputed.

7. There are multiple legitimate reasons to shred medical records, including once the record has been digitized, or if a facility had duplicate copies of the same record, and ICDC medical staff regularly shredded records that were captured elsewhere in paper or electronically. Ex. 2 at 51:8-52:1.

   - **DISPUTED.** Plaintiff testified that the records she observed being shredded were not present in the patients' electronic charts. Pl. Ex. 2, Wooten Dep. 257:15–25; Pl. Ex. 1 ¶ 17. Defendants' testimony about legitimate shredding practices does not eliminate that factual dispute. Ex. 2 at 51:8–52:1.

8. Plaintiff alleges she reported that detainees were subjected to medical procedures without providing informed consent, but she could not identify a single detainee whose chart she reviewed that lacked informed consent for any procedure, and Plaintiff did not have access to the hospital records where procedures were actually performed. Ex. 1 at 275:9-277:13.

   - **DISPUTED IN PART.** Plaintiff acknowledges that she lacked access to the outside physician's records. Pl. Ex. 2, Wooten Dep. 72:8–17. She nevertheless identified the detainee as one who told her she had undergone a procedure, could no longer have children, and had not consented, and Wooten testified

that she reported that account to Marion Cole. Id. at 66:7–67:16. Wooten also testified that the ICDC electronic record she reviewed did not contain a consent. Id. at 275:9–16.

9. Plaintiff was aware of LaSalle's General Rules of Conduct and tardiness, absenteeism, and no-call/no-show policies. Ex. 1 at 160:25-161:19; Ex. 1-16.

- **DISPUTED.** Plaintiff disputes that attendance was the actual reason for the July 2, 2020 reclassification. She denied the charged tardiness, testified that the deposition was her first time seeing at least one Letter of Correction, and noted that the four letters were all dated June 22, 2020. Pl. Ex. 2, Wooten Dep. 152:20–153:6, 154:19–23, 155:20–22; Pl. Ex. 8 (LaSalle_00560–00571); Pl. Ex. 1 ¶¶ 35, 36. Her grievance also alleged disparate treatment concerning attendance discipline. Ex. 1-11.

10. Plaintiff was familiar with LaSalle's no-call, no-show policy set forth in the employee handbook and standalone no-call, no-show policies, which she acknowledged on three separate occasions. Ex. 1 at 161:20-164:8; Ex. 1-17; Ex. 1-18; Ex. 1-19; Ex. 1-20.

- **DISPUTED.** Plaintiff testified that she had submitted a doctor's excuse and understood that it relieved her of daily call-ins, while management gave conflicting instructions. Pl. Ex. 2, Wooten Dep. 115:20–117:14; Doc. 131-9 at 11–12; Pl. Ex. 1 ¶¶ 28, 30. In her Senate interview, she recounted Paulk saying she was reclassified because she "thought [she] had the right to challenge authority." Wooten HSGAC Interview Tr. at 43 (Pl. Ex. 16).

11. Although she denies seeing letters of correction documenting her tardiness, Plaintiff acknowledges LaSalle's contemporaneous time records demonstrating that she was late for her scheduled shifts on June 9, 2020; June 14, 2020; June 17, 2020; and June 18, 2020. See Ex. 1 at 165:5-171:6; 1-22; 1-23; 1-24; 1-25; 1-26.

- **DISPUTED IN PART.** Plaintiff acknowledges that LaSalle's records purport to show late arrivals on June 9, 14, 17, and 18, 2020. Ex. 1 at 165:5–171:6; Ex. 1-22 through 1-26. She denied being late on those dates and testified that no one told her at the time that she was late. Pl. Ex. 2, Wooten Dep. 152:20–153:6, 154:19–23, 155:20–22. She also testified that HR could alter time entries. Id. at 167:1–8. The four Letters of Correction are all dated June 22, 2020. Pl. Ex. 8 (LaSalle_00560–00571); Pl. Ex. 1 ¶ 35.

12. On June 22, 2020, Plaintiff stopped going to work for her scheduled shifts because she received a test for COVID-19, a test which ultimately displayed a negative result. Ex. 1 at 120:14-123:1.

    - **UNDISPUTED.** Plaintiff stopped working on June 22, 2020 while awaiting COVID-19 test results, which ultimately proved negative. Ex. 1 at 120:14-123:1.

13. During the time she was out awaiting her COVID-19 test results, Human Resources Manager Joan Whitley informed Plaintiff that she needed to follow LaSalle's No Call-No Show Policy and call her supervisor every morning to inform her supervisor if she would be absent. Ex. 1 at 128:24-129:24, 133:11-134:7.

    - **DISPUTED IN PART.** While HR Manager Joan Whitley gave this instruction, Plaintiff disputes that it reflected a single, unambiguous directive. Plaintiff's immediate clinical supervisor, HSA Lakisha Brown, separately and contemporaneously told Plaintiff that daily sick-call reports were unnecessary during her COVID-19 quarantine, creating conflicting instructions from management regarding the operative call-in requirement. Plf.'s Interrog. Resp. No. 9; Pl. Ex. 2, Wooten Dep. 115:20-21, 117:11-12; Ex. 1 at 128:24-129:24, 133:11-134:7; Pl. Ex. 1 ¶ 30.

14. Plaintiff did not call in or attend work the following week, allegedly because Ms. Brown told her she did not need to in an undocumented conversation. Ex. 1 at 135:25-137:1, 142:1-5, 186:11-193:14; Ex. 1-29; Ex. 1-30; Ex. 1-31; Ex. 1-32.

    - **DISPUTED IN PART.** Plaintiff does not dispute that she did not call in or attend work the following week, but disputes Defendants' characterization of Brown's instruction as merely "alleged" or the conversation as without effect. Plaintiff testified that HSA Brown directly instructed her not to return to work until she received a negative COVID-19 test result. Ex. 1 at 135:25-137:1, 142:1-5, 186:11-193:14; Ex. 1-29; Ex. 1-30; Ex. 1-31; Ex. 1-32.

15. On July 2, 2020, Plaintiff's employment status was changed from full-time to PRN. Ex. 1 at 149:11-13.

    - **UNDISPUTED.** Plaintiff's full-time status was changed to PRN on July 2, 2020. Ex. 1 at 149:11–13; Pl. Ex. 9 (LaSalle_00383); Pl. Ex. 1 ¶ 3.

16. Warden David Paulk had the ultimate authority to terminate and issue discipline up to termination, and decisions about termination were made in consultation with Regional Director James McCormick. Ex. 3 at 23:9-24:10; Ex. 5 at 32:1-6.

    - **UNDISPUTED.** Warden David Paulk had ultimate authority to issue discipline up to termination, and decisions about termination were made in consultation with Regional Director James McCormick. Ex. 3 at 23:9-24:10; Ex. 5 at 32:1-6.

17. Warden Paulk made the decision to change Plaintiff's status from full-time to PRN, in consultation with Mr. McCormick who agreed with and supported the decision. Ex. 3 at 28:1-16; Ex. 5 at 59:21-60:5; Ex. 6 ¶ 2.

- **UNDISPUTED.** Paulk made the decision to change Plaintiff's status from full-time to PRN in consultation with McCormick, who agreed with and supported the decision. Ex. 3 at 28:1-16; Ex. 5 at 59:21-60:5; Ex. 6 ¶ 2**.**

18. Warden Paulk made the decision to change Plaintiff's status from full-time to PRN based on her attendance issues. Ex. 5 at 60:6-61:9; Ex. 6, ¶ 3.

- **DISPUTED.** Paulk attributes the decision to attendance; Plaintiff denied the charged tardiness, and the four Letters of Correction were all dated June 22, 2020. Pl. Ex. 2, Wooten Dep. 152:20–155:22; Pl. Ex. 8; Pl. Ex. 1 ¶¶ 35, 36. Her Senate interview recounts Paulk stating that she was reclassified because she "thought [she] had the right to challenge authority." Wooten HSGAC Interview Tr. at 43 (Pl. Ex. 16).

19. Although termination was warranted based on Plaintiff's attendance history, Warden Paulk and Mr. McCormick instead decided to place her on PRN status in hopes of continuing to use her nursing skills and ability to cover shifts. Ex. 3 at 29:12-30:4; Ex. 5 at 61:10-18.

- **DISPUTED.** Plaintiff testified that LaSalle offered shifts by email and later retracted or changed them by telephone. Pl. Ex. 2, Wooten Dep. 226:1–16, 230:17–24, 231:12–232:8; Pl. Ex. 1 ¶ 41. LaSalle also admitted LPN postings on August 3 and October 23, 2020, while its designee testified that four new LPN applicants were hired between July and December 2020. LaSalle Resp. to RFA No. 7 at 5 (lack-of-knowledge response; not an admission under Fed. R. Civ. P. 36(a)(4)); Pl. Ex. 4, Hearn 30(b)(6) Dep. 32:4–7, 36:14–18.

20. At the time Mr. McCormick participated in the decision to change Plaintiff's status from full-time to PRN, he was unaware of any of her alleged complaints. Ex. 4 at 17:23-18:5.

- **UNDISPUTED** that McCormick testified he did not know of Plaintiff's complaints before the reclassification. Plaintiff disputes the legal significance because LaSalle identifies Paulk as the decision maker and McCormick as the approving regional director. LaSalle Interrogatory Response No. 2 at 4–5.

21. At the time Warden Paulk made the decision to change Plaintiff's status from full-time to PRN, he was unaware of any of her alleged complaints regarding COVID-19-related procedures or alleged improper medical procedures performed on female detainees. Ex. 5 at 59:9-12, 61:19-22, 65:20-66:9; Ex. 6, ¶¶ 4-8.

- **DISPUTED.** Plaintiff's verified interrogatory responses state that Paulk personally controlled N-95 distribution and knew of disclosures through management meetings and chain-of-command routing. Doc. 131-9 at 9–10, 13. Wooten also testified that she went to Paulk for masks and that he knew she had complained. Pl. Ex. 2, Wooten Dep. 277:21–24; Pl. Ex. 1 ¶ 16. Paulk acknowledged questions about mask distribution but denied the specific exchange. Pl. Ex. 7, Paulk Dep. 48:25–49:13.

22. Due to the necessity of ensuring that nursing shifts were covered in the height of a global pandemic, Warden Paulk would have made the same decision to change Plaintiff's status from full-time to PRN based on her attendance issues even if he had known about her alleged complaints. Ex. 6, ¶¶ 9-10.

- **DISPUTED.** Paulk's statement about what he would have done is a counterfactual assertion relevant to Defendants' same-action defense, not an undisputed historical fact. Ex. 6 ¶¶ 9–10.

23. On July 3, 2020, after her change in status from full-time to PRN, Plaintiff submitted a handwritten grievance to LaSalle. Ex. 1 at 117:17-118:5; Ex. 1-11.

- **DISPUTED** only as to the submission date. The handwritten narrative is headed "July 2nd 2020," while Defendants identify it as a July 3 submission. Ex. 1-11. The parties otherwise agree that it followed the July 2 reclassification.

24. Plaintiff's July 3, 2020 grievance concerned the change to PRN status but made no mention of any alleged concerns or prior complaints related to COVID-19 policies or procedures at ICDC or related to allegedly unauthorized medical procedures. Ex. 1 at 119:17-120:17, 123:18-25; Ex. 1-11.

- **DISPUTED IN PART.** The handwritten grievance did not describe the earlier COVID-19 or medical-treatment concerns, but Plaintiff had separately reported sanitation and medical concerns to supervisors and had gone to Paulk concerning masks. Pl. Ex. 2, Wooten Dep. 66:7–67:16, 110:1–112:4, 277:21–24; Pl. Ex. 1 ¶¶ 9, 16. The grievance itself challenged the reclassification and alleged disparate treatment. Ex. 1-11.

25. Instead, Plaintiff's grievance focused on alleged friendships and familiar relationships between other members of staff and supervision of the nursing unit at ICDC. Ex. 1 at 124:8-125:12; Ex. 1-11; Ex. 2 at 40:10-25, 44:18-45:18.

- **UNDISPUTED** that the grievance addressed staff relationships and supervision issues. That document does not resolve whether Plaintiff had made separate oral reports to supervisors before the reclassification. Ex. 1 at 124:8–125:12; Ex. 1-11; Pl. Ex. 2, Wooten Dep. 66:7–67:16, 110:1–112:4.

26. Before her change in status from full-time to PRN, Plaintiff removed three detainees' medical records from ICDC despite knowledge that such actions violated the detainees' HIPAA rights and without permission from the detainees whose medical records she removed from the premises. Ex. 1 at 97:14-99:25, 253:24-255:5.

- **UNDISPUTED** that Plaintiff removed three detainees' medical records, did not obtain the detainees' permission, and understood that the removal implicated HIPAA. Ex. 1 at 97:14–99:25, 253:24–255:5. Plaintiff disputes the implication that the act was concealed or unrelated to her disclosures: she testified that Brown knew she took the records and that she retained three forms because she "needed proof that they actually had COVID." Pl. Ex. 2, Wooten Dep. 98:1–20, 245:16–25; Pl. Ex. 1 ¶ 55. The legal effect of that evidence is addressed in the memorandum.

27. Warden Paulk would have immediately terminated Plaintiff's employment had he learned at the time that she removed detainee medical records from the facility without authorization. Ex. 6, ¶ 11.

    - **DISPUTED.** Paulk's statement about what he would have done is a counterfactual assertion relevant to Defendants' same-action defense, not an undisputed historical fact. Ex. 6 ¶ 11.

28. After LaSalle transitioned Ms. Wooten from a full-time position to a PRN position, she did not apply for any subsequent full-time positions despite seeing openings for fulltime positions. Ex. 1 at 42:20-43:7; Ex. 2 at 54:25-55:6.

    - **UNDISPUTED** that Plaintiff saw full-time openings and did not apply for them. Ex. 1 at 42:20–43:7. Plaintiff disputes the inference that this fact resolves whether LaSalle denied her PRN work, because she remained classified as an employee and testified that offered PRN shifts were later changed or retracted. Pl. Ex. 2, Wooten Dep. 226:1–16, 230:17–24, 231:12–232:8; Pl. Ex. 1 ¶¶ 44, 45.

29. LaSalle does not offer open positions to internal candidates unless those candidates apply for the open positions and complete an interview process. Ex. 2 at 32:8-19, 33:25-34:10.

- **UNDISPUTED but immaterial**. LaSalle requires internal candidates to apply and interview for open positions. Ex. 2 at 32:8-19, 33:25-34:10.

30. LaSalle repeatedly attempted to schedule Plaintiff for PRN shifts, and Plaintiff repeatedly refused to provide availability or accept the work offered, ultimately leading LaSalle to no longer attempt to schedule her. Ex. 2 at 27:11-29:8, 35:18-36:10.

- **DISPUTED.** Although LaSalle sent proposed shifts, Plaintiff testified that some offers were later changed or retracted by telephone. Pl. Ex. 2, Wooten Dep. 226:1–16, 230:17–24, 231:12–232:8; Pl. Ex. 1 ¶ 41.

31. On July 22, 2020, after Plaintiff's transition from full-time to PRN, LaSalle attempted to schedule Plaintiff for nearly full-time shifts throughout late July and early August of 2020. Ex. 1 at 194:13-196:24; Ex. 1-33; Ex. 1-34.

- **DISPUTED.** While LaSalle sent emails proposing shifts, Plaintiff testified that offers were changed to days she could not do. Ex. 1 at 194:13 - 197:15.

32. Plaintiff originally confirmed availability to work on July 24, 25, and 26, 2020, before stating she was unavailable after unrelated modifications to her proposed schedule. Ex. 1 at 200:18-211:20.

- **DISPUTED.** Plaintiff testified that shifts proposed by email were later changed or retracted by telephone. Pl. Ex. 2, Wooten Dep. 226:1–16, 230:17–24, 231:12–232:8.

33. On August 5, 2020, Ms. Bell emailed Plaintiff asking for her availability for the month of September; Plaintiff did not respond to this email. Ex. 1 at 230:5-24; Ex. 1-40.

- **UNDISPUTED** that the August 5 email was sent and that Plaintiff did not respond to it. Ex. 1 at 230:5–24; Ex. 1-40. Plaintiff disputes the inference Defendants draw because she testified that she and Bell also communicated by phone and that other proposed shifts were later retracted. Pl. Ex. 2, Wooten Dep. 230:17–24, 231:12–232:8.

34. On August 13, 2020, Ms. Bell emailed Plaintiff offering shifts throughout late August and reminding Plaintiff to provide her availability to work during the month of September. Ex. 1 at 213:21-214:14; Ex. 1-37.

- **DISPUTED IN PART.** Plaintiff does not dispute that Bell sent the email. She testified that she and Bell frequently communicated by phone and that proposed shifts were sometimes retracted after the email offer. Ex. 1 at 218:11 –25, 230:17–24; Pl. Ex. 2, Wooten Dep. 231:12–232:8.

35. On August 14, 2020, Ms. Bell emailed Plaintiff offering shifts available in September, and Plaintiff did not respond to inform Ms. Bell of her availability. Ex. 1 at 217:14-220:10; Ex. 1-38.

- **DISPUTED IN PART.** Plaintiff does not dispute that Bell sent the email. She testified that proposed shifts were sometimes changed or retracted by telephone shortly after they were emailed. Ex. 1 at 218:2–25; Pl. Ex. 2, Wooten Dep. 231:12–232:8.

36. Throughout her time as a PRN employee, Plaintiff never provided available dates to work in response to LaSalle's repeated requests. Ex. 1 at 225:16-228:21; Ex. 1-39.

- **UNDISPUTED** that Plaintiff did not send Bell a written list of available dates in this exchange. Ex. 1 at 228:13–21. Plaintiff testified that she had been told LaSalle would call when needed, that she communicated with Bell by telephone, and that proposed shifts were sometimes retracted. Id. at 227:5–7, 228:14–16, 230:17–24; Pl. Ex. 2, Wooten Dep. 231:12–232:8. She did, however, provide Bell written October availability by email on September 3, 2020. Pl. Ex. 1 ¶ 42; Decl. Ex. J (LaSalle_00623–00624).

37. Plaintiff never provided available dates to work in October, November, or December of 2020, despite remaining on PRN status. Ex. 1 at 238:23-239:3.

- **DISPUTED IN PART. On September 3, 2020, Plaintiff provided written availability for October shifts by email to scheduler Shanise Bell, listing October 13, 16, 20, and 23, and was assigned no October hours. Pl. Ex. 1 ¶ 42; Decl. Ex. J (LaSalle_00623–00624). She does not dispute that she submitted no new availability requests in November or December 2020.** She testified that employees told her they had been instructed not to contact her and that Brown communicated such an instruction. Ex. 1 at 238:3–18. Whether that testimony made further outreach futile is a factual inference for the Court or jury.

38. On September 8, 2020, Plaintiff executed a verified declaration outlining her alleged complaints against ICDC/Defendants. Ex. 1 at 105:1-106:1; Ex. 1-10.

- **UNDISPUTED.** Plaintiff executed a verified declaration on September 8, 2020 outlining her complaints. Ex. 1 at 105:1-106:1; Ex. 1-10; Pl. Ex. 1 ¶ 46.

39. Prior to Plaintiff's September 8, 2020 complaint, LaSalle management had no knowledge of any complaints by Plaintiff related to COVID-19 violations, PPE deficiencies, and/or detainee medical treatment. Ex. 2 at 36:19-37:3.

- **DISPUTED.** Plaintiff testified that she reported sanitation and medical-treatment concerns to facility supervisors before September 2020. Pl. Ex. 2, Wooten Dep. 66:7–67:16, 110:1–112:4; Pl. Ex. 1 ¶¶ 8, 9. Her verified interrogatory responses state that Paulk controlled N-95 distribution and knew of disclosures through management meetings and chain-of-command routing; she also testified that she went to him for masks. Doc. 131-9 at 9–10, 13; Pl. Ex. 2, Wooten Dep. 277:21–24.

40. Just after making her September 2020 complaint, for the end of 2020 into 2021, Plaintiff resided in a series of hotels in Atlanta for nine months with her four children. Ex. 1 at 32:6-24; 33:10-23; 34:6-35:1.

- **DISPUTED IN PART and immaterial. Plaintiff temporarily relocated to Atlanta hotels with her four children after being advised that the city where she lived was unsafe; she testified that she did not know the exact time frame of the stay, and the cited testimony does not support a nine-month duration. Ex. 1 at 33:10–23, 34:6–35:1. Her declaration places the stay at approximately three months beginning in late September 2020, after which she returned to her home in Tifton. Pl. Ex. 1 ¶ 43. The duration is immaterial in any event because Plaintiff remained willing to commute for shifts. Pl. Ex. 2, Wooten Dep. 221:14–16; Pl. Ex. 1 ¶ 43.**

41. The drive to the ICDC facility from Atlanta was approximately three hours each way, and Ms. Wooten was living with four children, one of whom is disabled. Ex. 1 at 39:7-16.

- **UNDISPUTED.** The drive from Atlanta to ICDC was approximately three hours each way, and Plaintiff had four children including one with disabilities. Ex. 1 at 39:7-16.

42. During her time living in Atlanta, Plaintiff did not apply to any nursing jobs and was living "in hiding." Ex. 1 at 55:9-23.

- **DISPUTED IN PART.** Plaintiff does not dispute that she did not apply for nursing jobs while living in Atlanta. She testified, however, that she had no income and "would have gladly driven 12 hours to do a two-hour shift, if it was offered." Ex. 1 at 39:20–23, 55:9–23. That testimony disputes the inference that she was unwilling to work.

## II. PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

### Contractor-Coverage/Federal Nexus Facts (§ 4712)

1. LaSalle Southeast, LLC managed ICDC under the December 2, 2013 Operation, Management and Maintenance Agreement among Irwin County, LaSalle Southeast, LLC, and CGL/LaSalle Irwin Properties, LLC. Doc. 42-2 at 1. The agreement authorizes the Manager to operate and manage ICDC and defines "Corrections Contracts" under which detainees may be referred to the facility. Id. at 1, §§ 1.01(h), 2.01.

### Reported Concerns: Spring and Summer 2020

2. During spring 2020, Plaintiff testified that she reported sanitation and medical-treatment concerns to facility supervisors. Pl. Ex. 2, Wooten Dep. 66:7–67:16, 110:1–112:4; Pl. Ex. 1 ¶¶ 9, 20. She also reported COVID-19 testing and PPE concerns. Doc. 131-9 at 5–10; Pl. Ex. 1 ¶¶ 10, 15–16.
3. Plaintiff's verified interrogatory responses state that Warden Paulk personally controlled N-95 distribution, and Plaintiff testified that she went to him for masks and

that he knew she had complained. Doc. 131-9 at 9–10; Pl. Ex. 2, Wooten Dep. 277:21–24; Pl. Ex. 1 ¶ 16.

4. The four Letters of Correction in the record are all dated June 22, 2020. Pl. Ex. 8 (LaSalle_00560–00571). Plaintiff denied the charged tardiness and testified that the deposition was her first time seeing at least one of those letters. Pl. Ex. 2, Wooten Dep. 152:20–155:22.

**July 2, 2020 Reclassification and Later Scheduling**

5. Warden Paulk reclassified Plaintiff from full-time to PRN on July 2, 2020, after the spring 2020 period in which Plaintiff testified that she reported sanitation and medical-treatment concerns to supervisors. Pl. Ex. 9 (LaSalle_00383); Pl. Ex. 2, Wooten Dep. 66:7–67:16, 110:1–112:4.

6. Plaintiff did not work a PRN shift after July 2, 2020. The parties dispute why: LaSalle identifies proposed shifts and Plaintiff's availability responses, while Plaintiff testified that some proposals were later changed or retracted by telephone. Ex. 1 at 194:13–220:10, 225:16–230:24; Pl. Ex. 2, Wooten Dep. 226:1–16, 230:17–24, 231:12–232:8; Pl. Ex. 1 ¶ 41.

7. Plaintiff testified that management offered shifts by email and later changed or retracted some offers by telephone. Pl. Ex. 2, Wooten Dep. 226:1–16, 230:17–24, 231:12–232:8.

8. Defendant LaSalle posted Plaintiff's LPN position on Indeed, a job-search platform, on August 3 and October 23, 2020. LaSalle RFA Resp. No. 7.

Respectfully submitted this 27th day of July, 2026.

/s/ Thad M. Guyer
Thad M. Guyer [Bar No. ______]
T.M. Guyer and Friends, PC
[Street Address]
[City, State ZIP]
Tel: (206) 535-2395
Email: thad@guyerayers.com

Diana Christian [pro hac vice / Bar No. ______]
Government Accountability Project
Email: DianaC@whistleblower.org

Counsel for Plaintiff Dawn Wooten

**CERTIFICATE OF SERVICE**

I hereby certify that on this 27th day of July, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing to all counsel of record.

/s/ Thad M. Guyer
Thad M. Guyer