# EXHIBIT 2

# EXHIBIT 1

**EXHIBIT 1**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

DAWN WOOTEN,
Plaintiff,

vs. CIVIL ACTION NO. 7:22-cv-00148-WLS

LASALLE MANAGEMENT COMPANY, LLC, LASALE SOUTHEAST, LLC, and DAVID PAULK, an individual,

Defendants.
___________________________/

| | |
|---|---|
| DEPOSITION OF: | DAWN WOOTEN |
| AT THE INSTANCE OF: | Defendants |
| DATE: | April 16, 2026 |
| TIME: | Commenced: 11:00 a.m.<br>Concluded: 6:49 p.m. |
| LOCATION: | 106 East College Avenue, Suite 1200<br>Tallahassee, Florida |
| REPORTED BY: | ANDREA KOMARIDIS WRAY<br>Court Reporter and Notary Public in and for the State of Florida at Large |

APPEARANCES:

REPRESENTING THE PLAINTIFF:

STEPHANI L. AYERS
Law Office of Stephani L. Ayers, LLC
T. M. Guyer & Friends, PC
116 Mistletoe Street
Medford, OR 97501

THAD M. GUYER
T. M. Guyer & Friends, PC
116 Mistletoe Street
Medford, OR 97501

ROBERT L. GUYER
Lobby School
13714 N.W. 21st Lane
Gainesville, FL 32606

DIANE CHRISTIAN
MARIANNE FICHTEL
Government Accountability Project
1612 K St. NW, Suite #808
Washington DC, 20006

REPRESENTING THE DEFENDANTS:

P.J. KEE
Jones Walker, LLP
201 St. Charles Avenue, Suite 5100
New Orleans, LA 70170

JACOB J. PRITT
Jones Walker, LLP
201 St. Charles Avenue, Suite 5100
New Orleans, LA 70170

ALSO PRESENT:
JARED GUYER, Legal Assistant
KRISTIN BERG, Paralegal
DANIEL KRAMER, Readback Active Reporting
DR. PAMELA HEARN, Corporate Representative

Page 2

INDEX TO WITNESS


| DAWN WOOTEN | PAGE |
|---|---|
| Examination by Mr. Kee | |


INDEX TO EXHIBITS


| NO. | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit No. 1 | Letter from Government Accountability Project to Ridenhour Prize Committee, Bates Nos. DW0467 through DW0471 | 20 |
| Exhibit No. 2 | Plaintiff's responses and objections to defendant's first set of interrogatories | 43 |
| Exhibit No. 3 | Bates Nos. DW00538 and DW00539 | 59 |
| Exhibit No. 4 | Wooten dates of Employment, Bates No. LaSalle_00596 | 69 |
| Exhibit No. 5 | Letter to Ms. Wooten from Ms. Whitley, dated June 11, 2014, Bates No. LaSalle_00240 | 71 |
| Exhibit No. 6 | Letter to Ms. Wooten from Ms. Whitley dated May 2, 2016, Bates No. LaSalle_00174 | 71 |
| Exhibit No. 7 | Employee Grievance Procedures, dated September 11, 2017, Bates Nos. DW00012 through DW00018 | 81 |
| Exhibit No. 8 | The Wayback Machine GoFundMe | 92 |
| Exhibit No. 9 | Medical Records of inmates, Bates Nos. DW00841 through DW00843 | 97 |
| Exhibit No. 10 | OSHA Complaint, Bates Nos. DW00662 through DW000706 | 105 |


Page 3

INDEX TO EXHIBITS (Continued)


| NO. | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit No. 11 | LaSalle Corrections employee's complaint, Bates Nos. DW00030 through DW00039 | 117 |
| Exhibit No. 12 | Ms. Wooten's resume, Bates No. DW000813 | 142 |
| Exhibit No. 13 | Job listings for Tift Regional | 147 |
| Exhibit No. 14 | Claims Examiner's Determination, Bates Nos. LaSalle_00132 through LaSalle_00136 | 154 |
| Exhibit No. 15 | E-mail from Ms. Whitley to Ms. Grigsby, Bates No. LaSalle_00138 | 156 |
| Exhibit No. 16 | Employee's general rules of conduct, Bates Nos. DW00001 through DW00011 | 161 |
| Exhibit No. 17 | Employee handbook acknowledgment and receipt, Bates No. LaSalle_00250 | 161 |
| Exhibit No. 18 | No Call-No Show Policy, dated October 3, 2019, Bates No. LaSalle_00266 | 162 |
| Exhibit No. 19 | No Call-No Show Policy, dated May 3, 2016, Bates No. LaSalle_00322 | 163 |
| Exhibit No. 20 | No Call-No Show Policy, dated June 11, 2014, Bates No. LaSalle_00358 | 163 |
| Exhibit No. 21 | Leave request form, Bates No. LaSalle_00410 | 164 |
| Exhibit No. 22 | Letter of correction, Bates Nos. LaSalle_00560 through LaSalle_00562 | 165 |
| Exhibit No. 23 | Letter of correction, Bates Nos. LaSalle_00563 through LaSalle_00565 | 167 |


Page 4

INDEX TO EXHIBITS (Continued)


| NO. | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit No. 24 | Letter of correction, Bates Nos. LaSalle_00566 through LaSalle_00568 | 168 |
| Exhibit No. 25 | Letter of correction, Bates Nos. LaSalle_00569 through LaSalle_00571 | 168 |
| Exhibit No. 26 | Employee timecards, Bates No. LaSalle_00572 | 169 |
| Exhibit No. 27 | E-mail from Ms. Brown to Ms. Whitley, Bates No. LaSalle_00555 | 171 |
| Exhibit No. 28 | E-mail exchange re: Employee write-ups, Bates No. LaSalle_00556 | 178 |
| Exhibit No. 29 | E-mail from Ms. Bell to Ms. Whitley, Bates No. LaSalle_00559 | 186 |
| Exhibit No. 30 | E-mail from Ms. Bell to Ms. Whitley, Bates No. LaSalle_00558 | 188 |
| Exhibit No. 31 | E-mail from Ms. Whitley to Mr. Albright, Bates No. LaSalle_00576 | 189 |
| Exhibit No. 32 | E-mail exchange between Ms. Brown and Ms. Whitley, Bates Nos. LaSalle_00574 through LaSalle_00575 | 193 |
| Exhibit No. 33 | E-mail between Ms. Brown and Ms. Whitley, Bates No. LaSalle_00581 | 194 |
| Exhibit No. 34 | Text exchanges, Bates Nos. LaSalle_00120 through LaSalle_00124 | 196 |
| Exhibit No. 35 | E-mail exchanges between Ms. Bell and Ms. Wooten, Bates Nos. LaSalle_00584 through LaSalle_00588 | 197 |


Page 5

tried to kidnap my kids. So, I mean, it ain't, like, I pocketed this money. It went into security, death threats. We moved from hotel to hotel. We were eating from hotel to hotel. I had a whole security bodyguard at this point.
So, the money was not fundamentally for me personally; it was for protection.
Q Okay. My question is it just very simple: Were you accounting for money that was coming in relating to your whistleblowing activity?
A I was not. It was for protection. It wasn't for me.
Q So, you n- -- you're saying mo- -- you were aware the money was come coming in, but you never had access to it?
MS. AYERS: Objection. Misstates prior testimony.
MR. KEE: You can just say "form".
MS. AYERS: I can say what my objection is as well.
Thank you.
MR. KEE: No, w- -- we're in federal court.
MS. AYERS: Yes.
MR. KEE: You stick with "form".
MS. AYERS: I'm very aware of the federal



court rules.
Thank you.
MR. KEE: All right. Let's -- let's comply with them.
MS. AYERS: Go ahead, Ms. Wooten.
MR. KEE: Let's comply with them.
MS. AYERS: I am.
Thank you.
THE WITNESS: Restate your question.
BY MR. KEE:
Q Sure. Were you accounting for the money that was coming in, as a result of your whistleblowing activity?
A No, it was for security and --
MS. AYERS: Objection. Asked and answered.
A Yeah, it was for security purposes. It was not --
Q Okay. Who was pay- -- who was -- when you say "for security purposes", then, who was paying -- who was paying for security?
A I didn't set the GoFundMe up. It was set up -- I didn't even realize I had a GoFundMe. It was set up by someone else. I didn't even set that one up. I didn't set it up.
Q Ms. Wooten, you're not answering my question.



A I don't know who was keeping track of it or paying who. I didn't keep up with it. It was not set up for me; it was set up for security.
Q Who was making those decisions?
A It was set up -- whoever hired security --
Q Well, that's what I'm asking: Who was hiring -- who was doing that?
A So, I have no recollection of -- I knew, one day, these people showed up, picked us up in a black truck, and whisked us away.
Q Who?
A That's wh- -- whoever the body guards were. So, Project South were in connection with, I guess, the body guards. That's how we got Atlanta underground for about nine months.
Q So, you were living underground in Atlanta?
A Yeah, nine months, me and four kids.
Q Okay. And who was paying for your lodging?
A We came with Project South. Nobody showed me a check. Nobody gave me money. We just knew we had to be Point A and Point B.
Q No, I'm saying for those nine months, though, you were living somewhere, correct?
A We were living hotel to hotel.
Q Who was paying for those hotels?



A Project South, I'm assuming.
Q Okay. You didn't pay for those.
A No.
Q Okay. You didn't pay for your food?
A Whenever they gave access to this money, at some point, yes, I paid for food. I bought computers. I had clothes that I had to purchase for my children.
Q Okay. So, let's --
A So --
Q Let's take a step back. When -- so, it sounds like you did get access to some pot of money, I'll call it.
A At --
Q When was that?
A I'm not even aware when -- like I said, I didn't even know this thing was set up. I knew we were in Atlanta the end part of '20 --
Q Uh-huh.
A -- over into '21.
Q Okay. Now, wh- -- were you in Atlanta when you got access to this money?
A I'm thinking that we were. I want to say we were.
Q Okay. And were there any, you know, strings attached to what you could spend this money on or was

it -- was it just yours to spend it how you saw fit?
A I don't think anybody gave me stipulations. I know I bought food, clothes, computers, phones. Children needed things. We didn't have anything. I had no job.
Q Okay. And so, at what point did you leave to go to Atlanta?
A I don't have an exact date. I got a call one day in '20 that said I needed to --
Q From whom? Who called you?
A Project South called me.
Q Okay. And so, was that shortly after the September letter that was sent out in 2020?
A It -- ye- -- I want -- it wasn't very far. Like, we were out even at the presidential election. So, we w- -- that's just how long we had been...
Q Right, but -- so, it's pretty close, as far as you remember -- it was pretty close in time after that September letter in 2020?
A I want to say I made a -- the complaint. And then we got this -- I got different calls about, we're gonna kill you or hang you, kidnap your kids, had some trouble at school.
And then I got a call one afternoon saying that it was not safe for us to be in the city we were



in.
Q Okay. So, you recall that that -- when you went to Atlanta -- at least in your mind, you were in Atlanta for the election?
A We were in Atlanta for the election.
Q Okay. So, you left --
A Prior.
Q And -- was it, you know, a month prior or -- or was it --
A I don't know the time frame. I just know we were picked up from a hotel.
Q Let me ask you this -- let me ask you this: Project South would know when they came and picked you up and brought to you to Atlanta; is that correct?
A That was a call I got -- I don't --
MS. AYERS: Objection. Calls for speculation.
A So, I don't --
Q I'm asking your opinion.
A Oh, no, I don't know. I know I was picked up.
MS. AYERS: -- ask her opinion -- hold on a second, Dawn.
If you're gonna ask her opinion, ask for her opinion, please, but --
MR. KEE: That's right.
MS. AYERS: -- please don't ask --



MR. KEE: That's -- that's what I'm asking.
MS. AYERS: -- what Project South knows --
MR. KEE: I --
MS. AYERS: -- because she's not in a position to answer that.
Thank you.
MR. KEE: Okay. You can stick with "form", again.
MS. AYERS: I can make my objections.
Thank you.
MR. KEE: Okay. Just let's -- let's try to follow the rules. You say "object to form".
MS. AYERS: I --
MR. KEE: Okay.
MS. AYERS: Again, I'm following the rules. Please do not lecture me. If you'd like to go off record and talk about it, we certainly can, but do not lecture me in front of my client again.
Thank you.
MR. KEE: I'm just asking you to comply with the rules that we all have to follow.
MS. AYERS: I am complying with the rules.
Thank you.
MR. KEE: Calm -- calm down. There's no reason to yell.



MS. AYERS: I'm perfectly calm.
MR. KEE: You're -- you just screamed.
MS. AYERS: You're not --
MR. KEE: Okay. I'm gonna go back to my --
MS. AYERS: Do not lecture me again.
MR. KEE: -- my question.
MS. AYERS: Ask your questions and move on.
BY MR. KEE:
Q I'm gonna ask my question, Ms. Wooten. Would you, in your opinion, believe that Project South would be able to give us a precise date of when you left Tifton and went to Atlanta with your kids?
A I don't have a date when I left.
Q But they -- you -- in your opinion, they would have those records, since they're the ones paying for that, correct?
A Like I said, I don't know when I left.
Q That's not my question.
A That's my answer.
Q My question is: You would suspect that Project South would be able to tell us when exactly you left, when that black van was hired and you all were whisked away, correct?
A I got a call from them that I needed to be at Point A and I was picked up the next day.

Q Okay. And so, there's no way, while you were in Atlanta, that you could have worked as a -- a nurse at the -- the ICDC, correct?
A ICDC called me one time.
Q That's not my question.
A That's my -- but I'm -- but I'm answering --
Q My question is: At no time while you were in Atlanta -- you said, underground in Atlanta -- could you have worked a shift at ICDC, correct?
A If ICDC offered, I could have.
Q You would have driven back from Atlanta to work a shift? That's your testimony?
A The bodyguard followed me everywhere, so the bodyguard would have sat inside -- outside in the parking lot, let me complete my shift, and took me home.
Q And did you apply any -- did you apply for a full-time position, again, once you were moved to part-time?
A ICDC didn't offer me any options.
Q I didn't if they offered; I said, did you apply.
A The thing with me was I was told, I'll call you when I need you.
Q That's -- and that's because you worked PRN.
A They didn't know if I was PRN or part-time.



Q Okay. Well, you were not guaranteed any hours, correct?
A PRN, you had so many hours. I was told by administration there that you had to work to sustain PRN, but they didn't keep their bargain. They never called for substantial hours for PRN.
Q Okay. Do you know how long it is to drive from Atlanta to ICDC?
A I do.
Q It's about three hours?
A I do.
Q And so, it's your testimony that you would have driven, essentially, six hours to do a shift?
A I had four children.
Q Right.
A One who has a disability.
Q Right.
A I had no job.
Q Right.
A I had no income. I had nowhere that I was guaranteed to live when I left to go to Atlanta. I would have gladly driven 12 hours to do a two-hour shift, if it was offered.
Q But Project South was paying for your housing and your food and all your needs at that time, correct?



MS. AYERS: Objection. Misstates prior testimony.
Q Correct?
A Security purposes.
Q And your housing.
A Security purposes.
Q Which includes your housing.
A Security purposes.
Q Did that include your housing?
A Security -- for security purposes.
Q Did you have pay for the housing while you were in Atlanta?
A With what funds?
Q Did you pay any -- out of the anything, did you pay?
A You asked me would I come work. I said, yes, if it was offered.
Q My -- it's a simple yes-or-no: Did you pay for any lodging while you were in Atlanta?
A I had no job.
Q So, that's, no, you did not.
A I had no income.
Q But it was covered, correct?
A Security purposes, for my life, to sustain my life.



MR. PRITT: Call the magistrate, if she's not gonna answer the questions.
Q I mean, y- -- these are -- these are simple questions. So, I'll go back to what -- did you apply for any -- because I don't think I got an answer. Did you -- once you had been moved to part-time, at any point after that -- to PRN, did you -- did you apply to become a full-time again?
A The decision was made, from a full-time position that I already secured, that I was put to a PRN position.
Q That's not my question. My -- it's very simple. Did you apply -- when you were -- after you had moved to PRN, did you apply, again, to be a full-time?
A The job had the ability to move me to a full-time position. They moved me from a full-time to a PRN position.
Q Did you apply to be a full-time?
A I was full-time when they moved me PRN. No hours were being offered PRN.
Q I -- am I not -- are you understanding my question?
A I understand very well, sir.
Q Okay. So, after you were PRN, you -- did you see listings at ICDC for full-time nursing position?

A ICDC hired nurses after me being PRN.
Q Did you -- my question is: Did you see job postings for full-time positions at ICDC after July 2nd, 2020?
A ICDC was hiring nurses full-time.
Q And you saw those postings.
A They were hiring full-time.
Q Did you see those postings?
A They were hiring full-time.
MR. PRITT: Call -- call the judge.
MR. KEE: All right. We're gonna have to take a break, Thad, and -- I -- I'm getting no -- this is completely non-responsive answers to very straightforward questions. We're gonna have to call the judge.
MR. THAD GUYER: Well, let's go off the record.
(Brief recess.)
BY MR. KEE:
Q So, before the break, Ms. Wooten, I was asking if you had applied for the full-time nursing position at ICDC after you had been moved to PRN.
A No, I don't think I did.
Q You did not.
A No.



Q Okay. But you did see that it was posted?
A Yes. They had full-time positions open.
Q Okay. And those postings -- did you see that they were posted almost immediately after you were moved to PRN?
A I don't know what the time frame was. I just know they had full-time positions.
MR. KEE: Okay. I'm gonna show you what I'm marking as Exhibit 2.
(Exhibit No. 2 marked for identification.)
BY MR. KEE:
Q And I've got a -- I've got a flag for you there to -- so, hopefully, it will be easy to find what I'm gonna ask you.
So, these are -- I'll represent to you, these are your responses to the defendant's first set of interrogatories.
Do you remember being -- helping or do you remember reviewing this and verifying that the answers here were accurate? Do you recall that.
I'll direct you, if you flip to the 19th page, it says --
MS. AYERS: Counsel, she's reviewing the document --
Q It says --



MS. AYERS: -- which you have to give her time to do.
Q It says --
MS. AYERS: Thank you.
Q It says: This 28th day of August, 2025, refect- -- respectfully submitted, and it's got a digital signature, Dawn Wooten.
And then it has a verification: I, Dawn Wooten, do hereby verify that I've read the following answers to interrogatories and request for admissions and that they are true and correct, to the best of my knowledge.
Do you see that?
A Yeah.
Q Do you remember reviewing and verifying that the answers here were true and correct?
A Yeah.
Q Okay. If you turn to Page 15, there's an Interrogatory No. 15 on Page 15 that says: Identify all names or identities used by you in electronic media and/or social media including but not limited to electronic or digital addresses, pseudonyms, avatars, Twitter/X account names or handles, GoFundMe accounts, or Facebook and Instagram account names or handles, from January 2020 to the present.



And you -- do you see there that you identify GoFundMe?
A I did.
Q A GoFundMe account? Okay.
And that goes --
MR. KRAMER: What was that? What was that? What was the answer? I'm sorry.
Q Do you see --
MR. KRAMER: Ms. Woot- --
Q -- the Go- -- do you see the GoFundMe?
A Yeah, I see it.
Q Okay. And in quotes, it says, "Support Dawn Wooten, ICE whistleblower."
Do you see that?
A Yeah.
Q Okay. Did you have access to this GoFundMe?
A I don't -- I don't know if I had to --
Q Okay. But you knew it existed and was being hosted on your behalf?
A I don't remember. No, I don't remember.
Q Okay. You see -- you verified that this was true on August 25th, 2025, right? We -- we looked at your verification page?
A Yeah, I see that.
Q Okay. And then, in parentheses, after -- I

A All I know, security purposes. I wasn't -- I wasn't aware.
Q So, you were aware that a GoFundMe was set up for you for security purposes?
A Yes.
Q Okay. And how did you become aware of that?
A I want to say I was called -- like, Project South called and said that they were gonna pick us up. So, I mean, I wasn't aware, like --
Q So, this was created in September 2020. So, does that help you re- -- remember when you were picked up by that black van? Was it in September 2020?
A It doesn't.
Q Okay. Was there a discussion before -- did you learn that this GoFundMe was going to be set up before that September letter was set -- was sent out?
A No.
Q Okay. When did you learn that this GoFundMe was going to be set up?
A I don't have a -- I didn't even know a GoFundMe was going to be set up. So, I don't know.
Q You learned after the fact, is your testimony?
A After it was set up.
Q Okay. And that was -- it was public, right? I mean, you could go on visit the GoFundMe page?



A I think so.
Q And you did that? You visited the page?
A I didn't visit the page. I was told, like, other people visited it.
Q You never visited the page, in its entire existence?
A I was told that it existed.
Q My question is did you ever visit the page yourself?
A I don't know if I -- I can't tell you if I did or not. I don't know if I went on -- went in, yeah.
Q Well, it was a source of money, correct? You understand what a GoFundMe is?
A I know what it is. I do.
Q Okay. And, in this one, it is supporting Dawn Wooten. That's you, correct?
A Correct.
Q So, it's soliciting -- it -- it's a way for money to come in to you, correct?
A Correct.
Q And while -- you were saying while you were living underground in Atlanta, correct?
A Right.
Q Okay. And it's your testimony that you never went and checked that GoFundMe page to see how much



money was coming in?
A It said for security --
MS. AYERS: Objection.
A -- purposes.
MS. AYERS: Misstates her prior testimony.
Q Is it your testimony that you never checked that GoFundMe page while you were living in Atlanta?
MS. AYERS: Same objection. She already asked and answered this.
MR. KEE: Just "form".
MS. AYERS: No, that's not true, Counsel. It's not the --
MR. KEE: It's very true.
MS. AYERS: And also, I have to give you the opportunity to fix your deficient questions.
MR. KEE: Just "form".
MS. AYERS: No, that's not true.
MR. KEE: You can answer.
MS. AYERS: So -- you can say that; it's not true.
MR. KEE: You can answer.
MS. AYERS: Go ahead, Dawn.
THE WITNESS: No, I don't -- I was told it existed.
///



BY MR. KEE:
Q So, your testimony is is that you never checked the GoFundMe page while you were living in Atlanta.
A No.
MS. AYERS: Objection. Asked and answered. She said she doesn't remember and may have checked.
MR. KEE: Just let her testify.
MS. AYERS: I did.
MR. KEE: Okay. Then, just --
MS. AYERS: You're asking her the same question over and over and over and over again, Counsel.
MR. KEE: Just "form", again.
MS. AYERS: No --
MR. KEE: Will you --
MS. AYERS: That's not true.
MR. KEE: -- keep your objections to "form"?
MS. AYERS: You just keep telling me the same thing. It's just not true.
MR. KEE: Okay. I --
MS. AYERS: Go ahead, Ms. Wooten.
MR. KEE: I'm gonna -- I'm just gonna keep asking you to keep your objections to "form".
MS. AYERS: And I'm gonna keep doing my

objections the way I know that's proper.
Thank you.
MR. KEE: Okay.
BY MR. KEE:
Q And is it your testimony, at no point in time, you ever checked the GoFundMe page to see how much money had come in?
A I don't know. I could have. I don't -- I don't remember, like --
Q What's the highest amount of money you saw in the GoFundMe?
A I don't know.
Q What were you told was --
A I can't even remember what I was told. I don't --
Q Okay. How was it that you were -- how was it explained to you that you would be able to, I guess, tap into that money or use it?
A I don't remember anybody explaining anything to me about tapping into it or using it.
Q Okay. Were you -- how -- who was keeping track of your expenses? I mean, did you -- did somebody give you a credit card?
A No, I don't -- I don't know who was keeping track.

Page 54

Q Okay. Did -- did you submit receipts --
A No.
Q -- for, like, where you were going?
A Oh, I didn't -- no.
Q You didn't handle the hotel bills?
A No, I didn't see any of that.
Q Okay. Meals?
A No.
Q Okay. If you were going to -- if -- if you were going to -- did you look for work while you were in Atlanta?
A No. We were security, underground. Like, I had a bodyguard 24/7.
Q Okay. So, you didn't apply for any nursing jobs while you were living in Atlanta?
A No.
Q And were you just -- when you said you were hi- -- like, were you just staying in the hotel -- in hotels the whole time?
A Yes.
Q Okay. Were you leaving or were you just, kind of, actually hiding in a hotel?
A We were hidden.
Q Okay. So, you never left?
A A couple of times to go out to get something

Page 55

to eat, but back.
Q Okay. And did people bring food to you?
A No.
Q Okay. So, did you have to go out and buy groceries?
A No, we didn't cook in the hotel. They were fast-serve meals.
Q So, every meal you had for those several months you were living in Atlanta was fast-food meals?
A Yes.
Q Okay. But you never went out and paid for those fast-food meals?
A Not that I remember.
Q Okay. Did you, at any point, become an RN? A registered nurse?
A Yes.
Q Okay. What's the requirements to go from LPN to RN, in terms of -- do you have to -- is there another educational step that you have to take?
A Yeah, we have to go to school.
Q So, you go to school. Okay. And that costs money?
A Yes.
Q And who paid for that?
A I got a grant.

Page 56

Q Okay. From whom?
A I want to say it was, like, Southwest -- I don't remember exactly the company, but it was, like, Southern Habitat, something like that, where they paid for.
Q Okay. And was -- were you connected with that organization through your whistleblowing activity?
A No.
Q How did you become aware?
A The school told me about it to apply.
Q Okay. And what school did you go to?
A Southern Regional.
Q And where is that?
A Technical college. They have branches. I went in Thomasville.
Q Where -- is -- where is Thomasville?
A Georgia.
Q Okay. Is that -- when did you do that?
A I want to say some part of '23. I might have finished in '24.
Q Was this while you were still, kind of, out -- in hiding or was this after you -- you came out of the hiding?
A After.
Q Okay. And where were you living when you were

Page 57

A And it was several. I don't have -- like, yeah, it's HIPAA.
MR. KEE: We can take a break and you can confer with your attorneys again.
(Brief recess.)
BY MR. KEE:
Q Okay. Ms. Wooten, before we took a break, I was asking you to identify any woman who told you that, due to an invasive medical procedure, she was rendered sterile. And your response was "HIPAA".
Are you able, after this break, to identify any woman who told you that?
A I remember Ucenia Garcia.
Q And what did she tell you?
A We had a conversation. She had had a procedure. She was very young. After the procedure, she wasn't able to have children.
Q And she told you that she had an invasive medical procedure?
A She did.
Q Okay. And it says here "without informed consent". She told you that --
A Yes.
Q -- sh- -- that she did not give consent?
A Yes.

Page 66

Q Okay. And did you raise this issue with anyone at the facility?
A I spoke with my immediate supervisor. So, we followed the chain.
Q Who was that?
A At the time, it was Marion Cole.
Q And Marion Cole has passed away?
A She has.
Q Okay. And what did you do to make sure that your concerns were -- you know, made its way up the chain?
A That was it. You talked with your supervisor inside of this facility and they handle it from there. And administration would not see you to have conversations. They would always direct you back to your immediate supervisor.
Q Okay. You're aware of the grievance forms and procedures --
A I filed a --
Q -- at the facility?
A A grievance.
Q You're --
A So, we're -- was not aware at the time of the grievance process -- procedure.
Q You're saying, though, at the time that you

Page 67

told Ms. Cole, you were not --
A I wasn't.
Q -- aware of the grievance?
But, at the time that you were moved from full-time to PRN, you were aware of the grievance procedure.
A The last time I was aware. I, kind of, found out through another employee.
Q When did you Ucenia Garc- -- Ucenia -- is that the -- that's the name you said?
A Ucenia Garcia.
Q Ucenia Garcia -- when did she tell you this?
A I don't have an exact time or time frame. I can't -- what date. It was within that second stint at ICDC.
Q So, 2016 or 2019?
When you say this -- why don't we just go over -- your -- your stints at ICDC -- which were -- when were they?
A I started in 2018 was the first -- I graduated LPN -- let me see -- '09 -- '09 or '10. '09 or '10 was my first stint.
Q And how -- let me a- -- let me just -- so you don't have to remember or say everything, how long did that stint last?

Page 68

A About nine months.
Q Okay. And then your second stint was in 2014? It began in 2014?
A I want to say -- I want to say around 2014. I think I was there four years this time -- for three, four years the second time.
Q Okay.
A I was there a little bit -- might have been two years.
Q Okay. And then what about the third time -- when did that start and end?
A October of '19 to July of '20 --
Q Okay.
A -- I want to say.
MR. KEE: I'm gonna show you what I'm marking as Exhibit 4.
I'll give you...
(Exhibit No. 4 marked for identification.)
BY MR. KEE:
Q So, this was -- I'll represent to you this was a document from your personnel file. It's LaSalle 956. And it has dates, according to LaSalle's records, of your stints at -- at the facility.
So, the first -- first one that's listed, you see, is 6/11/14 to 8/14/15.

Page 69

Does that sound accurate to you?
A It doesn't.
Q Okay. And wh- -- why?
A It doesn't.
Q Why not?
A I was only there twice under LaSalle. So, these dates are not correct.
Q I'm sorry. You were -- say that again? I --
A I was only -- I was under LaSalle twice.
Q Right.
A The first time I worked there, somebody else owned the company.
Q So, that would have been in 2009?
A Or '10.
Q Okay. So -- right. So, these were when you were working at LaSalle; is that accurate?
A Huh-uh. I'm not gonna say these dates are accurate. I'm gonna have to say no.
Q Okay. What is it that's making you think that this is inaccurate?
A '14 -- I would have left in '16 because I went back to school -- was gonna go back to school in '16. So, they -- they don't look -- and I came back in '19.
MR. KEE: All right. I'm gonna show you what I'm marking as Exhibit 5.



(Exhibit No. 5 marked for identification.)
BY MR. KEE:
Q And this is LaSalle 240. And do you see that this is a -- an offer letter?
A Yeah. Yes.
Q From LaSalle to you?
A Yes.
Q And you see it corresponds with that 6/11/14 date?
A Yes, I'm not arguing the hire date. I'm arguing the resign date.
Q Okay. And you were hired on -- in -- 6/14 as a full-time -- an LPN full-time?
A Yes.
MR. KEE: Okay. I'm showing you what I'm marking as Exhibit 6.
(Exhibit No. 6 marked for identification.)
BY MR. KEE:
Q And you see this is another offer letter, 5/2/16? Do you see that?
A Yes.
Q Okay. And your title will be PRN? Do you see that?
A Yeah.
Q Okay. You're not disputing that that's your



signature at the bottom?
A I don't recall working for, like, LaSalle PRN.
Q You don't dispute that that's your signature, is my question.
A No, I don't.
Q Okay. And this 5/2/16 date of this offer letter corresponds with what is in Exhibit 4?
A It does.
Q Okay. So, I want to go back to the date, the timing of when Ucenia Garcia -- when you say she made this disclosure to you.
Are you saying that it was during that 2000- -- the second stint. Which one are you referring to?
A My second stint would have been the '19-to-'20 stint. So, my recollection to the '16 stint, with these documents. I don't even recall working there the '16 through the '17.
Q Okay. And so, that disclosure would have been during -- sometime in either 2019 or 2020?
A Within that, yes.
Q Okay. And it would have been before Ms. Cole's passing?
A Yes.
Q Okay. And how was it that you knew that she



did not give informed consent?
A She -- by her saying that she didn't have consent -- she didn't give consent to have this procedure; so, by what she told me.
Q Okay. And that consent would have been given at the doctor's office?
A I'm thinking, yeah.
Q Okay. Did you ask -- did you go verify -- did you ask the doctor if any consent was given?
A We didn't have legal acc- -- well, we didn't have access to his outside facility. He performed his procedures outside.
Q Okay. So, you did nothing to verify whether what she was saying was true or not?
MS. AYERS: Objection.
Q Did you do anything to verify what she said was true?
A So, when I was asked, had she had this procedure, that was a conversation that we had sitting at the desk. And the records would have been outside, unless they brought back on the inside with her.
And the time frame for my job was so short to her -- to reply. Like, I was removed really quick, really quick from the premises, really quick.
Q Okay. My question -- I don't think that

got all your body parts, and then you go down and you have this procedure and you find out now, after this, you can't have kids.

Q Well, did she leave the facility after the procedure and then she got put back into the facility? Meaning, was there --

A I --

Q -- a space and time where she said, I can no longer have kids. I've been trying and I can't have kids?

A She hadn't been -- she was admitted into the facility.

Q Right.

A Had this procedure when she got to the facility. Found out what this procedure was while at the facility. Whenever she got ready to go back home, she said she would have to tell her husband she couldn't have kids because she had this done while she was away at this facility.

I have no recollection or idea. I went by what she told me, went and looked, told her what she had. I mean, that's all I have.

Q Okay. And so, your opinion of whether or not she was sterile or not was solely based on what she told you.



A In good faith, what she told me, I went back, as a nurse, in concern for my patient, took back what she said.

Q But you're not a -- you wouldn't be able to tell whether or not that procedure would render her sterile or not, correct, just by looking at whatever was in the medical record?

A I'm not a doctor.

Q Right. So, you're not a doctor. You didn't speak to a doctor to see if she could have kids or not, right?

A The doctor didn't perform those procedures at the facility.

Q Right. So, you had no one to talk to to verify what she said was true.

A I talked to my detainee and what I saw in the records.

Q But nobody else, correct?

A The detainee and the records, so, no.

Q Okay. And then you said you told Marion Cole -- what did -- what exactly did you tell Marion?

A I had this detainee come to me, said she had this procedure done. I went and looked. Took back what information she had for the procedure that was done. And I was told to mind my damn business.



Q Marion Cole told you to mind your damn business?

A To mind my damn business.

Q Okay. So, that made it clear that she was not going -- in your opinion, not gonna elevate it, escalate it any further?

A Mind my damn business. So, I dropped it at my supervisor where I was supposed to drop it at. She was supposed to further it along.

Q You didn't think you should escalate it further, yourself?

A What -- administration inside of that facility would not talk to you. You couldn't talk to the warden. You were always directed back to your immediate supervisor and they would follow the chain of command.

Q But you did file a grieve- -- you -- you did get to speak to the deputy warden, correct?

A I spoke to the deputy warden about a concern that they filed against me, not my personal.

Q Yeah, if it affected you, you found a way to talk to the -- y- -- you found a way to talk to the deputy warden, correct?

A I didn't -- no, sir, I did not find a way to talk to him. They had already written me up for whatever and I was told to go to his office.



Q Okay. And you filed a grievance after, right?

A After.

Q Okay. So, there's a way to escalate things further within this facility, correct?

A Had I not been called up front, I would have never known how to file a grievance.

Q Okay. I'll say it again: There is a way, within this facility, to escalate things further.

A If they make it known to you, yes.

MR. KEE: Okay. And if they make it known to you -- I'm gonna show you -- I'm going to show you a document that you've produced as -- starting at DW12, okay, and it goes through to DW18. And I marked that as Exhibit 7.

(Exhibit No. 7 marked for identification.)

(Discussion off the record.)

BY MR. KEE:

Q Okay. This is a document that you produced, correct, Ms. Wooten? Do you see that?

This came from you, correct?

A (Examining document.) No, I don't remember producing this.

Q Okay. Do you see the "DW" that's -- those are the -- the Bates labels at the bottom-right -- those are Bates labels for documents that you produced.





Veritext Louisiana – CRLA/goDEPO cs-Louisiana@veritext.com
A Veritext Company www.veritext.com

A This would have been given to --
Q You produced this to us. This came from you, as in, this document was in your possession and you produced it to us.
So, my que- -- I'll a- -- I'll just start -- I'll ask you questions. Do you see this is the -- the policy -- the employee grievance procedures -- policies and procedures at LaSalle?
A Yeah, it is.
Q Okay. And it explains all the steps necessary, if you want to raise a grievance, relating to your employment or anything going on at IDC- -- C, here -- here are the policies and procedures how to do that, correct?
A Correct.
Q And you've complied with these procedures when you did file your grievance in July of 2020, correct?
A As far as I know.
Q Okay. I want to go back to Exhibit -- or -- so, back to Exhibit 3. And here, this statement, "Enough was enough. It was time take on a second job: whistleblower."
Do you agree that you were basically taking on a second job, becoming a whistleblower?
A I didn't.



Q Okay. Did you -- y- -- this is a document you produced. Is this -- did you correct this and say, I disagree, I was not taking on a second job as a whistleblower?
A I didn't agree whistleblowing was a second job.
Q My question was: Did -- did you ever tell anybody, you know, I don't agree with this, please take this out of this document or whatever platform this is going on?
A This document was sent on my behalf.
Q By whom?
A I don't know by whom. I'm assuming -- I don't know who submitted it.
Q Okay. And you see the second page -- you talk about -- or this document says, last sentence, "The movement to abolish this detention center as well as ICE detention centers, in general, picked up steam."
Was that a goal of -- of yours? Were you hoping that IDC- -- ID- -- ICDC would be shut down?
A That was not a goal for me.
Q It wasn't?
A It wasn't.
Q Okay. Second paragraph there, last page in the middle, sentence starting, "The solidarity I have



been shown gives me the strength to keep going. Bolstered by that support, we won a major battle in 2021. In response to the serious issues we raised, ICE stopped detaining non-citizens at the facility altogether."
You consider that a -- a major battle that ICE stopped using the ICDC facility?
A This was sent on -- like, this was sent for me.
Q A- -- and speaking in first person "I". Do you see that?
A I see that, but this was sent for me.
Q Okay. And I'm asking you, do you agree that that was a major -- won a major battle, that that was a -- a major victory, in your opinion?
A I don't have an opinion to that statement.
Q So, you disagree with this statement that is being put forth as your own statement.
A I didn't say I disagreed or agreed with it. I didn't -- it was sent for me.
Q I'm asking if --
A This was sent --
Q -- you agree with --
A This was sent for me.
Q I'm asking you, and you agree with it.



A I don't have a -- like, I don't know to agree or disagree.
Q Was it a major battle -- was it a major victory that ICE stopped using ICDC?
A I don't know to agree or disagree.
Q You -- you don't consider that a major win, a major victory, as stated here?
A I don't agree or disagree.
Q I don't understand what that means. Can you explain your- -- what -- what you mean by that?
A I'm not agreeing or disagreeing to it. It was sent for me. Like, somebody filled this out for me. Like, this was done for me.
Q Who?
A Like, this is -- I don't know. Like -- I'm reviewing this document. I'm not, like, targeting anybody.
Q Okay. But you would agree this statement looks like you were targeting ICDC, correct?
A I'm not targeting anybody.
Q I said, it looks like, based on this statement, that that was a major battle you wanted to win.
A I didn't want to win anything.
Q Okay. So, did you tell them, please remove

this on the GoFundMe page.
Q Okay.
A So, I did the interview, but thi- -- this was the interview done -- was not associated to this when I done the interview. This is my first time seeing that.
Q Okay. If you look, you see there's a write-up? It says: Here's my video of me with Ms. Wooten and her legal -- demonstrating that this -- okay.
And then it says: Nurse Wooten recently revealed that ICE is performing mass hysterectomies on undocumented immigrants kept in federal custody. Whistleblowing, especially as a black woman, comes with enormous risks and it is overwhelmingly likely that she sees backlash, harassment, and physical harm.
This fundraiser is intended to raise enough money for Ms. Wooten to install a security feature for her place of residence, in parentheses, $2,000, and six-plus months of private security, priced at $35 per hour, 20 hours a week, $13,000.
However, if Ms. Wooten needs the funds for something else, such as a legal team or even everyday support after giving up her job to reveal this corruption, she is free to use the fund as she sees fit. Every cent will go to Ms. Wooten. She has sole access to these funds.

Page 94

To reach her, contact her organizational reps, the Government Accountability Project and Project South.
Do you see that?
A I do.
Q Okay. So, it looks like the goal was to raise approximately $15,000, correct? That was the goal?
A I didn't have a goal. I didn't set it, but that's what it says.
Q It say- -- it says, this fundraiser is intended to raise enough money to install these things, and gives an estimate of 15 grand, correct?
A That's what it says.
Q Okay. And then, if you look at the first page, it even has 15 grand as the goal, right?
A Ye- -- it does.
Q And then, how much was raised?
A It does.
Q How much was raised?
A 104,961 is what it says.
Q $104,961, correct?
A Correct.
Q Okay. So, far exceeding the $15,000 goal, correct?
A Correct.
Q Okay. So, the $15,000 was for your s- -- the

Page 95

security that's contemplated.
Where did the rest of that money go?
A I have four children.
Q Uh-huh.
A We were in Atlanta underground. Food, housing, clothing, shelter, parenting, time far spent, rent. I had no job.
Q Did you keep this -- the -- the money?
A I don't remember how much of -- oh, God. How much of that money -- like I said, it all went so quick.
Q The money went so quick?
A I had no idea.
Q What went so quick? The money?
A Time, money far spent. So, yeah, I'm still without home -- I'm still without a house.
Q Okay. Is this for --
MR. KRAMER: Money, what, spent? I'm sorry? When you said --
THE WITNESS: Went -- it went quick, was far spent. Like, you -- it's nothing I kept a track of. Like, everything was so quick.
BY MR. KEE:
Q Is this more than you would have made as a -- during the time period, more than you would have made as a -- as a nurse at ICDC?

Page 96

A Probably, yes.
Q Okay. And you also -- did you have speaking engagements?
A I did.
Q And you got paid for those?
A Some.
Q Okay. How much would you get paid for a speaking engagement?
A 2-, $300, I remember. Not very much.
Q Okay. And you were being engaged for those speaks to talk about your whistleblowing activity and experience as a whistleblower, correct?
A Experience as a whistleblower, yes.
MR. KEE: Okay. So, I just want to go back to something you -- you raised some -- we talked about HIPAA. I'm gonna show you what I'm marking as Exhibit 9.
And I'll mark this -- these documents confidential. These are documents you produced to us. You see it's DW841, 842, and 843.
(Exhibit No. 9 marked for identification.)
BY MR. KEE:
Q Okay. And where did you get these documents from?
A ICDC.

Page 97

Q Okay. And they're medical records of patients?
A They are.
Q Okay. And they're protected by HIPAA?
A They are, depending on what you use them for.
Q W- --
A So, you couldn't take this information out and publicize somebody's information.
Q Okay. But you can -- Ms. Wooten can take it out if she wants to; is that...
A I had possession of them.
Q And you took them out of the facility, correct?
A Correct.
Q Okay. And these were detainees' medical records, correct?
A They were their results.
Q Okay. And who did you ask if you could take these medical records out of the facility?
A Lakeysia Brown is the supervisor.
Q Who did you ask?
A Lakeysia Brown.
Q Okay. You said, can I --
A Or La-kees-a.
Q You said, I can take -- can I take these



medical records?
A She was making copies of those medical records, so she walked them out as well.
Q Okay. My question is: Did she tell you that she could take these medical records?
A My immediate supervisor didn't see a problem with me getting -- yes.
Q Thank you.
Okay. Did you ask her, can I take these?
A Yes, we -- we talked about it.
Q Okay. And it's your testimony that she said, yes, you can freely take these medical records with you?
A Yep.
Q Okay. Is that in writing anywhere?
A It's not.
Q Did you memorialize and send a text and say, hey, Lakeysia, just want to be clear that you authorized me to take these medical records?
A No. She was taking medical records -- taking these as well. She had them in her possession as well.
Q Okay. And you know this is a violation of HIPAA, correct, what you did?
A Correct.
Q Okay. But you did it anyway.
A Yes.



Q Okay. When did you first hear about Project South?
A 2019, 2020.
Q How was it that you heard about them?
A I don't even recall how -- I got a call -- they were doing something inside the detention already.
Q Project South was?
A And they heard about me being demoted. So, I got a call from them.
Q Okay. You didn't reach out to them; they reached out to you?
A Yes.
Q Okay. Who called you?
A I want to say her name was Stephanie.
Q Stephanie? Okay.
What did she ask you?
A If I would like come and do, like, a talk or something.
Q An interview?
A She was asking me --
Q She wanted to interview you?
A Yeah.
Q Okay. About your experience in ICDC?
A Yes.
Q And what you were seeing?



A Yes.
Q Okay. And you had just been demoted, at that point?
A Just been --
Q From full-time to --
A Just been let go.
Q You said let go?
A Yes. Yeah.
Q Okay. Well, you -- maybe it's -- this is semantics. Maybe we're not gonna agree on the language, but it's -- according to ICDC, it's when you got -- your status changed from full-time to PRN, around that time period, July 2nd, 2020.
A Around that time.
Q Okay. And so, they wanted you to come in and do an interview?
A Yes.
Q Okay. What did they ask you?
A They had some things that they were already working on or had some issues, and so, I didn't get a whole lot of questions. It's, would I come to Atlanta and talk with them. They asked about -- I think, about the conditions, what I had saw.
Q In this interview -- when you went for the interview, was that in -- was that in Atlanta?

A It was.
Q Okay. So, you had to drive the three hours to Atlanta to go?
A I did.
Q And who was -- who was in the room when you were interviewed?
A It wasn't, like, a -- we talked over the phone. So, it was, like, a press release, like, when I arrived. It was a lot of press there.
Q When was that?
A I'm not sure of the date.
Q Okay. So, it sounds like there was -- you got called around July 2nd of 2020, by Project South and they were asking you questions and then asked if you would come and do a meeting with them and talk to them in-person?
A Yeah.
Q Okay. And that in-person meeting was in Atlanta?
A It was in Atlanta.
Q Okay. And you said that was -- it was, like, a press release? There was already press there?
A It was.
Q Okay. Had you signed a declaration by that point?



A I'm not sure. I'm not sure. I don't know the exact dates.
Q Okay. And how many conversations do you recall having between the time they first reach out to you, July of 2020, and this meeting that you had in Atlanta?
A I don't know how many conversations we had.
Q Was it more than one?
A I remember one. I don't remember how many conversations we had.
Q Okay. Was it -- were they Zoom conferences or were they over the telephone?
A Telephone.
Q Okay.
MR. KRAMER: A little louder, Ms. Wooten, if you --
THE WITNESS: Over the telephone.
BY MR. KEE:
Q Did they ask you to send any documents before the meeting?
A I don't know. No.
Q Did you send them the medical records that you had taken out of the c- -- out of the facility?
A No.
Q Did you tell them you had done that?



A No.
Q Did they ask if -- if you had taken any medical records?
A Not that -- no.
Q Did they ask you to take any medical records?
A No.
Q Okay. Did you show them that you had?
A No.
Q Well, you had to have told them at some point because it was produced in this case, correct?
A No, I never told them.
Q Okay. So, did you produce those documents to us -- to us that we just went over, the three medical records, or was that your legal team?
A My legal team.
Q Okay. So, at some point, your legal team got ahold of these medical records, correct?
A Correct.
Q Okay. And that came from you?
A Yes.
Q Okay. Do you recall giving -- handing over medical records to Project South --
A No.
Q -- before this lawsuit?
A No.



MR. KEE: Okay. I'm gonna show you what I'm marking as Exhibit 10.
It's, kind of, a large document, so I'm really just going to ask you right now just for date purposes. And I'll direct you to the -- to the page.
And, again, these are -- this is a document that -- that you produced. It's DW662 and the document ends on 706.
(Exhibit No. 10 marked for identification.)
BY MR. KEE:
Q So, if you flip -- and I'll -- I'll direct you to the -- by Bates label at the bottom, DW696. And just let me know once you're -- once you get there.
A I'm there.
Q Okay. And do you see it says, "Verified declaration of Dawn Wooten"? Do you see that?
A I do.
Q Okay. And then the last -- or second-to-last page, which is 705, it says, "Executed on September 8th, 2020, at Tifton, Georgia", and they've got your digital name, Dawn Wooten. Do you see that?
A I do.
Q Okay. Do you remember executing this on September 8th, 2020, at Tifton, Georgia?

A Yeah.
Q Okay. You didn't draft this yourself, did you?
A No, I had help.
Q Who drafted it?
A I had help with it, my legal team.
Q Project South drafted it?
A Yes.
Q Did you have any -- were there any drafts -- did you have any changes to anything or any corrections before you executed it?
A Not that I'm aware of.
Q And they sent you this by e-mail, the draft, for you to -- for you to execute?
A Yeah, I think so.
Q Okay. When you signed September 8th, 2020, when this was executed, was this before or after your meeting in Atlanta with the Project South team?
A I don't know exactly what date I went. So, I don't know exactly what date -- I don't know if it was before or after.
Q Okay. They -- the -- let's see. The 51 statements that are included in this -- the 51 paragraphs -- how was it -- since you didn't draft it, how was it that Project South was able to gather this



information and put it in this declaration for you to sign?
A We talked -- we had a -- like, a meeting.
Q In-pers- --
A Like -- so, like I said, we talked then.
Q Did you have an in-person meeting?
A I don't remember if it was in-person or over the phone.
Q Okay. Were you asked to, you know, provide any, you know, documented -- documentary support for what you were signing here?
A No.
Q Okay. Did -- and you provided no documents to them, correct?
A No.
Q Okay. And before you signed this or executed it, you had not met in-person with anyone at Project South?
A I don't know if I had or not. Like I said, it's been such a time -- it's been a long time ago.
Q Okay. Is there -- were there any other in-person meetings with Project South before that one in Atlanta?
A I don't know. I don't -- I don't know, so I can't say because I don't know if I had any before then



or -- or not.
Q So, these CDC regulations that are cited, are quoted in here -- did this -- are these things that you were looking at or knew about or was this something that Project South provided to you?
A We observed. I mean, it -- it might have been things they had as well, but it's things I just knew wasn't right.
Q I'm talking about just the regulations, what -- that are -- you know, for instance, Paragraph 16: Among other things, even before the COVID pandemic hit, ICE required -- and there's a list of A through H.
Is that something you knew? Is that something you told Project South or is that something Project South told you?
MS. AYERS: Objection. If Project South was acting as your legal counsel, don't reveal the substance of communications, please.
BY MR. KEE:
Q Did you know this before you received a draft of this declaration?
THE WITNESS: Stephani?
MS. AYERS: You can speak to what you knew before. Just don't speak to the content of



communications with your legal counsel. And Project South, I believe, was operating as your legal counsel at the time.
THE WITNESS: They were.
BY MR. KEE:
Q Let me ask you this: When did you sign a retention agreement with Project South?
A I don't know when or the exact date. So, I don't know when.
Q Okay. Was it before you received the draft of this declaration to sign?
A I don't know when.
Q Okay.
A Like, it's been -- this has been -- it's -- we're talking about 2020.
Q Right. And you said -- I think I just heard you say you knew things weren't right. You just knew things weren't right --
A I --
Q -- inside the facility?
A Yeah.
Q Yeah. And that's -- even though this was a novel virus that the whole world was trying to figure out, you just knew, though, that ICDC wasn't doing something properly. That's your testimony?

A Yeah.
Q Okay. And I don't think I got an answer. Did you know these regulations before you received a draft of this declaration?
A I don't know.
Q Where would you go find this? Do you have any idea?
A So, should they be posted?
Q I'm -- I'm asking you the question. Where -- where would you go find this?
A They should be posted.
Q Okay. Where did you go find this to learn about it?
A They should have been posted in the facility.
Q Okay. Where did you go learn about this?
A I had worked -- helped with my legal team, so they worked on it together.
Q So, it's through your legal team?
A We worked on it together.
MS. AYERS: Objection.
Q And then --
MS. AYERS: She's already testified she doesn't remember.
MR. KEE: She just test- -- she just answered the question.



MS. AYERS: Great.
BY MR. KEE:
Q Okay. 17. According to CDC -- and there's a long list in Paragraph 17 -- where did you go to find these standards that are set forth here?
A It's 2020. I don't know. I mean, we worked on it together.
Q Okay. How did you come to the conclusion that IC- -- ICDC never met the standards?
A Blood on the floor, dirty, nasty mops. They weren't cleaning.
Q Okay.
A What I observed --
Q The blood on the floor -- who did you go complain to about that?
A The supervisor. Administration knew about it.
Q Who -- who did you --
A Lakeysia Brown --
Q -- complain to?
A Marion Cole.
Q Okay. So, this was while Marion was still alive, was the blood was on the floor?
A Yes.
Q Okay. And what did -- did you say this is -- this violates some guideline?



A Yeah, it's not a -- it's not a proper procedure. Like, you can't leave blood on the floor --
Q What --
A -- for several days.
Q What proc- -- what did you say? What did -- what was it exactly?
A I don't know exactly what I said. I just know it just was not proper to leave it on the floor. It wasn't -- it wasn't right. It wasn't sanitary.
Q Okay. And then, what did they say to you?
A Mind my damn business.
Q So, that's the second time someone has told you, mind your damn business.
A I get told that all the time.
Q Okay. And Marion Cole told you that all the time?
A All the time, Marion Cole, Lakeysia Brown, Shanise Bell.
Q Okay. And then you said blood on the floor. What else did you say?
A Mops in buckets for days, like, sour mops. They're mopping with sour mops, like --
Q Okay. And did you complain about a mop or bucket to your supervisors?
A I did.



Q Who?
A Marion Cole, Lakeysia Brown, Shanise Bell.
Q And when was that?
A During the last stint. I don't have exact dates and times.
Q Okay. If you see blood on the floor at ICDC, when you were working as a nurse there, you understand there were blood kits?
A No.
Q To remove blood on the floor?
A No.
Q You didn't know that, as a nurse?
A I know that, as a nurse, but --
Q Okay.
A -- at ICDC, no.
Q No, what? You didn't --
A No kits available.
Q Your testimony here is that there were no blood kits available at the ICDC?
A IC- -- no.
Q Okay. If there were, you'd be responsible to clean that up, if you saw it?
A If I knew it had to be, yes.
Q If you knew there was a blood kit and you saw blood on the floor, that would fall under your

responsibility to clean it up, correct?
A Not just my responsibility, but because I found it, yeah.
Q Right. Okay. What did you do to try to clean it up yourself?
A Sour mop.
Q So, you -- you cleaned it up yourself?
A Sour mop. That's how I knew the mop was sour.
Q My question is: Did you clean it up yourself?
A That's how I knew the mop was sour. Yes, I mopped it.
Q Okay. So, you -- so, you mopped. Okay. And so, the blood was gone?
A I mopped it, yeah.
Q So, the blood was gone, correct?
A Yeah.
Q Okay. And so -- and then, after the blood was gone, you went and complained to the super- -- your supervisors that there was blood on the floor that you had to clean up?
A I complained first --
Q Okay.
A -- that the blood was on the floor.
Q Did they --
A Even showed it to the supervisor.



Q And did they tell you, okay, now, clean it up?
A No, nobody ever told me to clean it up.
Q Okay. So, it's your testimony that you tell the nurses that -- y- -- your supervisor that there's blood on the floor and they just ignore it, tell you to mind your business, and then you cleaned it up yourself.
A Disregarded it. Exactly, yeah.
Q Okay. And then did you complain to -- and you went back and complained to them about the mop?
A I complained about the mop in the same scenario. Like, what am I supposed to do with this? H- -- how -- I mean, this is -- yeah. So, nobody cared. As long as you kept your mouth shut at ICDC, you kept your job.
Q Okay. So, as long as you kept your mouth shut, you kept your job. That's your testimony?
A (Nodding head affirmatively.)
Q Okay. Do you remember filling out your grievance form?
A For -- not exactly when.
Q In July 2020, when you were moved from full-time to part-time -- or -- or PR- -- PRN?
A I remember writing, like, a 12- or 13-page --
Q Right.
A -- grievance, yeah.



Q It was a long grievance, you'd agree, correct?
A It was.
Q And you said nothing about COVID concerns, correct?
A I don't know what was exactly in my grievance. I had a lot that I was complaining about in my grievance. For one, I was trying to keep my job. So, it went begging for my job.
Q That's not my question. My question was: You did not say anything or make any complaint about anything related to COVID -- COVID in that grievance, correct?
MS. AYERS: Objection. Asked and answered.
Q You can answer.
MS. AYERS: She told you she doesn't remember.
Q You can answer.
A I don't remember what -- it was 12- or 14-page report.
Q What do you remember?
A Begging for my job in that grievance.
Q What were your complaints, though? What were you grieving about?
A I don't know exactly what I was -- like --
Q Nothing about hysterectomies, correct?
A Hysterectomies were not the focal -- they were



gynecological procedures. Everybody else blew up the hysterectomies.
Q Okay. So, the answer to that --
A It's not the focal.
Q -- my question is, yes, right, that you did not include that, anything about hysterectomies, in your grievance, correct?
A I don't -- I'm not sure. I don't --
Q Nothing about gynecological procedures, correct?
A I wrote a grievance, so I'm not sure.
Q Okay. You would agree it's markedly different from what's in your declaration, correct?
MS. AYERS: Objection.
A I don't know. I -- like, I had a 12-, 14-page grievance.
MR. KEE: All right. I'm gonna mark -- I'm gonna show you what I'm marking as Exhibit 11. And this is DW30 to 39.
(Exhibit No. 11 marked for identification.)
BY MR. KEE:
Q Okay. This is a copy of your grievance, correct?
A It is.
Q Okay. And you're the person who filled this





Veritext Louisiana – CRLA/goDEPO cs-Louisiana@veritext.com
A Veritext Company www.veritext.com

out?
A Yes.
Q Okay. And this is your handwritten letter, correct?
A Yes.
Q And before this letter was written, you had not -- Project South was not involved in any way, correct?
A I'm not sure if they were. I don't think they were, but I'm not sure.
Q Okay. They had not called you at this time to inquire about you being moved to PRN and your experiences at ICDC, correct?
A I'm not sure of the time frame.
Q Okay. Well, they didn't send you a draft grievance for you to sign, correct? You -- you actually did this one, yourself?
A Yeah, I filled -- this is my grievance I filled out.
Q And no one helped you draft this?
A No.
Q This came straight from you.
A Yes.
Q Okay. And the declaration, though, did not come straight from you, right? That was drafted by

Page 118

Project South?
MS. AYERS: Objection. Asked and answered.
Q Correct?
A My declaration, we worked on together.
Q Okay. But you didn't draft it, right?
A We worked on it together.
Q Now, I asked you before if you had any edits to that declaration, and now, are you suggesting that you did?
A No, I didn't say I had any edits. I said wh- -- when you first asked me this question, I said we worked on it together. You asked me, then, did I have any edits. I said no.
Q Right. But no one worked on this grievance that we're looking at right now, but you.
A Oh, yes, I worked on this grievance.
Q Okay. And if you look through here, do you see anything relating to COVID concerns?
A No. This grievance was for...
Q But you're -- you're "The Voice of the Voiceless", right, Ms. Wooten?
A Yes.
Q Right?
This is the time you're talking to the deputy warden. You're filing a grievance with -- the wardens

Page 119

are gonna see this, right?
A Correct. They let it --
Q And it wasn't -- and you didn't think it was important enough to put in here that there were COVID violations, COVID concerns, blood on the floor, dirty mops?
MS. AYERS: Objection. Argumentative.
Q Correct?
A This grievance was substandard size to -- this was an answer -- when I wrote this grievance, my answer in this grievance was solely to why I was being demoted. This is what this grievance is. So, nobody had any concern about what else I saw.
Q Okay. So, this -- so, the demotion that you're having the grievance about -- it had nothing to do with COVID compliance.
A This grievance was for the demotion.
Q Right.
A I was sick out with COVID.
Q But the demotion had nothing to do with any complaints about COVID compliance at ICDC, correct?
MS. AYERS: Objection.
A That's -- that's not correct because I was out with COVID. That was the purpose of this demotion. They were saying I was a no-call, no-show, so --

Page 120

Q Right, but that doesn't -- but your call -- no-call, no-showing had nothing to do with whether or not they were following CDC procedures in the facility, correct?
A That's not correct.
Q How is it incorrect?
A I had COVID. So, they weren't following the procedures. I was warranted to come to work, s- --
Q You didn't have COVID, though. You tested negative. You didn't have COVID.
MS. AYERS: Objection. Argumentative.
Q Correct?
A So, asymptomatic -- you're saying I'm -- so, you're saying I was asymptomatic.
Q That's what your medical record showed.
A So, you know you test in a window.
Q Okay. Were you tested positive or negative?
A So, I tested in a window. So, my physician saw fit for me to be out because I had COVID symptoms.
Q You got tested and it was negative, correct?
A Correct.
Q Okay. So, you didn't have COVID.
A Just COVID symptoms.
Q Okay. You didn't have COVID, correct?
A Just COVID symptoms.

Page 121

Q You did not have COVID, correct? Yes or no.
MS. AYERS: Objection.
Q Yes or no.
MS. AYERS: It's --
A I had COVID symptoms.
MS. AYERS: Can we ask what the test was? Okay. Negative.
Q Was the test negative?
MS. AYERS: How about that? She tested negative.
Q Correct?
MS. AYERS: Whether she had COVID or not, she can't say.
MR. KEE: Well, then she just said it. She said she had COVID. That's what started this whole thing.
MS. AYERS: Right --
MR. KEE: So --
MS. AYERS: -- but, like --
MR. KEE: So, now I'm --
MS. AYERS: -- you don't --
MR. KEE: I'm just asking her -- just "object to form".
BY MR. KEE:
Q What did the test show?



A Negative.
Q Negative. Okay.
So, you didn't -- this -- when you said this was about her -- you having COVID -- let me ask you, though: You went and had that test because you were having a medical procedure the next day?
A No. What medical procedure?
Q On the 22nd, were you being tested because you was having a medical procedure the next day?
A I'm unaware of a medical procedure, 22nd.
Q On the 23rd, you were having a -- a medical procedure on the next -- the next day.
A What procedure?
Q That's what I'm -- I'm asking you --
A I'm not --
Q -- was that the reason?
A No.
Q Okay. Now, I'm -- back to your grievance here, you agree that there is no complaints about gynecological procedures being performed at ICDC, correct?
A Correct.
Q Okay. Nothing about any failures to comply with COVID regulations.
A Correct.



Q Okay. And nothing about you having COVID, correct?
A The reason I was out because I was COVID-tested and symptomatic.
Q Okay. Let me read this. This is also in your complaint.
A Where are you?
Q Page 8 of it -- it's 38. You say, "I may not be employed after this grievance, but you're going to have issues with the relationship of the supervisors. "I was excited Ms. Brown was given" -- "Mrs. Brown was given the position as HSA, but she's shifted when her best friend came on board.
"I don't know her, but she doesn't know how to talk to you as an individual. I have no problem, again, with being supervised and doing my job to the best of my ability.
"It's morally and ethically wrong to change or create policy to throw your weight around --
A Uh-huh.
Q -- "to" -- what's that word? To -- what is it? I can't read it. That -- do -- do you see it?
A I do.
Q What's the word?
A Defa-mate.



Q Okay. "Defa-mate the character, build a case, and manipulate to build an empire filled with friends and family.
If others would speak out, my grievance would seem" -- "would be seen as unfair, but because their jobs would be threatened, they are afraid to."
A Uh-huh.
Q Okay. So, you're complaining now about basically the structure of this -- what -- just friends working together in leadership positions?
A The structure of the facility. So, yeah, friends.
Q Okay. And, again, that doesn't have anything to do with your COVID test, correct?
A It does because they collaboratively agreed together for the write-up.
Q Do you think there was a conspiracy between Ms. Brown, Ms. Bell, and Ms. Whitley to make this up?
A I believe there was a power for power.
Q Do you think they were lying?
A I don't think; I know.
Q You --
A But because they agreed together, yeah.
Q Okay. So --
A I do.

Q And what were they lying about?
A To keep their jobs. So, everybody covers for everybody to keep their jobs.
Q No, about you -- this situation -- what did they lie about?
A Nothing was done about it.
Q Done about what?
A Nothing was done about this situation. I mean, I got demoted, but nothing was done about it. Brown kept her job. Joan kept her job. And Shanise kept her job.
Q Well, they call- -- they didn't -- not -- you're the one who didn't call and no-showed, according to them?
A I was never called -- told to call or no-show. Ms. Brown had a doctor's excuse that told her specifically the amount of time that I would be out.
Q And when did you give that to Ms. Brown?
A I'm not aware of when I gave that to her. I gave her a copy of it, but she had it.
Q How did you retain a copy of it?
A I got it from the doctor.
Q You got two copies?
A So, I had two copies. I one to where I gave her a copy -- because things get lost inside of the

Page 126

facility. So, I copied it. I dated it. I signed it. I handed it to Ms. Brown. And I took the original. It was my original copy. It was my excuse.
Q You signed it, you said?
A I signed it or initialed it so she would know that I had it. I handed it to her, down line.
Q Okay. So, you initialed it and then copies were made with your initial on it?
A I gave her the original -- I kept the original copy. I made a copy and gave it to her.
Q What did -- which one did you put the -- your initials on?
A I don't know if I -- original or copy, but I gave it to her so she would have it. So, I initialed it.
Q Which one did you initial?
A It was --
Q The one you kept or the one you gave to her?
A She should have had initials on the one that she had.
Q What about the one you have?
A It should have my initials on it.
Q Okay. And you said no one told you that you had to call in?
A I was not told, whenever I gave that excuse to

Page 127

her, that I did not have to call in every day. I was not told that.
Q Are you disputing that Ms. Whitley told you that?
A I don't -- Joan didn't call and tell me about calling in. They changed the policy to fit them every minute.
Q So, they changed the policy -- what -- what do you mean?
A The rules change every minute. So, if I bring you a doctor's excuse -- I never had to call in. I never had to call in to say, hey, I'm not going to be here today. It was never a thing of me being told to call in.
Q So, I want to make this clear. Are you just -- are you disputing that Ms. Whitley called you and specifically told you that you needed to call in each of the days when you were scheduled and awaiting the COVID test results?
A I don't remember Ms. -- I don't remember her telling me I needed to call in every day. She knew I was gonna be out. I mean, I just never had that problem.
Q Okay. And you're -- y- -- you don't recall following up with Ms. Brown -- calling Ms. Brown and

Page 128

asking her, you know, how you should handle what Ms. Whitley told you?
A I had a conversation -- when I left my excuse with Ms. Brown, we had a meeting that day at the facility. I had handed her my excuse. I didn't have to call out.
And the rule changed -- I remember being home. So, the rule changed and I got a call saying -- let me see -- I got a call saying that -- like, what was the problem or issue or something.
So, Joan did call me, asked me what my issue was. I remember arguing with her. And she said that I would have to be -- I would have to call her, was what I would have to do, every day that I wasn't gonna be there -- home.
So, she did call me at home and told me I would have to call her every day that I was not going to be there. I called Ms. Brown and Ms. Brown told me that I didn't have to call every day; that was crazy because she had my doctor's excuse.
So, that's why I said the rules and the policies change minute by minute because, prior to leaving, there was no reason to call out. She had an excuse.
Q Okay. If you were symptomatic with COVID, why

Page 129

would you have gone to the facility to hand somebody -- to hand-deliver a note to somebody?
A Because I got a call from Ms. Brown that said that, if I did not come to this meeting, I would not have a job. She knew I had symptoms. I came in with 102 fever to a meeting.
Q Okay.
A We had a meeting at 5:00 p.m.
Q And that -- June 22nd?
A I want to say around that time.
Q Okay.
A I guess around th- -- I don't know the exact time.
Q Well, let me -- let me read your -- your grievance that you wrote in July of 2020. And this is on Page 1, DW31, about five lines down, "I began to inform him that Joan Whitley, Human Resources, called me on June 26th around 3:00 p.m. asking me what was going on with me.
"I told her that I was out and had been out since June 22nd, being COVID-tested and looking forward to results so I can have some minute medical procedure.
"I'm sure I'm negative, but I had have per my physician."
Does that --

Page 130

MS. AYERS: Sorry. Are you saying 21 or 31? Because we're -- like, 31 is not the right -- not the grievance, so -- it's 21 at the bottom, yeah?
MR. KEE: No, it's 31, DW31.
MS. AYERS: Okay.
MR. KEE: It's your document.
MS. AYERS: And that's the handwritten grievance?
MR. KEE: Yes.
MS. AYERS: Okay. We have that as 21 on our end. So, we're trying to figure out why where -- where we're off.
Thanks.
BY MR. KEE:
Q All right. So, does this refresh your recollection that you were not getting a COVID test because you were symptomatic, but it was because you needed to have this procedure done and your physician required it before the procedure could be completed?
A No.
Q Okay. And you say here, I'm sure I'm negative, but it -- my physician made me do it, correct?
A I was symptomatic and I have symptoms.
Q You don't say that anywhere in here, correct? Right?

Page 131

A I was symptomatic.
Q You don't say that anywhere in here, correct?
A No, but I was symptomatic.
Q You say in here, though, that you were getting COVID-tested because your physician ordered it so that you could have a medical procedure done, correct?
A So, it doesn't say I said my physician required me to have it.
Q Per your physician -- you don't see that? "But I had to have per my physician".
A Sym- -- I was symptomatic.
Q So, you're saying even -- in that -- but you're saying before, "I'm sure I'm negative, but I had to have it, per my physician." And your physician was looking to do a procedure on you, right. This --
A No, that's not what it says.
Q "This minute medical procedure"?
A That -- this -- this is 2020. That's not what it says. I had been out since the 22nd. So, I was out, already symptomatic. I was already out sick.
Q You didn't go to the physician to get -- because you were sick, right? You were scheduled to have a COVID test so that the procedure that you scheduled could be done, correct?
A No, I don't agree with that.

Page 132

Q Okay. Well, it says here, "And looking forward to results so I can have some minute medical procedure."
It doesn't say looking forward to results because I feel really sick and I think I have COVID, right? Correct?
A I was already out sick. I had been out since the 22nd. So, it's not a detailed script of my life that's written in here. There were the -- what needed to be highlighted for my job.
Q Okay. And where you highlighting was you were sure you weren't negative, right?
And you say here, "She proceeded to say I need you to call out every day you're not going to be here on your scheduled day", correct?
A Correct.
Q Okay. That's -- you know she he was director of HR?
A I know who Joan Whitley is.
Q And if she tells you to do something, as an employee, you need to follow her instructions, correct?
A Joan was not even sure --
Q She told you what you need to do is call in every day you're scheduled to work --
A Yeah, policy change.

Page 133

Q -- and tell --
A Yeah.
Q Yeah.
A Yep.
Q Okay. She told you that. You knew it, correct?
A Yes.
Q Okay. And then, according to you, you called Ms. Brown and said, do I actually need to follow this?
A Because I was told, did I follow my, like, immediate supervisor. That's why I said, ICDC -- there's no structure and nobody respects anybody inside of the facility.
Q Okay. Have you seen the e-mails between Lakeysia and Ms. Whitley -- Ms. Brown and Ms. Whitley where -- and Ms. Bell where they're asking Ms. Whitley to please call you because you're not showing up to work and to find out what's going on and to tell you what the rules are? Did you see --
A Lakeysia Brown knew.
Q I said: Did you see those e-mails.
A I have not.
Q Okay. So, you don't know those exist?
A I have not.
Q Okay. And so, even though the -- the -- how



often did you talk to the director of the HR?
A Vaguely.
Q How often would you during that last stint from October of '19 through this period in July of 2020? How many times did you talk to Ms. Whitley?
A I don't know how many times. I know we went --
Q You said "vaguely." Did you mean, like, not often?
A I don't -- like, vaguely, like, I talked to her -- the most I talked to her was defending myself through this last stint.
Q Right. She's not someone that you called and talked to often, correct?
A We talked every day.
Q Ms. Whitley?
A Every day I came to work.
Q Okay.
A Like, I didn't think it was an issue. There were a lot of things she could tell me. I was in her office every day.
Q Okay. And you knew that she was in charge of HR.
A Joan? Yes.
Q How often -- how many other times other than



this did she call you specifically and give you a direct instruction to follow?
A I don't recall. Just this one.
Q This is the only one?
A That I recall.
Q Okay. And you decided to get a second opinion, according to you.
A Because I gave my excuse to my supervisor, according to Joan, but evidently, because it's not documented or written, we never had this conversation. She told me to follow up with Lakeysia. That's why I called Lakeysia and Bell to see if I needed to call out every day.
Brown said I didn't need to call out every day.
Q Okay.
A So, evidently, the communication with Brown and Joan was cross-connected. They didn't even conversate until after the fact. So, they're gonna cover each other.
Q Okay. And you haven't seen all the e-mails leading up to this point?
A They're covering e-mails, but I haven't.
Q They're covering before the incident happens; that's your testimony?



A I haven't seen the e-mails.
Q Okay. All right. We'll get -- we'll get to those later.
And so, your testimony is still, though, that you were symptomatic with COVID in 20- -- on June 22nd and actually came -- came to the facility just to hand off your -- your doctor's note?
A Yeah, I was told, if I didn't come, I was gonna be fired.
Q Who told you that?
A Lakeysia Brown said I wouldn't have a job if I didn't come in for the meeting.
Q Okay. And what meeting was -- what were they talking about at this meeting?
A I don't know exactly what the meeting was about, but we would have a meeting talking about what needed to be done and things that were going on in the facility. I mean, it's been a -- I came to a meeting to hand the note in.
Q Okay. And how long was the meeting?
A About an hour, I guess, 30 minutes to an hour, around about.
Q Okay. And did you check in?
A Yeah, we had to check in --
Q You clocked in?

Q And then you did all the no-call, no-shows that next week, correct?
A So, they weren't -- I followed the supervisor. They were not on the same page, but they come together, so, that's what it, yeah, symmetrically looks like.
Q Okay. So, as of June 22nd, 2020, you thought something was gonna happen.
A Yeah, I should have never entered the building sick.
MR. KEE: Okay. I'll show you what I'm marking as Exhibit 12. And it says DW813.
(Exhibit No. 12 marked for identification.)
BY MR. KEE:
Q Before we go on, why did you sign this -- that form that we were just looking at, at the -- at the back -- the screening form, if you knew, according to you, the temperature was false?
A The supervisor said to allow me to come back. And me signing that form was my definite knowing that I was in the building, had these symptoms, that I had going on.
These papers disappear.
Q Because, like, people take records, you're saying?
A They disappear.

Page 142

Q Like you took?
A Like --
Q Is that what you're saying?
A Those records didn't disappear. Those records are still with the patient. They didn't disappear.
Q O- --
A Disappear means you never find them.
Q Oh, you t- -- so, you're saying you made the copies of the records and took them with you, outside of the facility.
A I answered that question.
Q Correct?
A I answered that question.
Q Correct?
A I answered that question.
Q Is that a yes or a no?
MS. AYERS: Asked and answered.
A I answered that question.
Q Is it a yes or a no?
A I answered that question already.
Q So was that a yes or a no.
A I answered that question already.
Q You're refusing to answer it?
A I answered that question already.
MR. KEE: Let's take a break. Why don't we

Page 143

were have another talk.
(Brief recess.)
BY MR. KEE:
Q Okay. Ms. Wooten, I handed you Exhibit 12, which I believe is -- is your -- a resume of yours?
A Uh-huh.
Q Is that what it is?
A Ye- -- yes.
Q Okay. And did you create this?
A Yes.
Q Do you know when you did?
A I don't know the exact time. I forget.
Q Or when the last time that you updated this?
A I don't.
Q Okay. Do you recall updating it before it was produced in this case?
A I don't recall. I might have, but I'm not sure it's updated.
Q Okay. Do you see, on the right, you have -- there -- it looks like a -- a list of jobs that you have held as a nurse?
A Yes.
Q Okay. This Affinity clinic, gastroenterol- -- enterology -- en-ter-ology -- this job -- it overlapped with the time period that you worked as a PRN at ICDC,

Page 144

correct?
A I didn't work at ICDC when I worked here. This was my Monday-through-Friday job.
Q Remember --
THE COURT REPORTER: Make sure you keep your voice up, please.
Q Remember we looked at that offer letter that was in 2016 and you were -- the offer was you were gonna work -- the offer was to work for ID- -- or LaSalle at IDC- -- ICDC in 2016, and you ended up working there through 2017? Do you recall that?
A Yeah.
Q So, it would have overlapped with your time at Affinity?
A Yeah.
Q Okay. And so, you said Affinity was your 9:00-to-5:00 job and then you would pick up shifts as a PRN at ICDC, correct?
A I believe so.
Q Okay. And then --
THE COURT REPORTER: Did -- I'm sorry. Did you say "I believe" or "I don't"?
THE WITNESS: "I believe so".
THE COURT REPORTER: Okay. You need to keep your voice up, please.

Page 145



Veritext Louisiana – CRLA/goDEPO cs-Louisiana@veritext.com
A Veritext Company www.veritext.com

Thank you.
BY MR. KEE:
Q Okay. And then, it looks like your -- your stint at Affinity ended in August of 2019, correct?
A Correct.
Q Okay. And that's when -- well, and then you applied to go back to ICDC in October of 2019, correct?
A Correct.
Q Okay. On the left here, you've got references. Who's Darlene Parker?
A She's my pastor.
Q Okay. Is she your Godmother, too, or --
A She is.
Q Or re- -- or is she related to you?
A She's not blood-related, but she's my -- she's my daughter's Godmom, so --
Q Okay. Is that the pa- -- when you said you were living with a pastor at some point, is that who you were living with?
A Yes.
Q Okay. And then you have here, Sharon Stringer [sic] at Tift Regional Medical Center, human resources.
Do you -- why do you have her listed?
A She was a resource whenever I got hired at



Affinity.
Q Okay. Did Af- -- is Affinity -- explain that connection.
A It's part of Tift Regional.
Q Okay. So, Affinity is part of Tift Regional?
A Yes.
Q Okay. And so, all -- so, HR-related matters went for -- at Affinity went through Sharon Stringer?
A Through Tift Regional.
Q Okay. And th- -- and star- -- Sharon was in charge of that --
A She was one --
Q -- of the --
A -- of the --
Q Okay.
A It was several human -- yeah, she was one of them.
MR. KEE: Okay. Got it. Understood.
I'm done with that document.
All right. I'm gonna show you what I'm marking as Exhibit --
MR. PRITT: 13.
MR. KEE: -- 13, which I'm gonna have to have you identi- -- help identify for me.
(Exhibit No. 13 marked for identification.)



BY MR. KEE:
Q Do you recognize this document that I just showed you?
A It looks like a printout of the jobs I applied for.
Q Okay. That's what I thought. I think this was represented as your job search --
A Okay.
Q -- or your application.
Did you print this out, yourself?
A No.
Q Okay. Does this paint -- you know, I guess I -- I apologize. It looks like it's a screenshot or a printout of a dashboard or some kind of website.
Did you have access to that? Like, does this look familiar to you?
A It does. These are my applications for...
Q For jobs?
A Yes.
Q Okay. And so, it looks like -- like, for instance, the first -- on the first page, which is -- and -- and sorry, I'll -- I'll identify this for the record. It's DW824 through DW833.
And on that first page, 824, the first one listed is scheduling specialist, 1307. So, that's a job



that you applied for?
A Yes.
Q Okay. And you applied for that in -- on May 15th of 2020, correct?
A Yes.
Q And that's while you were at ICDC?
A No.
Q What do you mean "no"?
A In 2020 of May, I wasn't at ICDC. I was -- I had been demoted, so I was not at ICDC.
Q Okay. You were demoted in July -- on July 2nd of 2020.
A Right.
Q So, you were still a full-time LPN at ICDC as of May 15th, 2020, correct, when you applied?
A Yeah.
Q Yes?
A June, June, July -- yes.
Q Okay.
A So, yeah.
Q And same with the scheduling specialist, 9- -- 1290, you were -- you applied on 5/15/2020?
A Yes.
Q And you also applied for the LPN Southwell Health and Rehab, PRN, correct?

told to self-quarantine by the testing facility until the results were returned. She tested negative, but was out through 4/16/20 due to have having to use a nebulizer for fluid in one lung. She returned to work 4/17/20.

"She was not let go and there was no lack of work. She could not work due to medical restrictions."

Is there anything in the rest of what I read that you think is untrue?

A The let go and lack of work -- like, she wrote this letter this way, but that's not what she told me.

Q Okay. So, she told -- did she -- did Joan tell you that you were let go?

A When I was out and I saw her on the 6th, she's the one that informed me that you could apply for COVID benefits. I was gonna be out. That's where I got that from.

Q Okay. But there wasn't a lack of work --

A That's what I was told.

Q -- at -- at -- hold on -- there -- hold --

A That's what I was told.

Q There wasn't a lack of work at the facility for LPNs, correct?

A That's what I was told.

Q Okay. I'm asking, was there a lack of work?



Did you think that there was a lack of work? Or did they just tell you, you're exhibiting COVID symptoms; go home and quarantine?

A I was told to go home and quarantine, but when I was told to fill this form out for unemployment, from Ms. Whitley, it was lack of work. She said because I could not come in and work due to being sick. So, there was no work for me.

Q So, your -- it's your testimony that Ms. Whitley advised you on how to fill out the employee benefits?

A Yes.

Q Unemployment benefits form?

A She told me how to fill it out.

Q Okay. And then, once she receives -- it's your testimony, once she receives notice of what you filled out and, according to what she said --

A She devised this letter.

Q She devised this letter, meaning, like, she --

A Created this letter.

Q And does devise -- does that mean, like, she had some ill motive or was trying to hide something?

A She was covering herself.

Q Because of what?

A Her job. You -- you can tell me to go out and



fill out for lack of employment -- this is what you tell me to fill out: I can't work because of COVID. And then you come back -- if you're reprimanded for it, I wouldn't know that. Then you devise this letter -- like, I saw this after the fact, after her instructional -- on what to do, this came later.

Q Okay. Were you out until 4/16 because you had to use a nebulizer for fluid in -- in a lung?

A I came it work with it and I couldn't stay with it, so I was out as long as I had it.

Q So, she says you came to work on 4/6/20, sent home, and then --

A For symptoms.

Q And then, for ten more days, you were out because you had fluid in your lung. Is that true?

A Yes.

Q And then you returned to work 4/17/20?

A Yes.

Q Okay. And at this time, I think we saw you were applying for full-time positions at Tift Regional, correct?

A Correct.

MR. KRAMER: You said what? Tift Regional?

THE WITNESS: Yes.

MR. KEE: All right. I'm gonna show you what



I'm marking as Exhibit 16, which is a document that -- which is a document that you produced. It's DW1 through 11.

(Exhibit No. 16 marked for identification.)

BY MR. KEE:

Q All right. Do you see this is LaSalle Corrections Employee's General Rules of Conduct?

A Yes.

Q Okay. And you see here that there's rules on tardiness, correct?

A Correct.

Q There's rules on unim-- unex--- unexcused absenteeism, correct?

A Correct.

Q And it references there, no-call, no-show?

A It does.

Q Okay. And this was a document that you had, correct?

A Correct.

MR. KEE: Okay. I'm just gonna show you something just for identification purposes. Exhibit 17, LaSalle 250.

(Exhibit No. 17 marked for identification.)

BY MR. KEE:

Q Okay. This is an employee handbook





Veritext Louisiana – CRLA/goDEPO cs-Louisiana@veritext.com
A Veritext Company www.veritext.com

acknowledgment and receipt. Is that your signature there?
A It is.
Q Okay. And that's the date that you signed this, 10/3/2019, correct?
A Correct.
Q Okay. And you received -- you're acknowledging receipt of the employee handbook, correct?
A Correct.
MR. KEE: Okay. I'm gonna show you what I'm marking as Exhibit 18, which is LaSalle 266.
(Exhibit No. 18 marked for identification.)
BY MR. KEE:
Q Okay. Is that your signature at the bottom?
A It is.
Q Okay. And that's dated the same day as employee handbook acknowledgment, 10/3/2019?
A Yes.
Q Okay. And this is the no-call, no-show policy, right?
A Right.
Q Okay. And this sets forth exactly what you're supposed to do when it comes to if you need to miss work, missed a shift that you're assigned to, right?
A Right.

Page 162

Q Okay. It also tells you the repercussions if you fail to comply?
A It does.
MR. KEE: Okay. I'll show you what I'm marking as Exhibit 19, which is LaSalle 322.
MR. KRAMER: Sorry. One more time, Attorney Kee?
MR. KEE: LaSalle 322.
(Exhibit No. 19 marked for identification.)
BY MR. KEE:
Q And, again, this is your signature, Ms. Wooten, correct?
A Correct.
Q Okay. And this is receipt of the no-call, no-po- -- no-show policy that you signed and received on 5/3/16?
A Yes.
Q And that was at the start of the stint at ICDC that started in 2016, correct?
MR. KEE: All right. I'm gonna show you what I'm marking as Exhibit 20. And it is LaSalle 358.
(Exhibit No. 20 marked for identification.)
BY MR. KEE:
Q And is that your signature?
A It is.

Page 163

Q Okay. And this is the copy of the no-call, no-show policy that you received in June of 2014, correct?
A Correct.
Q Okay. So, you -- is -- you understood, correct, that there was a no-call, no- -- no-show policy during your employment at ID- -- ICDC, correct?
A Correct.
MR. KEE: All right. I'm gonna show you what I'm marking as Exhibit 21, which is LaSalle 411 -- 410.
(Exhibit No. 21 marked for identification.)
BY MR. KEE:
Q Do you recognize this as the leave request form that was in place at ICDC when you worked there --
A Yes.
Q -- most recently? Okay.
And what was the policy or procedure for requesting leave time?
A You had to put it in so many days, I think, before or so much time before.
Q Before -- before the requested day off?
A Depending on who was gonna approve it. So, yeah.
THE COURT REPORTER: Who -- depending on what?

Page 164

MR. KRAMER: One more -- a little louder, Ms. --
THE WITNESS: Depending on who was gonna approve it.
MR. KEE: Okay. Okay. I'm gonna show you what I'm marking as Exhibit 22, which is LaSalle 560 through 561 and 562.
(Exhibit No. 22 marked for identification.)
MR. KEE: Might be easier if I just give you these --
MR. ROBERT GUYER: Say that --
MR. KEE: I'm j- -- that's the whole stack that I'm gonna go through.
MR. ROBERT GUYER: Oh, okay.
MR. KEE: But I'll individually mark them.
MR. ROBERT GUYER: Thank you.
BY MR. KEE:
Q Okay. Have you seen this document before?
A No.
Q Okay. It's a letter of correction, signed by Ms. Bell, and it ref- -- it's discussing -- it's an incident that happened on 6/9/20. Do you see that? Do you see that on the first page, "reason for this action"?
A Yeah.

Page 165



Veritext Louisiana – CRLA/goDEPO cs-Louisiana@veritext.com
A Veritext Company www.veritext.com

Q Okay. It says, "Employee was over 30 minutes late to her shift without giving any notice to supervisor."
Do you dispute that that occurred?
A I do.
Q You do?
A I do. I mean, I -- I haven't seen this. This is my first time seeing this.
Q Okay. And why do you dispute that that actually occurred?
A No one ever said anything to me about it. Like, this is my first time seeing this letter of correction.
Q Okay. And if you go to the third page, it says, "Witness: Attach all witness statements or interview statements." Do you see that?
A Yes.
Q Okay. And you see Ms. Brown signs this as well?
A Yes.
Q As giving these comments?
She says, "Nurse Wooten has continuously not adhered to the handbook in reference to the above-mentioned rules. She has continuously been late for her shift, which, in turn, causes unnecessary overtime for



the off-going shift.
"Several conversation and" --
A Wow.
Q -- "meeting have been held with Nurse Wooten, with Warden Paulk, the previous HSA, and myself, with regards to her attendance." Do you see that?
A Yes.
Q Okay. Do you dispute anything that's written there?
A Yes.
Q What?
A Late for her shift, several conversations with Wooten, with Warden Paulk, and the previous HSA, and herself -- those never occurred.
Q You're saying you were never counseled about --
A No.
Q About tardiness?
A No.
MR. KEE: Okay. I'm gonna show you what I'm marking as Exhibit 23. This is LaSalle 563 to 565.
(Exhibit No. 23 marked for identification.)
BY MR. KEE:
Q Do you see here, it's another letter of counseling. "Reason for action: 6/14/20, employee was



over 30 minutes late to her shift without giving any notice to supervisor." Do you see that?
A I do.
Q Okay. Do you dispute that -- do you disp- -- do you dispute that -- do you dispute that you were late that day?
A Yes, I never -- this is my first time seeing this document.
MR. KRAMER: Can you speak up a little louder, Attorney Kee? Is there -- are there papers on the microphone or near it?
(Discussion off the record.)
MR. KEE: Okay. I'm showing you what I'm marking as Exhibit 24, LaSalle 566 to 568.
(Exhibit No. 24 marked for identification.)
BY MR. KEE:
Q It's another letter of correction, 6/17/20, "Employee was over 30 minutes late to her shift without giving any notice to supervisor." Do you see that?
A Yes.
Q Do you dispute that you were late?
A Yes. This is my first time seeing this.
MR. KEE: Okay. I'll show you what I'm marking as Exhibit 25, which is 569 to 571.
(Exhibit No. 25 marked for identification.)



BY MR. KEE:
Q This relates to 6/18/20: "Employee was over 30 minutes late to her shift without giving any notice to supervisor." Do you see that?
A Yes.
Q Do you dispute that you were late?
A Yes. First time seeing this, too.
Q Okay. Remember that we saw that 5/15/20 was the date on the Tift Regional dashboard that showed that you were hired for the PRN position?
A Yes.
Q And you said you worked there about 30 days. So, would that have b- -- that would be overlapping with these dates where records indicate that you were tardy, correct?
A I don't even know if I was working those days.
Q I'm just saying that the time frame -- those 30 days, it would have -- this would have been the same time frame where you had this second job at PRN -- as a PRN at Tift Regional, correct?
A Yeah, I was still, yeah, there.
MR. KEE: Okay. I'm gonna show you what I'm marking as Exhibit 26. This is LaSalle 572.
(Exhibit No. 26 marked for identification.)

BY MR. KEE:
Q And if you see, this is a printout of your employee time cards?
A That you can vaguely see.
Q Okay. And this supports each of those instances where you were over 30 minutes late to your shift, correct? Correct?
A You can barely see it.
(Examining document.) 6/14 says what time?
Q 6:38 a.m.
A And 6/17?
Q 6:38 a.m.
A And the 18th -- the same?
Q 18th, 6:39 a.m.
A And then the last two?
Q Last two are -- the 8th is 6:23 a.m., and the 9th is 6:46 a.m.
So, does this reflect that, for each of those letter of corrections, that you were, indeed, clocked in 30 minutes -- over 30 minutes late?
A So, yes. Yes.
Q Okay. So, they weren't making that up when they -- when they put that in your letter of correction, correct?
A No one ever showed me a letter of correction.



This is my first time seeing it, the first time seeing those three.
Q But what's stated in there is -- is accurate in terms of you being tardy, correct?
A What's stated in there is accurate, according to the paper, correct.
MR. KEE: Okay. Okay. I'm gonna show you what I'm marking as Exhibit 27. This is May 21, 2020. It's an e-mail from Ms. Brown to Ms. Whitley and subject line is "Wooten". It's LaSalle 555.
(Exhibit No. 27 marked for identification.)
BY MR. KEE:
Q Okay. The e-mail from Ms. Brown states: I received a text mess- -- message from Dawn Wooten stating that she and her children were being screened for COVID and she would be out for the next ten days.
She stated that she would be sending her doctor's note. I called Wooten to advise her that she needed to call instead of texting. And I also reminded her of a conversation that she and I had several weeks -- weeks ago, open paren, (her primary care provider wrote and order for her to be retested for COVID-19 on Monday 4th), open paren. Wooten had previously requested that day off. She opt out of re- -- closed paren -- she opt out of retesting.



Then she proceeded to state, well, I am on my way to my doctor to have my kids and I screened for COVID. She was scheduling to work tonight from 6:00 p.m. to midnight.
Ms. Cole and I have spoken with Ms. Wooten repeatedly regarding her attendance and not following the appropriate call-out procedure. By no means am I saying that she cannot call out; however, I can attest to the fact that that she is not forthcoming and tends to get caught up in half-truths.
What steps do I need to take regarding this matter? Because we are short and I'm having to cover shifts personally.
Okay. When you miss a shift, who -- and you don't call -- there -- you're no-call, no-show, who has to come in and -- and handle that shift? What happens, operationally?
A I don't know how they handle it. I'm not a no-call, no-show, but I'm pretty sure that a next nurse or they call somebody else in to work that shift when somebody doesn't come or can't come.
Q Do you dispute Ms. Brown's statement here that, when there is a no-call, no-show, she's had to cover the shift personally?
A I'm disputing the entirety of this letter. I



don't know if she had to cover those shifts personally or not. I -- I'm not aware of that. I'm not aware of who covers those shifts.
Q You dispute that -- that you sent Ms. Brown a text message on 5/21 saying that you were taking your chil- -- you and your children were being screened for COVID?
A I don't recall sending her a text message. And this conversation is really different. Like, I don't recall this conversation and having to call Ms. Cole several weeks ago. So, I don't recall sending her a text message.
Q Did you tell her you that would be out for the next ten days; so, from May 21 and then ten days out --
A I don't --
Q -- because you were being tested for COVID?
A I don't recall sending her a text message.
Q Do you think she just made that up?
A I don't recall sending her a text message.
Q So, you dispute that you did.
A I dispute -- yeah, I don't recall sending her a text message.
Q Okay. Do you dispute that you told her you would be out for the next ten days?
A Yeah, I mean, I don't recall sending her a

absences, regardless of the aforementioned leave request.

"If the request does, in fact, state only 6/13/2020, then include it on the disciplinary. HR has offered to assist with the DR if needed."

You see that?

A Yes.

Q Okay. Do you remember there being any disciplinary action relating to this incident?

A No.

MR. KEE: Okay. I'm gonna show you what I'm marking as Exhibit 29 -- sorry. That's LaSalle 559.

(Exhibit No. 29 marked for identification.)

BY MR. KEE:

Q Okay. You see Ms. -- Ms. Bell is responding to Ms. Whitley. She says, "Joan, per my conversation with Deputy Warden Albright, he suggested that you reach out to Nurse Wooten for follow-up with her COVID results.

"Nurse Brown nor myself have heard anything from her since Monday, 6/22/20. Can you please reach out to her and see if you can get an update for us in regards to her results and her plans to return back to work?"



Do you see that?

A Yes.

Q Okay. And this -- your s- -- it's your testimony that on that Monday, 6/22/20, you actually brought in a -- a note to Ms. Brown?

A I don't know what date exactly they had the meeting. So, I come into a meeting sick. So, this would be the day that I come in with the temp and the form I had in the bag. So, I saw them on the 22nd.

Q Okay. And so, on the 24th -- on the 24th, you see that Ms. Bell has already had the conversation with Mr. Albright and is asking if HR can get involved and -- and get on the phone with you because no one -- neither -- neither she nor Ms. Brown have heard from you since Monday, June 22nd, correct?

A Reading this, but if I showed up to work the 22nd and came through the facility, according to that form where I had COVID symptoms, they saw me the 22nd.

Q It says, "Nurse Brown nor myself have heard anything from her since Monday, 6-" -- "June 22nd, 2020."

Do you recall them trying to reach out to you?

A No.

Q But you do recall Ms. Whitley getting in touch with you?



A She called me at some point. I don't know exactly what the dates were. At some point.

MR. KEE: Okay. I'm going to show you what I'm marking as Exhibit 30, which is LaSalle 558.

(Exhibit No. 30 marked for identification.)

BY MR. KEE:

Q And again, Ms. Bell is reaching out to Ms. Whitley --

MR. KRAMER: Oh, one more -- a little louder.

Q "Just wanted to follow up on our earlier conversation in regards to you reaching you out to Nurse Dawn Wooten. Nurse Wooten is scheduled to work this weekend and Nurse Brown nor myself have heard from her since Monday, 6/22/20.

"Can you please get back to me as soon as possible so we can find coverage? Otherwise, we will have to get cover shifts ourselves."

Do you see that?

A Yes.

Q Okay. And do you dispute that -- were you in -- let me ask you this: Were you in touch with Ms. Bell and Ms. Brown between Monday, June 22nd, and Thursday, June 25th?

A I don't think anybody reached out. I'm not really sure what the dates were. Nobody reached out to



me. I heard from Joan at some point.

MR. KEE: Okay. I'm gonna show you what I'm marking as Exhibit 31. It's LaSalle 576.

(Exhibit No. 31 marked for identification.)

BY MR. KEE:

Q Do you see here Ms. Whitley is recapping to Mr. Albright her efforts to reach out to you?

A But -- yeah, but how? It just says she reached out.

Q Okay.

A But how?

Q It says, "On June 25th, 2020, I reached out to LPN D. Wooten to check her status on returning to work. She stated she was still waiting for her COVID results to come in, so she could have a" -- and in brackets -- "procedure completed.

"She said she was hoping to be able to have it completed by next Monday, which was a Friday or by the ne-" -- "by the next day, which was a Friday, or by Monday at the latest, once the test results came back.

"I told her that, since we do not have a physician's excuse yet to cover her absences over the weekend, she would need to call in to RN L. Brown each scheduled workday that she misses work. And if she couldn't reach RN Brown, she was to contact RN S. Bell,





Veritext Louisiana – CRLA/goDEPO cs-Louisiana@veritext.com
A Veritext Company www.veritext.com

according to the call-out procedure.
"She repeated back to me that she would call in each scheduled workday and expected to be back at work on her next scheduled workday after the weekend, which would be Wednesday, July 1st."
Do you dispute that you repeated back to Ms. Whitley that you were to call in each scheduled workday?
A I don't remember having this, like, conversation with her. I called Brown at some point, not date-specific. Brown said I didn't have to call in every day. So, this e-mail now is saying that I had to call in every day and I repeated back to her that I would call in every scheduled workday.
Q Okay.
A So, I don't remember telling her that I agreed to call in every scheduled workday. I talked with her at some point -- I don't know if it was in this conversation -- to say, hey, I called Brown. She said I didn't have to call out every day. They had an excuse. This letter says there's no excuse.
Q She's recapping a phone call she had with you on June 25th, 2020.
Do you dispute that she told you you would need to call in every day that you were scheduled, if



you were not planning to come into work?
A We had a conversation at some point where she said that I needed to call Brown. I called Brown and Brown said I didn't need to call in every day. That's why I was so upset about the write-up.
Q Okay. And it says that -- do you dispute that you repeated back to Ms. Whitley that you would call in each scheduled workday?
A Yeah. Like --
Q You dispute that?
A Yes.
Q Okay. Why -- why is that?
A Because, if she told me to call my supervisor, which was Brown, I called Brown. Lakeysia Brown told me I didn't have to call out every day. To her, it made no sense. I didn't call out every day I was out. She said I had a doctor's excuse, so I left that as that.
I don't -- didn't tell Joan I'd call out every day.
Q You saw Ms. -- Ms. Bell said that there was no -- they had not received any doctor's note from you?
A Yes, when she put that e-mail in.
Q Do you -- do you think she was lying about that?
A She was. I give them a doctor's excuse.



Q Okay. So, everyone here is lying --
A I gave --
Q -- except for you?
MS. AYERS: Objection.
A I gave her a doctor's excuse.
Q Is -- so, Ms. Bell is lying, correct? Is Ms. Bell lying?
A I didn't give her -- she said I didn't give her a doctor's excuse.
Q She said there's no --
A That's not true.
Q Doctor's excuse?
A That's not true.
Q So, is that a lie?
A Yes.
Q Okay. Is Ms. Brown lying?
A Yes.
Q Is Ms. Whitley lying?
A Yes.
Q Is Warden Paulk lying?
A Yes.
Q So, all these folks whose names are on these e-mails are lying. The only person telling the truth is you.
A They're collaborating stories. Why was I not



included in these e-mails?
Q Okay.
A I could have easily been included in them.
Q These are administrators, correct?
A But it -- they put --
Q Are th- -- are they administrators?
A But they put the person --
Q Are they --
A They are. They are.
Q They are. Okay. And are they communicating with each other to try to figure out how to reach out to an employee to receive information so that they can operate the facility properly?
A They are.
MS. AYERS: Objection. Calls for speculation.
MR. KEE: She answered.
MR. KRAMER: What was the answer?
MR. KEE: "They are."
THE WITNESS: "They are."
MR. KEE: I'm gonna show you what I marking as Exhibit 32, which is LaSalle 574 -- oh, wait, there's two pages, I'm sorry, and 575.
(Exhibit No. 32 marked for identification.)
BY MR. KEE:
Q And do you see, in the middle here,

Ms. Whitley asked Ms. Bell and Ms. Brown -- after she had been informed that Dawn Wooten did not call out today, 6/28/20, Ms. Whitley says, "Has she sent anyone a copy of the doctor's note that put her out initially or any time after and submit a write-up for each day she has been no-call, no-show since I spoke to her Thursday?"

And Ms. Brown says, "She has not submitted a doctors' note."

So, it's your testimony that -- that Ms. Brown is lying here?

A Yes.

MR. KEE: Okay. Okay. I'm gonna show you what I'm marking as Exhibit 33, which is LaSalle 581.

(Exhibit No. 33 marked for identification.)

BY MR. KEE:

Q So, this is after -- this is July 22nd, after you had been moved to PRN status. Do you see that?

A So, I was moved PRN July 22nd.

Q July 2nd -- I m- -- effective July 2nd. I'm saying this is a -- during this -- at the point of this e-mail, you were on PRN status, correct?

A Correct.

Q You see they're putting together a list of



possible days that you can or that you would be assigned work shifts? Do you see that?

A Yes.

Q Okay. And Ms. Whitley says, due to -- "From any Sunday through Saturday week, she cannot work more than 28 hours, giving her a one-hour cushion, in case she goes over. Due to federal guidelines, anyone working as a part-time employee cannot work 30 or more hours in a week without being classified as full-time.

"Her schedule, as presented, have these totals and some will be need to be adjusted."

Do you see that?

A Yes.

Q Okay. And you were eventually -- you were informed of this, correct, that the schedule that had been originally presented to you around this time would need to be adjusted to reflect what Ms. Whitley had said?

A No.

Q No what?

A No, I wasn't given the schedule in the beginning at all. This is the first I'm seeing this.

MR. KEE: Okay. I'm gonna show you what I'm marking as Exhibit 34, which is LaSalle 120, 122, and 124.



(Exhibit No. 34 marked for identification.)

BY MR. KEE:

Q All right. And this is a text message from Ms. Shanise Bell's phone to you and Lakeysia Brown. Do you see that?

A I do.

Q Okay. And Ms. Bell says, "Good afternoon, Wooten, these are the following days you have been scheduled to work." And it's got from July 24th to August 29th. And she sends -- says, "I need to have a response or answer by the close of business today."

Do you see that?

A Yes.

Q And you confirmed that those days worked well for you, correct?

A Correct.

Q Okay. And then, Ms. Bell later says, "Nurse Wooten, please check your e-mail. There has been a schedule change and please respond to the e-mail once you review it," right?

A Right.

Q Okay. And this is while you were on the PRN status, correct?

A Correct.

MR. KEE: Okay. I'm gonna show you what I'm



marking as Exhibit 35, which is 184 through 188.

(Exhibit No. 35 marked for identification.)

BY MR. KEE:

Q At this time, you were -- does this refresh your recollection as to you refusing to work on what was offered -- on the days that were offered in that second amended schedule?

A I wasn't refusing to work those days. I got a phone call outside of this text message that said that these days had already been confirmed. So, they called me with a totally different schedule by phone.

I have four kids that I have to get together. So, they asked me the days I could work and they asked me the days I couldn't work. Then they, in turn, with this offered me the days that I couldn't work.

Q Okay. There were days on the first schedule that were texted to you that you confirmed you could work that were included on the second schedule, correct?

A The second -- where's the second schedule?

Q Well, do you recall there being days that overlapped?

A No. Where's the second schedule? Because --

Q I'm asking, do you recall from memory?

A I can't recall days that are being overlapped. I know they offered this -- this was agreed-to. They

offered me another schedule that I couldn't work those days on that schedule. She said she couldn't allow -- they changed the schedule totally.
Q But some of the days ov- -- were exactly the same.
A No, I --
Q Do you recall that being -- I'm asking do you recall that being the case?
A No.
Q The schedules say what they say, but do you recall that being the case?
A No, I don't recall there being any days --
Q Okay.
A -- that overlapped.
Q And what was it -- you didn't have another -- or you did have another job at that time.
A No, another job didn't have anything to do with this. This is what I agreed to and this is what I was gonna work. They changed the schedule to a whole 'nother schedule. This wasn't the same schedule. This is what I was offered. Then they pulled this offer back and said, all these days had been confirmed.
Q Because it was too many hours, right?
A I don't know what it was. They didn't tell me what it was. They just told me that these days had

Page 198

already been filled and they sent me a total different -- I got a total different schedule -- a total different that I don't even see in these e-mails. A total different schedule.
Q Okay. And you're saying that that was intentional? They -- they didn't actually want you to come work?
A It was intentional. You call me at 2:50 and say, hey, I'm agreeing at 2:50, then you call me back at 2:55 and say, oh, this is no longer available, but I got this. So, you're calling me back with the days I can't work via phone call.
Q You saw the text messages were not five minutes later. It was a day later. You saw the text messages, right?
A No, I didn't -- I didn't give a time. I said --
Q You said, five minutes later, you call me and say it's gone.
A When you offered me this --
Q Which was? Days before, the schedule had to be changed because you were -- they had you working too many hours, which would have meant you were gonna be a full-time employee.
A So, when you text me this -- so, you text me

Page 199

this --
Q Correct.
A -- and say, hey, by text message, I'm good with that. That's what I said, I can work it.
Then you call me on the phone -- there's no paper trail. There's a verbal conversation now that says those days -- you see can't work those. They're retracted.
Q Do you see where she said, "Nurse Wooten, please check your e-mail. There has been a schedule change. Please respond to the e-mail once you have" -- "once you review it"?
A I don't -- the schedule changed. I don't see the e-mail for the schedule change. Like, she sent me a whole total different --
Q Okay.
A -- days.
Q Look on Page 4 of 5 of the exhibit that we're looking at right now. Do you see Ms. Bell wrote, "Good evening, Wooten, there has been a schedule change. Please see the attached schedule for July and August. Please respond to this e-mail in reference to you being able to fulfill schedule."
The next day, you respond, "Good morning Ms. Bell, I do apologize for just reviewing your e-mail.

Page 200

After reviewing the sudden change of schedule from Tuesday's dates, I'm unavailable at this time."
So, in one day, you're "Unavailable at this time as a PRN employee to fulfill the schedule changes you sent out to me with such a short notice to respond. I do look forward to working with you in the future regarding future dates.
"Thanks in advance for your understanding."
Ms. Bell responds, "Nurse Wooten, you were originally" -- "you're already originally scheduled to work this weekend and you agreed to work then. Are you not working on the 24th, 25th, 26th? I had you scheduled for this weekend, due to you agreeing to work.
"please let me know by close of business today so that I can make the necessary adjustment."
You respond, "Due to the change in the schedule, I'm unavailable."
So, you were already -- on both schedules, you were scheduled to work the 24th, the 25th, and the 26th.
A Because you call me --
Q Correct.
A Correct.
Q Okay.
A Because you called me and told me they were no longer available. You didn't e-mail that, but you

Page 201

called and told me they were no longer available.
Then you e-mail me this.
Q Who? Who --
A Bell, Shanise Bell.
Q So, Shanise Bell e-mails you a document and says, here are new dates, including 24th, 25th, 26th, and then you say she calls you and says, that's not true.
A They are no longer available.
Q And then she e-mails you again and says, no, they are available. That's what your testimony is?
A When she first e-mailed me this, she said they weren't available. So, I get this e-mail that says the 24th, 25th, and 26th, oh, they're available. So, I tell her that, now, I'm no longer available to work those days.
When I tell her that by phone, she e-mails me and says, oh, they're magically reappear.
Q It says, you already scheduled to work this weekend. You agreed to work them, 24th, 25th, 26th.
In response, you don't say, did -- we just had this phone call and you told me they weren't available. You don't reference any phone call here. This is all over e-mail, correct?
A She e-mailed and she called me.



Q You don't reference any e-mail -- any phone call in this e-mail, correct?
A Correct, she verb- -- she verbally -- she phone call -- I mean, it's fine.
Q So, then she says -- she responds to your e-mail and says, "So, even though there were not any changes in this weekend, you are refusing" to -- "you are refusing the hours, correct? Also, please forward me available dates."
You say, "Ms. Bell I'm not refusing any hours or dates."
A Uh-huh.
Q "When the dates were sent on Tuesday, that was an offer."
A Uh-huh.
Q "Then another totally different offer was sent the close of day the next day. The next offer took precedence over the previous offer. Again, I'm not refusing days or hours."
But you did refuse to work those three days, 24th, 25th, 26th.
A I didn't refuse to work them.
Q Why didn't you work them.
A I didn't refuse to work --
Q Why did --



A -- those days?
Q -- you not work them?
A She retracted them said they weren't available.
Q When did she retract them? She just told you on Thursday, "Are you working on the 24th, 25th, 26th?"
You said no.
How was that a -- not a refusal to work those three days?
A She told me by phone they were no longer available.
Q She, then, follows back up --
A With a e-mail.
Q -- and says, so, you're not gonna work these days.
A After she called me on the phone.
Q Okay. So, you're still available. You can work these three days, right? In this e-mail, saying you can work these three days.
A When you call me today and ask me can I work the weekend, I've already got everything situated to work this weekend. I have to get babysitting adjusted. I've got to make sure I get my kids situated. At this time, they could not be left at home alone.
So, when she sent me this for a schedule, I



agreed to it because I was solidifying everything. She takes everything from me, but the weekend -- so, she changes the schedule. Now, it's 24th, 25th, 26th. So, it's a sudden change after I agree.
Q But they were on both schedules. In this text message, right here: 24th, 25th, 26th, 6:00 a.m. to 6:00 p.m. -- that's what you've been selected to work. "Good afternoon, ladies, these dates work well for me."
In this e-mail, she's saying again, these three days, you're scheduled to work and you're refusing to do it.
A I didn't refuse to work those days.
Q Why didn't you work them?
A She told me they were no longer available.
Q When? When? When? When?
A She told me they were no longer available, sir.
Q When, ma'am?
A She called -- after she sent this e-mail.
Q Which is there --
A And --
Q There are five e-mails where she is offering you these three days.
A I didn't refuse those days.
Q When did she take them back and tell you you

couldn't?
A It would be crazy for her to e-mail that she would incriminate herself. She called and said the days were not available; somebody else picked them up.
Then she sends back this e-mail...
Q Are you done?
A Well, I was waiting on -- I mean, I didn't refuse days.
Q Okay.
A I remember that.
Q Then she responds back again to your e-mail. She says, "Ms. Wooten, please refer back to the original message that was sent on Tuesday, July 1st, 2020, at 12:47 p.m. It stated the following: 'Good afternoon, Wooten, these are the following days you have been scheduled to work.'
"That was not an offer. Those were the days you were put on the schedule to work. You replied back and stated, 'Good afternoon, ladies, these days' were -- 'these days are well with me', which is an agreement to work those days.
"As I previously stated, you were down for those days in which you have agreed to work, via text message, regardless of the schedule change. Those days were your originally days to begin with.



"With that being said, if you're not going to be here, you have to adhere to employee handbook and call out each day you are not going to be here."
And you're saying she, again, called you again, after sending that e-mail, and told you, oh, you can no longer work those days; those are taken back?
A She said those days are not available.
Q At wh- -- after which of these e-mails that she sent saying they were available and you agreed to work?
A She said those days were not available to work. Somebody else took those days.
Q Okay. Do you recall calling out for those days: 24th, 25th, 26th?
A I don't.
Q Okay. There seemed to be -- or you seem to be suggesting that there was confusion about the difference between part-time or PRN?
A Yes.
Q Okay. What -- what's the -- what was your confusion there?
A I needed to know whether I was a part-time employee or a full- -- or a PRN employee.
Q What's the difference?
A Less hours.



Q As a PRN, you're not guaranteed any hours, correct?
A You have to work -- I don't know LaSalle's policy was, but you -- any other place I been, you work so many hours a month to maintain PRN status.
Q Okay. At this time, though, that wasn't the policy, correct?
A I'm not sure what the policy was. I just know what I was told: I'll call you when I need you.
Q Right. When they need you, right? Right?
A That's what I was told.
Q Okay. But you're not guaranteed, you know, you'll -- at the minimum, you'll get 20 hours, correct?
A I don't know. I can't say because I don't know what their base was.
Q Okay. Well, you were --
A That's what I was trying to get clarity for.
Q We showed you documents where you were a PRN starting in 2016 at ICDC, remember? Do you recall that?
A I recall.
Q Okay. You weren't guaranteed any hours as a PRN at that time, correct?
A I don't think -- I'm not sure. You had to work so many hours. I was always told you had to work so many hours to keep that status. So, I didn't ever



had to worry about it because I worked.
Q Okay. But you didn't even recall working at the same time you were at Infinity -- or Affinity, right? You didn't recall that those jobs overlapped?
A No, for a short time.
Q Okay. For almost a year, correct?
A Like, I don't -- yeah. So, according to your paper, yeah.
Q Okay. You don't think LaSalle made that up, that paperwork, do you, the dates of your employment and when you signed agreements?
A I don't know.
Q You do think so. It's possible.
A I don't know.
MR. KEE: Okay. I'm gonna show you what I've marked as Exhibit 36, which is LaSalle 590 to 592.
(Exhibit 36 marked for identification.)
BY MR. KEE:
Q Okay. And this follows up on this conversation -- if you turn to the back, Ms. Whitley says, "Good afternoon, Dawn, I have seen both the first schedule provided and the second schedule. Both have you scheduled to work tomorrow the 24th and Saturday the 25th from 6:00 until 6:00 p.m. Will you or you will you not be working those two days?





Veritext Louisiana – CRLA/goDEPO cs-Louisiana@veritext.com
A Veritext Company www.veritext.com

"You had previously accepted, since there was no change to those two days. The other changes to the schedule can be addressed once you have provided your calendar of availability.

"Further, I've attached the employee handbook for your convenience. The procedures for attendance are the same for all employees. If you have any questions, please do not hesitate."

And then you respond, "No, ma'am, I'm not available."

And is it your testimony that you -- is it still your testimony that you did not refuse to work those two days?

A I was not refusing to work those two days.

Q Well, why were you no longer available after, on the 21st, you had said you were available to work those days? What happened?

A Shanise Bell made those days and said they were not available. I get this text message July the 23rd at 5:05 p.m. So, that leaves me about three, four hours to find a babysitter for a shift that starts less than 14 hours to begin. It was too short of a notice for me. She had all business day to call me about this.

Q She --

A This is the close of business.



Q Okay. Ms. Bell was reaching out to you, though, at noon -- around noon, a little before 11:00, asking you to confirm if you were working this weekend, on these dates, correct?

A Those were the dates Shanise Bell made unavailable, but put it in this nice little document.

Q So, she just -- it was all a lie on Ms. Bell's part?

MS. AYERS: Objection. Asked and answered.

A Yes.

Q I don't know if you could hear that. She said "asked and answered".

Yes. That's your --

A Ye- --

Q -- testimony?

A Yes, she called me by phone, switched up with this paper trail.

Q So, she's covering a lie, basically, is your testimony?

A Yes. She's covering herself.

Q Okay. At -- at this point, had you been in contact with Project South or GAP, July 23rd?

A I don't know what time frame we talked, so I'm not sure.

Q Okay.



A I don't know.

Q Did you -- why didn't you tell Ms. Whitley that -- you know, in response to these e-mails, that Ms. Bell had called you and taken those days away, even though she was making this pretty paper -- paper trail to protect herself?

A Joan wouldn't admit we had conversations or not. They text or e-mail administratively. They had meetings every morning, so I was pretty sure they knew that this was how this was.

Q I don't understand. Why wouldn't you make clear to Ms. Whitley, who was trying to get you work, trying to get you to come in -- why wouldn't you explain to her fully why you weren't?

A It was a phone conversation. This is in an e-mail. My phone conversation wouldn't have mattered.

Q You're saying --

A She wasn't gonna do anything about it.

Q You're saying Ms. -- you had a phone conversation with Ms. Whitley about this?

A She wasn't gonna do anything about it.

Q And you didn't give her the opportunity to, correct?

A She wasn't gonna do anything about it.

Q That's your assumption.



A That's not my assumption. That's my fact. She wasn't gonna do anything about it.

Q That's your facts?

A She wasn't gonna do anything about it.

Q Why? Why do you say that?

A They already started this paper trail back and forth. And she was already testy with me asking about what my status was. At this point, I'm out of the facility. I'm not there. So, everybody is covering everybody.

Q They're trying to get you to come in and work, right?

A No.

Q They're -- they didn't want you to come work the 24th and 25th is your testimony?

A No, because, if they did, then the schedule wouldn't have changed two or three times, I wouldn't have got a phone call outside of these e-mails and then I wouldn't have got such a short -- short notice to come to work.

MR. KEE: All right. I'm gonna show you what I've marked as Exhibit 37.

(Exhibit No. 37 marked for identification.)

BY MR. KEE:

Q Let's test this, whether or not they wanted

you to come to work. Here, this is an e-mail from Ms. Bell with a schedule, correct?
A It is.
Q It's LaSalle 594. She says, "Good evening, Ms. Wooten, I have the following dates available. Please let me know if you want any of these dates.
"Also, please don't forget to send me your availability for the month of September. I'm currently working on September, so if you could send me your availability, I can put you down for some days. Here are the days for the upcoming weeks."
She gives you August 8th -- 18th, August 19th; August 27th, August 28th, August 30th, correct?
A She does.
Q Okay. Why are you laughing? What's funny about that?
A It's funny because these dates were offered on e-mail, but they were retracted by phone call.
Q So, this is another instance she's sending you an e-mail and then she's immediately calling you and saying, sorry, they're gone; don't accept those?
A They're not accepted. They're not -- yeah, they're no longer available.
Q When -- where do you have proof of that?
A They're text messages, they're not longer



available. So, I'm pretty sure she didn't --
Q Did you -- you got rid of those text messages?
A I didn't -- if I had them, I would have definitely brought them --
Q Well, what are you talking about?
A Definitely brought them --
Q Where -- where are these conversations captured that s- -- shows that Shanise Bell offers you dates to work and then --
A Texts me to say they're no longer available.
Q And texted you, okay. You're saying she sent you a text message?
A They're no longer available.
Q Okay. And she send that after August 13th, 2020, you're saying, is your testimony?
A Yes.
Q Yes?
A Yes.
Q Okay. And you didn't preserve those text messages?
A I didn't. I've got a whole 'nother phone since then.
Q So, you didn't -- you did not -- you did not preserve that phone that you had at the time you were receiving text messages from Shanise Bell regarding



availability in your schedule?
A No, it's --
MS. AYERS: Objection.
Q What's that?
MS. AYERS: Calls -- I said there's an objection.
MR. KEE: I'm not asking you. I heard your objection. I'm asking her.
THE WITNESS: I don't have them.
BY MR. KEE:
Q You don't have them?
MS. AYERS: Well, you don't have to shout at me.
Q Okay.
MS. AYERS: This is not --
Q Where is your phone?
A This is my current phone.
Q No. No. Where is that phone that had the text messages with Shanise?
A The phone is four, five years old.
Q Did you give it to your attorney?
A No, I don't even have it. Phone busted. That's why I got a new phone. That's why I switched phones.
Q When did you get --



A You couldn't use it.
Q When did you get the new phone?
A I'm unsure. Let's see, 2021, somewhere like that. I just switched phones again. This is the second time.
Q Okay. So -- okay. 2021. Okay. And you had sent notice -- or Project South representing you sent notice to LaSalle to preserve all relevant communications and documents and things of that like, right?
A I'm pretty sure. I don't know.
Q Okay.
A Like, my attorneys handle.
MR. KEE: Okay. All right. I'm gonna show you what I'm marking as Exhibit 38, which is 59- -- LaSalle 595.
(Exhibit No. 38 marked for identification.)
BY MR. KEE:
Q Okay. This is the next day. So, was this after you got the phone call where Shanise told you, sorry, those days aren't available?
A This is dated for August the 14th. What was the one prior to that?
Q August 13th.
A Yeah.

Q She would have called in between those two?
A It's a game. You don't have to believe me, it's fine. But yeah.
Q She did --
A You offer -- you offer and say they're not available.
Q Okay. She offered --
A They're not available.
Q Okay. And then -- but I'm asking, when did she call and tell you that?
A Whenever she sent the e-mail out for these days, I got a call they're not available. These days -- just scratch that, Wooten, they're not available.
Q How soon after did you get that phone call?
A No sooner than the e-mail hit.
Q Right.
A And you can verify and say, hey --
Q Like, five minutes out.
A I'm calling to say these days -- oh, they're not available.
Q So, like, five minutes after she'd send the e-mail and then you'd get the --
A I don't know the time frame, but right after you send the e-mail, 0it wasn't shortly after then that they were retracted or taken. So, enough for the e-mail



to be sent and enough for me to get a phone call to say they're not available.
Q Okay. So, the next day, she had told you that she's working on the September calendar and that she would give you the availabilities. And she asked you to send in availability, correct?
A Correct.
Q Okay. You didn't do that?
A It wasn't a need to send in availability. She told me she was gonna give me the days that were available.
Q Not my question. That's not my question.
A No.
Q Listen to my question.
A No.
Q No, you did not send it.
A No.
Q Okay. Then she responds and says: New -- "Open shifts for September" -- that's the subject line. "Good morning, Ms. Wooten, we have the following dates thus far for September. There will be more to come and I will e-mail them to you as soon as possible.
"Here is what I have so far: September 16th, September 23rd, September 28, September 29th", correct?
A Correct.



Q Okay. And she says, "please let me know by the close of business today if these days are okay with you. I look forward to hearing from you. Have a fantastic Friday."
Did you let her know by the close of business --
A That's why --
Q -- whether or not they were available.
A That's how I knew they were not available. Yes. So, yes.
Q Yes, what? You called?
A Yes, I called. Yes.
Q And you told her, I can work those?
A Yes.
Q Okay. Did you -- did you respond to this e-mail?
A No, I -- phone call -- she called. I responded to her phone call.
Q Okay. And you have the same cell phone provider?
A I do.
Q Okay. And so, we could request your phone records and would reflect what phone calls you made?
A (Indicating.)
Q And you think there would be a call showing



that you -- you called on August 14th, 2020 -- that you called Ms. Bell?
A I'm pretty sure or -- we talked at some point. I have -- might not have called her on that day, but she got an answer for those.
Q Well, she said, I need to know by close of business today.
A So, I don't know if I let her know by close of business or I let her know the next day, but I know she told me those days were not available.
Q The next time y'all spoke, she told you those days are not available?
A They were not available. They had already been picked up.
Q What about the -- is that the same thing that happened with the August?
A Same thing with August, same thing with June, same thing with July.
Q Okay. Why didn't you just respond by e-mail and say, I can take these? Did you have another job?
A I didn't have another job. I wasn't working at the time. And just because you show up PRN on somebody's roster doesn't mean that they're calling you for hours. So, no, I didn't have another job.
Q Right. So, you were looking for work.

A Yes.
Q And I think you told me that, at one point, if they had offered -- if ICDC had offered you any shift, you would have driven six hours there and back from Atlanta just to get there for one, right?
A I would have.
Q Okay. What changed?
A They become unavailable.
Q What about the 24th and 25th?
A The days become unavailable.
Q What -- what's funny about -- like, why is that funny?
A Because I lived this. I experienced this. You're getting what you're getting on paper. I get it, but I'm getting what I got at the same time. They were not a -- they were not available. The days were not -- so, when somebody calls you and tells you to come pick up a million dollars and then they tell you it's not available, then you don't get the million dollars because it's a wasted trip.
Then, when somebody else comes back to tell you, oh, the million dollars is back on the table, and you get a phone call from the person that put it out there, even though human resources is saying it's available, and they said the million dollars is not



available, you don't go. It's a wasted trip.
So, after the third time I was told it wasn't available, I didn't go. Then they get this, after you realize I get it a day before, saying, hey, I can go.
Q Okay. I- -- ICDC never pulled the August 24th and 25th from you, correct?
A Shanise Bell --
Q I'm sorry. July 24th, 25th, correct?
A They pulled the days were not available.
Q Okay. Hold on.
A Everything that was offered to me became unavailable when I accept it.
Q We're talking about two days. Two days, July 25 -- two -- two shifts, July 25th -- July 24th, 25th. They were on the text message that you agreed to, correct? Correct?
A In the -- when they changed the schedule and just left those two days?
Q And those two days were on the second schedule, correct?
A In the initial, yes, but I got a call saying they're not available even though you're looking at these e-mails.
Q Okay. But in the follow-up e-mails, they're saying they are available, right?



A In the e-mails, they're available; by phone, they're not. So, when you e-mail at 5:00 and say they're available, call me at 5:10 and say they're not available, that's the last time we talk. They weren't available.
Q Okay. So, you just -- you -- it was your understanding -- you came to the conclusion that any dates being offered for you to work, you were not gonna actually work them because they were just gonna pull them away from you.
A No, that's not true. I had to be told they were not available. I agreed -- once I agreed, they automatically become unavailable. So, that's not true.
Q Like the 24th and the 25th.
A They become unavailable. So, I never turned down work for ICDC. When they called and gave me three days, two days, one day, I was willing to work it, but when I agreed, then Shanise Bell said they were no longer available.
Q Okay. Even though Joan Whitley was s- -- telling you, after that alleged phone call, that they are available and they expected you to be there?
A They weren't available.
Q But Ms. Whitley was telling you they are. She's head of HR?



A She is, but they don't communicate. So, eventually, there was a stem in the communication. It was a miscommunication because, if Shanise Bell is telling me they're not available, then she didn't tell Joan that they were not available.
The days were not available. I never refused any work at ICDC.
MR. KEE: Okay. I'm gonna show you what I'm marking as Exhibit 39. And this is -- this is LaSalle 597.
(Exhibit No. 39 marked for identification.)
MR. KEE: Here I can just -- here, same thing.
You can just take -- I'm gonna go and -- and it will be easier.
BY MR. KEE:
Q Okay. I'm giving you Exhibit 39, which is LaSalle 597 and 598. Okay. You see this is that -- "Ms. Bell, good evening, Nurse Wooten had the following shifts and it's the August, 10th, 11th, 12th" -- do you see that?
A Yes.
Q And here you are -- you just told me you never turned down shifts and you say, "Good evening, I'm unavailable for these dates", correct? That's you turning down shifts, right?





Veritext Louisiana – CRLA/goDEPO cs-Louisiana@veritext.com
A Veritext Company www.veritext.com

A That's not me turning down shifts. That's her sending the e-mails saying these days are available and then you calling me saying they're not available.
Q That -- that -- that's not what happened here. Six minute- -- nine minutes later after the e-mail is sent -- or I'm sorry. The next day, you say, "Good evening, I'm available for those dates." She's trying to get you to work -- see if you can work these dates, correct?
A Those are the ones she sent, correct.
Q And then your response is, I'm not working those, right?
A I didn't say I'm not working those.
Q You said, I'm not -- "I'm unavailable to work those dates", correct?
A That was the response.
Q Okay. And those are three days you could have worked, right?
A Wrong.
Q What -- what's wrong about that?
A When you call me -- this is not gonna change, talking about this document. When -- whenever you call me --
Q Well, it's -- it's a new date.
A Yep --

Page 226

Q This is a new e-mail?
A When you call me --
Q New offer.
A When you call me and say they're not available after you offer them to me -- that's the issue that I had. You call me and it's like you throw me a fish and you yank it when I get ready to get it.
Q Where did she yank it? This -- this is you saying I'm unavailable on these three days. What did she yank?
A Her phone.
So, when you call me and say, hey, scratch that, Wooten -- I got a lot of "Scratch that, Wooten. They're not available. Somebody else have them."
Q Why did you even respond, then, if she called and told you they're unavailable? Why did you need to tell her, I'm unavailable? "Good evening, I'm unavailable for these days" -- if she just told you they're no longer on the table, why did you need to respond?
A I need- -- I'm not available for those days. You -- I mean, I'm not available for those days.
Q But why --
A What days?
Q -- e-mail her if you just had a -- if you had

Page 227

a phone call with her where she pulled those back? Why would you respond to this e-mail and say, I'm unavailable?
A I wasn't available for those days.
Q Okay. And then she says, in response, "Thanks for letting me know.
"Please don't forget to send your available days for next month so that I can compare it to our need and send you some days.
"Have a blessed and wonderful weekend." Do you see that?
A I do.
Q Okay. Did you ever send her available days?
A I don't recall sending her days. They let me knew what they had was available. That's what I was told: we'll call you when we need you.
Q She just told you, "Send me your available days for next month", correct, in this e-mail?
A In that e-mail, yeah.
Q And you never did, correct? Correct?
A No.
Q Okay. And, at this time, you were working with Project South?
A I don't know what time frame --
Q August 7th.

Page 228

A I started working with them. Like -- and it was, like -- I don't know what time -- like, it was nothing -- I don't know if I was working with them or not, like --
Q Does th- -- I mean, were you working with -- with about -- for about a month before you executed that verification -- or that declaration?
A I don't know what the time frame was.
Q They called you shortly after, on July 2nd, 2020, you said, right?
A I talked with them at some point.
Q Okay. So, around this time in August, about a month later, were you working with them?
A I don't know.
Q Okay. What about --
A I'm not sure --
Q -- with GAP?
A I'm not sure when I started with GAP.
Q Okay. And it's your testimony that Shanise is covering herself in some way by offering these days -- these days and requesting that you send your availability for next month?
A That's my story.
Q And you're sticking with it?
A I'm sticking with it.

Page 229

Q Okay. When she says she wanted to compare it to our need and send you some days, you think she was just lying to you?
A She was.
MR. KEE: Okay. Okay. I'm gonna show you what I'm marking as Exhibit 40, which is LaSalle 599. It's titled "Schedule".
(Exhibit No. 40 marked for identification.)
BY MR. KEE:
Q This is, again, Shanise on August 5th, "Good morning, Nurse Wooten, can you see please send me your availability for September so that I can see if it meets our needs for September? Once I receive your days, I will send you a final calendar for September."
Do you see that?
A I do.
Q And did you ever respond to this e-mail?
A I talked to Shanise Bell by phone a lot.
Q Did you -- my question is --
A No --
Q -- did you respond --
A -- I didn't respond --
Q -- to this e-mail?
A I don't recall responding to this e-mail.
Q Okay. And you never provided her dates -- did



you ever provide her dates for September?
A No, we talked by phone.
Q In e-mail, did you give her, like, a schedule?
A There's not a scheduling e-mail.
Q You're saying you -- you called her and gave her dates that you could work?
A We talked to her by phone.
My conversations --
Q Who's "we"?
A Shanise and myself.
Q Okay.
A So, Shanise and I talked by phone. My schedule was never allotted by dates. It was, hey, whatever you have available, let me know. That was my conversation I had with her through this whole thing: Whatever you have available -- let me know what you have available.
So, that's what -- it worked. She would let me know what she had available. And then, whenever she said it, she would call and say they were no longer available because she had people that took priority or precedence over me, PRN.
I couldn't make her give me days. I couldn't make her retract it.
Q I think my question was just: Did you ever



give her available days in -- for September so she could work on a schedule and try to get you some dates?
A I said no, by e-mail.
Q No --
A That's by e-mail.
Q And no, by phone?
A I didn't say no by phone. I said no by e-mail. You asked me about e-mail.
Q I'm asking phone --
A I said no. I talked with her over the phone about days.
Q So, you gave her specific days in September --
A Whatever days she had a- --
Q -- whenever you were available?
A No. Whatever days she had available was our conversation. Just let me know what days you have available.
Q Okay. She's specifically asking you, can you send me your availability so that I can see if it meets our needs.
And so, your response is that you called her and said, let me know what you have available and I'll let you know if I can work it?
A That's not what I said. What I said was, let me know what you days you have available. It's fine



with me. That was what I said.
So, in other words, whatever you have open, let me know what it is. I never said I couldn't work it or I was unavailable. So, I was making her job easier to say, hey, I have the 15th, 16th, 17th, 18th open, Wooten. Not trying to make her job hard by not giving her days because, when I gave them specific days that I could work, they told me those days were not available.
Q Well, that --
A This -- this has been it.
Q Well, that doesn't seem to jibe with August 6th, she gave you three days that she needed and you said, I'm unavailable, right? That doesn't really make sense with what you just said.
A It does by phone. When you have a phone call and she offers you those days and you tell me those days are no longer available, I've already sent my response to you to say, hey, it not.
Q Who is your phone provider, Ms. Wooten?
A Verizon.
Q Verizon?
And what's your phone number?
A (229)472-2465.
Q And have you had that same number/provider since June 2020?

Q What's that -- what -- what what's that (indicating)? What's that mean?
A I mean, no, I didn't let her know, like -- you couldn't have any contact. They were told not to have any contact with me.
Q So, they couldn't schedule you for work?
A They -- they were told that they couldn't have any contact. I got from several employees that they were told that they couldn't have any contact with me; that they had to signed non-disclosures. Like, you couldn't talk about that or any of that. And I got that from Lakeysia Brown, and she the supervisor.
Q What do you mean --
A That's how I found out about it.
Q How -- what do you mean? Explain that.
A Lakeysia Brown said that we could -- they could not have any contact with who I was; that the facility made them sign non-disclosures. So, no.
Q So, you didn't let any of them know?
A No.
Q Okay. What about Ms. Whitley?
A No.
Q Okay. Did you contact them in October, November, or December --
A No.



Q -- and ask them and say, hey, I'm available these days; here's my availability?
A No.
Q Okay. Did you let Tift know that you were available and willing to drive six hours to work a shift?
A No -- who was that's?
Q Tift --
A No.
Q -- Regional?
A Like I said, no, I didn't have any contact with anybody when I --
Q But you would have, right? You told me you would have driven six hours for one shift, right?
A I would have worked [sic] six hours for one shift.
Q Okay. And did you ask Tift if you could do one of those shifts -- Regional?
A When I left, nobody knew I was gone. So, no.
Q So, you didn't -- you didn't tell them.
A No.
Q That you were available for PRN work.
A PRN with them is they -- I got called -- or they would call and let you know. It wasn't a sudden -- like, a sudden thing. So, I would have gotten a call if



they had a shift available. So, no.
Q And they never called you?
A No.
Q Okay. How many shifts did you work after you were hired at Tift in 2020?
A I don't know.
Q How would you -- what would you look back to see?
A I don't even know. I can't get into anything to look back and see.
Q You get W-2s?
A I do, but I don't know how many --
Q Do you remember getting a W-2 --
A I don't.
Q -- from Tift?
A I do not.
Q Okay. Do you file taxes?
A I do.
Q Okay. So, you could look back at your -- the taxes you filed for 2020 and see, at least how much income you received from them?
A I couldn't. I would have to go where I file.
Q Where do you file?
A I use H&R Block.
Q Okay. And you don't have a copy, you're



saying?
A I don't know where it's at. I -- like I said, we've been homeless twice. I don't know where that paperwork is.
Q Okay. Is there any other jobs you didn't disclose --
A Not that I'm aware of.
Q -- in response to --
A Not that I'm aware of.
Q Okay. In response to Interrogatory No. 3, we say: Please describe with specificity the incidents in which you complained about COVID procedures at ICDC to Nurse -- the director of nursing, Ms. Shanise Bell.
And you've listed -- you've listed some things here, right? Some dates with some explanations. Do you see that?
A Yes.
Q Okay. What was the basis -- you see this late March, April 2020 -- you state: Testing denials. Plaintiff told about detainees with COVID symptoms were denied testing.
What was that based on?
A They had two COVID machines in the facility that they were not testing the detainees with. So, when the detainees asked to be tested, they told them, no,

they weren't testing them.
Q Who told you that -- told you that?
A I was in there with Shanise Bell and Brown when they told the detainees that they weren't testing them.
Q So, this says that Bell -- that you told Bell detainees with symptoms were denied testing.
Now you're saying that you were in a room where Ms. Bell actually denied testing?
A She denied them testing.
Q So, it didn't sound like you informed her; you saw her denying?
A She was informed and I saw her deny.
Q Okay. Wh- -- when did you see her deny testing?
A I don't know the exact dates that I went in. The inmates wanted to be tested and she told them no.
Q Okay. And what signs were they exhibiting to make you think they had COVID symptoms?
A Fever, cold, flu and they had positive detainees in the same dorm with them.
Q Okay. And why did Ms. Bell refuse here, and what you're saying, to test them for COVID?
A I don't know what her rationale was for refusing.

Page 242

Q You didn't ask her why -- why you're not testing them?
A She didn't test them because she didn't want to test them. They were new COVID-testing machines and they could what they wanted to do. They could -- they could make those decisions -- this is how it was ran. It's authority. They -- they, made those decisions.
Q I'm asking: Did you ask her why she did not test them?
A She didn't test them because she didn't want to test time. Like, I mean --
Q Did she tell you that?
A Like, why can't they?
Ye- -- she didn't want to be -- they didn't want to -- they didn't have to test them. The didn't want -- if they didn't want to, they didn't have to.
Q I'm not under- --
A And she didn't test them.
Q I'm not understanding what you're saying.
A So, why are you not testing them? I don't test them because I don't want to test them.
Q Okay. Is a provider order needed to test the detainee?
A I'm not recalling a provider order. That's why the machines were there. Like, if they were

Page 243

symptomatic --
Q No. No. No. No?
A So, I don't know.
Q Was it required?
A I don't know if one was required or not.
Q So, you have -- you don't know.
A No, I don't -- we didn't have to have required doctors' orders, I'm sure, because we was testing all the time before they got these new machines.
Q Okay. Do you -- it's a yes or no. Do you know whether a provider order was needed to test before you could test a detainee for COVID?
A We tested prior. So, no, I don't know.
Q You don't know. Okay. And that's late March, early April is the time period I'm talking about.
A Well, I'm not sure. So, no.
Q Test-result shredding, April '20 -- 2020. It says: Plaintiff reported to Bell that HSA Brown shredded approximately 45 COVID test results without filing them. Bell acknowledged, but took no action.
When -- when -- when was -- what did you see happening there?
A Exactly that. She was shredding the COVID test results of the detainees.
Q Was this at the same time that you said that

Page 244

you took COVID results home with you and Ms. Brown was also making copies of COVID test results?
A I was not aware if she was taking them home at that time, but she had them. She had them. So, I don't know the time frame or her taking those out -- whether these were the same ones or not, but she was taking those out.
Q The only person that you know of that actually took medical records home with them was you, correct?
A And Lakeysia Brown.
Q You knew that Lakeysia Brown did, too?
A She took --
Q How do you know that?
A Because she had a book bag, put in paperwork in it, taking it out of the building in a box.
Q Okay. And how did you get your medical records out of the building?
A I had three forms in a manila envelope.
Q Okay. Where did you -- and how did you hide that?
A I didn't.
Q You just walked right out of there with them?
A I did.
Q Okay. Why did you do that?
A I needed proof that they actually had COVID

Page 245

Q Okay.
A Yeah.
Q Okay. So, who, outside, then, of the facility did you need to prove that there were COVID -- there was COVID inside?
A I didn't have anybody outside to prove it to. This facility that I worked at said, we don't have COVID. So, at some point --
Q When --
A ICDC always denied COVID in the building.
Q Well, who -- I mean, that's an or- -- who -- who is saying -- who -- who is saying that? When you say ICDC -- that -- the building doesn't talk.
A Your administrative -- all your administrative -- no one knew to -- which you would not publicize, but no one knew to admit to -- you just wasn't. Just like these e-mails, I needed proof. I needed proof. If something came up, I needed proof. I needed proof.
Q So, this was something to protect yourself?
A I needed proof.
Q In -- in what way?
A I needed proo- -- I was being discharged, demoted, nobody was taking me seriously. My supervisors were saying, hey, shred this document. Hey, we can



abuse these people in here. We don't have to take care of these people in here. At some point, I was gonna need proof. This is my proof.
Q Why didn't you document -- you're saying you thought this was, like, some type of setup and you needed proof or s- -- I don't know what you're thinking, but you needed proof for something.
Why didn't you document your phone calls with Shanise Bell?
A They're mentally documented.
Q No, that's -- w- -- well, was not COVID mentally documented? Did you have to steal someone's medical records?
MS. AYERS: Object- -- objection.
A I --
Q Did you -- did you -- did you mentally note that there was COVID in the facility?
A I didn't steal anything.
MS. AYERS: Thank you.
Q Excuse me?
MS. AYERS: She didn't --
Q You didn't -- what?
MS. AYERS: -- steal anything --
A I didn't steal anything.
MS. AYERS: -- is what she said.



A I didn't --
Q How do you -- how do you reach that conclusion?
A I didn't steal thing.
Q What did you do?
MS. AYERS: Steal --
Q Did you remove it without authorization?
A My supervisor said I --
Q In violation of HIPAA?
A M- -- my supervisor said that I could be privy to these. My supervisor, that also took out the same documentation.
Q What does your -- your nurse's license -- what does it say about HIPAA violations? Are you allowed to keep your license?
MS. AYERS: Objection. Vague. A license can't speak, just like a building.
Q You can answer.
A My license don't say nothing about HIPAA violations.
Q You can violate HIPAA and you don't lose your li- -- No effect on your license?
MS. AYERS: Objection.
Q You can answer.
MS. AYERS: Calls for speculation.



Q What you know, as a nurse, what does your license say about HIPAA violations?
A That I --
Q And violations there- --
A -- am to take care of my patients in truth and good faith. That's what I was doing, taking care of my patients in good faith.
Q You were taking care of yourself, you said.
MS. AYERS: No.
A My --
Q That's what you said.
MS. AYERS: Objection. Mischaracterizes prior testimony.
Q How was taking a patient's medical records with -- did you ask them if they -- if you could have them?
MS. AYERS: Asked -- objection.
A Taking care of my patients.
MS. AYERS: Vague as to ask who --
Q Did you ask your patients --
A Don't yell at me.
Q Did you ask your patients --
A Don't yell at me, please.
Q Did you ask your patients if you could take their medical records with you home?

A I took care of my parents in good faith.
Q My question is very simple: Did you ask either one of those three individuals whose medical records you took home with you, whether or not you could do that?
A Every day I went in and took care of them in good faith. I didn't have to ask them that every day.
Q Let me ask again because this is a simple yes or no: Did you ask them whether or not you could take their medical record home with you?
A I took care of them in good faith.
Q That's non-responsive. Do you need me to ask it again?
Did you ask either three of those detainees whether you could take their medical record home with you?
A I asked my supervisor.
Q Did you ask the patients?
A I'm sure they wouldn't have mind --
Q Did you ask them?
A -- with the conditions.
Q Did you --
A But no --
Q Ask --
A No.



Q No.
A No.
Q Okay. So, you didn't have -- you didn't have their authority to do that, right? Correct?
A You asked did I ask them. I said no.
Q Okay. So, that -- you didn't have their authority.
I think you said you were doing it to protect them? Is that what you testified about?
A No. Taking care of my patients in good faith.
Q Okay. And taking their records without asking them -- that was part of that good-faith care you were giving your patients.
A They would have never gotten care without it.
Q They would have never -- you didn't give these records to anybody, correct?
A No, nobody got them.
Q Okay. So, how was it that they got better care by you taking their records?
A They were being shredded, so someb- -- so, no one would have never known they had COVID because they were being shredded.
So, what about the other --
Q Who was shredding --
A 43 --



Q Who --
A -- that needed to be taken care of?
Q Who was shredding those three [sic] medical records. Who did you see shred those medical records. That you took --
A Ms. Brown was shredding those medical records. She was shredding over 45 medical records. So, why were you concealing that?
Q So, Ms. Brown -- let me get this straight: Ms. Brown is shredding records. She's also making copies of them, putting them in her book bag and taking them home with her.
A She --
Q That's your testimony.
A Yes. She had already made copies.
Q Okay. Are you familiar with electronic records?
A I'm very familiar with electronic records.
Q Okay. And what's the process at ICDC in terms of transferring paper copies into electronic records?
A I don't -- I'm not a medical-records person, so --
Q Right.
A -- that would be what --
Q Somebody else.



A Yeah.
Q Okay. So, you don't know if there are electronic copies of all these COVID records.
A I do.
Q That would be somebody else.
A There weren't.
Q You don't know that because that's not your department, correct?
MS. AYERS: Objection.
Q Correct?
A There weren't. It's not my department, but it wasn't.
Q How do you know which -- what that department was doing? How do you know?
A Those records weren't scanned in.
Q How do you know what that department was doing?
A They weren't scanned in.
Q How do you know that?
A Whenever you go to their file to look for it, it wasn't present. She was shredding them.
Q Who?
A They were not being scanned in.
Q So, now, who else -- who else was shredding?
A Brown was shredding them.

Q Okay. Remember, I showed you to start this deposition?
MS. AYERS: Objection.
Q Remember that. False and defamatory statements -- do you remember that?
A No, I'm not aware.
Q Okay. Did you ever tell a nurse at ID- -- ICDC around this time when you were getting in trouble for attendance issues that they don't know who they're messing with?
MS. AYERS: Objection.
A I didn't even realize I was in trouble for attendance issues. This is the first time I saw it today.
Q Well, you had a grievance. You s- -- you got -- you went from full-time to part-time?
A It wasn't for -- yeah, that -- but I never saw that. So, that was the first time I realized I had an issue --
Q Well --
A -- was when I had the complaint to go see the warden.
Q Okay. When's -- after that, when you realized that, did you ever tell a fellow nurse -- and speaking of ICDC -- that they don't know who they're messing with?

Page 274

A No.
Q No? So, if a nurse were to testify to that, they would be lying?
A She would be lying or he would be lying.
Q Okay. That would be just another employee at ICDC that's lying about you.
A It would be.
Q Okay. Okay. Here, on Interrogatory No. 6, Page 8, informed consent, it says: Women underwent gynecological procedures without informed content. Plaintiff confirmed via chart reviews.
What chart did you review that showed that someone didn't give informed consent?
A The electronic record didn't have a consent in it.
Q For whom?
A For the detainees. Like I said, I looked at a couple of these.
Q No. No. No. What -- what detainee?
A I'm not sure of a name, but didn't have informed consent.
Q So, sitting here today, you can't identify a single detainee whose record you looked at that did not have informed consent?

Page 275

A I can't.
MS. AYERS: Objection.
A Yeah, I can't say off --
Q Okay. Okay. And what's your -- how do you know that -- that Warden Paulk learned about complaints that you allegedly made to Ms. Bell and Ms. Brown relating to COVID issues?
A They had a meeting every morning at 10:00 a.m.
Q Were you there?
A No. We were weren't allowed to be in those meetings.
Q Okay. So, you have no idea what was said in that meeting, correct?
A Correct.
Q Okay. And did you review the hospital physicians or -- or the physician at the hospital who performed the procedures -- did you review his medical charts to see if there was informed consent?
A Review them -- he had his own private practice.
Q Right. And you didn't look at this is files to see if there was a patient consent form, right?
A At his own personal practice?
Q Correct.
A No, he was not gonna let me in his own, personal practice.

Page 276

Q Right. So, you don't know if there was that was record there, correct?
A Not at his personal practice, I don't.
Q Okay. Or the hospital -- how about the hospital?
A We didn't have access to the hospital. I worked for the -- at the prison. I didn't work at the hospital --
Q Exactly. So, you didn't have access to those files to see if there was informed consent there, correct? Right?
A Correct.
Q Okay. And so, it sounds like you said you think that Warden Paulk learned of your complaints that you allegedly made to Ms. Brown and Ms. Bell through morning meetings, but you've admitted you weren't there.
Is there any instance where you have actual, personal knowledge where Warden Paulk was told about your complaints relating to COVID compliance?
A He knew I complained -- I went to get the masks from him one day. So, he already knew, hey, we need masks. It's COVID. Why are you not giving us these masks.
Q Well, I- --

Page 277

Q Okay.
A I think I got this for Joan to make sure I was paid or something.
MR. KEE: Okay. Okay. All right. Well, that's all the questions we have.
MS. AYERS: Great.
THE COURT REPORTER: Okay. Ms. Ayers, anything?
MS. AYERS: Nope.
THE COURT REPORTER: Read or waive?
MS. AYERS: She'll read.
THE COURT REPORTER: Okay. Are you ordering this at this time?
MR. KEE: Yes.
THE COURT REPORTER: Okay. And, Ms. Ayers, would you like a copy?
MS. AYERS: I'm not sure. We'll get back to you.
(Whereupon, the deposition was concluded at 6:49 p.m., and the witness did not waive reading and signing.)



CERTIFICATE OF OATH

STATE OF FLORIDA )
COUNTY OF LEON )

I, ANDREA KOMARIDIS WRAY, the undersigned authority, certify that the above-named witness personally appeared before me and was duly sworn.

DATED this 30th day of April, 2026.

ANDREA KOMARIDIS WRAY
NOTARY PUBLIC
COMMISSION NUMBER HH 415051
COMMISSION EXPIRES June 26, 2027



CERTIFICATE OF REPORTER

STATE OF FLORIDA )
COUNTY OF LEON )

I, ANDREA KOMARIDIS WRAY, Court Reporter, certify that the foregoing proceedings were taken before me at the time and place therein designated; that my shorthand notes were thereafter translated under my supervision; and the foregoing pages, numbered 1 through 292, are a true and correct record of the aforesaid proceedings.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

DATED this 30th day of April, 2026.

ANDREA KOMARIDIS WRAY
NOTARY PUBLIC
COMMISSION NUMBER HH 415051
COMMISSION EXPIRES June 26, 2027



Dawn Wooten
1224 Hall Avenue
Tifton, GA 31794
5070653.dw@gmail.com

April 30, 2026

RE: Deposition of DAWN WOOTEN
Taken on April 16, 2026
In the matter of DAWN WOOTEN vs. Lasalle Management, et al

Dear Ms. Wooten,

The above-referenced transcript is available for review. You should read the testimony to verify its accuracy. If there are any changes, you should note those with the reason on the attached Errata Sheet.

You should, please, date and sign the Errata Sheet and email to the deposing attorney as well as to Veritext at transcripts-fl@veritext.com, and copies will be emailed to all ordering parties.

It is suggested that the completed errata be returned 30 days from receipt of testimony, as considered reasonable under Federal rules*, however, there is no Florida statute to this regard.

If you fail(s) to do so, the transcript may be used as if signed.

Sincerely,

Veritext Legal Solutions

*Federal Civil Procedure Rule 30(e)/Florida Civil Procedure Rule 1.310(e).

| | | |
|---|---|---|
| LASALLE CORRECTIONS | Policy Number: | **11.3** |
| | Policy Name: | Employee Grievance Procedures |
| | Effective Date: | September 11, 2017 |

**REFERENCE:**

LaSalle Management Company Leadership

**POLICY:**

The policy of LaSalle Corrections is that all employees shall be treated fairly and equitably. Employees who feel they have not received fair treatment may present their grievance to appropriate management personnel for prompt consideration.

Employees or employees' witnesses shall not be subjected to harassment, retaliation, intimidation or coercion for pursuing a complaint or acting as a witness through these procedures.

These guidelines do not constitute an employment contract or a guarantee of continued employment. LaSalle Corrections reserves the right to change the provisions of these guidelines at any time.

These guidelines and procedures are adopted to guide the internal operations of LaSalle Corrections and do not create any legally enforceable interest or limit the Warden's or designee's authority to terminate any employee at will.

**PURPOSE:**

Employees shall have access to a formal grievance procedure to provide them with a fair and objective process for mediating issues, which cannot, or have not, been addressed informally.

Routine daily discussions between employees and supervisors regarding working conditions and related employment matters are the most constructive and expeditious means of developing and enhancing favorable and effective work relationships. When a matter cannot be resolved to the satisfaction of the employee, they may seek resolution by filing a grievance.

**SCOPE:**

This policy applies to all LaSalle Management Company Employees

**DEFINITIONS:**

1. <u>Corporation</u>: LaSalle Corrections, LLC
2. <u>Days</u>: Work days (Monday through Friday, excluding national holidays.)
3. <u>Regional Warden/ Operations Director/Appropriate Director or Designee</u>: Final responding authority for LaSalle Corrections.
4. <u>Employee</u>: Any person employed by LaSalle Corrections on a regular, non-contract basis.
5. <u>Grievance</u>: A complaint from an employee concerning their employment, wages, hours or other work-related conditions.
6. <u>Grievant</u>: Any employee who pursues a grievance under the procedures set out in these procedures.

EXHIBIT
PENGAD 800-631-6989
7
Wooten

7. Grievance Meeting: A meeting between a grievant and a LaSalle Corrections official to discuss the grievant's complaint. Such meetings will be conducted within the time frames established by these procedures and at a date and time that would afford all parties a reasonable opportunity to be present.
8. Submission Date: Date grievance is submitted to the office of the appropriate official or postmarked by the United States Post Office to the address of the appropriate official/employee.
9. Support Documentation: All written material submitted to and used by the Responding Authorities in arriving at their findings.
10. Witness: A person who has evidence pertinent to the grievance and who is willing to submit a written statement during the grievance procedure.

**PROCEDURES:**

**A. Discussion:**

1. Employees may file a grievance on any matter of concern or dissatisfaction related to their employment, wages, hours, or other work-related conditions.
2. The filing of a grievance by an employee will not be construed as reflecting unfavorably on an employee's good standing, performance, or loyalty and desirability to LaSalle Corrections. Similarly, the occurrence of occasional grievance will not be construed as reflecting unfavorably on the quality of supervision or on the general management of LaSalle Corrections.
3. These procedures apply to all regular, non-contract employees of LaSalle Corrections
4. The application of these procedures shall assure a fair opportunity for presenting and resolving the complaints and grievances of employees. If an employee grievance cannot be resolved, the employee may consider other courses of action In the matter.

**B. Grievable/ Non Grievable Issues**

1. **Grievable Issues** – Employee complaints or disputes that may be grieved are as follows:
   a) Application of policies, procedures, rules, regulations, ordinances, contract provisions and/or statutes;
   b) Disciplinary actions which are documented in an employee's personnel file;
   c) Acts of reprisal that result from the use of the grievance procedures; and
   d) Complaints of discrimination on the basis of race, color, creed, age, handicap, national origin and/or gender. A discrimination grievance must be based on factual information NOT perceptions or hearsay. Employees who feel they have been discriminated against must provide specific information such as person, date, time, documentation and possible witnesses to the discrimination to assist management in resolving the grievance.

2. **Non-Grievable Issues** – Management reserves the right to manage the affairs and operations of the company. Accordingly, the following complaints or disputes are not Grievable under the grievance policy unless it can be demonstrated that the action was based on discrimination:
   a) Content of policies, procedures, rules, regulations, ordinances and/or status;
   b) Requirements of grievance against or decisions made by the contracting agency or controlling jurisdiction;
   c) Termination, lay-off, demotion or suspension from duties due to lack of work, reduction in the workforce, job abolition and/or contract cancellation;
   d) Hiring, transfer, assignment, shift changes and retention of employees within the company provided such activities do not constitute disciplinary actions;

e) Methods, means and personnel by which work activities are to be carried out;

f) Performance ratings;

g) Employee benefits, rates of pay and/or position classification;

h) Non selection for promotion when the sole basis for the complaint is that the grievant was better qualified than the individual selected;

i) Complaints filed by a group rather than an individual;

j) Requirements for employees to perform other than normal duties during emergencies; and

k) Suspension from duties of company employees in emergencies or investigations.

**C. General Provisions**

Grievances submitted that are not in compliance with the procedures set out in these procedures will not be accepted.

1. All grievances must be submitted on the Employee Grievance Form.

2. Employees must submit the original completed and signed Employee Grievance Form within 10 days of the occurrence giving rise to the grievance or within 10 days of first learning of the occurrence, if it was not reasonable for the employee to have had knowledge of the occurrence sooner. Grievances over continuing conditions may be submitted at any time.

3. If an employee anticipates relying on the testimony of witnesses to support their grievance, the names of the witnesses should be listed and a brief summary of each witness's testimony should be attached to the Employee Grievance Form at the time the grievance is initially filed.

4. Elements of a Grievance: A grievance must contain the following:

    a) The specific complaint regarding the employment related matters in the workplace;

    b) How the actions complained about adversely affected the grievant's employment or working conditions; and

    c) The specific relief that is requested.

5. Time Limits:

    a) Except for the initial grievance submission, all time limits set forth in these procedures may be extended by mutual consent.

    b) All requests for time limit extensions must be submitted in writing.

    c) Management's failure to comply with established time limits for grievance responses (or extension dates) may be grounds for granting of the grievant's relief by authorities at a higher level.

d) The grievance will be considered closed if the initial decision is not appealed within the given time limit or mutually agreed extension thereof.

6. Witnesses:

a) LaSalle Corrections employees are encouraged to serve as witnesses and provide statements for the grievant and management when requested to do so by the appropriate authority. Service as a witness will be considered official business, for which the employee will be released by the supervisor on paid time during working hours. Employees who are witnesses in a grievance hearing shall provide their supervisor sufficient advance notice to provide adequate staffing.

b) No act of reprisal shall be taken against any employee who testifies in a grievance meeting.

7. The grievance procedure is not the proper forum to ask that another employee be disciplined. Including a request for such discipline in a grievance is grounds for the grievance to be rejected.

**D. Compensation/Reimbursement:**

1. Appearance as a grievant or witness at a grievance meeting will be considered official business for employees and such appearance will be on paid time.

2. A grievant that has separated employment from LaSalle Corrections prior to the time of the grievance proceeding will not be paid for their time or expenses in connection with the proceedings unless they are reinstated as a LaSalle Corrections employee as a result of the grievance.

3. LaSalle Corrections will not pay for the time or travel of witnesses who are not LaSalle Corrections employees at the time of the grievance proceedings.

4. Recording of Grievance Meetings: The steps of the grievance procedures are intended to be a problem-solving process for addressing grievances. The use of recorders (or reporters) at a grievance meeting at any step creates a formal and adverse atmosphere that is in direct conflict with the purpose of the problem-solving approach. Therefore, audio taping, videotaping, or written recording of a grievance meeting is not permitted. As a reasonable accommodation for their physical disability, a hearing-impaired employee involved in the grievance process may use a qualified interpreter or a recording device.

**E. Grievance Steps:**

There are two steps in the grievance process; however, both steps may not be available in all cases. The Employee Grievance Form is to be used by the employee and management respondents in all grievance procedures.

If at any step the employee requests the return of a grievance, either verbally or in writing, before a response at that step is rendered, the grievance procedure will be considered closed with no action taken.

An employee may not circumvent these procedures by forwarding a complaint to the next step until it has been addressed at the previous step.

An employee on new hire probation may not grieve a dismissal.

1. Step One: Warden/Regional Warden/Appropriate Director or Designee

    a) Employees shall submit their grievance to the appropriate LaSalle Corrections official identified above, unless the grievance relates to LaSalle Corrections policy. In such a case, the employees may file the grievance directly with the corporate office.

    b) Upon receipt of a grievance, the LaSalle Corrections official shall notify the facility or corporate office where the employee is assigned that a grievance has been received. The Human Resource Office or designee will assign a tracking number to the grievance and advise the recipient of this number to be affixed to the Employee Grievance Form. The grievance number will be formatted with the Facility Code-Year-Month-the number of employee grievances received in the same month. (Ex- BOW-2017-06-01). If the issues raised are outside the Warden's authority and responsibility, or if the grievance is against the Warden or his/her decision in a formal disciplinary hearing, the grievance shall be forwarded to the Regional Warden or designee for response.

    c) After reviewing the grievance, the responding authority may conclude that a grievance meeting would expedite the resolution of the grievance. The responding authority may schedule a grievance meeting with the grievant. If the responding authority schedules a grievance meeting, the responding authority shall notify the grievant of the date, time, location and manner (telephonically or in person) in which the grievance meeting shall be conducted and who may attend. The grievance meeting shall be scheduled within a reasonable time and written response submitted within ten (10) days of the conclusion of the grievance meeting. Nothing in this procedure shall be construed as to require a grievance meeting at Step One. If a meeting is scheduled and the grievant fails to appear, the grievance will be closed with no action taken. If no grievance meeting is held, the responding authority shall respond to the grievant in writing within ten (10) days of receiving the grievance.

    d) If the grievance cannot be responded to within the required time limits, a Time Limit Extension Agreement shall be mailed to the grievant, via certified mail, at the address listed on the Employee Grievance Form. The employee shall return the Time Limit Agreement to the responding authority.

    e) The original Employee Grievance Form with a Step One response shall be mailed, via certified mail, to the grievant at the address listed on the Employee Grievance Form. The Step One response shall list the name and address of the LaSalle Corrections official to whom the grievance should be submitted if the grievant is not satisfied with the response. A complete copy of all documentation shall be kept in a separate Employee Grievance file by the Human resource office where the Employee File is kept.

    f) The grievant may reject the Step One Response by submitting the Step Two Grievance form to the designated LaSalle Corrections official indicated in the Step One Response. All documentation originally reviewed at Step One, along with the Step Two Grievance form, must be submitted within ten (10) days after receiving the Step One response. If the grievant does not reject the Step One response or fails to submit within the established time limit, the grievance response will be

considered to have been accepted by the grievant and the grievance shall be closed with no additional action taken.

2. Step Two: Regional Warden/Appropriate Director or Designee

   a) Upon receipt of a Step Two Grievance appeal, and after reviewing the grievance, the responding authority may conclude that a grievance meeting would expedite the resolution of the grievance. The responding authority may schedule a grievance meeting with the grievant. If the responding authority schedules a grievance meeting, the responding authority shall notify the grievant of the date, time, location and manner (telephonically or in person) in which the grievance meeting will be conducted and who may attend. The grievance meeting shall be scheduled within a reasonable time and written response submitted within ten (10) days of the conclusion of the grievance meeting. Nothing in this procedure shall be construed as to require a grievance meeting at Step Two. If a meeting is scheduled and the grievant fails to appear, the grievance will be closed with no action taken. If no grievance meeting is held, the responding authority shall respond to the grievant in writing within ten (10) days of receiving the grievance.

   b) If the grievance cannot be responded to within the required time limits, a Time Limit Extension Agreement shall be mailed to the grievant, via certified mail, at the address listed on the Employee Grievance Form. The employee shall return the time Limit Extension Agreement to the responding authority.

   c) The responding authority shall respond within ten (10) days after the grievance meeting. The original Employee Grievance Form with the Step Two response shall be mailed, via certified mail, to the grievant at the address listed on the Employee Grievance Form. The decision of the responding authority at Step Two is final, and the grievance procedure in complete.

   d) When an employee is separated from employment, either voluntarily or involuntarily, any grievance filed by the employee that is in progress at the time of separation will continue to be processed, if the requested relief can be granted. If the requested relief cannot be granted, the grievance will be closed with no action taken.

**F. Limitations of Management Decisions at Step One by Facility Management:**

Management's responsibility in a grievance hearing is to uphold policies, procedures, rules and/o regulations of the corporation and the facility at which the grievant is employed. The decision of management will not exceed the following limitations:

a) Management at levels below that of the regional Warden or corporate office will not formulate or change corporate policies, procedures, rules or regulations;

b) Matters designated as non-grievable will not be considered;

c) Management decisions will be consistent with corporate policies and procedures, and with requirements of the contracting agency or controlling jurisdiction;

d) Management decisions may uphold, reverse or modify that action grieved. In cases where management determines that reinstatement with back pay and restoration of benefits is warranted, that decision should first be discussed with the Regional Warden prior to granting, the decision will not include award of damages or attorney's fees or any other cost or awards;

e) Management's responsibility is to inform employees of the existence of the Grievance Procedure, the right to use it and the availability of the regional or corporate office to answer questions about the grievance policy and procedures.

**G. Retention of Grievances:**

A copy of the completed Step One or Step Two grievance along with all documentation shall be kept in an employee grievance file at the same location of the employee personal file. This file will be maintained within the same time limits as the employee personal file in accordance to records retention policy.

**REVIEW:**

The Director of Operations will review this policy on an annual basis.

**ATTACHMENTS:**
**Step One Grievance Form**
**Step Two Grievance Form**

**POLICY APPROVAL:**

| Name: | Title: | Date: | Signature: |
|---|---|---|---|
| Jay Eason | Director of Operations | 11 September 2017 | On File |

December 2, 2020

VIA Email
Margo Westmoreland, Area Director
U.S. Occupational Safety and Health Administration
Savannah Area Office
450 Mall Boulevard, Suite J
Savannah, GA 31406
Fax: (912) 652- 4329
westmoreland.margo@dol.gov

**Re: OSHA Complaint on behalf of LaSalle Corrections employee Dawn Wooten, Against U.S. Immigration and Customs Enforcement, Irwin County Detention Center, and LaSalle Corrections**

Dear Ms. Westmoreland:

The undersigned attorneys represent Dawn Wooten, who is a citizen of the United States and a legal resident of the State of Georgia. She lives at 1224 Hall Avenue, Tifton, Georgia. Ms. Wooten is personally familiar with the facts as stated herein and is competent and willing to testify about them.

Ms. Wooten has been a Licensed Practical Nurse ("LPN") since 2009.

Ms. Wooten was first employed as an LPN at the Irwin County Detention Center ("ICDC") in Ocilla, Georgia in 2010.

ICDC is located at 132 Cotton Drive, Ocilla, Georgia 31774. The phone number for ICDC is (229) 468-4121 and the Warden of ICDC is David Paulk, dpaulk@irwincdc.com. Ms. Wooten's current supervisors at ICDC are the Health Services Administrator ("HSA"), Ms. Lakisha Brown, and the Director of Nursing, Shanise Bell.

ICDC is operated by LaSalle Corrections ("LaSalle"), a private company based in Louisiana. LaSalle is headquartered at 192 Bastille Lane, Suite 200, Ruston, Louisiana 71270. The phone number for the LaSalle headquarters is 318-232-1500, and the fax number is 318-232-1501. LaSalle contracts with U.S. Immigration and Customs Enforcement ("ICE") to operate prisons, jails, and detention facilities throughout the United States. ICE is headquartered at 500 12th St SW #5600, Washington, DC 20536._ICDC is one of about 20 facilities that LaSalle operates via contract with ICE.

Since ICDC first hired her in 2010, Ms. Wooten has voluntarily resigned from her position three times but has been reemployed by ICDC, most recently in October 2019. She still is employed by ICDC.

Since Ms. Wooten's most recent rehire at ICDC, she has been a full-time employee, working approximately 36-40 hours per week, including regular shifts from 6 am to 6 pm, six times in



EXHIBIT
10
Wooten
PENGAD 800-631-6989

DW00662

every two-week pay period. More recently, *after* Ms. Wooten raised questions about ICDC's compliance with workplace safety and health regulations, ICDC demoted Ms. Wooten from a full-time employee to an "on-call" employee, severely curtailing her hours.

On September 14, 2020, the undersigned filed a complaint on behalf of Ms. Wooten with the U.S. Department of Homeland Security, Office of Inspector General about workplace safety and health hazards and inhumane treatment of immigrants detained at ICDC. The contents of her complaint and her accompanying declaration, executed on September 8, 2020, are attached as exhibits and incorporated herein as a part of this OSHA complaint.

As evidenced in both documents, numerous workplace safety and health violations have occurred, and continue to occur, at ICDC. Many of these violations constitute violations of the OSH Act's General Duty Clause and evince ICDC's willful and intentional disregard for the health and safety of employees. General Duty Clause violations are willful if "an employer has demonstrated either an intentional disregard for the requirements of the [OSH] Act or a plain indifference to employee safety and health." *See* 29 U.S.C. § 654. *See also* OSHA, Field Operations Manual ("OSHA FOM"), at 4-22 (April 14, 2020), https://www.osha.gov/sites/default/files/enforcement/directives/CPL_02-00-164.pdf.

We, as representatives of and on behalf of our client, Ms. Wooten, request that OSHA conduct an in-person inspection of ICDC without delay. This complaint constitutes a formal complaint, as defined by and in conformance with Chapter 9, Section I (A)(1)(a) in OSHA's current, April 2020, Field Operations Manual ("FOM"). The violations that occurred at ICDC with respect to workplace health and safety include, but are not limited to, the following:

1. **ICE, LaSalle, and ICDC (collectively, "the Employers") have willfully failed to administer COVID-19 testing to immigrants who have reported symptoms, thus jeopardizing the health and safety of workers and immigrant detainees, and willfully depriving employees of a workplace that is "free from recognized hazards that are causing or are likely to cause death or serious physical harm."** ***See*** **29 U.S.C. § 654.** ***See also*** **OSHA FOM, at 4-22.**
   a. As stated in Ms. Wooten's declaration:
      i. "In March 2020, detainees in Unit C at ICDC began to report that they and their dormmates were experiencing well-recognized symptoms of COVID-19, such as fevers and sore throats. These detainees thus repeatedly requested to be tested for the disease. Ms. Brown and ICDC Director of Nursing, Ms. Shanise Bell, routinely rejected these requests. When I questioned Ms. Brown about these denials of COVID-19 testing for detainees exhibiting symptoms, Ms. Brown told me that she would not authorize testing for the detainees because 'all they want is attention. … Everybody want [sic] to be tested for COVID.'" Wooten Decl. ¶ 11, September 8, 2020.
      ii. "In June 2020, ICDC received two rapid response COVID-19 testing machines. These machines would produce COVID-19 testing results in eight minutes. I understood the machines were to be used for testing the

detainees, but I saw the machines in use only twice: once to test an ICDC employee and once for a detainee." *Id.* at ¶ 12.

iii. "From March through July 2020, rather than order a COVID-19 test for detainees seeking medical attention for a fever, I observed ICDC medical staff prescribing a seven-day course of over-the-counter cold medication to those detainees." *Id.* at ¶ 13.

iv. "From October 2019 through July 2020, I observed ICDC medical staff shredding detainees' written requests for exams or treatment and otherwise denying medical care by falsely documenting or reporting exams as performed that actually had not been performed. During May and July 2020, I reported this to Ms. Brown, who took no action but told me, 'One day they will be caught [shredding the exam requests].'" *Id.* at ¶ 14.

2. **ICE, LaSalle, and ICDC have willfully failed to follow their own decontamination and cleaning programs and schedules, exposing employees to hazardous bodily fluids and contaminants, including, but not limited to, blood or other potentially infectious materials. *See* 29 CFR 1910.1030. The Employers' failures have willfully deprived employees of a workplace that is "free from recognized hazards that are causing or are likely to cause death or serious physical harm" in multiple areas of the ICDC facility. *See* 29 U.S.C. § 654. *See also* OSHA FOM, at 4-22.**

   a. "From October 2019 through July 2020, ICDC failed to maintain hygiene, cleanliness, and sanitation standards for medical exam rooms and equipment." Wooten Decl. at ¶ 18.

   b. Ms. Wooten "observed exam room tables and floors that were rarely cleaned, wiped down, or mopped, and certainly not to ICE or CDC standards. There was often blood on the floor that had not been cleaned up." *Id.* at ¶ 19

   c. "To give just one example, a detainee's blood lay on the same spot, in the same pattern, an exam room for at least two full months. In other words, it was never mopped up." *Id* at ¶ 20. Ms. Wooten further states, through counsel, that this blood remained on the exam room floor from November/December 2019 until approximately March 2020.

   d. "ICE has developed and disseminated its own standards for hygiene, cleanliness, and sanitation for detention facilities like ICDC, which are described [in] ICE's Performance Based National Detention Standards ('PBNDS'), as revised in 2016. ICE also requires detention facilities like ICDC to comply with relevant hygiene, cleanliness, and sanitation standards established by the U.S. Centers for Disease Control and Prevention." *Id.* at ¶ 15.

   e. Notably, ICE, ICDC, and LaSalle failed to meet the requirements of the PBNDS even before the COVID-19 pandemic. *Id.* at ¶ 16. Specifically, the Employers have willfully failed to:

      i. Damp-dust all horizontal surfaces with an approved germicidal solution

daily, as required by the PBNDS. *Id* at ¶ 16a.

ii. Clean windows, window frames, and windowsills weekly, as required by the PBNDS. *Id.* at ¶ 16b.

iii. Clean furniture and fixtures daily as required by the PBNDS. *Id.* at ¶ 16c.

iv. Mop floors daily and use a double bucket mopping technique with a hospital disinfectant-detergent when the floor is soiled, as required by the PBNDS. *Id.* at ¶ 16d.

v. Use a clean mop head each time the floors are mopped, as required by the PBNDS. *Id.* at ¶ 16e.

vi. Launder cubicle curtains monthly or during terminal cleaning following the treatment of an infectious patient, as required by the PBNDS. *Id.* at ¶ 16f.

3. **Ms. Wooten is not aware of, never saw, reviewed, or was asked for her input regarding an Exposure Control Plan for blood pathogens or other infectious materials. *See* 29 C.F.R. 1910.1030(c) (requiring employers to "establish an Exposure Control Plan" and "solicit input from non-managerial employees responsible for direct patient care").**

   a. This disclosure to OSHA is Ms. Wooten's first instance disclosure of this hazard and is thus not included in any existing complaints or federal investigations.

4. **LaSalle has offered hepatitis B vaccinations to employees but simultaneously strongly and willfully discourages employees from electing to receive them. *See* 29 C.F.R 1910.1030(f)(1) (requiring employers to "make available the hepatitis B vaccine and vaccination series to all employees who have occupational exposure"). Further, Ms. Wooten never signed a waiver from LaSalle to waive her right to receive hepatitis B vaccinations from her employer, in violation of 29 C.F.R. 1910.1030(f)(2).**

   a. This disclosure to OSHA is Ms. Wooten's first instance disclosure of this hazard and is thus not included in any existing complaints or federal investigations.

5. **Ms. Wooten is not aware of the existence of "OSHA 300 Logs," does not know what they are, and does not know who administers and keeps them. *See* 29 C.F.R. 1904.35.**

   a. This disclosure to OSHA is Ms. Wooten's first instance disclosure of this violation and is thus not included in any existing complaints or federal investigations.

6. **ICE, LaSalle, and ICDC have willfully failed to keep medical records of COVID-19 cases among staff and detainees who contracted COVID-19 due to exposure to the virus in the work environment, in violation of 29 C.F.R. §§ 1904.4-1904.7.**

   a. This disclosure to OSHA is Ms. Wooten's first instance disclosure of this hazard and is thus not included in any existing complaints or federal investigations.

7. **ICE, LaSalle, and ICDC have willfully failed to post conspicuous notices informing employees of OSHA's protections and obligations and encouraging employees to contact the employer or the nearest office of the Department of Labor for assistance and information, including specific safety and health standards in the workplace. *See* 29 C.F.R. § 1903.2.**
    a. This disclosure to OSHA is Ms. Wooten's first instance disclosure of this violation and is thus not included in any existing complaints or federal investigations.
8. **ICE, ICDC, and LaSalle have willfully discouraged employees from reporting workplace-related injuries and illnesses and have told employees that there is no light-duty work for them if they became injured and unable to perform all their regular duties. Thus, the Employers encourage employees to return to work before fully recovering from an injury. *See* 29 C.F.R. 1904.35.**
    a. This disclosure to OSHA is Ms. Wooten's first instance disclosure of this violation and is thus not included in any existing complaints or federal investigations.
9. **ICE, ICDC, and LaSalle have willfully failed to provide sufficient personal protective equipment ("PPE") to employees and immigrant detainees, thus increasing employee and immigrant detainee risk to exposure to COVID-19 and other illnesses. *See* 29 C.F.R. 1910.132; 29 C.F.R. 1910.1030. Because illnesses like COVID-19 are highly contagious and potentially fatal, the Employers' failures have willfully deprived employees of a workplace that is "free from recognized hazards that are causing or are likely to cause death or serious physical harm" in multiple areas of the ICDC facility. *See* 29 U.S.C. § 654.**
    a. "PPE, of all kinds, always was in very short supply at ICDC. Some things, such as gowns and face shields were rarely if ever provided." Wooten Decl. at ¶ 22.
    b. "From March through July 2020, ICDC constantly failed to provide or unreasonably delayed the provision of adequate quantities of PPE to detainees and lower-level staff like [Ms. Wooten]." *Id.* at ¶ 23.
    c. Highly effective PPE, such as the N-95 mask, was only given to high-ranking staff who had minimal contact with immigrant detainees, while employees who were most at risk of contracting COVID-19 from immigrant detainees were given "inferior paper or cloth masks and were never given new masks to replace old or broken ones." *Id* at ¶ 24.
    d. "From March through early June 2020, there were no face shields or gowns provided." *Id.*
    e. Even though Ms. Wooten received a N-95 mask, her mask and the masks of other employees were never cleaned, repaired, or replaced. When staff complained, ICDC supervisors told staff and Ms. Wooten to go to stores and buy new masks on their own. *Id.* at ¶ 25.
    f. ICDC failed to give immigrant detainees even paper masks despite repeated and

urgent requests for the immigrant detainee population. Immigrant detainees were thus "forced to buy socks from the commissary to tie around their noses and mouths as substitute facemasks." *Id* at ¶ 26.

10. **LaSalle, ICDC, and ICE have willfully failed to properly train employees on PPE, as required by 29 C.F.R. 1910.132(f)(1). Specifically, LaSalle and ICE failed to:**

    a. Train staff and immigrant detainees on how to correctly don, doff, and dispose of PPE in violation of 1910.132(f)(1)(iii). Wooten Decl. at ¶ 27.

11. **LaSalle, ICDC, and ICE have willfully discouraged symptomatic employees from taking sick leave, in violation of 29 C.F.R. 1904.35. The Employers have further willfully discouraged symptomatic employees from reporting workplace-related illnesses by discriminating against employees who have reported COVID-19 symptoms based on the employees' race and ethnicity. *See* 29 C.F.R. 1904.35(b)(1)(iii). Because illnesses like COVID-19 are highly contagious and potentially fatal, the Employers' failures have willfully deprived employees of a workplace that is "free from recognized hazards that are causing or are likely to cause death or serious physical harm" in multiple areas of the ICDC facility. *See* 29 U.S.C. § 654.**

    a. From March 2020 to June 2020, LaSalle told nurses like Ms. Wooten that they were essential and that they were required to report to work and wear a mask even if they were symptomatic until they received confirmation that they tested positive for COVID-19.

    b. "From October 2019 through June 2020, ICDC discriminated against employees and detainees on the basis of race and ethnicity" when employees reported illness with COVID-19 or COVID-19 symptoms. Wooten Decl. at ¶ 44.

    c. On Monday, June 22, 2020, Ms. Wooten took a COVID-19 test as she had to receive a blood transfusion for her sickle cell condition. *Id.* at ¶ 45. At the time she was exhibiting symptoms of COVID-19, including muscle ache, fatigue, and shortness of breath. *Id.*

    d. At 5:00 pm on June 22, 2020, Ms. Wooten went to work and filled out a required COVID-19 screening form, where she answered "yes" to having symptoms of COVID-19. On the screening document, Ms. Wooten checked off that she has muscle or body aches, headaches, and diarrhea; all three are symptomatic of COVID-19. Despite answering "yes," Ms. Wooten was still cleared to work that day. However, because she was ill, Ms. Wooten only attended the 5:00 pm meeting in order to give her supervisor her medical excuse note. Ms. Wooten explained that several officers arrived to work while symptomatic and while waiting for their COVID-19 test results, and these officers later learned that they tested positive for COVID-19. Ms. Wooten recalls that at least thirteen officers who tested positive for COVID-19. Project South Complaint p. 22, September 14, 2020.

    e. Ms. Wooten's physician advised her to remain in quarantine while awaiting her

COVID-19 test results, as returning to work would violate the CDC Guidance. *Id.* at ¶ 46. Regardless, LaSalle required her to return to work, and thus she worked on Tuesday June 23, 2020 and Thursday June 25, 2020. *Id.* at ¶ 46.

f. Ms. Wooten's supervisor, Ms. Brown, advised Ms. Wooten that she was not required to call in to ICDC each day to report "sick" since her employer was fully informed that she was awaiting her COVID-19 test results. Regardless, when Ms. Wooten returned to work, she was reprimanded and demoted for her failure to report in sick each day. *Id.* at ¶ 50-51.

Please contact us at (202) 306-9779 or elizabethp@whistleblower.org to schedule a time to interview our client Ms. Wooten or if you have any questions or concerns.

Sincerely,

/s/

Elizabeth Paukstis, Staff Attorney
Samantha Feinstein, Staff Attorney
Dana Gold, Senior Counsel
Government Accountability Project
1612 K Street NW, Suite 1100
Washington, DC 20006

&

Priyanka Bhatt, Staff Attorney
Project South
9 Gammon Ave SE
Atlanta, GA 30315

Azadeh N. Shahshahani, Legal & Advocacy Director
Project South
azadeh@projectsouth.org

Exhibits:

1. September 14, 2020 Project South Complaint to Office of Inspector General, Department of Homeland Security
2. Declaration of Dawn Wooten
3. June 22, 2020 COVID Screening Form

PROJECT SOUTH
Institute for the Elimination of Poverty & Genocide

**September 14, 2020**

**VIA ELECTRONIC MAIL**

Joseph V. Cuffari
Inspector General
Office of the Inspector General
Department of Homeland Security
Washington, DC 20528

Cameron Quinn
Officer for Civil Rights and Civil Liberties
Department of Homeland Security
245 Murray Lane, SW
Washington, DC 20528

Thomas P. Giles
Acting Director of Atlanta ICE Field Office
U.S. Immigration and Customs Enforcement Atlanta Field Office
180 Ted Turner Dr. SW Suite 522
Atlanta, GA, 30303

David Paulk
Warden of the Irwin County Detention Center
132 Cotton Drive
Ocilla, GA, 31774

**Re: Lack of Medical Care, Unsafe Work Practices, and Absence of Adequate Protection Against COVID-19 for Detained Immigrants and Employees Alike at the Irwin County Detention Center**

Dear Mr. Cuffari, Ms. Quinn, Mr. Giles and Mr. Paulk:

Project South, Georgia Detention Watch, Georgia Latino Alliance for Human Rights, and South Georgia Immigrant Support Network file this complaint on behalf of detained immigrants at the Irwin County Detention Center (ICDC) operated by the private prison company, LaSalle Corrections; and Ms. Dawn Wooten, a licensed practical nurse employed by ICDC, who is a protected whistleblower and is

PROJECT SOUTH

Institute for the Elimination of Poverty & Genocide

represented by the Government Accountability Project and Project South. This complaint and Ms. Wooten's accompanying Declaration (which is incorporated by reference) document recent accounts of jarring medical neglect at ICDC including refusal to test detained immigrants for COVID-19 who have been exposed to the virus and are symptomatic, shredding of medical requests submitted by detained immigrants, and fabricating medical records. In addition, this complaint raises red flags regarding the rate at which hysterectomies are performed on immigrant women under ICE custody at ICDC. This complaint also documents hazardous and reckless actions taken by ICDC management such as allowing employees to work while they are symptomatic awaiting COVID-19 test results and hiding information from employees and detained immigrants about who has tested positive for COVID-19. In addition, this complaint documents ICDC's disregard for public health guidelines set by the Centers for Disease Control and Prevention by maintaining unsanitary conditions and continuously allowing transfers of detained immigrants, even those who have tested positive for COVID-19, and punishing immigrants with solitary confinement when they speak out against these injustices.

These life-threatening concerns require immediate attention and correction before more employees and detained immigrants at ICDC become sick with COVID-19 or other illnesses due to lack of medical care and proper COVID-19 policies. This complaint comes about a few months after another ICE Immigration Detention Center, Richwood Correctional Center, also operated by LaSalle Corrections, was reported to be using similar tactics including requiring employees who may be COVID-19 positive to work, concealing who has tested positive for COVID-19, mixing COVID-19 exposed individuals with those who are not, and more.[1] We therefore urge you to conduct a prompt and thorough investigation into these practices at ICDC as well as all other LaSalle operated facilities as these complaints suggest a more systemic problem.

## I) Background and Legal Standards

For years, detained immigrants at ICDC have reported human rights abuses including lack of medical and mental health care, due process violations, unsanitary living conditions and more as reported in Project South's 2017 report titled "Imprisoned Justice."[2]

In particular, detained immigrants have reported not being able to see a medical professional for several weeks despite submitting multiple sick call requests, not receiving life dependent medication consistently, and not receiving proper medical care once they are able to see a medical professional.

1 https://whistleblower.org/press-release/for-immediate-release-whistleblowers-from-richwood-correctional-center-in-louisiana-report-unsafe-practices-that-promote-the-spread-of-COVID-19COVID-19-in-ice-detention/; https://whistleblower.org/wp-content/uploads/2020/07/071020-letter-to-Congress-from-GovAcctProj-re-whistleblowers-ICE-Detention-COVID-19-FINAL-Submitted.pdf.

2 https://projectsouth.org/wp-content/uploads/2017/06/Imprisoned_Justice_Report-1.pdf.

Institute for the Elimination of Poverty & Genocide

During an interview with Project South, one detained immigrant said she was not given her breast cancer medication for six weeks.[3] In addition, she requested medical care four times and waited more than two weeks and still did not see a single medical professional.[4] She went on to say: "The medical unit is not helpful at all, even if you are dying."[5] She explained: "For everything, including serious illnesses, they just hand out ibuprofen."[6] Another immigrant reiterated the same problems, saying that he did not receive his HIV medication for three weeks.[7] He made five requests to see a doctor, but still had not seen one in over four weeks. He noted many individuals at Irwin have the same problem. He stated: "That's the major problem here … the medication."[8]

Another detained immigrant explained how he was sick and in pain and submitted multiple sick call requests but did not receive timely or proper medical care. He said: "I am very sick. I have been complaining. I don't know if they are really waiting to see me dead because sometimes they already see me on the floor laying crying, and not once, not twice, several times. All those things, sometimes make you hopeless and you know sometimes I feel like dying than to continue…"[9]

Detained immigrants have in fact raised red flags regarding the unsanitary conditions at ICDC as a whole. "This place is not equipped for humans," said one detained immigrant at Irwin.[10] Another immigrant stated: "This is the dirtiest facility I have ever been in: everything is dirty; one shower for more than fifty people; one bathroom for all of us; I don't even know how to give more details because it is all nasty, really nasty; only God is taking care of us here."[11] Another immigrant told Project South: "It's been hell. It's dirty, its nasty, and there is mold."[12] She went onto say: "The food is so bad that people can't keep it down."[13] She explained that the food is often spoiled and often times cockroaches and ants from the unit come into the food.[14] Another immigrant stated: "The meals are disgusting. There

3 Project South Interview at Irwin Detention Center, October 2019.

4 *Id.*

5 *Id.*

6 *Id.*

7 *Id.*

8 *Id.*

9 Call with Immigrant Detained at the Irwin County Detention Center, April 2020.

10 Project South Interview at the Irwin County Detention Center, October 2019.

11 Letter from Immigrant Detained at the Irwin County Detention Center, April 2020.

12 Project South Interview at the Irwin County Detention Center, October 2019.

13 *Id.*

14 *Id.*

Institute for the Elimination of Poverty & Genocide

are ants in the food."[15] A 2017 Department of Homeland Security Office of Professional Responsibility investigation also found that the medical exam rooms did not meet ICE detention standards. The report found: "In the medical examination rooms, floors and patient examination tables were dirty and dust was observed on horizontal surfaces. Waste containers were overfilled and in need of cleaning."[16]

These and the following accounts indicate that ICDC has violated ICE's Performance-Based National Detention Standards (PBNDS) and CDC COVID-19 guidelines for correctional facility operations, hygiene protocol, and prevention practices. The CDC Interim Guidance on Management of Coronavirus Disease in Correctional and Detention Facilities provides guiding principles for healthcare and non-healthcare administrators of detention facilities to reduce the transmission of COVID-19.[17] CDC hygiene guidelines direct detention centers to provide staff and detained persons with access to cloth face coverings, soap, running water and disposable paper towels, as well as alcohol-based hand-sanitizer.[18] The CDC also has very specific standards regarding Personal Protective Equipment ("PPE"), including "ensur[ing] that sufficient stocks of hygiene supplies, cleaning supplies, PPE, and medical supplies (consistent with the healthcare capabilities of the facility) are on hand and available, and have a plan in place to restock as needed if COVID-19 transmission occurs."[19] Staff and detained immigrants should also be trained to correctly wear and dispose of PPE.[20]

CDC guidance also urges detention centers to "suspend all transfers of incarcerated/detained persons to and from other jurisdictions and facilities…unless necessary for medical evaluation, medical isolation/quarantine, health care, extenuating security concerns, release, or to prevent overcrowding."[21] If a transfer is absolutely necessary, transferees should clear COVID-19 screening *before* the transfer and facilities should ensure that the receiving facility has the capacity to isolate transferred detained immigrants. Temperature checks should be performed immediately after detained immigrants arrive and before they join the general population in a facility.[22] The CDC also recommends that temperature checks be performed once a day for staff when they arrive, twice a day for quarantined detained immigrants, and once a day in housing units where COVID-19 has been identified.[23] If an individual

15 Project South Interview at the Irwin County Detention Center, October 2019.

16 https://www.ice.gov/doclib/foia/odo-compliance-inspections/2017IrwinCountyGA.pdf.

17 https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

18 *Id.*

19 *Id.*

20 *Id.*

21 *Id.*

22 *Id.*

23 https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

9 GAMMON AVENUE • ATLANTA, GEORGIA 30315 • (404) 622-0602 OFFICE • (404) 622-4137 FAX
www.projectsouth.org

Institute for the Elimination of Poverty & Genocide

with COVID-19 has been identified in a facility, CDC instructions urge the implementation of regular screenings and temperature checks for fourteen days in housing units that have not yet identified infections.[24]

CDC management and quarantine guidelines recommend that individuals with confirmed or supposed cases of COVID-19 be immediately placed under medical isolation and individually quarantined. Facilities should keep the movement of these individuals outside the medical unit at an absolute minimum by serving meals in isolation, keeping them isolated from all group activities, and assigning isolated individuals a dedicated bathroom if possible. Where such individuals must leave medical isolation, facilities should ensure that clean masks are provided and changed at least daily. However, the CDC recommends that detention centers "coordinate closely with their state, local, tribal, and/or territorial health department…to ensure effective medical isolation and quarantine, necessary medical evaluation and care, and medical transfer if needed."[25]

The guidelines also state that individuals with confirmed COVID-19 should be individually quarantined and advocate against the "cohorting" method unless "there are no other available options."[26] If cohorting is absolutely necessary, the CDC instructs that all individuals be monitored closely, with special mindfulness of detained immigrants who are at increased risk for severe illness from COVID-19. New individuals may not be added to an existing quarantine cohort after the fourteen-day clock has started, and the fourteen-day clock should *restart* if an individual in the cohort tests positive for COVID-19.[27] Regarding management strategies for staff, the CDC clarifies that staff identified as "close contacts" of someone diagnosed with COVID-19 should be tested and self-quarantined for fourteen days.[28]

The CDC also provides recommended hygiene and sanitation practices to limit the introduction and spread of COVID-19 in detainment centers. Regardless of whether COVID-19 cases have been identified, the CDC instructs detainment facilities to implement intensified cleaning and disinfecting procedures to prevent the spread of COVID-19.[29] Recommended procedures include cleaning and disinfecting frequently touched objects, surfaces, and equipment several times per day. Guidelines also

24 *Id.*

25 *Id.*

26 *Id.*

27 *Id.*

28 *Id.*

29 *Id.*

9 GAMMON AVENUE • ATLANTA, GEORGIA 30315 • (404) 622-0602 OFFICE • (404) 622-4137 FAX
www.projectsouth.org

PROJECT SOUTH

Institute for the Elimination of Poverty & Genocide

direct facilities to keep adequate supplies and to have plans for rapid restock to support intensified cleaning practices.[30]

ICDC has also violated multiple Performance-Based National Detention Standards (PBNDS) created by ICE outlining basic standards for treatment in ICE custody. PBNDS standard 4.3, which establishes detention standards for medical care, requires facilities to comply with plans implemented by federal, state, or local authorities addressing specific public health issues including communicable disease reporting requirements.[31] This includes CDC COVID-19 management guidelines. Designated medical staff must report all detained immigrants diagnosed with a communicable disease of public health significance to the IHSC Public Health, Safety, and Preparedness Unit.[32] Standard 4.3 also mandates that each facility have a medical procedure ensuring that all sick call requests are received and triaged within twenty-four hours after a detained immigrants submits the request.[33] It adds that housing unit officers should notify medical personnel immediately for urgent healthcare situations. Additionally, CDC COVID-19 guidelines direct facilities to ensure that detained individuals receive medical treatment at the first sign of COVID-19 symptoms and to implement the CDC's Prevention and Control Recommendations for Patients with Suspected or Confirmed Coronavirus Disease in Healthcare Settings as fully as possible within the correctional or detention context.[34]

To prevent the introduction and spread of communicable diseases, ICE PBNDS standards—even before the COVID-19 pandemic—require that all horizontal surfaces be disinfected and damp-dusted daily with an approved germicidal solution.[35] Furnitures, fixtures, and floors should also be cleaned on a daily basis, and windows and window curtains should be cleaned and laundered regularly. Floors should be mopped using a clean mop head and a hospital disinfectant-detergent solution.[36] Cubicle curtains should also be cleaned following treatment of an infectious patient.

Regarding food service, ICE's national detention standards institute cleaning, extermination, and storage requirements to prevent food contamination and pests. PBNDS standard 4.1 requires that food preparation areas be free of pest infestations, that all incoming food shipments be inspected for contamination and pest infestation, and that food be stored so that it is protected from insects, unclean

30 https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

31 2011 Operations Manual ICE Performance-Based National Detention Standards at 261–62, https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

32 *Id.* at 263.

33 *Id.* at 271.

34 https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

35 2011 Operations Manual ICE Performance-Based National Detention Standards at 30.

36 *Id.* at 30–31.

9 GAMMON AVENUE • ATLANTA, GEORGIA 30315 • (404) 622-0602 OFFICE • (404) 622-4137 FAX
www.projectsouth.org

Institute for the Elimination of Poverty & Genocide

surfaces, leakage, and other sources of contamination.[37] Sanitary guidelines must be observed during preparation and service, with hot foods maintained at a temperature of at least 140 degrees, and refrigerated foods maintained at a temperature of forty-one degrees or below.[38]

## II) Accounts from Detained Immigrants at ICDC and Ms. Wooten

### 1) Lack of Protection Against COVID-19 for Detained Immigrants

Unfortunately, the pattern of lack of medical care and unsanitary conditions at ICDC has only worsened in light of COVID-19. Detained immigrants have reported not being able to be socially distant, not having proper PPE, and being afraid of dying in the facility.[39] In April, after the pandemic hit, detained immigrants created a powerful video[40] where they plead to ICE and the public to release them in light of the horrid conditions. One woman said: "We're very afraid of being incarcerated here and dying here. We are daughters, we are mothers, we are wives, we need freedom. Please help us." Another woman stated: "We are exposed to the virus. They don't give us anything to cover ourselves so that we can protect ourselves." The women went on to talk about the lack of medical care and COVID-19 prevention procedures in place, including how "officers come and go without protective measures." As a result of this video going public, Irwin punished the immigrants by putting them on lockdown, limiting access to phones, taking away their ability to video chat with loved ones for several days, and subjecting them to solitary confinement. While weeks later, detained immigrants received a cloth or paper mask, they have yet to receive a new one to this day.

Immigrants detained at ICDC told Project South that they are afraid for their lives inside the facility. One immigrant told Project South: "I don't want to die here. Please release me, let me be with my family… A lot of people are afraid."[41] While the facility has signs about social distancing, immigrants reported that it is impossible to actually practice that inside the facility. One immigrant said: "There is no social distancing. We're in an open dorm room. Our beds are nothing but three feet apart. We don't understand how we're supposed to do that…our living space is so small; there's no way we could do that. Our toilets are about four feet apart with a little wall separating them…we breathe the

[37] 2011 Operations Manual ICE Performance-Based National Detention Standards at 236, 244, 248, https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

[38] *Id.* at 233.

[39] https://www.typeinvestigations.org/investigation/2020/04/09/i-cant-do-anything-doctor-detained-by-ice-waits-for-coronavirus-outbreak-to-hit/.

[40] https://www.youtube.com/watch?v=aQt6QbkWsLI&feature=youtu.be.

[41] Project South Interview with Detained Immigrant, Summer 2020.

Institute for the Elimination of Poverty & Genocide

same air, we sneeze, we cough next to each other."[42] Another immigrant said: "There is no way to protect [against COVID-19] at all here in the facility…There is no way to keep social distancing. There is no way at all because we are all together. We share everything together. There is no way at all we can feel protected here in the facility."[43] Immigrants also reported not being able to receive a new mask and having to wait several days in order to receive cleaning supplies to sanitize their pods. Some detained immigrants reported that they did not have soap to clean their cells, so instead had to use the soap they bought from commissary to sanitize their cells.[44] Other detained immigrants stated when they do receive cleaning materials and ask for a refill, every officer has the same answer: "We're short on staff, we can't get anybody to fill it up."

Multiple immigrants have reported on the issues of short-staffing at ICDC. One immigrant stated that some officers are afraid to go into certain pods due to the risk of being infected with of COVID-19.[45] Another immigrant reported that officers have had to pick up extra shifts and also work in the kitchen, which is done usually by detained immigrants, because many units are quarantining due to COVID-19.[46] Because of this, individuals reported that meals have been increasingly worse and have often been delayed.[47]

Immigrants also reported short-staffing in the medical unit, which has caused extra delays in receiving medical care. One immigrant recalled a weekend when a nurse did not show up for the daily pill call to give medication to the immigrants in her pod.[48] As a result of the skipped pill call, a diabetic immigrant who was insulin dependent became very ill and had to be taken for medical evaluation.[49]

42 Project South Interview with Detained Immigrant, Summer 2020.

43 *Id.*

44 GLAHR Interview with Detained Immigrant, Summer 2020.

45 Project South Interview with Detained Immigrant, Summer 2020.

46 *Id.*

47 *Id.*

48 *Id.*

49 *Id.*

9 GAMMON AVENUE • ATLANTA, GEORGIA 30315 • (404) 622-0602 OFFICE • (404) 622-4137 FAX
www.projectsouth.org

Institute for the Elimination of Poverty & Genocide

## 2) ICDC Allows Transfers of Individuals in and out of the Facility

*A) ICDC continues to transfer immigrants in and out of the facility against CDC guidelines and the advice of ICDC's medical director.*

In addition to the lack of social distancing and proper protection against COVID-19, the facility has continued to allow transfers of individuals in and out of the facility against CDC guidelines for correctional and detention facilities.[50] Dawn Wooten, who used to be a full-time employee at Irwin until July 2020, explained that Dr. Howard McMahan, the Medical Director of ICDC, pleaded with ICDC Warden David Paulk in March when the facility had its first COVID-19 case to stop all transfers of individuals in and out the facility, but the Warden did not listen. Ms. Wooten explained that Warden Paulk is allowing transfers of individuals into the facility who already have COVID-19. She also stated that ICDC is transferring immigrants out of the facility who either are COVID-19 positive or who have been tested but not yet received their results. On one occasion, Ms. Wooten stated that ICDC knowingly allowed the deportation of one immigrant who tested positive for COVID-19 to Mexico, and transferred another COVID-19 positive immigrant from ICDC to the Stewart Detention Center in Lumpkin, Georgia. Ms. Wooten explained: "If I say no, this person doesn't need to be transferred, they're positive, he [Warden Paulk] transfers them anyway."

An ICDC correctional officer also shared concerns regarding the transfers of individuals. One detained immigrant told Project South that an officer warned immigrants back when the pandemic first started by saying: "If we have lawyers, we need to complain to our lawyers because there are people who are coming from outside and they are bringing them straight to the facility…the officer told us in secret that we need to call our lawyers because this is our health, this is our lives."[51]

*B) ICDC does not properly quarantine new individuals arriving at the facility.*

Ms. Wooten also raised red flags regarding the procedures in place when new individuals arrive at the facility. She explained that when new individuals come into the facility, they should be housed in the medical unit where there are negative pressure rooms in order to contain the virus. However, ICDC houses new individuals in the general population units. In addition, she explained that ICDC does not properly implement the cohorting quarantine method as recommended by the CDC. The CDC defines cohorting as "the practice of isolating multiple individuals with laboratory-confirmed COVID-19 together or quarantining close contacts of an infected person together as a group due to a limited number

[50] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

[51] Project South Interview with Detained Immigrant, Summer 2020.

9 GAMMON AVENUE • ATLANTA, GEORGIA 30315 • (404) 622-0602 OFFICE • (404) 622-4137 FAX
www.projectsouth.org

Institute for the Elimination of Poverty & Genocide

of individual cells."[52] However, the CDC warns that "cohorting individuals with suspected COVID-19 is not recommended due to high risk of transmission from infected to uninfected individuals."[53]

At ICDC, Ms. Wooten and detained immigrants reported that entire dorm units of individuals go into cohorting for fourteen days after one individual is suspected or confirmed to have COVID-19. Ms. Wooten explained that the cohorting system is further problematic because ICDC mixes new transfers with individuals who have been quarantining already. For example, she said if an entire unit is cohorting for fourteen days, ICDC will put a new individual in a room with an individual who had already been quarantining for a number of days. Ms. Wooten explained that because ICDC put a new individual in the room, the fourteen-day clock should have restarted, but ICDC does not restart the clock. Instead, it allows the newly transferred individual to continue on the same quarantine timeline as the rest of the unit. That means that if the new individual does have COVID-19, and only had to quarantine for the remaining days the unit was quarantining, the new individual could expose the rest of the unit to COVID-19 since the individual never completed fourteen days of quarantining.

Detained immigrants have long decried this policy of allowing new transfers into their pods. When immigrants advocate for themselves and refuse to share a room with a new transfer due to concerns about COVID-19, they are punished. One immigrant told Project South that men had been complaining and advocating to not let new transfers come into their pod, but when they do so, they are thrown in solitary confinement.[54] He explained that after weeks of complaining, the captain at ICDC promised the men that they would not transfer new men into their pod. However, that promise was immediately broken when an officer brought a new man into their pod. When the man was told he had to share his cell with the newly transferred immigrant who just arrived at ICDC, he told the officer that he didn't feel comfortable due to COVID-19 and that the captain promised them they would not have to anymore.[55] However, the officer responded: "I don't care what the captain said; I do what I want to do," and proceeded to force the immigrant to share his cell with the new transfer.[56] One detained immigrant reported that when men continue to advocate against having to share a cell with a newly transferred individual, the officers will often put the men in solitary confinement for up to two weeks for refusing their orders.[57]

52 https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

53 *Id.*

54 Project South Interview with Detained Immigrant, Summer 2020.

55 *Id.*

56 *Id.*

57 *Id.*

Institute for the Elimination of Poverty & Genocide

Similarly, in the women's unit, one immigrant noted that ICDC was "trying to put them [new transfers] in quarantine away from us but yet you're putting us all together."[58] She explained that there is often internal confusion and miscommunication in intake forms and between the guards at ICDC so that officers don't know where to put new transfers. Another woman reiterated this sentiment, saying that officers "don't even know what they're doing" in regard to where they put new transfers.[59] She also noted: "This has been happening. New girls get here and they're put in a cell with a girl that's been here for about 24 or 48 hours." In one instance, she saw an officer put a new transfer with a person who had been there for a week. The officer told the woman that "this isn't her house, she's not paying bills, she doesn't have a say of who goes in the cell with her or not." The woman noted "It sounds like a horror story, but it's true."[60]

In other cases, new transfers who arrive in the women's unit are given rooms by themselves in the general unit. However, detained immigrants still share the same concerns because they are forced to share the same phones, tables, microwaves, etc. as everyone else and therefore could unknowingly spread the virus.[61]

### 3) Lack of COVID-19 Testing and Reporting

In August, ICE reported that a total of forty-one detained immigrants at ICDC tested positive for COVID-19.[62] However, Ms. Wooten stated that the actual number of those infected is much higher. She explained that this is because ICDC has not been actively testing detained immigrants and has not been "reporting all these cases that are positive" to ICE or the State Department.

*A) Detained women who were exposed to the virus and also had pre-existing conditions were refused COVID-19 testing for over a month.*

Men and women detained at ICDC also overwhelmingly reported not being tested for COVID-19 from March until August 18, where only those in ICE custody in the facility were given the option to be tested, but the same did not apply to those incarcerated at ICDC outside of ICE custody.[63] One woman in Unit C reported that 100 women slept in the unit where women "coughed, had fever and other discomforts, but officers did not listen to them when they reported their health problems," and that they

58 Project South Interview with Detained Immigrant, Summer 2020.

59 *Id.*

60 *Id.*

61 *Id.*

62 https://www.ice.gov/coronavirus.

63 Project South Interview with Detained Immigrant, Summer 2020.

Institute for the Elimination of Poverty & Genocide

were never tested for COVID-19.[64] After demanding that the sick women be taken to the medical unit, she reported that the women were finally taken but were brought back within an hour and just given pain killers.[65]

Similarly, women in Unit G-2 complained to the medical unit and ICE for over a month between July and August to get tested for COVID-19 after three women in their unit tested positive, but were not given any response and were not tested until August 18.[66]

The women in Unit G-2 explained that two women were not feeling well and had typical symptoms of COVID-19 including: fatigue, headaches, body pain, loss of smell and taste.[67] The women in the unit asked the pill call nurse to get their temperature checked, but the nurse refused saying that they had to put in a sick call request.[68] One of the sick women put in sick call requests three times over the span of a week and half before being taken to medical. The other sick woman waited over two weeks while putting in four or five requests to see medical. After the fifth request, the women in the unit gave up on any prospect of getting tested for COVID-19 or receiving proper medical attention. One woman explained: "We lost hope after they weren't being looked at, so we all knew it was up to us to take of ourselves."[69]

When the two women eventually did go to medical, they had their temperatures checked and were simply brought back to the general unit without being tested for COVID-19. One detained immigrant noted that when she visited the medical unit for a different reason, the nurse complained to her saying she didn't understand "why the detainees need to get tested for COVID-19."[70]

When the two women were brought back to the unit, they continued to interact with the rest of the women in the unit, even though they very likely were COVID-19 positive but had not been tested by ICDC.[71] One of the two women became so sick that she could not move out of bed.[72] When the immigrants in her unit asked the officer if they could give the food tray to the sick woman in bed, the

64 GLAHR Interview with Detained Immigrant, Summer 2020.

65 Project South Interview with Detained Immigrant, Summer 2020.

66 *Id.*

67 *Id.*

68 *Id.*

69 *Id.*

70 *Id.*

71 *Id.*

72 *Id.*

9 GAMMON AVENUE • ATLANTA, GEORGIA 30315 • (404) 622-0602 OFFICE • (404) 622-4137 FAX
www.projectsouth.org

Institute for the Elimination of Poverty & Genocide

officer refused and told them in a demeaning way that the woman still had to get up and get the tray herself.[73] It wasn't until both of these women became even more ill that they were transferred to Unit E-4, the quarantine unit, and were subsequently tested for COVID-19. Shortly after, a third woman in the same unit also had a similar experience where she had typical COVID-19 symptoms such as headaches and loss of taste and smell, but she was told by a nurse that she just had allergies and was not tested for COVID-19.[74]

Despite this exposure to COVID-19 and the fact that several women had pre-existing conditions like diabetes and hypertension, ICDC refused to test the women for COVID-19 even when the women submitted multiple requests to get tested.[75] The women explained that they put in multiple requests to medical as well as requests to ICE for about a month.[76] At the request of the women in unit G-2, on August 4, Project South submitted a complaint to ICE and the Office of Civil Rights and Civil Liberties requesting that they test the women in G-2 due to this exposure.[77] On August 5, ICE Assistant Field Office Director Patrick Musante responded claiming that:

> ICDC is currently following the Interim Considerations for SARS-CoV-2 Testing in Correctional and Detention Facilities, which can be found at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/testing.html. Any person housed in ICDC that is presenting symptoms, and feels sick, can fill out a sick-call request and then be seen by the ICDC medical staff for evaluation and treatment as appropriate.

When Project South followed up with immigrants in Unit G-2, they responded that they still had not been seen by medical or tested for COVID-19 despite ICE's response.[78] Project South followed up with ICE asking "what the protocol is for the medical unit to administer a COVID-19 test to a detained immigrant at ICDC (i.e. are there symptoms or temperature they must have)? Can your office provide details about how many individuals have been tested in Unit G-2 in the last month…" ICE declined to answer those questions.

After Project South's follow up advocacy with an officer at the Office of Civil Rights and Civil Liberties, ICDC tested immigrants inside the facility on August 18. However, ICDC did not test the

73 Project South Interview with Detained Immigrant, Summer 2020.

74 *Id.*

75 *Id.*

76 *Id.*

77 https://projectsouth.org/wp-content/uploads/2020/08/8.04.2020-Denial-of-COVID-19-Testing-at-Irwin-Letter-to-ICE.pdf.

78 Project South Interview with Detained Immigrant, Summer 2020.

Institute for the Elimination of Poverty & Genocide

other incarcerated population. ICDC also continued to bring new transfers into the pods where individuals had already been tested for COVID-19 and were awaiting their results—thereby mixing individuals who were tested with individuals who were not tested in one pod.

*B) Detained men with COVID-19 symptoms were also refused COVID-19 testing despite multiple requests to be tested.*

Similar to the women, detained men had been advocating for months to get tested for COVID-19. One immigrant told Project South:

> Many of us have been sick in the unit or have some type of symptom… for a very long time we started complaining…We were complaining to the captain and fighting for a long time because we needed at least to be tested…There is no way at all for us to be safe here…the guidelines say social distancing, here we cannot keep the social distancing…we share everything together.[79]

He shared that the men in the unit had been advocating verbally to the nurses at ICDC and the captain to get tested for COVID-19 since the pandemic started. He explained they didn't do a written request since the facility often does not respond to written requests.

Certain men even went on hunger strikes in protest in order to be released or at the very least receive better protections against COVID-19 and be tested. One immigrant said: "People went on serious hunger strikes for it."[80] He shared that an immigrant from Burkina Faso went on hunger strike about a month ago for three weeks and reportedly lost a lot of weight.[81] Often times when individuals go on hunger strike, ICDC shuts off their water source. Ms. Wooten confirmed that it was common practice for ICDC to shut off the water for those on hunger strike. Ms. Wooten stated that because of this policy, one detained immigrant was "drinking out of the toilet. It's what he had left."

In this case, after the men went on hunger strike, nothing had changed; ICE and ICDC did not implement any further protections against COVID-19 or test the immigrants for COVID-19 as they requested. The immigrant told Project South: "After they went on hunger strike, there was no change. There was nothing at all—so people gave up."[82]

79 Project South Interview with Detained Immigrant, Summer 2020.

80 *Id.*

81 *Id.*

82 *Id.*

PROJECT SOUTH

Institute for the Elimination of Poverty & Genocide

*C) Medical Staff at ICDC downplay the need for COVID-19 testing and actively don't use COVID-19 testing machines at the facility.*

Ms. Wooten's account confirms the accounts of detained immigrants regarding their experiences with the medical unit at ICDC. Ms. Wooten shared that detained women in Unit C complained about having a fever and sore throat during the pandemic. However, the HSA did not test them for COVID-19, downplaying the immigrants' symptoms and stating that "all they want is attention...Everybody wants to be tested for COVID-19." Ms. Wooten stated that even if a detained immigrant had COVID-19 symptoms like a fever, the nurse would do nothing but put them on an over-the-counter cold medication for seven days without testing them for COVID-19.

In addition, Ms. Wooten explained that the medical unit not only downplayed the need to test immigrants for COVID-19, it also declined to utilize two rapid-testing COVID-19 machines that ICE had purchased for $14,000 each. Ms. Wooten reported that no medical staff had been trained to use them even in August and that she saw the machine being used only once since it arrived at the facility in June. Instead, the machines were locked away in the supervisor's office. The ICDC's Director of Nursing (DON) refused to put the machines out into use claiming that she did not want the employees testing each other.

**4) General Lack of Medical Care**

*A) ICDC nurse shreds medical request forms from detained immigrants.*

Ms. Wooten also expressed significant concern regarding the lack of medical care for detained immigrants at Irwin. According to Ms. Wooten, it was common practice for the sick call nurse to shred medical request forms from detained immigrants who were requesting to go to the medical unit. She also stated that the sick call nurse sometimes fabricated records such as vital signs without ever seeing the individual requesting medical help.

At ICDC, in order to make a sick call request, detained immigrants can fill out a blue form and put it in a box on the wall in their unit that is picked up by a nurse at night. Detained immigrants can also fill out an electronic request on the Telmate tablet in their unit. Ms. Wooten stated that Irwin staff have encouraged detained immigrants to fill out the handwritten request claiming that ICDC will get to the complaint quicker. However, when detained immigrants do fill out the blue handwritten request, the nurse in charge of reviewing these documents shreds the forms without even looking at them or will complete an easy request and shred a difficult request. Ms. Wooten stated that she has seen the sick call nurse shred an entire box worth of forms without looking at them.

PROJECT SOUTH

Institute for the Elimination of Poverty & Genocide

Ms. Wooten recalls one time when a woman had put in twelve sick call requests in the span of two weeks because she had an infection from a laparoscopy procedure and was "oozing out of her belly button." Oftentimes detained immigrants fill out multiple requests to show the severity of the issue. When Ms. Wooten confronted the nurse who should have attended to this woman, the nurse claimed that she saw the woman the prior week. Ms. Wooten stated that she knew the requests must have been shredded because it was not possible for the nurse to have seen the woman the prior week. Ms. Wooten explained that if the nurse truly had seen the woman the prior week, the nurse would have seen that the woman was oozing green pus out of her belly button and required antibiotics immediately.

Ms. Wooten also explained that if someone puts in a request for shampoo and another request about having COVID-19 symptoms, the nurse would shred the request regarding COVID-19 symptoms and would only attend to the easier request by giving the detained immigrant shampoo. When the detained immigrant asks about the request regarding COVID-19, the nurse would lie and say that she never received it. Then, when the immigrant put in another complaint about COVID-19, the nurse would decline to see that person stating that she had seen them the other day. When Ms. Wooten would tell the nurse that the immigrant may still not be feeling well, the nurse would just say: "Oh I already saw him yesterday…they just want some attention."

Due to these type of practices by the ICDC medical staff, many detained immigrants have reported long wait times before being seen by a medical professional at ICDC, if they are seen at all. One detained immigrant reported that it takes anywhere from a few days to several weeks for medical to respond and "sometimes they don't call at all."[83] Another detained immigrant noted that women in her unit gave up after submitting several requests to see medical because no one responded to their requests.[84] One detained immigrant stated that he resorted to making verbal complaints to nurses and ICDC staff instead of written requests because "sometimes it goes in the request and they don't respond at all, so sometimes it's better to talk personally face to face."[85]

B) *ICDC nurse fabricates medical records when detained immigrants submit an electronic medical request form.*

When detained immigrants submit a medical request on the electronic/computer tablet, Ms. Wooten stated that the sick call nurse will not see the individual, but will fabricate vital signs indicating that the nurse saw the patient and will prescribe medicine. Ms. Wooten explained that if a detained immigrant submitted a request because he had a fever and runny nose, and wanted to be tested for

[83] Project South Interview with Detained Immigrant, Summer 2020.

[84] *Id.*

[85] Project South Interview with Detained Immigrant, Summer 2020.

Institute for the Elimination of Poverty & Genocide

COVID-19, the nurse will put in vital signs for the individual and prescribe cold medication on the tablet for the individual without ever talking to them or seeing them. One detained immigrant told Project South that he put in a request to see medical through the tablet because he was in pain. However, instead of coming to see him or taking him to the medical unit, the nurse responded through the tablet disregarding his statement about pain, and instead stating that he needs to take his medication and that he had been refusing his medication.[86] However, the detained immigrant explained to Project South that when he asked the pill call nurse if he had any medication prescribed to him, the nurse said he did not.[87] Then, when he made a another request to see the medical unit on the tablet, the nurse continued to refuse to see him claiming he refused his medication. The detained immigrant stated that he waited all week for a response back or a call, but no one ever responded or saw him. "When I put in a request [on tablet] they don't call me, they just respond on it [the tablet]. They say no, you have to take your medication. Why they don't want to see me, I'm in pain. They don't even call, we put in a request, it takes two to three weeks, they just respond on the tablet," he explained.[88]

Ms. Wooten further explained that detained immigrants are being told different things constantly regarding whether they should submit a written or electronic request. When detained immigrants submit a written request, they are told the nurses did not receive them and to submit an electronic one instead. "They're wishy washy with them and they play that game with them until they're literally going to kill somebody out there...If they send it in paper, the girl shreds them....If they put them in the computer system, she answers them, falsifies the vital signs and never sees them," said Ms. Wooten. When Ms. Wooten tried to tell the Health Services Administrator (HSA) about these issues, the HSA refused to hold the nurse accountable, saying that one day, she'll get caught.

*C) Detained immigrants receive poor treatment by certain medical staff at ICDC.*

In addition to not responding to sick call requests, Ms. Wooten raises red flags regarding the way in which Latino detained immigrants are treated by the medical staff. "Hispanics are treated the worst in the facility. I mean literally. They can't speak English. Even though they [ICDC] have the language line there, if they're trying to get understanding of their health it's like take these pills and get the hell on...[Hispanics] hurt and suffer through it." Ms. Wooten says that when medical staff actually take the time to use the language line like she did, they'll find that these immigrants often have underlying conditions such as tumors, histories of cancer, diabetes, mental health issues, and more. Detained immigrants have also reported that several ICDC staff have disrespected them for not speaking English. In a letter, detained immigrants stated: "[W]e also wish to report the harsh treatment that we receive by

86 *Id.*

87 *Id.*

88 *Id.*

some guards, some yell at us, or have a bad work attitude…We also ask for respect for those that do not speak English because they make fun of them and there is no respect."

Multiple other immigrants have also noted that the medical staff don't believe them or yell at them when they report pain. One detained immigrant stated: "The last two days I didn't sleep, but I don't fill any medical requests anymore because if I go there, they're going to isolate me, they are maybe going to give me nothing, or they are going to blame me, to yell at me saying I'm trying to exaggerate; so whenever I'm in pain, I'm in my room, I sleep, I pray to God, and cry…that's the only way I'm trying to survive."[89] The immigrant also stated that when he goes to the medical unit, "sometimes they don't even let you talk. You are complaining with pain, but they saw you are OK."[90] Another detained immigrant noted that when a detained immigrant tells the nurse what they are feeling, she will argue about "what you have and what you feel." [91] This detained immigrant went on to say: "Nurse X needs some help in terms of how to treat us. She's very rude. She probably thinks she's better than us."[92]

*D) Detained immigrants and ICDC nurses report high rates of hysterectomies done to immigrant women.*

Several immigrant women have reported to Project South their concerns about how many women have received a hysterectomy while detained at ICDC. One woman told Project South in 2019 that Irwin sends many women to see a particular gynecologist outside the facility but that some women did not trust him.[93] She also stated that "a lot of women here go through a hysterectomy" at ICDC.[94] More recently, a detained immigrant told Project South that she talked to five different women detained at ICDC between October and December 2019 who had a hysterectomy done.[95] When she talked to them about the surgery, the women "reacted confused when explaining why they had one done."[96] The woman told Project South that it was as though the women were "trying to tell themselves it's going to

[89] Project South Interview with Detained Immigrant, Summer 2020.

[90] *Id.*

[91] *Id.*

[92] *Id.*

[93] Project South Interview at the Irwin County Detention Center, October 2019.

[94] *Id.*

[95] Project South Interview with Detained Immigrant, Summer 2020.

[96] *Id.*

be OK." She further said: "When I met all these women who had had surgeries, I thought this was like an experimental concentration camp. It was like they're experimenting with our bodies."[97]

Ms. Wooten also expressed concern regarding the high numbers of detained immigrant women at ICDC receiving hysterectomies. She stated that while some women have heavy menstruation or other severe issues that would require hysterectomy, "everybody's uterus cannot be that bad." Ms. Wooten explained:

> Everybody he sees has a hysterectomy—just about everybody. He's even taken out the wrong ovary on a young lady [detained immigrant woman]. She was supposed to get her left ovary removed because it had a cyst on the left ovary; he took out the right one. She was upset. She had to go back to take out the left and she wound up with a total hysterectomy. She still wanted children—so she has to go back home now and tell her husband that she can't bear kids… she said she was not all the way out under anesthesia and heard him [doctor] tell the nurse that he took the wrong ovary.

Ms. Wooten also stated that detained women expressed to her that they didn't fully understand why they had to get a hysterectomy. She said: "I've had several inmates tell me that they've been to see the doctor and they've had hysterectomies and they don't know why they went or why they're going." And if the immigrants do understand what they're getting done, "some of them a lot of times won't even go, they say they'll wait to get back to their country to go to the doctor."

The rate at which the hysterectomies have occurred have been a red flag for Ms. Wooten and other nurses at ICDC. Ms. Wooten explained:

> We've questioned among ourselves like goodness he's taking everybody's stuff out…That's his specialty, he's the uterus collector. I know that's ugly…is he collecting these things or something...Everybody he sees, he's taking all their uteruses out or he's taken their tubes out. What in the world.

Intertwined with the issue of the reported high rates of hysterectomies is the issue of proper informed consent. Regarding the hysterectomies, Ms. Wooten explained: "These immigrant women, I don't think they really, totally, all the way understand this is what's going to happen depending on who explains it to them." Ms. Wooten stated that the sick call nurse tries to communicate with the

97 *Id.*

Institute for the Elimination of Poverty & Genocide

detained immigrants and speak Spanish to detained immigrants by simply googling Spanish or by asking another detained immigrant to help interpret rather than using the language line as medical staff are supposed to.

One detained immigrant reported to Project South that staff at ICDC and the doctor's office did not properly explain to her what procedure she was going to have done.[98] She reported feeling scared and frustrated, saying it "felt like they were trying to mess with my body." When she asked what was being done to her body, she was given three different responses by three different individuals. She was originally told by the doctor that she had an ovarian cyst and was going to have a small twenty-minute procedure done drilling three small holes in her stomach to drain the cyst. The officer who was transporting her to the hospital told her that she was receiving a hysterectomy to have her womb removed. When the hospital refused to operate on her because her COVID-19 test came back positive for antibodies, she was transferred back to ICDC where the ICDC nurse said that the procedure she was going to have done entailed dilating her vagina and scraping tissue off. The nurse first told the detained immigrant she was going to get this procedure done because she had heavy bleeding, but then told her it was because she had a thick womb. The woman quickly responded that she never had heavy bleeding in her life and was never told by the doctor that she had a thick womb. Instead she stated that the doctor had described an entirely different procedure that did not involve scraping her vagina. She stated: "I tried to explain to her that something isn't right; that procedure isn't for me." The nurse responded by getting angry and agitated and began yelling at her. She told Project South that seeing the nurse's nervous and angry response confirmed "that something was not right."

*E) Detained immigrants are subjected to unsanitary conditions in the medical and quarantine units.*

Detained immigrants and Ms. Wooten commented on the unsanitary conditions of the medical unit and quarantine unit in Unit E-4. Ms. Wooten reported that the patient exam tables could be dirty depending on the nurse. While nurses are supposed to wipe down the patient exam table and pull paper between patients as well as clean the floors, that does not always happen. Ms. Wooten reports that the medical area can be cluttered and unorganized. In addition, Ms. Wooten expressed concern over the quarantine units, stating that "the dorms down there are very nasty." She explained that while an employee sprays bleach in the showers, "nobody is getting in there scrubbing the showers." Ms. Wooten also stated that she knew that the Lysol being used to disinfect units was "watered down" and was not "fully concentrated."

Detained immigrants echoed this sentiment. One detained immigrant stated that ICDC's medical unit is "the worst one…it's really, really dirty." He also stated the medical unit sometimes smells and

98 Project South Interview with Detained Immigrant, Summer 2020.

PROJECT SOUTH

Institute for the Elimination of Poverty & Genocide

that "they don't clean." In a letter, another immigrant described the medical unit as being "dirty and with animals like ants and insects with only one bed, toilet and sink[.T]o be able to do her daily personal cleaning she had to wait for a guard to take her to the showers when they wanted and at whatever time they wanted."

In addition to the medical unit, others reported that the quarantine unit in Unit E-4 is also dirty. In a letter, detained women described the conditions at Unit E-4 as conveyed by a fellow detained woman:

> She was locked up in lockdown cells in E4 where the treatment was absolutely terrible. She was locked up with no right to commissary, no right to communicate with her family for many days, she had no right to use the microwave to prepare her food for two days. The rest of the time she was there, she was only allowed to go out for 15 minutes in the morning and 15 minutes in the afternoon, depending on the guard who was there because there were days where she was not permitted to leave at all. During the day, she asked the guards for water and was denied many times, during her isolation in the cell she never had cleaning products to keep the space clean, the shower water was extremely hot and this prevented her from correctly completing her personal cleaning. She only received personal hygiene products once (four small bar soaps, four tubes of toothpastes, four bottles of body wash, and two toothbrushes) that were not enough for the whole period of time that she was isolated. The treatment by the guards is humiliating and since she doesn't speak English they make fun of her. She came out after 22 days of psychological, physical, and emotional torture.

Another detained immigrant noted that while the quarantine unit looked clean from the outside, she realized that it was dirty. "The day room was disgustingly dirty. There were breadcrumbs on top of breadcrumbs…The tables were dirty, the walls…the handle for the microwave was dirty…everything was dirty," she reported. In addition, her individual cell was also not clean. She told Project South: "I had to clean the mat with shampoo because they didn't give me any chemicals. I had to clean the bunk metal with my shampoo as well." In one instance, she recalls that one woman in Unit E-4 asked for cleaning products in order to clean the unit herself but didn't get any all weekend. Instead, this woman used her socks as a mop and cleaned the floors for several days. The detained immigrant stated: "I couldn't believe what I was seeing…if it wasn't for my faith in God, I think I would have gone insane and just break down and probably gone as far as hurting myself. There are a lot of people here who end up in medical trying to kill themselves because of how crazy it is. If it wasn't for God, I probably would

9 GAMMON AVENUE • ATLANTA, GEORGIA 30315 • (404) 622-0602 OFFICE • (404) 622-4137 FAX
www.projectsouth.org

Institute for the Elimination of Poverty & Genocide

have ended up in the infirmary for suicide. It was just crazy. I can't believe this is the quarantine unit, the cohort unit; the floors are disgusting and nobody cares."

**5) Unsafe Working and Living Conditions**

*A) ICDC employees are instructed to work if they exhibit COVID-19 symptoms, are awaiting a COVID-19 test result, or have had a positive COVID-19 test result.*

Employees and detained immigrants have both raised serious concerns regarding ICDC's COVID-19 policies. According to Ms. Wooten, ICDC employees are expected to come into work even if they have COVID-19 symptoms and are awaiting test results. The HSA instructed medical staff to come into work while they were waiting to be tested, waiting for their test results, and even if they tested positive, stating that "we can work symptomatic and work positive as long as we had a mask on." Ms. Wooten explained that when employees arrive to work, they must fill out a screening document that asks them if they have any COVID-19 symptoms. The document expressly states:

> If there are any 'yes' answers to any questions above and/or if the temperature is equal to or greater than 100.4 degrees Fahrenheit, medical staff will be notified and the individual will not be allowed access to the facility and will be advised to seek medical attention.

However, Ms. Wooten stated that even when employees document that they do have symptoms, they are still made to work. For example, Ms. Wooten filled out the form on June 22, 2020 where she answered "yes" to having symptoms of COVID-19. On the screening document, Ms. Wooten checked off that she has muscle or body aches, headaches, and diarrhea; all three are symptomatic of COVID-19. Despite answering "yes," Ms. Wooten was still cleared to work that day. Ms. Wooten explained that several officers know of other officers who came into work symptomatic while waiting for their COVID-19 test results and later found out that they tested positive for COVID-19. Ms. Wooten recalls at least thirteen officers who tested positive for COVID-19.

In addition, the form asked for documentation of the employee's temperature. However, the thermometer at the front desk is "defective." Ms. Wooten stated that when she took her temperature on the thermometer, it sometimes read 89.6; other times it would read 90.4, so she knew it wasn't accurate. While she recorded the faulty temperatures on the form, Ms. Wooten noted that not all of the forms were placed in her medical file as they should have been. "They're not consistently in there — every day I work, it's supposed to be filed in my medical file," she explained.

*B) ICDC employees and detained immigrants report lack of proper PPE.*

Institute for the Elimination of Poverty & Genocide

Employees and detained immigrants alike have only received one mask since the beginning of the pandemic. Detained immigrants have stated that they have not received a new mask since they first received one many months ago.[99] Similarly, Ms. Wooten recalls requesting an N-95 mask several times since her mask broke, but she never received a new one. When she requested it, the supervisor told her the records show she already had one and therefore did not give her a new one. Instead, Ms. Wooten had to purchase her own mask in order to protect herself. In addition, Ms. Wooten stated that only upper level supervisors have N-95 masks. When she gave a mask to a correctional officer, her supervisor became angry and told Ms. Wooten that "it was not our responsibility to give officers [a mask.]"

Ms. Wooten recalls one time when upper level nurses brought a detained immigrant who presumably had COVID-19 into the shared office and removed his mask without informing Ms. Wooten. While the upper level nurses had N-95 masks on, Ms. Wooten did not have one and therefore had to walk out of the room to protect herself as an individual who is immunocompromised with diagnosed sickle cell anemia. Though Ms. Wooten has told her supervisors several times that she is immunocompromised, they have not provided her with any extra protections or a new N-95 mask even after she requested to get one multiple times. Ms. Wooten explained: "If I get sick with what I have, I won't make it. I don't have anybody else to raise my children." Instead, Ms. Wooten stated that there was no sympathy at all for her situation. The HSA stated: "life goes on," implying that that if she were to get sick or die, she would simply be replaced.

Similar to detained immigrants, ICDC staff report not being able to follow social distancing protocol within the office. Ms. Wooten explained: "It was on the wall, social distancing, but it was not actually carried out…It's hard to social distance; there's eight of us in the room…there's four computers…there's no way that as small as it [the office] was, we could be six feet apart."

Ms. Wooten also reported not having proper sanitization material in the medical unit. She reported that when medical staff requested and finally received sprays and sanitizers in May or June, the HSA took all of them and locked them in her office while leaving out only one bottle of the spray and sanitizer because she did not want the medical staff just "pass[ing] them out." Ms. Wooten explained that this resulted in employees not being able to properly sanitize their workspace. She stated: "You find yourself limited to what you spray and what you don't spray…we didn't have the resources to properly sanitize."

*C) ICDC refuses to tell employees and detained immigrants who has COVID-19.*

Detained immigrants and employees have also complained about ICDC's secrecy and lies regarding COVID-19. Neither the employees nor the detained immigrants know who has tested positive

[99] Project South Interview with Detained Immigrant, Summer 2020.

9 GAMMON AVENUE • ATLANTA, GEORGIA 30315 • (404) 622-0602 OFFICE • (404) 622-4137 FAX
www.projectsouth.org

Institute for the Elimination of Poverty & Genocide

for COVID-19. For example, Ms. Wooten explained that management at ICDC does not tell officers which detained immigrant or employee has COVID-19. She stated that when she tried to warn officers who are about to be in contact with a detained individual with COVID-19 so that they use proper precautions, she was reprimanded by management and told that warning other staff about cases was not her job. However, Ms. Wooten explained that it is their moral responsibility to tell the officers since the officers are the ones who are interacting with detained immigrants, transporting them and providing food to them, and therefore they are most at risk of contracting the virus.

Similarly, detained immigrants are anxious because they are not being told the truth about who has COVID-19 in the facility.[100] One immigrant stated: "We like to be informed. Just being informed helps things out…If we have someone to inform us about something, tell us about something that is going on, everything will be smooth…but getting people to give you information is impossible."[101] Another detained immigrant stated that since the pandemic started, "we've never been told…the facility never even confirm any positive cases; but from the people outside [I know] twenty cases at Irwin. The truth that we hear from them [ICDC] is different than the reality we see…we see other units in quarantine which means something is wrong, but nobody ever come and tell us what is going on…we are powerless, we can't do anything."[102]

One immigrant also noted that it seemed as though officers also did not know which immigrant had COVID-19. She explained that she was transferred to Unit E-4, the quarantine unit, for having COVID-19 antibodies and was awaiting her results for the most recent COVID-19 test. While she was in Unit E, an officer tried to put a new individual in the cell with her. When she refused and told the officer she shouldn't put the new person in her cell because she tested positive for COVID-19 antibodies and was awaiting her results for COVID-19, the officer reacted in shock exclaiming "you're positive for COVID-19?" The immigrant noted that the officers did not even know that she and others had tested positive for COVID-19 or had COVID-19 antibodies.

Not only does ICDC not share information about who has COVID-19; detained immigrants and employees reported instances where ICDC purposefully failed to disclose the truth about individuals who tested positive for COVID-19. Ms. Wooten has stated that the HSA and other upper lever nurses have withheld information about detained individuals testing positive for COVID-19. Ms. Wooten explained that the sentiment at ICDC is that "what you don't know you don't have to know." Ms. Wooten recalls a time when she had interacted with several detained individuals and asked the HSA if they had tested positive for COVID-19. The HSA responded that they had tested negative for COVID-

100 Project South Interview with Detained Immigrant, Summer 2020.

101 *Id.*

102 *Id.*

Institute for the Elimination of Poverty & Genocide

19, but in reality, they were suspected of having COVID-19 and were awaiting their test results. Ms. Wooten later discovered that those individuals had in fact tested positive for COVID-19 even though she was assured by the HSA that they were negative.

Similarly, one detained immigrant noted that the men in his unit explicitly asked the captain in June or July how many COVID-19 cases there were in the facility and the captain responded that there were no positive cases in the facility.[103] To the contrary, in May, ICE reported that six detained immigrants had already tested positive for COVID-19.[104]

In May 2020, the previous HSA, Ms. Cole, died from COVID-19. Many detained immigrants and employees believe she was exposed to the virus at the facility. Ms. Wooten stated that Ms. Cole explicitly told her and another colleague that she contracted COVID-19 from ICDC explaining that she only went to work and home without going anywhere else. However, when Ms. Cole died, the new HSA, told staff that Ms. Cole contracted COVID-19 from a family barbeque and attributed Ms. Cole getting COVID-19 and dying to Ms. Cole's old age and other underlying conditions.

Ms. Wooten explained that she believes ICDC is hiding information about COVID-19 in order to keep things quiet. She stated that everyone in the facility is scared at this point, so management does not want to tell officers and detained immigrants the truth because they are afraid of an uproar. Instead, the secrecy has created a "silent pandemic" where even if officers get COVID-19 from the facility, the officers won't be able to blame ICDC because no one knows how prevalent COVID-19 is inside ICDC due to not testing detained immigrants and not sharing who has the virus. Therefore, ICDC can put the blame on officers who test positive for COVID-19 by saying they contracted it from the grocery store or other places. Ms. Wooten explained that she believes that this strategy keeps "the publicity from coming to the facility."

*D) ICDC retaliates against employees for adhering to protocol and public health guidelines.*

When employees do speak out against violations occurring at ICDC, they are reprimanded. Ms. Wooten has witnessed other employees be reprimanded for doing "what's right," and she has been reprimanded and retaliated against, herself. She witnessed one captain be fired for refusing to let things slide and for following the CDC and PBNDS rules strictly. She gave the example of how this captain always placed detained immigrants strictly according to their ICE classification[105]; however, this was

103 Project South Interview with Detained Immigrant, Summer 2020.

104 https://www.ice.gov/coronavirus.

105 ICE categorizes detained immigrants as "being low, medium or high custody" and "house[s] them accordingly." 2011 Operations Manual ICE Performance-Based National Detention Standards at 62-66, https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

Institute for the Elimination of Poverty & Genocide

not common practice at the facility. Ms. Wooten believes that the captain was fired because he challenged the norm and because Warden Paulk "didn't like anybody to tell him no. You are not to tell him no."

Ms. Wooten herself faced retaliatory reprimand and demotion in July when she was suddenly demoted from being a "full-time" nurse (with regularly scheduled shifts) to an "as-needed" nurse (without regularly scheduled shifts), all without a proper explanation or adequate justification. In June, Ms. Wooten displayed symptoms of COVID-19 including muscle ache, fatigue, and shortness of breath and took a COVID-19 test. Ms. Wooten's doctor instructed Ms. Wooten not to return to work while she was symptomatic. Ms. Wooten submitted her doctor's notes to her supervisor. Despite this, she was required to work June 23 and June 25. However, she let her supervisor know that she would be quarantining until her COVID-19 results came back on June 29. While Ms. Wooten was quarantining at her home, she received a call from ICDC's HR staff telling her she had to call in sick each day she quarantined. Ms. Wooten then spoke with her supervisor who assured her that ICDC was aware she was quarantining and that she would not have to call out sick for following the doctor's orders, so she did not call out sick. When Ms. Wooten returned to work after her COVID-19 test result came back negative, she was summoned to see Deputy Warden Albright. He formally reprimanded Ms. Wooten for not calling out sick on the days she quarantined. The formal reprimand included testimony from her supervisor who falsely stated that she instructed Ms. Wooten to call in sick every day she planned to be absent while awaiting test results. A formal memo from Warden Paulk stated that if employees get tested for COVID-19: "[E]mployees are required to call out each day of their absence *unless they have submitted a physician's note* with specific dates of absence." (Emphasis added).

As discussed above, Ms. Wooten had, in fact, submitted two doctor's notes on June 22nd that explicitly stated she was excused from working until she was asymptomatic and until her COVID-19 test results came back. Despite these doctor's notes, she was still reprimanded, in violation of ICDC's own memo. Ms. Wooten later noted that the doctor's notes she submitted to her supervisor were never formally added to her medical records.

When Ms. Wooten talked to Warden Paulk about the reprimand, he expressed anger at her and demoted her effective immediately to "PRN" indicating an as needed basis which significantly reduced the number of hours she worked at the facility. Ms. Wooten believes that she was disciplined not because she missed work, but because she has been asking hard questions about testing detained immigrants for COVID-19 and warning officers when detained immigrants they are in contact with have tested positive for COVID-19. Ms. Wooten explained that she was aware of another employee who also did not call out sick while out, but that employee was never reprimanded. Ms. Wooten explained:

9 Gammon Avenue • Atlanta, Georgia 30315 • (404) 622-0602 Office • (404) 622-4137 Fax
www.projectsouth.org

PROJECT SOUTH
Institute for the Elimination of Poverty & Genocide

> You put two and two together. I'm asking for these things and I'm speaking for these detainees. I'm a problem. I'm being seen and I'm not supposed to be seen or heard. It makes it look like you're not doing your job... It [ICDC] has driven away so many people who work there whenever they go to speak out and they go to do what's right.

## III) Conclusion

Due to the gravity of these violations and the continued negative impact on the health and safety of both detained immigrants and ICDC employees, we ask that you review this complaint in an expedited manner. Thank you in advance for your time and consideration. If you have any questions or require additional information, please contact Azadeh Shahshahani, Legal and Advocacy Director at Project South at azadeh@projectsouth.org or Priyanka Bhatt, Staff Attorney at Project South, at priyanka@projectsouth.org.

Sincerely,

Project South
Georgia Detention Watch
Georgia Latino Alliance for Human Rights
South Georgia Immigrant Support Network

## VERIFIED DECLARATION OF DAWN WOOTEN

Pursuant to 28 U.S. Code § 1746, I, Dawn Wooten, hereby declare, under penalty of perjury of the laws of the United States of America, that the following is true and correct.

**INTRODUCTION**

1. I submit this Declaration in furtherance of my Disclosure and Retaliation Complaint to the U.S. Department of Homeland Security Office of Inspector General.

2. I am over 21 years of age and a legal resident of the State of Georgia. I live at 1224 Hall Avenue, Tifton, Georgia. I am personally familiar with facts as stated herein and am competent to testify about them. I certify that the facts stated herein are true and correct.

3. I have been a Licensed Practical Nurse ("LPN") since 2009.

4. I was first employed as a LPN at the Irwin County Detention Center ("ICDC") in Ocilla, Georgia in 2010.

5. Since my first period of employment at ICDC beginning in 2010, I have had periods of employment elsewhere, but I have been rehired by ICDC three times, most recently in October 2019.

6. ICDC is operated by LaSalle Corrections under contract to U.S. Immigration and Customs Enforcement ("ICE").

7. Since my most recent rehire at ICDC, I have been employed fulltime, working approximately 36-40 hours per week, including regular shifts from 6 am to 6 pm, six times in every two-week pay period.

8. Prior to July 2, 2020, I had never received a written reprimand at ICDC.

9. My most recent supervisor at ICDC was the Health Services Administrator ("HSA"), Ms. Lakisha Brown.

10. I am African-American woman.

**LASALLE VIOLATED FEDERAL LAWS, RULES, OR REGULATIONS; LASALLE'S ACTIONS POSED A SUBSTANTIAL AND SPECIFIC DANGER TO PUBLIC HEALTH OR SAFETY; AND LASALLE TOOK OR FAILED TO TAKE ACTIONS THAT CAUSED GROSS WASTE, FRAUD, OR MISMANAGEMENT.**

11. In March 2020, detainees in Unit C at ICDC began to report they and their dormmates were experiencing well-recognized symptoms of COVID-19, such as fevers and sore throats. These detainees thus repeatedly requested to be tested for the disease. Ms. Brown and ICDC Director of Nursing, Ms. Shanise Bell routinely rejected these requests. When I questioned Ms. Brown about these denials of COVID-19 testing for detainees exhibiting symptoms, Ms. Brown told me that she would not authorize testing for the detainees because "all they want is attention. … Everybody want [sic] to be tested for COVID."

12. In June 2020, ICDC received two rapid response COVID-19 testing machines. These machines would produce COVID-19 testing results in eight minutes. I understood the machines were to be used for testing the detainees, but I saw the machines in use only twice, once to test an ICDC employee and once for a detainee.

13. From March through July 2020, rather than order a COVID-19 test for detainees seeking medical attention for a fever, I observed ICDC medical staff prescribing a seven-day course of over-the-counter cold medication to those detainees.

14. From October 2019 through July 2020, I observed ICDC medical staff shredding detainees' written requests for exams or treatment and otherwise denying medical care by falsely documenting or reporting exams as performed that actually had not performed. During May and July 2020, I reported this to Ms. Brown, who took no action but told me, "One day they will be caught [shredding the exam requests]."

15. ICE has developed and disseminated its own standards for hygiene, cleanliness, and sanitation for detention facilities like ICDC, which are described ICE's Performance-Based National Detention Standards ("PBNDS"), as revised in 2016. ICE also requires detention facilities like ICDC to comply with relevant hygiene, cleanliness, and sanitation standards established by U.S. Centers for Disease Control and Prevention.

16. Among other things, even before the COVID-19 pandemic hit he U.S., ICE required

(and still requires) that:

"a. All horizontal surfaces shall be damp-dusted daily with an approved germicidal solution used according to the manufacturer's directions" —— ICDC never met this standard, especially not on a "daily" basis

"b. Windows, window frames and windowsills shall be cleaned on a weekly schedule." —— ICDC never met this standard, especially not on a "weekly" basis

"c. Furniture and fixtures shall be cleaned daily." —— ICDC never met this standard, especially not on a "daily" basis

"d. Floors shall be mopped daily and when soiled, using the double-bucket mopping technique and with a hospital disinfectant-detergent solution mixed according to the manufacturer's directions." —— ICDC never met this standards, especially not on a "daily" basis

"e. A clean mop head shall be used each time the floors are mopped." —— ICDC never met this standard

"h. Cubicle curtains shall be laundered monthly or during terminal cleaning following treatment of an infectious patient." —— ICDC never met this standards, especially not on a "monthly" basis.

17. According to the CDC:

"Even if COVID-19 cases have not yet been identified inside the facility or in the surrounding community, begin implementing intensified cleaning and disinfecting procedures according to the recommendations below. These measures may prevent spread of COVID-19 if introduced." This requires detention facilities like ICDC to:

A "Several times per day, clean and disinfect surfaces and objects that are frequently touched, especially in common areas. Such surfaces may include objects/surfaces not ordinarily cleaned daily (e.g., doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment, kiosks, and telephones)." —— ICDC never met this standard

B. "Staff should clean shared equipment several times per day and on

a conclusion of use basis (e.g., radios, service weapons, keys, handcuffs)." —— ICDC never met this standard

C. "Use household cleaners and EPA-registered disinfectants effective against the virus that causes COVID-19 as appropriate for the surface, following label instructions. This may require lifting restrictions on undiluted disinfectants." —— ICDC never met this standard

D. "Ensure adequate supplies to support intensified cleaning and disinfection practices, and have a plan in place to restock rapidly if needed." —— ICDC never met this standard

18. From October 2019 through July 2020, ICDC failed to maintain hygiene, cleanliness, and sanitation standards for medical exam rooms and equipment.

19. I observed exam room tables and floors that were rarely cleaned, wiped down, or mopped, and certainly not to ICE or CDC standards. There was often blood on the floor that had not been cleaned up

20. To give just one example, a detainee's blood lay on the same spot, in the same pattern, an exam room for at least two full months. In other words, it was never mopped up.

21. ICE and the CDC also require minimum standards of personal hygiene for all detainees, such as providing them with personal bars of soap, and providing female detainees with special hygiene products, such as tampons —— ICDC never met these standards.

22. The CDC has very specific standards regarding Personal Protective Equipment ("PPE"), including "Ensur[ing] that sufficient stocks of hygiene supplies, cleaning supplies, PPE, and medical supplies (consistent with the healthcare capabilities of the facility) are on hand and available, and have a plan in place to restock as needed if COVID-19 transmission occurs." —— PPE, of all kinds, always was in very short supply at ICDC. Some things, such as gowns and face shield were rarely if ever provided.

23. From March through July 2020, ICDC constantly failed to provide or unreasonably delayed the provision of adequate quantities of PPE to detainees and lower-level staff

like me.

24. I observed highly effective PPE, such as N-95 face masks, being reserved for high-ranking staff (who rarely had contact with the detainees and staff most likely to be exposed to COVID-19), while the most at-risk individuals were given only inferior paper or cloth masks and were never given new masks to replace old or broken ones. From March through early June 2020, there were no face shields or gowns provided.

25. As just one example, staff like myself were given an N-95 face mask in mid-March. They are supposed to be used one time or to last one day. Ours were never cleaned, repaired, or replaced. When staff complained, ICDC supervisors told us to go to stores and buy our own.

26. Detainees were rarely, if ever, given even paper facemasks (like surgical masks) even when they begged for them. For this reason, detainees were forced to buy socks from the commissary to tie around their noses and mouths as substitute facemasks.

27. The CDC also requires that staff and detainees "trained to correctly don, doff, and dispose of PPE" —— ICDC never trained anyone about how to put on, take off, and dispose of PPE.

28. The CDC requires regular temperature checks for COVID-19, with the frequency of temperature checks depending on the circumstances: immediately after detainees arrive and before they are brought into the general detainee population, once a day for staff as they arrive for work, twice a day for quarantined detainees, and daily "in housing units where COVID-19 cases have been identified." —— ICDC performed temperature check on new detainees and staff entering the facility, but it rarely performed other checks with the frequency the CDC requires.

29. More important, ICDC misused and never properly calibrated the hand-held temperature gun that was used for temperature check.

30. The guns was routinely pressed to the foreheads of staff and detainees, rather than being held 6-12" away, and were rarely, if ever, cleaned and sanitized.

31. The guns also were never calibrated, which necessary to produced accurate readings. For example, the gun frequently reported low temperatures for me, including below 90 degrees. These are the temperatures one gets when testing recently deceased

people, not living and breathing ones!

32. The CDC has established very detailed standards social-distancing, medical isolation, and COVID-19 quarantining of detainees and staff. For example, the CDC requires detention facilities to:

33. "Implement social distancing strategies to increase the physical space between incarcerated/ detained persons (ideally 6 feet between all individuals, regardless of the presence of symptoms)."

34. "Have staff "maintain a distance of feet or more from an individual with respiratory symptoms while interviewing, escorting, or interacting in other ways."

c. As soon as an individual [detainee] develops symptoms of COVID-19, they should wear a face mask (if it does not restrict breathing) and should be immediately placed under medical isolation in a separate environment from other individuals."

d. "Keep the individual's movement outside the medical isolation space to an absolute minimum.

e. "Provide medical care to cases inside the medical isolation space."

f. "Serve meals to cases inside the medical isolation space."

f. "Exclude the individual from all group activities."

g. "Assign the isolated individual a dedicated bathroom when possible."

h. "Ensure that the individual is wearing a face mask at all times when outside of the medical isolation space, and whenever another individual enters. Provide clean masks as needed. Masks should be changed at least daily, and when visibly soiled or wet."

i. "Facilities should make every possible effort to place suspected and confirmed COVID-19 cases under medical isolation individually. Each isolated individual should be assigned their own housing space and bathroom where possible. Cohorting should only be practiced if there are no other available options."

j. "If cohorting is necessary: Only individuals who are laboratory confirmed COVID-19 cases should be placed under medical isolation as a cohort. Do not cohort confirmed cases with suspected cases or case contacts."

k. "Incarcerated/detained persons who are close contacts of a confirmed or suspected COVID-19 case (whether the case is another incarcerated/detained person, staff member, or visitor) should be placed under quarantine for 14 days."

35. ICDC routinely ignored every one of these requirements.

36. From March through July 2020, ICDC adopted inadequate social-distancing policies. ICDC leadership failed to encourage and enforce the CDC's social distancing recommendations. What's worse, ICDC reprimanded staff for practicing social distancing. On various dates from March through May 2020, the former HSA, Ms. Marion Cole, and later in May and June 2020, Ms. Brown verbally reprimanded me for warning other staff to adhere to CDC-recommended distancing guidelines and to use extra precautions when working with someone who has tested positive for COVID-19.

37. For example, from March through July 2020, I observed ICDC unreasonably refuse to isolate, from the general population, both detainees who had tested positive for COVID-19 and those who were COVID-19-symptomatic.

38. From March through June 2020, ICDC routinely failed to inform detainees and staff which persons among the detainee population had tested positive for COVID-19. In June 2020, I had substantial contact with three detainees that, unbeknownst to me, were suspected of having COVID-19 and had submitted COVID-19 test samples. I expressed some concern about this to Ms. Brown and, without telling me the detainees were suspected of having COVID-19 and that they had submitted samples, she assured me the three detainees were negative for COVID-19. Later I learned that the three detainees had in fact tested positive.

39. The CDC also has very strict standards regarding detainee transfers. The CDC says that detention facilities must "restrict transfers of incarcerated/detained persons to and from other jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, or to prevent overcrowding" and "suspend all transfers of incarcerated/detained persons to

and from other jurisdictions and facilities (including work release where relevant), unless necessary for medical evaluation, medical isolation/quarantine, care, extenuating security concerns, or to prevent overcrowding."

40. From March through June 2020, ICDC routinely violated CDC rules regarding detainee transfers.

41. For example, on or about the end of May or early June 2020 ICDC transferred a detainee to the Stewart Detention Center despite ICDC leadership knowing he had tested positive for COVID-19. Other detainees, suspected of having contracted COVID-19 and awaiting their test results, were transferred to other facilities without knowing their test results. ICDC regularly transferred COVID-19-positive detainees to other ICE facilities without informing those facilities that the transferees had tested positive. At the same time, ICDC accepted the transfer of COVID-19-positive detainees from other ICE-related institutions without informing ICDC-housed detainees or ICDC-based staff that the new arrivals were infected with COVID-19. New arrivals were neither tested for COVID-19 nor isolated from other detainees.

42. The CDC states: "It will be especially important for [detention] facilities to coordinate closely with their state, local, tribal, and/or territorial health department when they encounter confirmed or suspected cases among incarcerated/detained persons or staff, in order to ensure effective medical isolation and quarantine, necessary medical evaluation and care, and medical transfer if needed." To the best of my knowledge, ICDC routinely ignored its reporting obligations.

43. For example, from March through May 2020, ICDC violated CDC and Georgia state reporting requirements regarding detainees determined to have or be suspected of having COVID-19 by undercounting and underreporting such cases to both LaSalle corporate and to the State of Georgia.

44. From October 2019 through June 2020, ICDC discriminated against employees and detainees on the basis of race and ethnicity. White nurses who were out sick were not required to report in sick every day, and they were not reprimanded and demoted when they did not report sick every day. In addition, White employees who were out sick with COVID-19 or suspected COVID-19 received "COVID pay," while ICDC did not pay me while I was out sick.

**RETALIATORY REPRIMAND AND DEMOTION.**

45. On Monday, June 22, 2020, I was off work to obtain a COVID-19 test prior to receiving a medically prescribed blood transfusion for my sickle-cell condition. At that time, I was exhibiting symptoms that indicating a potential COVID-19 infection, such as muscle ache, fatigue, and shortness of breath.

46. I expected to quarantine while awaiting the COVID-19 test results, and my physician, Dr. Margaret Richardson Nixon told me I would be in violation of CDC guidelines if I returned to work at ICDC while I was symptomatic. Nevertheless, ICDC required me to return to work and I worked Tuesday, June 23 and Thursday, June 25, 2020. I was scheduled to be off on Friday, Saturday, and Sunday, June 26-28, 2020.

47. I spoke with my supervisor, Ms. Brown. on Thursday evening, June 25, 2020, and told her I expected to receive my test results on Monday, June 29, 2020. An ICDC Human Resources staff-person, Ms. Joan Whitley, then called me and instructed me that I must report in "sick" each day even though ICDC understood I was in quarantine while awaiting the test results. I then spoke with Ms. Brown, who assured me that because ICDC was fully informed of my situation and my doctor's orders and thus it made no sense for me to burden myself and ICDC staff by reporting in sick every day while I was quarantined on doctor's orders.

48. On Monday, June 29, 2020, I received my negative COVID-19 test results and reported them via phone to Ms. Whitley that same day.

49. I returned to work on my next scheduled work-day, Wednesday, July 1, 2020.

50. On the following day, Thursday, July 2, 2020, I was summoned to see Deputy Warden Albright. I was presented with a written reprimand for not reporting to work or reporting in sick on Saturday, June 27, 2020. Ms. Bell was the charging official, Ms. Brown was the investigator, and ICDC Deputy Warden Albright was the reprimanding authority. Ms. Brown falsely indicated on the reprimand form and during the reprimand proceedings that she had informed me that I would have to "call in each day," when, in fact, she had never said that that and actually had said there was no need for me to do that.

51. On or about July 2, 2020, I discussed this matter with ICDC Warden Paulk. I told him of my ten-year history of employment at ICDC and my record of solid performance

and attendance. Warden Paulk expressed anger and frustration and told me that effective immediately he was demoting me. I was no longer to be a fulltime LPN, but instead I would be "PRN" or as needed. This meant that my hours were severely curtailed and I no longer had a regular shift.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 8, 2020, at Tifton,Georgia.

Dawn Wooten

Dawn Wooten

# COVID – 19 Employee/Visitor/Attorney/Contractor Screening Form

1. Have you ever been diagnosed with COVID-19? NO

2. Have you had close contact with a laboratory confirmed COVID-19 case in the last 14 days without wearing the appropriate PPE (Personal Protective Equipment) to include a gown, mask, goggles or face shield and gloves? NO

Close contact of a COVID-19 case—In the context of COVID-19, an individual is considered a close contact if they a) have been within approximately 6 feet of a COVID-19 case for a prolonged period of time or b) have had direct contact with infectious secretions from a COVID-19 case (e.g., have been coughed on). Close contact can occur while caring for, living with, visiting, or sharing a common space with a COVID-19 case. Data to inform the definition of close contact are limited. Considerations when assessing close contact include the duration of exposure (e.g., longer exposure time likely increases exposure risk) and the clinical symptoms of the person with COVID-19 (e.g., coughing likely increases exposure risk, as does exposure to a severely ill patient).

3. IN THE LAST 24 HOURS have you experienced any of the symptoms below: Yes

Cough
Fever (temperature equal to or over 100.4 degrees Fahrenheit) or chills
Felt feverish
Experienced chills or repeated shaking with chills
Difficulty breathing
Shortness of breath or difficulty breathing
Fatigue
Muscle or body aches ✓
Sore throat
New onset loss of taste or smell
Headache ✓
Congestion or runny nose
Nausea or vomiting
Diarrhea ✓

TEMPERATURE: 97.5

**IF THERE ARE ANY "YES" ANSWERS TO ANY QUESTIONS ABOVE AND/OR IF THE TEMPERATURE IS EQUAL TO OR GREATER THAN 100.4 DEGREES FAHRENHEIT, MEDICAL STAFF WILL BE NOTIFIED AND THE INDIVIDUAL WILL NOT BE ALLOWED ACCESS TO THE FACILITY AND WILL BE ADVISED TO SEEK MEDICAL ATTENTION.**

[signature]
Individual's Signature

Front Desk Officer's Signature

Individual's Printed Name

Front Desk Officer's Printed Name

6/23/2020
Date

6/23/2020
Date

DW00706

**LASALLE**
**CORRECTIONS**

For Official Use Only
*Grievance # ____________

STEP ONE

A. EMPLOYEE'S COMPLAINT: DATE: 7/3/2020

Employee's Name Jaun Wooten Social Security # ____________

Employee's Job Title Lpn

Employee's Home Address 1224 Hall Ave Tifton Ga. 31794
Street City State Zip

Home Phone 229-472-1046 229-472-2465 Work Phone 229-468-4121

Facility/Department Medical

Nature of Complaint: Be specific: include names, dates, places, rules, regulations, etc. How have you been affected and action or relief requested. Original must be submitted at each step. Attach separate page if needed.

See Additional pages (8)

Employee's Signature [signature] Date 7/3/2020

B. WARDEN/FACILITY DIRECTOR GRANTING REQUESTED RELIEF:

Name and Title ____________

Date Received ____________ there has/has not been grievance meeting held at Step One

RESPONSE:

EXHIBIT 11 Wooten
PENGAD 800-631-6989

Signature ____________ Date ____________

Employees must submit the original completed and signed Employee Grievance Form within 10 days of the occurrence giving rise to the grievance or within 10 days of first learning of the occurrence.

DW00030

July 2nd, 2020

(initials)

1of9

On July 2nd 2020 I was called up front to Admin to meet with Deputy Warden F Albright. He asked me to have a seat and asked was I aware why I was called to his office. I stated "No sir". He began then to tell me that He recieved a write up from Mrs. Lakeysia Brown in regards to a No Call No show. I replied "I have never not Called in for work nor (initials) not shown up when scheduled. He then asked me what is your response to this allegation. I began to inform him that Joan Whitley Human resources called me on June 26th around 3pm asking me what was going on with me. I told her that I was out and had been out since June 22nd being Covid 19 tested and looking forward to results so I can have some minute med. procedure. Im sure Im negative but I had to have per my physician. She proceeded to say, I need you to call out everyday your not going to be here on your scheduled day. I asked her even though I have a doctor's excuse not one but two. She asked had I given them to my supervisor Bell or Brown and I told her yes maam they have had them since Monday June 22nd. Mr. Albright said "so you have a doctor's note? I replied yes sir I have 2 that I turned in to Ms. Bell and Mrs. Brown on Monday June 22nd. He turned to Mrs. Kay and told her to go and get my medical file.

(initials)

2 of 9

When she returned they were not in my medical personell file. I began to tell him I brought them to them Bell and Brown. I actually handed it to Ms. Bell and she then in turn handed it to Mrs. Brown. We spoke on June 22nd about me being out. I expressed to Mrs Brown that I had to have a minute procedure at the hospital and needed ~~some~~ error to be Covid tested per my physician She stated "I don't understand that Wooten Tift Regional test you at the hospital before they do any thing right there at the hospital. You don't need a Covid swab. I'm still employeed there I famailarize myself with their policies. I don't believe this!" I told her well my physician doesn't order the blood test unless you are positive. She continued to say I don't believe that. I work still with Tift Regional and I know they test positive. She began to ask about what do you mean on this excuse "Until symptom Free." I told her that I was currently Sickle Cell Crisis and had body ache, head ache, and joint pain. She then said well Wooten I'm gonna have to take this up front to see what they say. She asked so your not comming to work tommorrow? I told her no maam. She said ok I'll call you and let you know what they say.



Web Site: www.cbaofga.com • e-Mail: educatio...

DW

3 of 9

Mr. Albright then asked me had I talked to Brown prior to the 27th of June. I said yes sir I called her June 26th that Thursday evening and informed her that Joan Whitley called me around 3pm asking me what did I have going on? I told her that I was out being Covid-19 tested needed a minute procedure and would return after the quarantine time. She told me I would need to call out everyday scheduled until I return. I asked Mrs. Brown what do I need to do? Do I need to call you everymorning waking you up when you know quarantine is 10 days and test results are 3-7 days. She stated "Wooten that doesn't make any sense to me; Don't you have a doctor's excuse that's crazy. I told her I haven't recieved my test results as of today June 26th I'm scheduled tommorow do I need to call out even though The nurse told me that it would probably be monday before I get my results if I hadn't got them today. She said again that doesn't make any sense if you have a doctor's excuse. I told her that I will not be there Sat or Sunday. 27th or 28th! As soon as I get them I'll call you. We hung up. Mr. Albright stopped me there and called Mrs. Brown to the front. When she arrived Ms. Bell was present as well. He asked Mrs. Brown

DW
4 of 9

about the conversation on the 26th she admitted talking to me stating that Ms. Wooten called out for Friday only and that she told me to do as Joan Whitley instructed me too. She admitted that I called her and informed of Mrs. Whitley told her to call out. But she said she never told me any thing about having a doctor's excuse. Mr. Albright asked me in front of them did I call out on the 27th I said no because Mrs. Brown said it didn't make sense I had a doctor's excuse. She said I told her to do as Joan said. Mrs. Bell agreed with Brown saying she sure did. Ms. Bell wasn't present I called Ms. Brown at home. Mr. Albright then told Mrs. Brown and Ms. Bell thats all he needed after he said I was found guilty of not calling out.

I spoke with Him after Mrs. Brown and Ms. Bell left the room. I expressed to him how unfair this situation was. They are Best Friends and they are going to agree and back up one another no matter what the situation. As supervisors they never came to me after returning to work on July 1st to talk with me or get an understanding on why there was no call made on June 27th or 28th that was a weekend.

(initials) 5 of 9

Instead they allowed me to report on July 1st work a 12 hour shift which I agreed to stay late and cover. This doesn't sound like someone who deliberately called and no showed 2 shifts that was called out or written up on 1 shift. In this meeting I found out then and only then that you take instruction from Human Resources not your immediate supervisor. I was told that I should have listen to Joan not Brown. No one made that clear until then. I have always been told by Mrs. Brown that Human Resources does not run medical. No one up there has a medical degree. You always take instruction from your immediate supervisor. You don't call out to them do you? I of course answered no.

Only upon returning back to work after submitting my doctors excuse that a memo was given to me that stated "If you chose to be Covid tested it is your responsibility to contact your supervisor calling out on every shift unless you have a doctor's note with specific days out." I was aware in writing on July 1st post my write up.

This seems really funny to fit my situation after rendering my excuses that were not in my medical file at the time of my hearing.

6 of 9

Mrs. Brown knows that the standard Covid test quarantine for symptoms are 10 days and test results 3-7 days as she has stated she works for Fift Regional and a previous excuse on 5/22 that has it in writing. This is where I have had the previous test before this test.

- I don't believe this was a justified write up. Am I being ~~bein~~ on targeted because I have a medical condition that warrants me to be out of work. Am I being punished and a case being built against me because I do have an excuse from a doctor. Am I being targeted because I am taking the necessary steps to keep myself safe?

- Medical is at a disadvantage with the buddy system. I was told by Warden Paul on July 2nd that I would be effectively PRN (He would see how this would work out) after found guilty of my hearing. You can hire your best friends, children, and get rid of Full time employees to PRN and replace with other family members or friends full time.

@
7 of 9

I have been told or given two directives: Human Resources takes presidence over medical and my supervisor saying Human Resources does not run medical. I'm confused. I don't know who to take directive from. Because either way I go I'm going to always be wrong because we can create documents to assure I'm wrong.

Will I be retaliated upon. Yes. Again you have a Best friend and family along with friends of the best friend to work against you. If one of the ones in the circle brings a charge against me I'm as good as guilty because I'm out numbered. Rules and Regulations are being created to suit the supervisors. Not treating the staff with respect. I'm being targeted and I don't know why no other than it has been said by Mrs. Brown to another nurse at the facility that "When her friend Bell gets here since you all can't follow directions we are going to get rid of everyone and start over. I guess this starts with me.

I was written up for a No call show. Another nurse told me she ~~st~~ also told Joan that she was not calling out everyday and she said Joan

told her she would shoot Brown a email. To this day she hasn't been reprimanded. And if she has post this grevance. Now you know why I complained about equality. Selective rules apply to selective people.

I may not be employeed after this grievance but your going to have issues with the relationship of the supervisors.

I was excited Mrs. Brown was given the position as HSA. But she shifted when her bestfriend came on board. I don't know her but she doesn't know how to talk to you as an individual. I have no problem again with being supervised and doing my job to the best of my ability.

Its morally and ethically wrong to change or create policy to throw your weight around to defimate the character, build a case, and manipulate to build a empire filled with friends and family.

If others would speak out my grievance would seen as unfair. But because their jobs were be threatened they are afraide too.

DW

9 of 9

Thank you for your prompt response to my concerns.

Dawn Wooten LPN
ICDC Ocilla Ga.
229-472-2465(C)
229-472-1046(H)
5070653.dw@gmail.com

LASALLE
CORRECTIONS

## EMPLOYEE'S GENERAL RULES OF CONDUCT

**AUTHORITY** Rodney Cooper, Director & Managing Wardens of LaSalle Corrections

**POLICY** Employees are representatives of LaSalle Corrections and are expected to adhere to the highest standards of conduct while on or off duty. Violation of any rule, regulation or statutory authority may subject the employee to disciplinary sanctions ranging from disciplinary action to dismissal.

These general rules of conduct do not constitute an employment agreement (contract) or a guarantee of continued employment, and LaSalle Corrections reserves the right to change them at any time. These rules do not limit in any manner the Administrator's authority to dismiss any employee at will.

**DISCUSSION** It is the employee's responsibility to be knowledgeable of or seek clarification of the LaSalle Corrections rules and regulations or statutory authority. Ignorance of the existence of any rule or regulation is not a defense for a violation of the same. No single document can anticipate or address every situation. Therefore, the Employee's General Rules of Conduct will be used in conjunction with other current policies and procedures, including, but not limited to the LaSalle Management Employee Handbook. In the event that no written or verbal instructions have been issued regarding a particular subject, the employee is expected to use sound judgment in arriving at a prudent course of action in the situation.

**DEFINITIONS** Reasonable suspicions: When information or knowledge is sufficient to induce a prudent and cautious person to believe a violation may have occurred.

**PROCEDURES:**

1. **Tardiness:** Tardiness is arriving late for a scheduled work day without authorization. Employees are required to report to work at the time specified unless excused by their supervisor. Employees who are unable to report to work on time should notify their supervisor of their estimated time of arrival for duty. Employee Tardiness above one hour will be classified as an unexcused absence discussed below.

2. **Unexcused Absenteeism:** Unexcused absenteeism consists of regularly scheduled work missed without authorization. Employees are required to report to work at the time scheduled unless prior arrangements are made with their supervisor. Employees who are unable to report to work on time should notify their supervisor of their estimated time of arrival for duty prior to the beginning of the shift in order for the supervisor to make necessary arrangements for the replacement. Any employee absent for three (3) consecutive work days without securing leave through the call out process will be considered to have abandoned his/her job; terminated and



EXHIBIT 16 Wooten
PENGAD 800-631-6989

1/17

documented as a No Call No Show (NCNS). Any employee who calls in and/or is absent for more than 1 day on sick leave must have a doctor's excuse upon returning to work.

3. **Call Out Process:** Employees working in a security department are required to call the Supervisor on duty at least 2 hours prior to their shift, to allow management to locate and secure alternate coverage for the scheduled shift.

4. **Failure to Aid Fellow Employees:** Whenever it is apparent that a fellow employee is in need of assistance, it is the obligation of all employees to take reasonable steps to render aid and assistance.

5. **Failure to Follow Orders:** Employees must obey all authorized regulations, policies and procedures. This includes, but is not limited to: (a) LaSalle Corrections, (b) Unit procedures, posted policies and directives, posted orders, and (c) all other written policies and procedures; i.e., employee handbook. Direct written or verbal orders must be obeyed cooperatively and promptly. When orders conflict, the last order received must be obeyed.

6. **Sleeping on Duty:** Employees are required to remain awake, alert and devote their full attention to their assigned duty or area of responsibility during working hours.

7. **Leaving a Security/Duty Post:** Employees are prohibited from leaving their assigned post without proper authorization. Security posts will not be vacated without proper relief.

8. **Gross Negligence:** Employee must perform their duties in such a manner that LaSalle Corrections derives the optimum benefit from their services. Any act or conduct on the part of the employee which endangers the life or safety of himself or others, jeopardizes security, or seriously impedes the efficient and effective operations of LaSalle Corrections is prohibited.

9. **Horseplay:** Horseplay between employees and inmates is prohibited. Horseplay includes but is not limited to such actions as wrestling, pushing, chasing, etc.

10. **Substandard Duty Performance:** Employees must perform their duties in a manner which meets or exceeds the minimum standards established for their position. Any act by the employee which results in a failure to meet the minimum standards of on-the-job productivity is prohibited.

11. **Failure to Follow Proper Safety Procedures:** Employees are required to observe and enforce current policies relating to safety in the work place.

12. **Personal Relationship:** Employees at LaSalle Corrections will not engage in personal relationships with contract monitors, inspectors, investigators, and/or other entities related to our contracts on or off the job.

LASALLE
CORRECTIONS

13. **Unprofessional Remarks and Comments:** Unprofessional comments by LaSalle Corrections staff or vendor staff in the presence of or directed at inspectors or visitors will not be tolerated.

14. **Falsification of Records:** Employees are required to submit truthful, accurate and complete records of events to which they are a part of or which they have knowledge of. Falsification of records also includes altering records to reflect incomplete or false information. By submitting the document the employee is attesting to the truthfulness, accuracy and completeness of the information presented. This includes, but is not limited to: certification of illness/doctor's excuse, disciplinary reports, incident reports, log books, investigation reports, unusual occurrence reports, accident reports, employee violation reports, time and attendance records, travel expense records, accounting records, as well as knowingly making false statements or deliberately omitting important facts to any person conducting an investigation for LaSalle Corrections.

15. **Theft of Personal or LaSalle Corrections Property:** Employees are prohibited from taking any item which is not their personal property, or of which they do not have permission to take from the rightful owner, with the intent to deprive the owner of that item or its use.

16. **Intentional Failure to Obey Any Legal Order for Proper Authority:** Any order issued by proper authority must be obeyed promptly by the employee. Legal orders are not limited to verbal instructions; they also include written policy, procedures and statutory authority. Any instructions from proper authority posted on the employee bulletin board are considered to be legal orders.

17. **Malicious Use of Profane/Abusive Language or Racial Slurs:** The use of profane or abusive language or racial slurs toward other employees, inmates or visitors to LaSalle Corrections is prohibited. Nor shall employees respond in like terms to what they consider imprudent or insulting language.

18. **Verbal or Physical Altercation with another Employee:** Verbal or physical altercations between employees in the work place are unacceptable practices. While on duty, employees are required to maintain a considerate, cooperative and cordial relationship toward fellow employees.

19. **Reporting to Work under the Influence of Alcohol or Drugs:** Employees must not report to work under the influence of alcohol or drugs. Employees should not consume alcoholic beverages for at least 8 hours prior to reporting to work. Employees taking prescription drugs which may interfere with the performance of their assigned duties must report this to their supervisor. An employee who tests positive for a controlled or illicit substance, or is in possession of a prescription drug for which no authorization is available, is also in violation of this rule. If suspected, an employee will be required to take an alcohol breathalyzer test, drug

test, or other appropriate test while on duty. Refusal of testing will result in termination.

**20. Introduction of Contraband:**

a. Employees shall not introduce into or remove from the grounds of LaSalle Corrections any item of contraband without specific order to do so.

b. Contraband is defined as any item in the possession or control of the employee (1) which is not issued to employees for their performance of their duties or (2) for which employees have not obtained their supervisor's permission to possess.

c. Specific items of contraband include but are not limited to: firearms, knives, ammunition, intoxicants, etc. and unauthorized written or verbal communication brought into or taken from an institution for an inmate, former inmate, associates or family members of inmates. This also includes transporting notes from one inmate to another at LaSalle Corrections.

d. Automobiles are also covered by this policy.

e. Where applicable, employees who introduce into or remove from an institution any form of contraband may be subject to criminal prosecution or immediate dismissal.

**21. Use of Alcohol or Drugs on the Job:** Use of alcohol or illicit drugs while on duty is prohibited.

**22. Violation of Statutory Authority/Rules/Regulations/Policies:** It is the employee's responsibility to have a clear understanding of and to know and comply with rules, regulations, policies, court orders and statutory authority governing the operation of LaSalle Corrections.

**23. Harassment/Discrimination:** All forms of harassment or discrimination relating to sex, gender, race, color, religious performance, national origin, age and disability are prohibited. Behavior of this nature may subject employees to criminal or civil penalties in addition to administrative action and PREA standards will be enforced at all times.

**24. Harassing or Retaliation against Another:** Employees are prohibited from harassing or retaliating against one another in any form, or for any reason. This includes all forms of harassment or retaliation for reasons including, but not limited to sex, gender, race, color, religious preference, national origin, age or disability.

**25. Mistreatment of Inmates:** Mistreatment usually takes the form of physical abuse, but it can also include such actions as threats, unauthorized or illegal denial of privileges, etc. Actions of this sort are prohibited.

26. **Use of Excessive Force:** The use of force to control a situation or to gain compliance with legal orders will be governed by existing policies and procedures. Only the minimum amount of force applied in compliance with existing policies necessary to achieve the desired results will be employed. The use of force to intimidate, coerce, punish or extract revenge is prohibited.

27. **Failure to Properly/Accurately Report a Use of Force:** Any employee involved in or a witness to a use of force incident is required to provide a complete factual account of his or her actions and/or observations, or the incident as outlined in existing policies and procedures.

28. **Failure to Turn in All Evidence Seized:** Employees are required to preserve and submit all evidence in its original form through an established chain of custody. All confiscated property, contraband, etc. must be properly accounted for and secured in accordance with the appropriate LaSalle Corrections policies.

29. **Destruction, Misappropriation or Unauthorized Use of LaSalle Corrections Equipment/Property:** Employees are prohibited from using LaSalle Corrections resources to further their private interest. This includes the prohibition of use of inmate labor except as specifically authorized. Employees shall not take any item of LaSalle Corrections property for the purpose of converting it to their own personal use. Employees shall not use LaSalle Corrections equipment for any purpose other than that for which it was originally intended. No employee shall willingly, or through negligence, destroy, damage or cause to be lost the property of others or of LaSalle Corrections.

30. **Refusal to cooperate with an Official Inquiry/Investigation:** Employees are required to cooperate fully in any investigation conducted by an authorized official of LaSalle Corrections, or by State or Federal Government in which LaSalle Corrections' interests are involved.

31. **Conviction of a Felony:** Employees convicted of a felony are subject to disciplinary action, up to and including termination of employment. Any conviction will be reviewed by the facility Warden and the Director of Human Resources

32. **Destroying Evidence or Giving False Information:** In an investigation, employees are required to preserve evidence in its original form and provide truthful information relating to the incident under investigation.

33. **Release of Information:** Employees are prohibited except in accordance with LaSalle Corrections, with approval from the Regional Warden, from releasing information relating to the incident under investigation.

34. **Accepting Goods, Money, Service or Favors:** Employees are prohibited from granting special favors to and asking for, or accepting gratuities (whether in property or service) from any inmate or for any inmate.

LASALLE CORRECTIONS

35. **Aiding and Abetting an Escape:** Employees are prohibited from aiding and abetting an escape or an escape attempt.

36. **Insubordination:** Employees are prohibited from showing contempt or disrespect through words or actions toward supervisors and managers, and must respond promptly to legal orders issued by these persons.

37. **Misconduct:** Employees are prohibited from engaging in any activity of a minor nature that would have an adverse impact upon the integrity or productivity of the employee or LaSalle Corrections.

38. **Trafficking and Trading:** Employees are prohibited from betting, trafficking, trading or gambling with inmates. Employees will not accept from, give or sell to, purchase for or deliver to an inmate any article, commodity or communication of any description except through authorized channels. Employees should not bet or gamble with inmates.

39. **Conviction of a Misdemeanor:** Employees convicted of a misdemeanor are subject to disciplinary action, up to and including termination of employment. Any conviction will be reviewed by the facility Warden and the Director of Human Resources.

40. **Reporting Arrests:** Employees shall not violate state or federal law. At the discretion of the Warden, employees charged with any criminal conduct may be placed on leave without pay, pending the outcome of the charges. A criminal conviction is not necessary to support a finding of violation of this rule. An employee must notify his/her immediate supervisor within Forty-Eight (48) hours in the event of the employee's arrest.

41. **Possession, Use or Sale of Illicit Drugs/Drug Paraphernalia:** Employees are prohibited from possessing, using, and/or selling drugs or drug paraphernalia while on or off duty. Possession, use, or sale of the same during off duty hours or in a private residence is not a defense for this violation. Behavior of this nature may subject employee to criminal possession.

42. **Denial of Uniform Access to Courts:** Employees are prohibited from interfering in any manner with the inmate's right of access to courts or to public officials. This includes, but is not limited to, unauthorized denial of legal visits or materials, harassing or retaliating against inmates for exercising their right to file a grievance or complaint, or exercising their right to corresponding with courts or public officials.

43. **Employee/Inmate Relationships (Association, Correspondence, etc.):** Employees are prohibited from establishing any type of personal relationship with inmates or former inmates that jeopardizes the security of LaSalle Corrections, compromises the effectiveness of the employee, or provides any of the individuals with special treatment, privileges or favors. Employees shall not assist an inmate or an inmate's visitor or family member in circumventing

LASALLE
CORRECTIONS

any applicable regulation or policy. This includes, but is not limited to, the writing of personal letters and making personal phone calls to inmates or to inmate's families or friends, as well as having sexual relations with inmates or with inmate families or friends.

44. **Staff-on-detainee Sexual Abuse/Assault:** LaSalle has zero tolerance for an employee's or other individual's sexual misconduct, sexual abuse, and sexual harassment with offenders. An employee is prohibited from subjecting another employee, offender, or other individual to harassment or retaliation for reporting or cooperating with an investigation of alleged sexual misconduct with offenders. Prison Rape Elimination Act (PREA) Standard §§ 115.11(a); 115.67(a), (e)

One or more staff member(s), volunteer(s), or contract personnel engaging in or attempting to engage in: contact between the penis and vagina or anus; contact between the mouth and the penis, vagina, or anus; penetration of the anal or genital opening of another person by hand, finger or any object; touching of the genitalia, anus, groin, breast, inner thighs, or buttocks, either directly or through clothing, except in the context of proper searches and medical examinations; the use of threats, intimidation, or harassment; indecent, profane or abusive language, or other actions (including unnecessary visual surveillance) or communication aimed at coercing or pressuring a detainee to engage in a sexual act; or repeated verbal statements or comments of a sexual nature to a detainee, including demeaning references to gender, derogatory comments about body or clothing, or profane or obscene language or gestures. Sexual conduct of any type between staff and detainees amounts to sexual abuse, regardless of whether consent exists. Behaviors of this nature may subject employees to criminal and/or civil penalties in addition to administrative action. Any behavior that violates PREA law is prohibited.

45. **On and Off Duty Conduct:** The employee's conduct on and off duty must be a prime concern to both the employee and the employer. Any misconduct on the part of the employee that jeopardizes the security of LaSalle Corrections, or calls into question their ability to perform effectively and efficiently in their position, or casts doubt upon the integrity of employees is prohibited.

46. **Refusal to Submit Searches:** When reasonable suspicion exists that employees have contraband on their person or in their personal belongings, employees may be required to submit to a search. Employees are expected to cooperate with LaSalle Corrections officials during the search of their personal belongings while on the LaSalle Corrections grounds. Upon entering LaSalle Corrections grounds or during routine inspections, employees give implied consent to the search of their person or property. When it is necessary to search the person or property of employees, the search shall be conducted with the authority of the Administrator or senior officer on duty. The employee's vehicle will be considered as part of his belongings as long as it is parked on the grounds of LaSalle Corrections.

LASALLE
CORRECTIONS

47. **Falsification of Employment:** Employees are required to provide complete and accurate information of their employment application and supporting documents.

48. **Subversion of LaSalle Corrections Policies/Procedure/Rules/Regulations:** Employees are prohibited from engaging in conversations, acts or conspiracies with other employees, or other persons in an attempt to subvert lawful orders, rules, regulations, policies and procedures as set forth by LaSalle Corrections management.

49. **Failure to Comply with Required/Mandatory Training:** All employees are required certain training such as Basic Jailer Certification, etc. throughout their employment to meet both company, state and federal regulations. Employees must attend and successfully complete all required training as a condition of employment.

50. **Disclosing Private Information:** Employees shall not allow unauthorized persons to have access to records under his/her control. Only authorized employees shall disclose confidential information contained in any records of LaSalle Corrections, and then only to persons authorized to receive this information.

51. **Appearance/Dress Code:** It is the policy of LaSalle Corrections that the appearance and dress of all employees reflect the professional standards of the facility.

    - All Security Officers will wear the uniform provided by the facility.
    - Each officer will report for duty in a clean, ironed uniform with the shirt tucked into the trousers.
    - A black or navy undershirt; if visible. Undershirt required.
    - Black closed toe shoes or boots.
    - Black socks; if visible.
    - Black leather belt (no wider than two (2) inches), with a plain metal buckle.
    - Only caps provided by the facility may be worn.
    - When jackets are not provided, only a plain black windbreaker or jacket without any markings is permitted, unless otherwise approved.
    - Limit of two (2) finger rings, a watch and medical bracelet or necklace.
    - No more than one (1) pair of conservative-style stud earrings per ear.
    - No tongue or bar piercings.

- No employee may carry personal handcuffs, handcuff keys, personal defense devices, pocketknives, personal pagers, or personal cell phone while on duty; without permission from the Warden.
- No extreme or unnatural hair colors; must be approved by the Warden.
- Employees, while in uniform, will not enter bars, lounges, liquor stores or saloons, nor loiter on their premises except as needed in the performance of their duties.
- Uniforms will not be worn during off hours.
- All personnel will limit the length of their fingernails to a conservative length.

**Disciplinary Actions:** If the Warden decides that disciplinary action is a necessary result of the incident, Disciplinary Action will be proposed based upon the guidelines described below:

**Available Penalties**

- Verbal Warning
- Written Reprimand
- Reassignment; assignment to another shift as designated by the Warden
- Demotion in Rank
- Suspension Without Pay – Must be approved by Regional Warden and Director of Human Resources
- Probationary period with Performance Improvement Plan (PIP)

*Based on the severity of the offense

- Dismissal

| **Policy Approval** | | |
|---|---|---|
| Approved for Distribution | Facility Warden | Signature on file |
| Policy Approved by | Chris Bell<br>Regional Warden/PREA Coordinator | Signature on file |
| Policy Approved by | Jay Eason<br>Regional Operations Director | Signature on file |
| Policy Updated by | Randi Clifton<br>Corporate HR Manager | Signature on file |

LASALLE
CORRECTIONS

# EMPLOYEE GENERAL RULES OF CONDUCT ACKNOWLEDGMENT AND RECEIPT

I hereby acknowledge receipt of the employee general rules of conduct of LaSalle Corrections.

I understand and agree that it is my responsibility to read and comply with the employee rules of conduct, and policies and procedures of LaSalle Corrections.

I understand that the employee rule violations and all other written and oral materials provided to me are intended for informational purposes only. The employee rule violations, employee handbook, company practices, and/or other communications do not create an employment contract or term. I understand that the rules of conduct and policies and procedures, both in the handbook and those communicated to me in any other fashion, are subject to interpretation, review, and change by management at any time without notice.

I further agree that neither this document nor any other communication shall bind the company to employ me now or hereafter and that my employment may be terminated by me or the company without reason at any time. I understand that no representative of the company has any authority to enter into any agreement for employment for any specified period of time or to assure any other personnel action or to assure any benefits or terms or conditions of employment, or make any agreement contrary to the foregoing.

I also understand and agree that this agreement may not be modified orally and that only a managing agent of the company may make a commitment for employment. I also understand that if such an agreement is made, it must be in writing and signed by the CEO of LaSalle Management Company.

____________________________________

Employee's Name in Print

____________________________________

Signature of Employee

____________________________________

Date Signed by Employee

______________________________________________________________

Signature of LMC Representative Title Date

**TO BE PLACED IN EMPLOYEE'S PERSONNEL FILE**

LASALLE CORRECTIONS

# EMPLOYEE HANDBOOK ACKNOWLEDGMENT AND RECEIPT

I hereby acknowledge receipt of the employee handbook of LaSalle Management Company.

I understand and agree that it is my responsibility to read and comply with the policies in the handbook.

I understand that the handbook and all other written and oral materials provided to me are intended for informational purposes only. The employee handbook, company practices, nor other communications create an employment contract or term. I understand that the policies and benefits, both in the handbook and those communicated to me in any other fashion, are subject to interpretation, review, and change by management at any time without notice. The Employee Handbook will be used in conjunction with other policies and procedures for purposes of recognition and discipline.

I further agree that neither this document nor any other communication shall bind the company to employ me now or hereafter and that my employment may be terminated by me or the company without reason at any time. I understand that no representative of the company has any authority to enter into any agreement for employment for any specified period of time or to assure any other personnel action or to assure any benefits or terms or conditions of employment, or make any agreement contrary to the foregoing. This signed document will be placed in the employee file.

I also understand and agree that this agreement may not be modified orally and that only the president of the company may make a commitment for employment. I also understand that if such an agreement is made, it must be in writing and signed by the president of the company.

Dawn Wooten

Employee's Name in Print

Dawn Wooten

Signature of Employee

10/3/2019

Date Signed by Employee

| Ko McKee | HR Clerk | 10/3/19 |
|---|---|---|
| Signature of LMC Representative | Title | Date |



EXHIBIT 17 Wooten

PENGAD 800-631-6989

CONFIDENTIAL

# NO CALL-NO SHOW POLICY

LaSalle Corrections Irwin County Detention Center (ICDC) has a No Call-No Show (NCNS) Policy requiring all employees to call the Sergeant and/or Lieutenant on duty (or their department supervisor) no less than two (2) hours before their shift begins if they are unable to report to work. If you are going to be late or unable to report to work, you are required to call in to the supervising officer or department supervisor before your shift starts.

Voice mails, texting, messaging or any other means of contact are not acceptable; you must personally speak on the phone to the Sergeant or Lieutenant on duty or department supervisor. If you do not report to work and you do not speak to the appropriate supervisor, this will be considered a NCNS and may be grounds for application of disciplinary action, as outlined in the Employee Handbook. Additionally, this NCNS Policy applies to overtime days. ICDC will document the NCNS as an indication that you have voluntarily quit without notification. Furthermore, termination due to No Call-No Show may also affect any unemployment benefits.

The No Call-No Show Policy also applies to any appointment you make involving ICDC. This is to include, but is not limited to, orientations, training classes, evaluations, physicals and drug screens. If you do not call before the time you are to make your appointment and notify ICDC that you will be late or unable to make the appointment, it may be grounds for disciplinary action, up to and including termination.

I have read the statement above and understand my responsibility in reporting to LaSalle Corrections Irwin County Detention Center in the event of my absence.

Dawn Wooten

Signature

Dawn Wooten

Printed Name

10/3/2019

Date

EXHIBIT
18
Wooten
PENGAD 800-631-6989

R041019

CONFIDENTIAL

# NO CALL-NO SHOW POLICY

LaSalle Corrections Irwin County Detention Center has a No Call-No Show Policy requiring all officers to call the Sergeant and/or Lieutenant on duty no less than two (2) hours before their shift begins if they are unable to report to work. If you are going to be late or unable to report to work, you are required to call in to the supervising officer before your shift starts. Voice mails are not acceptable; you must personally speak to the Sergeant or Lieutenant on duty. If you do not report to work and you do not speak to a shift supervisor, this will be considered a No Call-No Show and will be grounds for termination. All other employees are required to call their immediate supervisor prior to their start time if they are unable to report to work. LaSalle Corrections Irwin County Detention Center will document the No Call-No Show as an indication that you have voluntarily quit without notification. Furthermore, a No Call-No Show may also affect any unemployment benefits.

The No Call-No Show Policy also applies to any appointment you make involving LaSalle Corrections Irwin County Detention Center. This is to include, but is not limited to, orientations, training classes, evaluations, physicals and drug screens. If you do not call before the time you are to make your appointment and notify LaSalle Corrections Irwin County Detention Center that you will be late or unable to make the appointment, it may be grounds for termination.

I have read the statement above and understand my responsibility in reporting to LaSalle Corrections Irwin County Detention Center if I am unable to report to work.

D Wooten Lpn
Signature

Dawn Wooten
Printed Name

5/3/14
Date

EXHIBIT 19 Wooten
PENGAD 800-631-6989

LaSalle_00322

CONFIDENTIAL

# NO CALL-NO SHOW POLICY

LaSalle Corrections Irwin County Detention Center has a No Call-No Show Policy requiring all officers to call the Sergeant and/or Lieutenant on duty no less than two (2) hours before their shift begins if they are unable to report to work. If you are going to be late or unable to report to work, you are required to call in to the supervising officer before your shift starts. Voice mails are not acceptable; you must personally speak to the Sergeant or Lieutenant on duty. If you do not report to work and you do not speak to a shift supervisor, this will be considered a No Call-No Show and will be grounds for termination. All other employees are required to call their immediate supervisor prior to their start time if they are unable to report to work. LaSalle Corrections Irwin County Detention Center will document the No Call-No Show as an indication that you have voluntarily quit without notification. Furthermore, a No Call-No Show may also affect any unemployment benefits.

The No Call-No Show Policy also applies to any appointment you make involving LaSalle Corrections Irwin County Detention Center. This is to include, but is not limited to, orientations, training classes, evaluations, physicals and drug screens. If you do not call before the time you are to make your appointment and notify LaSalle Corrections Irwin County Detention Center that you will be late or unable to make the appointment, it may be grounds for termination.

I have read the statement above and understand my responsibility in reporting to LaSalle Corrections Irwin County Detention Center if I am unable to report to work.

SWooten LPN
Signature

Dawn N. Wooten
Printed Name

6/11/2014
Date

EXHIBIT
20
Wooten
PENGAD 800-631-6989

CONFIDENTIAL

LASALLE
CORRECTIONS

# Letter of Correction

☒Counseling #1 ☐Warning

Employee: Wooten, Dawn

Unit/Department: Medical

Last four of SSN:

Date of Corrective Action: 06/22/20

Reason for this action (Cite the date, the employee's action(s), and rules and regulations violated):

06/09/20-Employee was over 30 minutes late to her shift without giving any notice to supervisor. Rule #1, #2, #3,#5

Was employee aware of rules and regulations violated? ☒Yes ☐No

Corrective Action Guidelines provided to employee in this session:

Upon Employment, every new hire is giving a LaSalle Handbook. Nurse Wooten also had several conversations and meetings with Warden Paulk, Nurse Cole, and Nurse Brown.

Nature of employee's response:

This session is considered a preliminary disciplinary action, meant to be constructive in nature, and does not result in a penalty. However, it will remain in the employee's file and will be considered as part of the disciplinary record for 24 months. The employee's signature below verifies he/she received a copy of this Letter of Correction.

6-25-20

Employee Signature and Date

EXHIBIT
22
Wooten
PENGAD 800-631-6989

Supervisor Signature and Date



Rev. 042319

CONFIDENTIAL

LaSalle Corrections

# EMPLOYEE OFFENSE AND PREHEARING INVESTIGATION REPORT

**Purpose:** This form is used to record alleged violations of rules or regulations by employees. It also serves as a prehearing investigation report. If additional space is needed for any portion of this report, a continuation sheet may be attached.

**I. To be completed by the Charging Official:**

**Employee Name:** Wooten (Last) Dawn (First) (MI) **SSN:**

**Payroll Job Title:** Nurse-LPN **Date of Incident:** 06/09 (mm/dd/yyyy)

Description of employee's specific conduct. Do not reference rule number or describe the rule:

Nurse Wooten was over 30 minutes late to her shift on 06/09/20 without giving proper notice of her tardiness

**The employee's conduct may be a violation of rule number:** Rule #1

Shanise Bell DON BSN RN-CCHP — **Charging Official Name and Title (print)**

Shanise Bell BSN — **Signature**

6·25·20 — **Date**

**II. Employee's Statement:** The prehearing investigator shall obtain an employee's statement:

**Employee's Signature:** ____________________ **Date:** ____________________



LaSalle_00561

CONFIDENTIAL

**III. Witnesses:** Attach All Witness Statements or Interview Statements

**I. Prehearing Investigator's Review and Recommendation:**

**Employee Hearing:** ☐ **Yes** ☐ **No** **If yes, alleged rule violation number(s):** Rule #1, Rule #2, Rule #3, Rule #5

**Comments:** Nurse Wooten has continously not adhered to the handbook in reference to the above mentioned rules. She has continously been late for her shift which in return causes unneccessary overtime for the offgoing shift. Several conversation and meeting have been held with Nurse Wooten with Warden Paulk, the previous HSA, and myself with regards to her attendence.

Lakeysa Brown HSA, BSN-RN-CCHP
**Investigator's Name and Title (print)**

Lakeysa Brown BSN RN
**Signature**

6/25/20
**Date**

**II. Reprimanding Authority's Action:**

☐Proceed to employee hearing. Alleged rule violation number:
☐No employee hearing and no action taken.
☐No employee hearing and other action taken, such as additional training. Attach explanation of action taken.

**Reprimanding Authority's Name and Title** **Signature** **Date**

CONFIDENTIAL

LASALLE
CORRECTIONS

# Letter of Correction

☒Counseling #2 ☐Warning

Employee: Wooten, Dawn

Unit/Department: Medical

Last four of SSN:

Date of Corrective Action: 06/22/20

Reason for this action (Cite the date, the employee's action(s), and rules and regulations violated):

06/14/20-Employee was over 30 minutes late to her shift without giving any notice to supervisor. Rule #1, #2, #3,#5

Was employee aware of rules and regulations violated? ☒Yes ☐No

Corrective Action Guidelines provided to employee in this session:

Upon Employment, every new hire is giving a LaSalle Handbook. Nurse Wooten also had several conversations and meetings with Warden Paulk, Nurse Cole, and Nurse Brown.

Nature of employee's response:

This session is considered a preliminary disciplinary action, meant to be constructive in nature, and does not result in a penalty. However, it will remain in the employee's file and will be considered as part of the disciplinary record for 24 months. The employee's signature below verifies he/she received a copy of this Letter of Correction.

[Employee Signature] and Date

Shawnze Bellamy RN 6-25-20

Supervisor Signature and Date

EXHIBIT
23
Wooten
PENGAD 800-631-6989

CONFIDENTIAL

LaSalle Corrections

## EMPLOYEE OFFENSE AND PREHEARING INVESTIGATION REPORT

**Purpose:** This form is used to record alleged violations of rules or regulations by employees. It also serves as a prehearing investigation report. If additional space is needed for any portion of this report, a continuation sheet may be attached.

**I. To be completed by the Charging Official:**

**Employee Name:** Wooten Dawn **SSN:**

Last First MI

**Payroll Job Title:** Nurse-LPN **Date of Incident:** 06/ 14

(mm/dd/yyyy)

Description of employee's specific conduct. Do not reference rule number or describe the rule:

Nurse Wooten was over 30 minutes late to her shift on 06/ 14/ 20 without giving proper notice of her tardiness

**The employee's conduct may be a violation of rule number:** Rule #1

Shanise Bell DON BSN RN-CCHP — Shanise Bell BSN — 6·25·20

**Charging Official Name and Title (print)** **Signature** **Date**

**II. Employee's Statement:** The prehearing investigator shall obtain an employee's statement:

**Employee's Signature:** ______________________ **Date:** ______________________

**III. Witnesses:** Attach All Witness Statements or Interview Statements

**I. Prehearing Investigator's Review and Recommendation:**

**Employee Hearing:** ☐ **Yes** ☐ **No** **If yes, alleged rule violation number(s):** Rule #1, Rule #2, Rule #3, Rule #5

**Comments:** Nurse Wooten has continously not adhered to the handbook in reference to the above mentioned rules. She has continously been late for her shift which in return causes unneccessary overtime for the offgoing shift. Several conversation and meeting have been held with Nurse Wooten with Warden Paulk, the previous HSA, and myself with regards to her attendence.

| Investigator's Name and Title (print) | Signature | Date |
|---|---|---|
| Lakeysa Brown HSA,BSN-RN-CCHP | | 6/25/20 |

**II. Reprimanding Authority's Action:**

☐Proceed to employee hearing. Alleged rule violation number:
☐No employee hearing and no action taken.
☐No employee hearing and other action taken, such as additional training. Attach explanation of action taken.

| Reprimanding Authority's Name and Title | Signature | Date |
|---|---|---|
| | | |

CONFIDENTIAL

LASALLE
CORRECTIONS

# Letter of Correction

☒Counseling #3 ☐Warning

Employee: Wooten, Dawn

Unit/Department: Medical

Last four of SSN:

Date of Corrective Action: 06/22/20

Reason for this action (Cite the date, the employee's action(s), and rules and regulations violated):

06/17/20-Employee was over 30 minutes late to her shift without giving any notice to supervisor. Rule #1, #2, #3,#5

Was employee aware of rules and regulations violated? ☒Yes ☐No

Corrective Action Guidelines provided to employee in this session:

Upon Employment, every new hire is giving a LaSalle Handbook. Nurse Wooten also had several conversations and meetings with Warden Paulk, Nurse Cole, and Nurse Brown.

Nature of employee's response:

This session is considered a preliminary disciplinary action, meant to be constructive in nature, and does not result in a penalty. However, it will remain in the employee's file and will be considered as part of the disciplinary record for 24 months. The employee's signature below verifies he/she received a copy of this Letter of Correction.

EXHIBIT 24 Wooten
PENGAD 800-631-6989

...d Date

Supervisor Signature and Date

CONFIDENTIAL

LaSalle Corrections

**EMPLOYEE OFFENSE AND PREHEARING INVESTIGATION REPORT**

**Purpose:** This form is used to record alleged violations of rules or regulations by employees. It also serves as a prehearing investigation report. If additional space is needed for any portion of this report, a continuation sheet may be attached.

**I. To be completed by the Charging Official:**

**Employee Name:** Wooten Dawn **SSN:**

Last First MI

**Payroll Job Title:** Nurse-LPN

**Date of Incident:** 06/17

(mm/dd/yyyy)

Description of employee's specific conduct. Do not reference rule number or describe the rule:

Nurse Wooten was over 30 minutes late to her shift on 06/17/20 without giving proper notice of her tardiness

**The employee's conduct may be a violation of rule number:** Rule #1

Shanise Bell DON BSN RN-CCHP Shanise Bell RN 6·25·20

**Charging Official Name and Title (print)** **Signature** **Date**

**II. Employee's Statement:** The prehearing investigator shall obtain an employee's statement:

**Employee's Signature:** ______________________ **Date:** ______________________



LaSalle_00567

CONFIDENTIAL

**III. Witnesses:** Attach All Witness Statements or Interview Statements

**I. Prehearing Investigator's Review and Recommendation:**

**If yes, alleged rule**

**Employee Hearing:** ☐ **Yes** ☐ **No violation number(s):** Rule #1, Rule #2,Rule #3, Rule #5

**Comments:** Nurse Wooten has continously not adhered to the handbook in reference to the above mentioned rules. She has continously been late for her shift which in return causes unneccessary overtime for the offgoing shift. Several conversation and meeting have been held with Nurse Wooten with Warden Paulk, the previous HSA, and myself with regards to her attendence.

Lakeysa Brown HSA,BSN-RN-CCHP | Lakeysa Brown BSN, RN | 6/25/20

**Investigator's Name and Title (print)** **Signature** **Date**

**II. Reprimanding Authority's Action:**

☐Proceed to employee hearing. Alleged rule violation number:
☐No employee hearing and no action taken.
☐No employee hearing and other action taken, such as additional training. Attach explanation of action taken.

**Reprimanding Authority's Name and Title** **Signature** **Date**

CONFIDENTIAL

LASALLE
CORRECTIONS

# Letter of Correction

☐Counseling ☒Warning

Employee: Wooten, Dawn

Unit/Department: Medical

Last four of SSN:

Date of Corrective Action: 06/22/20

Reason for this action (Cite the date, the employee's action(s), and rules and regulations violated):

06/18/20-Employee was over 30 minutes late to her shift without giving any notice to supervisor. Rule #1, #2, #3,#5

Was employee aware of rules and regulations violated? ☒Yes ☐No

Corrective Action Guidelines provided to employee in this session:

Upon Employment, every new hire is giving a LaSalle Handbook. Nurse Wooten also had several conversations and meetings with Warden Paulk, Nurse Cole, and Nurse Brown.

Nature of employee's response:

This session is considered a preliminary disciplinary action, meant to be constructive in nature, and does not result in a penalty. However, it will remain in the employee's file and will be considered as part of the disciplinary record for 24 months. The employee's signature below verifies he/she received a copy of this Letter of Correction.

Employee Signature and Date

Supervisor Signature and Date

EXHIBIT
25
Wooten
PENGAD 800-631-6989



Rev. 042319

CONFIDENTIAL

LaSalle Corrections

## EMPLOYEE OFFENSE AND PREHEARING INVESTIGATION REPORT

**Purpose:** This form is used to record alleged violations of rules or regulations by employees. It also serves as a prehearing investigation report. If additional space is needed for any portion of this report, a continuation sheet may be attached.

**I. To be completed by the Charging Official:**

**Employee Name:** Wooten Dawn **SSN:**

Last First MI

**Payroll Job Title:** Nurse-LPN

**Date of Incident:** 06/18

(mm/dd/yyyy)

Description of employee's specific conduct. Do not reference rule number or describe the rule:

Nurse Wooten was over 30 minutes late to her shift on 06/18/20 without giving proper notice of her tardiness

**The employee's conduct may be a violation of rule number:** Rule #1

Shanise Bell DON BSN RN-CCHP — Shanise Bell BSN — 6-25-20

**Charging Official Name and Title (print)** **Signature** **Date**

**II. Employee's Statement:** The prehearing investigator shall obtain an employee's statement:

**Employee's Signature:** ______________________ **Date:** ______________________



LaSalle_00570

CONFIDENTIAL

**III. Witnesses:** Attach All Witness Statements or Interview Statements

**I. Prehearing Investigator's Review and Recommendation:**

**If yes, alleged rule**

**Employee Hearing:** ☐ **Yes** ☐ **No violation number(s):** Rule #1, Rule #2,Rule #3, Rule #5

**Comments:** Nurse Wooten has continously not adhered to the handbook in reference to the above mentioned rules. She has continously been late for her shift which in return causes unneccessary overtime for the offgoing shift. Several conversation and meeting have been held with Nurse Wooten with Warden Paulk, the previous HSA, and myself with regards to her attendence.

Lakeysa Brown HSA,BSN-RN-CCHP — *Lakeysa Brown BSN, RN* — 6/25/20

**Investigator's Name and Title (print)** — **Signature** — **Date**

**II. Reprimanding Authority's Action:**

☐Proceed to employee hearing. Alleged rule violation number:
☐No employee hearing and no action taken.
☐No employee hearing and other action taken, such as additional training. Attach explanation of action taken.

**Reprimanding Authority's Name and Title** — **Signature** — **Date**

CONFIDENTIAL

T&A.NET - LaSalle Management Co
Employee Timecards 6/7/2020 to 6/18/2020 printed at 11:52 on 6/19/2020

Page 24

| Date | Employee | Punches | REG | OT | Vaca | Holiday | Sick | Totals | Timecard Reason |
|---|---|---|---|---|---|---|---|---|---|
| EMPLOYEE: Wooten , Dawn N | | | | | | | | | |
| | | | | | | | | | |
| 6/14/2020 | | 6:38AM,6:53PM | 12.25 | | | | | 12.25 | |
| 6/17/2020 | | 6:38AM,6:13PM | 11.58 | | | | | 11.58 | |
| 6/18/2020 | | 6:39AM,7:11PM | 12.53 | | | | | 12.53 | |
| 6/8/2020 | | 6:23AM,6:51PM | 12.47 | | | | | 12.47 | |
| 6/9/2020 | | 6:46AM,6:27PM | 11.68 | | | | | 11.68 | |
| IR3783130 | Wooten, Dawn | | 60.52 | | | | | 60.52 | |

PENGAD 800-631-6989
EXHIBIT
26
Wooten

CONFIDENTIAL

## Wooten

Shanise Bell <sbell@irwincdc.com>
Wed 6/24/2020 5:43 PM
To: Joan Whitley <jwhitley@irwincdc.com>
Cc: Frank Albright <frank.albright@irwincdc.com>; Lakeysia Brown <lakeysiabrown@irwincdc.com>

Joan, per my conversation with Deputy Warden Albright, he suggested that you reach out to Nurse Wooten for follow up with her Covid results. Nurse Brown nor myself have heard anything from her since Monday 06/22/20.Can you reach out to her and see if you can get an update for us in regards to her results and her plans to return back to work?

Respectfully,

*Shanise Bell, BSN RN-CCHP*

LaSalle Management Company, LLC
Irwin County Detention Center
132 Cotton Drive
Ocilla, GA 31774
(229)-468-4121- work
sbell@irwincdc.com

PENGAD 800-631-6989
EXHIBIT
29
Wooten

CONFIDENTIAL

## Nurse Wooten

Shanise Bell <sbell@irwincdc.com>

Thu 6/25/2020 2:17 PM

To: Joan Whitley <jwhitley@irwincdc.com>

Cc: David Paulk <dpaulk@irwincdc.com>; Lakeysia Brown <lakeysiabrown@irwincdc.com>; Frank Albright <frank.albright@irwincdc.com>

Good Afternoon Joan, just wanted to follow up on our earlier conversation in regards to you reaching out to Nurse Dawn Wooten. Nurse Wooten is scheduled to work this weekend and Nurse Brown nor myself have heard from her since Monday 06/22/20. Can you please get back to me as soon as possible so that we can find coverage otherwise we will have to cover shift ourselves.

Respectfully,

*Shanise Bell, BSN RN-CCHP*

LaSalle Management Company, LLC
Irwin County Detention Center
132 Cotton Drive
Ocilla, GA 31774
(229)-468-4121- work
sbell@irwincdc.com

EXHIBIT
30
Wooten
PENGAD 800-631-6989

LaSalle_00558

CONFIDENTIAL

wooten

Joan Whitley <jwhitley@irwincdc.com>
Wed 7/1/2020 11:45 AM
To: Frank Albright <frank.albright@irwincdc.com>

On 6/25/20 I reached out to LPN D. Wooten to check her status on returning to work. She stated she was still waiting for her COVID results to come in so she could have a [procedure] completed. She said she was hoping to be able to have it completed by the next day, which was a Friday, or by Monday at the latest once the test results came back. I told her that since we do not have a physician's excuse yet to cover her absences over the weekend, she would need to call in to RN L. Brown each scheduled work day that she misses work, and if she couldn't reach RN Brown, she was to contact RN S. Bell, according to the call out procedure. She repeated back to me that she would call in each scheduled work day and expected to be back at work on her next scheduled work day after the weekend, which would be Wednesday, July 1st.

Thank you,
Joan Whitley
Human Resources
LaSalle Corrections Irwin County Detention Center
Ph: 229-468-4121 x243
Fax: 229-468-4186

PENGAD 800-631-6989
EXHIBIT
31
Wooten

CONFIDENTIAL

# Re: Wooten

Lakeysia Brown <lakeysiabrown@irwincdc.com>
Sun 6/28/2020 5:28 PM
To: Joan Whitley <jwhitley@irwincdc.com>; Shanise Bell <sbell@irwincdc.com>

She has not submitted a doctor's note

Best regards,

*Lakeysa Brown BSN, RN, CCHP*

*Director of Nursing*
LaSalle Management Company, LLC
Irwin County Detention Center
229-468-4400 **Office**
229-472-0277 **Work Cell**
229-468-4401 **Fax**

---

**From:** Joan Whitley <jwhitley@irwincdc.com>
**Sent:** Sunday, June 28, 2020 4:08 PM
**To:** Shanise Bell <sbell@irwincdc.com>; Lakeysia Brown <lakeysiabrown@irwincdc.com>
**Subject:** Re: Wooten

Has she sent anyone a copy of the doctor's note that put her out initially or any time after? And submit a write up for each day she has been NCNS since I spoke to her Thursday.

Thank you,
Joan Whitley
HR Manager
LaSalle Corrections
Irwin County Detention Center
jwhitley@irwincdc.com
Ph: 229-468-4121 x243
Fax: 229-468-4186

---

**From:** Lakeysia Brown <lakeysiabrown@irwincdc.com>
**Sent:** Sunday, June 28, 2020 7:04:35 AM
**To:** Joan Whitley <jwhitley@irwincdc.com>; Shanise Bell <sbell@irwincdc.com>
**Subject:** Re: Wooten

EXHIBIT
32
Wooten
PENGAD 800-631-6989

Good morning,
Dawn Wooten did not call out today (6/28/20).
Sent from my iPhone

CONFIDENTIAL

> On Jun 27, 2020, at 9:42 PM, Lakeysia Brown <lakeysiabrown@irwincdc.com> wrote:
>
> Good evening,
> Dawn Wooten did not call out to me for today as she was instructed to do so by Joan

CONFIDENTIAL

## Re: Wooten's schedule

Lakeysia Brown <lakeysiabrown@irwincdc.com>

Wed 7/22/2020 12:50 PM

To: Joan Whitley <jwhitley@irwincdc.com>

She is accommodating what we have open on the schedule.We have people taking vacation and time off. Those are the days we have open. Those are the only days we open.

Sent from my iPhone

On Jul 22, 2020, at 12:33 PM, Joan Whitley <jwhitley@irwincdc.com> wrote:

> The proposed schedule will need to be amended. From any Sunday through Saturday week, she cannot work more than 28 hours (giving her a 1 hour "cushion" in case she goes over). Due to federal guidelines, anyone working as a part-time employee cannot work 30 or more hours in a week without being classified as full time. Her schedule as presented have these totals and some will need to be adjusted:
>
> 7/24 and 7/25 = 24 hours in one week
> 7/26-8/1 = 36 hours
> 8/3-8/7 = 40 hours
> 8/9-8/15 = 24 hours
> 8/16-8/22 = 36 hours
> 8/23-8/29 = 36 hours
>
> Thank you,
> Joan Whitley
> Human Resources
> LaSalle Corrections Irwin County Detention Center
> Ph: 229-468-4121 x243
> Fax: 229-468-4186

PENGAD 800-631-6989 EXHIBIT 33 Wooten

LaSalle_00581

Verizon 10:45 AM

CONFIDENTIAL

W LB

2 People >

Good Afternoon Wooten, these are the following days you have been scheduled to work

July 24,25,26 : 6a-6p
July 31 : 6a-6p
August 1 : 6a-6p
August 3,4,5,6,7 : 7a-3p
August 9 : 6a-6p
August 15,16 : 6a-6p
August 18: 6p-11p
August 22,23: 6a-6p
August 27: 6p-11p
August 29: 6a-6p

I need to have a response or answer by the close of business today.

Wooten

W Good afternoon Ladies these days are well with me.

Yesterday 2:50 PM

Text Message

EXHIBIT 34 Wooten

PENGAD 800-631-6989

Verizon 10:45 AM

CONFIDENTIAL

W LB

2 People >

August 22,23: 6a-6p
August 27: 6p-11p
August 29: 6a-6p

I need to have a response or answer by the close of business today.

Wooten

Good afternoon Ladies these days are well with me.

Yesterday 2:50 PM

Lakeysia Brown

Ok Thank you

Wooten

Your Welcome Mrs. Brown

Ok thanks see you Friday

Wooten

Yes maam

Text Message

Verizon LTE 5:45 PM

CONFIDENTIAL

W LB

2 People >

Wooten

Good afternoon Ladies these days are well with me.

Yesterday 2:50 PM

Lakeysia Brown

Ok Thank you

Wooten

Your Welcome Mrs. Brown

Ok thanks see you Friday

Wooten

Yes maam

Today 5:19 PM

Nurse Wooten please check your email there has been a schedule change and please respond to the email once you review it. Thanks

Text Message

CONFIDENTIAL

## Schedule

Shanise Bell <sbell@irwincdc.com>

Thu 8/13/2020 5:19 PM

To: Dawn Wooten <5070653.dw@gmail.com>; Lakeysia Brown <lakeysiabrown@irwincdc.com>

Good Evening Ms. Wooten, I have the following dates available. Please let me know if you want any of these days. Also, please don't forget to send me your availability for the month of September. I am currently working on September so if you could send me your availability, I can put you down for some days. Here are the days for the upcoming weeks:

August 18, 19 from 10:00 a.m. -6:oo p.m.
August 27, 28 from 10:00 a.m- 6:00 p.m
August 30 from 10:00a.m. -6:00 p.m.

Please respond to this email by the close of business tomorrow 08/14/2020. I look forward to hearing from you.

Respectfully,

*Shanise Bell, BSN RN-CCHP*

LaSalle Management Company, LLC
Irwin County Detention Center
132 Cotton Drive
Ocilla, GA 31774
(229)-468-4121- work
sbell@irwincdc.com

EXHIBIT 37 Wooten PENGAD 800-631-6989

CONFIDENTIAL

## Open Shifts for September

Shanise Bell <sbell@irwincdc.com>
Fri 8/14/2020 9:49 AM
To: Dawn Wooten <5070653.dw@gmail.com>
Cc: Lakeysia Brown <lakeysiabrown@irwincdc.com>

Good Morning Ms. Wooten, we have the following dates available thus far for September. There will be more to come, and I will email them to you as soon as possible. Here is what I have so far.

September 16, 2020 8a-5p
September 23, 24 from 6a-6p
September 28, 29 from 6a-6p.

Please let me know by the close of business today if these dates are okay with you. I look forward to hearing from you. Have a Fantastic Friday!!

Respectfully,

*Shanise Bell, BSN RN-CCHP*

LaSalle Management Company, LLC
Irwin County Detention Center
132 Cotton Drive
Ocilla, GA 31774
(229)-468-4121- work
sbell@irwincdc.com

EXHIBIT
PENGAD 800-631-6989
38
Wooten

CONFIDENTIAL

Re: Open Shifts

Shanise Bell <sbell@irwincdc.com>
Fri 8/7/2020 4:10 PM
To: Dawn Wooten <5070653.dw@gmail.com>

Thanks for letting me know. Please don't forget to send me your available days for next month, so that I can compare it to our need and send you some days. Have a blessed and wonderful weekend!

Respectfully,

*Shanise Bell, BSN RN-CCHP*

LaSalle Management Company, LLC
Irwin County Detention Center
132 Cotton Drive
Ocilla, GA 31774
(229)-468-4121- work
sbell@irwincdc.com

---

**From:** Dawn Wooten <5070653.dw@gmail.com>
**Sent:** Friday, August 7, 2020 4:04 PM
**To:** Shanise Bell <sbell@irwincdc.com>
**Subject:** Re: Open Shifts

Goodevening. I'm unavailable for these days.

Thanks
Wooten

On Thu, Aug 6, 2020, 3:53 PM Shanise Bell <sbell@irwincdc.com> wrote:

Good Evening Nurse Wooten, I have following shifts open if you would like them. Please respond to this email by close of business tomorrow so that I can secure those dates for you.

August 10,2020 10am-6pm
August 11, 2020 10 am -6pm
August 12, 2020 10am-6pm

EXHIBIT
39
Wooten
PENGAD 800-631-6989

CONFIDENTIAL

Respectfully,

*Shanise Bell, BSN RN-CCHP*

LaSalle Management Company, LLC
Irwin County Detention Center
132 Cotton Drive
Ocilla, GA 31774
(229)-468-4121- work
sbell@irwincdc.com

CONFIDENTIAL

## Schedule

Shanise Bell <sbell@irwincdc.com>

Wed 8/5/2020 8:14 AM

To: Dawn Wooten <5070653.dw@gmail.com>

Cc: Lakeysia Brown <lakeysiabrown@irwincdc.com>

Good Morning Nurse Wooten, Can you please send me your availability for September so that I can see if it meets our needs for September? Once I receive your days I will send you a final calendar for September.

Respectfully,

*Shanise Bell, BSN RN-CCHP*

LaSalle Management Company, LLC
Irwin County Detention Center
132 Cotton Drive
Ocilla, GA 31774
(229)-468-4121- work
sbell@irwincdc.com

EXHIBIT
40
Wooten
PENGAD 800-631-6989