# EXHIBIT 3

**Q. If a person who was detained at Irwin County Detention Center was going to be taken off-site for a medical appointment at a doctor's office, would -- to your knowledge, would anybody on-site at ICDC prepare a package of paperwork to travel with that detainee?**
A. To my knowledge, I'm unsure.
**Q. Unsure?**
A. If they packed up paperwork for them to go to a physician's office.
**Q. What about to pack them up to go to a hospital, any paperwork that would go with them, to your knowledge?**
A. To my knowledge, yes, I'm sure they packed up a face chart.
**Q. A what chart?**
A. Face chart.
**Q. Face?**
A. Face chart.
**Q. F-A-C-E?**
A. Uh-huh.
**Q. Is that an acronym?**
A. No. Face -- face chart.
**Q. What does that refer to?**
A. Had their demographics on the front of that paperwork, present complaint.

**Q. Present complaint being medical complaint?**
A. Present situation. Chest pain, headache, nosebleed.
**Q. Medical request form would be part of that?**
A. I'm unsure.
**Q. Have you ever been a plaintiff in a lawsuit?**
A. No.
**Q. Have you ever been a plaintiff in any other capacity?**
A. No.
**Q. And you're not a plaintiff currently in a lawsuit filed against LaSalle?**
A. Yes, I guess.
**Q. And that's pending in the Middle District of Georgia, to your knowledge?**
A. To my knowledge, yes.
**Q. Have you ever filed a complaint with the Office of the Inspector General?**
A. Yes.
**Q. When did you make that filing?**
A. I'm unsure of the date.
**Q. September 2020 sound right?**
A. That sound about right.
**Q. How did you file the OIG complaint -- or strike that. No, never mind.**

**How did you file the OIG complaint logistically?**
MS. MCNAMARA: Object -- object to form.
BY MS. EVANS:
**Q. You can answer.**
A. Rephrase the question.
**Q. To file the OIG complaint, did you take a piece of paper, a packet of paper to a building? Did you do something online or did you file it in some other way?**
MS. MCNAMARA: Same objection.
THE WITNESS: Restructure the question.
BY MS. EVANS:
**Q. How did you get your OIG complaint -- or strike that.**
**How did you get your complaints that you wanted to tell the OIG about to them?**
A. I'm unsure.
**Q. Did you file something online?**
A. I'm unsure.
**Q. Did someone do it on your behalf?**
A. I sat with Project South. So Project South and I sat or talked when I talked with --
**Q. And I don't want to know anything that you told your lawyers. I'm sure they -- they told you that.**
A. No.
**Q. But you sat with your -- you sat with Project**

**South and they submitted something to the OIG on your behalf?**

A. Yes.

**Q. Did they do that online, to your knowledge?**

A. I'm unsure.

**Q. I'm going to hand you and your counsel what's been previously marked in this case as Exhibit 2, even though I know it's got a big Exhibit A on the front. It's just -- it was attached to something where it was Exhibit A. You can take as much time as you need to flip through Exhibit 2 and then I have some questions for you. You can just tell me when you're ready.**

(Tendered.)

MR. BATSON: Would you mind if we told the other folks that this is from -- what case it's from and what document number it is?

MS. EVANS: It's Exhibit 2.

MR. BATSON: Well, I mean, the Bates --

MS. EVANS: Oh, it was filed -- it was an attachment to a pleading that, I think, NBCUniversal filed at some point in -- in the current case.

MR. BATSON: Okay. And that's Doc 51-1?

MS. EVANS: That's what it says at the top of the page.

MR. BATSON: Okay.
BY MS. EVANS:
**Q. Have you had a chance to look at Exhibit 2?**
A. Page?
**Q. No. I'm just asking if you've had a chance to look through it before I start asking you questions about it.**
A. (Witness moves head up and down.)
**Q. What's reflected in Exhibit 2 was not what you filed with the OIG, is it?**
MS. MCNAMARA: Objection to form.
THE WITNESS: I'm unsure what you're asking.
BY MS. EVANS:
**Q. Is the letter reflected in Exhibit 2 what you submitted to OIG as your complaint when you first submitted a complaint to OIG?**
A. I'm unsure of what you're asking.
**Q. What was submitted to the OIG when you made your complaints to the OIG?**
MS. MCNAMARA: Objection to form.
THE WITNESS: What are you -- what are you asking? Like, clarify -- what are you asking me?
BY MS. EVANS:

**Q. Let me ask a different question.**
**What is the current status of your complaint to the OIG?**
A. I'm unsure.
**Q. Did you participate in a mediation over that OIG complaint?**
A. I'm unsure. So much time has passed.
(Plaintiff's Exhibit 209, Defendants' Status Update In Support Of Joint Motion For Extension Of Time To Respond To Plaintiff's Complaint In Equity For First Amendment Retaliation, was marked for identification.)
BY MS. EVANS:
**Q. I'm going to hand you what I'm marking as Exhibit 209. (Tendered.)**
**Exhibit 209, for the record, is a document printed off PACR in Ms. Wooten's case against LaSalle Corrections, LaSalle Management Company, LaSalle Southeast, Irwin County Detention Center and David Paulk. Case Number 722-CV-00148. And it's Document 27, entitled "Defendants' status update in support of joint motion for extension of time to respond to plaintiff's complaint in equity for first amendment retaliation."**
**Ms. Wooten, you can take as much time as you**

A. (Complying.)
**Q. And if you could please flip to page 18.**
A. (Complying.)
**Q. Do you see where it says Subsection D, "Detained immigrants and ICDC nurses report high rates of hysterectomies done to immigrant women"?**
A. Yes.
**Q. And you can take time if you would like to, to read the words that are under that subsection that start on page 18 and end toward the middle of page 20. And just let me know when you're ready.**
MR. BATSON: And you asked her to read to where?
MS. EVANS: I'm just asking her to read Subsection D, which goes from page 18 through -- toward the middle of page 20.
MR. BATSON: Okay.
MS. EVANS: As much as she needs to.
MR. BATSON: All right.
MS. EVANS: Before I ask her questions.
BY MS. EVANS:
**Q. Have you had a chance to look at Subsection D?**
A. Yes.
**Q. Did you review Subsection D that is here shown in Exhibit 2 before it was finalized?**

A. Yes, I did.
**Q. Did you have a chance to make additions, subtractions or edits?**
A. Talking with the attorneys with the information inside the document, yeah.
**Q. Yes?**
A. Yes.
**Q. If you could look simultaneously at Exhibit 210, Subsection D on page 18 of that document.**
A. This one?
**Q. Well, Subsection D in Exhibit 2, yes. But then, could you also pull up Exhibit 210 on page 18, Subsection D in that document as well?**
A. (Complying.)
**Q. Do you have both of the Subsection Ds in front of you?**
A. Yes.
**Q. The OIG whistleblower complaint that you -- strike that.**
**Did the OIG whistleblower complaint have a section regarding gynecological care for women who spent time at ICDC?**
A. I'm unsure.
**Q. Do you know if the OIG complaint -- strike that.**
**You're unsure if the OIG whistleblower complaint**

**had a section about gynecological care for women who spent time at ICDC?**
A. I am concurring with the attorneys that assisted in filing the complaint.
**Q. You -- strike that.**
**The OIG complaint was your complaint, true?**
A. OIG was my complaint, talking with the attorneys, my complaint, yes.
**Q. You're the whistleblower?**
A. Yes.
**Q. Your words in that complaint, true?**
A. Yes.
**Q. No one else's?**
A. Nope.
**Q. Were there complaints -- strike that.**
**Were there -- strike that.**
**Was there information in the OIG complaint that you submitted as a whistleblower regarding gynecological care of women who spent time at Irwin County Detention Center?**
A. Rephrase the question. What are you -- what are you asking me?
**Q. In the OIG complaint that you filed as a whistleblower, did you make allegations therein about gynecological care of women who spent time at Irwin**

**County Detention Center?**

A. I talked about the things that they told me.

**Q. So, yes?**

A. I talked about the things that they told me, that the women told me.

**Q. Was the information about gynecological care for women who spent time at Irwin County Detention Center that you made in the OIG whistle complaint, did it look more like what's in Subsection D of Exhibit 210 or more like what's in Subsection D of Exhibit 2?**

MS. MCNAMARA: Objection to form.

THE WITNESS: So what are you asking with the two documents? What are you -- what are you wanting me --

BY MS. EVANS:

**Q. Subsection D of Exhibit 2 is a lot longer than Subsection D in Exhibit 210, true?**

A. Yes, it is.

**Q. Did the information about gynecological care -- strike that.**

**Were your allegations that you made as a whistleblower in your OIG complaint regarding gynecological care for women who spent time at Irwin County Detention Center more like Subsection D in Exhibit 2 or more like Subsection D in Exhibit 210?**

A. Both forms are my words in both forms, so neither one of them outweighs the other. To me, it was my lived story and as to what the attorneys decided to put where and what we put where, in each section. So nothing takes from the other.

MS. EVANS: Move to strike as nonresponsive.

BY MS. EVANS:

**Q. In the OIG complaint that you filed as a whistleblower, was the information in there about gynecological care of women who spent time in Irwin County Detention Center more like what is in Subsection D of Exhibit 2, the longer version, or more like what's in Subsection D of Exhibit 210, the shorter version?**

MR. BATSON: Objection.

MS. MCNAMARA: Objection to form.

MR. BATSON: Objection to form.

THE WITNESS: They're both my words and they both -- one doesn't outweigh the other.

BY MS. EVANS:

**Q. I didn't suggest that one was your words or one wasn't. I am asking: What did the gynecological allegations that you made -- strike that.**

**What did the gynecological allegations about**

A. I reported what I was told.

**Q. Who are "nurses," plural?**

A. I'm unsure who the other nurses were.

**Q. So you wouldn't have put in the information about the other nurses in your OIG complaint, true?**

A. If they done -- they done their talk of -- Project South was monitoring the facility as well and they had already started talking to detainees.

**Q. I'm talking about your OIG complaint. You would have only put information in your OIG complaint that you saw or you heard, true?**

A. And what I was told. So that -- that was circumference to me. Like, I had two other nurses that told me they witnessed the same thing, but were not willing to sit in the seat.

**Q. Who were the two other nurses?**

A. LaKisha Brown and -- oh, I'll think of her name in a minute. I will come back to her name, but I'll think of who she is. You got Zenia Goolsbey that says the same thing.

**Q. Can you spell that for us, please?**

MR. BATSON: Is it Z or V?

THE WITNESS: Z. Z-E-N-I-A G-O-O-L-S-B-Y.

BY MS. EVANS:

**Q. She's a nurse?**
A. She's a nurse. Let me think of Ms. Anna's last name, A-N-N-A. I'll think of her last name in a few minutes.
**Q. Anna Carter?**
A. Carter.
MR. BATSON: Carden or Carter?
THE WITNESS: Carter, C-A-R-T-E-R.
BY MS. EVANS:
**Q. Any other nurses?**
A. Anna Carter and LaKisha Brown, Zenia Goolsbey.
MR. BATSON: And is it NaKisha or LaKisha.
THE WITNESS: LaKisha, L.
MR. BATSON: All right.
BY MS. EVANS:
**Q. Any other nurses?**
A. Not at the moment. I can't think of any at the moment.
**Q. And are LaKisha Brown, Zenia Goolsbey and Anna Carter the ICDC nurses, plural, that are referred to in the heading Subsection D of Exhibit 2?**
MR. BATSON: Objection as to form.
THE WITNESS: (Witness moves head up and down.) My plural nurses would be them.

BY MS. EVANS:
**Q. Did you share information that they shared with you to the OIG in your whistleblower complaint?**
A. I shared, if I'm not mistaken, what I was told and sitting down talking about how I sat with Nurse Brown, who was the supervisor and Anna Carter, who's the co-worker, a question: What is going on?
**Q. And what was said in response to that question?**
A. After being approached from the detained women and I asked them, what is going on? And I had somebody to reply. LaKisha relied, "Girl, he's getting that money." And Ms. Carter put her hands on my hand and told me, "I wouldn't touch that if I was you."
**Q. Did you ask her what she meant by that?**
A. I asked her what she meant by that and they were talking about, but you didn't really have to ask because the supervisor comes out vicariously and said, "Girl, he getting that money." Never did tell me who was the "he," but he's getting that money.
**Q. That's what LaKisha Brown said?**
A. That's what LaKisha Brown said.
**Q. And when did she tell you that?**
A. I want to say we talked before I was dismissed. I was dismissed in July, Ms. Cole passed in May. So I'm going to say between the excerpts of May to my exit out

the door.

**Q. The first sentence under Subsection D on Exhibit 2, do you see where it starts "Several immigrant women"?**

A. Yes.

**Q. "Several immigrant women have reported to Project South their concerns about how many women have received a hysterectomy while detained at ICDC."**

**Do you see that?**

A. I do.

**Q. Was whatever was reported to Project South, was that also reported to you?**

A. It was.

MR. BATSON: Object to the form.

THE WITNESS: I was told the same thing.

BY MS. EVANS:

**Q. And who are those several immigrant women?**

A. I don't have names for the several immigrant women. But every day that I went to the med cart to pass medicines, I was approached by immigrant women with their A numbers, asking what happened to them and some showing scars.

**Q. How many women?**

A. I started out, maybe five. Started out, maybe 15. Come back, maybe the next day, maybe 20. Coming

back, maybe 30, 35, 50.
**Q. Is that where the number tops out, 50?**
A. That's where I was exited out of the door and I'm probably sure that's not where it top out.
**Q. When you -- strike that.**
**The word "several immigrant women" referred to here in Exhibit 2, is that referring to 5, 15, 20, 50, which of those numbers?**
A. Several. Several asked. They never came to the cart as one person, so several each day.
**Q. Did any of those women tell you that they had a hysterectomy?**
A. Several of those women told me they had hysterectomies and various gynecological procedures. The hysterectomy falls up under that gynecological procedure.
**Q. How many said they had a hysterectomy?**
A. Various. The number varies. There were various numbers. Like I say, I was exited so quick from the facility.
**Q. What -- what to what various?**
A. Let's say 15, 20 --
**Q. 15 to 20 --**
A. -- plus.
**Q. 15 to 20 women told you they had a hysterectomy**

A. There was several that I built relationships with in -- inside to -- that they could trust to make sure that they got adequate medical care, so I'm unsure.

**Q. You don't know if she's one of those people that you built a relationship with or not?**

A. I don't. I had a family of women in there.

**Q. Can you name any women that you built a relationship with inside that they could trust to make sure that you were going to ensure that they got adequate medical care?**

A. Not off the top of my head, but Wendy Dial. Wendy Dial was one of those women that I made sure that she was on top of her -- and that's because we -- we -- I stayed on her every day about making sure she was taken care of and answering, researching questions. So she would be one that I could name off the top of my head.

I don't know what Yesinia's last name is, Y-E-S-I-N-I-A. I don't know exactly what her last name is, off the top of my head.

**Q. Anybody else?**

A. Not right now off the top of my head.

**Q. Did Ms. Dial tell you that she had a hysterectomy performed on her?**

A. I didn't get to talk with her. Like I said, I

was zoomed out so quick. I was exited out of the building. It was kind of like, today I find this out, tomorrow I'm gone.

**Q. Well, the third stint was between October 2019 and July 2020, right?**

A. Right.

**Q. Several months, about -- well, you left at the beginning of July, so let's say June.**

**At least eight months, right?**

A. Yes.

**Q. During that eight-month third stint, did Ms. Wendy Dial tell you that she had a hysterectomy performed on her?**

A. I had talked to Wendy, talking about those concerns. It was like a "Find this out for me. What is going on with my body?" And when I made the questions or asked the questions, I was exited.

**Q. Did Ms. -- strike that.**

**Did you look at Ms. Wendy Dial's medical records to confirm what happened to her?**

A. I was exited so quick. So I didn't have a chance to look at anyone else's records, outside of the ones that I had talked to prior on the inside, to being exited. Once it spread, it spread like wildfire and the facility discharged me so quick.

**Q. Did Yesinia tell you that she had a hysterectomy performed on her?**

A. I'm unsure what me and Yesinia talked about at the -- at the time. And she could have been one of the ladies that came -- like I said, they come to me in groups. It wasn't like me and you having a conversation and I could look you in the eyes and gather features to figure out who you were and I'm going to remember who you were the next time. I'm looking at several faces telling me the same thing and asking the same concerns. So could she have been in that group? She could have.

**Q. Do you recall looking at Yesinia's medical records?**

A. And I could have looked at Yesinia -- Yesinia's medical records or no. I looked at so many.

**Q. When was the first time that you raised a concern with anyone at ICDC or LaSalle about gynecological care concerns from the women, if you did?**

A. The first concern, I did. The first concern that I raised was, I want to say we were talking about in the beginning COVID. So we went from COVID to now, I'm in the midst of COVID and the med cart. So COVID around March, around April, you have May.

So in that stem, until my exit out of the door, I talked to Ms. Brown, LaKisha Brown and Ms. Anna Carter

was the first conversation I had coming from the med cart one day, talking to the women wanting to know what is going on with their bodies in these procedures.

And I get, like I said, that rollout from the supervisor, "Girl, he getting that money." And the second thing I get was a pat on the hand saying, "Wooten, you don't want to touch that."

**Q. Did you ever talk to Marion Cole about the gynecological concerns that you were hearing?**

A. Ms. Cole had passed.

**Q. Well, you said this started in March?**

A. In March, gathering information for that. We was COVID in March.

**Q. Did you tell Ms. Cole your concerns about COVID?**

A. My concerns -- we talked about COVID every day.

**Q. But you never talked to Ms. Cole about gynecological procedures?**

A. It come after Ms. Cole's passing.

**Q. So no one had raised a concern to you about any gynecological care treatment until at least May of 2020?**

A. Talking to me with COVID. Once the ladies found out that I was back in the building -- they build their communities, so they're, right now, trying to function on not dying from COVID. So that's -- that's the way we stemmed and looked at that. They're not getting masks

on the inside of the facility. We're being told that COVID does not exist on the inside of the facility.

I have lupus and here I am sick, working inside of the facility because I can't take a day off and they're requiring us to come to work. So their concern was COVID. When they got a break in there to come to the med cart to share what was going with their bodies, because Ms. Wooten was now coming down line, then that was in that time frame from -- we're looking at -- like I say, from March to May. We're looking at in that time frame of them talking about March, May, my exit. I'm outside of the facility.

So it became more evident to know that once I returned back with one medical record and I returned back with another medical record and another and another, then now, I was taking the precedence, not so much focal on COVID, but now, what's going on with their bodies.

**Q. Whenever the first time was that a woman came to you with concern about gynecological treatment while she was at Irwin County Detention Center, it would have been after Ms. Cole passed; is that right?**

A. It would have been in the time that Ms. Cole was out and passing, yes. I didn't -- I didn't have her to share it with.

**Q. Some time in May 2020?**
A. Some time in 2020, yes. I'm not going to limit it to May. She passed in May, so I didn't have a time to discuss anything with her --
**Q. So it must have been --**
A. -- prior to passing.
**Q. So it had to be some time after her passing, true?**
A. Within that time frame --
MS. MCNAMARA: Objection to form.
THE WITNESS: -- of that time of 2020. I won't limit it to May.
BY MS. EVANS:
**Q. But certainly not earlier than April or you would have had a chance to talk to Ms. Cole about it, right?**
A. COVID. I wouldn't limit it at that time to her in that -- 2020, my last stint.
**Q. Between -- let's see, sorry, strike that.**
**October 2019 is when you came back for your third stint, right?**
A. It was.
**Q. At any time in 2019, did any woman come to you with any concerns about gynecological care?**
A. October, November, December, it wasn't -- and

THE WITNESS: Yeah.

MS. EVANS: Oh, I'm sorry. I'm all over the place in that exhibit. 212. Sorry, forgive me. Thank you.

BY MS. EVANS:

**Q. Could you flip to the last page of Exhibit 212, please, where it says "Executive summary" at the top?**

A. Yes.

**Q. Do you see the paragraph second from the bottom that starts "The subcommittee did not"?**

A. Yes.

**Q. "The subcommittee did not substantiate the allegations of mass hysterectomies at ICDC" -- or strike that.**

**"The subcommittee did not substantiate the allegations of mass hysterectomies on ICDC detainees. Records indicate that Dr. Amin performed two hysterectomies on ICDC detainees between 2017 and 2019. Both procedures were deemed medically necessary by ICE."**

**Do you see that?**

A. I do.

**Q. How do you jive the idea that you saw 15 to 20 plus records showing hysterectomies performed on ICDC detainees, but the Senate only found two?**

A. That doesn't change what I saw. As opposed to

what, nine times out of ten, was destroyed.
**Q. Did you see any medical records destroyed while you were at ICDC?**
A. I did. I saw the shredding of documents.
**Q. Shredding of documents or shredding of medical records?**
A. Documents are medical records.
**Q. But do you know that they were medical records?**
A. They're medical records, they're documents.
**Q. Were they medical records showing hysterectomies were performed or were they medical request forms or something else?**
A. I'm unsure. Medical -- medical request forms and other documents. Like I said, my time was so short. Once I realized what I saw and went to asking questions, I was dismissed.
**Q. And when was that, that you started asking questions?**
A. I started asking questions, ladies come down line in the midst of COVID. So I started asking questions in COVID, in '20. My whole '20 life there was questions, what if's and why, why is this happening, why is this not happening. So I became pretty problematic pretty quick.
**Q. You had COVID concerns in early 2020, maybe even**

**2019, from what you told me earlier, right?**
A. I did.
**Q. And you started sharing those concerns immediately when you had them?**
A. Immediately. Me and Ms. Cole discussed COVID.
**Q. More than once?**
A. More than once.
**Q. And you shared it -- your concerns about COVID with others?**
A. With -- the facility talked about COVID. It wasn't a secret. It was -- we had COVID. It was COVID inside the facility. It was a mass pandemic.
**Q. And you started sharing concerns about hysterectomies, it sounds like, in May 2020?**
A. In the process of COVID, as well as asking questions of why I'm getting this many people coming to my cart and I'm looking at this many charts. In between my rotation from passing medications, I'm pulling records and they're printing records and I mean, it's not rocket science. It's just not.
**Q. So COVID concerns as early as late 2019, you shared, right?**
A. COVID?
**Q. Concerns?**
A. I shared late '19?

**Q. I'm asking. As early as late '19?**

A. Yes. Yes.

**Q. And concerns about gynecological care, you shared starting some time in May of 2020, after Ms. Cole passed?**

A. So COVID and gynecological procedures throughout the process of '20. So it heightened after Ms. Cole passed, yes.

**Q. Because you didn't share those gynecological concerns with Ms. Cole?**

A. No. No.

**Q. So probably, we're talking May 2020, right?**

A. Yes.

**Q. And you were dismissed when?**

A. June -- July the 2nd was my last day in the facility. Constructively discharged the 7th.

**Q. Did you ever talk to a detainee named Barbara Rozo Rua?**

A. Like I said, I talked to so many. I can't recollect names. I didn't learn them by -- they didn't have tags.

MR. BATSON: Could you, just for the record, spell that last name, please.

MS. EVANS: R-U-A and I think Pozo is P-O-Z-O.

BY MS. EVANS:
**Q. I'm going look back just real quickly at -- back on Exhibit 2, the letter. I just want to make sure I asked you.**
**On the page 20 at the bottom, 21 of 28 at the top, that last paragraph we read about the woman receiving three different responses by three different individuals?**
A. Uh-huh.
**Q. Do you recall that? And do you see it there on the exhibit?**
A. I see it on the exhibit.
**Q. Did you share that information in your OIG whistleblower complaint?**
A. I answered that. I'm not sure what's on the OIG complaint.
**Q. I just couldn't remember if we talked about that or not.**
**Did you ever have any conversation with a woman who was detained at Irwin County Detention Center named Kerline DeClaude? Kerline, K-E-R-L-I-N-E, Claude, C-L-A-U-D-E.**
A. I spoke with several detained women at the detention center. No recollection by name.
**Q. While you were at ICDC, did any woman share**

A. There was no intended audience from my perspective of anybody. I didn't just sought out for a particular place to catch this and run with it. It was how I was treated, how these women were treated, what I seen, what I experienced, what I repeated. So it was generalized for anybody that took any type of concern or our concern in the situation. There wasn't just a projected audience.

**Q. Why was exhibit -- to your understanding, why was Exhibit 2 created if the OIG complaint had already been filed by you as a whistleblower?**

MR. BATSON: Object to form.

THE WITNESS: In reference to -- there was no motive for why it was created. I'm --

BY MS. EVANS:

**Q. What's your understanding of its purpose?**

A. My understanding of the purpose of what I experienced and what these women went through needed to be heard, needed to be talked about, needed to be discussed, needed to be acknowledged.

**Q. As of September 14th, your whistleblower complaint with the OIG had already been filed through the OIG process, correct?**

A. Correct.

**Q. So why was Exhibit 2 created?**

A. I have no idea why Exhibit 2 was created. That's not a multi form -- multiform behind it.

**Q. Was it -- Exhibit 2 intended to be a tool for the media?**

A. It depends on how you look at it, but it's -- it wasn't intended for anybody. I answered that question. It wasn't intended for an audience. It wasn't intended for any type of attention or to draw any type of funding, if that's where we're headed.

**Q. Did you ever share a copy of the OIG whistleblower complaint with anyone other than your lawyers?**

A. No.

**Q. Because it was submitted through a confidential process, true?**

A. True.

**Q. Exhibit 2 was not submitted through that confidential process, true?**

A. I'm unaware of how it was submitted. I shared no documents from the conception of this case and conception of this situation, from the conception of the whistleblowing, I don't share anything outside of attorney.

**Q. You never shared Exhibit 2 with anyone?**

A. I never shared anything outside of attorney.

**Q. Are you familiar with the term media embargo?**
A. I am not.
**Q. I'm going to hand you what's been previously marked in this case as Exhibit 165. (Tendered.)**
MS. MCNAMARA: Can you identify that for the record, please?
MS. EVANS: Exhibit 165.
MR. BATSON: It's -- all right. It's -- it's in the -- which case is that -- 723 and it's Doc 16.
MS. EVANS: It was filed in the -- either the Motion to Quash or the Motion to Compel related to the subpoenas with Ms. Wooten, filed by her counsel. It's the 01 miscellaneous matter, if that helps you.
BY MS. EVANS:
**Q. Ms. Wooten, take whatever time you need to flip through Exhibit 165. My question is: Have you ever seen this document before?**
A. Yes.
**Q. And what is this document?**
A. Verified declaration of Dawn Wooten.
**Q. And was this submitted with your OIG whistleblower complaint?**
A. I'm unsure when it was submitted.

**Q. Was this prepared for the OIG whistleblower complaint?**
A. I'm unsure what it was prepared for.
**Q. Flip over to page 2, up at the top where it says "Declaration of Dawn Wooten."**
**Do you see that?**
A. Yes.
**Q. "Supporting her DHS OIG Complaint." Do you see that?**
A. I do.
**Q. Does that refresh your recollection that this was submitted with your OIG whistleblower complaint?**
A. It says "Supporting her DHS OIG Complaint."
**Q. Are you aware of any other declaration that you've prepared besides the one in Exhibit 165 for purposes of the OIG investigation?**
A. I'm not.
**Q. And you would have reviewed Exhibit 165 before you signed it, true?**
A. True.
**Q. Take whatever time you need to read through Exhibit 165, Ms. Wooten. And my question is: Is there anything that you believe was part of the OIG whistleblower complaint that's not in this declaration that comes to mind as you review it?**

A. No, I'm unsure.
**Q. Have you taken any time to review it to attempt to refresh your recollection as I've asked you this question here today?**
A. I'm looking through it. I'm unsure.
**Q. Okay. Are you going to look all the way through it and then tell me?**
MS. EVANS: Let the record reflect that the witness is turning pages without reading all of them.
MR. BATSON: Objection. That's speculative.
MS. EVANS: Unless she's a speed reader.
MR. BATSON: Evelyn Wood, here we go.
THE WITNESS: And your question was?
BY MS. EVANS:
**Q. Is there anything that you believe was part of the OIG whistleblower complaint that's not in this declaration that comes to your mind as you review it?**
A. I'm unsure.
**Q. Correct me if I'm wrong, but I don't see any mention of gynecological care, certainly not hysterectomies in this declaration.**
**Did you see something that you think I'm missing? I only see COVID.**

A. No.
**Q. You didn't notice anything about gynecological care in that declaration, did you?**
A. No.
**Q. Do you think that you included anything about gynecological care at all in your whistleblower complaint?**
A. I'm unsure. I don't have it before me.
**Q. Can you say under oath that you included anything regarding gynecological care in your OIG whistleblower complaint?**
A. I don't have it before me, so I can't say.
**Q. You can't even let me know as a general matter, whether you talked about gynecological care at all in your whistleblower complaint --**
A. I can't.
**Q. -- to the OIG?**
A. Because I'm un -- I'm unsure. I can't say. I don't have it before me.
**Q. If you could pull back up Exhibit 2, please?**
A. (Complying.)
**Q. And flip through it if you need to. Most of this letter reflected in Exhibit 2 is about COVID.**
**Would you agree with that?**
MR. BATSON: Objection as to form.

be done in a timely manner, Ms. Wooten was going to make sure because there was a dedication, not just to this job, but a dedication to those women, not just to those women, but to humans in that type of society as a setting. Corrections was my life.

**Q. Would you be surprised to hear that some detainee lawyers have said under oath that their -- they had clients who said that you did not treat detainee women well at ICDC?**

A. I wouldn't be surprised --

MS. MCNAMARA: Objection. Mischaracterization.

THE WITNESS: I wouldn't be surprised to hear that because everybody forms their own speculated opinion.

BY MS. EVANS:

**Q. Some people could have taken you the wrong way one day, right?**

A. I don't come in to be taken one day the wrong way. I don't have a wrong way to be taken.

MS. EVANS: Move to strike as nonresponsive.

BY MS. EVANS:

**Q. Do you think it's possible that you were trying to care for somebody and maybe shared information with**

**them that they thought, "Ms. Wooten doesn't care about me"?**

A. If I shared information with you, then that's a sign that I do care.

**Q. So would it surprise you that there are women who told their attorneys, apparently, that they didn't think you cared about them?**

A. It wouldn't --

MS. MCNAMARA: Objection to form.

BY MS. EVANS:

**Q. It wouldn't surprise you?**

A. Not because of my character, but it would.

**Q. And I'm not making a judgment on your character.**

A. Everybody perceives different.

**Q. Everybody perceives different, right? Is that what you said?**

A. Everybody perceives different.

**Q. Would it surprise to you hear that lawyers for detainees told the press that they heard mixed things about you?**

A. It's one's own opinion.

**Q. Would it surprise you to hear that at least one lawyer for detainees has called the hysterectomy allegations in the letter reflected in Exhibit 2 "muck," M-U-C-K?**

A. That's his opinion.
**Q. I'm going to hand you what's been previously marked as Exhibit 167. (Tendered) Exhibit 167 has been marked in another deposition in this case. It was a document filed in 723 Miscellaneous Matter 1, Document 1-5.**
**Ms. Wooten, have you ever seen this document before?**
A. I can't recall it. This was back in 2020, but no, I can't recall it.
**Q. This is a letter sent to the Honorable Dr. Joseph Cuffari, Inspector General, September 8, 2020, from John Whitty and Priyanka Bhatt.**
**Do you see that?**
A. I do.
**Q. The first line, "We represent Ms. Dawn Wooten" -- strike that.**
**The first line of the letter, the body of the letter, "We represent Ms. Dawn Wooten, LPN, currently a LaSalle Corrections nurse employed at the Irwin County Detention Center in Ocilla, Georgia. We are filing the attached whistleblower complaint on her behalf."**
**Do you see that?**
A. I do.
**Q. The second paragraph, do you see where it starts**

"Ms. Wooten's complaint"?
A. Yes.
Q. "Ms. Wooten's complaint alleges violations of lawyers, rules and regulations, as well as ongoing danger to public health and safety due to mismanagement of COVID-19 issues and other significant matters."
Do you see that?
A. Yes.
Q. Do you know what other significant matters refers to in this sentence?
A. I do not.
Q. Who within ICDC management or LaSalle management, if anyone, did you ever share concerns about gynecological care besides your supervisor at the time, LaKisha Brown?
A. LaKisha Brown.
Q. Anyone else?
A. Anna Carter.
Q. Was Anna Carter in management?
A. Anna Carter -- no, she was one of the floor nurses. I talked with David Paulk.
Q. You talked to David Paulk about gynecological care?
A. About COVID and the things the women had told me.

**Q. What did you tell him the women had told you?**
A. Had some women to come to my cart asking me what happened to their bodies, they've got these procedures that they're talking about that they're having and they're saying that they haven't given consent to them. What is going on? And I found myself out the door.
**Q. When was that conversation?**
A. We had this conversation with him around June. They gave me a month and I was out in July, somewhere around June. Him and LaKisha, all of us were talking together. I addressed it to Brown first and she laughed and made a joke and I talked with the warden and he walked off. I found myself written up. Outside.
**Q. And you're sure that during this conversation, you talked about gynecological care allegations from the women?**
A. I'm positive.
**Q. Did you talk about hysterectomies?**
A. I'm positive -- what I found at the time, there were hysterectomies.
**Q. What do you mean at the time there were hysterectomies?**
A. The one I -- the ones that I reported back to the women were hysterectomies that we discussed earlier this morning. You got a hysterectomy. Hey, you got a

hysterectomy. Hey, you got a hysterectomy. The ones that I was reporting back, that's what they were.

**Q. Did you show Mr. Paulk any medical records?**

A. Mr. Paulk is the warden that does not have any say-so in medical. He handles the security, but he oversees the facility. So who should have seen the medical records were LaKisha Brown, that had that right. Paulk didn't have any right in medical records.

**Q. Did you show the medical records to Ms. Brown?**

A. Ms. Brown had already seen the medical records. Ms. Brown was aware of the medical records. So aware, that she was confident enough to roll out and say, "Girl, he getting that money."

**Q. Did you show Ms. Brown any of the medical records that you looked at where you confirmed that hysterectomies were performed on --**

A. Ms. Brown was in the office with me --

**Q. Let me finish my question.**

**Did you show Ms. Brown any of the medical records that you looked at where you confirmed that hysterectomies were performed on 15 to 20 plus women?**

A. Oh, I was waiting for you to be finished.

**Q. I'm finished.**

A. Ms. Brown was in the office when I looked at these records. Each one of these I pulled up she saw.

So if I viewed 15 to 20, she viewed 15 to 20.
**Q. There was no medical records that you reviewed to confirm whether a hysterectomy was performed that Ms. Brown didn't see?**
A. That Ms. Brown did not see, correct. I wanted a witness.
**Q. Did you ever tell Dr. McMahan what you were seeing or hearing from these women?**
A. Dr. McMahan was not housed on-site. Dr. McMahan had his own office and he would come in on days that I was not there or not working. So I didn't have a conversation with Dr. McMahan. I wasn't there long enough to talk to the medical director. Like I said, I was shifted out of the door so quick.
**Q. Well, I think you said you started hearing these concerns in May 2020. So for at least two months, you were there.**
**On none of those days, you and Mr. McMahan -- Dr. McMahan were working on the same day?**
A. Not on the same days or he would come in after I got off from work.
**Q. What about the other doctor whose name you couldn't remember? Did you ever talk to him or her about what you were seeing or hearing from these women about gynecological care?**

MR. BATSON: First, objection.

THE WITNESS: The attorneys have it.

MR. BATSON: Objection as to form. Were you referring to the OIG whistleblower complaint or are you talking about the federal complaint?

MS. EVANS: I asked questions about both. I think both would be responsive.

MR. BATSON: Okay.

BY MS. EVANS:

**Q. Why have you not produced documents?**

A. The attorneys have it. I have what the attorneys have.

MR. GUYER: Right.

MS. EVANS: Is somebody attempting to testify on the Zoom?

THE WITNESS: It sound like that.

BY MS. EVANS:

**Q. We'll follow up with your attorneys on that.**

**I'm going to hand you what's been marked as Exhibit 166. (Tendered.) This is a document that was filed in Miscellaneous Matter 1 in the Middle District of -- this is for the record -- filed in the Miscellaneous Matter 01, in Document 1-4 in the Motion to Quash the deposition subpoena of Ms. Wooten.**

**My question for you, Ms. Wooten, is -- well,**

**strike that.**
**This is what I understand to be a picture of a -- actually, I don't know what it is, but it appears to be some kind of screenshot of an online submission.**
**My question to you, Ms. Wooten, is: Did you ever personally go onto the Office of Inspector General website reflected here at the top of Exhibit 166 and type in the information that appears here?**
A. The exhibit says I'm submitting the complaint on behalf of somebody else.
**Q. Where do you see that?**
A. I see that at the very top, the second bullet is highlighted.
**Q. Do you know who you were submitting this on behalf of?**
A. No. It was submitted on my behalf, it looks like, not me submitting it on the behalf of somebody else.
**Q. Well, that's why I'm asking. You said it appears that I am doing this on behalf of somebody else, so I was asking -- but that's not what you meant?**
A. No. Somebody was submitting it for me. So everything that I have been -- that's been submitted have been done legally though attorneys. I haven't made any decision outside of attorney counsel. So it gives

you the options. I'm submitting it myself, I'm submitting it on behalf of somebody else or I'm submitting it at the GHS Internal Affairs. The second bullet point at the top left-hand corner is highlighted.

**Q. And who do you think submitted this on your behalf?**

A. It's been -- it was submitted in -- what's the date?

**Q. I think it was September 8, 2020, but that's a question for you.**

A. I'm unsure.

**Q. If you flip over to the -- it says page 5 of 8 at the top, where it was filed in the miscellaneous matter.**

**Do you see that 5 of 8?**

A. Uh-huh.

**Q. Do you see where it says "Part 4, other actions"?**

A. Yeah.

**Q. It says, "Have you reported this matter to any other organizations, agencies?" And the -- the "no" circle is checked.**

**Do you see that?**

A. Yes.

**Q. Do you believe that the information you**

**submitted in your OIG whistleblower complaint was shared with any other organizations or agencies?**

A. If it's checked no, it's a no.

**Q. Could you pull back up Exhibit 211?**

A. (Complying.)

**Q. Do you have 211 in front of you?**

A. Yes.

**Q. Could you flip to page 6 of that document, please?**

A. (Complying.)

**Q. You can compare to Exhibit 210, if you need to, 210 being the original complaint, but paragraph 19 within Exhibit 211 appears to be new language. The other reason that you might get some assurance of that is that it refers to something that happened on January 3, 2022, and the original complaint was filed on December 29, 2022 -- well, that actually didn't make sense. Strike that.**

**You can -- you can compare it to Exhibit 210 if you want to. It appears to me that exhibit -- that on Exhibit 211, paragraph 19 is new, something that was put in the amended complaint. If you can read it and let me know if you think that's true.**

A. On January 3rd?

**Q. Yes.**

A. That's what you want me to read?
**Q. Yes.**
A. Like unaware -- like, you want me to -- what are you looking for in 19?
**Q. It appears to me that this was added in the amended complaint, that it wasn't part of the original complaint.**
**Do you know if that's true?**
A. So is it true that it's been added?
**Q. Yes.**
A. Where is 211? No, we're comparing it to --
MR. BATSON: 210.
THE WITNESS: So you're asking me has it been amended?
BY MS. EVANS:
**Q. It appears to me that this is new. Paragraph 19 was added in the amended complaint, which is Exhibit 211. It was not in Exhibit 210, that I can tell.**
A. There's a two-year difference.
**Q. There's a two-year difference between the filings. Paragraph 19, the wording that's in Exhibit 211, to me, does not appear to be anywhere, whether it's paragraph 19 or some other number, in what was filed on December 29, 2022, the original complaint**