# EXHIBIT 4

**hopefully. So let's just go to the questions. And I'm fine if you guys have the written copy of the questions. I'm just going to read them because that's protocol.**

MR. PRITT: And I think one thing I may be able to do to save you time here, Thad, we will --

MR. T. GUYER: Okay.

MR. PRITT: -- stipulate that she is here as to the official testimony of the defendant, LaSalle Southeast, with Dr. Hearn as its representative, referring to the listed topics and that she is giving the corporation's position on each of your questions. So you can just read the substance of the questions instead of having to read that whole thing every time.

MR. T. GUYER: Oh.

MR. PRITT: All right. I'll let you read them how you want, but...

MR. T. GUYER: Okay. So what we're going to do -- if I understand your stipulation, we're going to stipulate that an unspoken but understood and agreed upon preface to every one of my questions is the following, quote, As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, comma, unquote, that -- we can agree that's in every time?

MR. PRITT: Sure.

MR. T. GUYER: Okay. You know what? I think I'm

going to do it anyway. I don't -- it won't take us that long, so --

MR. PRITT: Sure. Yeah. Go for it.

MR. T. GUYER: I'm sorry. I'm afraid --

MR. PRITT: No, that's fine.

MR. T. GUYER: -- not doing that. I'm afraid. You guys are young.

**Q. All right. No. 1: As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 3, what is the corporation's position on whether Plaintiff Dawn Wooten maintained a clean disciplinary record with zero write-ups or formal reprimands for the eight straight months preceding June of 2020?**

A. I have no documentation to indicate there were any written write-ups on Nurse Wooten during the timeframe you specified.

**Q. Thank you. And we'll go to Question 2: As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 3, why did the corporation generate four separate letters of correction for Ms. Wooten dated June 9th to 18th, 2020, within a nine-day period after eight months of -- we'll just say an undocumented -- without documentation of any reprimands?**

A. The incidents in question, as far as lateness to work, were actually within the timeframe that the documents were produced.

**Q. Okay. Question 3: As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 3, what is the corporation's official explanation for why the four letters of correction dated June 9th to 18th, 2020, and any alleged prior attendance issues were not listed on the July '20 -- on the July 2, 2020, reprimand form that checked the box "no" for any previous disciplinary actions?**

A. The disciplinary actions were verbal counseling and not designated as reprimands until the time you saw the first reprimand noted.

**Q. Okay. So then -- so one follow-up here then. Is it -- it's the corporation's testimony that there were verbal reprimands that were not written up?**

A. There were verbal reprimands that were not written up, correct.

**Q. But if I understand you correctly, because they weren't documented, you're not able to tell me who made those verbal reprimands and when; is that correct?**

A. According to e-mails, I used that as my documentation of an event that occurred.

**Q. Okay. All right. Thanks. So other than**

**those e-mails, just to be clear, you have not had access to any other documents showing that there were verbal reprimands; is that correct?**

A. The documents that were presented indicated verbal reprimands, but that is all --

**Q. Okay.**

A. -- I have seen.

**Q. Okay. Gotcha. All right, 4: As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 3, what documentation of any ongoing attendance issues existed prior to June 12th of 2020?**

A. Once again, I refer back to e-mail documentation of attendance issues.

**Q. Okay. Thanks. And Question 5: As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 3, what is the corporation's position on why Ms. Wooten's consistent clock-in times in March, April, May and June 2020 became the subject of disciplinary action following the dates referenced in the September 8, 2020 whistleblower notice?**

MR. PRITT: I'll object to the form on that one, but you can answer, Dr. Hearn.

A. Let's go over that one more time. Can --

**Q. Sure.**

A. -- you just ask me again, please?

**Q. Okay. And let me just kind of lay a little foundation for it. And, of course, this is my foundation. Counsel can certainly object. This is just our review of it. One of the -- you guys -- LaSalle provided in discovery a lot of time records showing when Ms. Wooten checked in for work, and we found those records, and they all seemed to be about the same as her records consistently throughout. Maybe that's true; maybe that's not, but that's the foundation I'm laying for them.**

**With that understanding, and disagree with it if the corporation wants, what is the corporation's position on why Ms. Wooten's consistent clock-in times in March, April, May and June 2020 became the subject of disciplinary action following the dates referenced in the September 8, 2020, whistleblower notice?**

MR. PRITT: Object to the form. You can answer.

A. Whenever you have staff that are not timely and appear at the unit at the appropriate shift time they're designated, you may use the verbal tactic to encourage them and say, "You're running late. You need to do better." And that's not particularly documented. So what went on verbally before it came to the time where there was written documentation, I can't say --

within the medical department, which is Bell and Brown.

**Q. Thank you so much.**

A. Okay.

**Q. Seventeen: As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 5, what is the corporation's position on whether the non-assignment of any hours to Ms. Wooten for six consecutive months was a -- oh, I think I just asked that one.**

MR. PRITT: Yeah, I was going to give you an "asked and answered" there, but I didn't want to interrupt you.

MR. T. GUYER: Oh, I would have been so disappointed to get an "ask and answer." I hate those. So just stop me before you have to object, okay?

**Q. All right. Eighteen: As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 6, what is the corporation's position on all full-time and PRN licensed practical nurses, LPN and other nursing positions -- position openings posted, advertised or filled at ICDC from July 2, 2020, through December 31 of 2020?**

A. There were ads for a LPN position, full-time or part-time, and we had applicants for those positions. We filled --

**Q. Okay. Thank you.**

A. Go ahead.

**Q. Okay. Were you -- I'm sorry, I interrupted you again. You said, "We filled"; was that the end of it?**

A. Yes, we filled four nursing positions for the LPN --

**Q. Okay.**

A. -- status.

**Q. Okay. Thank you. So is that to say that in this time period, July 2nd through December 31st of 2020, the nursing staff never reached out to people that they were familiar with or working with and would say, "Hey, would you be interested in some job postings? We'd sure like to have you on board." Is that to say you don't do that kind of recruiting?**

A. We don't offer positions. If someone is interested in a position, they have to apply for the position. We have to have applicants for those positions. We don't just give positions to people, you know, onsite. They have to apply for those positions.

**Q. Okay. Thank you for that. So is that to say, then, that -- I take it that the -- with respect to your Shanise Bell and Lakisha Brown, if they knew that there was a posted position and they liked somebody, it's okay for them to suggest, "Hey, we have posted positions. Maybe you would like to apply." There's nothing wrong with that,**

**right?**

MR. PRITT: And I'll just object to the form here, Thad, as to -- just to get this on the record. Ms. Brown and Ms. Bell, they are no longer employed by LaSalle. So Dr. Hearn was not able to speak to them in preparation for this deposition. So just to the extent, as a 30(b)(6) rep, I don't think she could really speak to their actions or motivations other than what is reflected in the documents. But subject to that, you can answer, Dr. Hearn.

A. I can't say what Shanise Bell or L.A.K. Brown did.

**Q. Okay. Well, let's take you, for example. Certainly, of course, you'll correct me if I'm wrong, that if there's -- if you know good people that you think would be good for a posted position, you -- for example, there's nothing barring you, is there, from giving people a heads up, "Hey, you might want to apply for this position"?**

MR. PRITT: Object to the form: Beyond the scope of the topics. You can answer.

A. As a professional, I recommend nursing staff; physicians make applications to our company sporadically, whether we have a position or not. Because one day we may have a position come up, so that's the way I work, personally.

**Q. Okay. Thank you, Doctor. All righty. Then,**

**19: As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 6, why was an existing, fully credentialed LPN not offered, assigned or considered for any available hours or positions while LaSalle Southeast was actively advertising for LPN positions at ICDC during those same months?**

MR. PRITT: Object to the form. You can answer.

**Q. I take it's the same answer as before.**

A. Correct. Applicants must apply. They go through HR to apply for positions.

**Q. All right. Thank you. All righty. Question 20: As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 6, who were the individuals responsible for those LPN job postings and hiring decisions during July through December 2020?**

A. The job postings are placed by the HR director and the applicants come in to the HR director. The applicants are shared with the DON and/or HSA, and they are interviewed via the DON or HSA. Once an interview process goes forward and the applicant seems to be a good fit and they are offered a position, it goes back to HR to go through the background check and all the security components of what HR has to do to be able to work in a correctional facility.

**Q. Okay. And so just to put names in, in this July through December 2020, who would the names of those individuals be back then?**

A. Joan -- I forgot Joan's last name right now. Joan was the head of HR, and the DON was Shanise Bell and HSA was L.A.K. Brown.

**Q. Okay. And then Joan -- it's okay with me if somebody helps you out.**

MR. T. GUYER: Do you know the answer -- the last name, Jacob?

MR. PRITT: Is that Joan Whitley, that I heard?

THE WITNESS: It is Joan Whitley. I can't believe I could not remember her name, so thank you.

**Q. Okay.**

A. It is Joan Whitley.

**Q. Okay.**

A. It's on e-mails and whatnot.

**Q. All right. That counts as one of your lifelines. Okay. All right. Question 21: As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 6, what is the corporation's official explanation for posting open LPN positions while simultaneously assigning zero hours to an existing trained LPN who remained on payroll as a PRN?**

MR. PRITT: Object to the form. You can answer.

A. The positions -- or the shift positions that would be open would be offered to full-time staff, offered to PRNs. However, the PRNs had no obligation to say "yes" to the positions, and there was no obligation from the medical department to offer every PRN every shift. They're not guaranteed a shift. It may be there are no shifts available. But according to my review of the e-mails, it appeared that Nurse Wooten had no available time where she actually agreed to and showed up to work at a mutually agreed upon time.

**Q. Okay. Question 22: As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 6, were any of the LPN positions posted from July through December 2020 ultimately filled by new hires rather than by reassigning hours to Ms. Wooten?**

A. The applicants were reviewed, and there were new applicants who were hired.

**Q. All right. Thank you. So Question 23A: As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 7, what is LaSalle Southeast's corporate knowledge of plaintiff's whistleblower disclosures to HSA Lakisha Brown regarding COVID-19 violations, PPE deficiencies and/or detainee medical treatment?**

A. Until the September 8th OIG complaint, I had no knowledge -- the company had no knowledge of any complaints of the above.

**Q. Okay. And then do you recall if anyone tried, after receiving the -- Ms. Wooten's complaint, did anybody from LaSalle Southeast attempt to interview Lakisha Brown regarding her knowledge of that -- those complaints -- whistleblower disclosures by Ms. Wooten? Do you know?**

MR. PRITT: And, Dr. Hearn, to the extent that you're aware of any conversations with Ms. Brown involving in-house counsel, involving my colleague, Deirdre McGlinchey or other outside counsel, I'll instruct you not to answer as that portion of any investigation would be privileged or done in anticipation of litigation. If you're aware of any interviews with Ms. Brown -- and this will be the same objection for the next couple of questions as well, Thad, but with any of those folks that were not involving counsel, then you can answer.

MR. T. GUYER: Gotcha.

**Q. I think you probably understand that. So, essentially, let me put it this way, is -- I don't want to know what the legal department did or your outside lawyers if they were trying to conduct interviews with Brown and the others. So put the lawyers out of this. So all I want to know is: Are you aware of anybody other than the**

**lawyers trying to reach out to Lakisha Brown after Ms. Wooten made her whistleblower disclosures?**

A. Yes, I personally reached out to Mrs. Brown.

**Q. Okay. And did you have -- did you take any notes of whatever your reach-out to Ms. Brown was, or did she not respond?**

A. No. I traveled to the unit within two days of the release of this OIG complaint, where I saw Ms. Brown.

**Q. All right. And what did she say?**

A. My purpose was to review the documentation and the medical records for the patients that were housed at ICDC.

**Q. Okay. I gotcha. So did you ask Ms. -- did you ask Lakisha Brown when you went and met, "Hey, Wooten has filed these whistleblower disclosures. Do you know anything about them? Did she ever talk to you about them?" That kind of thing? Did you try to find out what Lakisha Brown knew about these disclosures that Wooten made in September?**

A. Yes, I did.

**Q. Okay. And what did Lakisha Brown say?**

A. She knew of -- nothing of the claims made by Nurse Wooten.

**Q. Okay. And did you document that that's what she said?**

A. No, I did not document in writing. I did not.

**Q. Okay. And do you -- have you talked to Lakisha Brown about Ms. Wooten since that time you went down there?**

A. I cannot recall talking to Ms. -- well, Ms. Brown was integral in getting information and chart review and documents to me, so -- but that's probably legal, so --

**Q. I gotcha.**

A. -- I don't need to talk about that.

**Q. Okey-dokey. So let's go on to 23B, and it's basically the same question: Did you talk with -- did you or anybody you know of, other than lawyers, talk with HSA Marion Cole regarding Ms. Wooten's whistleblower disclosures after she --**

MR. PRITT: Same objection. Oh, sorry, Thad. Same objection. Nothing -- don't disclose anything that involved lawyers; otherwise, you can answer.

A. No, I did not.

**Q. Okay. And we'll go to 23C. And it's the same exact question, except this time it's asking: Did you talk to DON Shanise Bell regarding Ms. Wooten's whistleblower disclosures after she made them in September?**

MR. PRITT: And same objection and instruction.

A. Two days after the whistleblower account, I was present at the unit, and I did see and speak with

Shanise Bell.

**Q. And what did she tell you?**

A. That she had no knowledge of the claims made in the September 6th whistleblower --

**Q. Okay.**

A. -- report.

**Q. And I take it you did not document that either?**

A. I did not.

**Q. Okay. 24, we're moving along here: As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 7, what is the corporation's position on the July 10, 2020, grievance and the nine-page handwritten statement Ms. Wooten provided to HR?**

A. Upon reading the grievance, it appeared to be more of a personal conflict between Ms. Wooten and the leadership in -- within the medical department. There was no --

**Q. Okay. Thank you.**

A. -- documentation of any of the complaints regarding COVID, regarding improper medical treatment of detainees at the facility. There was no complaint of poor conditions of cleanliness, and -- none of that was in that nine-page document. I believe it was nine pages.

**Q. Thank you. Other than the -- what lawyers might have been -- prepared, have you ever seen a report that was prepared by someone other than lawyers about Ms. Wooten's whistleblower disclosures?**

A. Okay. Would you run that by me again, please?

**Q. Yeah. Sure. I'm just trying to find out, is -- are you aware of whether or not LaSalle Southeast or any of the LaSalle family, other than lawyers, actually did some sort of investigation into Ms. Wooten's whistleblower disclosures? Anyone other than lawyers, doing an official investigation.**

MR. PRITT: Object to the form. You can answer.

A. As I stated, I was there two days after the occurrence and spent approximately three days there, but spent the next several years looking into many of these allegations myself.

**Q. Okay. Thanks. And have you ever generated documentation or a report on your conclusions about Ms. Wooten's whistleblower disclosures?**

MR. PRITT: Other than anything you sent to in-house counsel or outside counsel, you can answer.

A. No.

MR. T. GUYER: Well, let me discuss that one with you, Counsel, that if she prepared it and sent it to lawyers, our position is that would not make it a

privileged document. Do you disagree?

MR. PRITT: Let me -- give me a -- can I take a second off the record?

MR. T. GUYER: Yeah, of course.

MR. PRITT: Thanks.

THE GUARDIAN: Off the record --

MR. T. GUYER: Thanks.

THE GUARDIAN: -- 2:00.

(Off the record)

THE GUARDIAN: On the record, 2:00 p.m.

MR. PRITT: You can ask the question again. I'll let her answer it.

MR. T. GUYER: Thank you so much.

**Q. So the question was, is: You said that you did the investigation you've already described, talked to Lakisha Brown, etc., and didn't document that; but you worked on it, you said, several years since then. I just want to know, did you ever generate a report of what your findings were regarding Dawn Wooten's disclosures?**

A. No, I did not.

**Q. Okay. Thanks. All righty. Let me make sure -- I don't want to get that "asked and answered" one. All right. So question 25: As to the official testimony of**

**the defendant, LaSalle Southeast, with you as its representative, referring to Topic 7, what internal communications within LaSalle Southeast occurred regarding the September 8, 2020 whistleblower notice, except as it pertains to communications with lawyers?**

A. To my knowledge, all communication that I -- appears to have gone through legal.

**Q. Okay. Thank you. And question 26: As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 7, what investigation, if any, was done to determine if Ms. Wooten had been subjected to retaliation for her protected disclosures?**

MR. PRITT: I will just object to the extent that this was done in connection with counsel or by counsel.

MR. T. GUYER: Right.

MR. PRITT: But you can answer.

A. The information that I know has been related to discussions with attorneys.

**Q. Okay. Thank you. And by discussion with the attorneys, you mean -- you said "related to." You're saying that it was actual discussions with attorneys and attorneys back with staff. Those are the only ones you know about, correct?**

A. I guess I don't understand your question.

Let's try again.

**Q. Sure. Sure, sure. Okay. So here's the -- I'll read the question again, 26: As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 7, what investigation, if any, was done to determine if Ms. Wooten had been subjected to retaliation for her protected disclosures?**

**So I just want to know -- you saw that she said, "I've been retaliated against." Other than lawyers, are you aware of anybody investigating the merits or lack thereof of her claim that she was retaliated against? And if you don't know, you can just say you don't know.**

A. I'm just struggling with what I know now, which is through my involvement with the legal side of this. So I can't give you a good, clear answer, unfortunately.

**Q. Okay. Thank you. And Question 27: As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 7, why do the corporation's discovery responses state it was unaware of any complaints by Ms. Wooten before September 8, 2020, when she had already provided a detailed grievance on July 10th of 2020?**

A. I think if you look back at the question that

was posed, and this is legal speak and I may use the wrong answer -- I mean, the wrong verbiage, but there was -- there were the questions that were sent to LaSalle to answer, and the answers back from LaSalle. I'm not sure what you all call that in legal speak, but interrogatories, possibly? So --

**Q. I think so.**

A. Okay. So when I reviewed those, it looked like the question related to the improper care -- healthcare delivered to ICE detainees. It looked like there were -- it was related to poor conditions at the facility, and it looked like it was related to COVID. And so when you ask the questions, the question of -- was considering those things. The grievance per Ms. Wooten did not say anything about those three topics. It was merely about her supervisors and the issues that she was having regarding her write-ups and whatnot. It had nothing to do with those three topics.

**Q. Okay. Thank you. Question 28: As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 8, what were LaSalle Southeast's official policies, written standards, training programs and/or directives governing staff illness protocols, quarantine and daily call-in requirements at ICDC from March 2020 through September**

**2020?**

MR. PRITT: And this is another one, Thad, where -- what Dr. Hearn can testify to on this is any sort of patient-related policies, but she wasn't -- the more, like, HR employee-related policies, that'll be James as well, because he was directly involved in sort of those kinds of employee operational things. But anything on the, like, patient care side of things for this question, Dr. Hearn can testify to.

MR. T. GUYER: Okay.

MR. PRITT: Which it may be. As I look at the question, it looks like it's kind of all related to staff. So we may just kick that one to James as well, if that's okay.

MR. T. GUYER: I think you're right.

**Q. Okey-dokey. 29: As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 8, why was Ms. Wooten simultaneously told by her direct supervisor, Lakisha Brown, that she did not need to call in every day while on COVID-related quarantine?**

A. Upon review of the e-mails, I find that statement to be contradictory to what I read in the e-mails and the documents that we have for review.

**Q. All right. Thank you. Question 30: As to**

**the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 8, what is the corporation's position on why supervisors possess doctor's notes documenting Ms. Wooten's possible COVID symptoms and CDC recommended isolation, yet still claim she was a no-call, no-show?**

A. I have no documentation which was in her personnel file that I reviewed that had a note for her illness at the time.

**Q. Okay. Thank you. Question 31: As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 8, what is the corporation's position on any deviations from CDC guidelines and ICE, I-C-E, performance-based national detention standards -- PBNDS is the acronym -- regarding staff quarantine and illness protocols, and what were the justifications, if any, for such deviations?**

A. There were no deviations from the CDC protocols or the PBNDS protocols.

**Q. Thank you. Question 32: As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 8, why was Ms. Wooten required to attend an in-person disciplinary meeting while running a 102-degree fever?**

A. That statement seems to have some

inconsistencies from the documentation I reviewed. Even in Ms. Wooten's deposition, she called it a staff meeting, not a disciplinary meeting, that she claims that she attended. I notice a form, which staff would sign and check temperature and signs and symptoms, that the temp on that form was not 102.

**Q. Okay. Okey-dokey.**

MR. T. GUYER: All right. Can we take just a quick break?

MR. PRITT: Sure.

MR. T. GUYER: It occurs to me that I need to reschedule another meeting. So could we take five minutes?

MR. PRITT: Sure.

MR. T. GUYER: Is that okay? All right.

MR. PRITT: Yeah.

MR. T. GUYER: Great. All right.

THE GUARDIAN: Off the record, 2:11 p.m.

(Off the record)

THE GUARDIAN: On the record, 2:14 p.m.

MR. T. GUYER: Guardian, could you remind me again what your name is? Guardian, what's your name again?

THE GUARDIAN: It's -- oh, it's Dan. And we're on the record.