# EXHIBIT 5

**Q. Thank you. Question 2A: As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 2, what is the corporation's position on your specific relationship to LaSalle Southeast, LLC?**

MR. KEE: I'll just object to form, but you can answer.

A. Yeah. As I stated, my position is oversight and support of facility operations.

**Q. Okay. And what does that consist of? So, for example, is there a quality assurance part in that? Just give us an idea about what the main mission or objective of that oversight is.**

A. Quality assurance and contract compliance.

**Q. Okay. Thank you. All right. Question 2B: What is the corporation's position on the management, operational or personnel authority that you exercise over Irwin County Detention Center between July 2019 and December 2021?**

MR. KEE: Object to form. And this is one, Thad, when you say "you," you mean James personally or the company?

MR. T. GUYER: The company.

A. My responsibilities, again, are oversight and compliance assurance and support for the operations.

**Q. All right. Question 3A: As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 2, what is the corporation's position on the ownership interests between LaSalle Southeast, LLC, and LaSalle Management Company, LLC?**

MR. KEE: Object to form. You can answer.

A. LaSalle Management strictly provides back office support, such as accounting, HR and IT.

**Q. Okay. So if I understand you right, then LaSalle Management Company, LLC, does not have an ownership interest in LaSalle Southeast, LLC?**

A. That's correct. There is no ownership.

**Q. Thank you. Question 3B: What is the corporation's position on the management responsibilities between LaSalle Southeast, LLC, and LaSalle Management Company, LLC, with respect to ICDC operations?**

MR. KEE: Object to form. You can answer.

A. Can you rephrase that, please?

**Q. Sure. Sure. All right. So what I'm trying to get at here is that we have LaSalle Southeast Company Corporation, and then we have LaSalle Management Company. And the question is: As between those two, what are the management responsibilities between them? So, for example, does LaSalle Southeast have authority over LaSalle**

**Management Company, or is it vice versa?**
A. The ICDC facility has its own warden, and I represent the company as oversight and support for that warden in his -- his or her operations.
**Q. Okay. And your employer is who?**
A. My employer is South Western Correctional.
**Q. Okay. And so you are -- you're not an official with either LaSalle Southeast or LaSalle Management; is that correct?**
A. Yeah. My employer is South Western Correctional. Yes, sir.
**Q. Okay. Can you tell me who is the president or CEO of LaSalle Southeast?**
A. No, sir. I don't have that information.
**Q. And can you tell me who is the president or CEO of LaSalle Management?**
A. No, sir. I don't have that information.
**Q. Thank you. Okay. Question 3C: What is the corporation's position on the personnel authority between LaSalle Southeast and LaSalle Management Company with respect to ICDC? And I'm going to guess it's the same answer, is that right?**
MR. KEE: Object to form. You can answer.
A. Yes, sir. The warden of ICDC has total responsibility, and I provide that oversight and support to

him.

**Q. Okay. So the warden's the boss of the facility and you, as an official of Southern LaSalle -- part of LaSalle Corrections, you guys are their providing support, correct?**

A. Yes, sir. That's accurate.

**Q. And is it also accurate that you don't have the authority to tell the warden what to do?**

A. I typically work in conjunction with my wardens, and we consult and talk about things and try to reach a consensus.

**Q. Okay. So it's never come -- I take it, it's never come up as to who has the authority to boss who around then. You guys just do it collaboratively, is that right?**

A. Yes, sir. Yes, sir.

**Q. Okay. Thanks. All right. And do you know who employs Warden Paulk?**

A. LaSalle Southeast.

**Q. So he works for the -- Warden Paulk actually works for LaSalle Southeast?**

A. Yes.

**Q. Okay. Thank you very much. Hold on just a second. I need to get a Kleenex. I'll be right back.**

A. Okay.

THE WITNESS: I'm sorry. Oh. Okay. Yeah.

**Q. All righty.**

THE GUARDIAN: We're still on the record.

**Q. I am back.**

THE GUARDIAN: All right.

**Q. All right. Okay. All right. So now, on to 3D: What is the corporation's position on the financial relationship between LaSalle Southeast and LaSalle Management Company? And I take it you've generally already addressed that, correct?**

A. There is no financial relationship between the two.

**Q. Okay. So does LaSalle Southeast, to your knowledge, dispense money to anyone other than, presumably, paying the wages of Warden Paulk?**

MR. KEE: Object to form.

A. LaSalle Southeast has its own banking accounts and things such as that.

**Q. I see. And so do you know who is on the payroll of LaSalle Southeast, other than Warden Paulk?**

A. It would be most of the employees at the ICDC facility.

**Q. Okay. Thanks. All right. Question 4A: As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 2,**

A. It was the exhibits that I reviewed yesterday with the attorney.

**Q. Okay. Thank you. Can you tell me what PRN status is?**

A. Yes, sir. PRN is as needed.

**Q. All right. Now, as of July 2nd of 2020, did LaSalle Southeast have any kind of a personnel manual and policies that were distributed to the employees that discussed how discipline takes place?**

A. Yes.

**Q. Okay. Thank you. And do you know what is meant by the term "progressive discipline?"**

A. I do know what it means, yes.

**Q. Okay. And does that written policy that LaSalle Southeast had, did that provide for progressive discipline, meaning you might start with the reprimand and then go up to a suspension, if possibly -- terminated, etc.?**

A. It does reference progressive disciplinary, yes.

**Q. All right. Thank you. And do you know whether or not that -- we'll call it personnel policy -- is something that you are required to submit to the Department of Homeland Security?**

A. I do not know the answer to that, no.

**Q. Okay. Thanks. All right. So we'll move on to 15: As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 3, who, within the corporation, held final decision-making authority to change Dawn Wooten's status from full-time to PRN, effective July 2nd of 2020?**

A. That's Warden Paulk, in consultation with myself.

**Q. Okay. Thank you. Question 16: As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 3, did you, in your official capacity, approve, review or otherwise participate in the decision to change Dawn Wooten's status from full-time to PRN effective July 2nd of 2020?**

A. Yes, I did, and I agreed with that decision.

**Q. All right. Thanks. And then Question 17: As to the official testimony of the defendant, LaSalle Southeast, with you as its representative, referring to Topic 4, what is the corporation's position on whether any corporate-level review or approval occurred before the series of letters of correction issued to Dawn Wooten in June of 2020 or before July 2nd of 2020 reprimand and PRN demotion?**

MR. KEE: Object to form. You can answer.

A. There was no discussion prior to the reprimand.

**Q. Thank you. All right. Well, P.J., if I got it right, then that completes the 30(b)(6) --**

MR. KEE: Yeah.

**Q. -- deposition?**

MR. KEE: Thad, I just want to ask one question --

MR. T. GUYER: Okay.

MR. KEE: -- real quick.

EXAMINATION BY: MR. KEE

**Q. Okay. You were asked, Mr. McCormick, about your involvement in the decision making or the ultimate decision to have Ms. Wooten change from full-time to PRN. Can you describe more fully what it was that was told to you, or what the recommendation was originally when you were presented with Warden Paulk's -- what he was bringing to you relating to Dawn Wooten?**

A. Based on the disciplinary infraction and the ensuing investigation, which included her prior counseling sessions with her supervisor, the recommendation was made to Warden Paulk for termination. And Warden Paulk and I discussed that. And due to the dynamics of COVID and shortage of nurses and the crisis that everyone was in, we chose to transition that employee over to a PRN status in

the hopes that we could gain some use of her nursing skills to cover shifts; no matter what little or how much we could get, it was better than nothing. And we felt it was the best option for her and the company.

MR. KEE: I have no further questions.

MR. T. GUYER: Okay. Thank you. And I have no follow-up on that. All righty. So from this point on, I can dispense with that big, long -- official testimony thing and just kind of, like, talk like real people.

FURTHER EXAMINATION BY: MR. T. GUYER

**Q. So have you ever met or spoken with Dr. Mahendra Amin?**

MR. KEE: Before we start, I -- and I'm sorry to cut you off Thad, but, logistically, on the transcript, Court Reporter, this will be Mr. McCormick's personal deposition from here on.

THE GUARDIAN: Okay.

MR. KEE: So we'll get two separate transcripts, I think. Right, Thad? I mean, you agree with that?

MR. T. GUYER: Nicely stated. And what a great idea that is, two separate transcripts.

THE GUARDIAN: So, actually, we -- yeah, we didn't have that initially. If you would want to maybe take a five-minute break, we'd have to set up another one for a

separate audio.

MR. KEE: Is that okay, Thad, with you?

MR. T. GUYER: Oh, that's fine with me if you want to do it that way.

MR. KEE: Okay. And I think it's probably --

MR. T. GUYER: I have no problem with it.

THE GUARDIAN: All right. Let me take orders on this --

MR. T. GUYER: All right. So then why don't we save this. So we can go ahead and close this deposition out.

MR. KEE: Yes.

MR. T. GUYER: Counsel, I have no additional questions under this 30(b)(6). So thank you so much. And, Mr. McCormick, it was very nice meeting you in your representative capacity. I hope to meet you again soon in your personal capacity.

THE WITNESS: Yes, sir. Thank you, Mr. Guyer.

THE GUARDIAN: I do need to take orders. Attorney Guyer, would you like the original, sir?

MR. T. GUYER: We certainly would.

THE GUARDIAN: All right. And, Attorney Kee, would you like the copy?

MR. KEE: Yes, ma'am.

THE GUARDIAN: All right. The time is 11:17 a.m., and we are off the record. (Deposition concluded)

C E R T I F I C A T E

I, ROBERTA EBHERT, do hereby certify that JAMES MCCORMICK, the witness whose testimony is hereinbefore set forth, was duly sworn remotely on April 22, 2026.

The oath was administered by Kristoffer Bonilla, a Notary Public commissioned in the State of Louisiana.

I further certify that the foregoing transcript is a true and accurate record of the testimony provided, to the best of my knowledge and ability.

I further certify that I am not a relative or employee of any of the parties to this action, nor a relative or employee of counsel for any of the parties, nor am I financially interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 23rd day of April, 2026.

______________________________
Roberta Ebhert,
Guardian
Certified Deposition
Reporter (CDR)