# EXHIBIT 6

As guardian, I'll oversee the production of the transcript and make a certified copy, which will be available to all parties. Are there any additional stipulations between counsel?

MR. T. GUYER: No, not from plaintiff.

THE GUARDIAN: All right. Kristoffer, can you administer the oath, please?

THE NOTARY: Absolutely. Mr. McCormick, will you please state your full name for the record?

THE WITNESS: James McCormick.

THE NOTARY: Okay. And I ask you to raise your right hand, please. Do you swear or affirm that the testimony you're about to give is the truth, the whole truth and nothing but the truth?

THE WITNESS: I do.

THE NOTARY: Thank you.

THE GUARDIAN: Thank you. You may proceed, Attorney Guyer. Thanks Kristoffer.

MR. T. GUYER: Okay. Thank you.

EXAMINATION BY MR. T. GUYER:

**Q. All right. Nice to see you again, Mr. McCormick. We just finished doing a deposition in which you were the corporate representative. To the best of your knowledge, information and belief, did all of the**

**information that you gave us in that deposition -- was it true?**

A. Yes.

**Q. Okay. Thank you. All right. So have you ever met or spoken with Dr. Mahendra Amin?**

A. Yes.

**Q. Okay. And did you have -- what was your occasion to meet with him personally, if ever?**

A. It was one time and it was an introductory meeting to just introduce myself to him and him to me.

**Q. Okay. And why were you two introducing yourself to each other?**

A. During my oversight, walking through the facility, he's there as a medical provider --

**Q. Okay.**

A. -- that's all.

**Q. And does he have a -- did he have a contract with any LaSalle entity?**

A. I've never seen any contract. I don't know the answer to that clearly.

**Q. Okay. And do you know whether or not he had a contract with ICDC?**

A. I do not know what his contractual status was.

**Q. Okay. Now, is -- does Dr. Amin still provide services to detainees at ICDC?**

A. No, he does not.

**Q. Okay. And when did that stop?**

A. I am not certain about that.

**Q. All right. Do you know why it stopped?**

A. No, sir, I do not.

**Q. All right. Now, in -- let's just take 2020, when Ms. Wooten was there. My understanding, correct me if I'm wrong, is that the detainees themselves didn't specify "I want Dr. Amin." They specified they had a medical or gynecological need and ICDC sent them to Dr. Amin. Is that your understanding?**

MR. KEE: Object to form. You can answer.

A. Yes, that is my understanding as well.

**Q. All right. And do you know whether any funds from LaSalle Southeast were paid to Dr. Amin?**

A. I don't know the answer to that. No.

**Q. Thank you. And I -- other than that one time where you introduced yourselves to each other, as I understand, you've never had any other communications with him; is that right?**

A. That's correct. No other interactions.

**Q. All right. Prior to July 2nd of 2020, did you ever receive any kind of reports regarding the quality of services being rendered by Dr. Amin to the detainees at ICDC?**

A. No, sir, I did not.
**Q. All right. And to your knowledge, did Dr. Amin come to the facility and provide services at the facility, or was it that the detainees had to go to his office or some other place?**
A. To my knowledge, it was a combination of both.
**Q. All right. Thank you. If a detainee in 2020 thought that they were receiving poor medical care, how does -- what would be the official process for the detainee to report that or complain about it?**
A. It would be a multi-layered process and they had options; one was a verbal interaction with the medical staff on site; secondly, they could file a grievance, which would be a written grievance that would be responded to by staff; and, thirdly, they had the option of contacting the ICE personnel on site, either verbally or there was a separate process called "ICE Detainee Communication," where they could file, basically, another grievance that went directly to the ICE inspectors.
**Q. Okay. Thank you. What -- am I understanding you to say that there were actually Department of Homeland Security employees who actually had office space at ICDC?**
A. Yes, you are correct.
**Q. Okay.**
A. They had office space at ICDC.

**Q. Okay. And what names do you recall or do you know of -- do you recall from 2020 of any ICE personnel who were stationed there?**

A. The only name I recall is a lady named Beth Lemrick.

**Q. Okay.**

A. Otherwise, I -- there were five of them there in total, and that's the only name I recall.

**Q. Okay. And are they still there or -- people in those capacities from ICE?**

A. There are those people in that capacity today. But --

**Q. Okay.**

A. -- they are not the same people as five years ago.

**Q. And do you know any of the names of the ICE people who are there now?**

A. No, sir. I'm sorry. I don't.

**Q. All right. Thanks. I take it that you would not have any kind of regular meetings with ICE employees?**

A. Not regular, no.

**Q. Would -- but I take it then, from your answer, from time to time you actually would have meetings with ICE employees in 2020?**

A. Very limited. It would just be during my

**Q. Okay. And do you know if the employee handbook forbids retaliation against an employee who raises a concern of quality control in some way?**

A. Yes, sir, it does.

**Q. All right. So is it fair to say that the employees are told that -- if an employee wants to raise and elevate a concern about a problem at the facility, everybody is trained through that manual to know you cannot retaliate against the employee for raising that concern; is that correct?**

A. Everyone has acknowledged they are aware of that policy, yes.

**Q. Okay. Thank you. And if an employee thought that they were being retaliated against for raising a concern, what was the mechanism by which they could bring that attention to LaSalle Southeast?**

A. They had multiple avenues to make that knowledge known. It could be verbally to their supervisor or the warden of the facility. They could also utilize the employee grievance process, where they could file grievances in writing. And then, the third option is a -- what we refer to as a "hotline." It's a confidential employee service that's provided, where they can remain anonymous or they can state their name if they choose to. It goes to a third-party vendor, and then that complaint or

information is formatted and sent to the company for review and follow-up.

**Q. And was that hotline there in July of 2020; do you recall?**

A. Yes, that hotline was there at that time.

**Q. All right. And then, apart from retaliation, if an employee had a health or safety concern, how were they able to raise that concern? Through the same process --**

A. Yeah.

**Q. -- as you described?**

A. The same process, yes.

**Q. Okay. So you could just go tell your supervisor if that's how you chose to do it; is that correct?**

A. If you chose to, yes, that's one option.

**Q. Or if you wanted to go to -- if you wanted to raise it in the first instance with the warden, were you allowed to bypass the chain of command to do that; do you know?**

A. Yes, you were.

**Q. Okay.**

A. Yes.

**Q. And is that stated in the written policy?**

A. I'm not sure how it's stated, but I know it's

an option, yes.

**Q. Okay. Thanks. And do you know whether or not -- if a first-level supervisor receives a safety or quality concern, whether or not they're obligated to pass it up the chain of command to their supervisor.**

A. Yes, they are.

**Q. Okay. So is it fair to say that the ICDC, under the -- with the support of LaSalle Southeast, was that anybody who saw anything wrong or dangerous or safety concern could report it anywhere from the most informal level to the most formal level; is that correct?**

MR. KEE: Object to form. You can answer.

A. Yes, sir. That is correct.

**Q. All right. Thank you. In 2020, did Warden Paulk have a deputy warden?**

A. Yes, he did.

**Q. And who was that?**

A. Mr. Frank Albright.

**Q. And is he still there?**

A. No, sir.

**Q. Do you know when he left?**

A. Not specifically, but I believe somewhere around 2022.

**Q. All right. And was he a LaSalle Southeast employee?**

A. Yes, he was.
**Q. And other than doing whatever jobs Warden Paulk gave him, did he have any other specific jobs than that?**
A. His job was to assist and provide support to Warden Paulk.
**Q. All right. And do you know whether or not Frank Albright was involved in any way with the discipline of Ms. Wooten?**
A. I do recall, from reviewing the documents, that he conducted the investigation of the disciplinary report.
**Q. Okay. Thank you. And do you know whether or not Ms. Wooten's supervisors were -- gave information in the investigation?**
A. Again, from reviewing the documents, I do know that it was her supervisor who initiated the disciplinary process through a written write-up.
**Q. Okay. And do you know the name of that supervisor?**
A. It's Ms. Brown.
**Q. Okay. So Lakisha Brown?**
A. That's right, Lakisha. I'm sorry, I couldn't recall the name.
**Q. Well, sure. Okay. And then, how about Marion**

**Cole; do you know whether or not she was -- gave information in the investigation?**

A. That wouldn't have been possible. Ms. Cole had passed away prior to that.

**Q. Okay. Thank you. And then, how about Shanise Bell; do you know if she was involved in the investigation?**

A. I don't recall, from review, if I saw her name on anything or not.

**Q. Okay. Who reported to Lakisha Brown, to your recollection, in July of 2020?**

A. Who reported to her? I don't quite understand the question.

**Q. Well, I'm trying to kind of picture the chain of command. So did -- for example did Marion Cole or Shanise Bell report -- well, just say did Shanise Bell -- was Lakisha Brown her superior?**

A. Yes, Ms. Brown was Ms. Bell's superior.

**Q. Okay. Thanks. And do you know who Ms. Brown reported to? Who did she directly report to above her?**

A. Her direct report would have been Dr. Hearn.

**Q. Okay. All right. Thank you.**

A. Mm-hmm.

**Q. Okay. So it -- when is the first you learned of these allegations that Ms. Wooten has made in this lawsuit?**