# EXHIBIT 7

we're talking about the same exhibit, Exhibit 42. All right. Okay. That's right.

**Q. All right. So -- and next we'll go to -- because it's obviously not employee correspondence, but it doesn't matter. So Exhibit 43 "Employee Investigation Report."**

(Exhibit 43, introduced)

A. That would have been processed through the investigation phase with Deputy Warden Albright. It would have been part of the final packet before a determination was made.

**Q. All right. Thank you. And then -- and do you think you saw this around the time it was prepared?**

A. I don't specifically remember seeing it.

**Q. Is it the kind of document in the normal course of distribution of documents that would have come your way, or it's not the kind of thing that would have come your way?**

A. It would have went into the HR file.

**Q. All right. Thanks. All right. And --**

A. And that -- it may have went into the medical HR file --

**Q. Thanks a lot.**

A. -- or medical notes file.

(Exhibit 49, introduced)

**Q. I appreciate it. All right. The next one is Exhibit 49, and this is an amended Habeas petition in Oldaker v. Giles.**

MR. T. GUYER: And if you would scroll down --

A. This lawsuit, you're named as a defendant. I take it you've seen this before, correct?

A. I have seen it before.

**Q. All right. Thanks. All right. And you would have seen it back around the time you were sued, right?**

A. Correct.

(Exhibit 50, introduced)

**Q. All right. And the next is Exhibit 50. This is a transcript of a YouTube video, that was uploaded to the -- to YouTube on April 13th of 2020, with a group of Spanish-speaking women doing a video.**

A. And I take it you are familiar with the video itself; is that correct?

A. I am familiar with the video.

(Exhibit 51, introduced)

**Q. Okay. All righty. And then, Exhibit 51, is an interview transcript dated June 8th of 2021. Let me know if you're familiar with it.**

A. I'm not familiar with the Public Health Nursing Section. I don't know if I was copied on that or not, but I have seen it at least in preparatory.

**Q. Okey-dokey. All right. And now there's a couple that I don't have marked here. One is your deposition, and we have it marked out as an Exhibit --**

THE GUARDIAN: And --

MR. T. GUYER: We'll just refer to it as Exhibit A.

MR. KEE: So, Thad, I just want to -- before we move on, you had asked him about that exhibit. There were -- it seemed like, and I don't know if it was on purpose or not, but there was a lot of other pages, it looked like a in globo exhibit, the one --

MR. T. GUYER: Oh, okay.

MR. KEE: -- that you were just showing. If you -- I don't know, if you scrolled through that, for instance --

MR. T. GUYER: Yeah. Let's go back to that exhibit. And we're talking about Exhibit 51, correct?

MR. KEE: Correct.

MR. T. GUYER: So go ahead and scroll down.

**Q. And just if you could let us know when you see a page that you don't think you're familiar with.**

A. I'm not familiar with that page --

**Q. All right.**

A. -- that you got up there now.

MR. KEE: That's page 2.

MR. T. GUYER: All right. So keep going. And you just go onto the next one.

THE GUARDIAN: I have it.

**Q. All right. How about this?**

A. I'm not familiar with any of that question and answer.

**Q. Okey-dokey.**

MR. T. GUYER: So you keep on going then.

**Q. All righty. How about this e-mail? Is it an e-mail? Yeah.**

A. No, I'm not familiar with it. This was internal in HR.

**Q. Okay.**

MR. T. GUYER: Let's keep going down. We'll go to the next full page.

**Q. How about this document?**

A. That would be unemployment. I wouldn't be familiar with that. That would be HR.

**Q. All right.**

MR. T. GUYER: Let's keep going

THE GUARDIAN: It's the same.

MR. T. GUYER: Yeah. We'll just go to the next document if there's another one.

THE GUARDIAN: Okay.

**Q. All right. How about this exhibit?**

A. I don't recall seeing that document, no.

**Q. All right. Thank you.**

MR. T. GUYER: And keep going.

**Q. Okey-dokey. How about this page --**

A. No.

**Q. -- of the exhibit?**

A. No. This appears to be communication with OSHA representatives. At the time of the inspections, they would give no information. I could get nothing. So I didn't see any of that.

MR. T. GUYER: All right. Let's keep going.

THE GUARDIAN: I think that's all the same.

MR. T. GUYER: Okay. If it's all the same, then we're done with it?

THE GUARDIAN: Yeah. Let me see.

MR. T. GUYER: So let's --

THE GUARDIAN: It's only on page 23, though.

MR. T. GUYER: Oh, of how many pages?

THE GUARDIAN: 55.

payroll was being processed through agreement between LaSalle Southeast and Irwin County, and other than that, I, you know, I still speak to the sheriff almost on a three or four-times weekly basis.

**Q. Absolutely. He's the elected official and the highest official in law enforcement in the county, correct?**

A. That's what it appears.

**Q. Okay. Exactly. Thanks. And when -- did you work at the Irwin County Detention Center before the management of it was turned over to LaSalle Southeast?**

A. Yes.

**Q. Okay. And at that time, were you working for another contractor or were you a public employee?**

A. It was through another contract source, Irwin County Detention Center, Terry O'Brien. It was a group that the county had gotten into a bond deal with --

**Q. All right.**

A. -- and it stayed that way up until the time that that changed.

**Q. Thanks. And then, prior to that contract, at any time in the past were you a public employee of Irwin County?**

A. Never had a public job in my life, sir.

**Q. All right. And do you receive any kind of retirement benefits that the State of Georgia or the County**

**of Irwin provides to public employees?**

A. No, sir. I opted not to participate in the county program initially when it was made available to me.

**Q. All right. Well, let's go to the year of 2019, because that's -- our relevant time frame for this case is pretty much going to be 2019 to 2021. And our big focus will be on 2020, which you can tell from all the documents, is when Nurse Wooten was put on PRN status. Okay? Are you -- do you recall that time, that general time frame, December 2020?**

A. Generally, yes.

**Q. Okay. All right. So you were the warden in 2020; is that correct?**

A. That's correct.

**Q. And what are the duties of -- what were the duties of a warden in 2020?**

A. Overall review and management of the operation, including internal, external and transportation, and any issues with outside agencies or government agencies.

**Q. All right. And who did you report to in 2020?**

A. I had full discretion on pretty much everything. I did run a lot of questions through Mr. James McCormick, to make sure that I had somebody to sort of field my decisions through.

**Q. All right. And when it came to the problems with the attendance of Nurse Wooten, did you run those issues through with Mr. McCormick?**

A. At the end result when I made a determination, I ran it by him to see if he would -- was in agreement that it would be the right thing to do.

**Q. Okay. And then, do you know Dr. Pamela Hearn?**

A. I'm familiar with her.

**Q. And do you recall if you ever had any discussions with Pamela Hearn, M.D., about Dawn Wooten?**

A. I didn't personally have any communications.

**Q. Okay. All right. And then, do you have any military background?**

A. None, sir.

**Q. And then with respect to Mr. Albright, how long have you known him?**

A. I met Mr. Albright when he came to work with us through the duration there, so I've had no communication with him since he left.

**Q. And why did he leave?**

A. Contract with Immigration was pulled, and we reduced staff.

**Q. All right. And for how many months or years did you work with him at Irwin County Detention Center?**

A. I would have to go back and check his file to

see, sir. I don't --

**Q. More or less than one year?**

A. More than a year.

**Q. Okay. More or less than five years?**

A. Less than five.

**Q. Okay. Great. And what were his job duties in the 2020 time frame?**

A. His job duties were handling issues with anything to do with security in the facility, security issues, disciplinaries, investigations, whatever needed to be done.

**Q. All right. And I take it -- was he a direct report to you?**

A. Yes.

**Q. And was -- did his job include just essentially doing whatever task you delegated to him?**

A. He had a basic outline of responsibilities, and then if I issued or assigned a special project, then he would do that.

**Q. All right. Thanks. And do you recall if you ever assigned to him either a normal duty or a special duty on a project regarding Dawn Wooten?**

A. No, it was within his normal range of duties to deal with HR and any issues up to the point where a decision had to be made on continued employment.

**Q. All right. Thank you.**
A. It was then that I got involved.
**Q. All righty. Okay. And then, did Mr. -- he was deputy warden, was that his title?**
A. Yes.
**Q. And did Deputy Warden Albright have anybody who reported to him?**
A. He had a major and a captain and four lieutenants.
**Q. Okay. And who was the -- give me as many of those names as you can starting with the major. Basically in the 2020 time frame?**
A. I think Coretta Battle was a major, and the lieutenants -- there's been a rotation. I would have to go back and review records to give you that data.
**Q. All right. And do you recall any of the -- if the major or any of the lieutenants were involved in any matters regarding Dawn Wooten's employment?**
A. No.
**Q. Okay. It would not have been as part of their normal duties, I take it? Is that correct?**
A. It would have been outside their line of -- their normal duties.
**Q. Excellent. All right. So do you remember a woman named Lakeysia?**

A. They were done at the facility in the warden's office at a round table.

**Q. And approximately how many people attended?**

A. 8 to 12 --

**Q. All right.**

A. -- depending on the shifts and who was there.

**Q. And did anybody from medical other than Kakeysia Brown attend the meetings?**

A. I believe when Bell was made DON, she started participating in the meetings as well.

**Q. Okay. And do you --**

A. If one was out, the other would attend.

**Q. Great. And do you remember Bell's full name or first and last name?**

A. I don't remember the first name. Nurse Bell is --

**Q. Was it Shanise?**

A. It sounds familiar, but, I mean --

**Q. Okay. And what was her job?**

A. Director of nursing. She was supposed to oversee the operations of the scheduling and the day-to-day details of getting things done within the office.

**Q. All right. And does she still work there?**

A. No, sir.

**Q. And do you recall about when she left?**

A. I do not recall without referring to the file.

**Q. Okay. Since Ms. Bell and Ms. Brown left employment at ICDC, have you ever communicated with either one of them?**

A. I haven't talked to either of them.

**Q. Okay. All right. So I take it you must have had some sort of a reporting protocol or expectations. You could describe it in whatever word, but if something's going on out in the medical realm out there in the ICDC, at some level you expect people to bring it to your attention; is that right?**

A. I expect them to use the chain of command, which would be to go through the -- in this instance, it would be to go through the warden and HR, and then I would become involved at the end of the process.

**Q. Okay. All right. So that -- if -- well, you said let's just kind of break that down a little bit if we can. I know these things aren't always clear as crystal, but we do have these Monday meetings, and I take it that both -- that whether it was Brown or Bell, either one of them were free to bring up to you anything they thought was important, correct?**

A. Yes.

**Q. And do you recall either one of them ever bringing up anything about Ms. Wooten in that meeting?**

A. Not in the meeting, no.

**Q. Okay. So not -- the Monday meetings you feel pretty confident that you never heard anything from either Bell or Brown about Dawn Wooten, is that correct?**

A. Not in the group meeting.

**Q. Okay. Great. Now, does that -- did the group meeting have some sort of limitations as to what could be brought up and what couldn't?**

A. It was fairly regimented on the stats and statistics on what was going on. Medical would update on where they were at, who they got on suicide watch, hospitalization, any issues that they're having, you know, pill pass, its functioning, etc. But so far as, other than if they were short staffed, staffing wouldn't come up in that meeting.

**Q. Okay. Now, do you know what is meant by the term "whistleblower"?**

A. Sure.

**Q. Okay. And if Lakeysia Brown, for example, was aware that one of her nurses had become a whistleblower and was reporting things to the government, would you have expected Ms. Brown to let you know about that?**

MR. KEE: Object to form. You can answer that.

A. I would have expected, yes.

**Q. Okay. All right. So I asked you before about**

**the YouTube video from April of 2020, and I showed you the exhibit, which was the Oldaker lawsuit in which you were named by a bunch of women. That was in the same time frame. Do you recall during the Monday meeting ever having any discussions about the YouTube video?**

A. Not in the meeting.

**Q. Okay. And same question as to the Oldaker lawsuit, in -- do you recall in the Monday morning meeting ever having discussions about the Oldaker litigation?**

A. Neither subject would be correct for that meeting.

**Q. Okay. All right. So how did the YouTube video that was -- at least it was posted on YouTube in April of 2020, how did that come to your attention?**

A. Well, I was told by someone on staff that it had gone on YouTube, and that it had been put out, and we did a little checking, and we determined sort of where it came from.

**Q. Okay. And so was any part of that video or all of it, to your knowledge, recorded in the facility?**

A. Yes.

**Q. Okay. And did you determine who was behind that?**

A. There were assumptions, but no verification.

**Q. And what were the assumptions?**

A. The assumptions were that the video came from one of the tablets that they had set up. They had -- we had them for family visitation and etc. And that was done, pre-planned and done. And that's -- it was copied by the individual that made the call coming in for the visit and then uploaded it.

**Q. And who was that?**

A. I don't recall the name, sir. It went through several stages.

**Q. Do you remember the names of anybody associated with the making or the uploading of that video?**

A. Not right off the cuff. I don't remember the name, sir. There was -- there were several individuals that were anti-immigration and tied in with some of the groups that were calling in, speaking with detainees, which was absolutely their right to do so, and, I think, it grew from that group.

**Q. And did it come to your attention that Dawn Wooten was associated with the actual making of that video?**

A. Absolutely not. I never -- I was never told that.

**Q. Okay. Thank you. Now, the women later alleged that as soon as you found out about that video, you put some of them in segregation holds. Do you recall hearing that allegation against you?**

A. I don't remember hearing that allegation.

**Q. And do you remember putting anyone in -- changing anyone's custodial status in any way because, in whole or in part, they were associated with that video?**

A. I don't recall changing anybody's custodial status. That would have been with Lieutenant -- excuse me with Major Battle. She dealt with the detainees on it. She updated me a time or two. She may have moved some to another housing unit, but no lockdown. I mean, it was nothing to -- there was nothing there to discipline anybody for.

**Q. Okay. And Lieutenant's last name is what? Would you please spell it for us?**

A. It's the Major. Battle, B-A-T-T-L-E.

**Q. Thank you so much. Major Battle. What a cool name. So Major Battle -- how did Major Battle get assigned to look into that?**

A. Major Battle was over the facility. She was up under the deputy warden, so she was in the chain of command for handling issues.

**Q. Okay. So if -- and so do you know who Dr. Mahendra Amin is?**

A. I'm familiar with Dr. Amin.

**Q. Have you met him before?**

A. I have met him before.

**Q. Have you had any role in his having a contract with ICDC?**
A. No, sir. That would have been through IHC, which is immigration healthcare. That would be -- they're -- would be the ones to approve him for use.
**Q. Okay.**
A. His contracts were, I think, '96 he was in a contract to manage the Irwin County Hospital, but he came out of there, went to another one. So no, I wouldn't -- no.
**Q. Okay. Well, our understanding, and correct me if I'm wrong, is that if the women needed gynecological care, they were -- in 2020, they were sent to Dr. Amin.; is that your understanding?**
A. That was the level that they were using.
**Q. Okay.**
A. They had an additional, I think, over in Fitzgerald, that they would use.
**Q. Over where?**
A. There was one in Fitzgerald, a female OB/GYN there that they would use on occasion.
**Q. And is it your understanding that your nursing staff allowed the detainees to choose which of those two doctors they went to?**
A. No. They would have taken the first available

**Q. Okay. All right.**
A. In addition to that, they had SPLC and Project South down the road, and there were anywhere from four to eight or ten a day of those attorneys, or associates or assistants, in that facility meeting with these detainees daily, including on Saturdays and Sundays.
**Q. And what's Project South?**
A. It's one of the groups that's out there that is supposed to be defending the rights of the immigrants, I guess.
**Q. Okay. And when do you recall these lawyers first coming in to the facility in the 2020 time frame?**
A. As soon as we started housing a significant population of females.
**Q. And that would have been about when?**
A. I think 2012 is when it swapped over. So we had them forward in, so they were in there -- what? I don't know the exact year. I would have to go back and look, but they were there several years with us.
**Q. All right. So after this Oldaker litigation was filed with all these women making all these claims, and you were made aware of it, had you already been made aware of these kinds of claims of gynecological abuse?**
MR. KEE: Object to the form. You can answer if you'd like.

A. I don't recall the timing of when I saw the document versus when I first heard the allegations of abuse.

**Q. Okay.**

A. So I don't know what came first, the chicken or the egg there, sir. I apologize.

**Q. That's okay. At any rate, regardless of whether chicken or egg came fast [sic], when you got the lawsuit, do you remember being shocked by the allegations?**

A. Yes.

**Q. Okay. And do you recall if you asked anybody had they heard these allegations before?**

A. That was turned over to legal. And that was a medical issue, a medical investigation, and that was turned over to the appropriate people to deal with that.

**Q. Okey-dokey. All right. So, now, with respect to COVID-19, did it come to your attention that some of the detainees were complaining that they didn't think proper preventative measures were taken to protect them from COVID-19?**

A. There were remnants of that in generalities.

**Q. All right. Do you recall at some point whether or not you received a supply of masks that specifically arrived for the purpose of battling COVID-19?**

A. I had mask on hands before the outbreak.

**Q. All right. And do you remember Ms. Wooten asking you about a big bunch of masks that you had in your office and whether or not they could be distributed to the detainees?**

MR. KEE: Object to form. You can answer.

A. No, I do not.

**Q. Okay. Can you -- then the same with the staff? Were you receiving reports that the staff thought that they were not being protected appropriately from COVID-19?**

A. No. You know, nothing was coming back to me that they weren't being protected. There were questions upon the distribution of masks.

**Q. And who do you recall bringing that to your attention?**

A. I think maybe Marion Cole prior, but that was toward the end of it. Maybe the major may have said something about it, but we were following strict protocols.

**Q. All right. And do you recall anybody bringing to your attention that there was blood being spilled on the floors and it wasn't being timely cleaned up?**

A. No.

**Q. Okay.**

A. I mean, that -- we have blood spill kits. I mean, that's -- you know, if something happens, you clean

it up.

**Q. And how do you know about that?**

A. About what?

**Q. About there being blood spill kits.**

A. It was just part of the requirements to have in the facility.

**Q. And was it part of the requirements that you know that those blood spill kits were in the facility?**

A. They were to be held -- they were to be available within the facility for use, so, yes --

**Q. So that --**

A. -- it was required.

**Q. So that was a rule of -- a requirement of some sort, and you yourself, as warden, were obligated to know about that requirement; is that correct?**

A. It was part of an inspection protocol that would go through with immigration, U.S. Marshals, anybody else that was contracted people in there.

**Q. Okay. Thanks. Now, back to the DOs and the DSO. You -- how many of them were on duty at any given time?**

A. Four to five.

**Q. All right. And as I understand it, you provided some workspace for them at or near the facility?**

A. We provided workspace for them in the

facility.

**Q. Okay. So let's talk about -- a little bit about the facility itself then. I take it that -- obviously -- I'm just going to start backwards. So there must be a building and the facility is in the building, correct?**

A. Everything in the secured parameters inside the fence is in the facility.

**Q. Okay. Thanks. And how many buildings are there inside that fence?**

A. Individual buildings? We've got one two, three, four.

**Q. Great. And in which of the buildings are detainees kept?**

A. At that time, they were kept in various parts of the building. Some open units, some of the closed units.

**Q. Okay. But -- so you -- I think you said that there were four buildings. How many of those buildings actually housed detainees?**

A. Three of them.

**Q. Okay. Great. And was one of them -- were they all the same size, or was one of them considered the main housing unit?**

A. No. They -- you had the capacity for 576 in

ENF buildings combined, 256 per. The units up front were open dormitory units. You had capacity for 100 per side. So Alpha A1, A2, you could get a maximum of 200 in it. There were three dorms like that. We also had a unit outside that would hold 96.

**Q. What do you mean "outside"?**

A. It's an add-on modular unit that we put in for additional housing space, all steel construction, very secure.

**Q. Okay.**

A. Four units hold up to 24 inmates or detainees per unit.

**Q. Okay. And in how many of these four buildings were women detainees kept?**

A. They were all kept up front --

**Q. And what's "up front"?**

A. -- unless there was a reason to move them back for air conditioning down or something like that.

**Q. Okay. And what building was considered up front?**

A. The video you saw was C unit. That's one of the open dorms. That was one of the primary spots we kept them.

**Q. Okay.**

A. Around that time we were running around 850 on

were not there for security functions for the overview of the detainees on an hourly basis. That was our staff. They were there to make sure that everything got processed, paperwork was done, documentation was correct, any issues that the detainees had that they wanted addressed that we weren't addressing, or that had to do with their case file, that's what the SDDO and the SDOs were for -- or the DOs were for.

**Q. I see. And do you recall whether or not there was any written protocol -- by "written" I mean, it could be in any written form -- that said that if the DOs receive a complaint from a detainee about mistreatment, that the DO is obligated to let you know?**

A. That would be in the immigration procedure, but that was the process. If they had an issue, they would let us know immediately.

**Q. Okay. And so --**

A. And they could go to -- they could take it straight to medical, or they could go straight to legal if it was a law library issue, or they knew the staff that was running it. They knew the staff responsible for it, and they communicated.

**Q. So after the 2020 -- the April 2020 video, came out with the detainees holding plaque signs and making complaints, did anybody from the -- from ICE or the DSO or**

**DO come and want to talk to you about that video?**

A. It was discussed.

**Q. Where?**

A. I think we discussed it with the SDDO at the facility. And I'm quite certain I had a conversation with someone at the field office.

**Q. And do you recall where the -- whether either of these two meetings that you -- are you talking about two different meetings, or are you just talking about just generally hearing about it?**

A. Generally informing them of: "We've seen this. You've seen it. This is what we've got."

**Q. Okay. And do you recall if someone came and formally interviewed you to investigate the allegations that were made in that video?**

A. Immigration staff went in and talked with the people that they identified on video.

**Q. Did anybody --**

A. We also -- I think Major Battle discussed it with a number of them on the video.

**Q. Okay. Did anybody from immigration come and talk to you specifically about the video?**

A. I was in the general diatribe between the sheriff's office, ICE and our facility.

**Q. Do you recall anyone in particular coming and**

**saying, "I'd like to sit down with you or have a phone call with you and talk about what you know about the allegations that these women made in the video? Not Albright, not anybody else, you. We want to talk to you." Do you recall that happening?**

A. I talked to the SDDO there. She was in control. She -- that individual was tied to the AFOD in the Atlanta field office, and our communication went through that thread.

**Q. All right. And do you recall ever seeing any written report or notes of that meeting that you had with them -- with her?**

A. No. I don't -- I believe it was verbal. And then, whatever communication she had, that would be on their end.

**Q. All right. Thanks. All right. Then the same question about the lawsuit. When the Oldaker lawsuit came to your attention, do you recall whether or not anybody from immigration said, "We want to talk to you"?**

A. When that was received, it was turned over to legal. Immediately upon reception of something like that, we start preserving documents, doing everything that needs to be done. ICE legal got involved with it and our legal got involved with it. And then, if I was updated, it was on a random basis.

**Q. Thanks. Were there any requirements having to do with document retention that forbade the shredding of medical records?**
A. Technically, it's not good custom to -- it's not a good custom to shred any records. Okay.
**Q. And did anybody --**
A. We prefer either shredding or burning if they're marked for that.
**Q. And do you recall anybody coming to you and raising an issue or a concern over some document shredding that was going on while Nurse Wooten was there?**
A. Not while she was there, no, sir.
**Q. Okay. Do you recall after she was there?**
A. I heard some rumblings about it, but no.
**Q. And did you investigate those rumblings?**
A. I turned that over to the individuals that were running the department, and Dr. McMahan.
**Q. And who were those people?**
A. I think that was Brown, and she probably incorporated Bill into the investigation.
**Q. Okay. Thank you. Now, one of the -- at some point, you yourself made a decision to demote Nurse Wooten; is that correct?**
A. That's correct.
**Q. And did you obtain recommendations or**

**information from anybody before you took that decision?**

A. I made the determination. Once I made the determination, I filtered it back through Mr. James McCormick to get his input to see if he felt like I was in line with what would be proper.

**Q. All right. I got that part of it. That's on the approval end. But kind of as you've described it here, what Nurse Wooten's attendance was, that's not something that you determined -- you relied on somebody to tell you about her attendance, correct?**

A. Well, that's the reporting process up through the system, yes.

**Q. Okay. And who brought that to your attention? Was it Ms. Brown?**

A. Frank Albright initially when it got to be problematic.

**Q. Okay. At any point did Ms. Brown give you any input regarding Nurse Wooten's attendance or performance prior to you deciding to demote her?**

A. Prior to, it was alleged call-off issues. It was not -- you know, no call, no show. That type of thing that, you know, I'd heard mentioned. Again, that was all processed through the HSA, through the deputy warden until it was compiled.

**Q. And who was the HSA in June and July of 2020?**

A. That's still Brown.

**Q. Okay. All right. And did you, at any point, ask Ms. Brown for her recommendation on what should be done with Nurse Wooten?**

A. I don't recall asking for her recommendation on what to be done.

**Q. Okay.**

A. I recall having a discussion with her regarding the issues created.

**Q. Okay. And do you recall having asked Deputy Warden Albright what his opinion was as to what the appropriate discipline would be?**

A. I think we did have a conversation about that.

**Q. And do you recall what his recommendation was?**

A. His indication to me, if I recall correctly, was that -- with the way things had transpired, that it was a terminable offense, and after thought, we made the decision not to go that route.

**Q. And did you have any direct interactions with Nurse Wooten?**

A. Other than passing in the hallway speaking, no.

**Q. Okay.**

MR. KEE: Hey, Thad, we've been going about an hour and a half. I just -- whenever you get a chance, I'd like

to just take a quick bathroom break, if you don't mind.

MR. T. GUYER: I certainly do not mind.

MR. KEE: I don't mean to interrupt you.

MR. T. GUYER: All right. No, no. I know. This is actually a good time for us to go into our breakout room for, oh, let's say ten minutes. Okay?

MR. KEE: Okay. Perfect.

MR. T. GUYER: I'm near the end. I'm near the end.

MR. KEE: Okay. All right. Thank you, Thad.

MR. T. GUYER: All right. Thank you.

THE GUARDIAN: I'll take us off the record. The time is 11:58 a.m., and we are off the record.

(Off the record)

THE GUARDIAN: The time is 12:14 p.m., and we are back on the record.

**Q. Great. Just a few little follow-ups here. The first is: Is Major Battle still around?**

A. Actually, just -- she actually just went to work with us again --

**Q. No kidding?**

A. -- in a different setting.

**Q. And how long had she been gone?**

A. Several years.

**Q. Wow. So do you recall what she's doing now for you guys?**

A. We've got her as a -- what's termed a CPO for immigration. It is a position that assists the DOs and works with the detainees population to make sure that they're getting what they need -- if they're, you know, if they got issues, you know, they'll report it to ICE, if ICE hadn't already got it done or don't already know about it. If it's medical, they'll go to medical and follow up with it. Sort of like a case manager.

**Q. Okay. And how long ago was it that you said she came back?**

A. I got her back less than two months ago.

**Q. Less than one month ago?**

A. About two months ago.

**Q. Two months ago. Okay. Sounds good. All right. Did any staff at ICDC in 2020 come down with COVID, that you recall?**

A. Yes. Yeah --

**Q. Yeah?**

A. -- multiple staff come down with COVID.

**Q. Okay. And did any management come down with COVID?**

A. I had COVID, so --

**Q. Okay.**