# EXHIBIT 16

**Dawn Wooten Interview with Senate HSGAC (06-08-2021)**

---

**At the beginning of the call there was a round of introductions. Dana, Samantha, and Irvin introduced themselves. As did Taylor Burnette, Counsel for Jon Ossoff, Brandon Everett, Chief Counsel for Jon Ossoff, Meeran Ahn, Counsel for Jon Ossoff, and Kyle Brosnan from Sen. Johnson's staff.**

**Brandon:** Ms. Wooten how long have you been a nurse practitioner?

**Wooten:** I am 43. December will be 12 years. I'm an LPN. I've working in various facilities from nursing homes, to ER, to ICU, med surge, OBGYN, clinic work, health department work and I've been a correctional nurse only at ICDC on and off for 6 to 7 of the years I was nursing.

**Brandon:** When did you start at ICDC?

**Wooten:** The first hire date was March 2010, and I worked until December of that same year because the supervisor we had packed up her stuff one morning and told us she's leaving. They hired another supervisor and she hired someone else. So I was there for about 9 months.

**Brandon:** During your most recent time at ICDC who was your director supervisor?

**[0:00]**

**Wooten:** My direct supervisor in October until May was Marien Cole, she was an HSA, and Laquisha Brown was the D.O.N.

**Senate HSGAC:** And could you explain what HSA and DON are for us?

**Wooten:** The HSA is the...um...I want to say she's the Human Service Administrator I think is the title that they carry or Health Service Administrator, so she's like the hierarchy of the nursing department, she's the chief. The DON is the Director of Nursing. She's the understudy to the supervisor there.

**Senate HSGAC:** I see. And can you walk us through what type of work you typically perform at the center, your daily duties, and if those duties tend to change over time?

**Wooten:** The daily duties there at the facility were variant. We didn't have specific duties. If I worked from 6a to 6p, I would be sometimes a cart nurse, which was a medication nurse. That was, I would pass medications three times a day or pass the morning meds, lunch meds, and then 4 o'clock pm meds, which would be like bedding medication. I would also handle the emergencies if they called codes inside the facility that warranted nurses that would be my responsibility. I also put in orders for outside referrals that were referred from the nurse practitioners or the physicians that worked there. I was also responsible for handling the emergency situations that were in medical at the time, even though it was two of us to split those duties. At the same time if I needed to draw blood, I had to draw blood. If I needed to obtain specimens, urine of any kind, I was warranted to do that. I was also to answer the phone, to call the pharmacy, to order medicine. A 12-hour day there was not job specific, it was you do whatever, however, whenever.

**Senate HSGAC:** And it sounds like you certainly stayed busy?

**Wooten:** Yes.

**Senate HSGAC:** In terms of the other folks working at the medical unit at the center, um, our understanding is that the unit would have a medical director, a director of clinical services, the HSA, which you mentioned, can you give us a sense of what employees worked in the mental unit and what the hierarchy was in terms of the supervisors there?

**Wooten:** The daily duties there at the facility while their HSA would be present, sometimes half the day, sometimes all day. Might not be there 8-hour shift, she might be with us, at the time she was sick so she was with us from maybe 6 in the morning until maybe lunch. The DON, the Director of Nursing, was to be the one that took over from her, leaving the facility if she stayed half the day, she very suddenly stayed all day. The Director, or the Medical Director, he came in and worked maybe once a week, and saw,

maybe got to the point where four or five people that he once seed. The Nurse Practitioner were the gist of the run of the mill that were there during the day. They would see majority of your detainees that were there inside the facility. The DON was very vaguely there, so we spent a lot of time supervising ourselves.

**Senate HSGAC:** And so nurses like yourselves would be there full time, even if these other employees would be coming and going.

**Wooten:** Yes.

**Senate HSGAC:** Is that correct?

**Wooten:** Yes.

**Senate HSGAC:** And can you recall the names of the individuals who fulfilled these roles during your last stint at the center, who was the Medical Director, who was the Director of Nursing, that sort of thing?

**Wooten:** The HSA October until May, she passed in May, would have been Marien Cole, at the time. From May until my exposure in July, the HSA became her understudy, which is Lakeysia, L-A-K-E-Y-S-I-A, Brown, B-R-O-W-N, was the HSA. The Director of Nursing was Shanise Bell, S-H-A-N-I-S-E B-E-L-L. The Medical Director at the time of my leaving was Howard McMhann, H-O-W-A-R-D M-C-M-H-A-N-N. Nurse Practitioner upon leaving was Sebrina Newsome, S-E-B-R-I-N-A N-E-W-S-O-M-E, married name Taylor, T-A-Y-L-O-R. There was also, I worked with there were two others there was a Jessica Lyons, J-E-S-S-I-C-A L-Y-O-N-S. there was an older, Caucasian lady, I'll think of her name during this segment, she was one of the nurse practitioners that I would work interchangeably with that, as well. But she was not a full-time nurse practitioner she worked. I want to say, maybe one weekend out of the month, or two weekends out of the month. That was there at the time.

**[6:05]**

**Senate HSGAC:** That's helpful. Thank you for spelling out those last names for us. Can you talk a bit about what the relationship was between the detention center and the medical unit that you worked in? And the Irwin County Hospital?

**Wooten:** The detention ...sorry.

**Senate HSGAC:** No no, that’s fine. We just be interested in and you know what relationship existed between employees in the medical unit and providers that might be operating out of their own County Hospital.

**Wooten:** When I first started, I don't believe that there was a relation in relation to the facility because the detention center had to pay for the services that will be rendered there at the facility. My last time visiting there, the relationship between the hospital and Irwin County Detention Center would have been the physician, Dr. Amin would have been the relationship, he purchased the hospital. So he would have been the relationship person to the hospital at the time upon me leaving.

**Senate HSGAC:** And would employees inside the medical unit at the detention center be in communication with providers at their own County Hospital? Would there be a connection that way? Or would that be something that would be separate?

**Wooten:** I never had a connection with any of the physicians that were there at the hospital. We only, our responsibility as nurses, or my responsibility as nurses, if the nurse practitioner would refer the individual out to a facility we would always call and make the appointment, but never had any relation to the physician is there that would have been handled by another department or been handled by somebody else inside of the facility. But I'm very, very vague about the nurses. We never had that direct doctor/nurse outside the hospital relationship unless some of the others I never did.

**Senate HSGAC:** I see. And did you or any of the other employees at the detention center play a role in approving referrals for detainees to see outside providers for treatment? Or was that something...

**Wooten:** No, that should have been outside it was outside of my scope. It should have been outside of the nurses' scopes as well. Now, I never approved any referrals because there had to be a referral that came through the nurse practitioner just for example, if she said this person need to see a cardiologist refer them to tip area cardiology, then we will be the one to refer them but we wouldn't give the approval for them to be referred that came down through immigration customs enforcement.

**Senate HSGAC:** I see. And I assume that I also took the lead in vetting outside providers testing their credentials, making sure they are qualified to treat detainees. Is that is that consistent with your experience?

**Wooten:** Yes, yes.

**Senate HSGAC:** And in terms of coordinating follow up medical care, after a detainee thought outside provider, is this something that that you and your fellow nurses would handle, if you know say a detainee needed certain damages of certain medications after an outside procedure? Would that be something that the medical unit would be handling?

**Wooten:** That would be something that the that the nurses would depending on what a nurse was working, That was something that if I and I can speak for me if I was seeing someone that came back and they needed something to be done? Yes, nursing ethics would tell me To put a bandage on this incision that was not bandage when it came to me. Nursing ethics would tell me that this person is hurting to take for pain medicine, which a lot of times they would not have in the facility did not approve any narcotics for these procedures that they were having. So in your best interest, the next thing that you would be vital to give them would be Ibuprofen, if it was not Tramadol, and if they gave them Tramadol, and once Tramadol became a narcotic, it was only given for five to seven days for a major procedure, and it was a automatic stance to ibuprofen. So morally, ethically, as a nurse, that's something that came, it should have came natural. Like I say, I've been nursing 12 years, and it came natural to just care for the individual and follow up. Was it always a follow up done? No, it was not always a follow up done.

**[10:58]**

**Senate HSGAC:** So it sounds like that would have been largely left up to the individual nurses who might be working or interacting with the detainees and what they might consider necessary in terms of helping somebody who was in pain or needing medical assistance.

**Wooten:** Yes, that was always supervisory handed to us, from the supervisors saying that's basic nursing, but knew not to outside of scope.

**Senate HSGAC:** I see. And if you would receive complaints from detainees about their treatment by outside providers setting aside the specific allegations about doctor meetings, we'll talk about, but if you would just get complaints in general from detainees after getting back for medical treatment, would you play a role in relaying those complaints to an outside hospital or the provider that was involved in in treating the detainee?

**Wooten:** Outside, we didn't have grounds for outside but inside, yes. I talk inside a complaint inside, or I always brought the complaint to my supervisor. It was always brought an issue. I was on a chain of command. So my supervisor, I will always be aware if it was brought to me, she would always be aware of what was the complaint.

**Senate HSGAC:** I see. And that was, and that was detention center policy, to elevation complaints from detainees up to your supervisor?

**Wooten:** That was the protocol that I followed. Just job policies are very vague in that place. To be honest, we don't know what policies are created from situations to situations. So I always follow that chain of command. We were never given policies that told us what we needed to do, how we need to handle situation. It was kinda a moral and ethical thing that I wrote, while nursing. So we were never given a downward initiative. I just took it to the supervisor, because I thought that was the right thing to do. They withheld from there.

**Senate HSGAC:** I see. So there wasn't necessarily that employee handbook or a set of policies that would be distributed to nurses at the center that would, you know, detail how to escalate complaints or how to respond in certain circumstances?

**Wooten:** No, we didn't see a book for that. And I never saw a book for that.

**Senate HSGAC:** So essentially, you would just kind of left to improvise your own response based on the situation that you encounter.

**Wooten:** Yes.

**Senate HSGAC:** Now in terms of the relationship between the medical unit at the center and ICE. We've touched on this a little bit, but can you talk about what oversight that ICE officials provided concerning the medical care that was provided to detainees at the center? Was there an oversight function for ICE on terms of, you know, reviewing the procedures inside the facility, and then the procedures that outside providers would have performed?

**Wooten:** There was not an oversight for me to to my knowledge upon leaving there ICE would review the procedures, the only association that I can say that I had with ICE was, and I didn't really have that association. It was the association that we had a nurse in there that put in referrals for these procedures. So it was kind of like, hey, this Lieutenant approved this procedure that was over whatever unit it was for us, for them, hey, it was approved. It came back to us she handed us an approval sheet, it was approved, we call schedule the appointment, and it flowed that way.

**Senate HSGAC:** I see, so one nurse would be responsible for being that point of contact with ICE, passing along request for referrals for outside treatment.

**Wooten:** She was a medical assistant. She wasn’t a nurse, she was a medical receptionist.

**Senate HSGAC:** I see. Do you remember her name? This is the medical assistant.

**Wooten:** Yeah, give me 30 seconds.

**Senate HSGAC:** Sure.

**Wooten:** Howard, her last name is Howard, H-O-W-A-R-D.

**Senate HSGAC:** Ok, great. Are you aware...

**Unknown voice:** Was it Kim?

**Wooten:** Kim Howard, yes ma'am, Kim K-I-M.

**Senate HSGAC:** K-I-M, great, thank you. Are you aware of any other reporting from the medical unit to ice? Any kind of regular transmittals of information about treatments that detainees received or issues encountered? Is this something that you were aware of?

**Wooten:** Rephrase it.

**Senate HSGAC:** Sorry?

**Wooten:** Reiterate, ask that question again please.

**Senate HSGAC:** Oh sure, sure. Were you aware of any other information that the medical unit would send to ice, about medical treatment for detainees? You mentioned the referrals, that would be request for referrals to be sent out? And then the approvals would come back down. But are you aware of any other regular reports that would be sent from the medical unit to ice?

**Wooten:** No.

**[16:29]**

**Senate HSGAC:** And are you aware of any efforts that that ICE took to try to investigate or prevent waste, fraud and abuse in medical treatment? Either, you know, at the medical unit or in terms of treatment that outside providers provided?

**Wooten:** No, they never. No, I never even working with the supervisor that passed, I never heard them entail or saw ICE entail any concern of what was going on in the facility. concerning those, it was just we send the referrals, nothing was very seldom they denied that needed to be done. Nobody called to check to see how it was done. Why was it so many procedures being done? Or who was doing them? Who was referring them? It was kinda like a slotting goal. You know, they refer it, they approve it. They get it and they keep it. So no, no.

**Senate HSGAC:** I see. I see. Thank you. In the complaints that you submitted last year, you talked about how it was common practice for a sick owners (?) to shred medical request forms from detainees. And that sometimes, the nurse would even fabricate vital signs on these forms. Do you remember who was involved in you know, either shredding these forms or fabricating vital signs on those forms?

**Wooten:** Amber Strout, A-M-B-E-R S-T-R-O-U-T, she's the LPN, she was the sit call nurse. And Lakeysia Brown was our supervisor that I made aware in shredding documentation as well.

**Senate HSGAC:** And you may have mentioned this, but either of those individuals still at the center at this point, do you know?

**Wooten:** Lakeysia Brown is still employed as the Director of Nursing. They're probably gonna have to role her out. And Amber Strout they pushed her out. She's gone.

**Senate HSGAC:** I see. And do you have a sense of I mean, I know that you haven't been full time at the center in a while. But do you have a sense of whether you know, these practices in terms of destroying medical request forms are still taking place to center today?

**Wooten:** Yes, I received, there's an inside person that calls one of the girls that's not working. Sheila Woodard, S-H-E-I-L-A W-O-O-D-A-R-D gets a call from one of the nurses who's no longer there now. At the time it was Anna Carter, A-N-N-A C-A-R-T-E-R, LPN. Would call Sheila Woodard and let her know. Ms. Brown and Ms. Bell quit and I want to say oh about two months ago and they walk out in the left and they shredded something's going and they had a pharmacy tech that was working there, shredding documentation on their way out, they were gone three days and return back to the facility. Miss Bell is no longer there, but Miss Brown is there.

**Senate HSGAC:** I see, and were you aware of whether this activity occurred in compliance with a certain policy. Was this set as a policy by folks higher in the hierarchy at the center or was just something that nurses or the other employees took it upon themselves to do?

**Wooten:** It was not a policy that was set in place by hierarch-icy. I've never seen where it was okay to shred medical documentation of the individual in either place that I worked over 12 years, it was at a local level to where the local Ward and they're not sure, I'm pretty sure you might have gotten higher up once I started talking, got instructions higher up to get rid of this evidence, but locally, the ward and David Paulk, D-A-V-I-D P-A-U-L-K, always give me incentives on what to do in medical. And he gave the commands for medical once that supervisor, Marien Cole died off, like Lakeysia Brown is David Paulk, who runs them. The warden runs the medical unit. So I'm pretty sure they got instructions from the warden.

**Senate HSGAC:** I see. And can you talk about, under normal circumstances, what should have been done to preserve medical records to call requests were their policies about you need to keep this for 30 days, and you can file this in a certain location?

**Wooten:** I never saw policy on days or days to keep medical records. But nursing that's nursing moral ethics 101, you

always keep medical documentation I here five to seven years. It's something that stayed with me. The last supervisor Ms. Marien Cole always told us the keep medical documentation, I was a sick call nurse at one point for two years, I don't care if they give you the same request seven times over, you date it, you put the date on it, you staple them together, you put holes in them, you put it on their chart, because that's how we track them. That's how ICE is supposed to track they're being treated within a 72 hour time frame. You're supposed to recognize those and treat them in 72 hours.

**Senate HSGAC:** And setting the sick call medical request forms aside. Do you remember any other circumstances where staff at the center were shredding any documents or destroying records?

**Wooten:** When COVID hit, we started missing a lot. So this is this is this is my first time catching, just wanted to say, hey, they're actually shredding these documents? Could they have been shredding them previously? Pretty sure but to be bold enough to allow me to see it?

**Senate HSGAC:** Sure, sure. I understood. And circling back to fabricating vital signs on medical records. Do you have a sense of how a nurse would fabricate those signs? Would that be as simple as just inputting any information that they created on their own? Or are there certain procedures for making those kinds of additions to a medical record?

**Wooten:** No, there's not a set of procedures to make those corrections. Even if you go to make corrections to it. You're supposed to when you handwrite everything with computers, so you scratch hand write in your addendum, there should have been an addendum added to it. But to keep from adding an addendum to it, you go in is like pulling numbers out of my hat, you look like your 97.3 you look like your 98.4 inputting in the system and not change them. So it seems to be correct. Unless somebody finds out that it's not.

**Senate HSGAC:** I see. And in your complaint, you mentioned and you attempted to tell your HSA about these issues related to the destruction of request forms and fabrication of vital signs. Was that that Ms. Cole, that you talked with?

**Wooten:** No, that was Lakeysia Brown, Ms. Cole had passed Ms. Cole passed, was deceased May, May 31st.

**Senate HSGAC:** I see. And do you remember any reactions from Miss Brown when you raised this issue of the records of being destroyed or manipulated.

**Wooten:** She was cool as ice, I was more hysterical than she was. I heard the shredder going off and I turn around and the nurse is shredding and I go to my supervisor to say hey, Nurse _____ is shredding these documents and she's in the door. And when I mentioned it to her, I get this girl she ain’t gonna be satisfied unless to show him the last exam. And I'm like wow, this is the type of reaction, these are people lives down her life. She walked off in her office closed the door, never said anything else about it.

**Senate HSGAC:** Did you ever follow up with her or other people after that point about why this was taking place?

**Wooten:** When you ask her about it, to be honest, and you asked Miss Brown about it, and you bring it up again, it's more of like a, you ain't gonna be satisfied till you lose your job, that's not your business. won't let you know, I'm getting out of that. And I'm like, well, I see you're not gonna do anything about it. But there's nobody else over her to complain about other than the warden. When you take things to that level, he doesn't want to talk to you. He doesn't want to see you. He's always busy. And they're always in a meeting. So, before I could, you know, you could get what you really needed to get is like, close the door. We don't want to hear that come do your job.

**Senate HSGAC:** Sure. Understood. Can you talk a bit about how a detainee might submit a complaint about the quality of medical care they would get in the medical unit? What would they, what kind of forms or requests would they make if they had concerns about their treatment?

**Wooten:** A lot of them would put them on those blue medical request forms that were supposed to be just for, like a medical request. There was a young lady there at one time, that was handling, they were a yellow form. She was an officer that would handle the complaints regarding medical. Once you bring that yellow request to me, I have choice to adhere to it, say my hands, I can shred it, or I can throw it in the trash. So nine times out of 10, depending on what it was, it was shredded, or it was thrown in the trash.

**Senate HSGAC:** And were there certain people at the center who had responsibility for following up on these complaints or investigating the they were actually valid concerns that were being expressed.

**Wooten:** The officer would bring it to medical. On the medical side, it would be the HSA, Human Services Administrator. If she was in that position, and she chose not to fool with it, she could pass it down to the DON. So it was in the ball of the HSA or the DON. And that was to follow up on those complaints that they seek regarding medical staff treatment.

**Carl:** And excuse me, this is this is Carl from Senator Johnson's staff this room, can you just try to help us understand more? What's the difference between the blue and the yellow forms?

**Wooten:** The blue forms are what we call medical forms or blue request forms, they should be blue if they were coming to our medical unit for the nurses to triage, or to be seen by the nurse practitioner, depending on the complaint. Those were ours specifically that we will pick up in a box every night. The yellow ones were like a disciplinary form that they call the complaint or grievance. It was actually a grievance form is what they're telling us for them to file a grievance.

**Carl:** Got it. And detainees. May there were instances where there were basically put grievances on the blue forms, because that was what was available to them.

**Wooten:** Yes.

**Carl:** Got it understood, thank you.

**Senate HSGAC:** And I suppose there's certain policies at the center around storing or preserving the the grievances or the complaints that detainees would file about their medical care? Was there a requirement that had to be you know, kept for a certain period or was that also an area where there weren't any specific policies or procedures?

**Wooten:** That's one of those gray areas to where it was not a specific policy or procedure that we saw if they could throw them away or shred them. And then the grievance officer because we had a grievance officer. She will come back a lot of times and asked for those things. And I mean, they were waiting on her to answer so I didn't I never saw a policy that said they want to be stored for a certain amount of time.

**[29:13]**

**Senate HSGAC:** And did you ever see any indication that the grievance officer or other employees at the center, were investigating complaints, you know, interviewing nurses or speaking with the provider or pulling medical files and taking a look at what had happened?

**Wooten:** No, never but it was always detainees need to see mental health, or they were trouble makers. Never.

**Senate HSGAC:** And were you aware of the center ever communicating or sending complaints. Up to ICE with reports about what was being alleged or how frequently complaints were coming in.

**Wooten:** No, because then that would pull ICE to investigate or they will pull us into an investigation. They will try to keep a certification every year. So no, we ran like a well-oiled machine on paper.

**Senate HSGAC:** So it sounds like the less that ICE knew the better, at least as far as you were able to observe.

**Wooten:** They didn't they didn't take things yes didn't take things out. And it was it was a handoff. It was a handoff. It was ice and ice in DC working together. So it wasn't any need to complain to ice because they were not going to do anything about it. It was like a distinct handoff. They worked there together to keep that facility contracted and running.

**Senate HSGAC:** I see. Now, I want to ask you questions about the role of officers at the center. I'm thinking of folks who are there to preserve the security at the facility. With these types of officers ever present during the treatment of detainees inside the medical unit? Was there ever an armed officer or a different kind of officer who would be in the room while a detainee was being treated?

**[31:18]**

**Wooten:** When detainees went in for medical, medical always kept the officers out of the room, they caught them. So they handcuffed them, seat and hand shackles, but what they would have whenever they would have to be seen by those that kept the officer out because we were always told that the officer didn't have any business, even though they were a medical officer in the room while any kind of treatment was going on.

**Senate HSGAC:** I see. Did someone have a question? Sorry, I just thought maybe that was just some the static there. So would detainees always be restrained with shackles during their visits to the medical unit?

**Wooten:** If they were raising a concern, and it was a viable concern? Sure. There would be restrained. But if they weren't being cooperative and coherent to what they were not expecting or expecting? No, they wouldn't.

**Senate HSGAC:** And do you know, officers from the center would accompany detainees to their appointments with outside medical providers? Do you remember that occurring?

**Wooten:** Yes, they would accompany them. And at one time I was working in a facility when they brought up the detainees in had never seen it until then. I was working at affinity clinic here in Tifton, GI, and one of the officers from the facility brought in a young lady who was handcuffed and barely chained instead, in the actual initial office visit with her, while the physician that I worked with, was asking her personal questions, shackled.

**Senate HSGAC:** Are you aware of other instances in which officers would be with detainees in the room during their medical appointments? Is that something that would happen frequently? As far as you're aware?

**Wooten:** As far as I'm aware? Yeah.

**Senate HSGAC:** And can you recall if there were particular officers at the center who had the responsibility of accompanying detainees to those outside medical procedures?

**Wooten:** Faces? Yeah, names... I have to sit in and have to get back with you about names, but yeah.

**Senate HSGAC:** Sure. Sure understood. You also described in your complaint, how certain medical procedures occurred without the informed consent of detainees. Can you tell us a bit about what consent should have been paid/obtained from detainees and what policies and procedures are center, if any, were around that process?

**Wooten:** No policies or procedures that I could recollect on our end it was for process, it was back to that nursing moral ethics that says, I'm explaining this procedure to you, you have a choice to say yes or no to this procedure, not just the instructions in English, and I'm well versed in Spanish and I can't speak English and I'm pointing to this. And I'm in a strange place and I don't know anybody. I don't know what's going on. I don't know the situation. But because I know I'm hurting and I'm trusting you as the nurse and I'm trusting you as the physician to make sure

that I'm taking abruptly a care of while I'm out at this pointing. I'm X-ing it, not even a signature, because I can't read and write. But I'm X-ing it, and I'm trusting you to go, or I'm taking your word for it, when I get ready to leave this place, so it depended on the individual and I have to kind of pull it in because I get so passionate. It depends on the individual that take that time in that regard to say, hey, you're fixing a lose over your head, they're fixing the takeout uterus, or Hey, you're fixing to lose, a fallopian tube, hey, you know, you're not going to be able to birth children after this incident, you know, but what should have been found was the informed consent, it should have been explained, they should have had 24 hours to take this home and think about it or to their dorm. And think about, not just to say, Here, are you going to die if we don't do it.

**[35:48]**

**Senate HSGAC:** Right? And was there a standard form that would be provided? Or was this something that might be communicated verbally from the detainee to someone working at the center?

**Wooten:** We were supposed to have what we call if me, And I can talk about me, we have a language line. And I can call the language line and say, I need to translate that this is what this person is going out tomorrow for but I didn't work every day. So that was proper use the language line, so they got it for understanding, not get on your computer and try to speak Spanish and your English is just as broken as your Spanish will be. That's not your native language. So they should have been communicated to them in such a way to where they were informed to know. So no, there wasn't a set policy, it was just a consent form that was ran off. It didn't specify the specific procedure, you could have been consenting to lose an arm or was just whatever I told you it was you're consenting to.

**Senate HSGAC:** I see. And and you know, if the center maintained records of these forms, you know, relay that, would you or do you have concerns about those forms also being destroyed?

**Wooten:** Those forms, if any, are shredded, and if any, their signatures on them have been falsified at this point from September to now, I'm worried about them going back now making up signatures to the ones that they have not come in contact with and have found a missing evidence for it, I have no doubt that they won't be falsified,

I have no doubt that they won't be shredded. And shredded more than likely because that tells me that you didn't have this procedure done that you're lying. I didn't do this to you.

**[37:44]**

**Senate HSGAC:** And while you were working at the center, do you remember specific examples of those signatures being falsified by the folks who should have been trying to get an informed consent?

**Wooten:** The sick call nurse, Amber Strout, and on and on, and I apologize ahead of time, it sickens me. Because sick call was, it was a passion, and I'm walking in the room with her and she's reading from a computer Spanish. That is not how that comes across. I'm calling the language line. And the latest thing she asked her does she want a pair of shoes? And she thinks she asked her does she need medicine for a cold? So very unstructured, very unstructured.

**Senate HSGAC:** Right. Right. You actually have mentioned in your complaint that staff often refused to use the language line to help in these discussions. What would people say when they decided not to use the language line? Or what do you think was their their problem in trying to get translation services?

**Wooten:** If it was 30 of us that I needed translation services for and we're doing intake and I'm intaking 200 people the 30 of you are going to take me three to four hours when I can be done running through these intakes and checking everything on this intake in about two hours and 45 minutes for 200 people because we're going to do the same thing. It was time consuming.

**Senate HSGAC:** I see. You also mentioned that Spanish speaking detainees were often discriminated against at the center. This setting aside from language line issues, do you remember ways in which Spanish speakers would sometimes be discriminated against?

**Wooten:** We have, we have very very very, not just Hispanic, but you have those Cambodian and you have those spoke French and those that spoke Jamaican and those that spoke dialects, and

those who spoke Asian, those any of any of those that had a language barrier to communication were always pushed to the side, or it was like sign right here, and then they'd smile, sign right here , you know, it's kind of like, and excuse me, this term is, "get your ass out of the way, let me get to the next" or it will be a thing of intake, "well I'm gonna take all the ones that speak English, you can have all the other ones because we know it's gonna take them forever". So it was kinda like always last, always in the back, always whenever I can get to do and it was never done within that 72 hour time frame.

**[40:26]**

**Senate HSGAC:** I see. So the fact that it took extra effort to accommodate their language needs meant that they would always get pushed to the back of the line with this kind of thing?

**Wooten:** Yes but they're the ones with the highest dollar to their head that they talk about coming in the door.

**Senate HSGAC:** Can you talk about what you mean by that, highest dollar?

**Wooten:** Immigration and customs at one point, we were told, I read somewhere that they get 75 dollars a person walking in the door or 75 dollars a day. We were told they got a couple of thousand dollars a person, that immigration, we don't have immigration, we have had meetings with the warden, and if we don't get immigration in this building we can't keep this place open because now you have a facility, 150 beds, anything below 300, they have to start laying off. And if you get those who are immigrants, migrant workers and coming from other countries and other nationalities, that grant or that contract, that's what buys that contract to Irwin County Detention Center, immigration, customs and enforcement. If you don't get those type people, I've heard them say. If you don't get those type people that have that dollar on their head, we can't stay open.

**Senate HSGAC:** I see. And related to that, our understanding is that there were also individuals at the Irwin Center who might have been in custody of the US Marshal Service. Would you ever assist detainees or individuals incarcerated at the center who

weren't in ICE custody? Would you extend medical services to folks who had been brought in by the US Marshals, for example?

**Wooten:** Yes, but they didn't get the same treatment as detainees did.

**Senate HSGAC:** I see. Can you talk a bit about what would be the biggest differences between the treatment of those two groups?

**Wooten:** The Marshal service, they were what they called troublemakers, they would riot quick. And they would make their voices known, so to keep down controversy, and to keep down rioting, and they would tear things up inside the facility. They would, it would be made known. SO they serviced them, they didn't get a lot of outside referrals because the Marshal service did not approve a lot of outside referrals, and if the Marshal service saw that there was four/five people a week going out to have teeth pulled, or four/five people a week that was going out to have surgery, they put a stop hold, and you got a call saying "why are all of these people going out for the same thing?" So it was a distinct difference from there to where they would question where their money was going and immigration didn't question where these bodies were going.

**Senate HSGAC:** I see. I see. You also mentioned in your complaint that it was common at the Irwin Center to shut off water sources for detainees if they went on hunger strikes. Can you recall specific instances in which, this might have occurred, or employees at the center who might have participated in, or decided to shut of the water?

**Wooten:** David Paulk was always the one to say "shut off the water". I've seen it throughout, and never really understood, honestly, until now, and only because I heard one lady talking about not going out to see the gynecologist, he hurt me the last time I went out. We're looking at this around June, May/June. She's complaining about being hurt going out to see the doctor. And then put two and two together until they began to tell me, and I began to read the news, they put her down in echo, in a closer, in a single-cell, and shut off her water. She would not go see the gynecologist, and until she went to see him, her water was off for a couple of days, I want to say about two to three days. I might have

worked two to three days in that run of the mill this last time here. When I went back to check on her, I want to say the second day, she was bathing out of the toilet, and consuming had already been cut from water to drink prior to her sitting on the floor, bathing out of the toilet. And David Paulk, David took the initiative to turn the water off. Then the next thing that they had for her mental health, oh she needs mental health. I had Ms. Brown telling me oh she's mental health. But, in talking to her through this, it wasn't mental health. It was she didn't want to go out to see this physician. So until she agreed, her water was off. And not only was her water off, but they revoked their food trays, and there would often times be maggots and roaches in their food trays. I've seen a lot.

**Senate HSGAC:** So, the water supply and changing the food, in your experience, were used as a way to punish detainees or to pressure them into accepting certain treatment or consenting to certain procedures?

**[45:48]**

**Wooten:** It was a way of control, correct, a way of punishment. And not only was the water supply and the food, they would often times put them in separation.

**Senate HSGAC:** And do you remember any other ways in which staff at the center or leadership there would try to you know, punish detainees to, if they spoke out, protested, or didn't want to go along with the treatment that others had recommended for them?

**Wooten:** They would revoke their commissary as well.

**Senate HSGAC:** Would they ever eliminate funds in a commissary account or draw down those funds?

**Wooten:** I'm pretty sure but I can't say for sure. I'm pretty sure they did, they would revoke their um, they would tell them they didn't have money on the books, and they would be talking about money, so I'm pretty sure, I'm pretty sure.

**Senate HSGAC:** Right. Now, I don't expect you to know the answer to this question but did all this, the efforts to punish or to control, did these occur according to some sort of official policy or you know, some sort of escalation of disciplinary measures for detainees or was this all the kind of this that was improvised by folks who were running the center?

**Wooten:** I don't mean anything contextual when I say this, but we live in the South. And we still live to where there is supremacy, and yeah it was "I'm the chief, I'm gonna run it the way I wanna run it, you gonna do what I say to do, and if you don't do what I say to do, the big bold kitty..", I mean I've heard him talk about all of that. You're going to what I say, it was a thing of power and control.

**Senate HSGAC:** I see. You also mentioned that often exam tables in the medical unit could be dirty depending on the nurse who was responsible. Can you talk a bit more about what the sanitary conditions were like in the medical unit at the Irwin Center, and maybe if you can, the sanitary conditions at the center in general?

**Wooten:** There is the sanitary conditions in medical, were very nasty. The guys that came through to mop were the trustees or the detainees that they would have out to work that they paid a dollar, a dollar a day, there the facility. They would mop with sour mops, and we wouldn't have anything to wipe things down with, we wouldn't have any sanitary cloths, we wouldn't have cleaner, we wouldn't have germicide, we wouldn't have disinfectant. When COVID came, we knew we were going to have a massive outbreak because they were not already cleaning. There was a drop of blood that laid on the floor for about two months. A girl drew blood and it ran down a guy's arm on the exam table to the floor that was left there, seeing other detainees on this dirty exam table and nasty floor for about two months. Nobody, I never saw it got mopped up. I mentioned it to my supervisor, Ms. Brown, and she "girl, these some nasty people around here". You know you always got something nonchalant. The sanitary conditions for the detainees down in the pods, they didn't have a place to where they could wash their hands or wash their, or sanitize their hands, like they were supposed to have sinks like in a gym. Those were things they didn't have and their idea of spraying Lysol and disinfectant was putting it in one of those pump containers, like you do weeds, and they spray them around the baseboards. That was their idea of disinfectant in there. They never wiped anything out, no windowsills, they never mopped down, they always gave the

detainees "if you want it clean in here, you mop it out". You know? So they always gave them things then they stood and watched them clean up their areas, and they had a clean up crew that was hired at Irwin County Detention Center to do just that, but they sprayed, sprayed germicide like weeds. They sprayed Lysol like watered-down Lysol. They put it in a container like to spray weeds in a garden. They just went around inside 10-15 minutes down in a pod that should take you hours to clean, it was never done properly. It was very filthy. The kitchen was very filthy.

**[50:07]**

**Senate HSGAC:** And do you remember if there were official policies and procedures in place for how the medical unit should be cleaned on a regular basis and how you know employees should document when it was cleaned, that sort of thing?

**Wooten:** No. We never had a policy or procedure for that. We always got, "y'all live at home, y'all clean up at home, clean up behind yourself.

**Senate HSGAC:** And did you ever raise concerns about the state of the medical units to your supervisors?

**Wooten:** On numerous occasions, but I always got "we grown people. Grown people should know how to clean up behind themselves".

**Senate HSGAC:** So it was the responsibility of the individual nurses, whoever was you know working in the unit at that time to just kind of, clean up after themselves, or take it upon themselves to clean up whatever needed cleaned?

**Wooten:** If it, even though we had a sanitation committee/crew, sanitation guys, even though we had them, it was "hey, you do it", so you know it very vaguely got done. You clean up. We didn't have access to bleach. We didn't have access to chemicals. It all came through the sanitation crew, so at one point we were getting the "it wasn't our job" and at one point it was our job, but it must have been nobody's job cause it never got done.

**Senate HSGAC:** Right, right and how would the conditions be, at the center's medical unit, compare to other medical facilities that you've worked in in your career?

**Wooten:** This is probably a bad comparison, but I would, and people have problems with nursing homes, I worked inside of a nursing home, and I worked in some where they were not so clean and did not smell so good, you know because you have all of the wounds from the elderly. I did that, no, no kicking nothing. But this place compared to a nursing home, a nursing home was very clean. You could eat off a nursing home's floor compared to the prison.

**Senate HSGAC:** They told us, the complaint, uh last year, was concerns about the center's lack of COVID precautions. When you expressed those concerns inside the center, do you remember who you brought those issues to?

**Wooten:** I brought those issues first to Ms. Cole, who is deceased. Then I later put those issues over to Ms. Brown, who is the HSA now. I have sickle cell, I have four asthmatics in my house. I was told by a physician that if I got sick, I probably wouldn't live to raise the baby who's nine. It was just that bad to where we were importing positive people from sister facilities and exporting positive people to sister facilities. So we were pandemically in a pandemic, but we were a pandemic. We were the pandemic inside the pandemic. You know, and they were covering this up. They were covering it. And I was told you're going to lose your job, miss you must not want your job. Yes I want my job, but I want my life before my job. And the lives of these other people that I'm watching these detainees put up jumpsuits then put instead because they're making masks. Putting up socks, making masks. There was an outside organization that brought the detainees masks because my facility is holding 900 N95 masks that was enough to govern us over medical unit and the total facility three or four times over but they would hide them in David Paulk's office. He wouldn't give them. He gave one box to medical because he said that we didn't need but one box. And Ms. Brown, the nursing HSA agreed but she had her mask, her daughter wore it there, she had her mask. We're having to buy masks.

**Senate HSGAC:** And it sounds like many of the detainees had to improvise masks as well, out of materials that they were able to get access to.

**Wooten:** Yes, and the one nurse that would tell them there is COVID in this facility is no longer employed and can't find a job, because I told them hey protect yourselves. I got in trouble for giving a mask to a officer, the nursing, Ms. Brown took the box out of the closet and locked it in her office. "Boo you don't give him no mask. That's our security giver mask." I said "we're the medical unit, so the officers, we can't even treat the officers?" It's been so divided for, for years, so getting in trouble for giving a mask, sure. And I told a young lady to keep it. At one point, the nurses were asking the supervisors, we just gave you a mask, the string popped on my mask in March, I asked for another mask, I didn't get a mask until May. The string popped on that mask in May, after wearing it, it's only supposed to be worn so many times. It's not to be worn for months and months and months, so now the masks are failing and we're breathing in the inhaler so the mask where you clearly have a new mask, unused, in your office.

**Senate HSGAC:** Right. Right. Do you have a sense of why they were so reluctant to distribute masks, was it a matter of them being worried about them running out of their supply? Or was there some other reason that you think was responsible for that?

**Wooten:** The reason they didn't want to distribute masks, we received our first positive in February. David Paulk called down to medical and told Nurse Bostick, B-O-S-T-I-C-K, and told Amber Strout, that we were getting a detainee from Stuart Detention Center, which is a sister facility. And it could be positive, he could not be positive. When this guy came to us 21 years old, he was COVID positive. They moved him out of the Stuart facility because he was positive there, and the officers were raising holy hell cause he was positive inside the facility and they hid it. So they shipped him here, then I found out later to hide him, and they said that he was not positive. David Paulk told those two nurses not to tell any of us back there. The remainder of us were African-American. So he shared it with them, told them not to tell us. Bostick was so scared, she came over and told the Nurse Practitioner, Ms. Sebrina Taylor, and said "we're getting this patient here". This girl is taking cancer, she's taking chemo, so she's ___ when she's coming to work. So she's scared. Those two nurses, he gave them permission to leave for the

day. Leave the rest of us on shift. And Ms. Taylor goes in to treat this man, because Ms. Cole called and said “Wooten go in there and see that man”, I said “no ma’am, no hell no spam no turkey. I am not going in that room ”. “No ma’am, I am not going in there. I have kids at home.” So Ms. Taylor said “Dawn, I’ll go in, and I’ll see him.” They said this man was negative. We never saw the report for this man because Ms. Brown shredded it. I called the hospital, and the girl faxed me a report, she said the nurse, the supervisor got it. I said “no ma’am, she didn’t”, and I know she did. So when she said that, he was positive. Ms. Taylor, in turn, had open heart surgery, a breast-cancer survivor is now in the hospital, in this time, fighting for her life, cause she’s COVID positive. We were told not to talk about COVID, and the reason he didn’t give those masks is because he said he didn’t want to start a mask panic, he didn’t want to make everybody afraid. He wanted, he needed people to run that facility, so if he told everybody that they were ok but officers were coming up positive, they were leaving, they weren’t even telling us why they were home. We had to find out from other officers why they weren’t at work. He hid it. He wanted it hid.

**[58:32]**

**Senate HSGAC:** And as this COVID positive individual was being transferred into the facility, was there any guidance given to the medical unit about take these precautions, make sure this person's isolated, or separate him from others, or a series of action that effect the space he’s in? Did you get any recommendations from folks higher in the organizational chart?

**Wooten:** No, I didn’t get anything to him. He didn’t even clear intake, he didn’t even come through intake. The brought him in the back door and put him in a TB isolation room.

**Senate HSGAC:** And that’s tuberculosis isolation room?

**Wooten:** Yes. To where the fan doesn’t even suck out the particles. The room did not work. It was broken. So they put him in that room.

**Senate HSGAC:** Over time at the center, as the COVID threat developed and it, and the detainees often raised their own concerns, did you see any changes taking place in response?

**Wooten:** No.

**Senate HSGAC:** Were there better policies and procedures in place? Better equipment?

**Wooten:** No. There was a lot more manipulation and a lot more hiding and covering up. So no, no change for the better, it was change for the worse.

**Senate HSGAC:** Can you talk a bit about what manipulation and covering up that you observed?

**Wooten:** We had received in June two COVID rapid testing machines that we did not even know that we possessed. They were hid in the supervisor's office. And I happened to work late June the 25th, I'll never forget. I worked late that night, and she asked me if I'd stay, I say sure. So I stayed late and I worked with the physician. I worked that afternoon. These two machines come out of no where. Her, Lakeysia Brown and Shanise Bell, the HSA and the DON at the time, brought out two rapid machines, that we had not, had no knowledge of knowing we had in the facility. They tested the doctor that was there, and they tested a detainee that was there. And I asked Ms. Brown, I said, "when are y'all gonna show us how to use them?" "Girl you ain't gonna learn how to use it, you'll be in here testing each other. This ain't for you, this is for detainees". I said "they should be out for the use of the detainees, shouldn't they? I asked you about testing somebody last week and you told me no ma'am. No ma'am. So when did we get these?" "We got them in June but y'all won't be using them". She locked them back up in her office. I never saw them again.

**[1:01:08]**

**Senate HSGAC:** Do you think that that was still related to the desire to not create panic at the facility about the potential spread of COVID? Or was that for some other reason?

**Wooten:** Yes, because we did not, we were not even documenting this test date at the state level. The Health Department had no idea that Irwin County Detention Center had any positive cases and from February until March/April, February until May, I can count 15 people that were positive, from officers, to and that's just employees, that wasn't even detainees. So if they were to be used to be counted for detainees, all of these detainees are asking for "hey can we be tested?" "hey can we be tested?" and you're saying no, give them some ibuprofen, no you can have a cold pack. So they're giving a cold regimen to what could possibly be COVID because they're not wanting to test them and that means if you get so many numbers, you should have reported the first case to the state. That's what we were told since we were following CDC guidelines. We should have reported the first case, which never got reported, never got reported.

**Senate HSGAC:** So did you hear remarks from folks at the center, you know, regarding their reluctance to report out positive COVID tests to state authorities?

**Wooten:** The nurses, everybody was job scared. I'm the only fruit loop in the box that kind of jumped out and said hey, um, we're gonna talk about this, I need my nursing license, I have to live with myself, so, um, nursing-wise, all of us knew this was going on. All of us talked about it amongst ourselves, but I'm the voice person for the Kellogg's box who said hey, Trix are for kids. This cannot go on. I mean, just me, in a nutshell, once I mentioned it, everybody backed away, like we know what's going on, but that doesn't mean we talk too much. We ain't going to tell you nothing else. I got told that every day I came to work. You talk too much. But it was only, it was right. They were job scared.

**Senate HSGAC:** I see. I want to move on to the allegations that you raised about Dr. Amin and the hysterectomies that he performed on ICE detainees. Can you tell us when you first learned about the potential of unnecessary procedures occurring during Dr. Amin's care?

**Wooten:** I begin to tell 2014, but I just could not connect the dots. It was a 23 year old young lady that came to me and said that she couldn't have any children, she was a Hispanic young girl, said her husband was gonna leave her, and I asked her, well I was a sick call nurse at the time, in short, and I looked over her records, sure

enough she had had a total hysterectomy. I was exiting at the time, I had a special needs kid myself and I was getting some things done for him and it didn't hit me in the chest until I came back in '19, and these ladies were like "Hey Ms. Wooten, where you going?" or "Where you been?" and I built that relationship, and it's like well "Girl you still in here?" "Yeah I'm still in here fighting for my case, but I need you to check on something for me." So now I'm getting these in 2019, in July-October of 19 to July of 2021, 2020, I'm getting these papers every day with these numbers, and I'm getting "hey check on this for me". After about the fourth or fifth one, I'm like, something is not correct, something is wrong with this picture. But I never thought to say, hey, who is it? But they were bringing it, and I would take it back, so I'm getting 5, I'm getting 12, I'm getting 17, I'm getting 20, I'm getting 30 at this time, then I'm out the door, by that time. But getting it I'm realizing that something is not correct. So myself and Anna Carter were sitting inside of the medical records room and she was putting in some orders for the physician. It never did click that, to relate him to, cause I could never give a name to the physician orders, they just said this doctor. And I couldn't put two and two together. And the girl told me at the cart, "What he do? Collecting uteruses?" That's where they termed the Uterus Collector from in the media. And when we came back, we sat down, and I said "Ms. Carter, what is going on with these uteruses?" She looked and said "well everybody that he go out and get a procedure". Ms. Brown rolls out again "girl, he making that money". Nonchalant. And I asked Ms. Carter I said, well, what's going on? She put her hand ever so light on mine and said, "you don't want to touch that". So really aware that somebody else was aware, but everybody was scared to speak out or say anything about it, so I got up and I went in the medical records room, looking at the numbers and going through charts, cause here I am supposed to be passing medicine, I got a so consumed to where I was late to med passes trying to find out what was going on. And whenever I mentioned it, asked a couple of questions, then I'm written up now, I'm being pushed out.

**[1:06:35]**

**Senate HSGAC:** And as part of your own work to figure out what happened, did you talk to detainees who had been treated by Dr. Amin directly?

**Wooten:** I had a relationship with those ladies like, when I came to work they had done development like, they were eagle-ettes, and they had accepted that I was like the momma eagle. So when I came to work we always had this thing like ok momma what are you gonna feed us today, we haven't ate. And we always made those

medications, I made sure that they kept their medicines and their blood pressure medicines. So I kept that relationship, I'm like, what are y'all staying for down here? And they were like we've been asking people, we've been asking people to check on this but nobody would check on that, and we know you gonna check on it. So that's how I got, I think I got deemed with that responsibility, and it was like wow. Somebody really trusts me with their life, literally. So that's why I came, I built that relationship with them, kind of like, even though they were singing to me like Mother-daughter relationship, to where I would go down on lunch and I would check to make sure, "hey did you get this medicine, I've been off". So it was built, I built it all the time. I built that trust all the time.

**Senate HSGAC:** And as part of that relationship, did you observe medical problems that the women had after being treated by Dr. Amin and were you part of trying to get them the supplies that they need after that treatment?

**Wooten:** Like I said I couldn't just put it together, but I had a young lady that came up to the cart oozing green puss, and it was infected. And she had not had her antibiotics, or didn't have antibiotics because she was not prescribed antibiotics after the procedure and she said she had been telling other nurses and they were going to get her to medical and they never did. So, being a part of that, I could say safety clean up, yeah. Not knowing I'm cleaning up, but yeah.

**Senate HSGAC:** And did they have, um, problems getting in the kinds of supplies they needed, like bandages or antibiotics, after getting those treatments?

**Wooten:** She would have to, she would have to see the Nurse Practitioner to get antibiotics because, like I said, that's out of my scope as a nurse. And if I worked, no, they would not have had problems getting it or problems cleaning it, cause it's something that I would have done. Outside of me being there there were complaints about nobody not giving band aids or bandages or different things like that. There were kept on the cart. I didn't see why they would have, would not have access but, like I said, not everybody is like a me.

**Senate HSGAC:** Yeah, right, right. You know you also talked about the concern that Dr. Amin didn't get informed consent from the women before he performed the medical procedures here. Is that something that concerned the women that raised in the conversations?

**Wooten:** They never gave a name but they always talked about they had something that they didn't consent to. Cause we were not responsible for those consents. It's after they get to his office, then his nurse, they get those consents at his office. So it's kind of like I get it on back end, of it already happening, and they don't remember signing a consent or they say that they went into the office, he started an IV, so it's kind of like getting that information for them, doing the procedure, then they'd wake up and they don't remember signing things. So I got that like from the back end cause we're not responsible for, we never had that responsibility to get consents for him because we didn't even know what was going on, or I didn't, what was going on until all of this blew up and I was like, God I'm in the mist of this and I missed all of that?

**[1:10:35]**

**Senate HSGAC:** So after you saw some of the records related to this treatment and talked with the women, and talked with some of your colleagues, what concerns did you raise and who did you talk with as you tried to escalate some of the complaints that you became aware of?

**Wooten:** I would always talk with my supervisor and my colleagues, we always had, now my supervisor, she was, and I mean in the best world interest, she was nosy. Whatever we were talking about, she was gonna be in the mist of it, whether she did anything about it or not, she wanted to know what the latest news was gonna be and then we would find her up in David Paulk's office giving a spill of what we just discussed. So, I'm pretty sure at this point, everybody realized that after talking with her that it was like, what is going on? Why are they getting these procedures? There's not even a consent form in here. Consenting to what? I don't even see anything you had done because there is not a consent form and then you hear them tell you, "but I didn't sign one, I didn't sign one. What are these three holes on my belly for?". I raised those concerns about those consents from, at the chain of command because we were always supposed to follow the chain of command. You passed it on to your supervisor and then

she's supposed to take it to the next but it just never got taken anywhere else.

**Senate HSGAC:** Was there ever a reaction from your supervisors about these allegations, was there ever an explanation back to you about maybe what the center had done to look into it or any answers they had received from Dr. Amin or others?

**Wooten:** Nobody's reached out past this instance since I've been outside the facility, but working there the response I got from her was, you better leave that alone so you don't have a job. You must not want your job, I got that, so it was kind of like, shut up, leave it alone, quit meddling.

**Senate HSGAC:** And this is Ms. Brown?

**Wooten:** Yes.

**Senate HSGAC:** Ok. Are you aware of, independent of what Ms. Brown might have told you, are you aware of any steps at the center to respond to the allegations about Dr. Amin's behavior? You know any investigative staff, interviews with the women involved? Any other measures?

**Wooten:** No, the only measure that I, and I'm not being funny when I say this, the only measure that I figured that they took, was they dismissed me. They got rid of me. That was the only measure that they took. I was rolled up and put out

**Senate HSGAC:** You mentioned Ms. Carter, who, she was a fellow nurse at the center?

**Wooten:** Yes.

**Senate HSGAC:** Are you aware of other employees at the medical unit who were aware of concerns about Dr. Amin or I should say, who dealt with

detainees directly who became aware of concerns about Dr. Amin who were involved in trying to figure out what was happening?

**Wooten:** There was nobody that was trying to figure out what was happening because everyone knew if they went to meddling, they would be fired. I was the only nose for that news, in that instance. But nursing-wise, who was employed, everyone knew what was happening, everybody knew what was going on. I left, came back, and to be introduced into, this is what's going on, so when I got it, I talked about it, and I expressed it. But coming back in 19, this was brought to me. So they knew what was going on, how long I knew, they knew what was going on because they were there 4-5 years prior to me leaving, so they had been there a while. But for them to pick it up? Yeah. All the nurses knew what was going on. That was the top of the facility to certain ones that they would talk about it, and when people like myself walked up, it was like a hush-hush, you know, I can say that that's what my experience going back, but they knew what was going on.

**[1:14:48]**

**Senate HSGAC:** I see. And do you recall if the women ever submitted complaints or grievances by their treatment by Dr. Amin specifically? I know that they would raise concerns with you, but do you know if they filed formal complaints?

**Wooten:** Yes, I am aware that they filed formal complaints because Ms. Lequeta George, I think it's L-E-Q-U-E-T-A, George, G-E-O-R-G-E, one of the ladies complained to her about how rough he was in nature to her at one point, and she **tried** to find another physician for her to go to, and they would not address, and it never got addressed or it never got changed. That's also in a press release that she wrote here last year when she was questioned. She was the only one, who I guess was well brave enough to speak out concerning the situation that she tried to find somewhere else to go and Irwin County Detention Center wouldn't send her anywhere else, in short.

**Senate HSGAC:** And with Ms. George, the grievance officer that you had mentioned, or is that someone else?

**[1:16:00]**

**Wooten:** I think she was the supervisor for grievances. She handled those grievances as well. As well.

**Senate HSGAC:** I see. And then, other than Ms. George trying to find another physician who could handle this type of treatment, are you aware of the facility, the Irwin facility, doing anything else in response to the grievances that were filed?

**Wooten:** No.

**Senate HSGAC:** And do you know, either way, whether the center would have preserved records of the grievances related to Dr. Amin?

**Wooten:** They probably would have preserved them up until I went national, they probably shred them, burn now.

**Senate HSGAC:** And do you happen to know if any of those complaints were shared with ICE at some point?

**Wooten:** No, I'm pretty sure that they weren't cause ICE made sure we cleared the audit every year. We never failed an audit. ICE made sure that we passed the audit.

**Senate HSGAC:** And when you say that ICE made sure, can you expand a little bit about that and what you mean by that?

**Wooten:** I worked with, at the time it was Ms. Cole, Ms. Marien Cole, and we had a lieutenant ICE officer Copeland, COPELAND. Latrelle was her first name, LATRELLE. She came down, she done the audits for the time frame that I worked, and whatever deficiencies that she found inside that facility, if we corrected those over the two or three days that she was there, then we clearly passed the audit. Those deficiencies were not sent, I'm aware of, to ICE that we would have to clean those things up before we pass for contract. So we cleared contract because they work close together so she would let us know what we, what we needed to fix. That I remember one year I had to make a sharps book, not even knowing

this was going on, to where Ms. Cole had me to make a sharps book to say “Hey, we have to count sharps, cause we’re missing needles,” you know they weren’t even keeping track of sharps. And I made this book for sharps for two cabinets and that was checked off of her list not knowing until you find out later like wow, so this is how we’re passing the audit, you know, they’re sending us someone to tell us what’s messed up and what we need and what books we need so whenever the big people do come down, they’re gonna find what they need to find because this person has told us what we need to fix for the major audit, so the pre-audits, she would let us know what to fix for the major audit.

**Senate HSGAC:** I see. And you mentioned a sharps book, is that right?

**Wooten:** Yes.

**Senate HSGAC:** And that was a record to keep track of the needles that were used, the supply of needles?

**Wooten:** Yes, the needles and lances and scapples and things that the doctors and all used that we used, anything that was sharp. Scissors, forceps, and things like that.

**Senate HSGAC:** I see. In terms of actions that the center or the ____ might have taken after the allegations about Dr. Amin, are you aware of any non-disclosure agreements that the company or the center tried to sign with employees to ensure that they were silent about any allegations that they learned concerning Dr. Amin?

**[1:20:04]**

**Wooten:** I got a call, yes, “we can’t find the form”, because one of the nurses that was looking for the form they dismissed her. I don’t know if she was, if they kind of got a head’s up to where she was looking for it, because she was looking to find it for me that, Ms. Brown had the nurses to sign and say that nobody’s to talk about Wooten, to talk about the case, to look her up at work. If anybody calls them and says anything about it, if we find out that you discussed it, then we’re going to fire you. So they had the employees there, that I had a nurse that called me, Nora Coffe, NORA COFFE, called me

said that they had a non-disclosure signed, that she didn't sign it because we communicated. The nurse practitioner Taylor was gonna find it, but she didn't get it cause they didn't offer it to her either. They were trying to make sure that people that could get in contact with me could not afford me this form, so. Yes, they signed non-disclosures for that, for that.

**Senate HSGAC:** I see. And as far as you're aware, these agreements were focused on you and the allegations that you had raised, and contact with you?

**Wooten:** Yes. Yes, and talk about anything from the facility, they wanted everything to be forwarded to the warden or Ms. Brown so they could handle it. But they were not to talk about it nor discuss it, or they'd lose their job.

**Senate HSGAC:** So we've talked about the allegations concerning Dr. Amin, we've talked about the center's response to the threat of COVID, are there other issues you think we should be aware of in terms of the quality of the healthcare provided at the center? Anything from the provision of medications or responsiveness to sick requests or health forms or wait times or anything else that you think is notable?

**Wooten:** The, I think we discussed the, already, that they were not seeing, they have to be seen within a 72-hour toe frame, and then the punishment for those that were hunger strike or those that refused to follow protocol, you know control by food and water and dormancies conditions.

**Senate HSGAC:** And were there … sorry go ahead Kyle.

**Kyle:** Sorry we just have a couple of questions here about the stock frame kind of timeline, if that's ok? I don't know if you were going to move on or not

**Senate HSGAC:** No of course, feel free.

**Kyle:** Ok. Just to clarify, you became aware of these issues when you came back to the facility in 2019, is that correct?

**Wooten:** Yes.

**Kyle:** Ok. We've talked a lot today about medical records, would you, like how would sort of, if a detainee went to see Dr. Amin and got a procedure done, how long would it take for their medical record to come back with the indication of the procedure that happened? Like how long would that come back to you? I'm assuming you had the full record, for the detainee, right?

**Wooten:** Oh God, whenever he felt like sending it. I know that sounds kind of funny but coming back all I received was, all I've seen that I had was maybe a script for pain medicine narcotics, which they were not gonna get because ICDC was a non-narcotic facility, so they got tramadol, then the medical director would probably give it for 7 days. It would not come back saying what procedure that they had would not be in that packet. It would be kind of like a printout, like they do like for day surgery or something saying that, you know, don't lift, push, pull, anything within a 24-hour time frame but the details of that record and the details of that procedure did not come back that day with that person.

**Kyle:** Ok. But it would have eventually get there to the medical record?

**Wooten:** We would have to call for it, and whenever we received it, it would come in parts. It would never come as a whole. It would come partly dictated.

**Kyle:** Ok. Because I think you had told earlier that, so how did you find out about these hysterectomies happening? Was it word of mouth from detainees or, we have in our notes here, we could be wrong, and if we are we apologize, that you did go through some medical records to see what happened? We're just trying to get a better understanding of how you came to know this information.

**[1:25:01]**

**Wooten:** Yes, I did go through their charts. You were asking what came back with them that day, that's what we got that day. Going through their charts, you can go in and find out what procedures DNC or if it was noted in their charts, or I went back and say "hey there is nothing in your chart that said you had anything done". So it depended on when he sent those, if they scanned in, they came in partiality. So the ones that I viewed, I could say, hey this is what you had done, or hey, this is not a part of your record. It's not in here. So it's hard to give a time frame because he didn't send them, you know like when we go to the doctor, well me, I guess I'm the only Looney-Tune, but when I go I need my stuff whenever I leave, and that's just knowing from a nurse's standpoint, everybody's not medical. So I know what to look for, what I need, what notes I'm looking for, kind of like what medical jargon. With them, they're taking these packets back thinking that this is what happened to them, this is a copy of their consent form, this is a copy of their procedure, this is what he did to me today, but only to find out that you're getting a little bit of pain medicine, you're not getting any antibiotics, and you're getting a do not push/pull or you know tug, so you're getting that aftercare sheet but you're not getting what happened to you. So it's kind of like fishing, you have to fish to get it.

**Kyle:** Right, and the detainees, they don't know what happened and they're just coming to you because they don't feel good essentially, and so you kind of have to fish and...

**Wooten:** Right.

**Kyle:** ...figure out what happened to them.

**Wooten:** Right. So calling over you asked a "hey can I have so-and-so's records, it's been three weeks and I don't have anything for her". It's fishing. So yeah, fishing.

**Kyle:** Ms. Wooten is that what was happening when you became aware of this in 2019 was you saw some notations in a records and then you would call over to Dr. Amin's office and request additional records?

**Wooten:** If they have records. I only called over and requested, “hey I’m missing Betty Brown’s procedure note for, I need to know what I need to do for her care. I’m missing her notes, it’s not in here. It didn’t come with her.” And then they’ll say “well we faxed it”. And say “Ok well I’ll give you the fax number”. I’m waiting, sitting by the fax machine to get it, and like I say I’m the only person that I can say hey, I’ve been waiting for 15 minutes I haven’t got this record. So, but you still get it in partiality. You don’t get a whole record. I’ve never gotten like a whole, looking at this case, I could look and it and say God, I didn’t get stuff all together, was the way he would seem. So you’re missing stuff. So the more you look at it you figure out that this stuff is missing so yeah, if you didn’t call over to get it, if somebody didn’t put it up, if the nurse found a whole bunch of stuff on the shredder, on the fax machine, I’ve seen them shred a whole bunch of stuff out the fax machine cause they don’t want to scan it in. It’s just, it’s chaos.

**Kyle:** When the issues started coming up in 2019, was there, were you aware of Dr. Amin’s settlement with the Department of Justice in 2015 for fraudulent dealings of Medicare/Medicaid?

**Wooten:** No, I didn’t even know who he was. I couldn’t tell you his name, I didn’t know this man from a can of paint. I didn't know who he was, cause they never gave me his name. So no, I didn’t know who he was, what he did, I didn’t even know he was contracted to with La Salle, to work with La Salle, they always came and said “this physician” or “this doctor”. So no, I didn’t know anything about a settlement until after all of this opened up.

**Kyle:** Got it. Is Dr. Amin the only OBGYN in the area? I’m from DC and originally from New York so I wouldn’t know that part of Georgia if you dropped me there in a helicopter so, but I understand it’s kind of a rural area and so, is he kind of the only guy in town or are there more doctors around to pick from to do this type of care?

**Wooten:** Regionally, no. He’s not the only OBGYN. He would have to be regional, because he’s not even there in Ocilla. His domain is in Douglas, Georgia which is 25 to 30 minutes away, so if you broaden the spectrum left, right, north, south, east, and west, you’re gonna hit an OBGYN 365 retrospectively, so no, regionally. So no he’s not the only one regionally.

**Kyle:** Ok. I think we're good Brandon.

[1:30:00]

**Senate HSGAC:** Thanks Kyle.

**Unknown voice:** I have a few questions about the medical records that you were speaking about. Was there any center policy to try to get a full set of records from outside providers, are you aware of any center policy to try to do that after a detainee came back from a procedure? Or was it you, essentially, to try to get all these records from, for example, Dr. Amin?

**Wooten:** No, there was no center policy to try to get records, you know, you were just under that assumption, and like I said, Nursing Ethics 101 you were under that assumption when you got it that the physician, wherever we sent them out, that they would bring us that information that we needed so we would know how to treat them upon arriving back to the facility. So when you find it, it's the discretion of that nurse or the discretion of that nurse practitioner or whoever gets a hold of that packet, normally it's the nurse, to look at it and say, hey nursing ethics 101, this is missing. We didn't have a certain protocol or policy to obtain those records.

**Unknown voice:** And also related to medical records for outside providers, are you aware of any instance of anyone in the facility or center destroying these types of records?

**Wooten:** The medical records, yes. Amber Strout was destroying the medical records, we talked about Lakeysia Brown shredding those COVID testing, destroying the medical records, and even to the point to where Lakeysia Brown was getting some records for detainees getting ready to go, they would go in there and pull apart those records out that they wouldn't even send with them.

**Unknown voice:** And can you just tell us where these medical records were stored or how they were stored? Was it under, you know, a locked room, and who had access to this medical record room?

**Wooten:** Medical records were stored in the computer system. You can print them from the computer system. So you can print the records.

**Unknown voice:** I see. And did everyone have access to these medical records or was it just the employees in the medical unit?

**Wooten:** It was supposed to be just medical. Medical was only supposed to have access to medical records.

**Unknown voice:** Thank you.

**Senate HSGAC:** Ms. Wooten I just wanted to talk to you a bit about what you've experienced after raising these allegations and maybe what others have experienced at the center in terms of retaliation. In your complaint, you had mentioned that you had seen other employees reprimanded for doing what's right. Can you talk to what examples that you've seen of that taking place and how others may have been disciplined for trying to speak out?

**Wooten:** This is, this is hard in this instance, because this is kind of like I'm a loner, in this. I was outside at the time at the time I had spoken up. The door had already been opened. The can was out the worms, and you know they've already started with me speaking out, that you know this is the example. I was told that I was the example, and anybody else want to follow in that example is gonna be just like Wooten. Asked out the door, you know, so I was given that so that's why they made them sign non-disclosures and then the ones that they do have in there that we're discussing, I want to say like Nurse Angela Jackson, ANGELA JACKSON, she's the LPN. She called me and she began to speak up and say "Y'all know Wooten" and Brown heard them talking about it and said "Y'all ain't gonna be satisfied until y'all don't have a job. You're not supposed to be discussing Wooten in here", but you're in your office, according to Jackson, with the door closed, laughing at the press conferences that I did and googling the things that I've done and you're

coming out and we're not supposed to be talking about it, but you're telling them that she had to do something to take care of those files, so they're painting this picture to them to where this is where you're gonna be, you know, basically begging and homeless without a job, if you follow suit to speak out. So everybody was job scared, you know I can get a call once a week and say there is only 150 as of today, there is only 150 federal inmates in there. I was told today, just before this call I got a call saying they're still taking ICE immigrants inside this facility, they're still doing intake. I was told today that the warden had a meeting with them this morning that said hey y'all don't have to worry about this place being closed down, they don't have the authority to close this place down, that's just Wooten running her damn mouth, so you still talking about me and what's going on, so you just let yourself no hey they're not gonna shut it down, don't have the authority to close it down. So you know I'm getting that coming back, reported back to me, I can tell you verbatim for verbatim about this facility and I haven't been there since the sixth of July of last year because you get that report that calls and lets you know they're still running the ship as usual, that nothing has changed.

**[1:35:16]**

**Senate HSGAC:** You had also mentioned that you were demoted from a full-time nurse to an as-needed nurse. When did that occur?

**Wooten:** July the 2nd of 2020. I was written up, I was out sick, had a breathing treatment was a nebulizer, I couldn't take the nebulizer to work because it dispersed the particles in the air so I went out with an inhaler, but I was sick. I had been sick since February, just never got any better. Just cough, chest pain, congestion, diarrhea, runny nose -- I was sick. I had a doctor's excuse for the 22nd of June, I was gonna be out for ten days. I had to work in short the 27th, the 28th, but I'm raising all of these concerns on the back end and I've already been told taht I'm trouble so now I've been written up. Out of the twelve years I've been nursing, I've never been written up on the job, never. So I get this write up, I already know what this is, I know this is a thing to say hey we're going to slap you on the wrists, shut up, or you're not going to have a job. But my wheels don't work that way, I'm mentally wired different. So I work in reverse, I get this write up for the 27th, that said I was a no-call no-show. We get into this reprimand on the 2nd, I never knew I was written up. I came to work on the 1st of July and my supervisor never said nothing to me, Lakeysia Brown never said anything to me. The 2nd, her best friend Shanise Bell was who she hired as the DON, they

went in the office, she came out and said "Wooten, go to admin, and see what Albright wants". So I went up to see Deputy Albright, and he then tells me I've been written up. I said "What?". And he said "You are no-call, no-show". I said "I've never been a no-call, no-show, sir, on a job. I just talked to Ms. Brown Friday". Prior to being written up on Saturday, she showed I had a doctor's excuse that I was gonna be out, they knew I was gonna be COVID tested, that my test was probably a false negative, that I could really be sick, and I have sickle cell, so they knew that. And she told me not to worry about calling out. When we get to the meeting on the 2nd, he pushed call, she comes in, I didn't tell her that, we never had that conversation. Because she's the supervisor, she's believed that me and her never had this conversation. She told me that John Whitely said to call out every day we're supposed to be out. This was never a part of policy. This was inducted in the policy that David Paulk went back and backdated for 6/18, for 6/18 I gave them my excuse 6/22. I didn't get this new policy to call in and call out until 7/1, when I went back to work on the first. So I already know that this is a game that you play cause I see that this is a game that you play. It was only supposed to be a reprimand. Supposed to be a verbal warning, that's all it was supposed to be. But because I don't know how to let stuff go, and I think I missed my call, I should have been a private investigator, because I don't know how to let it go, I asked them, can I speak to the warden, which is what I needed to do because I didn't even know what rule 1, 3, and 5 were. We didn't have a policy book that I broke rule 1, 3, and 5. What are those? I've never seen that. So in short, I go in. He has his back turned. I will never forget it, I hate to relive it. But, he was looking at the computer, glasses on his nose. He carries that authoritative personality, women can't him what to do and definitely not an African-American women is not going to come into his office and challenge his authority. So I ask him I said "Paulk, I've been on you all these years, all the time I get ready to come back into this facility you clear me, this is the third time through. I'm a jam up nurse, you have never had a problem out of me. Why am I being written up? What is going on Paulk with this write up, I don't understand, I've never had a problem". He swivels around in his chair, leans in forward, and says "Because you thought you had the right to challenge authority in this place.

You're gonna be PRN from this day forward, effectively today. I'm done with the conversation." So I already knew that was a retaliation from raising the concerns inside the facility so this is how you're gonna have to beat me now on paper. I still did not know how to let it go. I said, "well can I be excused for today?" and he said "sure, you can go on home". So I asked Ms. Brown, I said "well can I go?" Let me talk to Paulk. So anyway, they let me go home for the day, I was floored. Did not know what just happened. So I cried all the way home and I said ok lord

you need to show me what I need to do, what I got to do, what is gonna happen. I mean do I go back to this place knowing that this is, do I ask for, I never asked them for any hours, I asked Joan for a letter. I said I need a letter for defects, cause I have kids, so I'm gonna swallow the pride I have on the inside and we're gonna get food stamps and Medicaid for now, while I've worked all my life. And I asked her for a letter and I said "Joan I need you to tell me in this letter who made me, which I knew, who made me PRN, why I was made PRN, and what was the effective date".

She sent me a letter that says that I'm able to get 24 to 28 hours a week, that PRN, part-time, is the same position, and I said no ma'am, everywhere I've worked PRN is per diem, it's we'll call you when we need you. There is no set hours for PRN. So now that she realizes that I'm not gonna let this go, she gets the letter that says I'm part-time, that I can get up to 28 hours a week.

So I'm waiting for them to give me 28 hours a week, I didn't get 28 minutes. And I still haven't gotten 28 minutes because they're holding me on their roster as employed and saying that I'm still employed with them, that I can work, and in the process of this, you're not calling me to work, you're hiring nurses, you're hiring bilingual nurses, you're hiring nurse practitioners, you're hiring offices, so you're hiring people in my position that I could work and you're hiring them full-time. So I'm like, wow, this is really what's going on. Never got called for anything, and on top of that not only do you not call me to work, you challenge my unemployment. You come in and let me know hey you don't get this unemployment, this is not yours, you didn't have a right to get this unemployment. They went through their time clock. Joan can put time in. I have sheets that I see that I put together, that I look at, that she's altered the time on the time sheet. She's added time in the time sheet because she can manually put time in on days that i work that I didn't work. On hours that I work, that I did not work. So this is submitted to the unemployment to now make me pay back this $2000 that I don't have a job, I'm trying to feed my kids, I got two in college, so you're retaliating after I walked out the door. It's constantly something with them. Lucky low and behold, I did beat the unemployment under the stipulation that you need to go back and make sure that she was not overpaying me. So still have not received a check since April because she threw that overpayment in there because she knew that she put in to the time sheets. So, still retaliating, I mean just does not want to give me that break.

**[1:42:59]**

**Senate HSGAC:** Can you tell us what PRN stands for, just so we're clear?

**Wooten:** PRN is an abbreviation for per-request needed. It means per diem or as needed, medical.

**Senate HSGAC:** I see. And that's still your status today with the center, is that right?

**Wooten:** Yes, they still have not given me a walking slip. I still have not been dismissed. They won't utilize me, but.

**Senate HSGAC:** And was there ever any other justification provided for your demotion to that status other than the call out issues?

**Wooten:** No, and the sheet said, it's clearly on the form, that they have an option to check boxes and the boxes are no disciplinary impulse, reprimand only, disciplinary probation, suspension without pay, reduction in pay, and the box clearly says demotion too. None of those box are checked, the box that's checked is reprimand only.

**Senate HSGAC:** And what has the reaction been in your community from folks that you encounter, where you're living, in response to the allegations you've raised and the spotlight that that's put on the center?

**Wooten:** The reaction has been very, very, very negative. My community has not supported, my community has not raised the issue, my community has not raised a concern, my community says maybe I need to start me a GoFundMe, so we can get some money for our kids, maybe I need to start this lie so we can get some money for my kids. Our very own ____ right here in Tifton, Georgia, just did an interview with WALB and says that this facility is closing, based off a lie. So it's been harsh here and it's harsh to get a job here. I worked at the local hospital, I can't even get a job at the hospital. I put in 27 applications to be employed and I always get we filled the position, when I go back to check it, the positions are still open.

**[1:45:27]**

**Senate HSGAC:** And I understand, from talking with Dana and some others that you've had some security concerns, as well, given some of the anger about the potential closing of the facility. Can you talk a bit about that, and what your concerns are going forward?

**Wooten:** The, I had a guy here maybe last week, I told Dana last week, a week before last, that sat across the street once they initially announced this Thursday and a Congressman gave his statement Friday morning, and I got a truck siting across the street, Caucasian guy in a baseball cap, windows tinted on this white truck, and my kids were outside playing, and I go out to see who it is and it speeds off, I can't catch a tag number, the cameras don't catch a tag number, I have a ring system set up here. It's not set up to the police station so we still have to call the police to get here. And we go past that day. The next day this vehicle is sitting out here, second day in a row, same spot, and I go outside, I always sit outside with a license to kill, so I sit outside with a 9-millimeter. It's what I sit outside with, on the porch at home. And I walk to the end of the road to get a tag number from this vehicle and he speeds off the opposite way as I'm posted up to get a tag, this time from a different angle. So I didn't get a tag number for that. I got a call shortly after that from Ms. Woodard saying "you made those people at the prison upset, they see you, they're gonna beat your ass" and I'm like wow so now I'm gonna be, I'm not the one who done those procedures, I'm not the one who harmed those ladies, I mean why am I being the target and she was like "Because you spoke up. You should have kept your mouth closed." So, and then my concern, is my kids. And I've always been pretty good myself. But my children, it's hard to go out into a public setting. My kids want to do sports and have things going on. It's hard for me to go in crowds now, because I have to be the, always watching, now I have to be the sniper in worst of times for my children. Now I find myself instead of enjoying games or enjoying festivities or enjoying parades I'm looking in the crowds to make sure that nobody notices my child or notice me or something, somebody's not going to do anything to us or harm us. Even my mom lives across, just buried my dad about two weeks ago or so, I mean her and my son are staying with my 15-year-old special needs child, is staying with her. We've asked for the security and patrol. I have not seen Tifton County Sheriff's Department drive by my house once since we asked for that letter. Like I said, I still live in the real world. This is an organization that, you're talking about non-police. This place that I spoke out against is police.

It is law enforcement, so what law enforcement wants to secure this girl that's coming out against law enforcement, and I'm a law enforcement officer, I think like that, so this is the only connotation that I can say they're not gonna patrol to see if anything goes on here. That's because it's law enforcement. A lot of them have children that work in this law enforcement or brothers or sisters or aunts and uncles that have worked at this facility. It's closing, they're less than 12, 15 miles apart, so I haven't gotten that ease to say I can go to sleep at night. I'm up at night and have been for months watching the dings, I have these security cameras stretched out to the neighbors' yard because I need to know if somebody is coming this way, so it goes off with every passing of a vehicle, every passing of a dog or a cat, every time the lady comes outside to empty her trash, on one end, it's set to wide perimeter so I can see if anybody's coming. I'm sitting outside in a rocking chair having to explain to my 9-year- old why I have a pistol in my lap outside just so they can ride the bike or walk the dog or they can play in the yard just a few minutes or they don't get any sunlight all together because once I'm in the house, I don't come out, and I'm not out after 6 o'clock pm. So now my daughter's like can I get a decent job cause it's gonna be Mommy it's just 7, I'm in before dark and I don't leave before dark, and I'm only out for a short periods of the day. It's like if we're going to make a move, we're going to the grocery store that's it. We're not gonna be out 2, 3 times. So it's like I've condensed my life down to once or twice a week. I can stay in the house all day long, but kids, I mean I think they're tired of watching the same reruns on TV. It's the same YouTube channels, but, not just wanting to step outside because somebody's stupid and then me, I don't want to have to put a bullet in somebody's child because I have children. I know that sounds, but, I mean standing guard for my children because you're upset about something that somebody else did to somebody else's body and you'd rather work the job than to make sure that somebody else's life is ok. What kind of a sick world do we literally live in?

**[1:51:17]**

**Senate HSGAC:** Thank you for sharing that, I know that, I'm sure it's been difficult. Are you aware of retaliation that some of the women who were detained at the center have experienced in response to them raising their allegations? I know you haven't been there full-time since July of last year, but do you know if they experienced deportations, or any other consequences as a result of their allegations, have you heard from women who have experienced this directly?

**Wooten:** They've experienced deportations, and they've experienced segregation, single- cell lock ups, and they've experienced a hold on commissary. A lot of these women have been deported and I know that from being in Atlanta. At one point we were in Atlanta, at one point, Congressman Jackson out of Houston, Texas, that's what they were there. She stopped out of plane to put a stop hold on one of the women because they had flew her all around the United States, she had been on four different flights, hiding her, deporting her. And she caught wind of it and caught them at the airport and that congressional move made them pull her off the plane. So they were getting rid of the ones that they knew had legitimate claims that they could legitimately prove. And then they were destroying the records on the ones that had legitimate claims as well, but they didn't have the resources back up their claims because their documentation and records had been shredded.

**Senate HSGAC:** In terms of next steps on our end, are there certain current or former employees at the center that you have mentioned already that you feel would be helpful for us to talk with at some point? I know we covered a lot of names, you've been helpful in spelling their names and being very clear about that but are there any one, is there any one else you think would be helpful for us to talk with about these allegations?

**Wooten:** I received from the ladies, from the nurses that worked there, that everybody who has come in and done a investigation has not pulled them to the side. These nurses are saying if they're pulled to the side, and you pull them to the side in groups, if there's 8 of them, you don't know who told what. That's the mindset that they have to keep their jobs. So if you go in and you individually ask these nurses in the medical department what they know, you'll be surprised at the things that they say they're willing, and I do believe at this point, willing to inform you. But where you're going to have a problem is, is that, you can't enter this facility like a just show up and say hey I'm gonna come in. And even once you get through the doors because they gave Congress last year hell. They told them that they could not enter the facility. They would not let them land a helicopter in the field. It was very, very, very, very ugly. So they got a warning and they make a call down line, Paulk calls Brown down line and lets her know hey we have visitors in the building, everybody better remain as instructed. So now you get them coming across and they saying that Congress can come in but they can't question any of the employees and they can't question any of the

people that are there. So, it's that stop hold. Hey, you're gonna be there January 14th, they're gonna shred everything January the 1st through the 13th. And they're gonna get rid of what needs to be, and I'm pretty sure everything has been, they're working probably on policies because as this news travels and this feed travels, they're working on things I was told, as they go. As it comes up, they're working on putting these things and backdating this stuff as it comes. Anything to discredit who I am.

**[1:55:28]**

**Senate HSGAC:** I see. And in terms of nurses who might be willing to share information about what we've talked about, are there any other individuals besides the names that you've already provided who you think might know something and might be willing to share information?

**Wooten:** Sam, you sent me, how do I pull it up? You sent me a, it's in the chat

**Samantha Feinstein:** I sent you an email, because the list that I have I couldn't like paste it in the chat because it's from a spreadsheet. So, but a lot of these are names that you've already mentioned, and I don't know how helpful these witnesses, you know all these witnesses will be but....

**Wooten:** Ok.

**Samantha Feinstein:** Do you have access to your email?

**Wooten:** I got a list. I have a list already down. Angela Jackson, I gave her name. You have Jackie Webb, JACKIE WEBB. Michell Tanner, MICHELL TANNER. You have Xenia Golsby, XENIA GOLSBY. I've got Nakedria Bussy, NAKEDRIA BUSSY. I have Erica Hurley, ERICA HURLEY. I mentioned Shelia Woodard, SHELIA WOODARD. We had Kim Howard. We mentioned Sebrina Taylor. Anna Carter. Rick Jones, RICK JONES. And, I'm gonna go, I have an Emily Mitchell, who was a nurse mental health provider, EMILY MITCHELL. Dedria Jordan, DEDRIA, Jordan, JORDAN. I'm gonna put, this is an officer, MAR-Marie, MARIE, Mayo, MAYO.

**Unknown voice 2:** Dawn, can you guys hear me?

**Wooten:** Yes.

**Unknown voice 2:** Yeah, I'm wondering if we could probably share this list possibly with the committee and know their rules and I wondered if you might want to, with the list, is there a _____ I guess Brandon and I would ask, are you looking for folks who you should talk to or folks you think would be amenable to talking to, which maybe...

**Senate HSGAC:** You know I think we're looking at kind of both buckets there. It would be great if there was a way to communicate to us which folks would be willing to talk with us of course, as Joe said to me, we have ways of compelling folks to talk with us as well, so if necessary, we use those procedures at some point. But you know if there are folks that you think would have well information and would be willing to talk with us, even on a confidential basis, we're always happy to make assurances about confidentiality and ____ information we received and it would be helpful for us to know that as well.

**[2:00:04]**

**Samantha Feinstein:** This might be a good touch point for me to jump in real quick, kind of a footnote on that. So, during today's interview with Ms. Wooten, she's mentioned some evidence that there has been some witness tampering, which very much could equate to criminal obstruction of justice and interfering with federal investigations. Many of the witness that Ms. Wooten mentioned today may have been asked not to speak about her or may have heard very disparaging things about her and they've had plenty of time to get ahead of this, and to add to that, pretty much all of the witnesses other than Dawn, would be witnesses who are extremely afraid of retaliation and reluctant to speak. The witnesses who shared information with Ms. Wooten have typically done so on a, kind of confidential, you know personal level confidential basis and have kind of preferred for her to be the person bringing this information, you know, really wanted to stay behind the scenes. So, I'm bringing this up, because you know she's already mentioned, it's good to pull them aside individually but just wanted to note there that, these are witnesses

who have been tampered with, these are witnesses who are very fearful. It's going to be important I think to secure their confidentiality, you know and have probably as many options available to them as you can to accommodate their fears and concerns, especially in light of what Dawn also shared today about the retaliation that she's personally experienced and how severe that was for her. This has a known chilling effect on the employees at ICDC so you know, I guess long story long is I want to prepare you for what to expect but also request that in addition to all of that, that in consulting with any of these witnesses that Ms. Wooten and her testimony be kept confidential and that she not be named as the referring source for these specific witnesses so that the retaliation against her and the hostilities against her do not worsen and you know I think that would probably be best for the investigation in general that it's not necessarily tied to Dawn although they may make assumptions as they will and yeah, I mean I guess, that's part my comment. My question to you all is, what is your plan for following up with witnesses and what are your next steps? There has been a lot that has been shared and discussed today and I don't know how much is going to be included in the scope of your investigation, but just I guess we would like to know a bit more about yeah, your plan for contacting witnesses, and of course we can follow up with a list of the people that Dawn has mentioned as well.

**Senate HSGAC:** Sure, and thanks for that, we share those concerns and we understand those points and that's helpful. In terms of contacting witnesses, I agree that it's very important not to imply in that initial outreach that we've spoken with Ms. Wooten or to refer to her statements to the subcommittee today as a way to frame our questions or interests to those individuals. We want to do everything we can to ensure we don't inadvertently contribute to the retaliation that she's experienced and I think it's not necessary for us to refer to her or to violate confidentiality in our conversation reaching out to those individuals, and perhaps if you can provide a list and as we go forward, if we go forward we can work with you to get your thoughts on how to bring our outreach or which individuals might be most comfortable talking with us, just so that we make sure that we're honoring the confidentiality that Ms. Wooten expects. In terms of next steps in general, as I mentioned before, this is an issue of very high interest from Senator Ossoff given the home state consideration here, given his interest in the national issues surrounding the detention of immigrants so we'll need to talk with him, talk with our colleagues on Senator Johnson's staff on the best way to

move forward but I think that we are interested in following up on many of these issues that Ms. Wooten has raised today, and just speaking for myself I found it extremely helpful to be able to talk with her so thank you Ms. Wooten for taking some time this afternoon to share your experiences with us.

**[2:05:34]**

**Wooten:** You're welcome.

**Samantha Feinstein:** Absolutely.

**Unknown voice 3:** Just a quick question: Ms. Wooten, did you email with your colleagues at all. I know nurses don't tend to email a lot but sort of as we're exploring potential universe of documents, I'm just curious if you utilized email and raised any of the concerns over email?

**Wooten:** I emailed for like, job wise, but I didn't raise, that's HIPAA to us but that's crazy that's HIPPAA with names and different things like that over email.

**Unknown voice 3:** I'm sorry can you repeat that? It didn't come through clearly.

**Wooten:** That I didn't email anything going on with my collegues back and forth because that's HIPAA, when you put names, medical names, so not that. I have emails going back and forth with jobs and this situation but not the complaints the concerns.

**Unknown voice 3:** Got it. That makes sense. Now I just want to reiterate the same message from Senator Johnson, from our folks here at Senator Johnson, thank you so much for time and your courage to come forward.

**Senate HSGAC:** And Ms. Wooten, unless my colleagues have any other questions, I would just close with one last question to you. If you did have the chance to talk with members of Congress,

members of the Senate directly about your experiences and what you observed at the Irwin County Center, what message would you want them to hear? What would be most important for them to know?

**Wooten:** I've always held that concept to treat others how you want to be treated. It's a world that we live in that we have to look out for another, and to take everybody's situation. Had I not taken their situation seriously, or took it as a valid cause, then this would have still been, going on to them, they would have still been experiencing these unnecessary procedures or they would have been treated this way, inhumanely. And it's better to say something than to say nothing.

**Senate HSGAC:** Thank you for that. And certainly, in our line of work we rely on people like you with the courage to speak out and say something, so thank you again for taking the time to talk with us. Thank you to Dana and the rest of the team for coordinating and we'll be in touch as we think about next steps here.

**Samantha Feinstein:** Before we conclude I have a question for you, is this interview with Ms. Wooten, has this been transcribed or will it be transcribed?

**Senate HSGAC:** We have a clerk, our clerk stan who was taking notes, and there will be a narrative summary of this interview and the questions and the back and forth but we're not transcribing it word for word, we're not recording.

**Samantha Feinstein:** Ok, gotcha. I just wanted to make sure because I think when it's transcribed, we have a right to review it and make amendments or corrections if anything is inaccurate. But this isn't going to be like a formal transcription, like of that nature.

**Senate HSGAC:** No.

**Samantha Feinstein:** Gotcha. Brilliant. Well if you have any follow up questions, do let us know. We'll still be available to you, and I think our homework is to send you a written list of witnesses,

including those that were mentioned today, just to support what Ms. Wooten provided. And if there is anything else you need from us, just let us know.

**Senate HSGAC:** We appreciate that. Thanks very much.

**Samantha Feinstein:** Thank you. Thank you so much for your time and your interest.