# EXHIBIT 17

*United States Senate*
***PERMANENT SUBCOMMITTEE ON INVESTIGATIONS***
***Committee on Homeland Security and Governmental Affairs***

***Jon Ossoff, Chairman***
***Ron Johnson, Ranking Member***

# MEDICAL MISTREATMENT OF WOMEN IN ICE DETENTION

## STAFF REPORT

## PERMANENT SUBCOMMITTEE ON INVESTIGATIONS

## UNITED STATES SENATE

**RELEASED IN CONJUNCTION WITH THE**
**PERMANENT SUBCOMMITTEE ON INVESTIGATIONS**
**NOVEMBER 15, 2022 HEARING**

**SENATOR JON OSSOFF**
**Chairman**

**SENATOR RON JOHNSON**
**Ranking Minority Member**

**PERMANENT SUBCOMMITTEE ON INVESTIGATIONS**

**DOUGLAS S. PASTERNAK**
Staff Director

**CAITLIN WARNER**
Chief Counsel

**MEERAN AHN & DANIEL M. EISENBERG**
Senior Counsels

**TAYLOR BURNETT**
Counsel

**DENNIS HEINRICH**
Detailee

**SAMANTHA ARREGUI, SHIZA ARSHAD, KARAZ AXAM, DANIELLE DAVIS, CORENZA JEAN, KRISTY HAMER, ISMAEL FAROOQUI, SAM KREVLIN, MALLORY LEOPOLD NEEDLE, ZOE LI, MARYANNE MAGNIER, MORGEN OLSON, KEVIN PARKER, MADELYN PHINNEY, NICHOLAS RAWLINSON, ANNIA ROCHESTER, AVERY SALINGER, NAILA SCOTT, ANDREW VAILLIENCOURT, & THOMAS WEAVER**
Law Clerks

**BRIAN DOWNEY**
Staff Director to the Minority

**SCOTT WITTMANN**
Deputy Staff Director to the Minority

**KYLE BROSNAN**
Chief Counsel to the Minority

**PATRICK HARTOBEY**
Senior Counsel to the Minority

**MAURA BRENNAN, CHRISTOPHER ECKHARDT JR., VICTORIA GARRASTACHO, SLOAN MCDONAGH, JAMES PRIEST, & DAVID SAMBERG**
Law Clerks to the Minority

**KATE KIELCESKI**
Subcommittee Clerk

**MEDICAL MISTREATMENT OF WOMEN IN ICE DETENTION**

**TABLE OF CONTENTS**


**I. EXECUTIVE SUMMARY** .......... 3
**II. BACKGROUND** .......... 21
**A. Key Players** .......... 22
**i. ICE and Relevant Subcomponents** .......... 22
**ii. ICDC and LaSalle** .......... 24
**iii. Dr. Amin and ICH** .......... 26
**B. Key Processes for Medical Treatment of ICDC Detainees** .......... 30
**i. ICDC Sick Call Process** .......... 30
**ii. ICE Surgical Approval Process** .......... 31
**iii. ICDC Grievance Process** .......... 33
**C. Key Medical Procedures and Treatments** .......... 34
**III. FORMER DETAINEES AND EMPLOYEES AS WELL AS FEDERAL ENTITIES HAVE ALLEGED SUBSTANDARD CARE AT ICDC** .......... 35
**A. Former Detainees Have Alleged Deficiencies Related to ICDC Healthcare** .......... 36
**B. Former ICDC Employees Reported Disturbing Conditions to the Subcommittee** .......... 38
**C. Internal DHS Entities Have Identified Numerous and Repeat Deficiencies at ICDC** .......... 41
**D. The DHS OIG Found That ICDC Generally Met ICE Detention Standards for Healthcare but Identified Areas for Improvement** .......... 44
**i. The DHS OIG Found That ICDC Medical Care Generally Met Standards but Improvements Are Necessary** .......... 44
**ii. The OIG Identified Seven Other Areas of Concern About ICDC Medical Care** 45
**IV. ALLEGED SERIOUS MEDICAL MISCONDUCT BY DR. MAHENDRA AMIN** .......... 47
**A. Former ICDC Detainees Have Raised Concerns About Conditions at ICDC and Alleged That Dr. Amin Performed Nonconsensual, Unnecessary, or Excessive OB-GYN Procedures** .......... 48
**i. Karina Cisneros Preciado** .......... 49
**ii. Jaromy Floriano Navarro** .......... 50
**iii. Wendy Dowe** .......... 53
**iv. Maribel Castaneda-Reyes** .......... 57
**v. Jane Doe #1** .......... 58
**vi. Jane Doe #2** .......... 60
**B. Former ICDC Employees Recounted Concerns Regarding Dr. Amin to the Subcommittee** .......... 62

**C. Several Medical Experts Identified "Disturbing Patterns" in Treatment by Dr. Amin** ..... 63

**i. OB-GYN Medical Experts Engaged by Immigration Advocacy Groups Found Alarming Surgical Patterns by Dr. Amin** ..... 64

**ii. The Subcommittee's Medical Expert Identified Concerning Treatment Patterns by Dr. Amin** ..... 65

**D. Response from Dr. Amin Concerning ICDC Allegations** ..... 69

**V. DR. AMIN WAS A CLEAR OUTLIER IN THE VOLUME OF CERTAIN OB-GYN PROCEDURES HE PERFORMED ON ICDC DETAINEES** ..... 70

**A. Despite Housing a Low Number of ICE Detainees, ICDC and Dr. Amin Accounted for a Large Percentage of OB-GYN Referrals, Visits, and Procedures Within the ICE System** ..... 71

**B. Dr. Amin Accounted for At Least One in Three OB-GYN Procedures and Received Nearly Half of All ICE Payments for OB-GYN Procedures Between 2017 and 2020** ..... 73

**VI. ICE FAILED TO EFFECTIVELY OVERSEE OR INVESTIGATE DR. AMIN** ..... 77

**A. Current ICE Oversight Mechanisms to Review Detention Centers and Medical Care** ..... 77

**B. ICE Had Limited Capabilities to Vet Off-Site Medical Providers or Monitor Their Medical Practices** ..... 80

**i. ICE Did Not Have a Thorough Process in Place to Vet Dr. Amin Before He Began Treating ICDC Detainees** ..... 80

**ii. ICE Never Identified Any Treatment by Dr. Amin as Potentially Excessive or Unnecessary and Lacked a Utilization Review Process to Identify Trends in Off-Site Medical Treatment** ..... 83

**iii. ICE Performed a Limited Investigation Following the Public Allegations Against Dr. Amin** ..... 86

**iv. ICE Personnel Failed to Conduct Site Visits to ICDC Between January 2018 and October 2020** ..... 89

**v. ICE Is Not Required to Monitor the Use of Language Translation Services by Off-Site Medical Providers** ..... 91

**vi. ICE Is Not Required to Ensure Off-Site Medical Providers Obtain Informed Consent** ..... 91

**vii. ICE Conducts Limited Oversight of Hospitals Providing Off-Site Services for Non-IHSC Detention Facilities** ..... 93

**VII. ICDC HAD LIMITED OBLIGATIONS TO CONDUCT OVERSIGHT OF OFF-SITE CARE FOR DETAINEES** ..... 94

**A. LaSalle Had Minimal Contractual Obligations Concerning Off-Site Medical Care at ICDC** ..... 94

**B. LaSalle Conducted a Limited Investigation of Abuse Allegations** ..... 99

**VIII. ICH DECLINED TO IDENTIFY EFFORTS TO INVESTIGATE DR. AMIN AND DID NOT IDENTIFY ANY CHANGES TO POLICIES AND PROCEDURES FOLLOWING THE 2020 ALLEGATIONS** ........ 101

**IX. CONCLUSION** ........ 103

## GLOSSARY OF ACRONYMS

| Acronym | Definition |
|---|---|
| CIA | Corporate Integrity Agreement |
| CMD | Custody Management Division |
| CMS | Centers for Medicare & Medicaid Services |
| CPI | Center for Program Integrity |
| CRCL | Office for Civil Rights and Civil Liberties |
| D&C | Dilation and Curettage |
| DHS | Department of Homeland Security |
| DOJ | Department of Justice |
| DON | Director of Nursing |
| DSCO | Detention Standards and Compliance Officer |
| DSM | Detention Service Manager |
| eCAMS | Electronic Claims Adjudication Management System |
| ERO | Enforcement and Removal Operations |
| FMC | Field Medical Coordinator |
| FOIA | Freedom of Information Act |
| GAO | Government Accountability Office |
| HHS | Department of Health and Human Services |
| HPMU | Health Plan Management Unit |
| HSA | Health Services Administrator |
| ICDC | Irwin County Detention Center |
| ICE | Immigration and Customs Enforcement |
| ICH | Irwin County Hospital |
| IGSA | Intergovernmental Service Agreement |

| | |
|---|---|
| IHSC | ICE Health Service Corps |
| IHSC Facilities | Facilities in which IHSC directly provides healthcare services |
| LaSalle or LaSalle Corrections | LaSalle Southeast, LLC |
| LEEP | Loop Electrosurgical Excision Procedure |
| LOU | Letter of Understanding |
| LPN | Licensed Practical Nurse |
| MedPAR | Medical Payment Authorization Request |
| NCCHC | National Commission on Correctional Health Care |
| Non-IHSC Facilities | Facilities in which local governments or their contractors provide services without embedded federal staff |
| NPDB | National Practitioner Data Bank |
| OB-GYN | Obstetrician and Gynecologist/Obstetrics and Gynecology |
| ODO | Office of Detention Oversight |
| OIG | Office of Inspector General |
| OPR | Office of Professional Responsibility |
| PBNDS | Performance-Based National Detention Standards |
| PSI or Subcommittee | Permanent Subcommittee on Investigations |
| RCD | Regional Clinical Director |
| VAFSC | Veterans Affairs Financial Services Center |

## I. EXECUTIVE SUMMARY

In May 2021, the Permanent Subcommittee on Investigations ("Subcommittee" or "PSI") initiated a bipartisan investigation into the alleged mistreatment of Immigration and Customs Enforcement ("ICE") detainees housed in the Irwin County Detention Center ("ICDC") in Ocilla, Georgia. Over the course of its 18-month-long investigation, the Subcommittee examined multiple allegations of medical abuse against detainees at ICDC, a private detention center owned and operated by LaSalle Southeast, LLC ("LaSalle" or "LaSalle Corrections"). The allegations stemmed from a September 2020 whistleblower complaint ("September 2020 complaint") filed by immigration advocacy groups and attorneys alleging that an off-site obstetrician and gynecologist ("OB-GYN"), Dr. Mahendra Amin, performed "high rates" of unauthorized hysterectomies on ICDC detainees.[1] The groups also alleged that ICDC had poor medical conditions and lax COVID-19 mitigation procedures.[2]

The Subcommittee's investigation identified serious issues relating to ICDC and specifically connected to Dr. Amin's care:

- Female detainees appear to have been subjected to excessive, invasive, and often unnecessary gynecological procedures.
- There appears to have been repeated failures to secure informed consent for off-site medical procedures performed on ICDC detainees.
- Medical care provided to detainees at ICDC was known by DHS to be deficient, but neither ICE nor LaSalle took effective corrective action.
- ICE did not conduct thorough oversight of off-site medical providers and procedures.

The Subcommittee did not substantiate the allegations of mass hysterectomies on ICDC detainees. Records indicate that Dr. Amin performed two hysterectomies on ICDC detainees between 2017 and 2019. Both procedures were deemed medically necessary by ICE.

Dr. Amin stopped treating ICE detainees after the September 2020 complaint became public. In December 2020, former ICDC detainees filed a class action lawsuit ("December 2020 lawsuit") against ICDC, ICE, Dr. Amin, Irwin County Hospital ("ICH"), and other federal and nonfederal parties alleging that the detainees had undergone nonconsensual and unnecessary gynecological procedures.[3] In addition, the lawsuit alleged a broader pattern of medical abuse

[1] Complaint by Project South, Georgia Detention Watch, Georgia Latino Alliance for Human Rights & South Georgia Immigrant Support Network to Joseph V. Cuffari, Cameron Quinn, Thomas P. Giles, & David Paulk, *Re: Lack of Medical Care, Unsafe Work Practices, and Absence of Adequate Protection Against COVID-19 for Detained Immigrants and Employees Alike at the ICDC County Detention Center* (Sept. 14, 2020) (projectsouth.org/wp-content/uploads/2020/09/OIG-ICDC-Complaint-1.pdf) [hereinafter *Project South Complaint*].
[2] *Id.*
[3] Consolidated Amended Petition for Writ of Habeas Corpus and Class Action Complaint for Declaratory and Injunctive Relief and for Damages (Dec. 21, 2020), *Oldaker v. Giles*, M.D. GA (No. 7:20-cv-00224-WLS-MSH).

and mistreatment of detainees at ICDC. The plaintiffs demanded $5 million in money damages and other relief. The litigation is ongoing.

As of early 2022, Dr. Amin was under criminal investigation by multiple federal agencies.[4] PSI staff attempted on multiple occasions to obtain voluntary testimony from Dr. Amin regarding his treatment of female ICE detainees at ICDC. Dr. Amin declined these requests. On February 7, 2022, the Subcommittee served Dr. Amin with a subpoena for deposition. Through his attorney, Dr. Amin submitted an affidavit stating that he declined to provide testimony pursuant to his Fifth Amendment privilege against self-incrimination. The Subcommittee accepted Dr. Amin's invocation of his rights and did not question him throughout the investigation.

In May 2021, the Department of Homeland Security ("DHS") directed ICE to discontinue its contract with ICDC. As of September 3, 2021, all immigrant detainees were removed from the ICDC facility and moved to other detention facilities. Effective October 7, 2021, ICE terminated the contract with LaSalle regarding its management of ICDC.[5] As of today, ICDC is still utilized to detain individuals under the custody of the U.S. Marshals Service. The federal government continues to contract with LaSalle to operate other detention facilities throughout the country.

The Subcommittee investigated the veracity of the allegations surrounding medical treatment at ICDC and sought to determine whether these treatments occurred against a backdrop of general medical neglect or abuse at the facility. The Subcommittee also sought to determine whether gaps in ICE policies permitted an off-site provider of medical care to perform unnecessary, nonconsensual, or excessive procedures on ICE detainees.

### A. Female Detainees Appear to Have Been Subjected to Excessive, Invasive, and Often Unnecessary Gynecological Procedures

According to expert medical analysis conducted for the Subcommittee, under Dr. Amin's care, female detainees appear to have undergone excessive, invasive, and often unnecessary gynecological procedures. Over the course of its review, the Subcommittee determined that Dr. Amin holds no board certifications, and in 2013 the Department of Justice ("DOJ") and the State of Georgia sued Dr. Amin, claiming he had committed Medicaid fraud by ordering unnecessary and excessive medical procedures.[6] That lawsuit was settled in 2015, when Dr. Amin and his codefendants paid a $520,000 settlement to the federal government while admitting no wrongdoing.[7]

---

[4] Letter from Counsel for Dr. Amin to the Senate Permanent Subcommittee on Investigations (Feb. 21, 2022). PSI is unaware of the current status of these investigations.

[5] U.S. Department of Homeland Security, Office of Inspector General, *Medical Processes and Communication Protocols Need Improvement at Irwin County Detention Center* (OIG-22-14) (Jan. 3, 2022) (https://www.oig.dhs.gov/sites/default/files/assets/2022-01/OIG-22-14-Jan22.pdf).

[6] Complaint (July 8, 2013), *United States v. Hospital Authority of Irwin County*, M.D. Ga. (No. 7:13-cv-00097-HL).

[7] The United States of America's Filing of Settlement Agreement (July 8, 2013), *United States v. Hospital Authority of Irwin County*, M.D. Ga. (No. 7:13-cv-00097-HL); U.S. Department of Justice, U.S. Attorney's Office Middle District of Georgia, *Hospital Authority of Irwin County Resolves False Claims Act Investigation for $520,000* (Apr.

The Subcommittee's review of Dr. Amin's treatment practices of ICE detainees after the settlement, from 2017 to 2020, identified a similar pattern of potentially excessive medical procedures. Dr. Amin was a clear outlier in both the number and types of procedures he performed compared to other OB-GYNs that treated ICE detainees. ICDC housed roughly 4% of female ICE detainees nationwide from 2017 to 2020. Dr. Amin accounted for roughly 6.5% of total OB-GYN *visits* among all ICE detainees in the same time period. However, he performed nearly one-third of <u>certain</u> OB-GYN *procedures* on ICE detainees across the country between 2017 and 2020 and more than 90% of some key procedures.

For example, from 2017 to 2020:[8]

- Dr. Amin performed 44 laparoscopies to excise lesions, or 94% of all such procedures conducted on all ICE detainees.[9]

- Dr. Amin administered 102 Depo-Provera injections, or 93% of all such injections provided by all OB-GYN specialists to ICE detainees.[10]

- Dr. Amin performed 163 limited pelvic exams, or 92% of limited pelvic exams conducted on all ICE detainees.

- Dr. Amin performed 53 dilation and curettage ("D&C") procedures, or 82% of all D&C procedures conducted by all OB-GYN specialists treating ICE detainees.[11]

---

29, 2015) (www.justice.gov/usao-mdga/pr/hospital-authority-irwin-county-resolves-false-claims-act-investigation-520000).

[8] The Subcommittee recognizes that this data in and of itself does not indicate that the treatments were unnecessary. ICE does not track the demographic information of its female population, and the agency could not provide the Subcommittee with information regarding key variables of the female detainee population, including age and medical history.

[9] A laparoscopy may be used to obtain a small tissue sample for testing or even remove organs like the appendix or gallbladder, and it is generally performed under anesthesia. Johns Hopkins Medicine, *Laparoscopy* (www.hopkinsmedicine.org/health/treatment-tests-and-therapies/laparoscopy) (accessed Nov. 13, 2022).

[10] Depo-Provera is an injection that contains the hormone progestin and is typically administered every three months to prevent pregnancy and manage issues related to the menstrual cycle. Mayo Clinic, *Depo-Provera (contraceptive injection)* (www.mayoclinic.org/tests-procedures/depo-provera/about/pac-20392204) (accessed Nov. 13, 2022).

[11] A D&C procedure removes tissue from inside the uterus. During this procedure, a provider will dilate the cervix and then use a surgical instrument called a curette (a sharp instrument or suction device) to remove uterine tissue. Mayo Clinic, *Dilation and Curettage (D&C)* (www.mayoclinic.org/tests-procedures/dilation-and-curettage/about/pac-20384910) (accessed Nov. 13, 2022).

**Figure 1: Number of OB-GYN Medical Procedures Performed on ICE Detainees and Percentage Nationwide of Dr. Amin's Procedures for FY 2017-2020**[12]

| ***Medical Procedure*** | **Dr. Mahendra Amin** | **Second Highest-Ranking Physician**[13] | **Total Number of Procedures on ICE Detainees Nationwide** |
|---|---|---|---|
| | | | |
| *Limited Pelvic Exam* | 163 (92%) | 4 | 179 |
| | | | |
| *Depo-Provera Injection* | 102 (93%) | 2 | 110 |
| | | | |
| *D&C* | 53 (82%) | 3 | 65 |
| | | | |
| *Laparoscopy* | 44 (94%) | 1 | 47 |
| | | | |
| ***Total Procedures*** | **362 (90%)** | **10** | **401 (100%)** |

Following the September 2020 complaint, the ICE Health Services Corps ("IHSC") stated it "conducted a comparative analysis of medical referrals and claims completed after receiving allegations about Dr. Amin."[14] IHSC also stated that it "conduct[ed] an analysis of referral and claims data at ICDC compared to other ICE detention facilities housing females and determined that the number of referrals and claims was not abnormal."[15] IHSC stated that it never identified any red flags regarding Dr. Amin's treatment of detainees before or after officials reviewed his procedures following the publication of the September 2020 complaint.[16]

---

[12] U.S. Immigration and Customs Enforcement, *Q&A Paper: IHSC Response to PSI Requests: Irwin County Detention Center* (Sept. 1, 2021) (response on file with the Subcommittee) [hereinafter *Sept. 1, 2021 ICE Q&A Paper*].
[13] The second highest-ranking physician for these procedures varied. This column represents the second highest-ranking physician providing these treatments to ICE detainees for each procedure.
[14] U.S. Immigration and Customs Enforcement, *Q&A Paper: Responses to Allegations of Inappropriate Care Provided by Dr. Amin for the Female Population of the Irwin County Detention Center (ICDC)* (June 23, 2021) (response on file with the Subcommittee) [hereinafter *June 23, 2021 ICE Q&A Paper*].
[15] *Id.* Information ICE used in this analysis is discussed in more detail in Section IV.
[16] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021). ICE later stated to the Subcommittee that based on the comparative analysis, ICE noted a possible overutilization of the D&C and laparoscopic procedures, but that it would need an expert OB-GYN review of the medical records because its analysis was based solely on medical claims data. Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).

An IHSC Regional Clinical Director ("RCD") approved each procedure before it was authorized. In interviews with the Subcommittee, IHSC officials explained that the disparity in the number of Dr. Amin's procedures compared to other doctors treating ICE detainees alone did not raise alarm either when the RCD approved the surgeries, or when IHSC retrospectively reviewed Dr. Amin's medical care. However, IHSC could not explain or provide context explaining why Dr. Amin was such an outlier compared to other doctors treating ICE detainees.

To better understand the appropriateness of Dr. Amin's treatment and care of ICDC detainees, the Subcommittee engaged Dr. Peter Cherouny, an OB-GYN physician who previously conducted medical reviews for the Department of Health and Human Services ("HHS") Office of Inspector General ("OIG") in other contexts. To support this investigation, Dr. Cherouny conducted an independent review of more than 16,600 pages of medical records obtained by the Subcommittee, pertaining to approximately 94 ICDC women Dr. Amin treated.

Dr. Cherouny identified significant issues with the care Dr. Amin provided to ICDC detainees and found Dr. Amin's use of certain surgical procedures to be "too aggressive" and inappropriate.[17] Dr. Cherouny's key findings include:

- Dr. Cherouny found that Dr. Amin performed 40 D&C procedures with a laparoscopy on ICDC detainees. He found that Dr. Amin's use of these procedures were "too aggressive" and that the "vast majority [of cases where Dr. Amin performed a D&C] appear to be manageable with imaging and appropriate hormonal therapy."[18]

- Dr. Cherouny concluded that Dr. Amin's practices were "woefully behind the times" and his treatment of ICDC detainees "is not meeting current standards of care."[19] He added, "[d]ue to a lack of knowledge or capability, Dr. Amin persistently uses inpatient, surgical options as diagnostic tools for benign clinical conditions."[20] Such conditions are "more appropriately managed with imaging studies and outpatient clinical tools."[21] Dr. Cherouny told the Subcommittee that Dr. Amin "appears unaware of these current options or does not have them available in his office or hospital."[22] In one interview with the Subcommittee, Dr. Cherouny summarized Dr. Amin's care as "pretty good medicine for the 1980s, but we're not there anymore."[23]

- Dr. Cherouny found that "Dr. Amin seemed to use a boiler plate approach to care. He uses a D&C and laparoscopy for primary diagnostic reasons and seems to 'pile

---

[17] Dr. Peter Cherouny, Interview with Senate Permanent Subcommittee on Investigations (Jan. 26, 2022); Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
[18] Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
[19] *Id.*
[20] Letter from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
[21] *Id.*
[22] *Id.*
[23] Dr. Peter Cherouny, Interview with Senate Permanent Subcommittee on Investigations (Sept. 8, 2022).

on' the pathologic diagnoses postoperatively."[24]

- Dr. Cherouny flagged that because Dr. Amin is not board certified, Dr. Amin "likely does no or limited continuing education to stay current" on up-to-date medical practices in these areas. He explained further that there appeared to be board certified OB-GYN providers in the area of ICDC and that he was "concerned" with how and why Dr. Amin was selected to treat this population.[25]

- Dr. Cherouny found that Dr. Amin performed 36 transvaginal ultrasounds on patients in the records he reviewed. Those records indicate Dr. Amin generally had "[p]oor performance and documentation of transvaginal ultrasound evaluation."[26] Dr. Cherouny commented further that Dr. Amin is "clearly not skilled in ultrasound of the female pelvis" and that he "appears to frequently confuse normal findings for pathology and uses these as indications for surgery."[27] Dr. Cherouny explained to the Subcommittee that these practices did not appear to comply with the American Institute of Ultrasound in Medicine Guidelines.[28]

- Dr. Cherouny explained that Dr. Amin "does not appear to follow the current recommendations regarding Pap smear management through colposcopy and further treatment."[29]

- Dr. Cherouny also found that Dr. Amin did not give "adequate time to affect a clinical response" in most of the 40 cases he examined where Depo-Provera injections were administered for abnormal uterine bleeding.[30] He explained that the "adequate time" for a response to this medication was six months and that was not given to these patients.[31] Dr. Cherouny noted that Dr. Amin generally used 2-6 weeks of clinical response time before declaring that the Depo-Provera medication failed and proceeded to surgery.[32]

- Dr. Cherouny explained that 40 patient records—of the 94 examined—indicated the patients had benign ovarian cysts removed by Dr. Amin, despite the fact that benign ovarian cysts "generally resolve without surgical intervention."[33] He noted that in the records he reviewed, Dr. Amin "persistently finds and removes

---

[24] Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
[25] *Id*.
[26] Letter from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
[27] Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
[28] The American Institute of Ultrasound in Medicine is a multidisciplinary medical association of more than 10,000 physicians, sonographers, scientists, students, and other healthcare providers. *See* American Institute of Ultrasound in Medicine, Training Guidelines (https://www.aium.org/resources/ptGuidelines.aspx) (accessed Nov. 13, 2022).
[29] Letter from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
[30] Letter from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Feb. 1, 2022).
[31] Letter from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
[32] *Id*.
[33] Letter from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Feb. 1, 2022).

functional ovarian cysts" and that the "vast majority" of the cysts "did not require removal."[34] He also noted that there are risks with this surgery like any other, including infection and bleeding, and other issues that "can result in pain and infertility, among other risks."[35]

- Dr. Cherouny explained that seven patients underwent a Loop Electrosurgical Excision Procedure ("LEEP"),[36] used to identify abnormalities on Pap smears,[37] and he found that the records he reviewed suggest Dr. Amin has "limited knowledge and/or skill in Pap smear management."[38] He noted that the "point of the [LEEP] procedure is to get tissue for diagnostic purposes and in each case [Dr. Amin] failed this outcome."[39] Dr. Cherouny attributed these failures to Dr. Amin's "technique" in performing the procedure.[40]

- Dr. Cherouny also found that "Dr. Amin frequently prescribes multiple treatments for a vaginal discharge complaint without an appropriate clinical evaluation."[41] The failure to conduct appropriate clinical evaluation in these circumstances "results in patients receiving multiple treatments for the same complaints without improvement."[42]

- Dr. Cherouny stated that "[i]t appears there was, likely, no oversight of the care provided to these patients. The repetitive nature of some of the issues, like inadequate cervical tissue after a LEEP procedure, would seem to prompt a review in many hospitals."[43]

Additionally, the Subcommittee interviewed three physicians—Dr. Ted Anderson, Dr. Margaret Mueller, and Dr. Sarah Collins.[44] These physicians were part of a medical team asked

---

[34] Letter from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022); Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
[35] Letter from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Feb. 1, 2022).
[36] A LEEP is a procedure in which a provider uses a heated, electric wire to remove cell s and tissues in the cervix and vagina. John Hopkins Medicine, *Loop Electrosurgical Excision Procedure (LEEP)* (www.hopkinsmedicine.org/health/treatment-tests-and-therapies/loop-electrosurgical-excision-procedure-leep) (accessed Nov. 13, 2022).
[37] A Pap smear or Pap test is a procedure used to test for cervical cancer in women. A Pap test requires a provider to insert an instrument called a speculum into the vagina to take a tissue sample from the cervix using a soft brush and scraping device known as a spatula. Mayo Clinic, *Pap Smear* (www.mayoclinic.org/tests-procedures/pap-smear/about/pac-20394841) (accessed Nov. 13, 2022).
[38] Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
[39] *Id*.
[40] *Id*.
[41] Letter from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
[42] *Id*.
[43] Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
[44] Dr. Anderson is the Vice Chair for Clinical Operations and Director of the Division of Gynecology at Vanderbilt University Medical Center. Vanderbilt University Medical Center, *Ted L. Anderson, MD, PhD* (https://www.vumc.org/obgyn/person/ted-l-anderson-md-phd) (accessed Nov. 13, 2022). Dr. Collins is an Assistant Professor at the Northwestern University, Feinberg School of Medicine. Northwestern Medicine, *Sarah A. Collins, MD* (https://www.nm.org/doctors/1942401948/sarah-a-collins-md) (accessed Nov. 13, 2022). Dr. Mueller is also an

by attorneys and advocacy groups later involved with the December 2020 lawsuit to review the medical charts for 19 ICDC detainees Dr. Amin treated.[45] The plaintiffs in the December 2020 lawsuit filed the summary findings of the medical review team and declarations from these doctors summarizing the chart reviews of select individual plaintiffs in support of the litigation.[46]

These experts concluded that Dr. Amin subjected women to aggressive and unethical gynecological care.[47] They found that Dr. Amin quickly scheduled surgeries when non-surgical options were available, misinterpreted test results, performed unnecessary injections and treatments, and proceeded without informed consent.[48] Dr. Collins later reviewed a new set of over 500 pages of medical records associated with 36 ICDC detainees in coordination with attorneys involved in the lawsuit by former detainees.[49] Dr. Collins stated that in many cases, Dr. Amin appeared to have proceeded with unnecessary or excessive treatment regardless of patient conditions.[50]

Subcommittee staff interviewed six former ICDC detainee patients treated by Dr. Amin—Karina Cisneros Preciado, Jaromy Floriano Navarro, Wendy Dowe, Maribel Castaneda-Reyes, Jane Doe #1, and Jane Doe #2—who described negative experiences with Dr. Amin.[51] All of these women, except Jane Doe #2, are plaintiffs in the December 2020 lawsuit. These women described feeling confused, afraid, and violated after their treatment by Dr. Amin. Several reported that they still live with physical pain and uncertainty regarding the effect of his treatments on their fertility. These women also described instances in which Dr. Amin was rough and insensitive while performing procedures, continued despite their complaints regarding pain, and failed to disclose the potential side effects of certain procedures or even answer

---

Assistant Professor at the Northwestern University, Feinberg School of Medicine. Northwestern Medicine, *Margaret G. Mueller, MD* (https://www.nm.org/doctors/1346570405/margaret-g-mueller-md) (accessed Nov. 13, 2022).

[45] The review team consisted of nine board-certified OB-GYN physicians and two nursing experts. The team examined 3,200 pages of medical records for 19 women who alleged medical maltreatment while detained at ICDC. The records for these 19 detainees were included in the files of the 94 detainees that Dr. Cherouny reviewed. *Executive Summary of Findings by the Independent Medical Review Team Regarding Medical Abuse Allegations at the Irwin County Detention Center* (Oct. 21, 2020) (on file with the Subcommittee).

[46] Docket, *Oldaker v. Giles*, M.D. GA (No. 7:20-cv-00224-WLS-MSH).

[47] *Executive Summary of Findings by the Independent Medical Review Team Regarding Medical Abuse Allegations at the Irwin County Detention Center* (Oct. 21, 2020) (on file with the Subcommittee).

[48] *Id*. Informed consent requires that patients are well informed of the planned benefits, potential risks, and possible alternative options of medical treatments, procedures or surgeries that a healthcare provider intends to perform. Importantly, it also requires that the patient clearly understands the benefits and potential risks of the proposed treatment option and is afforded ample opportunity to ask questions and obtain medically sound responses. Based on witness testimony to the Subcommittee and a review of medical records by a number of physicians, it appears that informed consent was not provided to multiple ICDC detainees treated off-site by OB-GYN specialist Dr. Amin. Dr. Amin did not voluntarily sit for an interview with the Subcommittee. However, in civil litigation against Dr. Amin he has claimed he always obtains informed consent from his patients.

[49] Email from Counsel for the National Immigration Project of the National Lawyers Guild to the Senate Permanent Subcommittee on Investigations (Oct. 22, 2021).

[50] Dr. Sarah Collins, Interview with Senate Permanent Subcommittee on Investigations (Oct. 19, 2021).

[51] All of these women entered ICDC detention following arrests by local law enforcement in the interior of the United States. These women's records were included in the documents reviewed by the medical experts engaged by the Subcommittee. Two former ICDC detainees the Subcommittee interviewed asked to remain anonymous.

questions regarding his diagnosis or treatment plan. Several women stated that they did not provide their consent to the examinations or procedures Dr. Amin performed.

### B. There Appears to Have Been Repeated Failures to Secure Informed Consent for Off-Site Medical Procedures Performed on ICDC Detainees

Obtaining informed consent from any patient is a sacrosanct responsibility of practicing physicians. This is particularly true when treating a vulnerable population in a confined institution. The American Medical Association's Code of Medical Ethics describes the importance of informed consent:

> To enable patients to participate meaningfully in decisions about health care, physicians have a responsibility to provide information and help patients understand their medical condition and options for treatment. […] Informed consent to medical treatment is fundamental in both ethics and law. It helps patients make well-considered decisions about their care and treatment.[52]

Furthermore, the Code of Medical Ethics advises: "Document the informed consent conversation and the patient's (or surrogate's) decision in the medical record in some manner. When the patient/surrogate has provided specific written consent, the consent form should be included in the record."[53]

ICE Performance-Based National Detention Standards ("PBNDS") define informed consent as: "An agreement by a patient to a treatment, examination, or procedure after the patient receives the material facts about the nature, consequences, and risks of the proposed treatment, examination or procedure; the alternatives to it; and the prognosis if the proposed action is not undertaken."[54]

The Subcommittee found that ICE does not monitor informed consent procedures for off-site medical providers and does not have a responsibility to do so.[55] IHSC officials stated to the Subcommittee that it is the sole professional obligation of the off-site provider to obtain informed consent from patients. Furthermore, there is no requirement in ICE's process for the approval or review of off-site medical procedures that an ICE official verifies that a consent form

---

[52] American Medical Association, Code *of Medical Ethics: Consent, Communication & Decision Making*, (https://www.ama-assn.org/delivering-care/ethics/code-medical-ethics-consent-communication-decision-making) (accessed Nov. 13, 2022).

[53] American Medical Association, *Informed Consent: Code of Medical Ethics Opinion 2.1.1* (https://www.ama-assn.org/delivering-care/ethics/informed-consent) (accessed Nov. 13, 2022).

[54] U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, *Performance-Based National Detention Standards 2011*, at 469-470 (Revised December 2016) (https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf).

[55] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021). According to ICE, the agency does not have a responsibility to monitor informed consent because providers are professionally and legally obligated to ensure informed consent. Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).

from a visit with an off-site provider is included in a detainee's medical file. The Subcommittee also found that LaSalle, the ICDC contractor, did not have any contractual obligation with ICE to oversee the off-site care of detainees housed at its facility.

According to medical experts who reviewed the records of Dr. Amin's ICDC patients, there was a lack of informed consent in many instances. For example, based on the records Dr. Cherouny reviewed, he stated that Dr. Amin did not provide sufficient information regarding surgical procedures with detainee patients.[56] The medical records reviewed do not consistently document thorough patient-doctor discussions and do not establish that patients were fully informed of all of their treatment options, including the benefits and risks of surgical procedures and other treatments, or whether they were clearly given a choice to opt out of any treatment at all.

Former ICDC detainees interviewed by Subcommittee staff stated that Dr. Amin did not explain or answer questions regarding examinations, medication administration, or surgical procedures he performed on them. For example, one former detainee treated by Dr. Amin, Ms. Castaneda-Reyes, stated that she was told she was having surgery to remove an ovarian cyst and that when she arrived for the surgery, an electronic tablet and a stylus were simply handed to her to sign with no explanation from the nurses, the anesthesiologist, or Dr. Amin about the surgery or its risks, and they did not ask if she had any questions.[57] This would appear to violate best practices of the doctor-patient informed consent process.

The Subcommittee received incomplete records from ICH, the hospital where Dr. Amin performed the procedures on ICDC detainees, and no records from Dr. Amin. Thus, the Subcommittee could not verify whether any consent forms for the anonymized patients the medical experts reviewed may have existed in files separately maintained by Dr. Amin or ICH. The records from ICH included signed consent forms from some anonymized ICDC patients. In some cases, the records indicate that a nurse discussed the surgical process with Dr. Amin's patients. However, these files do not indicate that Dr. Amin himself engaged in a thorough discussion with all of his patients regarding the informed consent process as would be expected medical practice for a physician. Furthermore, the records provided to the Subcommittee do not establish that the detainees Dr. Amin treated were fully informed of all of their treatment options.

### C. <u>Medical Care Provided to Detainees at ICDC Was Known by DHS to Be Deficient, but neither ICE nor LaSalle Took Effective Corrective Action</u>

Following its review of records and interviews with former detainees, former employees, and DHS auditors, the Subcommittee found that ICDC detainees made frequent complaints about the quality and timeliness of medical care they received at the facility.[58] Former ICDC nurses described deficiencies and delays in the treatment of detainees. Moreover, DHS offices

---

[56] Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
[57] Maribel Castaneda-Reyes, Interview with Senate Permanent Subcommittee on Investigations (Oct. 5, 2021).
[58] The Subcommittee did not seek to verify every complaint heard from witnesses or every allegation reviewed in written grievances. However, the Subcommittee reviewed an estimated 760 grievances and nearly 650 of them were related to medical care. In addition, the complaints by detainees mirrored observations that former ICDC nurses relayed to Subcommittee staff in interviews and that have previously been documented by DHS.

responsible for oversight of detention facilities identified numerous, repeated, and serious deficiencies with the ICDC medical unit as far back as 2012, but ICDC and ICE failed to take effective corrective action to address these issues.

ICDC medical staff dealt with a large number of medical complaints from detainees on a regular basis. These complaints ranged from cosmetic issues like dandruff and dry skin to more serious medical and mental health conditions.[59] When detainees were not satisfied with the services they received from the medical unit, they submitted grievances to be addressed by ICDC leadership. The Subcommittee reviewed more than 760 grievances filed by ICDC ICE detainees between 2018 and 2020. Of those grievances reviewed, the Subcommittee identified 659 medical grievances that contained allegations of delayed or deficient medical care. For example, one detainee stated that the facility failed to provide their diabetes medicine and as a result they started experiencing blurry vision due to elevated sugar levels.[60] In other instances, an individual with chronic seizures and those with other chronic ailments, such as asthma, high blood pressure, and anemia, stated they were forced to wait days and weeks for the ICDC medical staff to address their critical prescription needs. Records reviewed by the Subcommittee showed that medical unit staff generally responded to these grievances with 24 to 48 hours.[61]

One detainee interviewed by Subcommittee staff said he submitted multiple requests related to a toothache but never received a response.[62] He claimed his pain eventually stopped because the tooth fell out.[63] Another detainee, who fell and broke her foot while at ICDC, told Subcommittee staff she was not taken to see anyone to treat the injury for a full month.[64] Former detainees also described making multiple requests for access to their own medical laboratory or imaging results that went unaddressed.[65] The Subcommittee was not able to review the medical records for these detainees and could not verify their claims. Some detainees alleged that their medical complaints were either not addressed or they received delayed care.[66] The Subcommittee did not obtain records to corroborate the allegations made by these detainees. However, medical records reviewed by the Subcommittee showed that the ICDC medical unit frequently responded to medical requests within a few days and provided lab or imaging results when requested.[67]

---

[59] *See, e.g.*, LaSalle_167885-88, LaSalle_216450, LaSalle_216456 (sick calls for dandruff); LaSalle_232939-40, LaSalle_232942 (sick calls for dry skin and dry scalp); LaSalle_177638-41 (mental health sick call for depression); LaSalle_281516-19 (sick call for pain related to a hernia).

[60] Records indicate that ICDC staff responded three days later stating that staff would contact the detainee's previous detention center again to request records and obtain medication names and dosages. LaSalle_002652.

[61] Records indicate that ICDC medical staff generally responded to these grievances within one to two days after the grievance was filed. LaSalle_000187; LaSalle_002668; LaSalle_002598; LaSalle_002600.

[62] Senate Permanent Subcommittee on Investigations Staff Visit to Irwin County Detention Center (Aug. 17, 2021) (memorandum on file with the Subcommittee).

[63] *Id*.

[64] A.K., Interview with Senate Permanent Subcommittee on Investigations (June 23, 2021).

[65] Senate Permanent Subcommittee on Investigations Staff Visit to Irwin County Detention Center (Aug. 17, 2021) (memorandum on file with the Subcommittee).

[66] *Id*.

[67] For example, one detainee filed a sick call request on September 9, 2020 requesting test results and complaining of skin irritation and pain in her ovaries (LaSalle_177857-61). She was seen for all three requests at the medical unit on September 10, 2020 where she also requested her medical records at the same visit (LaSalle_177863-65). The detainee received her medical records on September 21, 2020 (LaSalle_177869). The detainee requested all of

Interviews with former ICDC staff provided additional insight on the issues with the ICDC medical unit. A former nurse described the facility's medical unit as "filthy."[68] Another former nurse described ICDC as "the least clean place of any place I have worked in."[69]

As far back as 2012, internal DHS audit and oversight entities identified deficiencies with the ICDC medical unit.[70] For example, the DHS Office for Civil Rights and Civil Liberties ("CRCL") cited issues at ICDC with record maintenance and medication distribution, including an incident involving a cancer patient who was never allegedly provided medication.[71]

In addition, a 2017 ICE Office of Detention Oversight ("ODO") review of ICDC found that ICDC staff inconsistently reviewed detainees' medical intake forms and often left sections of those forms blank.[72] The review also found a lack of documentation showing that medical staff had completed required staff training.[73] Finally, ODO found syringes and needles in examination rooms that were "neither secured nor inventoried."[74] Overall, the inspection examined 15 ICE detention standards and found 26 deficiencies in 10 standards, which included nine "medical care" deficiencies, a number of which were repeat deficiencies.[75]

In March 2020, five months prior to the public allegations against ICDC surfaced, another ODO inspection found that medical files at ICDC were stored improperly, on the floor and across desks, and examination tables in facility medical units were "torn beyond repair, making cleaning and decontamination impossible."[76] The ODO review found that ICDC was only in compliance with five of 18 ICE detention standards they examined overall and documented 36 deficiencies, including three regarding "medical care."[77]

---

her ICDC medical records on December 7, 2020 (LaSalle_178320). She signed an acknowledgment that she received her ICDC medical records on December 10, 2020 (LaSalle_178329).

[68] LPN #1, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (June 30, 2021).

[69] LPN #2, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (July 12, 2021).

[70] U.S. Department of Homeland Security, Office for Civil Rights and Civil Liberties, *Redacted Irwin Rec & Close Memorandum from FY13 Expert Report Memorandum* (Nov. 5, 2012) (notes from document review on file with the Subcommittee).

[71] U.S. Department of Homeland Security, Office for Civil Rights and Civil Liberties, *Redacted Irwin Rec & Close Memorandum Expert Report Memorandum* (Nov. 4, 2016) (notes from document review on file with the Subcommittee).

[72] U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, Office of Professional Responsibility, Inspections and Detention Oversight Division, *Compliance Inspection for the Irwin County Detention Center Ocilla, Georgia* (Mar. 2017) (https://www.ice.gov/doclib/foia/odo-compliance-inspections/2017IrwinCountyGA.pdf).

[73] *Id*.

[74] *Id*.

[75] *Id*.

[76] U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, Office of Professional Responsibility, Inspections and Detention Oversight Division, *Compliance Inspection for the Irwin County Detention Center Ocilla, Georgia* (Mar. 2020) (https://www.ice.gov/doclib/foia/odo-compliance-inspections/irwinCoDetCntr_OcillaGA_Mar3-5_2020.pdf).

[77] *Id*.

### D. ICE Did Not Conduct Thorough Oversight of Off-Site Medical Providers and Procedures

Past DHS reviews have documented consistent, ongoing, and unresolved deficiencies in ICE's medical record keeping procedures, prescription medication distribution practices, and overall quality of medical care at various ICE detention facilities, including ICDC. In addition, through multiple interviews with senior IHSC officials and a review of ICE documents, the Subcommittee identified key gaps in ICE oversight of physicians providing medical care to ICE detainees at facilities outside of its detention centers.

Highlights of the Subcommittee's investigation on ICE oversight of off-site medical providers include:

- ICE was not aware of, and did not review key information regarding Dr. Amin's professional history prior to the agency's agreement to allow Dr. Amin to treat ICDC detainees in 2014. ICE authorized Dr. Amin to treat ICE detainees based solely on the fact that he had an active medical license, admitting privileges at ICH, and was not otherwise prohibited from treating ICE detainees.

- ICE did not have access to the National Practitioner Data Bank ("NPDB")—a confidential federal clearinghouse of healthcare provider information—and was unable to conduct a search for Dr. Amin in the database before he began treating ICDC detainees. Had ICE been able to conduct this search, it would have found multiple past medical malpractice claims against Dr. Amin, and the fact that a major U.S. insurance company dropped him as a covered physician in 2005 due to "excessive malpractice cases" and an "extensive malpractice history."[78] ICE was not aware of the medical malpractice suits filed against Dr. Amin until <u>after</u> the September 2020 public allegations against him.

- ICE was unaware that DOJ and the State of Georgia had filed a 2013 lawsuit against Dr. Amin and other physicians at ICH until <u>after</u> the September 2020 allegations. The lawsuit included five counts, including allegations that Dr. Amin and his codefendants had engaged in Medicaid fraud, violated the Federal Anti-Kickback Statute and Georgia Medicaid policies, and maintained "standing orders" to conduct unnecessary gynecological procedures.

- Dr. Amin began treating ICDC detainee patients in 2014, the year after DOJ filed its lawsuit against him. In 2015, Dr. Amin, other physicians, and the hospital entered into a settlement agreement with DOJ and the State of Georgia and agreed to pay $520,000 to resolve the allegations regarding Medicaid fraud.

- ICE did not have a process to automatically flag the disproportionately high number of medical procedures Dr. Amin or any given doctor performs compared to his or her peers. While ICE informed the Subcommittee that the disparity in

---

[78] Staff conducted an *in camera* review at the U.S. Department of Health and Human Services of National Practitioner Data Bank information on Dr. Amin. (Dec. 9, 2021) (notes on file with the Subcommittee).

> the number of Dr. Amin's procedures alone would not be disqualifying, additional scrutiny of Dr. Amin's practices may have prevented unnecessary procedures from occurring.[79]

Since the initial September 2020 public allegations against Dr. Amin and ICE, IHSC has initiated limited vetting procedures of off-site medical providers. IHSC officials also noted, however, that even these new procedures likely would not have disqualified Dr. Amin from treating ICE detainees. An IHSC official told Subcommittee staff that the agency would not have deemed the information on Dr. Amin in the NPDB as disqualifying based on the fact that he maintains a current, active medical license with the state of Georgia, and the state had never restricted his license or otherwise intervened at any point in his medical service. As a result, the IHSC official said IHSC "would not have had any issues" with allowing Dr. Amin to treat ICE patients.[80]

Following the public allegations against Dr. Amin in September 2020, ICE conducted a limited review of medical records, claims, and referrals for his patients. ICE did not, however, obtain complete files from ICDC or ICH and ultimately suspended its investigation pending completion of a DHS OIG investigation into the allegations of inappropriate off-site gynecological care at ICDC.[81] In multiple conversations with Subcommittee staff, IHSC officials were only able to speculate about the reasons why Dr. Amin performed so many more procedures than other physicians providing OB-GYN care to ICE detainees. Dr. Amin stopped treating ICE detainees in September 2020.

**The Subcommittee's Investigation**

During the Subcommittee's 18-month long investigation, the Subcommittee interviewed more than 70 witnesses and reviewed more than 541,000 pages of records, including records from DHS, ICE, ICDC, LaSalle, and ICH.

The Subcommittee evaluated litigation materials, reports, declarations, expert medical assessments, and documents provided by the Department of Veterans Affairs Financial Services Center ("VAFSC"), and conducted an *in camera* review of documents from HHS and the Departments of Treasury.

---

[79] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021). ICE later stated to the Subcommittee that based on the comparative analysis, ICE noted a possible overutilization of the D&C and laparoscopic procedures, but that it would need an expert OB-GYN review of the medical records because its analysis was based solely on medical claims data. Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).

[80] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

[81] The DHS OIG started its review in October 2020. However, this review did not evaluate off-site medical care of ICDC detainees. This review "sought to determine whether ICDC provided detainees adequate [on-site] medical care and adhered to COVID-19 protections. This inspection did not review the gynecological procedure approval process for detainees at ICDC, which has been referred to our Office of Investigations." The review of gynecological treatment is currently underway. U.S. Department of Homeland Security, Office of Inspector General, *Medical Processes and Communication Protocols Need Improvement at Irwin County Detention Center* (OIG-22-14) (Jan. 3, 2022) (https://www.oig.dhs.gov/sites/default/files/assets/2022-01/OIG-22-14-Jan22.pdf).

The Subcommittee secured briefings from attorneys, advocates, physicians, and other entities including: the U.S. Marshals Service, the Centers for Medicare & Medicaid Services ("CMS"), HHS OIG, DHS OIG, the Nakamoto Group, and the Georgia Composite Medical Board.

Additionally, the Subcommittee interviewed nearly 50 former ICDC detainees, 40 of which were interviewed during the Subcommittee's August 2021 staff visit to ICDC. Subcommittee staff also interviewed seven former ICDC employees, four current ICDC or LaSalle employees, two ICH executives, three ICH nurses, six current ICE officials, and one former ICE official.

## FINDINGS OF FACT AND RECOMMENDATIONS

### Findings of Fact

(1) **Female detainees at ICDC appear to have been subjected to excessive, invasive, and often unnecessary gynecological procedures.**

(2) **The Subcommittee did not substantiate the allegation that ICDC detainees underwent "high rates" of unauthorized hysterectomies.** Dr. Amin performed two hysterectomies on ICDC detainees between 2017 and 2019. According to ICE, patient records indicated that both procedures were medically necessary.

(3) **Between 2017 and 2020 Dr. Amin performed a significantly higher volume of invasive procedures on ICE detainees compared to other OB-GYN physicians serving ICE detainees.** Dr. Amin ranked first among all physicians treating ICE detainees across the country during this period in terms of the number of D&C procedures, laparoscopies to excise lesions, and limited pelvic exams he performed, as well as the number of Depo-Provera injections he administered. In fact, of the 401 combined total number of these procedures performed on all ICE detainees by OB-GYN specialists across the nation, Dr. Amin performed 362 of these procedures—or 90% of them. In ten categories of OB-GYN procedures the Subcommittee reviewed, Dr. Amin was among the top five providers for eight of the ten procedures. For the specific OB-GYN procedures the Subcommittee examined, Dr. Amin performed nearly one-third of the total procedures performed on ICE detainees at **all** ICE detention facilities between 2017 and 2020. This was despite the fact that ICDC housed about 4% of the female detainee population.

(4) **For the specific OB-GYN procedures the Subcommittee examined, Dr. Amin received around half of all payments from ICE for these procedures.** From 2017 to 2020, physicians performed 1,201 of these ten types of OB-GYN procedures on ICE detainees, costing ICE over $120,400. Dr. Amin performed 392 of the 1,201 procedures and received approximately $60,000 for these procedures.

(5) **Dr. Amin had a history of medical malpractice suits filed against him**. Due to this history, a major U.S. insurance company dropped its contract with him nearly one decade before ICE began using his services at ICDC.

(6) **ICE was not aware of publicly available information regarding medical malpractice suits and a DOJ and State of Georgia Medicaid fraud complaint against Dr. Amin before he began treating ICE detainees.**

(7) **Prior to October 2019, ICE did not employ a thorough vetting process for physicians treating detainees at facilities outside detention centers.** ICE has since established a process to review board certifications, records of adverse actions, and a list of individuals and entities excluded from federal healthcare programs, but ICE never completed this process for Dr. Amin.

(8) **ICE officials stated that its new vetting procedures would not necessarily have disqualified Dr. Amin from treating detainees.** Due to the fact that the state of Georgia had never restricted Dr. Amin's license or otherwise intervened at any point in his medical service, and the information in the NPDB were unsubstantiated allegations that had been settled, ICE would not necessarily have disqualified Dr. Amin from treating ICE detainees.

(9) **ICE lacked a medical utilization review process to identify potential trends in off-site medical treatment.** Until recently, ICE did not maintain a system to detect trends in medical procedures by off-site physicians that might indicate medical waste, fraud, or abuse. ICE states it intends to change its procedures to standardize the medical request approval process and has begun to employ a web-based application for medical utilization review and management, beginning with a retrospective review of ICE medical claims.

(10) **ICE performed an investigation of medical treatments provided to ICDC detainees following the public allegations against Dr. Amin, but did not obtain complete medical records for ICDC detainees.** During its investigation, ICE did not obtain complete medical records for ICDC detainees and ultimately did not conduct a more thorough review due to the pending DHS OIG investigation involving off-site gynecological procedures.

(11) **ICE personnel failed to conduct site visits at ICDC between January 2018 and October 2020.** The Field Medical Coordinator assigned to ICDC did not visit ICDC between January 2018 and October 2020—the period of greatest activity for Dr. Amin in terms of office visit claims and procedures.

(12) **ICE is not required to monitor the use of language translation services by off-site medical providers or ensure these providers obtain informed consent for off-site medical procedures.** Instead, ICE has relied on off-site providers to fulfill their professional obligations to ensure detainees understand and consent to the medical care they receive.

(13) **ICE conducts limited oversight of hospitals providing off-site care to detainees.** To date, ICE has also performed no reviews of hospitals treating detainees to review the appropriateness of the medical care they provide, although ICE told the Subcommittee that it intends to conduct these reviews in the future.

(14) **ICE approved Dr. Amin's performance of OB-GYN procedures on a case-by-case basis and never identified any of Dr. Amin's treatments as potentially excessive or unnecessary.**

(15) **ICE's contract with LaSalle did not require the company or ICDC to conduct oversight of off-site medical care for detainees.** ICDC and LaSalle played no role in vetting off-site medical providers treating detainees, or ensuring that these providers obtained informed consent or used appropriate language translation services. No ICDC or LaSalle employee the Subcommittee interviewed recalled a review of treatment by Dr. Amin—prior to the public allegations in September 2020 or since—that found signs of waste, fraud, or abuse.

**Recommendations**

(1) **ICE should expedite efforts to improve the vetting of off-site medical providers for detainees and should consider expanding criteria for excluding providers.** ICE officials noted to the Subcommittee that even new vetting procedures ICE instituted in 2019 might not have excluded Dr. Amin—despite his previous malpractice settlements, the fact that a major insurance company severed its contract with him based on his history of malpractice cases, and his False Claims Act settlement with DOJ in 2015.

(2) **ICE should expedite efforts to identify trends in off-site medical procedures for detainees for potential waste, fraud, or abuse and should conduct regular audits of physicians, hospitals, or other facilities providing off-site care.** To provide context for its review efforts, ICE should also expand the range of information it collects from detention centers to include historic demographic population information and descriptions of on-site medical capabilities.

(3) **ICE should institute policies and procedures to ensure off-site providers obtain informed consent in connection with their treatment of detainees.** ICE currently expects that off-site medical providers will honor their professional obligations to ensure detainees understand and consent to medical procedures, but ICE has taken no responsibility for them doing so.

(4) **ICE should ensure it reviews all detainee complaints regarding medical treatment independently of site visits from Field Medical Coordinators.** ICE officials should have the ability to receive and review all detainee medical

complaints electronically and contemporaneously, regardless of whether staffing challenges prevent annual visits to detention facilities.

**(5) Federal immigration policy should support and allow for the swifter adjudication of immigration cases without undermining the procedural due process rights of immigrants.**

## II. BACKGROUND

On September 14, 2020, several immigration advocacy organizations filed a whistleblower complaint to DHS OIG, DHS CRCL, the ICE Atlanta Field Office, and the ICDC Warden alleging, among other claims, that an off-site medical provider for the ICDC facility had performed mass hysterectomies on detainees at ICDC.[82] This provider was later identified as Dr. Mahendra Amin, an OB-GYN specialist authorized to provide off-site medical services for ICDC detainees since 2014.[83] Three months after the initial complaint was filed, former ICDC detainees filed a class action lawsuit against ICDC, ICE, Dr. Amin, and other federal and nonfederal parties alleging that the detainees had received nonconsensual and unnecessary gynecological procedures.[84] The lawsuit also alleged a broader pattern of medical abuse and mistreatment of detainees at ICDC.[85] The lawsuit is ongoing.[86]

The initial September 2020 whistleblower complaint alleged that Dr. Amin performed mass hysterectomies on ICDC detainees.[87] However, the Subcommittee found this allegation to be false, and ICE determined that the two hysterectomies Dr. Amin performed on ICDC detainees appeared to be medically necessary.[88] Additional allegations in the September 2020 whistleblower complaint focused on ICDC's mismanagement of its response to COVID-19 and other issues related to medical care at ICDC.[89]

Dr. Amin stopped treating ICDC detainees in September 2020, when the public allegations against him first emerged.[90] In May 2021, DHS directed ICE to discontinue its contract with ICDC.[91] ICE terminated the contract effective October 7, 2021.[92] As of September 3, 2021, all ICE detainees were removed from ICDC.[93]

---

[82] The Subcommittee's investigation did not find that Dr. Amin performed a large number of hysterectomies. According to records obtained by the Subcommittee, he performed two hysterectomies on ICE detainees, one in 2017 and one in 2019. However, the data the Subcommittee obtained reveals that Dr. Amin did perform a dramatically larger number of other medical procedures on female detainees when compared to other OB-GYN specialists treating ICE detainees. Information on the hysterectomies Dr. Amin performed are discussed in more detail in Section IV below. *See* Project South Complaint, *supra* note 1.

[83] Consolidated Amended Petition for Writ of Habeas Corpus and Class Action Complaint for Declaratory and Injunctive Relief and for Damages (Dec. 21, 2020), *Oldaker v. Giles*, M.D. GA (No. 7:20-cv-00224-WLS-MSH).

[84] *Id.; June 23, 2021 ICE Q&A Paper*, *supra* note 14.

[85] Consolidated Amended Petition for Writ of Habeas Corpus and Class Action Complaint for Declaratory and Injunctive Relief and for Damages (Dec. 21, 2020), *Oldaker v. Giles*, M.D. GA (No. 7:20-cv-00224-WLS-MSH).

[86] *Id*.

[87] Project South Complaint, *supra* note 1.

[88] *June 23, 2021 ICE Q&A Paper*, *supra* note 14.

[89] Project South Complaint, *supra* note 1.

[90] *June 23, 2021 ICE Q&A Paper*, *supra* note 14; Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Oct. 22, 2021) (Tranche 18, 11144).

[91] U.S. Department of Homeland Security, *ICE to Close Two Detention Centers* (May 20, 2021) (https://www.dhs.gov/news/2021/05/20/ice-close-two-detention-centers).

[92] U.S. Department of Homeland Security, Office of Inspector General, *Medical Processes and Communication Protocols Need Improvement at Irwin County Detention Center* (OIG-22-14) (Jan. 3, 2022) (https://www.oig.dhs.gov/sites/default/files/assets/2022-01/OIG-22-14-Jan22.pdf).

[93] *Id*.

The Subcommittee's investigation examined the provision of healthcare on and off-site for ICDC detainees and reviewed Dr. Amin's treatment of female ICDC detainees. This section provides background on the key entities, policies, and procedures that served as the subject matter of the Subcommittee's investigation.

## A. Key Players

### i. ICE and Relevant Subcomponents

Fiscal year 2022 saw a record 2,378,944 apprehensions of migrants at the Southwest border.[94] Federal law requires that migrants in certain immigration proceedings be detained throughout the adjudication of their cases. ICE is the federal agency responsible for immigration enforcement, including detention of noncitizens who have violated U.S. immigration laws.[95] For decades, the federal government has struggled to balance the requirements of federal immigration law with rates of border apprehensions, rising timelines of completion for immigration cases, limited resources, and the rights and interests of detainees.

For Fiscal Year 2022, ICE housed immigration detainees in 130 detention centers, processing centers, and other facilities, with an average length of stay of about 25.8 days and an average daily population of about 22,578 detainees.[96] ICE executes its detention mission through two main entities: IHSC, which oversees healthcare at ICE detention facilities and ICE Enforcement and Removal Operations ("ERO"), which manages all aspects of enforcement and detention process.

#### a. IHSC

As part of its healthcare focused mission, IHSC directs patient care at ICE-run facilities and oversight of compliance with detention standards at facilities operated by non-federal entities.[97] IHSC maintains a workforce of 915 employees, including 600 commissioned officers of the U.S. Public Health Service, 15 federal civil servants, and 300 contract health professionals.[98] IHSC directly provides healthcare services in 21 facilities nationwide ("IHSC facilities").[99] IHSC monitors compliance with healthcare-related detention standards at approximately 150 other facilities in which local governments or their contractors provide services without embedded federal staff ("non-IHSC facilities") through the Field Medical Coordinators ("FMC") program.[100] When it housed ICE detainees, ICDC was a non-IHSC

---

[94] U.S. Customs and Border Protection, *Southwest Land Border Encounters* (Oct. 21, 2022) (https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters) (accessed Nov. 13, 2022).
[95] U.S. Immigration and Customs Enforcement, *Mission* (Aug. 17, 2022) (https://www.ice.gov/mission).
[96] U.S. Immigration and Customs Enforcement, *ICE Facilities Data FY22 YTD* (https://www.ice.gov/doclib/detention/FY22_detentionStats09292022.xlsx) (accessed Nov. 13, 2022).
[97] *June 23, 2021 ICE Q&A Paper*, *supra* note 14; Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).
[98] *June 23, 2021 ICE Q&A Paper*, *supra* note 14.
[99] U.S. Immigration and Customs Enforcement, *ICE Health Service Corps* (https://www.ice.gov/detain/ice-health-service-corps) (accessed Nov. 13, 2022).
[100] *Id.*; *June 23, 2021 ICE Q&A Paper*, *supra* note 14.

facility. If ICDC was unable to provide certain medical services with its on-site medical staff, it would transfer detainees off-site to receive medical services from providers in the community.

IHSC FMCs typically conduct at least one site visit per year at non-IHSC facilities to evaluate their adherence to detention standards and quality of care indicators.[101] IHSC employees known as RCDs are physicians with oversight responsibilities for all ICE-operated and non-ICE-operated facilities.[102]

**b. ICE ERO**

ICE ERO "manages all aspects of the immigration enforcement process, including identification and arrest, domestic transportation, detention, bond management, and supervised release, including alternatives to detention."[103] The Custody Management Division ("CMD") within ERO provides oversight of ICE detention facilities through two sub-divisions: the Custody Programs Division develops policies related to programing within detention facilities and oversees segregation procedures and policies to protect detainees with special vulnerabilities, and the Detention Management Division provides oversight of detention facilities through Detention Service Managers ("DSMs") and Detention Standards and Compliance Officers ("DSCOs") who inspect and audit certain detention facilities.[104] In addition to inspections by the Detention Management Division, CMD also performs announced annual inspections of detention facilities.[105]

**c. Other Federal Entities and Contractors**

In addition to IHSC and ICE ERO, federal immigration detention is overseen by:

- DHS OIG who conducts unannounced inspections of detention facilities for violations of ICE standards;
- ICE ODO who conducts biannual inspections of certain facilities;

[101] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021); *see also* Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 7, 2022) (Tranche 3, 01014-27). IHSC provides direct medical care at 21 facilities in the United States and, in FY 2021, "oversaw health care for over 169,000 detainees housed in 150 non-IHSC staffed facilities." U.S. Immigration and Customs Enforcement, *ICE Health Service Corps* (https://www.ice.gov/detain/ice-health-service-corps) (accessed Nov. 13, 2022).
[102] U.S. Immigration and Customs Enforcement Health Service Corps Official Regional Clinical Director, Interview with Senate Permanent Subcommittee on Investigations (Feb. 14, 2022).
[103] U.S. Immigration and Customs Enforcement, *Enforcement and Removal Operations* (http://www.ice.gov/about-ice/ero) (accessed Nov. 13, 2022).
[104] U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations, Custody Management Division, Briefing with Senate Permanent Subcommittee on Investigations (June 17, 2021).
[105] *Id*.

- DHS CRCL who investigates allegations of civil rights and civil liberties violations at detention facilities and issues policy recommendations to ICE headquarters, field offices, and facilities; and

- The Nakamoto Group, which is contracted by ICE to conduct annual inspections of detention facilities.[106]

### ii. ICDC and LaSalle

ICDC is located in Ocilla, Georgia. In 2007, the U.S. Marshals Service entered into an Intergovernmental Service Agreement ("IGSA") with Irwin County, Georgia, which allowed the Marshals Service, Federal Bureau of Prisons, and ICE to house federal detainees at ICDC.[107] The most recent IGSA between the federal government and Irwin County became effective on June 15, 2020.[108] In this IGSA, ICE agreed to maintain a minimum population of at least 600 detainees at ICDC with a bed day rate of $83 per detainee for the first 600 detainees and $65 per detainee above the 600-person threshold.[109]

On December 12, 2013, Irwin County entered into an agreement with LaSalle, a private company that operates correctional facilities in Louisiana, Texas, Arizona, and Georgia.[110] Under the agreement, LaSalle provided certain operation, maintenance, and management services to ICDC, either directly through LaSalle employees or individuals who contract with LaSalle.[111]

The current Warden of ICDC is David Paulk.[112] Mr. Paulk oversees officials including the Deputy Warden, Chief Security Officer, Captain of Administrative Services, Captain of Security, Health Services Administrator ("HSA"), Director of Nursing ("DON"), Medical Director, and food service manager.[113] According to Mr. Paulk, the ICDC staff comprised between 210 and 220 individuals when the facility operated at full capacity, during which it had 944 beds available.[114] Between FY 2017 and FY 2020, the average length of stay at ICDC rose

---

[106] In addition to these oversight bodies, detention facilities are required to maintain National Commission on Correctional Health Care and American Correctional Association accreditation. *Id.*; U.S. Department of Homeland Security, Office of Inspector General, *ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements* (OIG-18-67) (June 26, 2018) (https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf); Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021); Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).

[107] LaSalle_048633-89.

[108] LaSalle_048623.

[109] LaSalle_048636. Bed day is defined as "one person per day." *Id.*

[110] LaSalle Corrections, Our Locations (https://lasallecorrections.com/locations/) (accessed Nov. 13, 2022); LaSalle_009481-505.

[111] Counsel for LaSalle, Briefing with Senate Permanent Subcommittee on Investigations (May 19, 2021); LaSalle 009481-505.

[112] David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021).

[113] *Id.*

[114] *Id.*

slightly from 36 days to 42 days, and the average daily population varied between a high of 850 detainees and a low of 642 detainees.[115]

Under its agreement with Irwin County, LaSalle provided limited, basic medical services to detainees at ICDC, including intake screening, physicals, laboratory testing, routine healthcare, and emergency services or referrals.[116] According to LaSalle policy, the HSA at ICDC was responsible for ensuring detainees have access to care and supporting the delivery of healthcare services to detainees.[117] The HSA was to be aided by the DON, registered nurses, licensed practical nurses ("LPNs"), a medical records clerk, a dentist, and a psychiatrist.[118]

According to LaSalle policy, all detainees were supposed to receive an initial medical, dental, and mental health screening within 12 hours of arrival at ICDC that consisted of intake review questions and observatory assessments.[119] LaSalle policy also required that all female detainees had "access to appropriate and necessary medical and mental healthcare, gynecological and obstetrical treatment during their detainment," as well as access to pregnancy services and preventative screenings, such as breast examinations, mammograms, and sexually transmitted disease testing.[120] If ICDC medical personnel determine that they lack the capabilities or capacity to treat a particular ailment on-site, they would refer the patient to an outside provider. ICE would review and make the determination on whether the detainee would see an outside provider.

LaSalle was responsible for providing "communication assistance" to detainees who were limited in their English proficiency during on-site medical appointments.[121] ICDC medical unit staff were responsible for referring detainees in need of healthcare beyond facility resources or hospital services to an IHSC-approved facility, and "all surgeries and major treatments must be approved by the Warden of [sic] designee."[122] However, according to LaSalle's agreement with ICE, "[t]he primary point of contact for obtaining pre-approval for non-emergent care as well as the post approval for emergent care will be the IHSC FMC assigned to [ICDC]."[123] Medical providers with which LaSalle contracted also had to maintain "adequate records in accordance with HIPPA [sic] guidelines" for on-site care, and LaSalle had to provide transportation to off-site medical services for detainees.[124]

LaSalle also contracted with Dr. Howard McMahan for the provision of medical services as ICDC Medical Director, which involved overseeing the work of on-site medical employees and—while ICDC housed individuals for ICE—providing medical services as necessary to all

---

[115] U.S. Immigration and Customs Enforcement, *HSGAC/PSI Interviews with ICE Health Service Corps (IHSC) Personnel Get-backs* (Nov. 5, 2021) (response on file with the Subcommittee).
[116] LaSalle_027934-37.
[117] LaSalle_009506-09.
[118] *Id.*
[119] LaSalle_027993-97.
[120] LaSalle_028057-59.
[121] LaSalle_027938-43.
[122] LaSalle_009506-09.
[123] LaSalle_048633-89.
[124] LaSalle_009506-09.

detainees, including those with chronic illnesses.[125] Dr. McMahan is physically on-site at ICDC between two and a half and six hours per week and reports to Dr. Pamela Hearn, the Medical Director for LaSalle.[126]

**iii. Dr. Amin and ICH**

When an ICDC detainee required off-site OB-GYN care, ICDC medical personnel previously would refer the detainee patients to Dr. Mahendra Amin. Dr. Amin attended medical school at Government Medical College of South Gujarat University in Surat, India. He completed his internship at the New Civil Hospital in Surat, India and his OB-GYN residency at the University of Medicine and Dentistry in Newark, New Jersey.[127] Dr. Amin maintains an active medical license with the Georgia Composite Medical Board, which was issued on June 11, 1985.[128] However, he holds no board certifications.[129] Dr. Amin has practices in Douglas, Georgia, and Ocilla, Georgia, and he has admitting privileges at ICH and Coffee Regional Medical Center.[130]

According to public reports and documents reviewed by the Subcommittee, a company incorporated by Dr. Amin called "MGA Health Management, Inc." ("MGA") entered into a contractual relationship with ICH in 1996 to run daily operations for the hospital.[131] A November 2010 Amended and Restated Management Services Agreement between MGA and ICH states that MGA had "the authority and responsibility to supervise and manage the day-to-

---

[125] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021).

[126] *Id.*

[127] Emily Shugerman & William Bredderman, *ICE Hysterectomy Doctor Wasn't Even a Board-Certified OB-GYN*, Daily Beast (Sept. 19, 2020) (www.thedailybeast.com/ice-hysterectomy-doctor-wasnt-even-a-board-certified-ob-gyn); Georgia Composite Medical Board, License Details for Mahendrakumar Govindbhai Amin (https://gcmb.mylicense.com/verification/) (search first name "Mahendra" and search last name "Amin") (accessed Nov. 13, 2022).

[128] Georgia Composite Medical Board, License Details for Mahendrakumar Govindbhai Amin (https://gcmb.mylicense.com/verification/) (search first name "Mahendra" and search last name "Amin") (accessed Nov. 13, 2022). Georgia state law requires one year of postgraduate training after medical school to obtain a medical license, and board certification is a voluntary process. *See* Rules and Regulations of the State of Georgia, Rule 360-2-.01 Requirements for Licensure (https://rules.sos.ga.gov/gac/360-2); Shugerman & Bredderman, *supra* note 127.

[129] The American Board of Obstetrics and Gynecology has stated that "its records show Amin is not certified by the organization," and the American Board of Medical Specialties—the primary organization for physician board certifications in the United States—stated that Dr. Amin was not certified by any of its 24 member boards. Shugerman & Bredderman, *supra* note 127.

[130] *Id.*; Georgia Composite Medical Board, License Details for Mahendrakumar Govindbhai Amin (https://gcmb.mylicense.com/verification/) (search first name "Mahendra" and search last name "Amin") (accessed Nov. 13, 2022); Alan Judd, *At ICE Detention Center, Red Flag Raised about Gynecologist*, Atlanta Journal-Constitution (Oct. 2, 2020) (www.ajc.com/news/at-ice-detention-center-red-flag-raised-about-gynecologist/SH7TJ35UJRAOXONQH7KALL7IVM/).

[131] *See* Production from Irwin County Hospital to the Senate Permanent Subcommittee on Investigations, *November 10th Amended and Restated Management Services Agreement between MGA Health Management and Irwin County Hospital Authority* (Aug. 5, 2021); Shugerman & Bredderman, *supra* note 127; Alan Judd, *At ICE Detention Center, Red Flag Raised about Gynecologist*, Atlanta Journal-Constitution (Oct. 2, 2020) (www.ajc.com/news/at-ice-detention-center-red-flag-raised-about-gynecologist/SH7TJ35UJRAOXONQH7KALL7IVM/).

day operation of the Facilities."[132] Under the agreement, MGA was required to assist the hospital "in the recruitment of physicians to join the medical staffs of the Facilities," including by "screening candidates presented by any physician recruitment firms or possible candidate to locate or relocate their medical practice to the area served by the Hospital."[133] MGA received an annual fee of $960,000 in exchange for its services.[134] In addition to the amended agreement, in November 2010, MGA and ICH entered into a promissory note for $2,303,847.71.[135] According to current ICH CEO Paige Wynn, the promissory note was a loan from Dr. Amin for renovations to the hospital.[136]

In December 2014, the November 2010 amended agreement was terminated, and Dr. Amin and ICH entered into a "Physician Services Agreement."[137] The new agreement established Dr. Amin as the Chief Medical Officer of ICH and an independent contractor receiving an hourly fee.[138] Under the agreement, the ICH Board of Trustees "retain[ed] control over all functions of the Hospital."[139] As Chief Medical Officer, Dr. Amin was required to assist with the development of policies and procedures regarding regulatory compliance, conduct oversight over hospital credentialing, assist the CEO and other hospital staff with accreditation and licensure, assist the DON with evaluating staffing needs, prepare operating and capital budgets for the hospital, and assist the Chief Compliance Officer with implementation of a compliance plan.[140]

Dr. Amin's agreement with the hospital continued to be renewed from 2015 through 2020.[141] He continues to serve as the Chief Medical Officer and was re-credentialed in 2021.[142] According to Ms. Wynn, Dr. Amin is "by far the busiest" physician at the hospital, the main doctor at ICH, and the busiest physician in the community at large.[143]

---

[132] Production from Irwin County Hospital to the Senate Permanent Subcommittee on Investigations, *November 10th Amended and Restated Management Services Agreement between MGA Health Management and Irwin County Hospital Authority* (Aug. 5, 2021).
[133] *Id.*
[134] *Id.*
[135] ICH005144-49.
[136] Ms. Wynn told the Subcommittee that the hospital renovations were completed and the Promissory Note was fully paid by ICH in May 2021. Paige Wynn, Irwin County Hospital, Interview with Senate Permanent Subcommittee on Investigations (Aug. 25, 2021).
[137] ICH005120-35.
[138] According to counsel for ICH, in 2014, all agreements between ICH and Dr. Amin were provided to the HHS OIG and subsequently reviewed by an Independent Review Organization HHS OIG approved. ICH005120-35; Email from Counsel for Irwin County Hospital to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).
[139] ICH005120-35.
[140] ICH005128-29.
[141] ICH005101; ICH005113; ICH005114-19; ICH005136-41; ICH005143.
[142] Paige Wynn, Irwin County Hospital, Interview with Senate Permanent Subcommittee on Investigations (Aug. 25, 2021).
[143] *Id.* Counsel for ICH noted to the Subcommittee that the community is "small" and contains approximately 9,500 residents. Email from Counsel for Irwin County Hospital to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).

According to a 2016 survey from the American Medical Association, around 63% of OB-GYN specialists have been sued at least once, and around 44% of these specialists have been sued at least twice.[144] The NPDB shows that Dr. Amin settled at least seven medical malpractice lawsuits between 1998 and 2007.[145] The settlements involve allegations concerning a mother's death, a miscarriage, fetal brain damage, stillbirths, and a pelvic abscess/infection.[146] (See Figure 2.) The Subcommittee's review of the NPDB showed that a major private insurance company terminated its contract with Dr. Amin in 2005 due to "excessive malpractice cases" and an "extensive malpractice history."[147]

**Figure 2: Dr. Amin Malpractice Settlements in the NPDB**[148]

| Date | Settlement |
|---|---|
| March 16, 2007 | Settlement for improper performance: 29-year-old underwent a hysterectomy for pelvic pain and bleeding; allegedly resulted in right **ureterovaginal fistula.**[149] |
| April 30, 2004 | Settlement for delay in treatment of identified fetal distress: alleged delay in C-section led to post-surgical pulmonary embolism which resulted in **mother's death.** |
| February 21, 2002 | Settlement for delay in delivery (inductive or surgery): allegedly resulted in **stillbirth.** |
| November 30, 2001 | Settlement for obstetric not otherwise specified: alleged failure to evaluate 21-week gestation resulted in **miscarriage.** |
| November 15, 1999 | Settlement for improperly managed labor not otherwise specified: alleged failure to diagnose and treat group B streptococcus infection, which resulted in **fetal brain damage.** |
| September 7, 1999 | Settlement for failure to diagnose: alleged **pelvic abscess/infection.** |
| February 26, 1998 | Settlement for delay in delivery: alleged failure to monitor fetus resulted in **stillbirth.** |

Many of the contractual arrangements for services by Dr. Amin described above occurred after DOJ and the State of Georgia joined a complaint filed by two employees of ICH in July 2013 against ICH, Dr. Amin, and eight other ICH physicians, alleging violations of the False

---

[144] The survey did not provide numbers on the percentage of OB-GYN specialists sued seven times in less than one decade. José R. Guardado, PhD, *Medical Liability Claims Frequency Among U.S. Physicians*, American Medical Association: Policy Research Perspectives (2017) (https://www.ama-assn.org/media/21976/download).

[145] *June 23, 2021 ICE Q&A Paper*, *supra* note 14; Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Sept. 27, 2021) (Tranche 10, 3037-42).

[146] *Id*.

[147] Staff conducted an *in camera* review at HHS of National Practitioner Data Bank information on Dr. Amin. (Dec. 9, 2021) (notes on file with the Subcommittee).

[148] *June 23, 2021 ICE Q&A Paper*, *supra* note 14; Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Sept. 27, 2021) (Tranche 10, 3037-42).

[149] A ureterovaginal fistula describes an unusual opening that develops between the vagina and the tubes that carry urine from the kidneys to the bladder, also known as ureters. Mayo Clinic, *Vaginal Fistula* (https://www.mayoclinic.org/diseases-conditions/vaginal-fistulas/symptoms-causes/syc-20355762) (accessed Nov. 13, 2022).

Claims Act and the Georgia False Medical Claims Act.[150] The complaint asserted that physicians at ICH billed Medicare and Medicaid for treatments and procedures performed by nurses and technicians instead of physicians.[151] Nurses allegedly followed "standing orders"—scripted procedures—regardless of an individual patient's condition.[152]

These standing orders allegedly required that "certain tests always be run on pregnant patients, without any medical evaluation and regardless of her condition."[153] For example, the 2013 DOJ complaint stated:

> [N]o matter what symptoms the patient may be exhibiting, ICH performs an OB ultrasound on every pregnant patient, without consulting [Dr. Amin] or obtaining his or any other doctor's medical opinion for that particular patient. . . . Dr. Amin's standing order for ultrasounds on his patients constitutes a pattern of medical services that he, ICH, and the on-call doctors know or should know are not medically necessary.[154]

The complaint further alleged that Dr. Amin and other physicians allegedly engaged in a kickback scheme and directed patients to ICH despite the availability of a closer hospital.[155]

In April 2015, the defendants reached a civil settlement and agreed to pay $520,000 to resolve the allegations without a determination of liability.[156] In announcing the settlement, DOJ noted that it "marks the end of an investigation into alleged violations of the Federal Anti-Kickback Statute, the Federal Stark Law, and related Georgia Medicaid policies."[157]

In October 2015, ICH replaced MGA with a different management company—ER Hospital LLC; however, Dr. Amin remained on the medical staff at the hospital, as the Medical Director.[158] Along with the civil settlement, ICH entered into a five-year Corporate Integrity

---

[150] The other named physician defendants included: Ashfaq Saiyed, M.D.; Romana Bairan, M.D.; Arturo Ruanto, M.D.; Concordio Ursal, M.D.; Drew Howard, M.D.; Steve Anderson, M.D.; Robert Reese M.D.; and Marshall Tanner, M.D. Complaint (July 8, 2013), *United States v. Hospital Authority of Irwin County*, M.D. Ga. (No. 7:13-cv-00097-HL).
[151] *Id.*
[152] *Id.*
[153] *Id.*
[154] *Id.*
[155] *Id.*
[156] The United States of America's Filing of Settlement Agreement (July 8, 2013), *United States v. Hospital Authority of Irwin County*, M.D. Ga. (No. 7:13-cv-00097-HL); U.S. Department of Justice, U.S. Attorney's Office Middle District of Georgia, *Hospital Authority of Irwin County Resolves False Claims Act Investigation for $520,000* (Apr. 29, 2015) (www.justice.gov/usao-mdga/pr/hospital-authority-irwin-county-resolves-false-claims-act-investigation-520000).
[157] U.S. Department of Justice, U.S. Attorney's Office Middle District of Georgia, *Hospital Authority of Irwin County Resolves False Claims Act Investigation for $520,000* (Apr. 29, 2015) (www.justice.gov/usao-mdga/pr/hospital-authority-irwin-county-resolves-false-claims-act-investigation-520000).
[158] Irwin County Hospital, *2018 Annual Hospital Questionnaire* (Feb. 28, 2019) (www.irwincntyhospital.com/fileadmin/Files/Irwin/Transparency_Documents/HTR-Annual-Hospital-Questionnaire.pdf).

Agreement ("CIA") with the HHS OIG that became effective in January 2015.[159] The CIA required ICH to establish and maintain a compliance program that included a compliance officer and committee, develop and implement a code of conduct setting forth its "commitment to full compliance with all Federal healthcare program requirements," develop and implement written policies and procedures related to the operations of the hospital's compliance program, and provide training to staff regarding the compliance program and code of conduct.[160] Counsel for ICH told the Subcommittee that ICH followed all recommendations in the CIA, and both HHS OIG and an Independent Review Organization that HHS OIG approved and reviewed this implementation, as well as monitoring and reporting by ICH.[161]

As of early 2022, Dr. Amin was under active criminal investigation by multiple federal agencies.[162] In addition, the DHS OIG is currently examining two other matters that relate to the issues PSI investigated. First, the DHS OIG Office of Investigations is reviewing the gynecological procedure approval process for ICDC detainees who underwent treatment by Dr. Amin.[163] Second, the DHS OIG is conducting an audit of all surgical procedure authorizations and approvals across all ICE detention centers.[164]

### B. Key Processes for Medical Treatment of ICDC Detainees

#### i. ICDC Sick Call Process

According to LaSalle's medical care policy, "[i]t is the policy of LaSalle Corrections to ensure a sick call procedure that allows detainees the unrestricted opportunity to freely request medical, mental health and dental services that are provided by a physician or other qualified medical staff in a clinical setting."[165] To request routine medical assistance, detainees filled out a Health Services Request Form located in each residential housing unit or in the ICDC medical unit and submitted these forms at designated "Sick Call" boxes.[166] Alternatively, detainees could complete an electronic request form on tablet computers available in each dormitory.[167] The timeframe for the medical unit to respond to a request was 24 to 48 hours, and appointments for

---

[159] Production from Irwin County Hospital to the Senate Permanent Subcommittee on Investigations, *Corporate Integrity Agreement between the Office of Inspector General of the U.S. Department of Health and Human Services and Hospital Authority of Irwin County* (Aug. 5, 2021).
[160] *Id.*
[161] Email from Counsel for Irwin County Hospital to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).
[162] Letter from Counsel for Dr. Amin to the Senate Permanent Subcommittee on Investigations (Feb. 21, 2022). PSI is unaware of the current status of these investigations.
[163] U.S. Department of Homeland Security, Office of Inspector General, *Medical Processes and Communication Protocols Need Improvement at Irwin County Detention Center* (OIG-22-14) (Jan. 3, 2022) (https://www.oig.dhs.gov/sites/default/files/assets/2022-01/OIG-22-14-Jan22.pdf).
[164] *Id.*
[165] LaSalle_011126.
[166] LaSalle_011127; LaSalle_014225-26; LaSalle_014246-47.
[167] Amber Hughes Strout, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 22, 2021). Nurse Hughes Strout worked as a sick call nurse at ICDC from 2016 to April 2021.

detainees were typically scheduled within one week of their request.[168] The detainee would either see a nurse practitioner or physician assistant for basic needs or the facility's medical director Dr. McMahan for more involved medical questions.[169] If the facility lacked the capabilities to treat ICE detainees in house, ICDC would refer them to IHSC-approved off-site providers.[170]

### ii. ICE Surgical Approval Process

The IHSC RCD reviews requests for routine, nonemergency surgery for detainees by off-site providers.[171] According to ICE, detainee patients are first evaluated in the facility medical unit by the facility clinician.[172] (See Figure 3.) If the facility clinician believes a detainee patient's medical condition warrants a referral to an off-site specialist, the facility submits a Medical Payment Authorization Request ("MedPAR"). The FMC reviews and approves the MedPAR for the initial consult. If the off-site provider recommends surgery, the facility will submit a MedPAR for the surgery. The FMC will review the surgery request and forward the request to the RCD for review. The RCD will review the documentation accompanying the surgery request and use their clinical judgment to approve or deny the surgery via email. The facility is required to submit the approved MedPAR with the referral authorization number to the off-site provider for reimbursement.[173]

[168] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021); Amber Hughes Strout, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 22, 2021); Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).
[169] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021).
[170] Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).
[171] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021); U.S. Immigration and Customs Enforcement Health Service Corps Official Regional Clinical Director, Interview with Senate Permanent Subcommittee on Investigations (Feb. 14, 2022).
[172] Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01255); Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations, *Summary Report: Irwin County Detention Center-Employee Allegations & Media Response* (Sept. 27, 2021) (Tranche 10, 3037-42).
[173] *Id.*; Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 7, 2022) (Tranche 3, 00947, 00983).

**Figure 3: IHSC Surgery Approval Process**[174]




[174] Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01255); Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations, *Summary Report: Irwin County Detention Center-Employee Allegations & Media Response* (Sept. 27, 2021) (Tranche 10, 3037-42).

Along with the referral, RCDs may review laboratory and imaging reports and the off-site provider's examination notes.[175] When additional information or documentation is needed to aid in the RCD's determination of the referral, RCDs will contact the FMCs who will then ask the off-site provider for that information.[176] RCDs will make decisions regarding surgical requests based on the needs of the patient and clinical practice guidelines.[177] IHSC officials noted to the Subcommittee that IHSC currently does not provide guidance to RCDs regarding requirements for approving referral requests.[178] In rare cases, an off-site provider can appeal if an RCD rejects a request due to lack of medical necessity, and a surgical request can be escalated to IHSC leadership.[179] RCDs are also responsible for identifying unusually frequent referrals to a certain provider or insufficient justifications for referrals.[180]

### iii. ICDC Grievance Process

When ICDC detainees had issues related to their detention, including medical treatment, detainees were supposed to utilize LaSalle's grievance process. According to LaSalle policy, ICDC is responsible for providing "a grievance system that protects the detainee's rights and ensures they are treated fairly by providing procedures for them to file both informal and formal grievances, which will receive timely responses relating to any aspect of their detention, including medical care."[181] The policy defines a "grievance" as a "formal written complaint filed by a detainee related to any aspect of facility life or condition of detention that personally affects the detainee grievant."[182] To file a grievance, ICDC detainees filled out a paper grievance form or the electronic form on tablet computers.[183] ICDC's "grievance officer" then

---

[175] An IHSC official told the Subcommittee that IHSC does not require specific documents to be submitted to RCDs with each referral. U.S. Immigration and Customs Enforcement Health Service Corps Official Regional Clinical Director, Interview with Senate Permanent Subcommittee on Investigations (Feb. 14, 2022). The Subcommittee reviewed emails between the ICDC FMC and the ICDC RCD regarding surgical requests and found that provider visit notes, documentation of prescribed medication, imaging reports, and lab results were generally forwarded to the RCD along with the surgical request. *See, e.g.*, Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Apr. 25, 2022) (Tranche 10, 01445-61); Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Apr. 25, 2022) (Tranche 11, 01792-1806); Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Apr. 25, 2022) (Tranche 13, 02645-56).

[176] U.S. Immigration and Customs Enforcement Health Service Corps Official Regional Clinical Director, Interview with Senate Permanent Subcommittee on Investigations (Feb. 14, 2022).

[177] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021).

[178] U.S. Immigration and Customs Enforcement Health Service Corps Official Regional Clinical Director, Interview with Senate Permanent Subcommittee on Investigations (Feb. 14, 2022).

[179] *Id.*; U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021).

[180] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (May 17, 2021).

[181] According to the policy, an informal grievance is an "oral or written complaint attempting to resolve an issue through an informal process. The issue may be resolved by staff at any level without complete processing of a formal grievance." LaSalle_011690.

[182] *Id*.

[183] David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021); Frank Albright, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 21, 2021); Shanise Bell, formerly of Irwin County Detention Center, Interview with Senate

processed and forwarded the grievances to the relevant department heads who would respond to the grievances.[184] For example, all medical grievances were referred to the HSA.[185] According to former HSA Lakeysa Brown, the medical unit responded to medical grievances within 72 hours.[186] ICDC addressed non-medical grievances typically within 5 to 15 days.[187] After a grievance was investigated and addressed, it was logged and stored by the facility.[188]

Specifically for medical grievances, the HSA investigated each grievance.[189] According to former HSA Brown, the investigative process generally involved calling the detainee to the medical unit.[190] For example, regarding a grievance related to medication, the detainee's chart would be reviewed to see if the medication was ordered and the detainee would be called to the medical unit for a "face-to-face encounter" to resolve the issue.[191] If the issue was resolved, the resolution and date of the resolution was noted in a grievance log, and no further response was required. If a detainee was not satisfied with the resolution, the detainee could pursue the formal grievance process or appeal to the grievance board, which was composed of the Warden, Deputy Warden, and one other facility official.[192] Detainees were also able to submit grievances related to off-site providers through this grievance process, and the HSA would "explore" the complaint.[193]

### C. Key Medical Procedures and Treatments

The report will discuss the following medical procedures and treatments:

- Colposcopy: A colposcopy used to examine the cervix, vagina, and vulva for signs of disease. The procedure is recommended after an abnormal Pap test result. During the

Permanent Subcommittee on Investigations (Oct. 13, 2021); Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).

[184] David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021); Frank Albright, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 21, 2021).

[185] David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021).

[186] Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).

[187] David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021).

[188] *Id.*; Frank Albright, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 21, 2021); Shanise Bell, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Oct. 13, 2021); Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).

[189] Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).

[190] *Id.*

[191] *Id.*

[192] *Id.*; David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021).

[193] Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021); Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).

procedure, a colposcopy—a magnifying instrument—is used to identify any suspicious cells. A small sample of tissue may be collected if suspicious cells are identified.[194]

- Depo-Provera: Depo-Provera is an injection that contains the hormone progestin and is typically administered every three months to prevent pregnancy and manage issues related to the menstrual cycle.[195]

- Dilation & Curettage ("D&C"): A D&C procedure removes tissue from inside the uterus. During this procedure, a provider will dilate the cervix and then use a surgical instrument called a curette (a sharp instrument or suction device) to remove uterine tissue.[196]

- Laparoscopy: A laparoscopy may be used to obtain a small tissue sample for testing or even remove organs like the appendix or gallbladder, and it is generally performed under anesthesia.[197]

- Loop Electrosurgical Excision Procedure ("LEEP"): A LEEP is a procedure in which a heated, electric wire is used to remove cells and tissues in the cervix and vagina.[198]

- Pap smear: A Pap smear or Pap test is a procedure used to test for cervical cancer. A Pap test requires a provider to insert an instrument called a speculum into the vagina to take a tissue sample from the cervix using a soft brush and scraping device known as a spatula.[199]

## III. FORMER DETAINEES AND EMPLOYEES AS WELL AS FEDERAL ENTITIES HAVE ALLEGED SUBSTANDARD CARE AT ICDC

ICDC detainees, former ICDC medical unit employees, and federal entities have alleged substandard medical care at ICDC. The Subcommittee reviewed more than 700 grievances submitted by ICDC detainees. The grievances reviewed by Subcommittee staff included complaints regarding delays in medical care and lack of quality medical care. During a visit by Subcommittee staff to ICDC in August 2021, multiple detainees raised concerns regarding long wait times for medical care and issues obtaining translation services and medical test results. The Subcommittee also conducted interviews with eight former ICDC detainees who expressed

---

[194] Mayo Clinic, *Colposcopy* (https://www.mayoclinic.org/tests-procedures/colposcopy/about/pac-20385036) (accessed Nov. 13, 2022).
[195] Mayo Clinic, *Depo-Provera (Contraceptive Injection)* (www.mayoclinic.org/tests-procedures/depo-provera/about/pac-20392204) (accessed Nov. 13, 2022).
[196] Mayo Clinic, *Dilation and Curettage (D&C)* (www.mayoclinic.org/tests-procedures/dilation-and-curettage/about/pac-20384910) (accessed Nov. 13, 2022).
[197] Johns Hopkins Medicine, *Laparoscopy* (www.hopkinsmedicine.org/health/treatment-tests-and-therapies/laparoscopy) (accessed Nov. 13, 2022).
[198] John Hopkins Medicine, *Loop Electrosurgical Excision Procedure (LEEP)* (www.hopkinsmedicine.org/health/treatment-tests-and-therapies/loop-electrosurgical-excision-procedure-leep) (accessed Nov. 13, 2022).
[199] Mayo Clinic, *Pap Smear* (www.mayoclinic.org/tests-procedures/pap-smear/about/pac-20394841) (accessed Nov. 13, 2022).

concerns regarding medical treatment at the facility and referrals to off-site providers. PSI could not verify all of these allegations.

The Subcommittee also heard concerns from three former ICDC nurses who collectively worked at the facility from 2016 to 2020. The three nurses shared concerns regarding unsanitary medical unit conditions, delays in medical care, record keeping issues, and inconsistent use of language translation services.

Internal DHS entities—ICE ODO and DHS CRCL—have identified numerous and repeat deficiencies at ICDC over the past few years. Since 2017, at least three ODO inspections of ICDC documented violations of safety and health standards, including medical standards, at ICDC. CRCL inspections of ICDC conducted within the past ten years found ICDC detainees failed to receive appropriate or timely medical care, identified poor medical unit conditions at ICDC, and found medical records were mishandled. In addition, a recent DHS OIG report on medical care provided by ICDC found that ICDC generally met ICE detention standards but identified areas for improvement. The OIG report did not review the gynecological procedure approval process or the surgical approval process for detainees at ICDC. It is currently engaged in a separate investigation reviewing those matters.

### A. <u>Former Detainees Have Alleged Deficiencies Related to ICDC Healthcare</u>

ICDC medical staff dealt with a large number of medical complaints from detainees on a regular basis. These complaints ranged from cosmetic issues like dandruff and dry skin to more serious medical and mental health conditions.[200]

When detainees were not satisfied with the services they received from the medical unit, they submitted grievances to be addressed by ICDC leadership. The Subcommittee reviewed more than 650 medical grievances. The grievances reviewed included complaints regarding delays in medical care and lack of quality medical care. Detainees detailed not receiving requested medical care for severe stomach pain, severe intestinal pain, blood in urine, and mouth pain and bleeding.[201] One detainee grievance described being in pain for two months and not receiving a requested tooth extraction.[202] In addition, there were allegations of not receiving prescribed medications and waiting weeks for required medical care. One detainee stated that

---

[200] *See, e.g.*, LaSalle_167885-88, LaSalle_216450, LaSalle_216456 (sick calls for dandruff); LaSalle_232939-40, LaSalle_232942 (sick calls for dry skin and dry scalp); LaSalle_177638-41 (mental health sick call for depression); LaSalle_281516-19 (sick call for pain related to a hernia).

[201] Records indicate that for the detainee asking for "urgent help" due to stomach pain, the detainee had submitted a medical request one week before and received no response. The detainee filed this grievance, and ICDC staff responded to the detainee's grievance within six days stating that the detainee had been placed "on the list to be evaluated by the sick call nurse." LaSalle_002597. Records indicate that the detainee who detailed intestinal pain was seen for the issue three days after submitting the grievance. LaSalle_002831. Records indicate that the detainee who complained of urinary pain was seen for the issue within four days of submitting the grievance. LaSalle_003150. Records indicate that the detainee who complained of experiencing "severe mouth pain including bleeding" felt that "medical isn't providing care." The Warden spoke with the medical unit for the detainee and an off-site appointment was scheduled. LaSalle_000349.

[202] Records indicate that within an hour of the grievance submission, ICDC staff responded, "[y]ou have an upcoming appointment with the dentist." LaSalle_002659.

the facility failed to provide their diabetes medicine and as a result they started experiencing blurry vision due to elevated sugar levels.[203] Records obtained by the Subcommittee indicate that medical unit staff responded three days after the detainee's initial complaint.[204] Other detainees with chronic conditions, such as seizures, asthma, high blood pressure, and anemia, alleged in grievances that they were forced to wait days and weeks for their prescriptions.[205] Records reviewed by the Subcommittee, however, showed that medical unit staff generally responded to these grievances with 24 to 48 hours.[206] Another detainee said that he had submitted requests for a toothache, but ICDC staff never responded, and the pain ultimately stopped because the tooth fell out.[207] The Subcommittee could not verify the accuracy of this detainee's claims.

In an interview with Subcommittee staff, ICDC detainees also complained about slow or non-existent translation services at ICDC. For example, one detainee stated that he had repeatedly asked to go to the medical unit, and once he did arrive, it took one and a half hours to reach a translator on the language line.[208] The Subcommittee's document review revealed widespread and common use of translation services at ICDC. Documents show ICDC medical unit staff completed a "communication assessment" at intake to determine whether the detainee spoke English and made such notes in their medical files.[209] If a detainee did not speak English, the medical file included a note indicating which language the detainee spoke and a code for the interpretation services provided.[210] Other records identify the use of translation services when assessing sick call requests.[211] In addition, during a Subcommittee staff visit to ICDC in August

---

[203] LaSalle_002652.
[204] Records indicate that ICDC staff responded three days later stating that staff would contact the detainee's previous detention center again to request records and obtain medication names and dosages. *Id*.
[205] Records indicate that a detainee who suffered from chronic seizures had not received their third dose of seizure medications for a few days. The ICDC HSA responded two days later stating that the pill cart nurses had been instructed to administer the detainee's medication three times daily and stated, "I can assure you that this matter will not occur again." LaSalle_000187. Records indicate that a detainee with asthma complained of waiting more than one month for an inhaler. An inhaler was ordered for the detainee one day after the grievance was filed. LaSalle_002668. Records indicate that a detainee with high blood pressure complained of not receiving medication for two days and that "every other day a nurse will not find my blood pressure [medications]." The ICDC medical unit staff responded to the complaint and changed the status of the grievance from "open" to "closed" two days after the grievance was filed. LaSalle_002598. Records indicate a detainee with anemia had not received iron supplements for two weeks despite multiple requests. ICDC medical unit responded to the detainee by stating they did not see the detainee's "multiple medical requests," and placed the detainee "on the [nurse practitioner] list" the day after the grievance was submitted. LaSalle_002600.
[206] Records indicate that ICDC medical staff generally responded to these grievances within one to two days after the grievance was filed. LaSalle_000187; LaSalle_002668; LaSalle_002598; LaSalle_002600.
[207] Senate Permanent Subcommittee on Investigations Staff Visit to Irwin County Detention Center (Aug. 17, 2021) (memorandum on file with the Subcommittee).
[208] *Id*.
[209] *See, e.g.*, LaSalle_199415; LaSalle_386054; LaSalle_396725 (indicating these detainees were English speakers).
[210] *See, e.g.*, LaSalle_248643; LaSalle_350105 (indicating that these detainees spoke Spanish and were provided a Spanish interpreter). The codes appear to be different for each use of the interpreter.
[211] *See, e.g.*, LaSalle_315366 (identifying that an interpreter was used in a July 14, 2017 medical request to address complaints of abdominal pain and a need to refill pain medication); LaSalle_315368 (identifying that an interpreter was used in a July 5, 2017 medical request for medical records); LaSalle_315370 (indicating an interpreter was used in a January 7, 2017 medical request complaining of irregular bleeding).

2021, ICDC medical unit staff showed Subcommittee staff how they use translation services.[212] ICDC staff were able to quickly and easily obtain a translator for a language of their choosing over the phone.[213]

Several detainees also stated to Subcommittee staff that they never received test results after medical tests. For example, one detainee told staff that the medical unit took a blood and urine sample for his kidney issues; he had yet to receive results from these tests one month later.[214] Another detainee said he had experienced knee pain and received an off-site X-ray, but he never received the results.[215] He stated that he continued to experience pain in his knees, and submitted multiple medical requests, but he had not received a response.[216] Subcommittee staff did not review the medical records for these detainees. However, Subcommittee staff reviewed medical files for other detainees and found that they received their test results when requested.[217]

The Subcommittee conducted more extensive interviews with eight former ICDC detainees who expressed concerns regarding medical treatment at ICDC and referrals to off-site providers. Several detainees described instances where another detainee's medical records ended up in their own medical file.[218] One detainee said that at one point during her detainment at ICDC, she fell and fractured her left foot.[219] It then took approximately one month before ICDC staff transported her to an off-site provider.[220] During this appointment, she said that the provider stated to her that he was surprised ICDC did not bring her for treatment sooner.[221] The Subcommittee was unable to verify the specifics of each of these claims.

### B. Former ICDC Employees Reported Disturbing Conditions to the Subcommittee

In interviews with the Subcommittee, three former LPNs who worked at ICDC collectively from 2016 to 2020 shared their concerns regarding unsanitary medical unit conditions, delays in medical care, record keeping issues, and inconsistent use of language translation services at the facility. These three individuals asked to remain anonymous. In interviews with the Subcommittee, the LPNs did not provide specific details or any corroborating evidence to support any of the alleged misconduct. The Subcommittee's review of hundreds of

---

[212] Senate Permanent Subcommittee on Investigations Staff Visit to Irwin County Detention Center (Aug. 17, 2021) (memorandum on file with the Subcommittee).
[213] *Id.*
[214] *Id.*
[215] *Id.*
[216] *Id.*
[217] For example, one detainee filed a sick call request on September 9, 2020 requesting test results and complaining of skin irritation and pain in her ovaries (LaSalle_177857-61). She was seen for all three requests at the medical unit on September 10, 2020 where she also requested her medical records at the same visit (LaSalle_177863-65). The detainee received her medical records on September 21, 2020 (LaSalle_177869). The detainee requested all of her ICDC medical records on December 7, 2020 (LaSalle_178320). She signed an acknowledgment that she received her ICDC medical records on December 10, 2020 (LaSalle_178329).
[218] N.A., Interview with Senate Permanent Subcommittee on Investigations (June 23, 2021); A.K., Interview with Senate Permanent Subcommittee on Investigations (June 23, 2021).
[219] A.K., Interview with Senate Permanent Subcommittee on Investigations (June 23, 2021).
[220] *Id.*
[221] *Id.*

thousands of pages of records from LaSalle did not identify instances corroborating these allegations. The Subcommittee makes no determination on the veracity of any of the LPNs' allegations.

LPN #1 described the ICDC medical unit conditions as "filthy."[222] They stated that the floors and examination tables were always dirty and they had to wipe down surfaces when they arrived to work.[223] They noted that staff members were responsible for bringing their own cleaning supplies, even during the COVID-19 pandemic.[224] When asked how the sanitary conditions at ICDC compared to previous places of employment, LPN #2 described ICDC as "the least clean of any place I have worked in."[225] LPN #3 stated that the conditions at ICDC were "terrible" and the building needed a lot of work.[226] In addition, LPN #1 stated that prior to ICE audits of the medical unit, the ICDC medical staff "scrambled" to get the unit in order, and according to LPN #3, medical unit staff would "shuffle things around" before ICE officials visited the unit.[227]

LPN #1 also alleged to the Subcommittee that detainee requests for medical attention were not addressed in a timely manner, and detainees often had to submit multiple requests before being seen.[228] LPN #1 recalled one detainee who submitted 14 medical requests, but did not provide the name of the detainee to allow the Subcommittee to verify the accuracy of this claim.[229] LPN #1 also stated that in some cases, detainees were not even seen by ICDC medical staff, however she did not raise this issue with her supervisors and did not provide specific cases to support this claim.[230] According to records reviewed by the Subcommittee, detainees generally received care within a few days after submitting requests, and ICDC medical staff responded to most requests within days.[231]

---

[222] LPN #1, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (June 30, 2021).
[223] *Id*.
[224] *Id*.
[225] LPN #2, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (July 12, 2021).
[226] LPN #3, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (July 19, 2021).
[227] LPN #1, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (June 30, 2021); LPN #3, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (July 19, 2021).
[228] LPN #1, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (June 30, 2021).
[229] *Id*. The Subcommittee was unable to identify the individual referenced in this statement and thus could not verify this claim.
[230] *Id*.
[231] For example, one detainee filed a sick call request on September 9, 2020 requesting test results and complaining of skin irritation and pain in her ovaries (LaSalle_177857-61). She was seen for all three requests at the medical unit on September 10, 2020. (LaSalle_177863-65). This detainee was added to the sick call list within 24 hours of submitting a complaint for irregular bleeding on November 24, 2020 (LaSalle_178294) and for general pain on December 23, 2020 (LaSalle_178607) and was seen within two days for a December 28, 2020 sick call complaining of blood in her stool (LaSalle_178635; LaSalle_178642).

LPN #2 stated that ICDC medical staff, "when possible," tried to see detainees within 24 hours after submission of a medical request, but sometimes it was not possible when the medical unit was short-staffed.[232] In addition, if the ICDC nurse responsible for triaging sick call requests was absent over the weekend, detainees had to wait until Monday to be seen.[233]

Regarding record keeping inside the medical unit, LPN #1 stated, without providing specifics, that they saw some medical requests "tucked away" and "underneath a box."[234] LPN #1 told the Subcommittee that when they showed these requests to a fellow nurse, the nurse responded that it "happens all the time."[235] LPN #3 told the Subcommittee, without providing specific examples, that if a detainee submitted multiple requests, some medical unit staff would say, "we have already seen them for that" and "get rid" of the sick call request.[236]

LPN #1 alleged that medical unit staff had fabricated vital signs.[237] Specifically, LPN #1 alleged the shift nurses would fabricate vital signs for patients in medical isolation and make little changes to previous vitals taken.[238] Instead of taking vital signs, LPN #1 alleged ICDC medical staff were "busy surfing the internet."[239] LPN #1 provided no names of detainees or cases to support this allegation. In interviews with the Subcommittee, ICDC Medical Director Dr. McMahan, former ICDC HSA Brown, and former ICDC DON Shanise Bell denied these events occurred.[240] The Subcommittee identified no evidence of fabrication of vital signs or document destruction.

The former LPNs also told the Subcommittee about instances in which the medical unit did not use language translation services. For example, LPN #1 told the Subcommittee that one time when a detainee needed blood drawn, another nurse did not bother to call a translation provider and instead made another detainee waiting to be seen by medical staff translate for the patient.[241] The LPN did not tell the Subcommittee the name of the nurse or detainee to allow for verification. LPN #3 told the Subcommittee that if medical unit staff had "piles of intake,"

---

[232] LPN #2, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (July 12, 2021).
[233] *Id*. LPN #3 also stated that detainees who would place a sick call request on Saturdays and Sundays would not be seen until Monday because sick call nurses would not work on the weekends. LPN #3, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (July 19, 2021).
[234] LPN #1, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (June 30, 2021).
[235] *Id*. LPN #1 also alleged that a "stack" of grievances against a certain nurse were destroyed and "nothing was done." *Id.*
[236] LPN #3, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (July 19, 2021).
[237] LPN #1, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (June 30, 2021).
[238] *Id*.
[239] *Id*.
[240] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021); Shanise Bell, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Oct. 13, 2021); Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).
[241] LPN #1, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (June 30, 2021).

translation services might not have been used.[242] LPN #3 also noted that staff could not use translation services when internet or phone services were down at the facility.[243] The Subcommittee's document review, however, indicated widespread use of translation services both at intake and during sick call requests.[244]

### C. Internal DHS Entities Have Identified Numerous and Repeat Deficiencies at ICDC

ICE ODO has completed at least three compliance inspections of ICDC dating back to 2017. In these inspections, ODO documented violations of safety and health standards, including medical standards, at ICDC. ODO identified several medical deficiencies as repeat deficiencies and "priority components" for mitigation.

In 2017, ODO found that intake screening forms were inconsistently reviewed and the mental health, medical history, and medication sections of intake forms were incomplete or left blank.[245] ODO further noted that of the 35 medical records it reviewed, three detainees had not received health appraisals or dental screenings at all and two more detainees received their appraisals and screenings outside of the required 14-day timeframe.[246] ODO identified both of the intake-related deficiencies as a "priority component and repeat deficiency."[247] ODO also found a lack of documentation showing that ICDC medical staff had completed required training.[248] In reviewing medical records, ODO discovered that the materials "were not organized in a uniform or orderly manner, and many documents were awaiting filing at the time of inspection."[249] Finally, ODO found syringes and needles in examination rooms that were "neither secured nor inventoried."[250] Overall, the inspection examined 15 ICE detention standards and found 26 deficiencies in 10 standards, which included nine "medical care" deficiencies, a number of which were repeat deficiencies.[251]

---

[242] LPN #3, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (July 19, 2021).
[243] *Id.*
[244] *See, e.g.*, LaSalle_248643, LaSalle_350105 (indicating that these detainees spoke Spanish and were provided a Spanish interpreter at intake); *see also, e.g.*, LaSalle_315366 (identifying that an interpreter was used on a July 14, 2017 medical request to address complaints of abdominal pain and a need to refill pain medication); LaSalle_315368 (identifying that an interpreter was used on July 5, 2017 to receive a request for medical records); LaSalle_315370 (indicating an interpreter was used in a January 7, 2017 sick call request complaining of irregular bleeding).
[245] U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, Office of Professional Responsibility, Inspections and Detention Oversight Division, *Compliance Inspection for the Irwin County Detention Center Ocilla, Georgia* (Mar. 2017) (www.ice.gov/doclib/foia/odo-compliance-inspections/2017IrwinCountyGA.pdf).
[246] *Id.*
[247] According to ODO, "priority components" are "considered critical to facility security and the legal and civil rights of detainees." *Id.*
[248] *Id.*
[249] *Id.*
[250] *Id.*
[251] *Id.*

In March 2020, ODO found that patient examination tables in the ICDC medical units were "torn beyond repair, making cleaning and decontamination impossible."[252] In the medical department, "medical records were stored on the floor and across the desks throughout the area."[253] ODO noted that the medical storage issues were a "repeat deficiency."[254] In addition, ODO found that staff were not conducting regular medication room inventories and could not validate if requested peer reviews were conducted by an outside physician.[255] The ODO review found that ICDC was only in compliance with five of 18 ICE detention standards examined overall and documented 36 deficiencies, including three regarding "medical care."[256]

In December 2020, ODO reviewed medical records of 12 detainees relating to their initial physical examination and found that one out of the 12 medical files had not been "reviewed nor signed by the physician within 14-days of the detainee's arrival to assess the detainee's priority for treatment."[257] According to counsel for LaSalle, ODO identified these issues from numerous medical encounters ICDC facilitated in December 2020 and conducted 20 voluntary interviews with ICE detainees and a remote examination as part of its investigation.[258]

Over the past ten years, DHS CRCL has also conducted two on-site investigations of ICDC and noted deficiencies with the facility's provision of medical care. Two CRCL Expert Recommendation Memoranda from November 2012 and November 2016 indicate that CRCL

---

[252] U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, Office of Professional Responsibility, Inspections and Detention Oversight Division, *Compliance Inspection for the Irwin County Detention Center Ocilla, Georgia* (Mar. 2020) (www.ice.gov/doclib/foia/odo-compliance-inspections/irwinCoDetCntr_OcillaGA_Mar3-5_2020.pdf).
[253] *Id.*
[254] *Id.*
[255] *Id.* According to the 2008 Performance-Based National Detention Standards, health authorities at detention centers must coordinate an external review of licensed medical professionals at their facilities every two years. *Id.* In interviews with the Subcommittee, LaSalle medical personnel stated that physicians outside of the ICDC medical unit conducted peer reviews on an annual basis and included chart reviews of patients of ICDC providers. Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021); Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).
[256] U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, Office of Professional Responsibility, Inspections and Detention Oversight Division, *Compliance Inspection for the Irwin County Detention Center Ocilla, Georgia* (Mar. 2020) (https://www.ice.gov/doclib/foia/odo-compliance-inspections/irwinCoDetCntr_OcillaGA_Mar3-5_2020.pdf).
[257] U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, Office of Professional Responsibility, Inspections and Detention Oversight Division, *Compliance Inspection of the Irwin County Detention Center Ocilla, Georgia* (Dec. 2020) (www.ice.gov/doclib/foia/odo-compliance-inspections/irwinCoDetCntrOcillaGA_Dec14-17_2020.pdf). According to counsel for LaSalle, ICDC challenged or explained the two deficiencies in the December 2020 ODO report. Specifically, regarding the physician sign-off deficiency, counsel for LaSalle explained that a local policy allowed for a licensed nurse practitioner to sign off on initial health assessments; the one medical file missing a physician sign-off had a signature from a nurse practitioner. Regarding the lack of consent forms for psychotropic medications, ICDC staff maintained these forms in its files and submitted them to ODO on March 24, 2021. Counsel for LaSalle, Briefing with Senate Permanent Subcommittee on Investigations (May 19, 2021).
[258] Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021). ODO did not issue any corrective action as a result of this review. Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).

conducted site visits to ICDC due to complaints it received regarding the facility.[259] The November 2012 memorandum detailed findings from a medical expert concerning circumstances in which ICDC detainees failed to receive appropriate or timely medical care.[260] The medical expert noted instances in which staff inappropriately handled medication, failed to process laboratory orders correctly, and elected to prescribe medication for serious conditions instead of alerting the medical director immediately—actions that could have resulted in serious injury to detainees.[261] In one case, staff allegedly never ordered medication for a detainee who suffered from chronic seizures; in several other cases, detainees waited multiple days for medical attention for acute conditions.[262] After reviewing 11 randomly-selected medical records, the expert concluded that five files showed unacceptable response times to sick call requests.[263] Another review of eight complaints from detainees concluded that four detainees had received inappropriate medical care.[264]

A second CRCL memorandum from November 2016—while generally describing medical care at ICDC as "good"—identified issues with medication distribution, medical records maintenance, and nurse staffing.[265] The medical expert for this review concluded that medication was not consistently available to detainees at ICDC and specifically identified an incident in which medication was allegedly prescribed—but never administered—to a detainee with a serious cancer condition.[266] The expert also identified two intake healthcare appraisals out of a set of 13 randomly-selected files that failed to meet appropriate standards and noted that ICDC medical records were not easily navigable.[267]

---

[259] According to the November 2012 memorandum, CRCL received three complaints from December 2011 to April 2012 and a report by the American Civil Liberties Union of Georgia "regarding concerns related to conditions of detention at ICDC. Following a review of these complaints, CRCL decided to conduct a site review of ICDC to review medical care and overall correctional policies." Similarly, the November 2016 memorandum indicated that CRCL conducted a site visit to ICDC following "numerous allegations alleging civil rights and civil liberties violations of persons being detained at ICDC" since 2015. The allegations related to medical and mental healthcare, use of force, food service, segregation, recreation, and the detainee grievance system. U.S. Department of Homeland Security, Office for Civil Rights and Civil Liberties, *Redacted Irwin Rec & Close Memorandum from FY13 Expert Report Memorandum* (Nov. 5, 2012) (notes from document review on file with the Subcommittee); U.S. Department of Homeland Security, Office for Civil Rights and Civil Liberties, *Redacted Irwin Rec & Close Memorandum Expert Report Memorandum* (Nov. 4, 2016) (notes from document review on file with the Subcommittee).

[260] U.S. Department of Homeland Security, Office for Civil Rights and Civil Liberties, *Redacted Irwin Rec & Close Memorandum from FY13 Expert Report Memorandum* (Nov. 5, 2012) (notes from document review on file with the Subcommittee).

[261] *Id.*

[262] *Id.*

[263] *Id.*

[264] *Id.*

[265] U.S. Department of Homeland Security, Office for Civil Rights and Civil Liberties, *Redacted Irwin Rec & Close Memorandum Expert Report Memorandum* (Nov. 4, 2016) (notes from document review on file with the Subcommittee).

[266] *Id.*

[267] *Id.*

### D. The DHS OIG Found That ICDC Generally Met ICE Detention Standards for Healthcare but Identified Areas for Improvement

Following receipt of the September 2020 whistleblower complaint, the DHS OIG opened an audit in October 2020 to evaluate whether "ICDC provided detainees adequate medical care and adhered to COVID-19 protections."[268] According to the audit report that was released in January 2022, the OIG determined that ICDC "generally met [ICE] detention standards, which specify that detainees have access to appropriate and necessary medical, dental, and mental health care."[269] However, the OIG noted that the evaluation of ICDC's medical processes revealed that the facility's chronic care, continuity of care, and medical policies and procedures were inadequate. Further, the OIG identified seven other areas of concern within the ICDC medical unit.[270]

The OIG noted that its inspection did not review the gynecological procedure approval process for detainees at ICDC. That investigation has been referred to the OIG's Office of Investigations due to the potential criminal nature of the investigation and remains ongoing.[271] In addition, the OIG has initiated a separate audit that will focus on how surgical procedures are authorized and approved for detainees across the ICE system.[272]

#### i. The DHS OIG Found That ICDC Medical Care Generally Met Standards but Improvements Are Necessary

For the audit, the OIG utilized a contract medical team from the National Commission on Correctional Health Care ("NCCHC") to review medical records of ICDC detainees.[273] The NCCHC medical team was comprised of one physician and two registered nurses. The team reviewed 200 detainee records, including records for detainees held at ICDC for 180 days or longer between the fiscal years 2017 and 2020.[274] These chart reviews occurred in conjunction with a virtual site visit that occurred in February 2021.[275]

---

[268] U.S. Department of Homeland Security, Office of Inspector General, *Medical Processes and Communication Protocols Need Improvement at Irwin County Detention Center* (OIG-22-14) (Jan. 3, 2022) (https://www.oig.dhs.gov/sites/default/files/assets/2022-01/OIG-22-14-Jan22.pdf).
[269] *Id.*
[270] Those seven areas of concern include: health assessments, medication administration, sick call, health records, program administration, emergency care, and women's health. *Id.*
[271] *Id.*
[272] *Id.*
[273] *Id.*
[274] The medical chart reviews included 195 randomly selected records for detainees at ICDC for 180 days or longer between FY 2017 and FY 2020, including 118 male detainee records and 77 female detainee records. The team reviewed an additional five records based on concerns detainees raised with OIG staff during interviews. The nursing staff reviewed 158 records, "focusing on completeness, timeliness, and proper actions," while the physician reviewed the charts of 37 detainees with chronic illnesses. *Id.*; U.S. Department of Homeland Security, Office of Inspector General, Briefing with Senate Permanent Subcommittee on Investigations (Feb. 1, 2022).
[275] *Id.*

The OIG "determined that ICDC adhered to the ICE 2011 PBNDS, which specify that detainees have access to appropriate and necessary medical, dental, and mental health care."[276] The OIG's contract medical team "assessed the adequacy of medical processes and policies and the appropriateness of any actions taken to address medical concerns."[277] Of the 36 medical processes the NCCHC medical team evaluated, the team determined three—chronic care, continuity of care, and policies and procedures—were inadequate.[278]

The NCCHC medical team determined that the care ICDC provided for specific chronic conditions "such as hypertension, hyperlipidemia, diabetes, asthma, and menstrual disorders, appeared adequate, but that the chronic care program itself was inadequate."[279] For this review, the NCCHC physician reviewed medical files for 37 ICDC detainees with chronic conditions.[280] The physician identified issues in chronic care management in 15 of the medical files.[281] These issues included inconsistent guidelines for chronic care; lack of monitoring and documenting the current status of detainees with chronic conditions; and issues with the interpretation, documentation, and sharing of lab information with detainees.[282]

The NCCHC physician identified issues with ICDC's continuity of care process in 12 of the 37 detainee medical files reviewed.[283] These issues included "multiple medical files missing care plans, records without planned chronic care visits, missing laboratory results, and improper medications."[284] The team also identified inconsistent medical record keeping including unexplained orders, grievance responses, improper referrals, and timeliness concerns.[285]

#### ii. The OIG Identified Seven Other Areas of Concern About ICDC Medical Care

The OIG identified seven additional areas of concern in the ICDC medical unit: (1) health assessments, (2) medication administration, (3) sick call, (4) health records, (5) program administration, (6) emergency care, and (7) women's health.[286] A number of the OIG's findings mirror similar allegations the Subcommittee reviewed during its investigation.

With respect to health assessments, the NCCHC medical team concluded that in general, "ICDC's compliance with standards [for medical intake screening] was adequate, but there is room for improvement."[287] Of the 195 detainee intake records reviewed, the NCCHC team found that medical care at intake was "timely and complete," and that three records showed

---

[276] *Id.*
[277] *Id.*
[278] *Id.*
[279] *Id.*
[280] *Id.*
[281] *Id.*
[282] *Id.*
[283] *Id.*
[284] *Id.*
[285] *Id.*
[286] *Id.*
[287] *Id.*

"minor issues that were not reflections of an inefficient intake program."[288] The OIG noted, however, that seven records indicated an initial health screening occurred after the required 14-day timeframe, and 15 records lacked health assessment documentation altogether.[289]

The medical contractors concluded that the ICDC medication management process was ultimately "adequate," but that there were "some issues in medication administration."[290] The NCCHC medical team found that it was "almost impossible to provide an accurate assessment of medication administration practices based on the documentation provided in the health record."[291] In order to determine the adequacy of the medication administration procedures at ICDC, the contract medical team needed documents, such as the original order and documentation of the first dose, that were not in the health records of the detainees they reviewed.[292] The NCCHC medical team also found additional concerns with records management of chronic care patients that refused to take prescribed medications.[293]

The NCCHC medical team reviewed 195 health records with 236 sick call visits and determined that the care provided during 8 of the 236 visits could have been "more appropriate."[294] The contract team identified additional issues with nursing protocols that allow the ICDC "nursing staff to provide over-the-counter medications without checking the current medications the detainee is prescribed."[295] For example, the NCCHC medical team determined it was inappropriate that ICDC LPNs were allowed to prescribe ibuprofen to detainees while the detainee was already on another non-steroidal anti-inflammatory drug or were on orders to not be administered such medication.[296]

The NCCHC medical team also identified issues with health records management. The OIG noted that during the review, the medical team was "unable to determine if a Health Insurance Portability and Accountability Act (HIPAA) program was in place and properly applied" at ICDC.[297] The team requested evidence that ICDC staff had undergone HIPAA training, but ICDC did not provide any.[298]

With respect to program administration, the NCCHC medical team found that "ICDC's medical unit had not developed a continuous quality improvement program."[299] Such a program would improve detainee healthcare by "identifying problems, implementing and monitoring corrective action, and studying the improvement program's effectiveness."[300] The OIG

---

[288] *Id.*
[289] *Id.*
[290] *Id.*
[291] *Id.*
[292] *Id.*
[293] *Id.*
[294] *Id.*
[295] *Id.*
[296] *Id.*
[297] *Id.*
[298] *Id.*
[299] *Id.*
[300] *Id.*

explained that "ICDC did not provide documentation showing any organized approach to evaluate the delivery of health care services."[301]

The ICDC medical unit was "unable to provide emergency response drill documentation" to the NCCHC medical team.[302] With the missing documentation, it was "unclear whether drills were being conducted."[303] The OIG explained that the lack of emergency preparation could "hinder proper response to emergency situations at ICDC."[304]

Regarding women's health, the OIG's contract medical team concluded that, based on its medical records review, women's healthcare at ICDC was "appropriate."[305] The OIG noted, however, "off-site specialty provider care information was not consistently returned to the ICDC medical unit."[306]

## IV. ALLEGED SERIOUS MEDICAL MISCONDUCT BY DR. MAHENDRA AMIN

In the September 2020 complaint to DHS OIG, DHS CRCL, the ICE Atlanta Field Office, and the ICDC Warden, a whistleblower alleged that Dr. Amin had performed a high volume of hysterectomies on female detainees at ICDC.[307] This allegation was not substantiated by the Subcommittee. In December 2020, several detainees filed a lawsuit against Dr. Amin, ICDC, ICE, and other parties alleging that Dr. Amin had subjected them to nonconsensual and unnecessary gynecological procedures as part of a broader pattern of medical abuse at ICDC.[308] This litigation is ongoing. Other complaints making similar allegations followed, including complaints to the Georgia Composite Medical Board.[309]

Ultimately, the Subcommittee's investigation found that Dr. Amin performed just two hysterectomies, one in 2017 and one in 2019, which ICE deemed to be medically necessary. However, the Subcommittee did find that Dr. Amin performed an unusually high number of other gynecological procedures on ICDC detainees.

As described in Section I, the Subcommittee discovered that Dr. Amin had also been the subject of similar allegations just seven years earlier. A 2013 DOJ complaint against Dr. Amin and other parties alleged that he and other physicians at ICH had maintained "standing orders" that required nurses to perform certain medical treatments on pregnant women regardless of their

---

301 *Id.*
302 *Id.*
303 *Id.*
304 *Id.*
305 *Id.*
306 *Id.*
307 Project South Complaint, *supra* note 1.
308 Consolidated Amended Petition for Writ of Habeas Corpus and Class Action Complaint for Declaratory and Injunctive Relief and for Damages (Dec. 21, 2020), *Oldaker v. Giles*, M.D. GA (No. 7:20-cv-00224-WLS-MSH).
309 Complaints for six ICDC detainee patients treated by Dr. Amin are on file with the Subcommittee.

condition and without an evaluation from a physician.[310] Dr. Amin and the other defendants reached a civil settlement with DOJ in 2015 without a determination of liability.[311]

In 2014—the year before his settlement with DOJ—Dr. Amin began providing OB-GYN services to detainees at ICDC.[312] The Subcommittee interviewed six of these detainees who described feeling confused, afraid, and violated after their encounters with Dr. Amin—and many of the women reported that they still live with pain and uncertainty regarding their fertility. Former nurses at ICDC also told the Subcommittee that they had observed confusion among detainee patients regarding the procedures they were scheduled to receive by Dr. Amin and why they were receiving them. The nurses also informed the Subcommittee that they observed excessive numbers of OB-GYN treatments by Dr. Amin.[313] Dr. Amin stopped treating female ICDC detainees after the whistleblower complaint was filed in September 2020.[314]

The Subcommittee also spoke with multiple experts in the OB-GYN field of medicine. These doctors reviewed medical records of former ICDC patients who were treated by Dr. Amin. Each expert raised significant concerns about the treatment Dr. Amin provided to ICDC detainees.

### A. Former ICDC Detainees Have Raised Concerns About Conditions at ICDC and Alleged That Dr. Amin Performed Nonconsensual, Unnecessary, or Excessive OB-GYN Procedures

To assess the allegations in the complaints, the Subcommittee spoke directly with six of the women Dr. Amin treated: Karina Cisneros Preciado, Jaromy Floriano Navarro, Wendy Dowe, Maribel Castaneda-Reyes, Jane Doe #1, and Jane Doe #2. All of these women, except Jane Doe #2, appear as plaintiffs in the December 2020 lawsuit against the federal government and other parties.[315] Based on interviews with the women and reviews of their medical records, it appears that Dr. Amin deployed a specific pattern in examining and treating these women. Records and testimony indicate that Dr. Amin performed a vaginal ultrasound on all six women, diagnosed five of the women with ovarian cysts, and subsequently prescribed Depo-Provera

---

[310] Complaint (July 8, 2013), *United States v. Hospital Authority of Irwin County*, M.D. Ga. (No. 7:13-cv-00097-HL).

[311] The United States of America's Filing of Settlement Agreement (July 8, 2013), *United States v. Hospital Authority of Irwin County*, M.D. Ga. (No. 7:13-cv-00097-HL); U.S. Department of Justice, U.S. Attorney's Office Middle District of Georgia, *Hospital Authority of Irwin County Resolves False Claims Act Investigation for $520,000* (Apr. 29, 2015) (www.justice.gov/usao-mdga/pr/hospital-authority-irwin-county-resolves-false-claims-act-investigation-520000).

[312] *June 23, 2021 ICE Q&A Paper*, *supra* note 14.

[313] LPN #2, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (July 12, 2021); LPN #3, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (July 19, 2021).

[314] *June 23, 2021 ICE Q&A Paper*, *supra* note 14; Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Aug. 10, 2021) (Tranche 16, 10869). The same day, Dr. Amin sent a letter to a LaSalle employee stating that he had "decided to sever my ties with ICDC and will no longer be treating ICDC patients." Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Oct. 22, 2021) (Tranche 18, 11144).

[315] *See* Consolidated Amended Petition for Writ of Habeas Corpus and Class Action Complaint for Declaratory and Injunctive Relief and for Damages (Dec. 21, 2020), *Oldaker v. Giles*, M.D. GA (No. 7:20-cv-00224-WLS-MSH).

injections for each woman with the cyst diagnosis. Dr. Amin also appears to have recommended surgical procedures to four of the women, including a cyst removal, D&C, and a LEEP. One patient avoided undergoing a procedure from Dr. Amin because she tested positive for COVID-19 antibodies on the day of her scheduled surgery.[316]

#### i. Karina Cisneros Preciado

Ms. Cisneros Preciado—a 23-year-old mother and survivor of domestic abuse—was brought to the United States by her mother from Mexico in 2007 at the age of eight.[317] She was detained at ICDC from July 2020 to January 2021 following an arrest in Georgia for domestic violence against an abusive partner.[318] Shortly before her detainment at ICDC, she gave birth to her daughter, and she sought postpartum treatment while at ICDC.[319] Ms. Cisneros Preciado also experienced pain in her lower abdomen.[320] She was ultimately referred to Dr. Amin.

Ms. Cisneros Preciado recalled that at her first appointment on September 2, 2020, Dr. Amin did not acknowledge her when he came into the room.[321] She stated that instead of explaining the procedures he intended to perform, Dr. Amin simply told Ms. Cisneros Preciado to "open your legs."[322] She stated that the ICDC female guard who escorted her to the visit sat directly in front of her during this encounter, so she did not feel comfortable complying.[323] Once the guard moved and stood next to her, she complied, and Dr. Amin inserted a long white tube into her vagina.[324]

Ms. Cisneros Preciado explained that the ICDC nurse had told her that she would be getting a Pap smear at this visit; however, based on her previous treatments, Ms. Cisneros Preciado said that she knew this was a vaginal ultrasound and not a Pap smear.[325] Ms. Cisneros Preciado told Subcommittee staff that she became confused and extremely uncomfortable, but she did not feel that she had any choice about what occurred.[326]

---

316 Jaromy Jazmin Floriano Navarro, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).
317 Karina Cisneros Preciado, Interview with Senate Permanent Subcommittee on Investigations (Oct. 6, 2021).
318 Ms. Cisneros Preciado told Subcommittee staff that she was actually the victim in the altercation that led to her arrest. Her charges have subsequently been dismissed. *Id.*; Email from Counsel for Ms. Cisneros Preciado to the Senate Permanent Subcommittee on Investigations (Nov. 10, 2022).
319 Karina Cisneros Preciado, Interview with Senate Permanent Subcommittee on Investigations (Oct. 6, 2021); LaSalle_177704 (August 11, 2020 medical request from Ms. Cisneros Preciado stating, "I would like to get [p]renatal[] [vitamins]. I had a baby a few months ago and I still need them.").
320 LaSalle_177736 (August 17, 2020 sick call request from Ms. Cisneros Preciado stating, "I have pain in the lower part of my stomach. Like my ovaries."); *see also* LaSalle_177737-39.
321 Karina Cisneros Preciado, Interview with Senate Permanent Subcommittee on Investigations (Oct. 6, 2021); LaSalle_178472-82.
322 Karina Cisneros Preciado, Interview with Senate Permanent Subcommittee on Investigations (Oct. 6, 2021).
323 *Id.*
324 *Id.*
325 *Id.*
326 *Id.*

She said that Dr. Amin told her that she had an ovarian cyst and he planned to administer a Depo-Provera injection, but he never provided any other information about the injection.[327] According to Dr. Amin's notes from the visit, his treatment plan included prescribing a Depo-Provera injection and having Ms. Cisneros Preciado return for a follow-up visit in four weeks.[328]

Ms. Cisneros Preciado recalled shaking while dressing after this encounter ended.[329] After she dressed, the ICDC guard put handcuffs back on Ms. Cisneros Preciado, and Dr. Amin's nurse asked her to sign a form.[330] While Ms. Cisneros Preciado was handcuffed, a nurse administered the Depo-Provera injection.[331] Ms. Cisneros Preciado learned after the appointment that Depo-Provera was a form of contraception.[332] According to an ICDC medical unit provider's notes from September 26, 2020, Ms. Cisneros Preciado "got a Depo – states wasn't explained."[333]

Ms. Cisneros Preciado did not return to Dr. Amin for additional treatment because the allegations about him became public a few weeks later.[334] On October 5, 2020, Ms. Cisneros Preciado received a transvaginal ultrasound at ICH for "report [of an] ovarian cyst."[335] The imaging report states that the ultrasound showed "[t]he uterus is normal in its appearance" and found an "[u]nremarkable evaluation of the pelvis."[336]

Ms. Cisneros Preciado currently resides in Fort Lauderdale, Florida.

#### ii. Jaromy Floriano Navarro

Ms. Floriano Navarro—a 29-year-old mother of three daughters—was brought to the United States from Mexico when she was about eight years old by a family member, and was detained at ICDC from October 2019 to September 2020 following an arrest for traffic

---

[327] *Id.*
[328] LaSalle_178463; LaSalle_178465-67.
[329] Karina Cisneros Preciado, Interview with Senate Permanent Subcommittee on Investigations (Oct. 6, 2021).
[330] *Id.*
[331] *Id.*
[332] *Id.*
[333] LaSalle_178401.
[334] Karina Cisneros Preciado, Interview with Senate Permanent Subcommittee on Investigations (Oct. 6, 2021). According to medical records reviewed by the Subcommittee, Ms. Cisneros Preciado experienced irregular bleeding after the Depo-Provera injection and was referred to another OB-GYN provider in December 2020. The new OB-GYN provider prescribed oral Provera and Sprintec. LaSalle_178294; LaSalle_178295-97; LaSalle_178323; LaSalle_178354-64.
[335] LaSalle_178414-23.
[336] LaSalle_178223.

violations.[337] Ms. Floriano Navarro described ICDC to the Subcommittee as "living in Hell."[338] She said that the facility was dark and dirty, and detainees were treated like they were "less than human."[339] Ms. Floriano Navarro also stated that the drinking water in the facility was "nasty" and "always dirty."[340] She explained that detainees would often drink water from a rusty faucet, and rust would fall into the water.[341] Additionally, she stated that the conditions at ICDC terrified her because she believed she "could die in there and nobody is going to know how it happened."[342]

While at ICDC, Ms. Floriano Navarro complained of painful menstrual cramps for about five to six months before she was ultimately referred to Dr. Amin.[343] Prior to her appointment with Dr. Amin she had heard him referred to as "Mr. Two-Fingers" because "he would always just stick his two fingers inside of you."[344] When Ms. Floriano Navarro ultimately met with Dr. Amin for the first time on February 24, 2020, she thought he was "cold" and stated that he did not look her in the eyes or say hello but instead walked in and said "lay back, open your legs."[345] During this appointment, Dr. Amin performed a vaginal ultrasound, determined Ms. Floriano Navarro had an ovarian cyst, and administered a Depo-Provera injection.[346] Ms. Floriano Navarro stated that she was grateful that she understood English because otherwise she would not have known what was occurring.[347] Ms. Floriano Navarro recalled that no one asked her if she would be comfortable removing her clothes for an examination and stated that "no one ever got my consent."[348]

Ms. Floriano Navarro recalled that Dr. Amin did not explain anything in later appointments and did not look her in the eyes.[349] In a subsequent visit with Dr. Amin on May 26, 2020, Ms. Floriano Navarro was under the impression she was to receive her second Depo-

---

337 Ms. Floriano Navarro was arrested for possession of marijuana in 2013. Jaromy Jazmin Floriano Navarro, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021); Declaration of Jaromy Jazmin Floriano Navarro (Nov. 18, 2020) (on file with the Subcommittee); Email from Counsel for Ms. Floriano Navarro to the Senate Permanent Subcommittee on Investigations (Nov.10, 2021); Email from Counsel for Ms. Floriano Navarro to the Senate Permanent Subcommittee on Investigations (Apr. 26, 2022); Email from Counsel for Ms. Floriano Navarro to the Senate Permanent Subcommittee on Investigations (Nov. 12, 2022).
338 Jaromy Jazmin Floriano Navarro, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).
339 *Id.*
340 *Id.*
341 *Id.*
342 *Id.*
343 *Id.*; *see, e.g.*, LaSalle_334271 (January 15, 2020 sick call request from Ms. Floriano Navarro stating, "I'm experiencing severe back pain and cramps due to my period."); LaSalle_334412 (February 6, 2020 sick call request from Ms. Floriano Navarro complaining of "cramps").
344 Jaromy Jazmin Floriano Navarro, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).
345 *Id.*; LaSalle_335998-336018.
346 Jaromy Jazmin Floriano Navarro, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021); LaSalle_333620-21 (The impressions from the transvaginal ultrasound report included "[e]nlarged uterus. Thickened Endometrium. Follicular cysts on both ovaries."); LaSalle_333625.
347 Jaromy Jazmin Floriano Navarro, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).
348 *Id.*
349 *Id.*

Provera injection; however, this did not occur, and Dr. Amin prescribed antibiotics after she presented with right side pain, white discharge, and pain with urination.[350] According to ICDC nurse notes from a June 5, 2020 encounter, Ms. Floriano Navarro continued "having cramps in lower [abdomen] and [] was told by Dr. Amin that she needed to have cyst removed."[351] On June 29, 2020, Dr. Amin administered the second Depo-Provera injection.[352]

At a July 22, 2020 appointment, Dr. Amin informed Ms. Floriano Navarro that she would be receiving surgery for her cyst.[353] Ms. Floriano Navarro said that she did not understand why Dr. Amin decided on surgery rather than giving the Depo-Provera injections a chance to work.[354] On July 31, 2020, the day of her scheduled surgery for what she believed to be a cyst removal, Ms. Floriano Navarro stated that an ICDC guard informed Ms. Floriano Navarro that she was scheduled to receive a hysterectomy.[355] Ultimately, this surgery did not take place because Ms. Floriano Navarro tested positive for COVID-19 antibodies.[356] When Ms. Floriano Navarro returned to ICDC, she inquired about the potential hysterectomy.[357] Ms. Floriano Navarro stated that an ICDC nurse told her that the ICDC guard must have misheard the name of the treatment and that she was actually scheduled for a D&C procedure.[358]

Ms. Floriano Navarro's surgery was later rescheduled for August 14, 2020.[359] Before her surgery date, Ms. Floriano Navarro asked the ICDC medical unit whether her upcoming surgery was for a cyst drain procedure, to "remove [her] womb," or to remove an ovary.[360] According to ICDC nurse notes, Ms. Floriano Navarro presented to the ICDC medical unit the day before what she believed was her scheduled surgery date to remove a cyst and was "informed she is having a D&C scope which is a dilation of the uterus to look around and take samples as needed for testing."[361] However, Ms. Floriano Navarro still refused the surgery due to her confusion regarding which surgical procedure she would be undergoing.[362]

Ms. Floriano Navarro recalled feeling pressured by the ICDC medical unit to receive the surgery.[363] Additionally, she recalled one ICDC officer stating that she "might as well" have the

---

[350] LaSalle_333435-44; LaSalle_333446; LaSalle_333450.
[351] LaSalle_334989-91.
[352] LaSalle_333616; LaSalle_333625.
[353] LaSalle_333602-15. According to Dr. Amin's request for a D&C and laparoscopy, Ms. Floriano Navarro "was seen back on Feb. 24, 2020 and was given Depo Provera injection. She follow[ed]-up a couple of times and more hormones were tried without a response. The plan is to schedule her for a D&C scope." Dr. Amin requested the outpatient surgery for July 31, 2020. LaSalle_333614.
[354] Jaromy Jazmin Floriano Navarro, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).
[355] *Id.*
[356] *Id.*; ICH004869-4900; LaSalle_333646-55.
[357] Jaromy Jazmin Floriano Navarro, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).
[358] *Id.*
[359] LaSalle_333700-10.
[360] LaSalle_333712.
[361] LaSalle_335569-71.
[362] Jaromy Jazmin Floriano Navarro, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).
[363] *Id.*

surgery because it was “already paid for,” and that she could go back to her home country and “start fresh.”[364] In medical requests submitted on August 20, 2020, Ms. Floriano Navarro wrote, “I did speak with the ICE agents, I was a bit scared, I do remember the period I had for about 3 weeks” and asked if the D&C procedure could be rescheduled because she was “cramping more now.”[365] On September 14, 2020, Ms. Floriano Navarro was taken to see Dr. Amin once more, and he again diagnosed her with an ovarian cyst and questioned Ms. Floriano Navarro’s decision to reject the surgery.[366] Ms. Floriano Navarro was rescheduled for a D&C procedure on September 18, 2020.[367] On September 16, 2020, Ms. Floriano Navarro was deported to Mexico, where she currently resides.[368]

**iii. Wendy Dowe**

Ms. Dowe—a 51-year-old mother of four children—arrived in the United States in 1997 on a visitor visa and ultimately overstayed that visa.[369] She was detained for one and a half years following an arrest for possession of marijuana and providing a false information to a law enforcement officer.[370] Ms. Dowe described ICDC as a “nightmare” and stated that she “would not even put dogs in ICDC.”[371] She further stated that “I can’t give you the words for it,” and she “does not like to relive or remember” her time at ICDC.[372]

While at ICDC, Ms. Dowe requested an appointment with an OB-GYN specialist because she had experienced heavy and painful menstrual cycles.[373] On December 21, 2018, Ms. Dowe had an initial appointment with Dr. Amin.[374] As with the other women, Ms. Dowe said that Dr. Amin performed a vaginal ultrasound and told her that she had ovarian cysts.[375] Ms. Dowe stated that she asked Dr. Amin to explain what he meant by “cyst,” but he refused to answer her question.[376] Instead, Ms. Dowe said that Dr. Amin told her that the explanation would be provided in writing and forwarded to ICDC nurses because he “was not authorized” to give Ms. Dowe that information.[377] Ms. Dowe said that she did not “know what was going on.”[378]

---

364 *Id.*

365 LaSalle_333723; LaSalle_333725; *see also* LaSalle_335656-58.

366 LaSalle_333658-67; LaSalle_333747.

367 LaSalle_333753-62.

368 Jaromy Jazmin Floriano Navarro, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).

369 Email from Counsel for Ms. Dowe to the Senate Permanent Subcommittee on Investigations (Apr. 25, 2022).

370 Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021); Email from Counsel for Ms. Dowe to the Senate Permanent Subcommittee on Investigations (Nov. 18, 2021).

371 Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).

372 *Id.*

373 *Id.*; *see* LaSalle_323784 (December 12, 2018 sick call request from Ms. Dowe stating, “I’m on my cycle now for two weeks and bleeding heavily and I’m week [sic] and dizzy.”); LaSalle_323943 (December 20, 2018 sick call request from Ms. Dowe stating, “I have pain in my abdomen.”).

374 LaSalle_323830-42; LaSalle_323897-901.

375 Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021); ICH000972-1058.

376 Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).

377 *Id.* A review of Ms. Dowe’s medical records indicate a diagnosis of “multiple uterine fibroids and ovarian cyst,” but did not describe what a cyst was.

378 *Id.*

According to ICDC nurse notes after Ms. Dowe returned from her visit, Dr. Amin had provided "new written orders, [] order for labs, [] order for [a] transvaginal pelvic sonogram, and a follow-[up] appointment" for an "[abdominal] mass" diagnosis.[379]

On January 10, 2019, medical records indicate that Ms. Dowe received a transvaginal ultrasound at ICH as requested by Dr. Amin.[380] The ultrasound report's impressions included "multiple uterine leiomyomata" and "[n]ormal ovaries with cysts present bilaterally."[381] The next day, Ms. Dowe had a follow-up visit with Dr. Amin.[382] At this visit, Dr. Amin determined that Ms. Dowe needed a D&C scope based on his impressions that Ms. Dowe was suffering from chronic pelvic pain, metrorrhagia, menorrhagia, and dysmenorrhea.[383] Ms. Dowe told the Subcommittee that on the day of her surgery, the ICDC medical unit staff called her to the medical unit to be transported to an "outside appointment."[384] Ms. Dowe recalled that the medical unit staff did not tell her what doctor she was going to see, nor was it explained that she was to have surgery that day.[385] Ms. Dowe received surgery on January 29, 2019.[386] It was only when she arrived at the hospital that she learned she was scheduled for surgery.[387]

Ms. Dowe said she was shackled at her feet and waist and "physically was not able to argue" with the ICH nursing staff about the surgery.[388] She recalled "it was too much for me at the time."[389] Ms. Dowe also told the Subcommittee that she did not recall signing any consent forms prior to this surgery.[390] After the surgery, Ms. Dowe said she awoke in the ICDC medical unit with pain in her lower abdomen.[391] She said she felt the bandages on her abdomen, and she had to ask the nursing staff about what had occurred.[392] The ICDC nurses stated that they could not answer her questions because they had not received paperwork from Dr. Amin.[393]

---

[379] LaSalle_323885-86; *see also* LaSalle_323899-323900.
[380] LaSalle_324222-29; LaSalle_324286.
[381] LaSalle_324286.
[382] LaSalle_324213-14.
[383] *Id.*; LaSalle_324285. Menometrorrhagia is the medical term for excessive, prolonged and/or irregular bleeding unrelated to menstruation. Cleveland Clinic, *Abnormal Uterine Bleeding* (my.clevelandclinic.org/health/diseases/15428-uterine-bleeding-abnormal-uterine-bleeding) (accessed Nov. 13, 2022). Mennorhagia is the medical term for menstrual periods with abnormally heavy or prolonged bleeding. Mayo Clinic, *Menorrhagia (Heavy Menstrual Bleeding)* (https://www.mayoclinic.org/diseases-conditions/menorrhagia/symptoms-causes/syc-20352829) (accessed Nov. 13, 2022). Dysmenorrhea is the medical term for menstrual cramps. Mayo Clinic, *Menstrual Cramps* (www.mayoclinic.org/diseases-conditions/menstrual-cramps/symptoms-causes/syc-20374938) (accessed Nov. 13, 2022).
[384] Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).
[385] *Id.*
[386] ICH000972-1058; LaSalle_324488-507; LaSalle_324913-14; LaSalle_325088-92.
[387] Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).
[388] *Id.*
[389] *Id.*
[390] *Id*. The Subcommittee found a signed consent form for a D&C with laparoscopy in Ms. Dowe's medical records from ICH. ICH000991-92.
[391] Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).
[392] *Id.*
[393] *Id.*

Ms. Dowe told Subcommittee staff that she learned a week later that she had undergone a cyst removal procedure.[394] Following the procedure, Ms. Dowe continued to have pain in her stomach and was referred to Dr. Amin for a follow-up visit.[395] On March, 19, 2019, Ms. Dowe went back to Dr. Amin. At this visit, like Ms. Floriano Navarro, Ms. Dowe received a Depo-Provera injection.[396] Ms. Dowe also recalled that Dr. Amin told her she needed another surgery—a hysterectomy.[397] Ms. Dowe stated that when she asked why, Dr. Amin said it was for a cancerous tumor in her ovary and stated it was the "size of a cantaloupe."[398] She explained that Dr. Amin asked her how many children she had, and after she answered, he stated, "Okay, you're good, you don't need no more [children]."[399] Dr. Amin requested the hysterectomy be scheduled April 11-13, 2019, and in his request for a hysterectomy summarized his care for Ms. Dowe as the following:

> The patient is a 47 year old female … [Patient] recently had surgery D&C scope on 01-29-19. Operative findings were leiomyoma of the uterus 16 week size, pelvic endometriosis. Pathology was benign. [Patient] came in for another [appointment] 03-19-19 chief complaints were vaginal pain and abdominal pain. [Patient] was still bleeding since February 2019. Depo Provera injection was given. The plan is to admit for a hysterectomy.[400]

On April 10, 2019, the day before her scheduled hysterectomy surgery, Ms. Dowe refused to undergo the procedure.[401] According to ICDC nurse notes, Ms. Dowe stated, "I'm not going to no appointment for a hysterectomy" and added "I will get it done when I get out of here" and signed a refusal of treatment form.[402] After Ms. Dowe declined the hysterectomy, she said she was subjected to pressure from ICDC staff.[403] Ms. Dowe stated that ICDC staff told her she was "crazy" for refusing medical treatment and attempted to force her to see a psychiatrist several times.[404]

According to a May 7, 2019 sick call request, Ms. Dowe continued to experience gynecological issues writing, "bleeding for the past three weeks now and it can't stop I [am] feeling very week [sic]."[405] On May 28, 2019, Ms. Dowe was referred back to Dr. Amin.[406] Dr.

---

[394] *Id*.
[395] *See* LaSalle_324737 (February 17, 2019 sick call request from Ms. Dowe stating, "I still have the swelling and the pain in my stomach [sic] and left side of my back is swollen and hurts alot [sic].").
[396] Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021); LaSalle_325086.
[397] Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021); LaSalle_325087.
[398] Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).
[399] *Id*.
[400] LaSalle_325085.
[401] LaSalle_325361; LaSalle_325364.
[402] *Id*.
[403] Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).
[404] *Id*.
[405] LaSalle_325749.
[406] LaSalle_325846-54; LaSalle_326062-63.

Amin's notes from this appointment stated that Ms. Dowe needed to have surgery—a hysterectomy—as "soon as possible" and noted that she had been approved for the procedure.[407] On June 7, 2019, Ms. Dowe again refused the hysterectomy.[408]

On August 8, 2019, Ms. Dowe submitted a sick call request asking for a "second opinion" because her ovary was "hurting" and she had been "bleeding over a month."[409] According to ICDC medical records, an order for a provider visit was put into the system stating that Ms. Dowe wanted "to discuss getting a second opinion with another OB/GYN on problems she is having."[410] By October 2019, Ms. Dowe still had not received a second opinion. ICDC medical unit notes for an encounter with Ms. Dowe on October 30, 2019 states, "Mrs. Dowe has been referred to mental health for stress. She does not want to have surgery [a hysterectomy] because she is afraid. She wants a second opinion for the surgery. Will try to find another OB/GYN for consulting."[411]

Based on documents reviewed by the Subcommittee, there is no record that Ms. Dowe received a second opinion. In fact, Ms. Dowe was referred back to Dr. Amin in February 2020 for "stomach and vaginal pain."[412] Dr. Amin's notes indicate that his impression for Ms. Dowe's pain was due to "fibroids" and noted to follow up yearly or as needed.[413] A few weeks after that appointment, Ms. Dowe submitted a sick call request stating that she was "still in terrible pain in my ovary."[414] She was seen in the medical unit the next day, and the nurse notes for the visit included instructions for a provider visit noting that Ms. Dowe "still wants second opinion."[415]

In March 2020, due to continuing pain in her lower abdomen which was "getting worse," Ms. Dowe was scheduled to see Dr. Amin again despite requesting a second opinion.[416] A March 4, 2020 outside provider referral order for Ms. Dowe stated, "Referral to Dr. Amin to discuss option of fibroid biopsy/Total Hysterectomy."[417] However, the order was canceled due to Ms. Dowe's scheduled release from the facility a few weeks later.[418] Ms. Dowe was ultimately deported to Jamaica in April 2020. Since leaving ICDC, Ms. Dowe says she has seen a doctor who confirmed that she does not have a cancerous tumor.[419]

---

407 LaSalle_326062-63.
408 LaSalle_326174-75; LaSalle_326178.
409 LaSalle_319164.
410 LaSalle_319161-62.
411 LaSalle_320169.
412 LaSalle_322136-37; LaSalle_322785.
413 LaSalle_322785.
414 LaSalle_322419.
415 LaSalle_322421-23.
416 LaSalle_322511.
417 LaSalle_322528-29.
418 *Id.*
419 Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).

### iv. Maribel Castaneda-Reyes

Ms. Castaneda-Reyes—a 30-year-old mother to three children—was brought to the United States from Mexico when she was ten years old by her parents.[420] Ms. Castaneda-Reyes is a rape and domestic abuse survivor.[421] Ms. Castaneda-Reyes was detained at ICDC from June to December 2020 following a May 2020 arrest for possession of a controlled substance.[422] She recalled that she was "shocked" by the living conditions when she first arrived at ICDC.[423] She said there were spider webs covering the surfaces at ICDC, and when she arrived, staff provided her with dirty, used underwear.[424] Like others, she described the water as discolored and "not drinkable."[425]

While at ICDC, Ms. Castaneda-Reyes originally sought medical treatment for a hernia; however, she began "spotting" and the ICDC medical unit referred her to Dr. Amin.[426] On August 12, 2020, Ms. Castaneda-Reyes had her first appointment with Dr. Amin.[427] According to Dr. Amin's notes, Ms. Castaneda-Reyes presented with "irregular menstrual cycle" and had been bleeding for three weeks intermittently.[428] Ms. Castaneda-Reyes told Subcommittee staff that at her first appointment with Dr. Amin, he told her to lift her legs and "rammed" a camera inside of her.[429] According to medical records reviewed by the Subcommittee, Dr. Amin performed a pelvic ultrasound and his ultrasound report indicated a "right ovarian mass."[430] Ms. Castaneda-Reyes recalled that Dr. Amin told her that she had a cyst and that the best course of action would be surgery or a Depo-Provera injection.[431] Ms. Castaneda-Reyes informed Dr. Amin that she was already on birth control. However, Dr. Amin administered a Depo-Provera injection anyway.[432] Ms. Castaneda-Reyes inquired about her hernia, but Dr. Amin responded that he did not treat hernias.[433] In the same appointment, Ms. Castaneda-Reyes received a Pap smear from Dr. Amin.[434] She stated that this was the most painful Pap smear she had ever received and "the way he checks you is not how a regular doctor checks you."[435]

---

[420] Maribel Castaneda-Reyes, Interview with Senate Permanent Subcommittee on Investigations (Oct. 5, 2021); Declaration of Jane Doe #5 – Maribel Castaneda-Reyes (Dec. 16, 2020) (on file with the Subcommittee).
[421] *Id*.
[422] *Id.*; Email from Counsel for Ms. Castaneda-Reyes to the Senate Permanent Subcommittee on Investigations (Oct. 15, 2021)
[423] Maribel Castaneda-Reyes, Interview with Senate Permanent Subcommittee on Investigations (Oct. 5, 2021).
[424] *Id*.
[425] *Id*.
[426] *Id.;* LaSalle_281089; LaSalle_281102-04; LaSalle_281156; LaSalle_281182; LaSalle_281187-89; LaSalle_281244-45; Declaration of Jane Doe #5 – Maribel Castaneda-Reyes (Dec. 16, 2020) (on file with the Subcommittee).
[427] LaSalle_282410-20.
[428] LaSalle_282348-49.
[429] Maribel Castaneda-Reyes, Interview with Senate Permanent Subcommittee on Investigations (Oct. 5, 2021).
[430] LaSalle_282342.
[431] Maribel Castaneda-Reyes, Interview with Senate Permanent Subcommittee on Investigations (Oct. 5, 2021).
[432] *Id.*; LaSalle_282396-97; LaSalle_282401.
[433] Maribel Castaneda-Reyes, Interview with Senate Permanent Subcommittee on Investigations (Oct. 5, 2021).
[434] Declaration of Jane Doe #5 – Maribel Castaneda-Reyes (Dec. 16, 2020) (on file with the Subcommittee); LaSalle_282348-49.
[435] Maribel Castaneda-Reyes, Interview with Senate Permanent Subcommittee on Investigations (Oct. 5, 2021).

In a follow-up appointment on August 26, 2020, Dr. Amin told her that her ovarian cyst was abnormal and that surgery was the best course of action.[436] According to Dr. Amin's notes and request for surgery, Ms. Castaneda-Reyes was seen "on 08-12-20 for irregular periods for 3 weeks on [and] off. She was treated with depo provera [sic] injection, Pap smear [and] HPV was detected. The plan is to schedule for D&C, LEEP, scope."[437]

On September 4, 2020, Ms. Castaneda-Reyes arrived at ICH for surgery.[438] She recalled that the anesthesiologist made fun of her teeth, and that the nurses and the anesthesiologist did not explain the procedures, but simply handed her an electronic tablet with a document on it and a stylus to sign it—"everything was quick."[439] According to Ms. Castaneda-Reyes, she was not shown the document or given time to read it.[440] Following the surgery, Ms. Castaneda-Reyes only learned that Dr. Amin performed a D&C and a LEEP by reviewing her own medical records.[441]

Ms. Castaneda-Reyes currently resides in Gainesville, Georgia.[442] Since her release from ICDC, a physician told her that she would not be able to have any more children because her uterine lining is so thin.[443] She has also sought mental health counseling and is taking medications for her mental health to help cope with the trauma from her time at ICDC.[444] Additionally, Ms. Castaneda-Reyes says she experiences constant pain shooting down her leg that has left her unable to run, which she used to do for enjoyment, and unable to bend which forced her to leave her previous job.[445]

#### v. Jane Doe #1

Jane Doe #1—38-year-old mother of a 13-year-old daughter—was brought to the United States from Mexico by her grandparents at the age of three and was detained at ICDC from January to December 2020 following an arrest in South Carolina for possession of a controlled

---

[436] LaSalle_282376-85; LaSalle_282341; *see also* Maribel Castaneda-Reyes, Interview with Senate Permanent Subcommittee on Investigations 5 (Oct. 5, 2021); Declaration of Jane Doe #5 – Maribel Castaneda-Reyes (Dec. 16, 2020) (on file with the Subcommittee).
[437] LaSalle_282340.
[438] ICH005031-99; LaSalle_282319-28; LaSalle_281403-04; LaSalle_281406-10.
[439] Maribel Castaneda-Reyes, Interview with Senate Permanent Subcommittee on Investigations (Oct. 5, 2021); Email from Counsel for Ms. Castaneda-Reyes to the Senate Permanent Subcommittee on Investigations (Nov. 10, 2022).
[440] Email from Counsel for Ms. Castaneda-Reyes to the Senate Permanent Subcommittee on Investigations (Nov. 10, 2022).
[441] Maribel Castaneda-Reyes, Interview with Senate Permanent Subcommittee on Investigations (Oct. 5, 2021).
[442] *Id.*
[443] Email from Counsel for Ms. Castaneda-Reyes to the Senate Permanent Subcommittee on Investigations (Nov. 10, 2022).
[444] Maribel Castaneda-Reyes, Interview with Senate Permanent Subcommittee on Investigations (Oct. 5, 2021); Email from Counsel for Ms. Castaneda-Reyes to the Senate Permanent Subcommittee on Investigations (Nov. 10, 2022).
[445] Maribel Castaneda-Reyes, Interview with Senate Permanent Subcommittee on Investigations (Oct. 5, 2021).

substance.[446] Jane Doe #1 described the water at ICDC as not drinkable and having a yellowish tint.[447] She also stated that ICDC staff were rude and would laugh at the detainees who did not speak English.[448] While detained at ICDC, Jane Doe #1 stated that she generally felt like a "caged animal."[449]

On January 4, 2020, Jane Doe #1 requested an appointment with an OB-GYN provider to obtain a prescription for estrogen pills.[450] She said that she had previously undergone a hysterectomy and wanted medication to regulate her hormone levels.[451] On February 7, 2020, Jane Doe #1 had her first appointment with Dr. Amin.[452] Even though Jane Doe #1 explained her medical history to the nurse at Dr. Amin's office, she was still told to undress, which she thought was odd.[453]

Jane Doe #1 stated that when Dr. Amin arrived, he told her that he would be performing a vaginal ultrasound, which he described as a standard procedure.[454] Instead of gently inserting the instrument, Jane Doe #1 stated that Dr. Amin "just shoved it in there."[455] When Jane Doe #1 told Dr. Amin she was in pain, Jane Doe #1 said he responded: "it's okay; almost done."[456] He then performed a finger examination, which according to Jane Doe #1, felt like "he shoved his whole hand" inside of her.[457] She further stated that it burned and she tried to hold still, but Dr. Amin just told her to stop moving.[458] Dr. Amin ultimately prescribed the estrogen pills for her.[459]

In August 2020, Jane Doe #1 ran out of her estrogen pills and had another appointment with Dr. Amin on September 8, 2020.[460] During this visit, Jane Doe #1 stated to the Subcommittee that a nurse working with Dr. Amin encouraged her to receive a Pap smear.[461] As with the vaginal ultrasound, Jane Doe #1 stated that the Pap smear was rough, and she again told Dr. Amin that she was in pain, but he did not stop the examination.[462] Jane Doe #1 recalled that she attempted to ask questions, but Dr. Amin told her she would be notified of any abnormal

---

[446] This former ICDC detainee asked to remain anonymous. Jane Doe #1, Interview with Senate Permanent Subcommittee on Investigations (Oct. 12, 2021); Declaration of Jane Doe #1 (Dec. 18, 2020) (on file with the Subcommittee).
[447] Jane Doe #1, Interview with Senate Permanent Subcommittee on Investigations (Oct. 12, 2021).
[448] *Id.*
[449] *Id.*
[450] *Id.*; LaSalle_443112.
[451] Jane Doe #1, Interview with Senate Permanent Subcommittee on Investigations (Oct. 12, 2021); LaSalle_443114.
[452] Declaration of Jane Doe #1 (Dec. 18, 2020) (on file with the Subcommittee); LaSalle_443017-18; LaSalle_443067-74.
[453] Jane Doe #1, Interview with Senate Permanent Subcommittee on Investigations (Oct. 12, 2021).
[454] *Id.*; LaSalle_443019.
[455] Jane Doe #1, Interview with Senate Permanent Subcommittee on Investigations (Oct. 12, 2021).
[456] *Id.*
[457] *Id.*
[458] *Id.*
[459] *Id.*; LaSalle_442999.
[460] LaSalle_442629-30; LaSalle_442633; LaSalle_442636; LaSalle_443179-81.
[461] Jane Doe #1, Interview with Senate Permanent Subcommittee on Investigations (Oct. 12, 2021); LaSalle_443172.
[462] Jane Doe #1, Interview with Senate Permanent Subcommittee on Investigations (Oct. 12, 2021).

results and walked out of the room.[463] Jane Doe #1 stated that she never received the results of this test.[464] Dr. Amin wrote her a prescription for estrogen pills at this appointment.[465] Jane Doe #1 did not see Dr. Amin again.[466] During her interview with the Subcommittee, Jane Doe #1 stated that she is still afraid to see a doctor following her experience with Dr. Amin.[467]

Following her release from ICDC, Jane Doe #1 now resides in Jackson, South Carolina.[468] Jane Doe #1 was recently arrested again for possession of a controlled substance.[469]

**vi. Jane Doe #2**

Jane Doe #2—a 32-year-old mother to a 14-year-old U.S. citizen daughter—was brought to the United States from Cameroon by her parents when she was two years old.[470] Jane Doe #2 was detained at ICDC from October 2017 to February 2020, following a 2017 encounter with the police, the charge from which was later dropped.[471] Jane Doe #2 informed the Subcommittee that she actively sought medical services available to detainees, as the services were free to her.[472]

During her time at ICDC, she experienced "severe" pain in between her menstrual cycles.[473] In March 2019, Jane Doe #2 complained of pelvic pain and abnormal menstrual cycle and was referred to Dr. Amin.[474] Similar to Ms. Navarro, Jane Doe #2 said that she was told by

---

463 *Id.*
464 *Id.*
465 LaSalle_443170.
466 Jane Doe #1, Interview with Senate Permanent Subcommittee on Investigations (Oct. 12, 2021).
467 *Id.*
468 *Id.*
469 Email from Counsel for Jane Doe #1 to the Senate Permanent Subcommittee on Investigations (Nov. 10, 2022).
470 This former ICDC detainee asked to remain anonymous. Email from Counsel for Jane Doe #2 to the Senate Permanent Subcommittee on Investigations (Nov. 15, 2021).
471 Jane Doe #2, Interview with Senate Permanent Subcommittee on Investigations (Oct. 4, 2021); Email from Counsel for Jane Doe to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022). The dropped charge (shoplifting) arose from an incident in which she was sitting in the car outside of a gas station when her friends attempted to steal beer without her knowledge. Prior to this dropped charge, she was convicted of three non-violent misdemeanors from two incidents: shoplifting and possession of stolen goods when she was underage (2007) and misdemeanor larceny (2014). The 2014 conviction arose from her being present during a former boyfriend's criminal act. She did not participate in the criminal act herself. Although she was initially charged with conspiracy to commit robbery with a firearm or dangerous weapon, felony possession of cocaine, and felony possession of a controlled substance she was only convicted of misdemeanor larceny. Email from Counsel for Jane Doe #2 to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).
472 Jane Doe #2 mentioned that detainees were able to receive free glasses within 90 days and get their teeth whitened within six months so she "wanted to do stuff like that." Jane Doe #2, Interview with Senate Permanent Subcommittee on Investigations (Oct. 4, 2021).
473 *Id.*; Email from Counsel for Jane Doe #2 to the Senate Permanent Subcommittee on Investigations (Nov. 10, 2022). *See also* LaSalle_244060 (December 21, 2017 medical request from Jane Doe #2 stating, "My menstruation cramps are causing me severe pain please help me."); LaSalle_245228 (October 29, 2018 medical request from Jane Doe #2 stating, "I am having very bad cramps, and I need something for the pain please.").
474 LaSalle_245699; LaSalle_245701; LaSalle_245724; LaSalle_245744; LaSalle_245747-48.

other detainees that Dr. Amin was "rough," and she should not see him or allow him to treat her because he "messes people up."[475]

On April 3, 2019, Jane Doe #2 had her initial appointment with Dr. Amin.[476] She stated that Dr. Amin told her that she had an ovarian cyst and prescribed Depo-Provera injections.[477] Jane Doe #2 noted that Dr. Amin did not provide an explanation regarding the Depo-Provera injection, other than saying it would hopefully shrink the cyst, and did not explain the potential side effects.[478] Jane Doe #2 received a Depo-Provera injection at this visit.[479]

According to medical records reviewed by the Subcommittee, Jane Doe #2 had follow-up visits with Dr. Amin on April 17, 2019 and May 2, 2019.[480] At the May 2019 visit, Jane Doe #2 complained that she had not started her period.[481] According to Dr. Amin's notes for the visit, Dr. Amin prescribed another Depo-Provera injection and a follow-up appointment in one month.[482] On June 19, 2019, Jane Doe #2 returned to Dr. Amin and received a Depo-Provera injection.[483] Dr. Amin also performed a pelvic ultrasound at the appointment and found an "enlarged uterus" and "follicular cysts on both ovaries."[484]

After the June 2019 appointment, Jane Doe #2 experienced vaginal bleeding and was referred back to Dr. Amin on August 2, 2019.[485] According to Dr. Amin's visit notes, Jane Doe #2 had been bleeding "since [her] last visit [on] 6/19/19" and her menstrual cycle had been "spotting to heavy."[486] Dr. Amin's plan included prescribing Provera and Tramadol and performing a D&C scope.[487] Jane Doe #2 recalled that Dr. Amin told her that the Depo-Provera injections she received did not work and she would need a D&C.[488] Jane Doe #2 stated that Dr. Amin did not explain this procedure, but because she believed that Dr. Amin worked for a "government organization," she did not feel the need to second-guess his opinion.[489]

According to Dr. Amin's request to perform a D&C and laparoscopy, Jane Doe #2 had been seen by his office since April 3, 2019 for lower pelvic pain, bleeding with cramps, and irregular periods and was "diagnosed with cysts on both ovaries and enlarged uterus."[490] Jane Doe #2 received two Depo-Provera injections, Provera hormone tablets, and pain medication,

---

[475] Jane Doe #2, Interview with Senate Permanent Subcommittee on Investigations (Oct. 4, 2021).
[476] LaSalle_245759-68; LaSalle_245874-75.
[477] Jane Doe #2, Interview with Senate Permanent Subcommittee on Investigations (Oct. 4, 2021).
[478] *Id.*; Email from Counsel for Jane Doe #2 to the Senate Permanent Subcommittee on Investigations (Nov. 10, 2022).
[479] LaSalle_242761.
[480] LaSalle_245858-66; LaSalle_245976-78; LaSalle_246023-32; LaSalle_246109.
[481] LaSalle_246109.
[482] *Id.*
[483] LaSalle_246813-23; LaSalle_440128; LaSalle_440131.
[484] LaSalle_440132.
[485] LaSalle_247113-14; LaSalle_247297-98; Email from Counsel for Jane Doe #2 to the Senate Permanent Subcommittee on Investigations (Nov. 10, 2022).
[486] LaSalle_440130.
[487] *Id.*; LaSalle_440129.
[488] Jane Doe #2, Interview with Senate Permanent Subcommittee on Investigations (Oct. 4, 2021).
[489] *Id.*
[490] LaSalle_440125.

which all "failed."[491] As a result, Dr. Amin scheduled Jane Doe #2 for a D&C and laparoscopy and indicated that "[s]he agrees and understands the procedure."[492]

On August 23, 2019, Dr. Amin performed a D&C and laparoscopy on Jane Doe #2.[493] Following her procedure, Jane Doe #2 stated that Dr. Amin informed her that he had performed a D&C and removed a portion of her fallopian tube.[494] She said that Dr. Amin also told her that she would never be able to have children naturally again.[495] Jane Doe #2 stated to Subcommittee staff that Dr. Amin never explained that the removal of a fallopian tube was a possible risk associated with a D&C.[496]

According to medical records reviewed by the Subcommittee, Jane Doe #2 received another Depo-Provera injection on September 9, 2019.[497] A few months later in November 2019, Jane Doe #2 experienced "spotting" and was "not sure why" because she had a D&C and received a Depo-Provera injection.[498] In January 2020, Jane Doe #2 submitted a medical request for a follow up with Dr. Amin regarding her D&C and an overdue Depo-Provera injection.[499] On February 6, 2020, Jane Doe #2 returned to Dr. Amin's office for a follow-up visit. His staff administered another Depo-Provera injection at this visit and recommended a follow-up appointment in three months.[500]

Jane Doe #2 currently resides in Baltimore, Maryland.

### B. Former ICDC Employees Recounted Concerns Regarding Dr. Amin to the Subcommittee

As mentioned above, Subcommittee staff spoke with three former LPNs who collectively worked at ICDC between 2016 and 2020. LPN #1 told the Subcommittee that they recalled an instance in September 2020 in which a detainee returned from an outpatient procedure performed by Dr. Amin not fully understanding the type of procedure she received and questioning whether she would be able to have children.[501] The LPN did not name this patient and the Subcommittee's document review was unable to verify this claim.

---

[491] *Id.*
[492] *Id.*
[493] LaSalle_240221; LaSalle_240259-60; LaSalle_440113-23; ICH002539-2617.
[494] Jane Doe #2, Interview with Senate Permanent Subcommittee on Investigations (Oct. 4, 2021). According to an ICDC psychiatric progress note five days after the surgery, Jane Doe #2 was "'bothered' by the fact that she went into surgery expecting a D&C and ended up having a salpingectomy x 1." LaSalle_240320.
[495] Jane Doe #2, Interview with Senate Permanent Subcommittee on Investigations (Oct. 4, 2021).
[496] *Id.*
[497] LaSalle_242760.
[498] LaSalle_241418.
[499] LaSalle_242247.
[500] LaSalle_242759-60; Email from Counsel for Jane Doe #2 to the Senate Permanent Subcommittee on Investigations (Nov. 10, 2022).
[501] LPN #1, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (June 30, 2021).

LPN #1 also told the Subcommittee that in a previous role, they observed patients of Dr. Amin at ICH signing consent forms for surgical procedures while the patients were on the operating table.[502] That nurse stated that some of these patients "were about to drift off to sleep" from anesthesia and "were just coherent enough" to sign the forms; "that lets you know that the patients have no recollection of what they agreed to," they said.[503] The Subcommittee was unable to verify this claim. In addition, the Subcommittee interviewed two nurses that work at ICH and assist Dr. Amin in surgeries who told the Subcommittee that they were not aware of any instances where Dr. Amin or ICH staff received signatures on informed consent forms after the patient was administered anesthesia.[504]

LPN #2 stated to the Subcommittee that Dr. Amin performed "a lot" of D&C procedures.[505] That nurse stated that any detainee sent to Dr. Amin for the third time would receive a D&C, and that it was almost a "standard thing" that detainees would receive D&Cs when being treated by Dr. Amin.[506] LPN #3 was not aware of Dr. Amin performing unnecessary procedures prior to their departure from ICDC in 2018.[507] However, they said they were aware of complaints from patients outside ICDC regarding the quality of care Dr. Amin provided.[508]

### C. <u>Several Medical Experts Identified "Disturbing Patterns" in Treatment by Dr. Amin</u>

Subcommittee staff consulted with four medical experts regarding Dr. Amin's treatment of former ICDC detainees and reviewed documents prepared by these experts regarding their evaluation of the medical records of some of these detainees. Subcommittee staff first interviewed Dr. Ted Anderson, Dr. Sarah Collins, and Dr. Margaret Mueller, members of a team ("Team") asked by attorneys and advocacy groups later representing plaintiffs in the December 2020 lawsuit to review the medical files of some ICDC detainees who were treated by Dr. Amin.[509] This Team reviewed over 3,200 pages of partial medical records for 19 ICDC

---

[502] *Id.*
[503] *Id.*
[504] Ryan Lupo, Irwin County Hospital, Interview with Senate Permanent Subcommittee on Investigations (Oct. 20, 2021); Julie Harper, Irwin County Hospital, Interview with Senate Permanent Subcommittee on Investigations (Oct. 21, 2021).
[505] LPN #2, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (July 12, 2021).
[506] *Id.*
[507] LPN #3, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (July 19, 2021).
[508] *Id.*
[509] Dr. Anderson is the Vice Chair for Clinical Operations and Director of the Division of Gynecology at Vanderbilt University Medical Center. Vanderbilt University Medical Center, *Ted L. Anderson, MD, PhD* (https://www.vumc.org/obgyn/person/ted-l-anderson-md-phd) (accessed Nov. 13, 2022). Dr. Collins is an Assistant Professor at the Northwestern University, Feinberg School of Medicine. Northwestern Medicine, *Sarah A. Collins, MD* (https://www.nm.org/doctors/1942401948/sarah-a-collins-md) (accessed Nov. 13, 2022). Dr. Mueller is also an Assistant Professor at the Northwestern University, Feinberg School of Medicine. Northwestern Medicine, *Margaret G. Mueller, MD* (https://www.nm.org/doctors/1346570405/margaret-g-mueller-md) (accessed Nov. 13, 2022). The Team was comprised of nine board-certified OB-GYN physicians and two nursing experts. The members of the team are: Ted Anderson, MD; Haywood L. Brown, MD; Sarah Collins, MD; Caron Jo Gray, MD; Julia Geynisman-Tan, MD; Geri D. Hewitt, MD; Margaret Mueller, MD; Andrea Shields, MD; Geoffrey Schnider,

detainees. The Subcommittee received complete medical records from ICDC and partial medical records from ICH (which included the 3,200 pages of partial medical records the Team reviewed). The Subcommittee consulted its own medical expert, Dr. Peter Cherouny, an OB-GYN physician from Vermont.[510] Dr. Cherouny reviewed over 16,600 pages of medical records pertaining to approximately 94 former detainees treated by Dr. Amin to provide the most comprehensive analysis of Dr. Amin's treatment.[511] Based on all of the various medical records reviewed, all consulted experts determined that Dr. Amin did not follow current medical guidelines for patient care, and all experts determined that Dr. Amin followed a pattern of treatment for almost all patients he treated regardless of their specific diagnosis or condition.

#### i. OB-GYN Medical Experts Engaged by Immigration Advocacy Groups Found Alarming Surgical Patterns by Dr. Amin

In October 2020, the Team produced an executive summary of findings regarding allegations of medical abuse allegations at ICDC.[512] Two members of the Team—Dr. Ted Anderson and Dr. Haywood Brown—testified in a closed meeting of the Senate Democratic Caucus on October 26, 2020.[513]

The plaintiffs filed Drs. Anderson and Brown's testimony in support of the litigation in November 2020 and referenced the Team's executive summary in an amended complaint filed in December 2020.[514] The plaintiffs also submitted three declarations drafted by Dr. Mueller in support of their case: (1) a declaration summarizing her review of the records as a whole; (2) a

---

MD; Michelle Collins, PhD, CNM; and Suzanne McMurtry Baird, DNP, RN. According to the executive summary, the records of 19 women were the "first records available and were limited by production from the facility, which appear[ed] to be incomplete." *Executive Summary of Findings by the Independent Medical Review Team Regarding Medical Abuse Allegations at the Irwin County Detention Center* (Oct. 21, 2020) (on file with the Subcommittee). As previously discussed, immigration advocacy groups and attorneys made allegations regarding Dr. Amin's treatment of ICDC detainees in a September 2020 whistleblower complaint. The complaint asked for DHS OIG, DHS CRCL, IHSC, and ICDC to conduct an investigation into these allegations. Following the filing of this complaint, an immigration attorney named Andrew Free was contacted by immigration attorneys for some of the women detained at ICDC. Mr. Free offered his assistance and ultimately obtained the medical records of some of the former ICDC detainees who were treated by Dr. Amin. Mr. Free determined that a review by medical experts, rather than a review conducted by immigration advocates, would be the most beneficial to the federal government's investigation into the allegations. Mr. Free contacted a women's health attorney, Adam Snyder, to form this medical review team. Members of the review team were not affiliated with immigration advocacy organizations nor were they compensated for their services. Andrew Free, Briefing with Senate Permanent Subcommittee on Investigations (June 11, 2021); Adam Snyder, Briefing with Senate Permanent Subcommittee on Investigations (June 24, 2021).

[510] Dr. Cherouny is a Professor Emeritus at the University of Vermont, Larner College of Medicine. Dr. Peter Cherouny Curriculum Vitae (on file with the Subcommittee).

[511] The 16,600 pages of medical records for 94 patients that Dr. Cherouny reviewed included the 3,200 pages for 19 patients reviewed by the Team.

[512] *Executive Summary of Findings by the Independent Medical Review Team Regarding Medical Abuse Allegations at the Irwin County Detention Center* (Oct. 21, 2020) (on file with the Subcommittee).

[513] *Testimony of Dr. Ted Anderson* (Oct. 26, 2020) (on file with the Subcommittee); *Testimony of Dr. Haywood Brown* (Oct. 26, 2020) (on file with the Subcommittee).

[514] Yesnia Aff. In Support re 2 Motion for Temp. Restraining Order (Nov. 19, 2020), *Oldaker v. Giles*, M.D. GA (No. 7:20-cv-00244-WLS-MSH); Consolidated Amended Petition for Writ of Habeas Corpus and Class Action Complaint for Declaratory and Injunctive Relief and for Damages (Dec. 21, 2020), *Oldaker v. Giles*, M.D. GA (No. 7:20-cv-00224-WLS-MSH).

declaration summarizing her review of the medical records of lead plaintiff, Yanira Oldaker; and (3) a declaration summarizing her review of the records of another plaintiff, Mbeti Ndonga.[515] Dr. Collins, another member of the Team, reviewed an additional set of over 500 pages of medical records of ICDC detainees. Immigration advocacy organizations obtained these additional records in Freedom of Information Act ("FOIA") litigation, and the records are connected to the December 2020 lawsuit.[516] Subcommittee staff interviewed Dr. Anderson, Dr. Mueller, and Dr. Collins about their findings and to gain a better understanding of the medical procedures performed by Dr. Amin.

Based on the records it reviewed, the Team found that a number of women were subjected to "patterns of aggressive and unethical care," including what they believed to be inappropriate invasive procedures and diagnostic tests, such as ultrasounds, LEEPs, and Pap tests.[517] Dr. Mueller and Dr. Collins also commented on the context in which Dr. Amin subjected these women to treatment. Specifically, Dr. Mueller highlighted to the Subcommittee that Dr. Amin's patients were members of a vulnerable group undergoing painful procedures from a doctor they did not choose.[518] Dr. Collins emphasized that physicians occupy a position of power relevant to their patients, and she felt that "power was abused" in the case of Dr. Amin.[519]

#### ii. The Subcommittee's Medical Expert Identified Concerning Treatment Patterns by Dr. Amin

The Subcommittee provided over 16,600 of pages of medical records pertaining to approximately 94 ICDC female detainees to Dr. Peter Cherouny, a medical expert the HHS OIG relied upon to perform a medical record review for one of its previous studies.[520] Like Drs.

---

[515] *See* Declaration of Margaret Mueller, MD, FACS, FACOG for Yanira Oldaker (Nov. 18, 2020), *Oldaker v. Giles*, M.D. GA (No. 7:20-cv-00224-WLS-MSH); Declaration of Margaret Mueller, MD, FACS, FACOG for Jane Doe # 1 (Mbeti Ndonga) (Dec. 14, 2020), *Oldaker v. Giles*, M.D. GA (No. 7:20-cv-00224-WLS-MSH); Medical Care Provided to Women in Detention at Irwin County Detention Center: Declaration of Margaret Mueller, MD, FACS, FACOG (Dec. 20, 2020), *Oldaker v. Giles*, M.D. GA (No. 7:20-cv-00224-WLS-MSH).

[516] Dr. Sarah Collins, Interview with Senate Permanent Subcommittee on Investigations (Oct. 19, 2021). According to counsel representing former ICDC detainees in the *Oldaker* litigation and in a FOIA lawsuit against ICE, Dr. Collins reviewed 518 pages not included in the original 3,200 pages of records the Independent Medical Review Team received. Email from Counsel for the National Immigration Project of the National Lawyers Guild to the Senate Permanent Subcommittee on Investigations (Oct. 22, 2021).

[517] *Executive Summary of Findings by the Independent Medical Review Team Regarding Medical Abuse Allegations at the Irwin County Detention Center* (Oct. 21, 2020) (on file with the Subcommittee). Dr. Mueller explained that a LEEP is an excisional procedure in which the surgeon "excises or removes" a portion of a woman's cervix. In general, a LEEP is only used if pre-cancerous cells are detected. The short-term implications for a LEEP include extensive bleeding that could become extensive enough to require a hysterectomy. A LEEP can also result in long-term implications, including reproductive consequences. In addition, the removal of a significant portion of the cervix can often create cervical insufficiency, which can lead to the pre-term loss of pregnancies. Dr. Mueller explained that if there is no indication for a particular procedure and no identifiable benefit, performing this procedure is "only exposing a woman to a risk." Dr. Margaret Mueller, Interview with Senate Permanent Subcommittee on Investigations (July 27, 2021).

[518] Dr. Margaret Mueller, Interview with Senate Permanent Subcommittee on Investigations (July 27, 2021).

[519] Dr. Sarah Collins, Interview with Senate Permanent Subcommittee on Investigations (Oct. 19, 2021).

[520] *See* U.S. Department of Health and Human Services, Office of Inspector General, *Instances of IHS Labor and Delivery Care Not Following National Clinical Guidelines or Best Practices* (OEI-06-19-00190) (Dec. 2020)

Anderson, Mueller, and Collins, Dr. Cherouny determined that Dr. Amin followed a "boiler plate approach to care" for almost all patients he treated.[521] This "algorithm" Dr. Amin employed was generally used for a patient presenting with abnormal bleeding and/or pelvic pain.[522] Dr. Amin would first perform a transvaginal ultrasound, where he would often diagnose patients with ovarian cysts that required treatment. Dr. Amin would then prescribe Depo-Provera injections to treat the cysts. He would not allow the Depo-Provera to take effect, and would instead declare the treatment a failure and proceed to surgery. In one interview with the Subcommittee, Dr. Cherouny summarized Dr. Amin's care as "pretty good medicine for the 1980s, but we're not there anymore."[523] The sections below discuss what Dr. Cherouny saw in the medical records and Dr. Amin's treatment patterns.

#### a. Dr. Amin's Flawed Use of Transvaginal Ultrasounds

Dr. Amin generally performed transvaginal ultrasounds in response to patients presenting with menstrual abnormalities, such as heavy bleeding and/or pelvic pain. The Subcommittee learned that a transvaginal ultrasound is not usually the first step in an evaluation for menstrual abnormalities.[524] Instead, the first step for a patient with abnormal bleeding would be to conduct a pregnancy test and compile a thorough patient history to determine how long the bleeding has occurred.[525]

Of the approximately 94 patient records he reviewed, Dr. Cherouny determined that Dr. Amin performed transvaginal ultrasounds on 36 of the women he treated.[526] Dr. Cherouny commented that generally, "the documentation of these ultrasounds was limited and appeared incomplete."[527] He added that the records he reviewed show that Dr. Amin generally had "[p]oor performance and documentation of transvaginal ultrasound evaluation."[528] Dr. Cherouny further explained that Dr. Amin is "clearly not skilled in ultrasound of the female pelvis" and that he "appears to frequently confuse normal findings for pathology and uses these indications for surgery."[529] Dr. Cherouny also stated that it was likely that Dr. Amin's ultrasound practices were not in compliance with the American Institute of Ultrasound in Medicine guidelines.[530]

---

(https://oig.hhs.gov/oei/reports/OEI-06-19-00190.pdf). Dr. Cherouny reviewed LaSalle medical records, ICH medical records, the files reviewed by the Team, and the additional set of over 500 pages of records Dr. Collins reviewed.

[521] Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).

[522] Dr. Sarah Collins, Interview with Senate Permanent Subcommittee on Investigations (Oct. 19, 2021).

[523] Dr. Peter Cherouny, Interview with Senate Permanent Subcommittee on Investigations (Sept. 8, 2022).

[524] Dr. Sarah Collins, Interview with Senate Permanent Subcommittee on Investigations (Oct. 19, 2021).

[525] *Id*.

[526] Letter from Dr. Peter Cherouny to the Senate Permanent Subcommittee on Investigations (Feb. 1, 2022).

[527] *Id*.

[528] Letter from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).

[529] Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).

[530] Dr. Peter Cherouny, Interview with Senate Permanent Subcommittee on Investigations (Jan. 26, 2022).

### b. Dr. Amin's Misuse of Depo-Provera Injections

Dr. Cherouny found that Dr. Amin administered Depo-Provera injections, at least once, to 40 women in what appeared to be an attempt to manage abnormal uterine bleeding.[531] The Subcommittee learned that physicians generally "shy away" from using" these injections because side effects may complicate a diagnosis.[532]

Dr. Cherouny determined that in most of the cases he reviewed, Dr. Amin deviated from the standard of care and the Depo-Provera "was not given adequate time to affect a clinical response" in these women.[533] He explained that the "adequate time" for a response to Depo-Provera was six months. Dr. Cherouny noted that Dr. Amin generally used 2-6 weeks of clinical response time before declaring that the Depo-Provera medication failed and proceeded to surgery.[534] Dr. Cherouny added that Depo-Provera is not the preferred treatment for management of abnormal uterine bleeding because it causes unwanted side effects, including menstrual cycle irregularity.[535]

### c. Dr. Amin's Aggressive Surgical Approach

Dr. Cherouny identified that Dr. Amin performed a D&C with laparoscopy on 40 patients out of the approximately 94 patient files he reviewed.[536] The Subcommittee learned that a D&C is not a first step of action, and it is not indicated as necessary in the treatment for chronic pelvic pain.[537] Furthermore, a D&C is generally only indicated after an endometrial biopsy if the doctor did not obtain enough tissue after an endometrial biopsy, if a post-pregnancy patient is bleeding, or for acute management purposes if a woman comes into an emergency room bleeding.[538]

Dr. Cherouny found that Dr. Amin's use of these procedures were "too aggressive."[539] Dr. Cherouny stated to the Subcommittee that Dr. Amin often did not follow standard practice, which would have been to escalate from a transvaginal ultrasound to advanced imaging, like an MRI or a CT scan.[540] Instead, for the vast majority of patients, Dr. Amin proceeded directly from an ultrasound to a D&C and operative laparoscopy, using these procedures as diagnostic

[531] Letter from Dr. Peter Cherouny to the Senate Permanent Subcommittee on Investigations (Feb. 1, 2022).
[532] Dr. Margaret Mueller, Interview with Senate Permanent Subcommittee on Investigations (July 27, 2021).
[533] Letter from Dr. Peter Cherouny to the Senate Permanent Subcommittee on Investigations (Feb. 1, 2022).
[534] Letter from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
[535] Dr. Peter Cherouny, Interview with Senate Permanent Subcommittee on Investigations (Jan. 26, 2022). Dr. Cherouny stated that most patient records he reviewed were premenopausal or perimenopausal women. The initial treatment recommendation for women at this age includes oral progestin, like Provera, a levonorgestrel-containing IUD or combination birth control rather than Dr. Amin's use of Depo-Provera injections. *Id*.
[536] Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
[537] Dr. Margaret Mueller, Interview with Senate Permanent Subcommittee on Investigations (July 27, 2021).
[538] *Id*.
[539] Dr. Peter Cherouny, Interview with Senate Permanent Subcommittee on Investigations (Jan. 26, 2022).
[540] *Id*.

tools.[541] Dr. Cherouny added that the "vast majority [of cases where Dr. Amin performed a D&C] appear to be manageable with imaging and appropriate hormone therapy."[542]

Dr. Cherouny also found that during the previously mentioned surgeries, Dr. Amin removed or aspirated ovarian cysts in 40 women.[543] The Subcommittee learned that the general standard of care for simple, or functional, ovarian cysts would have been to do nothing and repeat an ultrasound in six weeks.[544] Dr. Cherouny stated that these cysts were "benign in every case," and the "majority were functional ovarian cysts in normally cycling ovaries" that would "generally resolve without surgical intervention."[545] Out of the 40 patients who underwent cyst removals or aspirations, Dr. Cherouny only identified one patient whose pathology reports indicated the removal was reasonable.[546]

In addition, Dr. Cherouny identified seven patients who underwent a LEEP—a procedure used to further assess abnormalities identified by a Pap smear and colposcopy—and found that the records he reviewed suggest Dr. Amin has "limited knowledge and/or skill in Pap smear management."[547] He explained that the "point of the [LEEP] procedure is to get tissue for diagnostic purposes and in each case [Dr. Amin] failed this outcome."[548] Dr. Cherouny attributed these failures to Dr. Amin's "technique" in performing the procedure.[549] For example, one patient who underwent a LEEP had a negative Pap smear and positive HPV test. In this case, the appropriate management would have been a follow-up Pap smear and HPV test one year later, but Dr. Amin performed a LEEP.[550] Dr. Cherouny stated this was "well outside of the guidelines."[551] For two other patients who received a LEEP, Dr. Cherouny found that no abnormal tissue was detected and there was no indication of a colposcopy before the LEEP.[552] Dr. Cherouny stated that Dr. Amin skipped "certainly a few" steps in the diagnostic process before performing a LEEP.[553]

#### d. Dr. Amin's Questionable Informed Consent Practices and Lack of Board Certification

Dr. Cherouny explained to the Subcommittee that informed consent requires the patient to have "adequate, accurate, and useful information."[554] Based on the records he reviewed, Dr. Cherouny stated that Dr. Amin did not provide specific information regarding surgical

---

541 *Id.*
542 Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
543 Letter from Dr. Peter Cherouny to the Senate Permanent Subcommittee on Investigations (Feb. 1, 2022).
544 Dr. Ted Anderson, Interview with Senate Permanent Subcommittee on Investigations (July 20, 2021).
545 Letter from Dr. Peter Cherouny to the Senate Permanent Subcommittee on Investigations (Feb. 1, 2022).
546 Dr. Peter Cherouny, Interview with Senate Permanent Subcommittee on Investigations (Jan. 26, 2022).
547 Letter from Dr. Peter Cherouny to the Senate Permanent Subcommittee on Investigations (Feb. 1, 2022).
548 Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
549 *Id.*
550 Dr. Peter Cherouny, Interview with Senate Permanent Subcommittee on Investigations (Jan. 26, 2022); Letter from Dr. Peter Cherouny to the Senate Permanent Subcommittee on Investigations (Feb. 1, 2022).
551 Dr. Peter Cherouny, Interview with Senate Permanent Subcommittee on Investigations (Jan. 26, 2022).
552 *Id.*; Letter from Dr. Peter Cherouny to the Senate Permanent Subcommittee on Investigations (Feb. 1, 2022).
553 Dr. Peter Cherouny, Interview with Senate Permanent Subcommittee on Investigations (Jan. 26, 2022).
554 Dr. Peter Cherouny, Interview with Senate Permanent Subcommittee on Investigations (Apr. 13, 2022).

procedures with detainee patients and there was "no documentation of discussions regarding options for care."[555]

Dr. Cherouny flagged that Dr. Amin "does not appear to be board certified" and "likely does no or limited continuing education to stay current" on up-to-date medical practices in these areas.[556] He explained further that it appears there are board certified OB-GYN providers in the area of ICDC and that he was "concerned" with how and why Dr. Amin was selected to treat this population.[557] He noted that the American College of Obstetricians and Gynecologists requires annual continuing medical education, which helps OB-GYN physicians stay current in their training.[558] Dr. Cherouny stated that it was likely that Dr. Amin would have pursued different treatment methods had he been board certified.[559]

Dr. Cherouny also noted that "[i]t appears there was, likely, no oversight of the care provided to these patients. The repetitive nature of some of the issues, like inadequate cervical tissue after a LEEP procedure, would seem to prompt a review in many hospitals."[560]

### D. Response from Dr. Amin Concerning ICDC Allegations

Following the public allegations in the September 2020 whistleblower complaint and December 2020 lawsuit, Dr. Amin filed two defamation lawsuits against NBCUniversal Media, LLC and the author Don Winslow.[561] In these complaints, Dr. Amin stated that he performed only two hysterectomies on ICDC detainees.[562] According to the complaints, for both hysterectomies "the patients were informed and consented to the procedures."[563] In addition, Dr. Amin claimed that ICE "conducted an independent review of the treatment plans and approved the [hysterectomies]," which "confirms that the procedures were medically necessary."[564]

The complaints also stated that Dr. Amin "never performed" a procedure on an ICDC detainee without obtaining ICE approval and was supervised by at least one other person when he treated ICDC detainees, which "was a matter of protocol."[565] Dr. Amin further claimed that he "always obtains" informed consent, uses interpreters for non-English speaking patients, and "has never treated any patient roughly or inappropriately."[566] Both lawsuits are ongoing.

---

[555] *Id.*; Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
[556] Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
[557] *Id.*
[558] Dr. Peter Cherouny, Interview with Senate Permanent Subcommittee on Investigations (Jan. 26, 2022).
[559] *Id.*
[560] Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
[561] *Amin v. NBCUniversal Media*, No. 5:21-cv-00056 (S.D. Ga. Sept. 9, 2021); *Amin v. Winslow*, No. 3:21-cv-01635 (S.D. Cal. Sept. 17, 2021).
[562] *Id.*
[563] *Id.*
[564] *Id.*
[565] *Id.*
[566] *Id.*

When allegations against Dr. Amin first emerged in September 2020 regarding his treatment of ICDC detainees, he sent a letter to a LaSalle employee, obtained by the Subcommittee that stated, in part:

> Recently, allegations have been made regarding my treatment of ICDC detainees. To be clear, I vigorously deny these allegations, and am confident that a full review will demonstrate that the care that I provided to all of my patients, including those housed at ICDC, was medically necessary and appropriate, and always done with the full informed consent of the patient.[567]

The Subcommittee tried on multiple occasions to obtain voluntary testimony from Dr. Amin regarding his treatment of female ICE detainees at ICDC. Dr. Amin declined the Subcommittee's requests for a voluntary interview. On February 7, 2022, the Subcommittee served Dr. Amin with a subpoena for deposition. Dr. Amin submitted an affidavit to the Subcommittee stating that he was innocent of the allegations and that he declined to provide testimony pursuant to his Fifth Amendment privilege against self-incrimination.[568] His attorney also mentioned the ongoing criminal investigation into Dr. Amin at the time in a cover letter accompanying the affidavit.[569] The Subcommittee is unaware of whether the criminal investigation is still ongoing.

## V. DR. AMIN WAS A CLEAR OUTLIER IN THE VOLUME OF CERTAIN OB-GYN PROCEDURES HE PERFORMED ON ICDC DETAINEES

Despite housing a low percentage of the total population of female ICE detainees (4%), ICDC and Dr. Amin accounted for a substantial number of OB-GYN procedures overall (over one-third), a large total of invasive procedures performed on ICE detainees, and a sizeable proportion of all taxpayer money spent on OB-GYN procedures for ICE detainees. The Subcommittee's data analysis revealed that Dr. Amin was an outlier in the number of invasive procedures performed and how much money he billed the government for these procedures. While the Subcommittee could not account for every variable of the ICE female population (e.g. ICE does not track and does not know the health histories of the female populations across ICE detention centers) the data the Subcommittee received from ICE shows potentially alarming differences in the treatment patterns of ICDC detainees compared to female detainees housed at other ICE detention centers across the country.

---

[567] Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Oct. 22, 2021) (Tranche 18, 11144).
[568] Letter from Counsel for Dr. Amin to the Senate Permanent Subcommittee on Investigations (Feb. 21, 2022).
[569] *Id.* PSI contacted Dr. Amin's counsel during the Subcommittee's errata review process and did not receive a response. Email from the Senate Permanent Subcommittee on Investigations to Counsel for Dr. Amin (Nov. 10, 2022).

### A. Despite Housing a Low Number of ICE Detainees, ICDC and Dr. Amin Accounted for a Large Percentage of OB-GYN Referrals, Visits, and Procedures Within the ICE System

ICE data provided to the Subcommittee shows that ICDC housed roughly 4% of female ICE detainees between 2017 and 2020.[570] (See Figure 4.) The Subcommittee also received data from ICE concerning the total number of OB-GYN referrals, visits, and procedures for all ICE facilities from 2017 to 2020.[571] These statistics show that OB-GYN referrals from ICDC, as a percentage of total annual OB-GYN referrals across the ICE system, increased from 9% in 2018 to nearly 17% in 2020.[572] Between 2017 and 2020, OB-GYN referrals for ICDC female detainees accounted for 14% of OB-GYN referrals for all ICE female detainees.[573] (See Figure 5).

**Figure 4: FY 2017-2020 Female ADP Percentage at ICDC vs All ICE Facilities**[574]

| Fiscal Year | ICE Female Average Daily Population (ADP) | ICDC Female ADP | ICDC Female ADP as a Percentage of Total ICE Female ADP |
|---|---|---|---|
| **2017** | 5,716 | 196 | 3.43% |
| **2018** | 6,224 | 210 | 3.37% |
| **2019** | 7,552 | 269 | 3.56% |
| **2020** | 4,997 | 218 | 4.36% |

---

570 U.S. Immigration and Customs Enforcement, *HSGAC/PSI Interviews with ICE Health Service Corps (IHSC) Personnel Get-backs* (Nov. 5, 2021) (response on file with the Subcommittee); Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 8, 2022) (Tranche 4, 1073-95).

571 *June 23, 2021 ICE Q&A Paper*, *supra* note 14; *Sept. 1, 2021 ICE Q&A Paper*, *supra* note 12; Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 2, 2022). As explained above, referrals for off-site care from a detention facility will include referrals for initial treatment after facility staff has evaluated a detainee, as well as later referrals for surgical procedures that the off-site provider has recommended. Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Sept. 27, 2021) (Tranche 10, 3037-42); Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01255).

572 *June 23, 2021 ICE Q&A Paper*, *supra* note 14; Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 2, 2022).

573 *Id.*

574 U.S. Immigration and Customs Enforcement, *HSGAC/PSI Interviews with ICE Health Service Corps (IHSC) Personnel Get-backs* (Nov. 5, 2021) (response on file with the Subcommittee); Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 8, 2022) (Tranche 4, 1073-95). In an internal memorandum from October 2020, ICE noted that the female population of ICDC increased in 2019 "due to the closure of other detention facilities" in the Atlanta area of responsibility. Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Sept. 27, 2021) (Tranche 10, 3037-42).

**Figure 5: 2017-2020 Total Number of ICE OB-GYN-Related Referrals and ICDC OB-GYN-Related Referrals**[575]

| Fiscal Year | Total ICE OB-GYN Referrals | ICDC OB-GYN Referrals | ICDC OB-GYN Referrals as a Percentage of Total ICE OB-GYN Referrals |
|---|---|---|---|
| **2017** | 783 | 126 | 16.09% |
| **2018** | 1,127 | 103 | 9.14% |
| **2019** | 1,652 | 240 | 14.53% |
| **2020** | 1,703 | 288 | 16.91% |
| **Totals** | **5,265** | **757** | **14.38%** |

From 2017 to 2020, ICE detainees had 2,567 OB-GYN specialist visits system wide.[576] ICE paid approximately $191,812 for these visits.[577] (See Figure 6.) Between 2017 and 2020, Dr. Amin performed the fourth-most visits (167) of OB-GYN providers treating ICE detainees, which accounted for roughly 6.5% of total OB-GYN visits for that time period and 7.3% of the total ICE paid for these visits.[578] (See Figure 7.)

**Figure 6: Total Number of OB-GYN Specialist Visits by ICE Detainees for 2017-2020**[579]

| Fiscal Year | 2017 | 2018 | 2019 | 2020 | Total |
|---|---|---|---|---|---|
| **Total Count** | 281 | 643 | 829 | 814 | **2,567** |
| **ICE Payment Amount** | $17,177.38 | $47,792.88 | $66,421.87 | $60,419.95 | **$191,812.08** |

---

[575] *June 23, 2021 ICE Q&A Paper*, *supra* note 14; Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 2, 2022). ICE noted that "[w]hile several other practitioners served ICDC over [the 2017 to 2020] time period, most OB-GYN patients were being seen by Dr. Amin." *June 23, 2021 ICE Q&A Paper*, *supra* note 14. In September 2021, ICE provided initial data regarding the number of OB-GYN referrals for ICE detainees. Specifically, ICE provided the following totals for ICDC OB-GYN referrals: 209 (FY17), 178 (FY18), 526 (FY19), 648 (FY20), 1,561 (total FY17-20). ICE explained that these totals were part of ICE's "initial data reporting" and its "referral analyst was still determining the best methods for data analysis." In addition, the earlier data was a "combination of claims and referral data" and "[a]s a result multiple counts […] were included which significantly inflated the totals." *June 23, 2021 ICE Q&A Paper*, *supra* note 14; Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Feb. 10, 2022).

[576] *Sept. 1, 2021 ICE Q&A Paper*, *supra* note 12.

[577] *Id.*

[578] *Id.* According to ICE, this total refers only to billing by Dr. Amin for office visits. As mentioned below, Dr. Amin submitted claims for treatment for 313 detainees in total between 2014 and 2020, which would have included billing for "care and services he would have provided in the Emergency Room and inpatient at the local hospitals." U.S. Immigration and Customs Enforcement, *November 4, 2021 HSGAC/PSI Additional Follow-Up Questions* (Nov. 16, 2021) (response on file with the Subcommittee).

[579] *Sept. 1, 2021 ICE Q&A Paper*, *supra* note 12.

**Figure 7: Top Five Providers of OB-GYN Visits for ICE Detainees for 2017-2020**[580]

| Top Five Specialists/Providers | Total Visit Count | Billed Charges | ICE Payment Amount |
|---|---|---|---|
| Top Provider 1 | 231 | $55,360.00 | $25,405.00 |
| Top Provider 2 | 205 | $35,545.00 | $16,466.59 |
| Top Provider 3 | 173 | $39,755.00 | $9,216.88 |
| **Dr. Mahendra Amin** | **167** | **$22,050.00** | **$14,002.77** |
| Top Provider 5 | 155 | $32,050.00 | $10,576.38 |
| **Total** | **931** | **$184,760.00** | **$75,667.62** |

### B. Dr. Amin Accounted for At Least One in Three OB-GYN Procedures and Received Nearly Half of All ICE Payments for OB-GYN Procedures Between 2017 and 2020

In September 2021, ICE produced statistical information to the Subcommittee regarding certain OB-GYN procedures Dr. Amin performed for ICE detainees between 2017 and 2020, as well as data on the frequency and cost of these OB-GYN procedures across the ICE detention system.[581] The Subcommittee determined that Dr. Amin accounted for at least one out of three OB-GYN procedures and received nearly half of all payments from ICE for 10 OB-GYN services between 2017 and 2020 despite the fact the average daily female population at ICDC accounted for roughly 4% of the average daily female population in all ICE detention facilities.[582] Specifically, from 2017 to 2020, physicians performed 1,201 of these OB-GYN procedures on ICE detainees.[583] The procedures cost ICE over $120,416.[584] (See Figure 8.)

580 *Id.*
581 *Id.* These procedures include: hysterectomies, tubal ligations, BX/curett of cervix with scope; conization of cervix; cryocautery of cervix; D&C; injection, medroxyprogesterone acetate, 100 mg; laparoscopy, excise lesions; laparoscopy, lysis; transvaginal US, obstetric; US exam, pelvic complete; and US exam, pelvic, limited. According to ICE, no tubal ligations were performed by any OB-GYN provider on ICE detainees from 2017 to 2020. *Id.*
582 *See id.*; Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 8, 2022) (Tranche 4, 1073-95). The 10 procedures are: BX/curett of cervix with scope; conization of cervix; cryocautery of cervix; dilation and curettage; injection, medroxyprogesterone acetate, 100 mg; laparoscopy, excise lesions; laparoscopy, lysis; transvaginal US, obstetric; US exam, pelvic complete; and US exam, pelvic, limited. *Sept. 1, 2021 ICE Q&A Paper*, *supra* note 12.
583 *Sept. 1, 2021 ICE Q&A Paper*, *supra* note 12.
584 *Id.*

**Figure 8: Total Number of Ten OB-GYN Procedures Performed on ICE Detainees and Related Costs for 2017-2020**[585]

| **Fiscal Year** | **2017** | **2018** | **2019** | **2020** | **Total** |
|---|---|---|---|---|---|
| **Total Count** | 99 | 238 | 388 | 476 | **1,201** |
| **Payment Amount** | $5,673.96 | $15,738.35 | $46,024.38 | $52,979.45 | **$120,416.14** |

The Subcommittee found that Dr. Amin was a clear outlier among physicians providing specialist OB-GYN care to ICE detainees and performed significantly more invasive procedures than other OB-GYN providers treating ICE detainees between 2017 and 2020 despite having the fourth-most visits from ICE detainees over the same time period. According to the data, Dr. Amin ranked first among physicians performing D&C procedures on female detainees between 2017 and 2020—with 53 procedures during this time compared to three procedures for the second-ranked physician.[586] Similarly, Dr. Amin also ranked first for Depo-Provera injections, having administered 102 injections during the same time period (and the "Hospital Authority of Irwin County" administered another two), compared to two shots for the next-highest provider.[587] Dr. Amin also ranked first for laparoscopies and limited pelvic exams. Dr. Amin performed 44 laparoscopies to excise lesions, compared to only one procedure for the second-ranked provider, and 163 limited pelvic exams, compared to four exams for the second-ranked provider.[588]

Overall, in ten categories of OB-GYN procedures, Dr. Amin was among the top five providers for eight of those ten procedures—and for seven out of these eight procedures, Dr. Amin was among the top two providers.[589] Dr. Amin accounted for almost one-third—392—of 1,201 total procedures performed by OB-GYN providers on ICE detainees between 2017 and 2020.[590] He was paid approximately $60,000 for these services—nearly half of all payments ($120,400) from ICE for these services.[591] (See Figure 9.) In addition, the payout rate for Dr. Amin for these ten procedures was 31% compared to the payout rate of 27% for the 1,201 total number of procedures performed by all OB-GYN providers treating ICE detainees.[592]

---

[585] *Id*. As indicated above, the 10 procedures are: BX/curett of cervix with scope; conization of cervix; cryocautery of cervix; dilation and curettage; injection, medroxyprogesterone acetate, 100 mg; laparoscopy, excise lesions; laparoscopy, lysis; transvaginal US, obstetric; US exam, pelvic complete; and US exam, pelvic, limited. *Id*.
[586] *Id*.
[587] *Id*.
[588] *Id*.
[589] The figure does not include the two procedures in which Dr. Amin was not among the top five providers—"BX of cervix w/scope, LEEP" and "US exam, pelvic, complete." *Id*.
[590] Subcommittee staff calculated the 392 gynecological or obstetrical procedures based on the following information regarding certain procedures performed by Dr. Amin from 2017 to 2020: conization of cervix (4); D&C (53); cryocautery of cervix (7); injection, medroxyprogesterone acetate, 100 MG (102); laparoscopy, excise lesions (44); laparoscopy, lysis (6); transvaginal US, obstetric (13); and US exam, pelvic, limited (163). *Id*.
[591] *Id*. In addition to the $59,967.05 ICE paid for the eight procedures, ICE paid $1,160 for the two hysterectomies Dr. Amin performed from 2017 to 2020. *Id*.
[592] *Id*. According to ICE data, Dr. Amin billed $193,100 for these procedures and was paid $59,967. For the 1,201 total number of these procedures, OB-GYN providers billed $441,708 and were paid $120,416. *Id*.

**Figure 9: Top Five Providers for Eight OB-GYN Procedures for ICE Detainees for 2017-2020**[593]

| **Top 5 Providers: Laparoscopy, Excise Lesions** | | | |
|---|---|---|---|
| # | Provider Name | Total Count (47) | Payment Amount ($28,862.04) |
| 1 | **Mahendra G Amin MD PC** | **44 (93.6%)** | **$27,960.34 (96.9%)** |
| 2 | Top Provider 2 | 1 | $113.27 |
| 3 | Top Provider 3 | 1 | $788.43 |
| 4 | Top Provider 4 | 1 | $0.00 |
| **Top 5 Providers: Injection, Medroxyprogesterone Acetate** | | | |
| # | Provider Name | Total Count (110) | Payment Amount ($8,647.98) |
| 1 | **Mahendra G Amin MD PC** | **102 (92.7%)** | **$8,608.98 (99.5%)** |
| 2 | Top Provider 2 | 2 | $0.00 |
| 3 | Top Provider 3 | 2 | $0.00 |
| 4 | Top Provider 4 | 1 | $0.00 |
| 5 | Top Provider 5 | 1 | $0.00 |
| **Top 5 Providers: US Exam, Pelvic, Limited** | | | |
| # | Provider Name | Total Count (179) | Payment Amount ($7,348.51) |
| 1 | **Mahendra G Amin MD PC** | **163 (91%)** | **$6,941.12 (94.5%)** |
| 2 | Top Provider 2 | 4 | $162.99 |
| 3 | Top Provider 3 | 2 | $0.00 |
| 4 | Top Provider 4 | 2 | $23.36 |
| 5 | Top Provider 5 | 2 | $50.09 |
| **Top 5 Providers: Dilation and Curettage** | | | |
| # | Provider Name | Total Count (65) | Payment Amount ($12,511.14) |
| 1 | **Mahendra G Amin MD PC** | **53 (81.5%)** | **$10,736.45 (85.8%)** |
| 2 | Top Provider 2 | 3 | $440.83 |
| 3 | Top Provider 3 | 2 | $445.37 |
| 4 | Top Provider 4 | 2 | $239.02 |
| 5 | Top Provider 5 | 2 | $218.58 |
| **Top 5 Providers: Laparoscopy, Lysis** | | | |
| # | Provider Name | Total Count (8) | Payment Amount ($3,356.75) |
| 1 | **Mahendra G Amin MD PC** | **6 (75%)** | **$2,677.10 (79.8%)** |
| 2 | Top Provider 2 | 2 | $679.65 |

[593] ICE stated that certain procedures did not have "Top 5" providers and only had a "Top 2" or "Top 3." *Id.* Additionally, as discussed above, of the approximately 94 patient records he reviewed, Dr. Cherouny determined that Dr. Amin performed transvaginal ultrasounds on 36 of the women he treated. However, the information provided by ICE indicated that Dr. Amin performed only 13 transvaginal ultrasounds. When asked to explain this discrepancy, ICE stated that it provided the Subcommittee with "medical claims data." According to ICE, if the ultrasounds were performed in Dr. Amin's office, he may not have billed for the ultrasounds separately by Current Procedural Terminology (CPT) code. In addition, if the ultrasounds were performed at a hospital, the hospital would have billed for the ultrasound and possibly bundled into other coding/billing and not billed as separate CPT codes. Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Apr. 27, 2022).

| **Top 5 Providers: Cryocautery of Cervix** | | | |
|---|---|---|---|
| # | Provider Name | Total Count (13) | Payment Amount ($1,854.65) |
| 1 | **Mahendra G Amin MD PC** | **7 (53.8%)** | **$958.68 (51.7%)** |
| 2 | Top Provider 2 | 3 | $429.11 |
| 3 | Top Provider 3 | 2 | $316.99 |
| 4 | Top Provider 4 | 1 | $149.87 |
| **Top 5 Providers: Conization of Cervix** | | | |
| # | Provider Name | Total Count (15) | Payment Amount ($3,230.43) |
| 1 | Top Provider 1 | 6 | $1,237.32 |
| 2 | **Mahendra G Amin MD PC** | **4 (26.7%)** | **$1,000.29 (31%)** |
| 3 | Top Provider 3 | 1 | $277.63 |
| 4 | Top Provider 4 | 1 | $243.19 |
| 5 | Top Provider 5 | 1 | $238.39 |
| **Top 5 Providers: Transvaginal US, Obstetric** | | | |
| # | Provider Name | Total Count (209) | Payment Amount ($10,580.18) |
| 1 | Top Provider 1 | 33 | $2,968.76 |
| 2 | Top Provider 2 | 18 | $454.63 |
| 3 | Top Provider 3 | 16 | $457.65 |
| 4 | **Mahendra G Amin MD PC** | **13 (6.2%)** | **$1,084.09 (10.2%)** |
| 5 | Top Provider 5 | 11 | $820.33 |
| | | **Total Count of Procedures for Dr. Amin: 392** | **Total Payment Amount to Dr. Amin: $59,967.05** |

According to information from ICE, Dr. Amin submitted referrals for four hysterectomies, but he performed only two hysterectomies—one on June 14, 2017 and the other on August 9, 2019.[594] ICE stated to the Subcommittee that "medical records show that both procedures were medically necessary."[595] Regarding the other two hysterectomies, one detainee refused the procedure and the other detainee was released from ICE custody before the surgery.[596] In total, ICE approved 14 hysterectomies between 2017 and 2020, and ICE was billed $31,843 in professional fees for these services and paid $8,731.[597] For the two hysterectomies Dr. Amin performed, ICE paid Dr. Amin $1,160.[598] No other provider treating ICE detainees performed more than one hysterectomy during this period.[599]

---

594 *June 23, 2021 ICE Q&A Paper*, *supra* note 14.
595 *Id.*
596 *Id.*
597 According to ICE, "[m]edical services are reimbursed at the lesser of billed charges or the Medicare allowable, therefore the initial charges to ICE will generally not be the same as the amount paid out to the provider." *Sept. 1, 2021 ICE Q&A Paper*, *supra* note 12.
598 *Id.*
599 From 2017 to 2020, the number of hysterectomies approved by ICE annually included: 2017 (6), 2018 (2), 2019 (5), and 2020 (1). *Id.*

## VI. ICE FAILED TO EFFECTIVELY OVERSEE OR INVESTIGATE DR. AMIN

During the period in which Dr. Amin performed the services described in Section IV above, ICE, ICDC, and ICH all had responsibilities related to ensuring ICDC detainees received appropriate medical treatment. As the sections below describe, ICE, in particular—and other DHS components and federal contractors—maintains a complex oversight system designed to monitor detainee healthcare and general conditions inside detention facilities. ICE, however, engaged in limited efforts to vet Dr. Amin, monitor or review the treatment he provided, ensure he obtained informed consent or used language translation services, or investigate the public allegations against him.

### A. Current ICE Oversight Mechanisms to Review Detention Centers and Medical Care

IHSC Field Medical Coordinators ("FMCs") typically conduct at least one site visit per year at non-IHSC facilities to evaluate their adherence to detention standards and quality of care indicators.[600] FMCs will also conduct a general overview of the layout of facilities, identify any safety concerns related to medical care, assess the quality of health services, and follow up on previous findings from other DHS auditors or private contractors.[601] In preparation for site visits, FMCs will review trends regarding complaints from detainees concerning medical care.[602] FMCs will also review a sample of medical records at each facility and conduct further investigations if they detect any deviations.[603] In addition, FMC site visits will include a review of a sample of sick call requests at each facility.[604] FMCs will document the results of their site visits and include any recommendations and facility actions and share the site visit reports with the facility and appropriate ICE Field Office Director.[605]

To the extent that systemic issues arise with medical care at detention centers, IHSC will work with these entities to draft a corrective action plan, which will often link recommendations to specific detention standards.[606] Local and regional FMCs will review facility responses to

---

[600] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021); *see also* Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 7, 2022) (Tranche 3, 01014-27). IHSC provides direct medical care at 21 facilities in the United States and, in FY 2021, "oversaw health care for over 169,000 detainees housed in 150 non-IHSC staffed facilities." U.S. Immigration and Customs Enforcement, ICE Health Service Corp Focused on Best Patient Outcomes (https://www.ice.gov/features/health-service-corps) (accessed Nov. 13, 2022).

[601] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021); Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01256).

[602] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021).

[603] *Id.*

[604] *Id.*

[605] Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01256).

[606] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021).

corrective action plans and close any addressed recommendations.[607] As with ICE oversight generally, FMC efforts will often overlap with inspections and investigations from ODO, CRCL, the American Correctional Association, NCCHC, and the Nakamoto Group.[608]

IHSC employees known as Regional Clinical Directors ("RCDs") are physicians with oversight responsibilities for all IHSC-staffed and non-IHSC-staffed facilities. RCDs report to IHSC's Deputy Medical Director.[609] These employees supervise facility clinical directors and ensure facilities comply with IHSC medical policies.[610] RCDs will also perform the duties of a clinical director for facilities without a clinical director and supervise clinical staff, lead quality control meetings, establish weekly facility plans, and meet with department heads and providers.[611] As previously noted, RCDs are also responsible for identifying unusually frequent referrals to a certain provider or insufficient justifications for referrals.[612]

The Veterans Affairs Financial Services Center ("VAFSC") processes medical claims for reimbursement by ICE in response to claims from off-site healthcare providers, including the receipt of requests through the MedPAR system and the provision of lists of billed treatments or procedures to IHSC.[613] IHSC staff will then review and verify these treatments and procedures before VAFSC issues reimbursements to providers.[614] Starting in 2020, the Health Plan Management Unit ("HPMU") inside IHSC has overseen all medical claims, and IHSC has also acquired national care guidelines—effective June 2021—to support reviews of medical care for potential waste or fraud.[615]

The IHSC officials the Subcommittee interviewed explained that IHSC plays a role in monitoring and investigating complaints from individuals that receive medical care while in detention. Detainees can raise concerns verbally with facility employees, through a written complaint, or by calling a hotline.[616] At IHSC-staffed facilities, staff will investigate any complaints that are received; for non-IHSC facilities, the FMC will conduct an investigation.[617]

---

[607] *Id.*
[608] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (May 17, 2021).
[609] U.S. Immigration and Customs Enforcement Health Service Corps Official Regional Clinical Director, Interview with Senate Permanent Subcommittee on Investigations (Feb. 14, 2022).
[610] *Id.*
[611] *Id.*
[612] *Id.*; U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (May 17, 2021).
[613] *Id.* ICE noted to the Subcommittee that medical records are not uploaded to MedPAR because this functionality does not exist. FMCs or RCDs may, however, request these requests and upload them to a detainee's referral in the IHSC electronic health record. Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).
[614] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (May 17, 2021).
[615] *Id.*; *June 23, 2021 ICE Q&A Paper*, *supra* note 14; Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01254).
[616] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (May 17, 2021).
[617] *Id.*; Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).

The IHSC investigative unit will also investigate complaints submitted to the ICE Office of Professional Responsibility ("OPR").[618] For these OPR cases, IHSC staff will conduct interviews, review relevant medical records, and present findings to the IHSC Medical Director.[619] Upon finding that the investigation has substantiated a complaint, the Medical Director will forward the findings to the IHSC Health Care Compliance Division, which will establish a corrective action plan for the relevant facility and monitor compliance.[620]

Detainees receiving medical treatment from an off-site healthcare provider can raise concerns regarding their care in a follow-up visit with detention facility staff.[621] Detainees can also raise concerns through the same procedures applicable to complaints regarding on-site medical care, and IHSC will respond in the same way—with the addition of outreach to the off-site provider for discussions or interviews.[622] If IHSC receives a particularly egregious complaint—or frequent complaints—against an off-site provider, IHSC will attempt to identify a replacement provider in the community with similar expertise.[623] An IHSC official noted to the Subcommittee, however, that because detention facilities often operate "in the middle of nowhere," no comparable specialists may be available.[624] In addition, an October 2021 DHS OIG report similarly noted that "[r]emote locations and reluctance among some medical specialists to treat detainees reduce access to specialty care."[625] In this case, IHSC will recommend that ICE transfer the complaining detainee to another facility near another specialist who can provide the same treatment, if medically indicated.[626]

Finally, as explained in more detail in Section B below, IHSC has begun to engage in limited vetting efforts for physicians providing off-site care, including a review of board certifications, records of adverse actions, and the HHS OIG List of Excluded Individuals/Entities.[627]

---

[618] Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).
[619] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (May 17, 2021).
[620] *Id.*
[621] *Id.*
[622] *Id.*
[623] *Id.*
[624] *Id.*
[625] U.S. Department of Homeland Security, Office of Inspector General, *Many Factors Hinder ICE's Ability to Maintain Adequate Staffing at Detention Facilities* (OIG-22-03) (Oct. 29, 2021) (https://www.oig.dhs.gov/reports/2022/many-factors-hinder-ices-ability-maintain-adequate-medical-staffing-detention-facilities/oig-22-03-oct21).
[626] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (May 17, 2021).
[627] *Id*. HHS OIG possesses the authority to exclude individuals and entities from federally funded health care programs for various reasons, including for Medicare or Medicaid fraud. HHS OIG maintains a list of these individuals and entities and routinely updates this list on its website. U.S. Department of Health and Human Services, Office of Inspector General, *Exclusions Program* (oig.hhs.gov/exclusions/).

### B. ICE Had Limited Capabilities to Vet Off-Site Medical Providers or Monitor Their Medical Practices

As part of its investigation into the role ICE could or should have played in preventing alleged medical abuses against ICDC detainees, the Subcommittee conducted three interviews with a group of senior IHSC officials, interviewed senior officials from the ICE Atlanta Field Office, interviewed the IHSC employee responsible for approving surgical procedures at ICDC, received narrative responses and statistics from the agency, and reviewed nearly 17,000 pages of medical records, complaints, and other internal ICE materials. The Subcommittee's review suggests that ICE lacked—and continues to lack—key tools to detect or deter any off-site provider performing unnecessary or excessive medical treatments for ICE detainees.

The only vetting ICE performed on Dr. Amin before he began treating ICDC detainees was to confirm that he was a licensed doctor and affiliated with an accredited hospital. ICE also failed to identify any treatment by Dr. Amin as potentially excessive or unnecessary and did not maintain a utilization review process to detect high numbers of medical procedures by off-site physicians that might indicate medical waste, fraud, or abuse.[628] ICE was also unaware of any detainee complaints against Dr. Amin before the public allegations emerged in September 2020.[629] IHSC officials explained to the Subcommittee that ICE policies do not require detention facilities to forward all medical grievances to ICE. Instead, FMCs will review grievances during their site visits to facilities.

The FMC assigned to ICDC, however, did not conduct a site visit between January 2018 and October 2020—a period in which Dr. Amin billed ICE for hundreds of procedures. Finally, ICE does not maintain policies and procedures to monitor the use of language translation services by off-site providers, ensure off-site providers obtain informed consent from detainees, or review the appropriateness of medical care at hospitals providing off-site services.

#### i. ICE Did Not Have a Thorough Process in Place to Vet Dr. Amin Before He Began Treating ICDC Detainees

In a statement to the Subcommittee, ICE explained that "[a]t the time Dr. Amin became a provider for detainees at ICDC in 2014, ICE did not have an independent vetting process for licensed medical providers in the community, though it has since begun implementing such a process."[630] IHSC officials told the Subcommittee that ICE authorized physicians to treat

[628] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

[629] *June 23, 2021 ICE Q&A Paper*, *supra* note 14.

[630] *Id*. By comparison, the Centers for Medicare & Medicaid Services ("CMS") Center for Program Integrity ("CPI") screens providers for enrollment into the Medicare program, and states are required to screen providers for enrollment into their Medicaid programs. (States may utilize CMS's screening of providers in lieu of conducting state screenings for providers enrolling in both Medicare and Medicaid.) CMS utilizes contractors to conduct the screening of providers. Contractor screening procedures include checking the provider's licensure status, site visits, fingerprint checks, reviewing the HHS OIG Exclusion List, and reviewing other databases for felony convictions and other adverse actions. Providers may be disqualified from Medicare enrollment for not having a valid license, failing the site visit, having a felony conviction, being on the HHS OIG Exclusion List, or other grounds specified in regulation pertaining to program integrity or non-compliance. CMS also has established a Preclusion List, which is

detainees if the provider had a valid license and hospital credentials.[631] As a result, IHSC did not maintain an independent vetting process for off-site medical providers or otherwise require a review of these providers before they treated detainees.[632]

IHSC officials stated to the Subcommittee, however, that in October 2019, it began a credentialing process that involves a review of a provider's board certification, records of adverse actions like license suspensions or revocations in the federal National Practitioner Data Bank ("NPDB"), and a check against the List of Excluded Individuals/Entities the HHS OIG maintains.[633] In addition, IHSC started conducting NPDB queries "intermittently" on providers "when there were concerns raised regarding the provision of care."[634] IHSC officials also explained that IHSC might also perform additional research to supplement information in the NPDB.[635]

IHSC officials further explained that in the event IHSC finds a past complaint or investigation, officials will investigate; if the concern was previously adjudicated and resolved in favor of the provider, and the provider is the only provider in a particular community, IHSC will proceed with the provider for a trial period.[636] Officials also stated that IHSC will not use providers who have had their licenses suspended by a medical licensing board or have an extensive history of misconduct, fraud, or malpractice leading to an adverse outcome, such as death or loss of limb.[637] They explained, however, that the reviews IHSC conducts do not

---

a list of providers who are precluded from receiving payment for Medicare Advantage items and services and prescribers where pharmacy claims for Medicare Part D drugs prescribed by them to Medicare beneficiaries are to be rejected or denied. Medicare Advantage plans are required to deny payment for a healthcare item or service furnished by an individual or entity on the Preclusion List and Part D sponsors are required to reject a pharmacy claim (or deny a beneficiary request for reimbursement) for a Part D drug that is prescribed by an individual on the Preclusion List. Providers on the HHS OIG Exclusion List will also appear on CMS's Preclusion List, but some providers on the CMS Preclusion List may not appear on the HHS OIG Exclusion List due to different criteria. Centers for Medicare & Medicaid Services, Briefing with Senate Permanent Subcommittee on Investigations (May 25, 2021); *see also* Centers for Medicare & Medicaid Services, *Preclusion List Frequently Asked Questions (FAQs)* (Dec. 16, 2020) (www.cms.gov/Medicare/Provider-Enrollment-and-Certification/MedicareProviderSupEnroll/Downloads/Preclusion_List_FAQs.pdf); Joe Stefansky, *CMS Preclusion v. OIG Exclusion*, Streamline Verify (Feb. 8, 2021) (www.streamlineverify.com/cms-preclusion-vs-oig-exclusion/).

[631] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

[632] *June 23, 2021 ICE Q&A Paper*, *supra* note 14. In addition, although IHSC enters into Letters of Understanding with hospitals providing medical care to detainees, it does not engage in vetting efforts for these facilities beyond verifying their accreditation. *Id*.

[633] *June 23, 2021 ICE Q&A Paper*, *supra* note 14; U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021); U.S. Immigration and Customs Enforcement, *HSGAC/PSI Interviews with ICE Health Service Corps (IHSC) Personnel Get-backs* (Nov. 5, 2021) (response on file with the Subcommittee); Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01258-60).

[634] Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Apr. 27, 2022).

[635] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021).

[636] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (May 17, 2021).

[637] *Id.*; U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021).

involve obtaining data on claims a provider may have submitted to Medicare and a review of this data for potentially unusual patterns.[638]

The new recruitment process IHSC has instituted is retrospective, meaning that IHSC has focused on off-site providers with no previous Letter of Understanding ("LOU") with IHSC or a prior credentialing review.[639] IHSC has also established LOUs with certain new providers.[640] As part of this process, IHSC has phased in a requirement that providers submit a "provider packet" to ICE that includes a LOU, recruitment letter, and forms needed for reimbursement.[641]

As of June 28, 2021, 5,044 off-site specialty providers treated detainees in ICE custody, and IHSC completed retrospective reviews for only 96 providers, reviews were in progress for 55 providers, and reviews were pending for 70 providers.[642] According to IHSC, no providers had been disqualified under the new independent vetting system as of September 2021.[643] IHSC has noted that it will increase the amount of LOUs processed each year as it expands its staffing.[644]

ICE had not completed the process described above for Dr. Amin at the time of the public allegations against him in September 2020.[645] A December 30, 2020, email to a senior IHSC official noted that the LOU process was not started for Dr. Amin "due to the back log of 100+ recruitment requests pending for LOU's [sic] and 100+ in progress. [...] The credentialing process was not completed either."[646]

After learning of the September 2020 allegations, however, ICE searched for information concerning Dr. Amin in the HHS OIG List of Excluded Individuals/Entities and did not find any information indicating he had been excluded or debarred.[647] ICE found that Dr. Amin held an active license from the Medical Board of Georgia and did not discover any public board actions

---

[638] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021). ICE noted to the Subcommittee that the credentialing process includes a check of the HHS OIG List of Excluded Individuals/Entities, which is a "list of 'bad actors.'" Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).
[639] U.S. Immigration and Customs Enforcement, *PSI Briefing Get Backs* (July 26, 2021).
[640] *Id*. An LOU will explain that the provider will accept Medicare rates, provide IHSC with access to medical records, and perform an agreed set of services. U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021).
[641] *June 23, 2021 ICE Q&A Paper*, *supra* note 14; Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 7, 2022) (Tranche 3, 01072).
[642] U.S. Immigration and Customs Enforcement, *PSI Briefing Get Backs* (July 26, 2021) (response on file with the Subcommittee).
[643] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).
[644] U.S. Immigration and Customs Enforcement, *PSI Briefing Get Backs* (July 26, 2021) (response on file with the Subcommittee).
[645] *June 23, 2021 ICE Q&A Paper*, *supra* note 14.
[646] Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Sept. 17, 2021) (Tranche 7, 2010).
[647] *June 23, 2021 ICE Q&A Paper*, *supra* note 14; Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Sept. 27, 2021) (Tranche 10, 3041).

against him.[648] ICE also found that Dr. Amin held privileges at Coffee Regional Hospital and ICH and was a board eligible OB-GYN.[649] Finally, ICE noted that it reviewed documents related to prior medical malpractice settlements paid by Dr. Amin and his 2015 settlement with DOJ—but again, this occurred *after* the September 2020 allegations.[650]

According to IHSC, under the new independent vetting process, these adverse actions would be reviewed but would only be "red flags" if any allegations were substantiated.[651] Therefore, if the new vetting system had been applied to Dr. Amin, based on IHSC's assessment that the information in the NPDB were only allegations and not substantiated as the claims were "settled" without a determination of liability, and the fact that the state of Georgia had never restricted Dr. Amin's license or otherwise intervened at any point, ICE would not necessarily have disqualified him from treating ICE detainees.[652]

An IHSC official also explained to the Subcommittee that in no scenario would an off-site provider undergo a peer review.[653] ICE later noted that community-based providers are not ICE employees or contractors and therefore not subject to ICE's peer-review requirements.[654] An IHSC official told the Subcommittee that because peer reviews are standard practice in the medical community, IHSC made a "reasonable assumption" that ICH and its treatment oversight board reviewed Dr. Amin's treatment and charts.[655]

### ii. ICE Never Identified Any Treatment by Dr. Amin as Potentially Excessive or Unnecessary and Lacked a Utilization Review Process to Identify Trends in Off-Site Medical Treatment

IHSC never identified any treatment by Dr. Amin as potentially excessive or unnecessary. When asked about the fact that the volume of procedures Dr. Amin performed on ICDC detainees was substantially out of proportion to the number of OB-GYN procedures performed by any other OB-GYN treating ICE detainees, IHSC officials explained that the disparity alone was not reason for alarm and that the surgeries were approved on a case-by-case basis by IHSC.[656]

In addition, before September 2020, IHSC never sought to determine whether any of the OB-GYN procedures Dr. Amin performed were medically necessary beyond the initial approval

[648] *Id.*
[649] *Id.* "Board eligible" refers to a physician who has completed the requirements necessary before undergoing a board examination, but who has not taken or passed the examination. MedicineNet, *Medical Definition of Board Eligible* (www.medicinenet.com/board_eligible/definition.htm) (accessed Nov. 13, 2022).
[650] *June 23, 2021 ICE Q&A Paper*, *supra* note 14.
[651] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).
[652] *Id.*
[653] IHSC officials told the Subcommittee that it conducts peer reviews of its staff at IHSC facilities. *Id.*
[654] Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).
[655] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).
[656] *Id.*

process.[657] ICE further noted to the Subcommittee that because "Dr. Amin is a community provider who owns and operates his own private practice and he is not an ICE employee or contractor," no corrective actions in response to allegations concerning his treatment were available during the period in which he treated ICDC detainees.[658]

In interviews with the Subcommittee, IHSC officials explained that until recently, IHSC did not maintain a real-time or automated system to detect high numbers of medical procedures by off-site physicians that might be indicative of waste, fraud, or abuse.[659] As ICE stated to the Subcommittee in November 2021, "IHSC does not have a utilization review process in place to identify overutilization of medical procedures."[660] Although the VAFSC—the entity responsible for processing claims from off-site providers—has certain limited capabilities to detect suspicious activity, IHSC officials noted to the Subcommittee that these functions are "not impressive," and VAFSC does not automatically screen or report claims to ICE for waste, fraud, or abuse.[661] Essentially, VAFSC currently focuses only on the existence of an authorization for a particular medical procedure.[662]

Because IHSC has not obtained satisfactory "deep dive" metrics on waste, fraud, and abuse from its current arrangement with VAFSC, it has recently worked to transition to an electronic claims management system—the Electronic Claims Adjudication Management System ("eCAMS")—from VAFSC to more efficiently adjudicate claims.[663] IHSC officials estimated that IHSC could begin using eCAMS in fiscal year 2022.[664]

---

[657] *Id*.
[658] *June 23, 2021 ICE Q&A Paper*, *supra* note 14.
[659] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (May 17, 2021); U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021); U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021). In contrast, the CMS Center for Program Integrity utilizes contractors to conduct various reviews at different points during the Medicare payment process. According to CMS officials, CMS receives over 1.2 billion Medicare claims a year, and CMS reviews less than 1 million. Medical Review Contractors conduct primarily prepayment reviews and prior authorizations and Recovery Audit Contractors conduct post-payment reviews. All payment reviews are informed by data analytics. CMS review contractors must adhere to statute, regulations, and the Medicare Program Integrity Manual, and CMS conducts oversight of its contractors to ensure they make accurate decisions. Centers for Medicare & Medicaid Services, Briefing with Senate Permanent Subcommittee on Investigations (May 25, 2021).
[660] U.S. Immigration and Customs Enforcement, *HSGAC/PSI Interviews with ICE Health Service Corps (IHSC) Personnel Get-backs* (Nov. 5, 2021) (response on file with the Subcommittee).
[661] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (May 17, 2021).
[662] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021).
[663] *Id.;* U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (May 17, 2021).
[664] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Permanent Subcommittee on Investigations (June 23, 2021).

The current IHSC system is around 20 years old.[665] This new claims processing system "will support fraud, waste, and abuse [] reviews related to medical claims."[666] In June 2021, IHSC procured national care guidelines from Milliman Care Guidelines and has begun using a web-based application from this entity for utilization review of ICE medical claims, beginning with a retrospective review of these claims.[667]

According to IHSC, the Milliman Care Guidelines "will be used for [utilization review] in retrospective, concurrent, and prospective formats when used in its fullest potential."[668] Although IHSC has not established the criteria and process for investigations regarding instances of suspected waste, fraud, or abuse flagged by the new system, the investigations will be conducted by "trained [Certified Professional Medical Auditors] based on established criteria, national care guidelines [Milliman Care Guidelines], as well as related CMS and Title 18 regulations."[669]

Although IHSC is unable to identify trends using VAFSC, IHSC officials explained to the Subcommittee that RCDs may report unusually frequent numbers of referrals to a certain provider.[670] In an interview with the Subcommittee, an IHSC official with first-hand knowledge of RCD practices confirmed that reporting a high number of referrals was part of the RCD's responsibilities.[671]

However, in an interview with the RCD specifically responsible for approving surgical referrals for ICDC detainees, the RCD stated to the Subcommittee that they did not track the total number of referrals to off-site providers or referrals by types of surgical procedures and, in fact, did not "track referrals at all."[672] Instead, to determine whether the number of referrals was unusual, the ICDC RCD would review factors such as the population at a facility. The ICDC

---

665 *Id.*

666 *June 23, 2021 ICE Q&A Paper*, *supra* note 14.

667 U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021); Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021); Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01254).

668 Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01254).

669 Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01256).

670 U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (May 17, 2021). ICE noted to the Subcommittee that even if an outlier was identified, it would require a review of medical records and consultation with an expert physician to make a determination of over-utilization and/or inappropriate medical services. Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021); U.S. Immigration and Customs Enforcement Health Service Corps Official Regional Clinical Director, Interview with Senate Permanent Subcommittee on Investigations (Feb. 14, 2022).

671 U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (May 17, 2021).

672 U.S. Immigration and Customs Enforcement Health Service Corps Official Regional Clinical Director, Interview with Senate Permanent Subcommittee on Investigations (Feb. 14, 2022).

RCD stated that they did not compare off-site providers in question to other off-site providers or facilities to determine a high number of referrals.[673]

The ICDC RCD stated that they did not flag any referrals for Dr. Amin.[674] The ICDC RCD stated to the Subcommittee that they were not concerned with the disparities in procedures between Dr. Amin and the other off-site providers as discussed above because some facilities housed a larger female population than other facilities, and questioned "why should I be concerned."[675] Furthermore, the RCD stated that RCDs in general are not required to provide regular reports relating to referrals to IHSC.[676]

IHSC stated that it intends to provide nationally-recognized steps for RCDs to follow before approving referrals for medical procedures.[677] As mentioned above, IHSC does not currently provide guidance to RCDs regarding the referral approval process.[678] For example, IHSC does not provide guidance to RCDs for determining the medical necessity of a D&C procedure, and the review process for a hysterectomy is the same for a hernia.[679] The ICDC RCD stated to the Subcommittee that they considered the detainee's needs and factored in the psychological impact of undergoing surgery while detained.[680] This RCD stated that they relied mainly on their medical training and expertise when evaluating referrals.

In an interview with the Subcommittee, however, the ICDC RCD stated they had no additional training specific to the OB-GYN specialty since residency rotations in the 1980s and 1990s.[681] IHSC explained to the Subcommittee that while this review process "previously relied on clinical judgment of individual medical experts, the new system will combine clinical judgment with an approach that includes nationally recognized community standards of care based on evidence-based practice (EBP) and will also allow IHSC to collect more information and facilitate more efficient and effective reviews."[682]

### iii. ICE Performed a Limited Investigation Following the Public Allegations Against Dr. Amin

Dr. Amin stopped seeing ICE detainees in September 2020, after the publication of the whistleblower allegations.[683] IHSC conducted a limited review of medical records for his

---

673 *Id.*
674 *Id.*; *see also* Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01255).
675 U.S. Immigration and Customs Enforcement Health Service Corps Official Regional Clinical Director, Interview with Senate Permanent Subcommittee on Investigations (Feb. 14, 2022).
676 *Id.*
677 U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021).
678 *Id.*
679 U.S. Immigration and Customs Enforcement Health Service Corps Official Regional Clinical Director, Interview with Senate Permanent Subcommittee on Investigations (Feb. 14, 2022).
680 *Id.*
681 *Id.*
682 *June 23, 2021 ICE Q&A Paper*, *supra* note 14.
683 *Id.*

patients, but IHSC officials explained to the Subcommittee that they did not undertake a deeper dive because they were told by ICE ERO leadership to "stand down" and await the completion of the DHS OIG investigation.[684] IHSC officials stated a more extensive evaluation would have required an "in-depth review of the record," which IHSC did not have due to incomplete records from ICDC.[685] IHSC officials informed the Subcommittee that ICH refused to provide additional records to IHSC due to the ongoing DHS OIG investigation.[686]

ICE explained that IHSC conducted a "comparative analysis of medical referrals and claims completed after receiving allegations about Dr. Amin."[687] IHSC did not compare services performed by Dr. Amin to services by other providers for ICDC detainees, "as Dr. Amin saw the majority of OB/GYN patients from 2014 to 2020 and such a comparison would not have been helpful."[688] IHSC did "conduct an analysis of referral and claims data at ICDC compared to other ICE detention facilities housing females and determined that the number of referrals and claims was not abnormal."[689]

More than one year after the public allegations regarding Dr. Amin emerged, IHSC staff expressed uncertainty to the Subcommittee as to why significant disparities existed between the volume of OB-GYN procedures he performed and procedures by other off-site physicians treating detainees.[690] IHSC staff, for example, speculated that ICDC might have had a higher percentage of female detainees than other facilities.[691] Those explanations do not explain the fact that Dr. Amin performed more than 90% of particular OB-GYN procedures when compared to the entire ICE detention network across the United States, and yet the ICDC facility housed just 4% of the female population.

---

[684] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021); Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01257). ICE noted that it is standard practice across DHS components to cease investigations while DHS OIG moves forward with its investigation to mitigate the risk of interfering with the OIG investigation. Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021). Similarly, the decision to "stand down" here was "done to preclude potential interference and/or duplication of effort with DHS OIG." ICE stated that the DHS OIG's investigation "takes precedence over ICE investigations." Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01257).
[685] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021). ICE also reported to the Subcommittee that DHS CRCL has opened numerous investigations into inappropriate medical care provided to female detainees at ICDC, including translation issues, general conditions, and alleged retaliation in response to grievances. Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).
[686] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).
[687] *June 23, 2021 ICE Q&A Paper*, *supra* note 14.
[688] *Id*.
[689] *Id*. Information ICE used in this analysis is discussed in more detail in Section IV above.
[690] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).
[691] *Id*.

IHSC officials also suggested that other factors affecting the number of OB-GYN claims for ICDC detainees could include whether ICDC referred all OB-GYN specialty care off-site, in contrast to policies and capabilities at other detention facilities that might perform routine gynecological exams and treatments on-site.[692] ICE later noted to the Subcommittee, however, that *no* detention facilities would have the capacity to perform D&C procedures or laparoscopies on-site, "as those are [operating room] procedures that need to be performed in an ambulatory surgical center or hospital by [an] OB-GYN."[693]

Relatedly, IHSC officials mentioned anecdotal evidence that in-house ICDC medical staff might have been uncomfortable performing certain procedures like administering Depo-Provera injections, leading to a higher volume of shots administered by Dr. Amin.[694] ICE later explained, however, that IHSC did not review whether facilities administered Depo-Provera shots or pelvic exams on-site and may not have been able to make this determination, given that non-IHSC-run detention centers would not have reported this care to IHSC.[695] IHSC also identified other factors relevant to an analysis of OB-GYN claims, including age, pregnancy and birth history, previous pelvic and birth history, previous pelvic infections, and surgical history for female detainee populations.[696]

However, IHSC officials did not take the factors described above into account when analyzing the data it compiled for Dr. Amin's treatments because it would have involved "a huge undertaking," and IHSC had discontinued its efforts due to the DHS OIG investigation.[697]

As mentioned above, IHSC found that Dr. Amin only performed two hysterectomies,[698] and ICE stated to the Subcommittee that "medical records show that both procedures were medically necessary."[699] According to IHSC officials, substantial intramural fibroids and cervical cancer were the medical indications for the two procedures.[700] IHSC further determined that "Dr. Amin performed total hysterectomies on less than 1% of those detainees to whom he provided OB/GYN services," which it described as "not excessive" given hysterectomy rates among the U.S. female population.[701]

---

692 *Id.*
693 U.S. Immigration and Customs Enforcement, *HSGAC/PSI Interviews with ICE Health Service Corps (IHSC) Personnel Get-backs* (Nov. 5, 2021) (response on file with the Subcommittee).
694 U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).
695 U.S. Immigration and Customs Enforcement, *HSGAC/PSI Interviews with ICE Health Service Corps (IHSC) Personnel Get-backs* (Nov. 5, 2021) (response on file with the Subcommittee).
696 Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).
697 U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).
698 Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Sept. 27, 2021) (Tranche 10, 3039).
699 *June 23, 2021 ICE Q&A Paper*, *supra* note 14.
700 U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).
701 *June 23, 2021 ICE Q&A Paper*, *supra* note 14.

After the conclusion of its limited review, IHSC produced an internal summary memorandum for DHS headquarters dated October 5, 2020, which included recommendations regarding prior authorization and concurrence utilization review—a review of medical services while the patient receives these services—as well as continuing the LOU process with off-site providers and related credentialing process.[702] IHSC further recommended working with ICDC and LaSalle staff to secure community OB-GYN services for ICDC detainees and suggested that the FMC assigned to ICDC conduct a site visit as soon as possible.[703] These recommendations have been implemented throughout all contract facilities with IHSC, including ICDC prior to September 2021 when the contract ended.

#### iv. ICE Personnel Failed to Conduct Site Visits to ICDC Between January 2018 and October 2020

As noted above, ICE policies state that FMCs should conduct at least one site visit per year at non-IHSC facilities to ensure these facilities have complied with contractual detention standards.[704] However, an investigation that former DHS Acting Deputy Secretary Ken Cuccinelli began into ICDC allegations in the fall of 2020 found that the FMC responsible for ICDC had not visited the facility in several years.[705] Mr. Cuccinelli stated that he was alarmed by the prospect of involuntary hysterectomies and formed a three-person team to inspect the ICDC facility, review detainee medical records, and interview female detainees over the course of approximately one week in the fall of 2020.[706]

Mr. Cuccinelli told the Subcommittee finding that the FMC had not visited the facility in several years "was not a favorable discovery" and stated: "You would think the people responsible for medical care would get to the … facility."[707] After his team's initial review, in which they tentatively determined that involuntary hysterectomies were not occurring, Mr. Cuccinelli stated he was primarily concerned with the FMC's lack of visits to ICDC.[708]

The October 5, 2020, IHSC memorandum mentioned above confirmed this finding from the Cuccinelli investigative team. The memorandum explained that the last FMC site visit to

[702] According to ICE, the agency is in the process of implementing these recommendations. Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Sept. 27, 2021) (Tranche 10, 3037-42) (notes on file with the Subcommittee); U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021); Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Feb. 11, 2022).

[703] Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Sept. 27, 2021) (Tranche 10, 3037-42) (notes on file with the Subcommittee).

[704] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021); U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

[705] Ken Cuccinelli, Interview with Senate Permanent Subcommittee on Investigations (Sept. 20, 2021).

[706] *Id.*; *see also* Natalie Andrews and Michelle Hackman, *U.S. Opens Investigation into Claims of Forced Hysterectomies on Detained Migrants*, The Wall Street Journal (Sept. 16, 2020) (www.wsj.com/articles/lawmakers-seek-investigation-into-allegations-of-mass-hysterectomies-on-detained-migrants-11600291610).

[707] Ken Cuccinelli, Interview with Senate Permanent Subcommittee on Investigations (Sept. 20, 2021).

[708] *Id*.

ICDC was conducted on January 8, 2018, and no site visit occurred in 2019 "due to the government shut down at the beginning of the year and [temporary staffing] requirements for FMCs which made scheduling and completing the ICDC site visit difficult."[709] The memorandum further explained that the FMC "prioritized" site visits to facilities that had major findings and non-compliance with standards during the 2018 site visits.[710] An IHSC official told the Subcommittee that IHSC prioritizes facilities that have had serious medical concerns in the past, and "ICDC was not one of those facilities."[711] In addition, the FMC completed a site visit to Stewart Detention Facility in Lumpkin, Georgia, instead of ICDC in 2019 because "Stewart had recently transitioned to an IGSA."[712] A site visit was scheduled for ICDC in March 2020, but that visit did not occur due to the COVID-19 pandemic, and the FMC "prioritized ICDC for an onsite visit in October 2020."[713]

According to an IHSC official, the October 2020 ICDC site visit did, in fact, occur and no significant medical deficiencies were identified.[714] ICE also noted to the Subcommittee that ICDC received site visits from the Nakamoto Group in June 2018, June 2019, and September 2020, as well as an ODO visit in March 2020, and that ICE CMD had a DSCO assigned to ICDC.[715]

---

[709] Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Sept. 27, 2021) (Tranche 10, 3038). An IHSC official explained that IHSC clinical staff is required to support ITOS (IHSC Temporary Duty On-call Schedule) efforts for 30 days each year to address staffing shortages. Another IHSC official stated that IHSC staff is constantly pulled into activities such as COVID-19 testing for U.S. Customs and Border Protection, making site reviews difficult. This official told Subcommittee staff that ICE leadership is aware that other activities will "fall off" as a result. U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021). A recent DHS OIG report noted that "FMC resources are…limited; approximately 40 FMCs are responsible for oversight of 148 non-IHSC staffed ICE detention facilities." In response, ICE noted that it had analyzed FMC staffing levels and "concluded that it was necessary to add FMC positions. ICE officials stated that formal presentation of the evaluation and staffing recommendations is pending, but that some new positions were created." U.S. Department of Homeland Security, Office of Inspector General, *Many Factors Hinder ICE's Ability to Maintain Adequate Staffing at Detention Facilities* (OIG-22-03) (Oct. 29, 2021) (https://www.oig.dhs.gov/reports/2022/many-factors-hinder-ices-ability-maintain-adequate-medical-staffing-detention-facilities/oig-22-03-oct21).

[710] Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Sept. 27, 2021) (Tranche 10, 3038).

[711] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021). This official also stated that complications due to ITOS responsibilities—a temporary duty on-call schedule for the IHSC clinical workforce—was a reasonable explanation for the absence of a site visit to ICDC in 2019. *Id.*

[712] Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Sept. 27, 2021) (Tranche 10, 3038).

[713] *Id.*

[714] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021). The 2020 ICDC site visit report found the facility compliant with the standards and noted that "[t]here were no areas of concern noted during reviews of medical records, facility processes, procedures, and policy." Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 14, 2022) (Tranche 5, 01095).

[715] Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021). ICDC received a "Meets Standard" rating from the Nakamoto Group for each inspection from 2018 to 2020 and met the ICE PBNDS. The Nakamoto Group did not identify significant medical deficiencies. Information on the March 2020 ODO site visit is discussed in more detail in Section II above.

### v. ICE Is Not Required to Monitor the Use of Language Translation Services by Off-Site Medical Providers

IHSC does not monitor the use of language translation services by non-IHSC facilities, such as ICDC, although it tracks the use of these services in IHSC-staffed facilities on a yearly basis and audits invoices to the translation vendor.[716] Similarly, IHSC does not monitor use of language translation services by off-site providers even though it provides a phone number and code for a "language line translator" with a referral to an off-site specialist.[717] IHSC officials stated to the Subcommittee that they believe each provider has a professional responsibility to provide language services to ensure their patients understand each proposed treatment—and neither IHSC nor the relevant detention facility plays a role in ensuring a provider meets this responsibility.[718]

Internal ICE emails appear to confirm that ICE does not monitor the use of language translation services by off-site medical providers. In a September 17, 2020, email to ICE officials, a *New York Times* reporter asked whether ICE had records of Dr. Amin's use of translation or interpretation services for ICDC detainees.[719] An ICE Atlanta Field Office official later sent an internal email stating that Dr. Amin "uses a language line service," but "we do not track his usage."[720]

### vi. ICE Is Not Required to Ensure Off-Site Medical Providers Obtain Informed Consent

ICE detention standards define informed consent as: "An agreement by a patient to a treatment, examination, or procedure after the patient receives the material facts about the nature,

---

Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (June 8, 2021) (668-703); Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Jan. 31, 2022) (Tranche 2, 00295-893).

716 U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021); U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021). According to IHSC officials, ICE ODO and DHS CRCL monitor the use of language services in non-IHSC facilities and will indicate any deficiencies related to these services in their reports. U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

717 U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021). Documents reviewed by the Subcommittee showed that off-site referrals included a phone number and code for a translator. *See, e.g.*, LaSalle_333444; LaSalle_333490; LaSalle_333516.

718 U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

719 Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Oct. 27, 2021) (Tranche 17, 11058).

720 Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Oct. 27, 2021) (Tranche 17, 11057).

consequences, and risks of the proposed treatment, examination or procedure; the alternatives to it; and the prognosis if the proposed action is not undertaken."[721]

As with language translation services, ICE does not monitor off-site providers to ensure they obtain informed consent from detainees before providing medical services.[722] Instead, IHSC officials explained to the Subcommittee that providers have a professional responsibility to obtain informed consent and include consent forms with medical records, and hospitals have an incentive to obtain consent to avoid risking their accreditation.[723] As a result, neither IHSC officials—including RCDs—nor detention facilities like ICDC have a role in ensuring providers fulfill these responsibilities.[724] In fact, the ICDC RCD had "no idea" what the process was for obtaining consent for a surgical procedure from a detainee.[725]

During its limited investigation into allegations concerning Dr. Amin, IHSC searched for consent forms related to certain detainee patients and found that forms were missing in some cases.[726] According to IHSC, this was "not best practices,"[727] and IHSC officials reinforced to ICDC the importance of maintaining full records for all off-site medical procedures.[728] Mr. Cuccinelli identified a major concern related to female ICDC detainees who indicated they did not understand or consent to treatments Dr. Amin performed.[729] Mr. Cuccinelli also stated that "there was definitely a disconnect" in the patient-doctor relationship, and detainees were not in a position to understand the procedures that occurred, "which is in itself inadequate."[730]

Internal communications also appear to confirm that ICE relied on off-site providers to meet their professional obligation to obtain consent instead of verifying that detainees provided consent or auditing consent documents after treatments. For example, in an email exchange from

---

[721] U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, *Performance-Based National Detention Standards 2011*, at 469-470 (Revised December 2016) (https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf).
[722] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).
[723] *Id.;* U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021). IHSC officials and medical staff at randomly selected facilities stated to the Government Accountability Office that "ICE expects community providers, as licensed medical professionals, to execute all aspects of informed consent when providing care to detained noncitizens," and that "it is the responsibility of the off-site community provider to obtain and document informed consent." Government Accountability Office, *Immigration Detention: ICE Needs to Strengthen Oversight of Informed Consent for Medical Care*, 15 (GAO-23-105196) (Oct. 2022) (https://www.gao.gov/products/gao-23-105196).
[724] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021); U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021); U.S. Immigration and Customs Enforcement Health Service Corps Official Regional Clinical Director, Interview with Senate Permanent Subcommittee on Investigations (Feb. 14, 2022).
[725] U.S. Immigration and Customs Enforcement Health Service Corps Official Regional Clinical Director, Interview with Senate Permanent Subcommittee on Investigations (Feb. 14, 2022).
[726] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).
[727] *Id.*
[728] *Id.*
[729] Ken Cuccinelli, Interview with Senate Permanent Subcommittee on Investigations (Sept. 20, 2021).
[730] *Id.*

September 2020, an official from the Consulate General of Mexico stated that the medical file for Y.J.—a Mexican national who was subject to gynecological procedures by Dr. Amin while detained at ICDC—was missing consent forms and asked an ICE Atlanta Field Office official "how consent is obtained from detainees and if there are any forms they have to sign to submit themselves to invasive procedures."[731] This ICE official replied by stating that "[c]onsent forms are obtained by the surgeon" and that "files are maintained at his office and at the hospital."[732]

Recently, the Government Accountability Office ("GAO") conducted a review of 48 medical files from six ICE detention facilities across the country.[733] GAO determined that these facilities generally documented informed consent for care provided within the facility's medical unit.[734] Like ICDC, however, GAO determined that most facilities reviewed did not include consent documentation in medical records for off-site medical care.[735] GAO highlighted that ICE policies do not require detention facilities to obtain documentation of informed consent for off-site medical care.[736] GAO recommended: (1) ICE should establish and communicate a policy requiring IHSC-staffed facilities to collect informed consent documentation for medical care from community providers; (2) ICE should require non-IHSC-staffed detention facilities to collect informed consent documentation for medical care from community providers; and (3) ICE should include a review of these policies in its oversight mechanisms once they are established.[737]

#### vii. ICE Conducts Limited Oversight of Hospitals Providing Off-Site Services for Non-IHSC Detention Facilities

ICE conducts limited oversight of hospitals providing off-site care to ICE detainees. IHSC, for example, did not maintain a written agreement or contract with ICH while ICDC housed detainees, and IHSC officials indicated that any agreement with the hospital would be at the "local level."[738] Although ICE has begun entering into LOUs with hospitals, as mentioned above, it never concluded an LOU with ICH.[739] However, according to ICE, an LOU is not a contract or agreement that directs hospitals on how to provide medical care and other services to

[731] Citizens for Responsibility and Ethics in Washington, National Immigration Project of the National Lawyers Guild, and Project South, *Deliberate Indifference: Records Show ICE's Systemic Failures at Georgia Detention Facility at the Center of Gynecological Abuse Investigations* (June 2021) (nipnlg.org/PDFs/2021_03June_ICE-ICDC-Report.pdf).
[732] *Id.*
[733] Government Accountability Office, *Immigration Detention: ICE Needs to Strengthen Oversight of Informed Consent for Medical Care* (GAO-23-105196) (Oct. 2022) (https://www.gao.gov/products/gao-23-105196).
[734] *Id.*
[735] *Id.*
[736] *Id.*
[737] *Id.*
[738] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021). As noted above, ICDC detainees received OB-GYN services at ICH due to Dr. Amin's affiliation with the hospital.
[739] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

detainees.[740] Before ICH began treating ICDC detainees, IHSC also did not conduct any reviews to determine whether the hospital had been the subject of previous allegations concerning medical waste, fraud, or abuse.[741]

IHSC officials said they intend to review inpatient hospital admissions using the Milliman Care Guidelines as part of IHSC's new utilization review process, but no reviews have been performed to date.[742] IHSC also has not required hospitals to submit regular reports or other information concerning the treatment of detainees, with the exception of clinical updates regarding in-patient care, and it does not provide guidance or policies to hospitals regarding appropriate treatment.[743]

## VII. ICDC HAD LIMITED OBLIGATIONS TO CONDUCT OVERSIGHT OF OFF-SITE CARE FOR DETAINEES

LaSalle, the contractor who operated the ICDC facility, says it played a very limited role in vetting off-site physicians treating detainees from ICDC, reviewing the medical care they administered, or ensuring that detainees provided informed consent in connection with these procedures. LaSalle and ICDC employees were also unaware of any review by ICDC staff prior to the September 2020 complaint that revealed abuse, waste, or fraud in connection with care Dr. Amin provided or any complaints or grievances from ICDC detainees concerning Dr. Amin.

Finally, LaSalle and ICDC conducted a limited review of medical records for ICDC detainees who had received gynecological surgical procedures from Dr. Amin following the public allegations against him. LaSalle Medical Director Dr. Hearn could not make a conclusive determination regarding the appropriateness of the gynecological care Dr. Amin provided. LaSalle representatives stated to the Subcommittee that no ICDC employee had authority or responsibility related to the quality or nature of care off-site physicians provided—only the duty to negotiate and maintain arrangements with these physicians.

### A. LaSalle Had Minimal Contractual Obligations Concerning Off-Site Medical Care at ICDC

In interviews with the Subcommittee, ICDC officials described limited efforts to vet Dr. Amin before he provided care to ICDC detainees or review the care he eventually provided. For example, ICDC Warden Paulk, Deputy Warden Frank Albright, and Medical Director Dr.

[740] ICE noted to the Subcommittee that LOUs are only intended to describe the services the provider can offer and to ensure the provider agrees to accept Medicare reimbursement rates. Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).
[741] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).
[742] *Id.*; Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01254); Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022). *See also* Milliman Care Guidelines, *Industry-Leading Evidence-Based Care Guidelines* (https://www.mcg.com/care-guidelines/care-guidelines/) (accessed Nov. 13, 2022).
[743] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

McMahan were unaware of the 2015 settlement between Dr. Amin and other parties and DOJ or the previous malpractice lawsuits against Dr. Amin.[744] Dr. McMahan also stated that he was not aware of any efforts by ICDC to vet Dr. Amin before he began treating ICDC detainees.[745]

LaSalle representatives explained to the Subcommittee that the company plays no role in vetting off-site medical providers for detainees.[746] Dr. Hearn, Medical Director for LaSalle, also confirmed that LaSalle employees play no role in vetting off-site providers.[747] All current ICDC and LaSalle employees the Subcommittee interviewed indicated they became aware of recent allegations against Dr. Amin only through the public disclosures in September 2020.[748]

LaSalle explained to the Subcommittee that the IGSA between ICDC and ICE required only that ICDC "ensure…access to an offsite emergency medical provider at all times."[749] Moreover, according to LaSalle's contract with ICE, the only obligation of the HSA related to this issue was, in collaboration with ICE, to "negotiate[] and maintain[] agreements with nearby medical facilities or health care providers to provide required health care not available within the facility."[750]

Regarding oversight of medical care by Dr. Amin, Dr. McMahan explained that the HSA, in accordance with her general oversight concerning access to care, and the DON might have become aware of certain aspects of care by off-site providers and would consult with him, as the facility's Medical Director, on occasion.[751] Dr. McMahan, however, could not recall any particular circumstances in which these officials referred a patient who had seen Dr. Amin to him for further oversight.[752]

---

[744] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021); David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021); Frank Albright, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 21, 2021).
[745] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021).
[746] Counsel for LaSalle, Briefing with Senate Permanent Subcommittee on Investigations (May 19, 2021).
[747] Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021).
[748] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021); David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021); Frank Albright, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 21, 2021); Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021).
[749] LaSalle_048633-89; Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).
[750] LaSalle_027934-37; Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).
[751] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021); LaSalle_027935.
[752] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021).

Former HSA Brown confirmed that she did not recall any instance in which she asked Dr. McMahan to review care Dr. Amin provided.[753] She also stated that she was not aware which ICDC employees were able to monitor or review the treatment Dr. Amin provided to ICDC detainees.[754] Additionally, Dr. Hearn stated to the Subcommittee that she was not aware of any efforts at the detention center level, in general, to oversee the care detainees receive from off-site providers.[755] She did recall, however, instances in which she had reviewed the volume of referrals to off-site providers from detention centers for signs of waste, fraud, or abuse, pursuant to her authority to make decisions regarding "the deployment of health resources" to "support the delivery of health care services."[756]

In addition, former HSA Brown did not recall undertaking any analysis of medical treatment by Dr. Amin prior to the public allegations against Dr. Amin.[757] Warden Paulk and Deputy Warden Albright were not aware of any review of Dr. Amin by ICDC staff, prior to September 2020, that revealed irregularities or indications of waste, fraud, and abuse in the treatment Dr. Amin provided to detainees.[758] Dr. Hearn was similarly unaware of any review of this kind taking place before the public allegations against Dr. Amin.[759] In addition, none of the ICDC employees the Subcommittee interviewed were aware of efforts to review trends related to detainees refusing to receive treatment from Dr. Amin.[760] In an interview with the Subcommittee, former HSA Brown recalled one complaint from a detainee in November 2018 refusing to see Dr. Amin because she "felt uncomfortable" and requested a different provider.[761]

---

753 Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022). According to LaSalle, former HSA Brown did not have "access to sufficient records to enable such a review." Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).
754 Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).
755 Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021).
756 *Id.*; LaSalle_027935; Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).
757 Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022). According to LaSalle, former HSA Brown did not have "access to records sufficient to undertake" any analysis of medical treatment by Dr. Amin. Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).
758 David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021); Frank Albright, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 21, 2021).
759 Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021).
760 *Id.*; Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021); David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021); Frank Albright, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 21, 2021); Amber Hughes Strout, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 22, 2021); Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).
761 Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).

Dr. McMahan also explained to the Subcommittee that he was unaware of any issues with Dr. Amin failing to obtain informed consent from detainee patients, and Warden Paulk was similarly unaware of any concerns that detainees may not have provided informed consent.[762] Former HSA Brown told the Subcommittee that off-site providers were responsible for obtaining informed consent from the detainee in the language understood by the detainee.[763] She did not recall ICDC medical unit staff having access to detainees' records from an off-site visit to review for a record of consent or having the ability to monitor off-site providers to ensure consent procedures were followed.[764]

Dr. Hearn explained to the Subcommittee that detention center staff play no role in ensuring off-site providers obtain informed consent from detainees.[765] Similarly, LaSalle representatives stated that responsibility for obtaining informed consent for off-site treatment lies with the relevant healthcare provider.[766] Relatedly, Dr. Hearn also stated that staff would play no role in verifying that detainees receive language translation services during off-site care.[767] Former HSA Brown confirmed that ICDC medical unit staff could not verify off-site providers' use of translation services and stated that it is the responsibility of the off-site provider to obtain consent and ensure that an interpreter is utilized.[768]

ICDC officials were also unaware of the existence of any complaints or grievances by ICDC detainees concerning Dr. Amin and no records of complaints or grievances concerning his care were discovered by ICDC, with the exception of the complaint former HSA Brown recalled discussed above and an email that Warden Paulk stated he received in November 2018 from the

---

[762] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021); David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021).
[763] Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022). This was in accordance with ICE 2011 PBNDS, Section 4.3 V.D ("Informed consent shall be obtained prior to providing treatment (absent medical emergencies)."). Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).
[764] Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).
[765] Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021).
[766] Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021); Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022); *see also* 2011 PBNDS, Section 4.3 V.D ("Health care practitioners should explain any rules about mandatory reporting and other limits to confidentiality in their interactions with detainees. Informed consent shall be obtained prior to providing treatment (absent medical emergencies)." LaSalle's own Medical Request and Consent for Treatment Form, for procedures inside its detention facilities, grants LaSalle "authority to administer and perform routine examinations, treatments of minor illnesses and injuries, medications and diagnostic procedures which may be necessary to address my above medical complaint." LaSalle_014225-26.
[767] Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021).
[768] Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022). In documents reviewed by the Subcommittee, off-site referral packets from ICDC to the off-site provider included the IHSC MedPAR authorization and had information for a "language line translator." *See, e.g.*, LaSalle _323835; LaSalle_324227; LaSalle_324493.

Southern Poverty Law Center.[769] The email discussed an ICDC detainee who had suffered a miscarriage while in custody and was still suffering from "debilitating pain."[770] According to the email, the detainee was seen by Dr. Amin at least twice, but her pain returned and worsened.[771] The email further stated that the detainee's "experience with Dr. Amin was so painful and traumatic that she did not want to be sent back to him."[772] According to subsequent emails, ICDC responded to this complaint by sending the detainee to a different off-site provider "unassociated with Dr. Amin."[773]

With the exception of the one complaint discussed above, former HSA Brown was unaware of any complaints from detainees or staff regarding Dr. Amin.[774] Dr. McMahan also was unaware of any complaints from detainees or staff regarding Dr. Amin, and apart from an email containing a memorandum regarding Dr. Amin that Deputy Warden Albright viewed shortly after joining ICDC, Deputy Warden Albright learned of no complaints regarding Dr. Amin.[775] Dr. Hearn was similarly unaware of any complaints against Dr. Amin.[776]

As explained in Section III above, however, all of the women the Subcommittee interviewed concerning their treatment by Dr. Amin recalled submitting grievances to ICDC, ICE, or both, expressing their concerns to ICDC staff, or requesting second opinions. Ms. Dowe, for example, stated that she requested a second opinion after Dr. Amin recommended a hysterectomy following her cyst removal.[777] However, Ms. Dowe recalled that an ICDC nurse informed her that ICE would not pay for a second opinion.[778]

Ms. Castaneda-Reyes recalled that she shared concerns about her interaction with Dr. Amin with a mental healthcare provider at ICDC, but this individual then downplayed these concerns.[779] She also recalled that she shared her concerns with ICDC guards about infertility

---

[769] David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021); LaSalle_2573-77; Email from Paralegal to Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations Staff (Sept. 24, 2021); Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).
[770] LaSalle_2574.
[771] *Id.*
[772] *Id.*
[773] LaSalle_2573.
[774] Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022). No complaints from detainees or staff regarding Dr. Amin were later located by LaSalle. Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).
[775] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021); Frank Albright, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 21, 2021). Deputy Warden Albright could not further recall the specific content of this email or memorandum in his interview with the Subcommittee.
[776] Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021).
[777] Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021); *see also* LaSalle_319164; LaSalle_320169.
[778] Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).
[779] Maribel Castaneda-Reyes, Interview with Senate Permanent Subcommittee on Investigations (Oct. 5, 2021). This encounter was not reflected in Ms. Castaneda-Reyes' medical records.

following treatment by Dr. Amin, but one guard dismissed her concerns because Ms. Castaneda-Reyes already had three children.[780]

Jane Doe #2 also stated that she told multiple nurses at ICDC regarding her experiences with Dr. Amin. She recalled that "none of them were shocked," and they told her that she was not the first one Dr. Amin had "messed up."[781] Ms. Floriano Navarro remembered submitting grievances to obtain more information about the procedures Dr. Amin performed.[782] The Subcommittee was only able to substantiate Ms. Floriano Navarro's recollections.

### B. LaSalle Conducted a Limited Investigation of Abuse Allegations

Following the public allegations against Dr. Amin, Dr. Hearn conducted a review of medical records for ICDC detainees who had received gynecological surgical procedures since 2016.[783] Former HSA Brown told the Subcommittee that she, along with other medical unit staff, pulled the charts for all female detainees who were referred to Dr. Amin over the past few years.[784] Over three days, Dr. Hearn reviewed referrals from ICDC to Dr. Amin and verified that the referrals were appropriate and had been approved by IHSC.[785] Due to the limited and incomplete patient records ICDC had access to, she could not, however, make a conclusive determination regarding the appropriateness of the gynecological care detainees received.[786]

According to LaSalle representatives, the company "does not have access to hospital records other than those provided to detainees or sporadically provided to ICDC staff."[787] Dr. Hearn also reviewed ICDC grievance logs, and she informed the Subcommittee that she did not find any material raising concerns regarding off-site gynecological services.[788] She did not interview detainees—most of whom were no longer at ICDC—or speak to Dr. Amin—who was represented by legal counsel—during her review.[789] Former HSA Brown stated that she was interviewed by LaSalle headquarters.[790] She also stated that she was not presented with the findings of Dr. Hearn's review.[791]

---

[780] *Id.*
[781] Jane Doe #2, Interview with Senate Permanent Subcommittee on Investigations (Oct. 4, 2021). These encounters were not reflected in Jane Doe #2's medical records.
[782] Jaromy Jazmin Floriano Navarro, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021); LaSalle_333712; LaSalle_335569-71.
[783] Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021).
[784] Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).
[785] Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021).
[786] *Id.*; Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).
[787] Letter from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).
[788] Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021).
[789] *Id.*; Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).
[790] Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).
[791] *Id.*

Dr. McMahan also reviewed the past five years of gynecological procedures performed on ICDC detainees, including procedures Dr. Amin performed.[792] Specifically, he reviewed medical charts and the "number of procedures done and justifications for doing them."[793] He stated that his analysis was a "broad review," and he found "very few surgical interventions in the realm of the allegations."[794] For example, Dr. McMahan found only three hysterectomies had been performed over the last five years for ICDC detainees.[795] Dr. McMahan stated that he focused on hysterectomies and laparoscopies, in contrast to the wider evaluation he understood LaSalle conducted.[796] His review also did not include interviews of detainees—most of whom were no longer at ICDC—nor ICDC or ICH staff.[797]

Dr. McMahan recalled that the review process only took "one afternoon."[798] He reviewed medical charts and the "number of procedures done and justifications for doing them."[799] He told the Subcommittee that he was "concerned about the allegations," but found "nothing alarming at all" in the medical files and that his review of those files confirmed that there "was nothing out of line, nothing egregious."[800] Although he had not received a formal briefing on the LaSalle investigation, he spoke with Dr. Hearn in the course of her review, and he understood from that conversation that his findings were similar to the results from her inquiry.[801]

In his interview with the Subcommittee, Warden Paulk was unaware of the specific scope of the LaSalle investigation or the medical review Dr. McMahan conducted, but stated that he was aware that Dr. Hearn and Dr. McMahan had reviewed certain medical files.[802] He also explained that he had not received a briefing concerning any findings from the two investigations and had not seen any written product summarizing these findings.[803] Warden Paulk was also unaware of any ICDC investigative efforts involving ICH or interviews with ICDC employees.[804] Similarly, Deputy Warden Albright was unaware of any investigative efforts regarding Dr. Amin.[805]

Finally, prior to the removal of ICE detainees from the facility, all ICDC employees the Subcommittee interviewed were unaware of ICDC implementing any new policies or procedures

---

[792] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021).
[793] *Id.*
[794] *Id.*
[795] *Id.*
[796] *Id.*
[797] *Id.*
[798] *Id.*
[799] *Id*; Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).
[800] *Id.*
[801] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021).
[802] David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021).
[803] *Id.*
[804] *Id.*
[805] Frank Albright, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 21, 2021).

specifically in response to the allegations concerning Dr. Amin.[806] In addition, Warden Paulk, Dr. McMahan, and former HSA Brown were unaware of any investigative efforts that identified particular ICDC employees as failing to exercise an appropriate standard of care in overseeing detainee treatment.[807] Dr. Hearn was also unaware of LaSalle identifying any employees who had failed to exercise this standard of care.[808]

LaSalle representatives stated to the Subcommittee that no ICDC employee has authority or responsibility related to the quality or nature of care off-site physicians provide—only the duty to negotiate and maintain arrangements with these physicians.[809] Specifically, LaSalle representatives stated that "LaSalle staff are not contracted or otherwise allowed to be present for medical procedures [like] hysterectomies."[810]

## VIII. ICH DECLINED TO IDENTIFY EFFORTS TO INVESTIGATE DR. AMIN AND DID NOT IDENTIFY ANY CHANGES TO POLICIES AND PROCEDURES FOLLOWING THE 2020 ALLEGATIONS

Dr. Amin continues to serve as the Chief Medical Officer and exercises a broad leadership role at ICH.[811] The current ICH executives the Subcommittee interviewed were not aware of the initial vetting process for Dr. Amin when he first joined the hospital staff but mentioned he was re-credentialed in 2021.[812] The executives further explained that the current ICH re-credentialing process involves checking a physician's license, running a background check, checking for exclusion from Medicare and Medicaid programs, and reviewing any medical malpractice cases, which are relevant but not determinative for this process.[813] While an

---

[806] *Id.*; Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021); David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021); Amber Hughes Strout, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 22, 2021); Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021); Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).

[807] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021); David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021); Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022); *see also* Amber Hughes Strout, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 22, 2021). According to LaSalle, no ICDC employees have authority or responsibility for medical care provided by off-site providers. Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).

[808] Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021). According to LaSalle, "[n]o LaSalle employees are authorized or are allowed to review the quality of nature of care provided by off-site medical providers." Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).

[809] Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021); *see also* LaSalle_027934-37.

[810] Letter from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).

[811] Paige Wynn, Irwin County Hospital, Interview with Senate Permanent Subcommittee on Investigations (Aug. 25, 2021).

[812] *Id.*

[813] *Id.*

ICH representative noted that Dr. Amin had been accused of medical malpractice, the representative also noted he was "cleared by multiple jury trials."[814] ICH executives also explained to the Subcommittee that under the CIA with HHS OIG, an outside auditor reviewed all ICH agreements, including the agreement with Dr. Amin, as discussed above.[815]

ICH CEO Paige Wynn stated she had not received any complaints against Dr. Amin from patients or staff since she joined the hospital in 2015.[816] Ms. Wynn also stated that she was not aware of any instances in which ICH identified waste, fraud, and abuse related to Dr. Amin—and apart from the 2015 DOJ settlement, she was not aware of any such issues related to Dr. Amin.[817]

The Subcommittee reviewed at least one medical file from ICH in which a nurse noted that she had questioned a detainee patient of Dr. Amin about the type of surgery she was having. According to the notes, the patient "didnt [sic] know she was having surgery" and spoke "very little English."[818] Using a language translation service, the nurse confirmed that the patient "wasnt [sic] aware of having surgery" that day.[819] The notes also indicate that the patient "is refusing surgery at this time" and will "wait and have it done in her country."[820] The notes further state that the surgery was not performed and the patient left the hospital.[821] According to ICH representatives, there is no indication that Ms. Wynn had seen this note.[822]

Ms. Wynn, explained that she first learned about the allegations against Dr. Amin from public reporting in September 2020.[823] ICH officials declined to provide any information to the Subcommittee concerning any investigative actions the hospital took in response to the public allegations against Dr. Amin.[824] Ms. Wynn stated that ICH had not changed any policies or procedures in response to the allegations and does not have "any plans" to implement new policies.[825] ICH has also not implemented any new policies or procedures designed to monitor Dr. Amin, specifically, and ICH officials explained he was subject to the same rules as other medical staff. [826]

---

[814] *Id*. Counsel for ICH also stated to the Subcommittee that Dr. Amin has not had any disciplinary actions brought against him during his tenure at ICH. Email from Counsel for Irwin County Hospital to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).
[815] Paige Wynn, Irwin County Hospital, Interview with Senate Permanent Subcommittee on Investigations (Aug. 25, 2021).
[816] *Id*.
[817] *Id*.
[818] ICH004737.
[819] *Id*. The medical file indicates the scheduled surgeries were a D&C, laparoscopy, and LEEP. ICH004734.
[820] ICH004737.
[821] *Id*.
[822] Email from Counsel for Irwin County Hospital to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).
[823] Paige Wynn, Irwin County Hospital, Interview with Senate Permanent Subcommittee on Investigations (Aug. 25, 2021).
[824] *Id*.
[825] *Id*.
[826] *Id*.

## IX. CONCLUSION

Anyone held in the custody of the U.S. government should receive proper medical care. The Subcommittee's investigation into ICDC found that was not always the case for the female ICE detainees at that facility. Additionally, for years, deficiencies in detainee medical care that were identified by multiple DHS oversight components went unaddressed.

Gaps in policies and procedures concerning off-site medical services and a weak vetting process of off-site medical experts limited ICE's ability to obtain insight into the professional conduct of Dr. Amin. ICDC accounted for a small percentage of the total female ICE detainee population, yet Dr. Amin performed more medical procedures on female detainees than all other ICE off-site medical providers providing OB-GYN care. ICE failed to recognize or adequately explain the vast discrepancy of medical procedures that Dr. Amin performed on ICDC female detainees compared to other providers treating ICE detainees. The agency has still not provided any clear explanation for this disparity. Even now, senior ICE officials can only speculate about why Dr. Amin performed a significantly higher volume of certain OB-GYN procedures compared to his peer physicians.

Although ICE has promised reforms in response to many of these deficiencies, Congress should continue to exercise aggressive oversight over medical care at ICE facilities. ICE and DHS should consider implementing the following recommendations:

1. ICE should expedite efforts to improve the vetting of off-site medical providers for detainees and should consider expanding criteria for excluding providers.

2. ICE should expedite efforts to identify trends in off-site medical procedures for detainees for potential waste, fraud, or abuse and should conduct regular audits of physicians, hospitals, or other facilities providing off-site care.

3. ICE should institute policies and procedures to ensure off-site providers obtain informed consent in connection with their treatment of detainees.

4. ICE should ensure it reviews all detainee complaints regarding medical treatment independently of site visits from Field Medical Coordinators.

5. Federal immigration policy should support and allow for the swifter adjudication of immigration cases without undermining the procedural due process rights of immigrants.