# EXHIBIT 18

# Exhibit A

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**

YANIRA YESENIA OLDAKER; TATIANA ALEKSEYEVNA SOLODKOVA; LUZ ADRIANA WALKER; JANE DOE #5; JANE DOE #6; LOURDES TERRAZAS SILAS; JANE DOE #8; JANE DOE #15; JANE DOE #22; DANIELA CHAVEZ MORALES; JAROMY JAZMÍN FLORIANO NAVARRO; MBETI VICTORIA NDONGA; KEYNIN JACQUELIN REYES RAMIREZ; PAULINE BINAM; and ANA GABRIELA ADAN CAJIGAL, on behalf of themselves and others similarly situated,

*Plaintiffs*,

v.

JARVIS MCMILLER, in his official capacity as Acting Director of the Atlanta Field Office of U.S. Immigration and Customs Enforcement; THOMAS P. GILES, in his individual capacity; TAE JOHNSON, in his official capacity as Director of U.S. Immigration and Customs Enforcement; ALEJANDRO MAYORKAS, in his official capacity as Secretary of Homeland Security; MERRICK GARLAND, in his official capacity as Attorney General of the United States; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; PATRICK MUSANTE, in his individual capacity and official capacity as Chief of Staff of the Atlanta Field Office of U.S. Immigration and Customs Enforcement; CESAR CIPRIAN, in his individual capacity and official capacity as Supervisory Detention and Deportation Officer at the ICE Atlanta Field Office; ANA RIVERA, in her individual capacity and official capacity as the Medical Director of

Case No.: 7:20-cv-00224-WLS-MSH

**[PROPOSED]**
**CONSOLIDATED FOURTH AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND FOR DAMAGES**[1]

**Deleted:** David N. Dreyer Sirine Shebaya
(admitted *pro hac vice*)¶
GA Bar No. 411322 DC Bar No. 1019748 ¶
**Dreyer Sterling, LLC** **National Immigration Project of the** ¶
437 Memorial Dr., SE, Ste. A-2 **National Lawyers Guild (NIPNLG)** ¶
Atlanta, GA 30312 2201 Wisconsin Ave NW, Suite 200¶
Tel: (404) 234-4447 Washington, DC 20007¶
david@dreyersterling.com Tel: (617) 227-9727¶
sirine@nipnlg.org ¶
Elora Mukherjee (admitted *pro hac vice*) ¶
NY Bar No. 4427233¶
Columbia Law School Immigrants' Rights Clinic¶
**Morningside Heights Legal Services, Inc.**¶
435 West 116th Street, Room 831¶
New York, NY 10027¶
Tel: (203) 668-2639¶
emukherjee@law.columbia.edu¶
¶
*Attorneys for Plaintiffs*¶
*(Additional counsel listed on signature page)*¶
¶

[1] After the Defendants' respective Motions to Dismiss were fully briefed and decided, the only claims remaining are those asserted under the Federal Tort Claims Act against the United States Government.

Case 7:22-cv-00148-WLS-ALS Document 183-18 Filed 01/12/25 Page 3 of 195

medical director of the ICE Health Service Corps; UNKNOWN ICE OFFICIALS ##1-X, in their individual capacities and official capacities as U.S. Immigration and Customs Enforcement Health Service Corps employees; UNKNOWN ICE OFFICIALS ##1-X, in their individual and official capacities; IRWIN COUNTY DETENTION CENTER; LASALLE SOUTHEAST, LLC; HOSPITAL AUTHORITY OF IRWIN COUNTY; DAVID PAULK, in his individual capacity and official capacity as Warden of Irwin County Detention Center; MAHENDRA AMIN, in his individual capacity and official capacity as physician at the Irwin County Hospital; MARTEKA GEORGE, in her individual capacity and official capacity as Inmates' Services Director at ICDC; MIA MINES, in her individual capacity and official capacity as ICDC officer; WILLAIM RABIOU, in his individual capacity and official capacity as ICDC officer; "FNU" HUGHES, in her individual capacity and official capacity as ICDC officer; "FNU" SMITH, in her individual capacity and official capacity as ICDC officer; "FNU" CONEY, in her individual capacity and official capacity as ICDC officer; "FNU" HANES, in his individual capacity and official capacity as ICDC officer; "FNU" FAISON, in her individual capacity and official capacity as ICDC officer; "FNU" BATTLE, in her individual capacity and official capacity as ICDC officer; "FNU" VAUGHN, in her individual capacity and official capacity as ICDC officer; "FNU" SCOTT, in her individual capacity and official capacity as ICDC officer; "FNU" SLACK, in her individual capacity and official capacity as ICDC officer; UNKNOWN ICDC OFFICERS ##1-X, in their individual and official capacities,

*Defendants*.

**TABLE OF CONTENTS**


INTRODUCTION ........................................................................................................ 1

PARTIES ........................................................................................................ 3

I. Plaintiffs ........................................................................................................ 3

II. Federal Defendants ........................................................................................................ 5

III. Irwin County Detention Center Defendants ........................................................................................................ 8

IV. Irwin County Medical Defendants ........................................................................................................ 10

JURISDICTION AND VENUE ........................................................................................................ 11

EXHAUSTION ........................................................................................................ 11

FACTUAL ALLEGATIONS ........................................................................................................ 14

I. Widespread and Systematic Abuse by Defendant Amin ........................................................................................................ 14

II. The Whistleblower Complaint ........................................................................................................ 14

III. Defendants' Knowledge and Disregard of Defendant Amin's Abuses ........................................................................................................ 15

IV. A Broader Pattern of Medical Abuse or Neglect ........................................................................................................ 21

V. Congressional Investigation into ICDC ........................................................................................................ 25

VI. Independent medical report on practices at ICDC ........................................................................................................ 26

VII. Defendants' Conspiracy to Execute Removal Orders to Deter, Prevent, and Retaliate for Attempts to Participate in Lawsuits and Investigations ........................................................................................................ 26

VIII. Defendants Disregard Congressional Intervention to Halt Retaliatory Deportations ........................................................................................................ 28

IX. Defendants Engaged in a Pattern of Retaliatory Actions Against Victims and Witnesses of Medical Abuse at ICDC ........................................................................................................ 31

X. Defendants Have Actively Endangered Plaintiffs' Health, Denied Plaintiffs Adequate Medical Care, and Retaliated Against Plaintiffs ........................................................................................................ 34

A. Plaintiff Yanira Yesenia Oldaker ........................................................................................................ 34

B. Plaintiff Tatiana Alekseyevna Solodkova ........................................................................................................ 42

C. Plaintiff Luz Walker ........................................................................................................ 46

D. Plaintiff Lourdes Terrazas Silas .... 50

E. Plaintiff Jane Doe #5 .... 54

F. Plaintiff Jane Doe #6 .... 58

G. Plaintiff Jane Doe #8 .... 62

H. Plaintiff Jane Doe #15 .... 66

I. Plaintiff Jane Doe #22 .... 70

J. Plaintiff Jaromy Jazmín Floriano Navarro .... 72

K. Plaintiff Mbeti Victoria Ndonga .... 77

L. Plaintiff Keynin Jackelin Reyes Ramirez .... 81

M. Plaintiff Ana Gabriela Adan Cajigal .... 86

N. Plaintiff Pauline Nadege Binam .... 91

O. Plaintiff Daniela Chavez Morales (formerly referred to as Jane Doe #25) .... 99

XI. Several Putative Class Members Have Suffered the Same Harms .... 104

XII. The Federal Government's Inter-Governmental Agreement with Irwin County and ICE's Detention Standards .... 120

A. Inter-Governmental Agreement Between Federal Government and Irwin County .... 120

B. ICE's Performance-Based National Detention Standards and ICE's Oversight Role .... 122

CLASS ACTION ALLEGATIONS .... 126

CLAIMS FOR RELIEF .... 132

FIRST CLAIM FOR RELIEF Violation of the First Amendment Against Federal Defendants (Retaliation) .... 132

SECOND CLAIM FOR RELIEF Violation of the First/Fourteenth Amendment (Retaliation under 42 U.S.C. § 1983) .... 135

THIRD CLAIM FOR RELIEF Violation of First Amendment (alternative claim under *Bivens*) .... 138

FOURTH CLAIM FOR RELIEF Violation of the Fifth Amendment (Punitive Conditions of Confinement and Deliberate Indifference against Federal Defendants) ........ 141

FIFTH CLAIM FOR RELIEF Violation of the Fourteenth Amendment (Punitive Conditions of Confinement and Deliberate Indifference pursuant to 42 U.S.C. § 1983) ........ 144

SIXTH CLAIM FOR RELIEF Violation of the Fifth Amendment (Alternative First Amendment claim against ICDC Defendants under *Bivens*) ........ 148

SEVENTH CLAIM FOR RELIEF Violation of the Administrative Procedure Act and the Immigration and Nationality Act (Deportation of witnesses and individuals in the midst of legitimate efforts to protect their civil rights or civil liberties) ........ 152

EIGHTH CLAIM FOR RELIEF Violation of the Administrative Procedure Act (Failure to follow PBNDS) ........ 155

NINTH CLAIM FOR RELIEF Violation of 42 U.S.C. § 1985(2) – Conspiring to Deter Testimony/Participation in Investigations and Court Proceedings ........ 157

TENTH CLAIM FOR RELIEF Violation of the Right to Due Process Under the Fifth Amendment (Deportation of essential witnesses) ........ 161

ELEVENTH CLAIM FOR RELIEF Breach of IGA Contract ........ 163

TWELFTH CLAIM FOR RELIEF Negligent Hiring or Retention ........ 164

THIRTEENTH CLAIM FOR RELIEF Gross Negligence ........ 167

FOURTEENTH CLAIM FOR RELIEF Medical Battery ........ 169

FIFTEENTH CLAIM FOR RELIEF Medical Malpractice ........ 171

SIXTEENTH CLAIM FOR RELIEF Intentional Infliction of Emotional Distress ........ 173

SEVENTEENTH CLAIM FOR RELIEF Negligent Infliction of Emotional Distress ........ 175

EIGHTEENTH CLAIM FOR RELIEF Negligence, Gross Negligence, and Recklessness under the Federal Tort Claims Act and Georgia Law ........ 176

NINETEENTH CLAIM FOR RELIEF Negligence *per se* under the Federal Tort Claims Act and Georgia Law ........ 179

TWENTIETH CLAIM FOR RELIEF Negligent Supervision under the Federal Tort Claims Act and Georgia Law ........ 180

TWENTY-FIRST CLAIM FOR RELIEF Intentional Infliction of Emotional Distress under the Federal Tort Claims Act and Georgia Law .......................... 182

TWENTY-SECOND CLAIM FOR RELIEF Negligent Infliction of Emotional Distress under the Federal Tort Claims Act and Georgia Law .......................... 184

TWENTY-THIRD CLAIM FOR RELIEF Attorneys' Fees And Costs ......................... 185

PRAYER FOR RELIEF ........................................................................................................... 186

**INTRODUCTION**

1. Plaintiffs are fifteen women who are or were detained by Defendants at the Irwin County Detention Center ("ICDC"). Each was subjected to, or ordered to be subjected to, non-consensual, medically unindicated, and/or invasive gynecological procedures by Mahendra Amin, with the knowledge or participation of other Defendants. In many instances, the medically unindicated gynecological procedures Defendant Amin performed on Plaintiffs amounted to sexual assault. These procedures were performed in the presence of unknown ICDC officials ##1-X. Since at least 2018, women at ICDC have reported Defendant Amin's abusive behavior to ICDC guards, officers, and medical staff, and to ICE employees. Defendants also knew that from 2013 to 2015, Defendant Amin was investigated by the Department of Justice ("DOJ") for conducting medically unnecessary procedures. The abuses Plaintiffs experienced by and/or under the direction, control or authority of Defendant Amin are part of a broader pattern and practice of medical abuse and mistreatment at ICDC.
2. After Plaintiffs spoke out, or attempted to speak out, about their abuse, Defendants retaliated against them in order to silence them. In an attempt to chill Plaintiffs' speech, Defendants engaged in a range of retaliatory actions. They placed or threatened to place Plaintiffs in medical units or solitary confinement; placed them on cell restriction; and transferred them to other units to separate protestors. They physically assaulted some women who spoke out, including while they were handcuffed. When women detained at ICDC went on hunger strike, Defendants rationed or threatened to ration their access to water, took money out of their commissary accounts, and limited or cut off their access to phones, tablets, video calls and email. In addition to limiting phone access, Defendants systematically monitored outgoing phone calls, abruptly cutting the line

Case 7:20-cv-00224-WLS-ALS Document 98 Filed 01/22/21 Page 9 of 195

when Plaintiffs and other detainees mentioned hunger strikes or medical treatment or spoke with reporters. Defendants also delayed delivery of Plaintiffs' prescribed medication and denied them access to the law library and to their own medical records. Defendants destroyed letters documenting abusive medical treatment; refused to produce individuals at hearings related to Defendant Amin's abuses; refused to coordinate with consular officials; obstructed congressional committees' requests for information about medical treatment; and made false claims to congressional investigators.

3. Defendants have further retaliated against and attempted to silence Plaintiffs by deporting or attempting to deport them in retaliation for their speech or attempted speech about the abuses they have suffered at Defendants' hands.
4. Defendants' actions have violated Plaintiffs' First Amendment and Due Process rights. Defendants have also failed to follow their own policies in violation of the Administrative Procedure Act and have committed multiple other violations of federal and Georgia state law.
5. Plaintiffs now seek relief from this Court, on behalf of themselves and others similarly situated, for the abuse they suffered by and/or under the direction, control, or authority of Defendants. They further seek this Court's protection to enable them to freely pursue their claims against their abusers and to enable them to testify in ongoing investigations into Defendants' violations of their rights.

## PARTIES[2]

### I. Plaintiffs

6. Plaintiff Yanira Yesenia Oldaker is a 37-year-old woman who was brought to the United States from Mexico at the age of three. She was detained in ICE custody at ICDC from January 1, 2020 until December 30, 2020. She currently lives in Jackson, South Carolina.

7. Plaintiff Tatiana Alekseyevna Solodkova is a 49-year-old woman who arrived in the United States in 2016 after fleeing persecution in Russia and being trafficked to the U.S. She was detained in ICE custody at ICDC from February 14, 2020 until December 31, 2020. She currently lives in housing provided by Jubilee Partners, Inc. in Comer, Georgia.

8. Plaintiff Luz Adriana Walker is a 55-year-old woman, originally from Colombia, who has lived in the United States for more than 22 years. She was detained in ICE custody at ICDC from November 23, 2018 until December 23, 2020. She currently lives with her husband, a United States citizen, in High Point, North Carolina.

9. Plaintiff Lourdes Terrazas Silas is a 42-year-old woman from Bolivia who has lived in the United States for more than twenty-one years. She was detained in ICE custody at ICDC from March 6, 2020 until January 21, 2021. She currently lives in Triangle, Virginia.

10. Plaintiff Jane Doe #5 is a 29-year-old woman from Mexico who has lived in the United States since she was around eleven years old.

[2] After the Court decided the Defendants' respective Motions to Dismiss, the only claims remaining are those asserted under the Federal Tort Claims Act against the United States Government.

11. Plaintiff Jane Doe #6 is a 33-year-old woman from Guatemala and a mother of six. She was detained in ICE custody at ICDC from February 2019 until January 2021. She currently lives in Georgia.
12. Plaintiff Jane Doe #8 is a 22-year-old woman from Mexico who was brought to the United States when she was eight years old. She was detained in ICE custody at ICDC from July 2020 until January 2021. She currently lives in Fort Lauderdale, Florida.
13. Plaintiff Jane Doe #15 is a 38-year-old woman from Bolivia. She was detained in ICE custody at ICDC from February 2020 until January 2021. She currently lives in Arlington, Virginia.
14. Plaintiff Jane Doe #22 is a 40-year-old citizen of Senegal who came to the United States when she was eighteen years old. She was detained in ICE custody at ICDC from May 2020 until January 6, 2021. She currently lives in Stone Mountain, Georgia.
15. Plaintiff Jaromy Jazmín Floriano Navarro is a 29-year-old woman from Mexico. She was detained in ICE custody at ICDC from October 18, 2019 until her sudden deportation on September 16, 2020.
16. Plaintiff Mbeti Victoria Ndonga is a 38-year-old woman who was brought to the United States from Kenya when she was two years old. She was detained in ICE custody at ICDC from April 2019 until December 16, 2020. She currently lives in Georgia.
17. Plaintiff Keynin Jackelin Reyes Ramirez is a 33-year-old woman who arrived in the United States fleeing persecution from Honduras. She was detained in ICE custody at ICDC from January 30, 2020 until December 11, 2020. Ms. Reyes Ramirez currently resides in Carrollton, Georgia.

18. Plaintiff Ana Adan Cajigal is a 25-year-old woman who first came to the United States from Mexico when she was six months old. She was detained in ICE custody at ICDC from around late February 2020 until December 11, 2020. She currently resides in Smyrna, Georgia.

19. Plaintiff Pauline Nadege Binam is a 32-year-old woman who came with her parents to the United States from Douala, Cameroon at the age of two. She was detained in ICE custody from October 13, 2017 to on or about September 19, 2020. She currently lives in Randallstown, Maryland.

20. Plaintiff Daniela Chavez Morales (formerly referred to as Jane Doe #25) is a 40-year-old woman originally from Mexico. She was detained in ICE custody at ICDC from February 24, 2018 through February 4, 2019. She is currently in Chiapas, Mexico.

**II. Federal Defendants**

21. Defendant United States of America is subject to suit for personal injuries caused by the negligent or wrongful acts or omissions of its employees or agents acting within the scope of their employment or office under circumstances where Defendant United States of America, if a private person, would be liable. *See* 28 U.S.C. § 1346(b).

22. At all relevant times, Defendant United States of America acted through its agency, the Department of Homeland Security ("DHS"), and its subagency Immigration and Customs Enforcement ("ICE").

23. Defendant ICE is a federal law enforcement agency within DHS. ICE is responsible for the criminal and civil enforcement of immigration laws, including the detention and removal of immigrants. Enforcement and Removal Operations ("ERO"), a division of ICE, manages and oversees the immigration detention system. As such, Defendant ICE was a legal custodian of Plaintiffs and others similarly situated.

Case 7:20-cv-00224-WLS Document 398-18 Filed 10/12/26 Page 13 of 195

24. Defendant Jarvis McMiller is named in his official capacity as the Director of the ICE Atlanta Field Office. The ICE Atlanta Field Office is responsible for, among other things, carrying out ICE's immigration detention operations at ICDC. Defendant McMiller is responsible for administering the immigration laws and the execution of detention and removal determinations for individuals under the jurisdiction of the ICE Atlanta Field Office, which includes those detained at ICDC.

25. Defendant Thomas P. Giles is the former Director of the ICE Atlanta Field Office. The ICE Atlanta Field Office is responsible for, among other things, carrying out ICE's immigration detention operations at ICDC. Defendant Giles was responsible for administering the immigration laws and the execution of detention and removal determinations for individuals under the jurisdiction of the ICE Atlanta Field Office, which includes those detained at ICDC. As such, Defendant Giles was a legal custodian of Plaintiffs and others similarly situated. He is named in his individual capacity.

26. Defendant Tae Johnson is named in his official capacity as Director of ICE. In this capacity, he is responsible for the enforcement of immigration laws and for ICE's policies, practices, and procedures. He has authority over the detention and removal of noncitizens throughout the United States. As such, he was a legal custodian of Plaintiffs and others similarly situated.

27. Defendant Alejandro Mayorkas is named in his official capacity as Secretary of DHS. In his official capacity, Defendant Mayorkas is responsible for administering the immigration laws pursuant to 8 U.S.C. § 1103(a) and is legally responsible for the detention and removal of immigrants. As such, he was a legal custodian of Plaintiffs and others similarly situated.

Case 7:22-cv-00148-WLS-ALS Document 133-18 Filed 03/22/24 Page 14 of 195

28. Defendant Merrick Garland is named in his official capacity as the Attorney General of the United States. In his official capacity, he is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103(g). As such, he was a legal custodian of Plaintiffs and others similarly situated.

29. Defendant Patrick Musante is named his individual capacity and in his official capacity as Assistant Field Office Director and Chief of Staff of the ICE Atlanta Field Office. In his official capacity, Defendant Musante is responsible for the administration of immigration laws and the execution of detention and removal determinations and is a custodian of Plaintiffs and others similarly situated.

30. Defendant Cesar Ciprian is named in his individual capacity and in his official capacity as a Supervisory Detention and Deportation Officer at the ICE Atlanta Field Office.

31. Defendant Ada Rivera is named in her individual capacity and in her official capacity as the medical director of the ICE Health Service Corps.

32. Defendants Unknown ICE Officials ##1-X are an unknown number of ICE employees, including ICE Enforcement and Removal Operations ("ERO") employees and ICE Health Service Corps employees, whose identities are unknown to Plaintiffs. ICE ERO employees are responsible for managing and overseeing the immigration detention and removal system. ICE Health Service Corps employees approve or approved referrals of residents at ICDC to outside medical providers, including to Defendant Amin, and are responsible for investigating complaints by detained individuals in ICE custody related to medical care. They are named in their individual capacities and in their official capacities.

**III. Irwin County Detention Center Defendants**

33. Defendant Irwin County Detention Center ("ICDC") is a detention facility located in Ocilla, GA. Irwin County, GA contracted with the federal government to detain individuals pursuant to federal immigration laws at ICDC. The Biden Administration announced it was ending the contract with ICDC in May 2021 and did, in fact, end the contract in October 2021.
34. Defendant LaSalle Southeast, LLC ("LaSalle") is a limited liability corporation that does business in this judicial district for the purpose of profit. Defendant LaSalle has contracted with Irwin County for the operation of ICDC. At all times material to this complaint, Defendant LaSalle was acting under color of law.
35. Defendant David Paulk is named in his individual capacity and in his official capacity as the Warden of ICDC. Defendant Paulk is responsible for overseeing the administration and management of ICDC. In this capacity, he is or was the immediate custodian of Plaintiffs and others similarly situated. Defendant Paulk was at all times material to this complaint acting under color of law.
36. Defendant Marteka George is named in her individual capacity and in her official capacity as the Inmates' Services Director at ICDC. Defendant George was at all times material to this complaint acting under color of law.
37. Defendant Mia Mines is named in her individual capacity and in her official capacity as an officer at ICDC. Defendant Mines was at all times material to this complaint acting under color of law.
38. Defendant William Rabiou is named in his individual capacity and in his official capacity as an officer at ICDC. Defendant Rabiou was at all times material to this complaint acting under color of law.

Case 7:22-cv-00144-WLS-ALS Document 139-18 Filed 07/12/24 Page 16 of 195

39. Defendant "FNU" Hughes is named in her individual capacity and in her official capacity as a nurse at ICDC. Defendant Hughes was at all times material to this complaint acting under color of law.

40. Defendant "FNU" Smith is named in her individual capacity and in her official capacity as an officer at ICDC. Defendant Smith was at all times material to this complaint acting under color of law.

41. Defendant "FNU" Coney is named in her individual capacity and in her official capacity as an officer at ICDC. Defendant Coney was at all times material to this complaint acting under color of law.

42. Defendant "FNU" Hanes is named in his individual capacity and in his official capacity as an officer at ICDC.[3] Defendant Hanes was at all times material to this complaint acting under color of law.

43. Defendant "FNU" Faison is named in her individual capacity and in her official capacity as an officer at ICDC. Defendant Faison was at all times material to this complaint acting under color of law.

44. Defendant "FNU" Battle is named in her individual capacity and in her official capacity as an officer at ICDC. Defendant Battle was at all times material to this complaint acting under color of law.

45. Defendant "FNU" Vaughn is named in her individual capacity and in her official capacity as an officer at ICDC. Defendant Vaughn was at all times material to this complaint acting under color of law.

[3] Possible alternative spellings could include "Haynes."

46. Defendant "FNU" Scott is named in her individual capacity and in her official capacity as an officer at ICDC. Defendant Scott was at all times material to this complaint acting under color of law.

47. Defendant "FNU" Slack is named in her individual capacity and in her official capacity as an officer at ICDC. Defendant Slack was at all times material to this complaint acting under color of law.

48. Defendants Unknown ICDC Officers ##1-X are an unknown number of officers at ICDC whose identities are unknown to Plaintiffs and who performed functions including accompanying women detained at ICDC to their medical appointments, receiving and responding to verbal and written complaints, and responding to requests for medical care or assistance. They are named in their official capacities as officers at ICDC and in their individual capacities. Defendants Unknown ICDC Officers ##1-X were at all times material to this complaint acting under color of law.

**IV. Irwin County Medical Defendants**

49. Defendant Hospital Authority of Irwin County ("Irwin County Hospital") is a general medical and surgical facility located in Ocilla, GA.

50. Defendant Mahendra Amin is named in his individual capacity and in his official capacity as a physician affiliated with the Irwin County Hospital. Defendant Amin was authorized by unknown ICE officials and/or unknown ICDC officers to provide medical services to detained individuals in ICE custody at ICDC. Defendant Amin was, at all times material to this complaint, acting under color of law.

**JURISDICTION AND VENUE**

51. This Court has subject matter jurisdiction over Claims One through Eleven pursuant to 28 U.S.C. § 1331, 1651 and 5 U.S.C. § 702

52. This Court has subject matter jurisdiction over Claims Eleven through Seventeen and Claim Twenty-Three pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy giving rise to Claims One through Ten and Claim Twenty-Three.

53. This Court has subject matter jurisdiction over Claims Eighteen through Twenty-Two pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b), in that these claims are against Defendant United States of America, for money damages for personal injuries caused by the negligent or wrongful acts or omissions of United States employees acting in the scope of their office or employment, under circumstances where Defendant United States of America, if a private person, would be liable.

54. This Court has the authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202 and 28 U.S.C. § 1651.

55. Monetary damages are available pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971) as to Federal Defendants and, as to Irwin County Defendants, under 42 U.S.C. § 1983 and Georgia state law.

56. Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred or are occurring in this district.

**EXHAUSTION**

57. Plaintiffs Oldaker, Solodkova, Walker, Silas, Floriano Navarro, Ndonga, Ramirez, Cajigal, Binam, Chavez Morales, and Jane Does ## 5, 6, 8, 15 and 22 (collectively, "FTCA Plaintiffs") have administratively exhausted their administrative remedies for purposes of their claims under the Federal Tort Claims Act ("FTCA") against the United States of America for the actions of ICE employees and/or agents. *See* 28 U.S.C. §§ 2675, 1346.

Case 7:22-cv-00148-WLS-ALS Document 138-2 Filed 07/01/24 Page 19 of 195

58. On February 24, 2021, FTCA Plaintiffs submitted individual administrative tort claims to DHS and ICE in accordance with the FTCA, 28 U.S.C. § 2675(a). Their administrative claims allege that FTCA Plaintiffs were subject to non-consensual, medically unnecessary, and/or invasive gynecological procedures as a direct and proximate result of ICE's negligent, grossly negligent, and reckless acts, omissions, and conduct. Their administrative claims also allege medical negligence, negligence *per se*, negligent supervision, medical battery, and intentional infliction of emotional distress under Georgia tort law.

59. By letter dated February 2, 2022, FTCA Plaintiffs Floriano Navarro, Ndonga, Oldaker, Solodkova, Walker, Terrazas, Cajigal, Jane Doe #5, Jane Doe #6, Jane Doe #8, Jane Doe #15, Jane Doe #22, claims were finally denied in writing by ICE and such denials were sent to Plaintiffs.

60. FTCA Plaintiff Keynin Reyes Ramirez has not received written denials by ICE as of the filing of this amended complaint. Their claims are deemed denied, due to the agency's failure to make a final disposition within six months after the date of submission. *See* 28 U.S.C. 2675(a).

61. Plaintiffs' FTCA claims are timely under 28 U.S.C. § 2401(b) because the claims were submitted to the appropriate agency within two years of accrual and this action was filed within six months of an official and final denial of the claims.

62. On March 29, 2024, FTCA Plaintiffs Pauline Binam and Daniela Chavez Morales submitted individual administrative tort claims to DHS and ICE in accordance with the FTCA, 28 U.S.C. § 2675(a). Their administrative claims allege that FTCA Plaintiffs were subject to non-consensual, medically unnecessary, and/or invasive gynecological

procedures as a direct and proximate result of ICE's negligent, grossly negligent, and reckless acts, omissions, and conduct. Their administrative claims also allege medical negligence, negligence *per se*, negligent supervision, medical battery, and intentional infliction of emotional distress under Georgia tort law.

63. FTCA Plaintiffs Pauline Binam and Daniela Chavez Morales have not received a decision or response from the U.S. Government as of the filing of this amended complaint. Their claims are deemed denied, due to the government's failure to make a final disposition within six months after the date of submission. *See* 28 U.S.C. § 2675(a).

64. Plaintiffs Binam and Chavez Morales's FTCA claims arise out of the pattern of medical abuse and retaliation set out in the First Amended Complaint. These claims satisfy the relation back requirement under Rule 15(c)(1)(B) of the Federal Rules of Civil Procedure, and equitable tolling applies because the government had timely notice of these claims, both through this litigation and extensive national news coverage. Not a single other Plaintiff who filed an FTCA complaint based on the same pattern of medical abuse and retaliation received an administrative settlement without first having to assert an FTCA claim in federal court; accordingly, it would have been an exercise in futility to require Binam and Chavez to file administrative complaints any sooner than they did. Nor are their FTCA claims barred by any state statute of repose, as (1) Congress's FTCA scheme preempts a general state statute of repose, and (2) defendants undertook intentional acts to conceal the extent of their negligence. Thus, Binam and Chavez's FTCA claims are not futile, relate-back to the filing of the First Amended Complaint, and do not prejudice the single remaining defendant in this case, the U.S. Government.

Case 7:22-cv-00148-WLS-ALS Document 138-18 Filed 01/12/26 Page 21 of 195

## FACTUAL ALLEGATIONS

### I. Widespread and Systematic Abuse by Defendant Amin

65. Plaintiffs were victims of non-consensual, medically unindicated and/or invasive gynecological procedures, including but not limited to unnecessary surgical procedures under general anesthesia, performed by and/or at the direction of Defendant Amin.

66. As detailed below, in many instances, the non-consensual and/or medically unindicated gynecological procedures Defendant Amin performed on Plaintiffs amounted to sexual assault. These procedures were performed in the presence of unknown ICDC officials ##1-X.

67. Since at least 2018, and likely as early as 2013, Defendants knew about the medical abuse women detained at ICDC have suffered at the hands of Defendant Amin. They nonetheless continued a policy or custom of sending women to be mistreated and abused by Defendant Amin until September 22, 2020.

68. The experiences Plaintiffs had at the hands of Defendant Amin form part of a disturbing pattern of inhumane medical abuse and mistreatment at ICDC.

### II. The Whistleblower Complaint

69. On September 14, 2020, a nurse from ICDC, Ms. Dawn Wooten, raised the first alarm about unnecessary medical procedures at ICDC.[4]

70. Ms. Wooten described a general failure to obtain consent for medical procedures and a pattern of performing medically unindicated procedures.[5] She also described long delays

---

[4] Complaint by Project South, Georgia Detention Watch, Georgia Latino Alliance for Human Rights & South Georgia Immigrant Support Network to Joseph V. Cuffari, Cameron Quinn, Thomas P. Giles, & David Paulk, *Re: Lack of Medical Care, Unsafe Work Practices, and Absence of Adequate Protection Against COVID-19 for Detained Immigrants and Employees Alike at the ICDC County Detention Center* (Sept. 14, 2020), https://projectsouth.org/wp-content/uploads/2020/09/OIG-ICDC-Complaint-1.pdf.

[5] *Id.* at 20.

between requests for medical attention and receipt of care, and responses to a broad range of requests for medical care with ibuprofen.

71. This whistleblower complaint corroborates Plaintiffs' experiences throughout their detention at ICDC.

72. ICE continued to send patients from ICDC to Dr. Amin after the whistleblower complaint became public. It was not until on or about September 22, 2020, that ICE announced that Dr. Amin would no longer see ICDC patients. The date on which ICE actually stopped sending any patients to Dr. Amin is unknown but, upon information and belief, was after September 22, 2020, as Plaintiff Jane Doe #22 was sent to him on that date.

**III. Defendants' Knowledge and Disregard of Defendant Amin's Abuses**

73. Since at least 2018, women treated by Defendant Amin and their counsel have reported Amin's abusive behavior to certain Defendants and their agents, including unknown ICE agents and ICDC officers, both verbally and in writing.

74. Multiple women detained at ICDC, including several Plaintiffs, complained verbally or in writing to unknown ICE agents and ICDC officers about the painful, unnecessary, non-indicated, and/or non-consensual medical procedures Defendant Amin performed on them.

75. Despite these complaints, Defendants continued a policy or custom of regularly sending women detained at ICDC to be treated by Defendant Amin.

76. Unknown ICE Officials ##1-X and/or ICDC Officials ##1-X accompanied women detained at ICDC, including Plaintiffs, to their appointments with Defendant Amin. They remained in the room as he performed painful non-consensual procedures on them. They witnessed the women crying out in pain and asking Defendant Amin to stop,

Case 7:22-cv-00148-WLS Document 133-18 Filed 01/12/24 Page 23 of 195

which he generally refused to do. They witnessed that Defendant Amin did not obtain consent for many of the procedures he performed on women detained at ICDC. They observed that he did not inform Plaintiffs of less-invasive treatment alternatives to the procedures he performed. They also witnessed that he frequently did not make any attempts or respond to requests to provide interpretation or to speak to each woman in a language she could understand.

77. Federal and ICDC Defendants also knew that from 2013 to 2015, Defendant DOJ investigated Defendant Amin for similar behavior—performing unnecessary medical procedures in violation of the False Claims Act—as part of the lawsuit *United States v. Hospital Authority of Irwin County*, No. 7:13-cv-00097-HL (M.D. Ga.).[6]

78. In *United States v. Hospital Authority of Irwin County*, the DOJ alleged that "Dr. Amin has a standing order at ICH [Irwin County Hospital] which requires that certain tests always be run on pregnant patients, without any medical evaluation and regardless of her condition. For example, no matter what symptoms the patient may be exhibiting, ICH performs an OB ultrasound on every pregnant patient, without consulting [Dr. Amin] or obtaining his or any other doctor's medical opinion for that particular patient. . . . Dr. Amin's standing order for ultrasounds on his patients constitutes a pattern of medical services that he, ICH, and on-call doctors know or should know are not medically necessary."[7]

[6] Press Release, Department of Justice, U.S. Attorney's Office, Middle District of Georgia, Hospital Authority of Irwin County Resolves False Claims Act Investigation for $520,000 (Apr. 29, 2015), https://www.justice.gov/usao-mdga/pr/hospital-authority-irwin-county-resolves-false-claims-act-investigation-520000.

[7] Complaint at 15, 17, *United States v. Hospital Authority of Irwin County*, No. 7:13-cv-00097 (M.D. Ga. July 8, 2013).

Case 7:22-cv-00148-WLS-ALS Document 118-2 Filed 01/12/24 Page 24 of 195

79. Despite this knowledge, Defendants continued to send women detained at ICDC to be treated by Defendant Amin.

80. On information and belief, Federal Defendants, including Defendants Giles and Musante, knew that Defendant Amin was subjecting detained individuals at ICDC to invasive and unnecessary gynecological procedures and surgeries without informed consent.

81. Defendant ICE, Defendant Giles, as the Field Office Director, and Defendant Musante, as the Assistant Field Office Director and later Chief of Staff, are tasked with ensuring that all detention facilities in their areas of responsibility comply with applicable detention standards and policies.

82. On information and belief, Defendants Giles and Musante were aware of Defendant Amin's abuses at ICDC prior to the whistleblower complaint, and as early as 2018.

83. Defendants Giles and Musante disregarded the serious risk of harm that individuals detained at ICDC faced, as well as the actual harms to which some had been subjected.

84. Defendant Ciprian was aware of the invasive and unnecessary gynecological procedures and surgeries at ICDC. Plaintiff Daniela Chavez Morales (formerly known as putative class member Jane Doe #25) told Defendant Ciprian in 2018 about the inadequate medical care provided by Defendant Amin. However, Chavez Morales was nevertheless taken to Defendant Amin who subjected her to an invasive and unnecessary gynecological surgery.

**Deleted:** Putative

**Deleted:** Jane Doe #25

85. At the very latest, Federal Defendants became aware of Defendant Amin's abuses on September 14, 2020, when Ms. Wooten submitted a whistleblower complaint to Defendant Giles describing his misconduct.

Case 7:22-cv-00148-WLS-ALS Document 138-18 Filed 07/01/24 Page 25 of 195

86. Even after the whistleblower complaint was filed and widely publicized, Defendants continued to send women detained at ICDC to be treated by Defendant Amin. For example, Plaintiff Jane Doe #22 was sent to Defendant Amin on or about September 22, 2020, a full week after the allegations of abuse were made public. Putative class member Rojas Fañas was also sent to Defendant Amin after the whistleblower complaint had been made public and the allegations of abuse were reported by the media.

87. Defendant Ciprian disregarded the serious risk of harm to the women subjected to Defendant Amin's abuses, including Plaintiff Daniela Chavez Morales (formerly known as putative class member Jane Doe #25), who has now been told that she has a significantly reduced change of successfully carrying a future pregnancy to term as a result of Defendant Amin's procedure on her body without her informed consent. In fact, Chavez Morales wrote to Defendant Ciprian in 2018 describing the inadequate medical care provided by Defendant Amin and her fears of being treated by him. Chavez was nonetheless subsequently taken to Defendant Amin for invasive and unnecessary gynecological surgery.

Deleted: ,

Deleted: Jane Doe #25

Deleted: Jane Doe #25

88. Defendants Unknown ICE Officials ##1-X are an unknown number of officials who work for the ICE Health Service Corps and/or ICE Enforcement and Removal Operations. ICE Health Service Corps officers are responsible for approving referrals at ICDC to outside medical providers and are responsible for investigating complaints by detained individuals in ICE custody related to medical care. ICE Enforcement and Removal Operations officers are responsible for the placement of women in particular detention centers, are generally responsible for detained women's cases, and are regularly in touch with women whose cases they manage about issues relating to their

Case 7:20-cv-00224-WLS Document 139-18 Filed 11/12/24 Page 26 of 195

detention and removal. Because of their direct involvement with medical care at ICDC, specifically approving outside referrals and responding to complaints, and/or with managing placement and cases of women detained at ICDC, Defendants Unknown ICE Officials ##1-X were aware of Defendant Amin's abuses at ICDC.

89. Defendants Unknown ICE Officials ##1-X did not adequately investigate complaints by detained individuals in ICE custody at ICDC related to medical care. As a result, Defendants Unknown ICE Officials ##1-X disregarded the serious risk of harm to individuals detained at ICDC, who were repeatedly sent to Defendant Amin after approval from Defendants Unknown ICE Officials ##1-X.

90. Defendant Ada Rivera is the Medical Director for ICE Health Service Corps, who oversees the operations of ICE Health Service Corps. On information and belief, Defendant Ada Rivera has known since at least 2018 about complaints against Defendant Amin. At the very latest, Defendant Rivera was made aware of Defendant Amin's abuses upon the public outcry over the whistleblower complaint.[8] Nevertheless, ICE Health Service Corps continued to approve referrals for women at ICDC to see Defendant Amin for at least a week after the filing of the whistleblower complaint. As a result, Defendant Rivera disregarded the serious risk of harm to individuals detained at ICDC.

91. Defendants ICDC, LaSalle, their employees, agents, and/or contractors also knew that Defendant Amin was subjecting detained individuals at ICDC to invasive and unnecessary gynecological procedures and surgeries without informed consent.

---

[8] *See* Elliot Spagat & Jeff Amy, *Democrats to investigate forced surgery claims in Georgia*, Wash. Post (Sept. 15, 2020), https://www.washingtonpost.com/health/democrats-to-investigate-forced-surgery-claims-in-georgia/2020/09/15/6cf0cbb2-f7b3-11ea-85f7-5941188a98cd_story.html.

Case 7:22-cv-00148-WLS-ALS Document 133-18 Filed 01/12/24 Page 27 of 195

92. On information and belief, Defendants ICDC, LaSalle, and Paulk, as individuals and entities in charge of running the day-to-day operations of the facility, were aware of the non-consensual and/or medically unindicated invasive procedures and surgeries performed by Defendant Amin without informed consent.

93. By failing to investigate these abuses or taking immediate action to prevent further harm, Defendants ICDC, LaSalle, and Paulk disregarded the serious risk of harm to individuals sent to Defendant Amin purportedly for gynecological procedures and surgeries.

94. From July to November 2018, counsel for putative class member Jane Doe #35 repeatedly raised concerns about gynecological treatment at ICDC with Defendants ICDC, LaSalle, Paulk, and ICE and its agents. Counsel's efforts included multiple conversations with Defendant George explaining that Dr. Amin had mistreated Jane Doe #35. In late October 2018, Defendant George confirmed to counsel that she was "not surprised to hear this complaint against Dr. Amin." By this time, Defendant George had received "several previous verbal complaints about Dr. Amin."[9]

95. On November 8, 2020, counsel for Jane Doe #35 personally met with Defendant Paulk to express concern about gynecological treatment at ICDC. The following day, counsel wrote to Defendant Paulk documenting the "four months" of "advocacy with ICE and ICDC" to seek care of Jane Doe #35's debilitating pain resulting from gynecological complications. Counsel wrote that despite this debilitating pain, Jane Doe #35 "hesitated

[9] Caitlin Dickerson, Seth Freed Wessler & Miriam Jordan, *Immigrants Say They Were Pressured Into Unneeded Surgeries,* N.Y.Times (Sept. 29, 2020), https://www.nytimes.com/2020/09/29/us/ice-hysterectomies-surgeries-georgia.html.

to seek medical attention because her last experience with Dr. Amin was so painful and traumatic that she did not want to be sent back to him."

96. Defendants ICDC and LaSalle had a policy, practice, or custom of referring individuals to Defendant Amin despite their knowledge of his abuses.

97. ICDC officers and medical staff, including Defendants Mines, Rabiou, Hughes, Smith, Doney, Hanes, Faison, Battle, Vaughn, Scott, Slack, and Unknown ICDC Officers ##1-X, were aware of the abuses by Defendant Amin. By failing to report Defendant Amin's abuses or taking immediate action to prevent further harm, ICDC officers and medical staff disregarded the serious risk of harm to individuals sent to Defendant Amin for gynecological procedures and surgeries.

**IV. A Broader Pattern of Medical Abuse or Neglect**

98. The medical abuses Plaintiffs suffered at the hands of Defendants form part of a broader pattern of medical abuse or neglect at ICDC, of which Defendants were fully aware.

99. Immigrants detained at ICDC reported lack of access to adequate medical care for years, including unanswered requests for treatment, failure to provide necessary medication or prenatal care, and long wait times of up to two weeks to see medical staff at the facility.[10]

100. Despite their knowledge of these well-known issues of medical neglect and mistreatment at ICDC, and repeated requests by Plaintiffs and others detained at ICDC for adequate care and reasonable accommodations, Defendants ICDC, LaSalle, and

[10] Project South & Penn State Law Ctr. for Immigrants' Rts. Clinic, *Imprisoned Justice: Inside Two Georgia Immigrant Detention Centers* 48-49 (2017) [hereinafter *Imprisoned Justice*], https://projectsouth.org/wp-content/uploads/2017/06/Imprisoned_Justice_Report-1.pdf; *see also* ACLU-GA, *Prisoners of Profit* 89-90 (2012), *archived at* https://web.archive.org/web/20120530173158/https://acluga.org/Prisoners_of_Profit.pdf (documenting multiple "unreasonable delays in receiving medical care" at Irwin, including failure to provide necessary cancer treatment, x-rays, pain medication, treatment for diabetes and high blood pressure, among other medical neglect and mistreatment).

Case 7:22-cv-00148-WLS-ALS Document 133-18 Filed 07/01/24 Page 29 of 195

Unknown ICE agents denied adequate medical care to detained individuals at ICDC and failed to provide reasonable accommodations to individuals who suffered from recorded physical and mental impairments that substantially limited their major life activities.

101. In fact, instead of providing such care and accommodations to individuals in their custody, Defendants ICDC, LaSalle, and Unknown ICE agents retaliated against those who sought medical care, including placement in solitary confinement in response to requests for medical assistance.[11]

102. Even when seen by providers, immigrants detained at ICDC consistently reported cursory exams that failed to respond to health concerns and lack of appropriate medication or treatment, accompanied by an absence of adequate language interpretation.[12] Immigrants detained at ICDC also routinely described lack of mental health screenings and fears of reporting mental health concerns given the practice of inappropriately placing immigrants on suicide watch in solitary confinement.[13]

103. DHS itself documented serious violations of health and safety standards at ICDC, citing, for example, unsanitary conditions in medical unit cells that "needed to be mopped,

[11] *Imprisoned Justice*, *supra*, at 51; *see also* ACLU-GA, *supra*, at 91 (noting that "[o]ver two-thirds of the detainees interviewed expressed fear and concern at the possibility of complaining" due to retaliatory behavior from guards including being placed in solitary: "[I]f you complain, it only gets worse."). Reports have also documented the misuse and overuse of solitary confinement at ICDC in other contexts. Det. Watch Network, *A Toxic Relationship: Private Prisons and U.S. Immigration Detention* 5 (2016), https://www.detentionwatchnetwork.org/sites/default/files/reports/A%20Toxic%20Relationship_DWN.pdf (describing the placement of an 18-year-old girl in solitary after she reported suffering harassment on account of her sexual orientation and the placement of a new arrival at ICDC in segregation due to lack of space in housing units).

[12] *Imprisoned Justice*, *supra*, at 48. *See also* ACLU-GA, *supra*, at 90 (noting that "no staff member of the medical unit is able to provide interpretation for detainees who do not speak English well or at all" and as one interviewee described because "[t]here was no interpreter . . . I had no idea why or what was happening. Even if you go because you're sick they ignore you.").

[13] *Imprisoned Justice*, *supra*, at 48-49. *See also* ACLU-GA, *supra*, at 90-91 ("Many detainees suffer from depression, anxiety, insomnia, and other emotional difficulties" and are "generally afraid to talk about their mental health" for fear of being placed in segregation instead of receiving treatment).

walls wiped down, toilets cleaned, and trash and refuse removed."[14] In a compliance inspection report, DHS cited failures by medical staff at ICDC to complete required trainings, including in CPR and emergency first aid training.[15] Inspectors also documented failures by the medical staff to consistently review intake screening forms to assess priority for treatment and the lack of critical information related to mental health, medical history, and medications in health screenings.[16] Inspectors were unable to validate if an external state physician conducted peer reviews as requested and inspectors documented "examination tables . . . torn beyond repair, making cleaning and decontamination impossible" as well as broken cabinets, drawers and doors "held together with tape."[17]

104. In April 2020, women detained at ICDC released a video pleading for release from detention due to the harmful conditions at ICDC, including the unsanitary conditions and lack of protection against the COVID-19 pandemic.[18]

---

[14] U.S. Dep't of Homeland Sec., Immigr. & Customs Enf't, Office of Pro. Resp., Inspections & Det. Oversight Div., *Compliance Inspection for the Irwin County Detention Center* 6 (2017), https://www.ice.gov/doclib/foia/odo-compliance-inspections/2017IrwinCountyGA.pdf. *See also* ACLU-GA, *supra*, at 81, 85–87, 94 (highlighting other hygiene concerns and concerns about sanitary conditions, food, access to medical care, delays in receiving medications, misuse and overuse of solitary confinement among other "serious and systematic problems with living conditions, medical attention, and treatment of detainees at Irwin"). For examples of lack of adequate or effective medical or dental care at other ICE detention facilities, *see generally* U.S. House of Representatives, Comm. on Homeland Sec., *ICE Detention Facilities: Failing to Meet Basic Standards of Care* 13-20 (Sept. 21, 2020) (describing ongoing abuses committed at facilities owned and operated by LaSalle Corrections, Inc., among others).

[15] U.S. Dep't of Homeland Sec., Immigr. & Customs Enf't, Office of Pro. Resp., Inspections & Det. Oversight Div., *supra*, at 8–9.

[16] *Id.* at 9.

[17] U.S. Dep't of Homeland Sec., Immigr. & Customs Enf't, Office of Pro. Resp., Inspections & Det. Oversight Div., *Compliance Inspection of the Irwin County Detention Center* 15 (2020), https://www.ice.gov/doclib/foia/odo-compliance-inspections/irwinCoDetCntr_OcillaGA_Mar3-5_2020.pdf.

[18] Letter from Sarah H. Paoletti, Director, Transnat'l Legal Clinic, & Azadeh Shahshahani, Legal & Advoc. Director, Project South, to Dubravka Simonovic, UN Special Rapporteur on Violence Against Women, & Elizabeth Broderick, UN Working Grp. On Discrimination Against Women & Girls, (Nov. 19, 2020) (citing Rachel Taber, *Women Detained at Irwin County ICE Processing Center Fight for Their Lives Against COVID-19*, YouTube (Apr. 13, 2020), https://www.youtube.com/watch?v=aQt6QbkWsLI&feature=youtu.be), https://projectsouth.org/wp-content/uploads/2020/11/2020.11.19_UN-Communication-ICDC-Medical-Neglect-and-Abuse.pdf.

Case 7:22-cv-00148-WLS Document 18-8 Filed 11/12/22 Page 31 of 195

105. This inhumane treatment of women at ICDC included destruction of immigrants' medical request forms, fabrication of medical records, accusations of exaggerating pain, taunting of non-English speaking immigrants, lack of interpretation, and performance of surgeries and gynecological procedures without informed consent and without explanation.[19]

106. On January 3, 2022, the DHS Office of the Inspector General ("OIG"), issued a report of an investigation following the whistleblower complaint filed by Ms. Wooten in September 2020. The OIG report focused on medical care and COVID-19 and expressly did not address the process for approval of gynecological procedures or retaliation claims because they are subject to separate OIG investigations.[20] The report confirmed that ICDC's provision of medical care was lacking and its oversight and evaluation of the provision of medical care was inadequate.

107. The report highlighted that ICDC did not have basic oversight mechanisms in place with respect to medical care. For example, OIG could not determine if ICDC had any Health Insurance Portability and Accountability Act (HIPAA) program in place and found no evidence that HIPAA training was provided to the medical team at the facility.[21] Additionally, the report found that ICDC had no documentation of any organized approach to evaluating the delivery of health care.[22] The report also found that ICDC did

[19] *Id.*
[20] Memorandum from Joseph V. Cuffari, Inspector Gen., to Tae D. Johnson, Acting Dir. of U.S. Immigr. & Customs Enf't 3 , *Medical Processes and Communication Protocols Needs Improvement at Irwin County Detention Center* (Jan. 3, 2022), https://www.oig.dhs.gov/sites/default/files/assets/2022-01/OIG-22-14-Jan22.pdf.
[21] *Id.* at 11.
[22] *Id.*

not implement or enforce adequate social distancing measures to protect against the spread of COVID-19.[23]

## V. Congressional Investigation into ICDC

108. On September 15, 2020, the day after Ms. Wooten blew the whistle on abuses at ICDC, Senator Cory Booker called on the DHS Inspector General to immediately investigate the whistleblower complaint.[24]

109. *The New York Times*, *The Washington Post*, *The Los Angeles Times*, and numerous other media outlets all covered the whistleblower complaint and the subsequent congressional outcry.[25]

110. Soon after the whistleblower report, multiple federal agencies opened investigations into allegations of medical abuses of women detained at ICDC. Those federal agencies include the DOJ, DHS OIG, and the Federal Bureau of Investigation ("FBI").

111. On September 26, 2020, a congressional delegation visited ICDC to investigate the experiences of detained women.[26] The congressional delegation included Representatives Joaquin Castro, Nanette Barragan, Adriano Espaillat, Juan Vargas, Jimmy Gomez, Lou

---

[23] *Id.* at 13.

[24] Letter from Sen. Cory A. Booker to Inspector Gen. Joseph V. Cuffari (Sept. 15, 2020), https://www.booker.senate.gov/imo/media/doc/9.15.20%20Letter%20to%20DHS%20OIG%20re%20GA%20Whistleblower%20Complaint%20FINAL%20SIGNED%20(002).pdf.

[25] Caitlin Dickerson, Seth Freed Wessler, & Miriam Jordan, *Immigrants Say They Were Pressured Into Unneeded Surgeries*, N.Y. Times (Sept. 29, 2020), https://www.nytimes.com/2020/09/29/us/ice-hysterectomies-surgeries-georgia.html; Elliot Spagat & Jeff Amy, *Democrats to Investigate Forced Surgery Claims in Georgia*, Wash. Post (September 14, 2020), https://www.washingtonpost.com/health/nurse-questions-medical-care-at-immigration-jail-in-georgia/2020/09/14/1eed5708-f701-11ea-85f7-5941188a98cd_story.html; Molly O'Toole, *19 Women Allege Medical Abuse in Georgia Immigration Detention,* L.A. Times (Oct. 22, 2020), https://www.latimes.com/politics/story/2020-10-22/women-allege-medical-abuse-georgia-immigration-detention.

[26] Press Release, Cong. Hisp. Caucus, Congressional Hispanic Caucus Statement on Investigation of Irwin County Detention Center (Sept. 26, 2020) https://chc.house.gov/media-center/press-releases/congressional-hispanic-caucus-statement-on-investigation-of-irwin-county.

Case 7:22-cv-00148-WLS-ALS Document 133-18 Filed 01/12/24 Page 33 of 195

Correa, Raul Ruiz, Sheila Jackson Lee, Sylvia Garcia, Hank Johnson, and Pramila Jayapal.[27]

**VI. Independent medical report on practices at ICDC**

112. In October 2020, a team of independent medical professionals reviewed over 3,200 pages of medical records for 19 women detained at ICDC, including some of Plaintiffs' records, and provided their report to Congress.[28]

113. The report by the medical team described an "alarming pattern" of medical abuse, including but not limited to description of widespread practices that corroborated the inhumane practices Plaintiffs describe and exposed them to multiple unnecessary gynecological procedures and surgeries without informed consent by Defendant Amin.[29]

**VII. Defendants' Conspiracy to Execute Removal Orders to Deter, Prevent, and Retaliate for Attempts to Participate in Lawsuits and Investigations**

114. Immediately after Ms. Wooten's whistleblower report was made public, Defendant ICE initiated retaliatory deportations against women detained at ICDC who spoke out about the medical abuse that they had suffered or witnessed.[30] Federal and ICDC Defendants,

---

[27] Press Release, Cong. Hisp. Caucus, Congressional Hispanic Caucus and House Judiciary Committee Lead Congressional Delegation to Investigate Reports of Abuse at the ICE Irwin County Detention Center (Sept. 24, 2020) https://chc.house.gov/media-center/press-releases/media-advisory-congressional-hispanic-caucus-and-house-judiciary.

[28] Molly O'Toole, *supra*; Greg Walters, Carter Sherman, & Neda Toloui-Semnani, *'A Disturbing Pattern': ICE Detainees Were Pressured to Have Gynecological Surgery, Doctors Say*, VICE (Oct. 24, 2020), https://www.vice.com/en/article/88a95x/ice-detainees-were-pressured-to-have-gynecological-surgery-doctors-say.

[29] O'Toole, *supra*; ; Walters et al., *supra*. A week later, the Inter-American Commission on Human Rights expressed its concern over the non-consensual surgeries and sterilizations at ICDC, citing the whistleblower complaint and the medical report. Press Release, Org. of Am. States, IACHR Expresses Its Concern Over Reports of Sterilizations and Surgical Interventions Without Consent in Migrant Detention Centers in the United States (Oct. 30, 2020), https://www.oas.org/en/iachr/media_center/PReleases/2020/262.asp. The IACHR emphasized the serious violations of reproductive and sexual rights at ICDC along with the overall negligent medical care, the lack of protective measures during the COVID-19 pandemic, the lack of interpretation and language barriers to accessing medical care, as well as discriminatory treatment and intimidation of immigrants at ICDC. *Id.*

[30] Gianna Toboni, Ana Sebescen, & Nicole Bozorgmir, *ICE Attempts to Deport Multiple Witnesses in Gynecologic Surgery Scandal*, VICE (Nov. 5, 2020), https://www.vice.com/en/article/jgqq7p/ice-attempts-to-deport-multiple-witnesses-in-gynecologic-surgery-scandal.

Case 7:22-cv-00148-WLS-ALS Document 133-18 Filed 01/12/24 Page 34 of 195

including unknown ICE agents and ICDC officers, collectively engaged in a pattern of swiftly deporting victims and witnesses who had complained about their abuse to ICDC and ICE, spoken or attempted to speak to investigators, filed or attempted to file federal lawsuits, or had valuable information to share regarding medical abuses at ICDC.

115. Plaintiffs Floriano Navarro and Jane Doe #31—both of whom were detained at ICDC and subjected to medical abuse during their detention—were deported within a day after they spoke out or confirmed that they had spoken out about medical abuses at ICDC. Federal investigators were unable to interview "at least eight women who were deported after receiving questionable medical diagnoses and treatment at Irwin."[31]

116. On September 15, 2020, after the whistleblower report generated significant public and media attention, officers at ICDC questioned detained women about the identity of the source of information in the whistleblower report. Plaintiff Floriano Navarro was among the women targeted by the guards for this questioning.. During her detention at ICDC, Defendant Amin had subjected her to non-consensual, invasive gynecological procedures and repeatedly pressured her into undergoing a hysterectomy, which she avoided on the day of the scheduled surgery only because she had tested positive for COVID-19.[32] On September 15, 2020, Unknown ICDC Officer #1 specifically asked Ms. Floriano Navarro whether she had spoken up. Ms. Floriano Navarro responded,

[31] Neda Toloui-Semnani, Carter Sherman, & Emily Green, *Women Say They Were Abused and Deported by ICE. Now They Fear Being Silenced.*, VICE (Dec. 11, 2020), https://www.vice.com/en/article/akd73b/women-say-they-were-abused-and-deported-by-ice-now-they-fear-being-silenced.

[32] *"They Wanted to Take My Womb Out": Survivor of Medical Abuse in ICE Jail Deported After Speaking Out*, Democracy Now! (Oct. 26, 2020), https://www.democracynow.org/2020/10/26/ice_irwin_detention_center_invasive_surgeries.

Case 7:20-cv-00224-WLS Document 183-18 Filed 11/12/24 Page 35 of 195

"Yes, it was me. . . . I told a lawyer that you guys were doing illegal surgeries here."[33] Defendants deported Ms. Floriano Navarro the following day.

117. Moreover, Federal and ICDC Defendants attempted to deport Plaintiffs Oldaker, Ndonga, Reyes Ramirez, Binam, and Walker soon after they spoke out about the abuse they suffered, made known that they were willing to speak out, and/or were publically identified as a victim and witness of the abuse. Plaintiff Ndonga, for example, was informed by ICE that it had lifted a hold on her deportation within hours of her speaking with investigators from DOJ, DHS OIG, and FBI.

118. Shortly before the Congressional Delegation arrived at ICDC on September 26, 2020, Defendants ICDC, LaSalle, and their employees, agents, and/or contractors moved several survivors of Defendant Amin's abuse from the "Charlie" pod to the "Golf" pod. The "Golf" pod is in a trailer behind the main ICDC facility. The Congressional delegation did not speak with anyone in the "Golf" pod.

119. Defendants and/or their employees, agents, and/or contractors also actively suppressed and interfered with the ability of women in the "C" Pod cells to speak with the congressional delegation on September 26, 2020. Minutes before the congressional delegation arrived, Defendants ICDC, LaSalle, their employees, agents and/or their contractors ordered the women not to speak to anyone in the congressional delegation and to stay in their beds.

## VIII. Defendants Disregard Congressional Intervention to Halt Retaliatory Deportations

120. On November 7, 2020, the U.S. House of Representatives Committee on the Judiciary submitted a letter to DHS expressing grave concern that ICE was moving forward with

[33] *Id.*

the removal of alleged victims and potential witnesses of forced medical procedures at ICDC, even as investigators attempted to collect testimony. The letter expressed concern that these deportations would interfere with these women's ability to provide testimony to the investigations and demanded that ICE "immediately pause the removal of women who come forward with allegations of misconduct until all investigations are completed."

121. On November 12, 2020, the House Oversight Committee demanded that ICE "immediately cease efforts to deport any individuals who may be witnesses to or victims of the medical malpractice alleged at ICDC."[34]

122. On November 19, 2020, thirty U.S. Senators and seventy-five U.S. Representatives demanded that DHS and ICE "immediately stay the removal of witnesses in the investigations in the provision of medical care at the Irwin County Detention Center."[35]

123. On November 25, 2020, the House Committee on Homeland Security and the House Committee on Oversight and Reform issued a subpoena against Defendant LaSalle after its refusal to provide "even the most basic information about the treatment and care provided—at taxpayer expense—to women detained at ICDC." The Committees

[34] Press Release, House Comm. on Oversight & Reform, Oversight and Homeland Security Committees Demand ICE Cease Deportations of Victims and Witnesses Alleging Medical Mistreatment at Detention Facilities (Nov. 12, 2020), https://oversight.house.gov/news/press-releases/oversight-and-homeland-security-committees-demand-ice-cease-deportations-of.

[35] Letter from Sen. Richard Blumenthal et al. to Tony H. Pham, Senior Official Performing the Duties of the Director, U.S. Dep't of Homeland Sec., Eric Dreiband, Assistant Attorney Gen., U.S. Dep't of Just., & Christopher Wray, Dir., Fed. Bureau of Investigation (Nov. 19, 2020), https://www.menendez.senate.gov/imo/media/doc/STOP%20Removal%20of%20potential%20witnesses%20at%20ICDC_%20Bi-Cameral%20Letter.pdf.

Case 7:22-cv-00148-WLS-ALS Document 133-18 Filed 01/12/24 Page 37 of 195

concluded that Defendant LaSalle "is actively obstructing the Committees' efforts to examine the troubling allegations raised by Ms. Wooten and others."[36]

124. Despite these repeated demands from congressional committees and members of Congress, Defendants continued to schedule and implement deportations of victims of and witnesses to medical abuses at ICDC after the women made known that they chose to testify and participate in federal lawsuits and the federal investigations.[37]

125. Defendants Giles and Musante were responsible for removing individuals within the Atlanta Field Office's jurisdiction, which includes individuals at ICDC. Defendants Giles and Musante authorized and facilitated the deportations of the women detained at ICDC who spoke out or made known they were willing to speak out about the medical abuse they had suffered or witnessed.

126. Defendants ICE, ICDC, LaSalle, and their employees, agents and/or contractors, including Defendants Paulk, Hanes, and Unknown ICDC Officers ##1-X, facilitated and carried out the deportations of the women detained at ICDC who spoke out about or made known they were willing to speak out about the medical abuse they had suffered or witnessed.

127. On information and belief, Defendants ICE, ICDC, and LaSalle and their employees, agents, and/or contractors have coordinated and agreed to this pattern of swift deportations and attempted deportations of Plaintiffs and other victims and witnesses who speak out or attempt to speak out about the medical abuses at ICDC.

---

[36] Letter from Chairman Bennie G. Thompson, Comm. on Homeland Sec., & Chairwoman Carolyn B. Maloney, Comm. on Oversight & Reform to Rodney Cooper, Exec. Dir., LaSalle Corr. (Nov. 25, 2020), https://homeland.house.gov/imo/media/doc/LaSalle%20subpoena%20letter.pdf.

[37] Toboni et al., *supra* note 28.

### IX. Defendants Engaged in a Pattern of Retaliatory Actions Against Victims and Witnesses of Medical Abuse at ICDC

128. Federal and ICDC Defendants have engaged in a broader pattern of retaliatory actions against Plaintiffs and other victims and witnesses of Defendant Amin's abuses who all have valuable information to share with federal investigators regarding medical abuses at ICDC. Defendants implemented multiple policies and practices at ICDC that chilled Plaintiffs' speech and denied them the ability to exercise their First Amendment rights.

129. These retaliatory actions against Plaintiffs and other victims and witnesses of medical abuse at ICDC include, but are not limited to, placing or threatening to place them in medical units or solitary confinement; placing them on cell restriction; transferring them to other units to separate protestors; physically assaulting them, including while handcuffed; threatening to deprive hunger strikers and protestors of property and commissary; threatening to shut off or ration water; withholding their food; delaying delivery of their prescribed medication; denying them access to the law library and to their own medical records; denying them internet access; limiting or denying them phone access; monitoring their phone calls and abruptly ending their calls when discussing hunger strikes, medical treatment, or when speaking with reporters; destroying their letters documenting treatment; refusing to produce individuals at hearings related to Defendant Amin's abuses; refusing to coordinate with consular officials; obstructing congressional committees' requests for information about medical treatment; and making false claims to congressional investigators.

130. Defendants and/or their employees, agents, and/or contractors have retaliated against women for exercising their First Amendment right to protest the conditions of the facility.

Case 7:22-cv-00148-WLS-ALS Document 138-18 Filed 07/12/24 Page 39 of 195

131. In March 2020, women in one unit began a hunger strike in protest of ICDC's failure to provide them with masks, cleaning products, and other necessities to limit the spread of COVID-19. In response, Defendants ICDC, LaSalle and their employees, agents, and/or contractors, including Defendant Battle, cut off participants' WiFi or device access, barring them from contacting their relatives and legal counsel.

132. Defendant Battle told detained individuals that they could not engage in peaceful protest by having signs on the wall. Defendants and their employees, agents, and/or contractors also denied participants access to water and took away participants' commissary funds in retaliation for the strike.

133. On at least one occasion, Defendants and/or their employees, agents, and/or contractors responded to a detained individual's exercise of her First Amendment right of free expression with physical violence.

134. On April 12, 2020, Andrea Manrique Yaruro, a detained individual at ICDC, spoke in a video she and others filmed on ICDC's tablet. In the video, Ms. Manrique Yaruro spoke about the conditions in ICDC, and specifically about the spread of COVID-19 in the facility.

135. Another woman said in the video, "We . . . fear that they'll retaliate against us for speaking out. [We are] afraid they'll put us in solitary confinement and cut off contact with our families because we spoke out. If you don't hear from us again . . . that's what happened." Guards subsequently punished four or five of the women in the video by placing them in solitary confinement. The guards told the women they were being locked down in solitary because they made the video.

136. A family member of another detained individual sent the video to reporters, who uploaded it to the internet. One week later, ICDC staff and/or ICE officials physically assaulted Ms. Manrique Yaruro in retaliation for participating in the video, causing serious injuries that persist to this day.

137. The guards physically assaulted Ms. Manrique Yaruro in front of many other women, and word of the attack spread throughout the facility. Crucial witnesses in the federal investigations were afraid to speak up about Defendant Amin because of their fear that ICDC would brutalize them in retaliation for their speech, just like they did to Ms. Manrique Yaruro.

138. The culture of retaliation was pervasive within ICDC, where ICDC officers and/or ICE officials protected other officers who engaged in unlawful activity. Defendant Faison, for example, refused to identify another officer who tackled a detained woman at ICDC.

139. Individuals who filed grievances against ICDC employees were targeted for retaliation. Defendant Coney, for example, targeted Ms. Terrazas Silas after she filed a grievance against Defendant Coney. And Unknown ICDC Officer #2 saw Ms. Terrazas Silas writing a grievance about the night shift guards, took the statement from her, and then ripped it up.

140. Defendants and their employees, agents, and/or contractors also told detained individuals that they would place them in solitary confinement for speaking out about any investigation into medical abuses or conditions at ICDC.

141. Defendants' suppression of the free speech rights of women detained at ICDC only intensified in the wake of the whistleblower report and during congressional and federal investigations into medical abuses at ICDC.

X. **Defendants Have Actively Endangered Plaintiffs' Health, Denied Plaintiffs Adequate Medical Care, and Retaliated Against Plaintiffs**

A. **Plaintiff Yanira Yesenia Oldaker**

142. Plaintiff Yanira Yesenia Oldaker is a 37-year-old woman who came to the United States at age three from Mexico. She has a 12-year-old daughter who is a U.S. citizen. She was detained in ICE custody at ICDC from January 1, 2020 until December 30, 2020. She was the victim of and witness to medically unnecessary and non-consensual gynecological procedures at ICDC.

143. Ms. Oldaker has been diagnosed with severe and chronic post-traumatic stress disorder (PTSD) and major depression. As a result, she has periods of being overwhelmed by her anxiety, anger, and sadness, accompanied by physical responses of dizziness, clamminess, and overall stress within her body. She also has trouble concentrating, remembering things, and suffers from insomnia.

144. ICDC has failed to provide adequate mental health treatment to Ms. Oldaker or otherwise accommodate her disabilities.

145. Ms. Oldaker was detained at ICDC on January 1, 2020 and two days later, requested medical assistance due to hot flashes, feeling tired and waking up in the middle of the night. She had undergone a hysterectomy in 2014 due to endometriosis and had those symptoms on and off for six years, which she had treated with an estrogen patch before she was detained. As a result, she put in a request with the medical unit to ask for a prescription.

146. On January 13, 2020, Sebrina Taylor, who is described as a "Requesting Provider," entered a gynecological referral for Ms. Oldaker into the ICDC medical system.

147. Unknown ICDC Officers sought approval from ICE Health Service Corps to refer Ms. Oldaker to Defendant Amin. Unknown ICE Officials approved the request and referred Ms. Oldaker to Defendant Amin, whom she saw in February 2020. She explained to the nurse that she was having hot flashes and needed a new estrogen patch.

148. Instead of prescribing a patch, Defendant Amin asked her to undress for an ultrasound. Ms. Oldaker explained to Defendant Amin that she had undergone a hysterectomy, but he said that he did ultrasounds on all of his patients. Defendant Amin then violently jammed a transvaginal ultrasound monitor inside her and, after removing it, pushed several fingers into her vagina, causing her excruciating pain. Ms. Oldaker squirmed and told him "no," but he kept going. A survivor of extreme sexual violence, Ms. Oldaker described it as feeling like she was "being raped again." At the end of the visit, he prescribed her Estrace pills.

149. A female ICDC officer accompanied Ms. Oldaker from ICDC and played on her phone during Defendant Amin's examination.

150. Defendant Amin's examination caused Ms. Oldaker so much pain that she had to take ibuprofen. She experienced vaginal bleeding and had discharge for days afterwards. She felt pain upon urinating and when wiping herself.

151. Unknown ICDC Officers sought approval from ICE Health Service Corps to refer Ms. Oldaker to Defendant Amin again. Unknown ICE Officials approved the request, and Ms. Oldaker saw Defendant Amin again on September 8, 2020 for a medication refill. She did not want to see him again, but needed medication to manage her hot flashes and he was her only option.

152. During that visit, she explained that she just wanted a refill of her prescription. But the nurse told her she had to have a pap smear. She did not understand why that was necessary given that she had had a full hysterectomy, but the nurse gave her no choice.

153. The pap smear that Defendant Amin performed was exceedingly painful. He inserted a metal clamp in Ms. Oldaker's vagina. He scraped inside and when he pulled the metal clamp out, it hurt even more. She was in agonizing pain. When she wiped, she realized Defendant Amin had not used lubrication.

154. The pain Ms. Oldaker experienced lasted for days afterwards. She had trouble sitting, was sore, and could not wipe herself for several days. Defendant Amin's pap smear also exacerbated her PTSD. It took her back to the physical and sexual abuse she had suffered in the past. She still cannot stop thinking about the experience and does not understand why Defendant Amin treated her this way.

155. On October 26, 2020, Ms. Oldaker submitted her sworn testimony about her experiences with Defendant Amin to the DOJ. This step clearly communicated Ms. Oldaker's willingness to cooperate with federal investigators and expose medical abuses at ICDC.

156. On November 5, 2020, an attorney provided the DOJ, the DHS OIG, and the FBI with a list of seventeen women detained at ICDC and a summary of each woman's experiences of medical abuse and neglect while detained at ICDC. Ms. Oldaker's name and experiences with Defendant Amin were included in that communication.

157. On information and belief, as a result of this November 5, 2020 communication, Federal Defendants became aware that Ms. Oldaker was a victim of and witness to medical abuses at ICDC.

158. On the evening of November 7, 2020, in response to a phone call from an organizer who was checking on the safety and well-being of the women detained at ICDC, Ms. Oldaker realized that her commissary account had been "zeroed out." Ms. Oldaker, like others detained at ICDC, knew that when a commissary account is emptied, ICE officials will deport that person swiftly, usually within 24 to 48 hours.

159. When Ms. Oldaker learned that her commissary had been zeroed out, she panicked. She could not bear the thought of being deported from the only country she has ever known and the likelihood of never seeing her beloved daughter again. Ms. Oldaker did everything in her power to try to stop her deportation, and on November 8, 2020, Ms. Oldaker was able to find legal counsel to represent her.

160. On November 8, 2020, Ms. Oldaker's attorney and multiple congressional offices contacted Defendant ICE on Ms. Oldaker's behalf to ensure that ICE was aware that Ms. Oldaker was a victim and witness in ongoing federal investigations who wished to testify and had not yet been given an opportunity to testify. However, Defendant Musante informed Ms. Oldaker's attorney on the evening of November 8, 2020, that Ms. Oldaker was scheduled to be deported the following morning on November 9, 2020.

161. On information and belief, Defendants planned and conspired to swiftly deport Ms. Oldaker because she had participated in, and wished to continue participating in, the federal investigations about medical abuse at ICDC.

162. During the early morning hours of November 9, 2020, officers transported Ms. Oldaker to the tarmac of the airport in Columbus, GA to effectuate her deportation.

163. Following the filing of the instant lawsuit at approximately 6 a.m. on November 9, 2020, the officers transporting Ms. Oldaker to the airport in Columbus, GA informed her that her deportation had been halted.

164. The transporting officers forced Ms. Oldaker to sign two documents. The officers informed Ms. Oldaker that these documents were necessary to effectuate her removal and told her that she would be removed "in three weeks to a month." Ms. Oldaker could not read the documents while she was handcuffed but signed them anyway because she felt that she had no choice. After Ms. Oldaker signed the documents, the officers transported her back to ICDC.

165. After November 9, 2020, Defendants retaliated against Ms. Oldaker because of her willingness to speak out against medical abuses at ICDC.

166. ICE, LaSalle, and ICDC and their employees, agents, and/or contractors denied Ms. Oldaker the medication that she needed. Ms. Oldaker takes daily medication to control her severe and complex PTSD and recurring nightmares, but ICDC staff refused to give Ms. Oldaker her medication for almost a full day and a half after she was returned to ICDC. ICDC staff told Ms. Oldaker that they could not give her the medication because she "was not supposed to be there." As a result, Ms. Oldaker suffered debilitating headaches and could not sleep. Because ICDC had depleted Ms. Oldaker's commissary funds before her attempted deportation, Ms. Oldaker could not purchase ibuprofen to treat her withdrawal headaches.

167. ICDC staff also refused to return Ms. Oldaker's personal hygiene items and personal effects. For almost a day and a half after Ms. Oldaker's return, ICDC staff retained her toothbrush, deodorant, shampoo, clothes, undergarments, pens, and personal and legal

Case 7:20-cv-00224-WLS-ALS Document 138-18 Filed 07/12/24 Page 46 of 195

papers. Critically, ICDC staff retained the piece of paper with the phone number of Ms. Oldaker's counsel written on it, and Ms. Oldaker consequently struggled to contact her counsel.

168. Ms. Oldaker finally called her counsel on a monitored line on the evening of November 10 and informed her counsel that ICDC still retained most of her belongings and that she needed medications. Almost immediately after this phone call, ICDC returned Ms. Oldaker's belongings to her. Within about an hour, she was given her medications. This sequence of events strongly suggests that ICDC staff were listening to privileged and confidential attorney-client communications between Ms. Oldaker and her counsel.

169. For weeks after Ms. Oldaker's return to ICDC on November 9, 2020, ICDC denied Ms. Oldaker access to her detention center phone account. Prior to Defendants' attempted deportation of Ms. Oldaker, she had a phone account. On information and belief, all the other people detained at ICDC who wanted phone accounts had their own phone accounts at the time. Ms. Oldaker repeatedly requested access to a phone account. Defendants' decision to deny Ms. Oldaker a phone account was an effort to silence her from speaking out about abuses at ICDC. Defendants' decision to deny Ms. Oldaker a phone account restricted her ability to communicate with her counsel, the media, members of Congress, and the public at a time when there was national and international concern about abuses at ICDC.

170. For weeks, despite making repeated requests to unknown ICDC officers and/or ICE officials, including supervisory officers, Ms. Oldaker did not have a phone account. As a result, she had to rely on the phone accounts of other women detained at ICDC to make phone calls. While Ms. Oldaker had been using other women's phone accounts for calls,

Defendants limited Ms. Oldaker's phone calls to five minutes in duration. Before Ms. Oldaker's attempted deportation, Ms. Oldaker was allowed to make 15-minute phone calls. Other women detained at ICDC were likewise permitted to make 15-minute phone calls. Ms. Oldaker had been singled out for abbreviated five-minute phone calls. This pattern of abbreviated five-minute phone calls began when Ms. Oldaker attempted to speak about how she was nearly deported with Adolfo Flores, a reporter from the media outlet BuzzFeed, on November 9, 2020.

171. When undersigned counsel expressed concerns about the denial of phone access for Ms. Oldaker, ICE falsely responded:

> She [Ms. Oldaker] has a phone account and it is active, it has never been "turned off," she has just six cents on her account, she can add money to it anytime she wants through commissary. She has not made any requests to add minutes. Each detainee gets 500 free minutes per month, she used all hers this month. She last used the phone on 11/10/20. She can add funds to the account, set up unmonitored calls with the attorney through the process, have her family add funds, call collect, or wait until next month for 500 more minutes.

172. In fact, Ms. Oldaker's phone account had been suspended or deleted, as confirmed by multiple employees of the Correct Solutions Group. The Correct Solutions Group administers the phone accounts at ICDC. When contacted about Ms. Oldaker's phone account, employees of the Correct Solutions Group explained that they "get the names directly from Irwin" to set up phone accounts, said their "suggestion is to try contacting the detention center," and explained that "[w]e don't put the names in." The U.S. Attorney's Office subsequently conceded that ICE "discovered" that her phone account had been suspended.

173. Despite Defendants' retaliatory actions against Ms. Oldaker, she continues to speak with reporters and congressional staffers and plans to do so throughout the pendency of any

investigations. Ms. Oldaker is desperate to share her story and ensure that Defendants, their employees, agents, and/or contractors no longer abuse vulnerable immigrant women who are detained. Simultaneously, Ms. Oldaker gravely acknowledges that her willingness to speak out about medical abuses at ICDC increases the risk of retaliation against her.

174. Since Ms. Oldaker has voiced her experiences publicly, two experts have offered her evaluations. After reviewing Ms. Oldaker's medical records, Dr. Margaret Mueller, M.D., concluded: "There was no medical indication to perform a transvaginal ultrasound" because, following her total hysterectomy, "there are no reproductive organs to evaluate." After conducting a mental health evaluation for Ms. Oldaker by videoconferencing, Dr. Jennifer McQuaid, PhD, concluded: "the events with Dr. Amin served to trigger and exacerbate Yanira's existing distress. They became associated with previous incidences in which Yanira felt both a lack of control and pain, that she did not anticipate, and from which she was unable to remove herself."

175. If Ms. Oldaker is deported to Mexico, it will be impossible for her to meaningfully participate in the pending federal investigations and any other investigations that may be opened to expose medical abuses and retaliation against women at ICDC.

176. If Ms. Oldaker is deported to Mexico, it will be impossible for her to meaningfully engage with U.S.-based media outlets that have expressed ongoing interest in covering her experience and the experiences of other women detained at ICDC.

177. If Ms. Oldaker is deported to Mexico, she will not have anyone to receive her, a place to stay, access to reliable internet, access to counsel, access to medical professionals, or the

Case 7:20-cv-00224-WLS Document 389-18 Filed 10/12/24 Page 49 of 195

support she needs to participate in ongoing investigations about non-consensual, medically unindicated, and/or invasive medical procedures at ICDC.

178. Ms. Oldaker's imminent deportation fits into a pattern of swiftly deporting victims and witnesses of medical abuse at ICDC once they identify themselves as willing to exercise their First Amendment rights to testify.

**B. Plaintiff Tatiana Alekseyevna Solodkova**

179. Plaintiff Tatiana Alekseyevna Solodkova is a 49-year-old woman, who fled to the United States from Russia in 2016. She was detained in ICE custody at ICDC from February 14, 2020 through December 31, 2020. Ms. Soldokova suffered from multiple serious health concerns while in detention, including heart and breathing issues from chronic bronchitis and asthma, along with kidney, liver, thyroid, and breast problems. She was also the victim of non-consensual gynecological procedures and narrowly avoided unnecessary gynecological surgery performed by Defendant Amin.

180. As a result of her medical issues, Ms. Solodkova experienced frequent chest pain, difficulty breathing, and pain in her liver and kidneys while detained.

181. Ms. Solodkova also has suffered from major depressive disorder in addition to post-traumatic stress disorder. Because of her detention and actions by Dr. Amin and other Defendants, she has experienced clinically significant levels of mood changes, mood reactivity, and anxiety. She still experiences anxiety, mood changes, difficulty sleeping, breathing, concentrating, and remembering her life prior to being detained.

182. Ms. Solodkova repeatedly asked for medical assistance for these health problems while in detention, but her requests for assistance were repeatedly ignored, and medical staff was frequently angry with her.

Case 7:20-cv-00224-WLS-ALS Document 139-18 Filed 10/12/26 Page 50 of 195

183. ICDC failed to provide adequate health care and treatment to Ms. Solodkova or otherwise accommodate her disabilities.

184. The medical staff and providers who saw Ms. Solodkova often did not use interpreters, so she was unable to communicate her symptoms and medical history to them. The language barriers also meant that she often did not understand diagnoses or proposed treatment plans. She has a family history of cancer and was very fearful that she had cancer too.

185. While detained in ICDC, Ms. Solodkova lived in constant fear of contracting COVID-19 She was at heightened risk from COVID-19 due to her underlying medical conditions. Ms. Solodkova's comorbidities noted above made her particularly afraid of COVID-19, but she was unable to maintain appropriate levels of hygiene because Defendants failed to provide her with sufficient masks or hand sanitizer. Many guards did not wear masks or gloves, and Ms. Solodkova did not have access to regular COVID testing. She was only tested once while she was in detention, despite her health problems, including her breathing and heart concerns.

186. Ms. Solodkova slept poorly, struggled to remember things, and felt hopelessness due to her inability to access adequate medical care.

187. Ms. Solodkova was taken in handcuffs to see Defendant Amin three times over the course of August and September of 2020. No one told her where she was going or why she was going there. Each time, Unknown ICDC Officers and/or ICE officials sought approval from ICE Health Service Corps to refer Ms. Solodkova to Defendant Amin. Unknown ICE Officials then approved the request and referred Ms. Solodkova to Defendant Amin.

Case 7:20-cv-00224-WLS Document 188-18 Filed 01/12/26 Page 51 of 195

188. Defendant Amin performed transvaginal ultrasound exams, a pelvic exam that was very painful, and a pap smear on Ms. Solodkova.

189. Defendant Amin did not explain his actions to Ms. Solodkova and did not show her ultrasound images. She did not understand why he performed these exams and is still confused about her diagnosis. There was no interpreter at these appointments.

190. Defendant Amin indicated that Ms. Solodkova needed to have surgery but did not explain why. Based on Defendant Amin's hand gestures, Ms. Solodkova understood that she would be put under general anesthesia for the surgery. Ms. Solodkova shook her head to demonstrate her lack of consent to the operation.

191. At ICDC, a nurse insisted that Ms. Solodkova sign a document, which she later learned was a form to refuse the surgery with Defendant Amin.

192. Ms. Solodkova repeatedly requested her medical records in order to understand what was wrong with her, but it took multiple requests over months for her to receive them.

193. When ICDC finally produced the medical records, they were incomplete and no Russian translation was provided.

194. While detained, Ms. Soldokova continued to be afraid that something was medically wrong with her and that she needed the surgery Dr. Amin recommended, until she spoke with another doctor and learned that surgery was not needed.

195. Ms. Solodkova never received a diagnosis or treatment for her breathing, heart, kidney, liver, breast, or thyroid-related symptoms while at ICDC.

196. Ms. Solodkova never received any mental health care while at ICDC, which further traumatized her and exacerbated her fears.

197. The medical abuse Ms. Solodkova experienced made her scared of getting medical care, including after she developed an infection that required medication from dental treatment by a man she reported had shaky hands and was extremely elderly, making her afraid to return to the dentist.

198. Despite her fears of reprisal by Defendants, their employees, agents and/or contractors, Ms. Solodkova has participated in advocacy efforts since the attempted deportation of a number of women who suffered similarly at the hands of Defendant Amin.

199. An attorney provided Ms. Solodkova's name to federal investigators from DOJ, DHS OIG, and the FBI, and provided information about the medical abuses that she had suffered on November 5, 2020.

200. Upon information and belief, as a result of this November 5, 2020 communication, Federal Defendants became aware that Ms. Solodkova was a victim of and witness to medical abuses at ICDC.

201. An attorney included her name and a number in a follow up email that was sent on November 10, 2020 to nine different officials at DHS, DOJ, OIG, ICE and the FBI. The email again reiterated that Defendant Amin subjected Ms. Solodkova to non-consensual, invasive procedures and emphasized the "valuable information" she has "to share with the federal investigators about the non-consensual, invasive procedures."

202. A follow-up email dated November 24, 2020 from an attorney to the FBI, OIG, and DOJ emphasized Ms. Solodkova's ongoing willingness to and interest in testifying before Congress.

203. While detained at ICDC, Ms. Solodkova participated in a hunger strike to protest conditions there.

204. When Ms. Solodkova and other women at ICDC spoke out about conditions there, ICDC officers and/or ICE officials repeatedly threatened to punish them by placing them in isolation or deporting them. Because of these threats, Ms. Solodkova was afraid to speak out.

205. Ms. Solodkova is committed to ensuring that Defendants, their employees, agents, and/or contractors no longer abuse vulnerable immigrant women who are detained. Simultaneously, she is cognizant that her willingness to speak out about medical abuses at ICDC increases the risk of retaliation against her.

206. If deported to Russia, Ms. Solodkova recognizes that it would be impossible for her to meaningfully participate in the pending federal investigations and any other investigations that may be opened to expose medical abuses and retaliation against women at ICDC.

**C. Plaintiff Luz Walker**

207. Plaintiff Luz Adriana Walker is a 55-year-old woman originally from Colombia who has lived in the United States since 2000 and became a lawful permanent resident in 2005. She was detained in ICE custody at ICDC from November 23, 2018 through December 23, 2020. While detained at ICDC, she was subjected to non-consensual and medically unindicated invasive gynecological procedures at the hands of Defendant Amin.

208. Ms. Walker has experienced several medical and mental health issues since being detained. On November 18, 2020, Ms. Walker underwent carpal tunnel surgery. She experienced a significant amount of pain, reduced strength, and had difficulty with basic tasks that require the use of her hands. Because she was not provided physical therapy for her hands, she experienced prolonged pain and problems using her hands. Following

Case 7:22-cv-00148-WLS-ALS Document 138-18 Filed 10/12/24 Page 54 of 195

her experiences at ICDC, she suffers from diagnosed emotional trauma and depression and has symptoms characteristic of insomnia.

209. ICDC failed to provide adequate treatment to Ms. Walker or otherwise accommodate her disabilities.

210. Following a January 18, 2020 physical exam by an ICDC provider, Ms. Walker was referred to Defendant Amin for an annual pap smear in February 2020. She had not complained of any gynecological issues.

211. According to medical records, ICDC Nurse Practitioner Jessica Lyons requested a pap smear for Ms. Walker. On January 21, 2020, ICDC employee Mattie Davis approved a referral to Defendant Amin, and the appointment took place on February 14, 2020.

212. Ms. Walker was taken into Defendant Amin's office through the back door in handcuffs and shackles. Once inside, she was told to undress and remove her underwear.

213. When Defendant Amin came into the exam room, the first thing he said was, "When are you going to be deported?" The ICDC transport guard who was present in the room told Defendant Amin that his question to Ms. Walker was not appropriate and not why she was there.

214. Without explaining what he was doing or asking for Ms. Walker's consent, Defendant Amin then performed a transvaginal ultrasound on Ms. Walker. She does not know why this invasive procedure was done. Defendant Amin was rough with inserting the ultrasound wand and did not use lubrication, which caused Ms. Walker a lot of pain. For about three days afterwards, she had a constant vaginal burning sensation.

215. Ms. Walker has had multiple gynecological exams in her lifetime, and none involved a transvaginal ultrasound.

Case 7:20-cv-00224-WLS Document 198-9 Filed 10/12/24 Page 55 of 195

216. Defendant Amin wanted to give Ms. Walker a family planning shot but she told him she had not had her period in years. Defendant Amin also performed a pap smear on Ms. Walker. She asked for the results but never received them. Defendant Amin also told Ms. Walker he was referring her for a mammogram, but she did not receive one.

217. Ms. Walker remains very disturbed by her experience with Defendant Amin. His failure to obtain consent for the transvaginal ultrasound was particularly trauma-inducing in light of childhood experiences. Ms. Walker discussed these at length with the mental health professionals who have submitted an expert report detailing their trauma-based diagnosis.

218. While detained at ICDC, Ms. Walker knew at least ten women who underwent gynecological surgery or other procedures by Defendant Amin, in some cases without consent to, or understanding of, the procedure performed. Ms. Walker can attest to the fact that many of the women operated on by Defendant Amin, some of whom do not speak or understand English, were confused about what had been done to them, indicating that he did not obtain their informed consent. Regarding the now-deported women, Ms. Walker can attest to the fact that after their surgeries they experienced debilitating pain, often for a month or longer, which is also true for others who saw Defendant Amin and are still in the country.

219. Ms. Walker was witness to the lack of care shown to the women by ICDC employees, who did not clean their surgical wounds, leaving Ms. Walker and other detainees to do this. ICDC officers and/or ICE officials laughed at one of the women for asking for help when she was in pain, saying that she was "faking." An ICDC employee made another

Case 7:20-cv-00224-WLS Document 139-18 Filed 07/12/24 Page 56 of 195

woman who was being deported carry her own mattress out of the dorm, in the middle of the night, just days after her surgery when the woman could barely walk.

220. Ms. Walker cared for many of the women operated on by Defendant Amin, bringing them food and ibuprofen from the ICDC commissary, and helping them clean their incisions. She helped one woman get to the bathroom when she was having trouble standing and assisted her in going up and down the stairs to their second-floor housing unit.

221. Ms. Walker also tried to cheer and distract these women who, following their surgeries or other treatments by Defendant Amin, were often crying in pain during their lengthy recovery period, and/or were depressed, despondent, and sleeping excessively.

222. On November 22, 2020, Ms. Walker was identified to federal investigators as a witness concerning Defendant Amin's mistreatment of women at ICDC by Plaintiff Yanira Yesenia Oldaker's attorneys.

223. On November 25, 2020, and again on December 1, 2020, Ms. Oldaker's attorneys identified Ms. Walker to the Assistant United States Attorneys representing ICE and ICDC as an ICDC detainee with a final removal order who warranted protection from deportation because she possesses information relevant to ongoing federal investigations of abuse at the detention center and planned to participate in this consolidated complaint.

224. Two days later, on December 3, 2020, an Unknown ICE Official at ICDC fingerprinted Ms. Walker and told her that her travel documents were being expedited by the Colombian consulate, indicating ICE was preparing to promptly deport her.

225. On December 17, 2020, Ms. Walker was still experiencing pain and inflammation from her carpal tunnel procedure and described a sensation of "something eating me from the inside." She was started on a course of antibiotics only after Defendants were aware that she was talking to her lawyers. She was given pain medication only after her lawyers contacted ICE to request medical attention for her likely infection.

226. Defendants also retaliated against Ms. Walker and other women who spoke out about conditions inside the detention center. Around March 2020, Ms. Walker participated in a hunger strike with other women in her housing unit to protest the dangerous conditions inside ICDC. ICDC officials and/or ICE officials withheld the women's food, threatened to cut or ration their water, separated the women, and threatened them with "early deportation, among other retaliatory actions. Defendant George was among the ICDC officers and/or ICE officials who threatened the women with deportation as punishment for protesting, telling the women that ICDC was her facility, and she was in charge. As a result of these threats, the women stopped the hunger strike. One of the women leading the strike was deported soon after the strike ended.

**D. Plaintiff Lourdes Terrazas Silas**

227. Lourdes Terrazas Silas is a 42-year-old woman originally from Bolivia who has lived in the United States for more than twenty-one years. She was detained in ICE custody at ICDC from March 6, 2020 to January 21, 2021. During this time, she was subjected to non-consensual, medically unindicated, and invasive gynecological procedures by Defendant Amin.

228. Ms. Terrazas Silas has ongoing chronic pelvic pain which was exacerbated by Dr. Amin's unnecessary and invasive procedures and treatment. Since her experiences with Dr. Amin, she has suffered from depression and is taking medications for her

Case 7:22-cv-00148-WLS-ALS Document 138-18 Filed 07/02/24 Page 58 of 195

depression. Her medical conditions have substantially limited her ability to perform major life tasks. For example, she is unable to sleep at night because of the pain, and sometimes the pain is so severe that she is unable to get out of bed.

229. Defendants failed to provide adequate treatment to Ms. Terrazas Silas or otherwise accommodate her disabilities.

230. Unknown ICDC Officers sought approval from ICE Health Service Corps to refer Ms. Terrazas Silas to Defendant Amin on several occasions. Unknown ICE Officials approved the request and referred Ms. Terrazas Silas to Defendant Amin.

231. Ms. Terrazas Silas first saw Defendant Amin in around March of 2020. Defendant Amin conducted a painful gynecological examination. He then left the room without further comment and ordered his nurses to administer unknown injections. Ms. Terrazas Silas was told by the nurses that the injections were to treat pain, but she experienced lingering side effects of fevers, nausea, vomiting, diarrhea, and cramps. A nurse informed Ms. Terrazas Silas one of the injections was actually a birth control shot. Ms. Terrazas Silas did not consent to any birth control injections.

232. During her second appointment with Defendant Amin, Ms. Terrazas Silas refused a second birth control shot and confronted Defendant Amin about giving her the prior shot. He told her there was nothing more to say after he conducted a second painful gynecological examination.

233. Ms. Terrazas Silas was brought to Defendant Amin a third time after she visited medical for an infection. Defendant Amin asked her why she was there and when she explained she had an infection, he said that had nothing to do with him, but still proceeded to conduct yet another painful gynecological examination. During this appointment,

Defendant Amin told Ms. Terrazas Silas he would have to remove her entire uterus because there was a tumor the size of a coconut. When she requested a second opinion, Defendant Amin negotiated with her, telling her the surgery is expensive and, at least this way, ICE would pay for it. When she continued to refuse the surgery, Defendant Amin said, "If you were in your twenties or thirties I would understand why you don't want the surgery, but you're an old woman."

234. Ms. Terrazas Silas spoke to an ICDC officer on May 9, 2020, who noted "she wants 2nd opinion [illegible] Fibroid – [not] happy . . . how she was explained need for hysterectomy." Ms. Terrazas Silas also spoke to an Unknown ICE or ICDC official on May 20, 2020, who noted Defendant Amin recommended a hysterectomy and she wanted a second opinion.

235. As word about the COVID-19 pandemic reached ICDC, Ms. Terrazas Silas decided to join a hunger strike in protest of the facility's lack of cleaning supplies, masks, and inadequate social distancing measures. The women removed their uniforms and made a video that was posted online.

236. In retaliation for their speech, Major Battle placed the women in lockdown, and other Unknown ICDC Officers and/or ICE Officials cut off their Wi-Fi and confiscated the women's personal supplies, including their food, drinks, and the tablets they used to contact individuals outside of the facility. Defendant Slack threatened to either transfer Ms. Terrazas Silas to a stricter lockdown in the E-4 pod or cut off her access to water if Ms. Terrazas Silas did not resume eating.

237. Given ICDC's failure to implement adequate safety measures to prevent the spread of COVID-19, Ms. Terrazas Silas was exposed to the virus in July 2020. She was

transferred to the E-4 pod for isolation, where she was forced to spend 20 days in lockdown. During this time, Defendants Coney and Smith insulted her and denied her access to toilet paper, menstrual pads, water, and the phone.

238. Despite notifying officers that she could not breathe well in the room because it was humid and moldy, officers denied Ms. Terrazas Silas's request for air flow, referring to her pejoratively as "infected." She "felt like a dog" putting her mouth near the bottom crack of the door to try to breathe fresh air. Defendant Coney subsequently sprayed the same crack of the door with disinfectant. Ms. Terrazas Silas wrote a grievance about Defendant Coney, but an Unknown ICDC Officer ripped the grievance up.

239. Extreme medical neglect and mistreatment was so entrenched in the culture at ICDC that Ms. Terrazas Silas no longer trusted the medication administered to her by ICDC medical personnel. She believed that they had given her the wrong medication and also the wrong dosage of her prescription medicine, causing her to avoid swallowing pills given to her by the nurses. She also waited months for treatment of a stomach ulcer diagnosed in 2016.

240. After the investigation into Defendant Amin began, Ms. Terrazas Silas started having routine appointments with lawyers and other professionals. ICDC officers and/or ICE officials began to make Ms. Terrazas Silas feel uncomfortable, telling her things like "you are very popular lately, are you leaving soon?"

241. Ms. Terrazas Silas has spoken out about the experiences with and abuse she has suffered at the hands of Dr. Amin. She wants to share her story and ensure that Defendants, their employees, agents, and/or contractors no longer abuse vulnerable immigrant women who are detained. Simultaneously, Ms. Terrazas Silas gravely acknowledges that her

willingness to speak out about medical abuses at ICDC increases the risk of retaliation against her.

242. If Ms. Terrazas Silas is deported to Bolivia, it will be impossible for her to meaningfully participate in the pending federal investigations and any other investigations that may be opened to expose medical abuses and retaliation against women at ICDC.

243. If Ms. Terrazas Silas is deported to Bolivia, it will be impossible for her to meaningfully engage with U.S.-based media outlets that have expressed ongoing interest in covering her experience and the experiences of other women detained at ICDC.

**E. Plaintiff Jane Doe #5**

244. Plaintiff Jane Doe #5 is a 29-year-old citizen of Mexico. She was raped in Mexico at the age of 6 and came to the United States with her family in 2003, when she was around 11 years old. At the age of 23, she was raped in the United States. She was also subjected to domestic violence in two relationships by the fathers of her children. She has three children who are U.S. citizens, ages four, seven, and eleven. She had one miscarriage involving twins, and in her most recent pregnancy she had to be on bed rest for five months and had to take shots to maintain the pregnancy.

245. Jane Doe #5 was detained at ICDC from June 18, 2020, until December 24, 2020. She asked for medical care for an umbilical hernia that was very painful. She was also having some vaginal bleeding. She was sent for a CT scan and ultrasound and then told that she would be sent to an outside OB/GYN. She did not understand why an appointment was being made with an OB/GYN when her main complaint was the hernia.

Case 7:22-cv-00148-WLS-ALS Document 139-18 Filed 07/12/24 Page 62 of 195

246. Unknown ICDC Officers sought approval from ICE Health Service Corps to refer Jane Doe #5 to Defendant Amin. Unknown ICE Officials approved the request and referred Jane Doe #5 to Defendant Amin.

247. Jane Doe #5 had her first visit with Defendant Amin on August 12, 2020. He gave her a vaginal ultrasound. The procedure was very rough and painful. She felt violated and was in pain for several days afterward. Defendant Amin also did a pap smear, which felt like sandpaper inside of her. He opened the metal clamp inside her very quickly without explaining what he was doing. While performing an internal exam with his hand, Dr. Amin pressed down on the area with the hernia, which was painful.

248. After the exam, Defendant Amin told Jane Doe #5 that she had a cyst and advised that she get an injection of Depo-Provera, (a "Depo shot"), commonly prescribed as an injectable form of birth control. He mentioned cancer, which scared her, because her father had died of cancer. Jane Doe #5 did not understand what the Depo shot was before she got it. She had a hard time understanding Defendant Amin and did not have much of an opportunity to ask questions, as she felt rushed.

249. After the visit, when Jane Doe #5 had a chance to look at the papers, she saw that depression is a side effect of the Depo shot. She would not have agreed to the shot if Defendant Amin had mentioned that beforehand because she had previously struggled with severe depression and anxiety.

250. Jane Doe #5 gained around twenty pounds in one month after taking the Depo shot and is now obese, with a BMI of 31. Her back aches from the weight gain and she has no energy. She currently feels depressed and anxious most of the time.

251. In August 2020, when Jane Doe #5 met with Defendant Amin, he told her the cyst was abnormal and the best option was surgery. He did not give her any additional information.

252. Jane Doe #5 found out from some nurses at ICDC that she was going to have three surgical procedures performed by Defendant Amin on September 4, 2020. She did not know what the procedures were and did not understand the terms the nurses were using. She did not see Defendant Amin before or after the surgeries.

253. When she brought up questions about the surgeries, the staff at ICDC told that if she did not do it now, ICE may not agree to take her later. She was afraid of cancer and felt pressured to do the surgeries right away.

254. After the surgeries, she requested her medical records, which indicated that Defendant Amin had not performed three procedures but rather six procedures on her.

255. Jane Doe #5 bled for two days after the surgeries and was in constant pain, but never had a follow-up appointment with Defendant Amin.

256. After begging for a follow-up appointment, she was finally taken to see a different doctor on October 29, 2020. That doctor told her that Defendant Amin "cut or burned" part of her uterus, but she does not know exactly what was done. This doctor also informed her that Defendant Amin's note says she has endometriosis.

257. Jane Doe #5 feels worse than she did before the surgery. She only received Tylenol, which is not enough to control her pain, and no other post-surgery care.

258. Jane Doe #5 has several large scars on her abdomen. Her anxiety and depression have worsened, and she is suffering from insomnia. She is unable to sleep on most nights. She was never treated for her hernia.

Case 7:20-cv-00224-WLS Document 138-18 Filed 07/12/26 Page 54 of 195

259. A specialist who reviewed Jane Doe #5's medical records found that she may not be able to carry a child.

260. Jane Doe #5 suffers from severe pain because of her medical conditions, including an umbilical hernia. This pain has been exacerbated by Defendant Amin's non-consensual, invasive, and unnecessary gynecological procedures. She has difficulty using the bathroom as a result of the pain.

261. ICDC failed to provide adequate treatment to Jane Doe #5 or otherwise accommodate her disabilities.

262. Jane Doe #5 experienced retaliation after speaking out about her experiences with Defendant Amin. It became harder for her to receive the medical assistance she needed: her pain was ignored, and her prescribed medication was delayed so she ran out of it. She had to put in medical requests constantly to try to get the medical care that she needs. The guards became increasingly rude to her and she heard them talking about her. She heard at least one guard say that women detained at ICDC who spoke out about the abuse would "pay for this."

263. Jane Doe #5 also witnessed retaliation against other women who spoke out, including at least one woman who was deported and forced to carry her own bags right after having surgery. She observed how quickly ICE tried to deport Yanira Yesenia Oldaker. Jane Doe #5 fears further retaliation based on what has happened to other women.

264. When representatives from Congress visited ICDC, Jane Doe #5 wished to speak with them but never had an opportunity to do so. She was not permitted outside that day and the representatives were never brought to her dorm.

Case 7:22-cv-00148-WLS-ALS Document 138-2 Filed 07/31/24 Page 65 of 195

265. On or about December 12, 2020, Jane Doe #5 requested mental health care and was told she did not have anxiety or depression. She was told that she was just suffering from stress and insomnia. However, an outside evaluation by a specialist indicates that Jane Doe #5 requires treatment for depression.

**F. Plaintiff Jane Doe #6**

266. Plaintiff Jane Doe #6 is a mother of six who has been living in the U.S. with a U visa since 2014. She is pursuing immigration relief. Jane Doe #6 was detained in ICE custody at ICDC from February 2019 until January 2021. During this time, she was a victim and a witness to non-consensual and invasive gynecological procedures at ICDC, as well as to abuse at the hands of Defendant Amin and ICDC employees, agents, and/or contractors.

267. Jane Doe #6 repeatedly asked for medical assistance for health problems while in detention, but her requests for assistance were repeatedly ignored, and the medical staff frequently expressed anger towards her.

268. In May 2019, Jane Doe #6 was taken to Defendant Amin for the first time–a month after complaining of ovary pain. Despite knowing that Jane Doe #6 speaks very little English, she was seen without a translator being present. When Defendant Amin came into the room, he hardly acknowledged Jane Doe #6. Defendant Amin did not explain what he was going to do to Jane Doe #6 or ask for her consent; rather, he put an ultrasound inside of her, conducted an intravaginal ultrasound examination, and then put his fingers inside of Jane Doe #6's vagina. Jane Doe #6 had never had an intravaginal ultrasound before or had a doctor touch her in this way. She initially trusted Defendant Amin because he was a doctor. Defendant Amin's assistant and an ICDC guard were both in the room. Jane Doe #6 explained to Defendant Amin that she did not understand what he

was saying, but he continued to speak only English to her. No one in the room explained what was happening to Jane Doe #6 or why Amin had invaded her body with equipment and with his fingers.

269. After the ultrasound, Defendant Amin promptly left the room. The nurse told Jane Doe #6 that Defendant Amin had found a cyst on her ovary and that she needed a Depo shot to remove the cyst. She was told that if the shot did not work, she would need surgery. Jane Doe #6 did not know what a Depo shot was, but took the injection because she thought she needed it to survive and wanted to live for her children. No one gave Jane Doe #6 information about the shot. The shot caused Jane Doe #6 vaginal bleeding for two weeks.

270. Jane Doe #6 prayed she would not need surgery because she had seen other women go through surgeries conducted by Defendant Amin. She noticed that, after the surgery, those women were in extreme pain and barely able to rise from bed. She also noticed that many women at ICDC would not get the medication that they had been told to take after their surgeries.

271. In July 2019, Jane Doe #6 was taken to see Defendant Amin for a second time. He again conducted a vaginal ultrasound and put his hands inside of Jane Doe #6's vagina with no explanation. And again, there was no translator in the room. Defendant Amin left the room promptly after and left it to a nurse to provide information to Jane Doe #6. Jane Doe #6 was not shown the results of the ultrasound examination while it was being conducted or afterwards. Instead, a nurse told Jane Doe #6 that the cyst was no longer there, but that there was now a "black shadow" on her uterus and that Defendant Amin had prescribed pills for her to take. Because Defendant Amin had already left the room,

Jane Doe #6 could not ask what the black shadow was or what prescription Defendant Amin had given her.

272. Jane Doe #6 also was prescribed medication for a urinary tract infection ("UTI") during the July 2019 visit to Amin's clinic. Yet, after she was returned to ICDC, Jane Doe #6 was given only three of the five-day course of medication for her UTI. This was not the first time the staff at ICDC refused to give Jane Doe #6 medication. She was previously refused medication for a prior UTI when ICDC medical staff told her to drink more water instead of providing her medication.

273. In November 2019, Jane Doe #6 was taken to see Defendant Amin for a third time because she was having irregular periods. Defendant Amin did not explain what he was going to do but conducted a vaginal ultrasound and put his fingers in her vagina. There was no translator present. The ICDC officer who brought Jane Doe #6 to the appointment spoke Spanish, but refused to translate for Jane Doe #6.

274. In early 2020, Jane Doe #6 sought treatment for pain near her navel. She was taken to the hospital, given an X-ray, and told she needed surgery. Despite requests, she has never been shown the medical test results nor has the surgery been scheduled. She wants the suffering to stop but has not gotten any care despite her pleas for medical assistance.

275. Jane Doe #6 faced additional mistreatment at the hands of ICDC employees, agents, and/or contractors. For instance, in 2019, an Unknown ICDC Officer told Jane Doe #6 to wear filthy underwear, soiled with large bloodstains. It was only after Jane Doe #6 begged the officer for clean underwear that he relented and gave her a cleaner pair to wear.

276. In March 2020, Jane Doe #6 participated in the hunger strike in her unit, E2. The women were striking to protest the poor conditions at ICDC and because the staff had failed to inform the detainees about the pandemic. When Unknown ICDC Officers and/or Unknown ICE Officials learned that one of the women had told her husband about the strike, they put the unit on lockdown. Jane Doe #6 observed an officer refuse to give water to a woman in her unit. Later that evening, the officers confiscated all of the women's food in the commissary. Then, the tablets that the women used to make calls and emails stopped working. Later, the officers threatened to disconnect the water, including in the bathrooms, and to put the women in solitary confinement if the strike continued. In response to these threats, the women ended the hunger strike.

277. After the hunger strike, women were stopped from going to the law library. In addition, when women tried to share their experiences about the hunger strike over the phone, the phone call would disconnect, sometimes mid-sentence. Although Jane Doe #6 has been at the ICDC for almost two years, the only time that one of her phone calls were dropped was after she referred to the hunger strike during her call.

278. In July 2020, Jane Doe #6 was tested for COVID-19 and told that she had tested positive. She requested to see her test results, but they were never provided to her. Purportedly in response to the test results, Jane Doe #6 was put into lockdown for nineteen days. Even in lockdown, the guards are supposed to let the women out of lockdown for at least one hour each day, but the guards routinely disregarded this process. On one of her days in lockdown, Jane Doe #6 was not let out at all, despite her pleas to the guards.

Case 7:22-cv-00148-WLS-ALS Document 138-8 Filed 10/22/24 Page 69 of 195

279. In November 2020, Jane Doe #6 spoke with investigators from the DOJ about her experiences. She is committed to ensuring that Defendants, their employees, agents, and/or contractors no longer abuse vulnerable immigrant women who are detained. Simultaneously, she knows that her willingness to speak out about medical abuses at ICDC increases the risk of retaliation against her.

280. If deported to Guatemala, it would be impossible for Jane Doe #6 to meaningfully participate in the pending federal investigations or any other investigations that may be opened to expose medical abuses and retaliation against women at ICDC.

**G. Plaintiff Jane Doe #8**

281. Plaintiff Jane Doe #8 was born in Guadalajara, Mexico. She was brought to the United States in 2007, when she was eight years old. While detained at ICDC from July 2020 until January 2021, she was subjected to non-consensual, invasive gynecological procedures by and at the direction of Defendant Amin.

282. When Jane Doe #8 was nine or ten years old, she was a victim of frequent sexual abuse from her stepfather. As a result of this trauma, she suffers from anxiety and depression. She also has a history of experiencing panic attacks that are triggered by being touched by men, even those with whom she had intimate relationships. Jane Doe #8 reported that touches from her high school boyfriend triggered panic attacks because it would remind her of the abuse she suffered as a child.

283. While in custody, Jane Doe #8 requested medical attention after experiencing pain in her lower abdomen. In September 2020, Jane Doe #8 was taken to see Defendant Amin. Prior to her appointment, the guard took Jane Doe #8 to intake, where they cuffed her hands and ankles and put a chain around her waist. Then, Unknown ICDC Officers and/or Unknown ICE Officials took her to the clinic in handcuffs. At the clinic, they

Case 7:20-cv-00224-WLS Document 133-18 Filed 07/01/26 Page 70 of 195

took her weight and blood pressure while she was handcuffed. She then was escorted by an Unknown ICDC Officer or Unknown ICE Official into a room where a nurse directed her to undress in front of the guard, despite Jane Doe #8's distress in doing so. She was forced to be completely naked in front of the guard before putting on a paper gown.

284. The nurse told Jane Doe #8 that Defendant Amin would see her but did not tell her what was going to be done during the visit. When Defendant Amin came into the room, he did not acknowledge Jane Doe #8 with even a hello. Rather, he said "open up your legs." Jane Doe #8 was then forced to open her legs and expose herself to the guard sitting at eye level and directly facing her vagina. Defendant Amin did not explain what he was doing or why he was doing it.

285. Defendant Amin performed a transvaginal ultrasound without alerting Jane Doe #8 that he would be doing so. Because of her history with sexual abuse, she instantly felt violated as he put the equipment inside of her without any explanation. After the exam, Defendant Amin told her that she had a cyst on her left ovary. Defendant Amin said that he was going to give her a Depo shot and that if the cyst did not dissolve in four weeks, she would be scheduled for surgery to remove the cyst.

286. Defendant Amin promptly left the room. At no time did he explain what a Depo shot was or ask Jane Doe #8 whether she wanted to receive the shot. After he left, Jane Doe #8 was allowed to get dressed, but was immediately handcuffed again. The guard never left the room. The nurse then gave Jane Doe #8 the shot while she was handcuffed. Jane Doe #8 was then asked to sign paperwork that she did not understand. Neither the nurse nor Defendant Amin explained the contents of the paperwork to Jane Doe #8.

Case 7:22-cv-00148-WLS-ALS Document 133-18 Filed 10/12/24 Page 71 of 195

287. Jane Doe #8 learned that the Depo shot was a form of birth control from another woman, who had also been transported to the medical facility that day for a visit with Defendant Amin. That other woman also reported that she had been told by Defendant Amin that she had a cyst on her left ovary that required a Depo shot. Jane Doe #8 was surprised and alarmed to learn that the Depo shot was birth control. Due to her fear of the side effects of birth control, she would have asked questions had she known they were injecting her with birth control medication.

288. After her visit with Defendant Amin, Jane Doe #8 experienced intense anxiety. She did not know what would happen if the cyst did not dissolve or what the surgery entailed because neither Defendant Amin nor any other medical or other staff explained anything to her.

289. Jane Doe #8 learned that at least five other women in her pod at ICDC had also been told, during their appointments with Defendant Amin, that they had cysts on one of their ovaries. She also learned that these women had surgeries performed by Defendant Amin.

290. After receiving the Depo shot, Jane Doe #8's menstrual cycle became extremely irregular and longer lasting.

291. In late October 2020, Jane Doe #8 visited the medical office at ICDC. She spoke with a gynecologist named Jessica. She informed the gynecologist of the symptoms she had experienced since receiving the Depo shot. Jessica told Jane Doe #8 not to believe the reports that had circulated in the news about Defendant Amin, urging her to tell other women that the news reports about Defendant Amin were not true.

Case 7:22-cv-00148-WLS-ALS Document 18-2 Filed 07/31/26 Page 72 of 195

292. At ICDC, the women's phone calls were monitored and recorded. Jane Doe #8 tried to speak about her experience with Defendant Amin over the phone to her mother. When she tried speaking about what happened, the phone call would disconnect. Jane Doe #8 thought her mother hung up, but her mother later informed her that she had not. This happened repeatedly and only when Jane Doe #8 tried to speak with her mother about her experience with Defendant Amin.

293. Jane Doe #8 has requested all of her medical records at ICDC but has only received medical records for the last month of her time at ICDC. These records did not include any of the records from her appointment with Defendant Amin. When Jane Doe #8 asked a guard for her complete medical records, she was told that her request may not be possible.

294. Jane Doe #8 has not been able to receive an independent physical examination. Because of the side effects she experienced from the Depo shot administered by Defendant Amin, she has requested an independent physical examination to understand what happened to her.

295. Jane Doe #8 is committed to ensuring that Defendants, their employees, agents, and/or contractors no longer abuse vulnerable immigrant women who are detained. Jane Doe #8 has spoken with reporters and congressional staffers about the abuse she experienced at ICDC. Simultaneously, she knows that her willingness to speak out about medical abuses at ICDC increases the risk of retaliation against her.

296. If deported to Mexico, it would be impossible for Jane Doe #8 to meaningfully participate in the pending federal investigations and any other investigations that may be opened to expose medical abuses and retaliation against women at ICDC.

Case 7:22-cv-00148-WLS-ALS Document 139-18 Filed 10/12/24 Page 73 of 195

**H. Plaintiff Jane Doe #15**

297. Plaintiff Jane Doe #15 was detained in ICE custody at ICDC beginning in February 2020. During this time, she was a victim and a witness to non-consensual and invasive gynecological procedures at ICDC, as well as abuse, at the hands of Defendant Amin and ICDC employees, agents, and/or contractors.

298. Jane Doe #15 does not speak English. She is a native Spanish speaker.

299. Jane Doe #15 has also witnessed retaliation against women who speak out about these forced procedures at ICDC.

300. Jane Doe #15 has witnessed retaliation against women who speak out at ICDC. She witnessed several women receive time in solitary confinement as punishment for speaking up when they are abused or harassed. She knows women who spent as long as fifteen days in solitary confinement for "causing problems."

301. In April 2020, four or five women were placed in solitary confinement after they recorded a YouTube video showing their mistreatment and the unsanitary living conditions in ICDC. Jane Doe #15 feared that she would be placed in solitary confinement if she spoke up about her experiences.

302. Jane Doe #15 also witnessed physical violence when she saw multiple guards attack another detainee named Michelle. Jane Doe #15 saw the guards throw Michelle to the ground and pin her down with their knees while they filmed the assault. Jane Doe #15 is terrified that this type of assault could happen to her.

303. These incidents, among others, caused Jane Doe #15 to stay silent while she suffered the same pattern of harassment and abuse from the staff at ICDC.

304. Jane Doe #15 has also suffered unnecessary and traumatic medical procedures performed on her by Defendant Amin. She underwent surgery performed by Defendant Amin in June 2020.

305. In May 2020, Jane Doe #15 began experiencing pain in her pelvic area. She was seen by Defendant Amin for this pain. During the appointment, he asked her no questions. Jane Doe #15 could not understand what he said while he conducted a vaginal ultrasound because there was no translator present. By the time a nurse arrived to translate, Defendant Amin had already left the room.

306. The nurse informed her in Spanish that there was a cyst on her right ovary "the size of an egg," as well as fibroids in her uterus. Jane Doe #15 later learned that Defendant Amin had told many women in Jane Doe #15's unit that they had cysts "the size of an egg."

307. At the May 2020 appointment, the nurse gave Jane Doe #15 an injection, but neither Defendant Amin nor the nurse gave Jane Doe #15 any information about the injection or what medication she was being injected with. The nurse simply told her that the injection would make the cyst go away. Because Defendant Amin did not return after the nurse arrived, Jane Doe #15 could not ask him any questions about her diagnosis or the injection. Jane Doe #15 still does not know what substance was injected into her.

308. The injection did not help Jane Doe #15. Instead, she experienced consistent vaginal bleeding for ten days before she was able to see Defendant Amin again.

309. At the second appointment, Defendant Amin performed a vaginal ultrasound and explained, with the aid of the nurse, that her cyst and fibroids remained and that she would need surgery. This terrified Jane Doe #15. She had witnessed several women

return in terrible condition after surgeries performed by Defendant Amin. She saw them experience crippling pain. One woman bled for weeks. Jane Doe #15 also saw that many of Defendant Amin's former surgery patients were deported soon after their procedures, and she feared the same would happen to her if she received surgery.

310. Jane Doe #15 was frightened of the surgery, but the nurse told her that without it she would lose her uterus and never be able to have children. Jane Doe #15 was willing to risk anything to preserve her chance to become a mother, so she went forward with the surgery despite being given no information about what it entailed or when it would be performed.

311. A few days later, on June 25, 2020, an Unknown ICDC Officer or an Unknown ICE Official came to Jane Doe #15 around 11:00 p.m. and told her not to drink or eat anything after midnight. He did not explain the reason for this instruction. The next morning, on June 26, 2020, Unknown ICDC Officers and/or Unknown ICE Officials woke her up without any explanation and transported her to the hospital in handcuffs. This was when Jane Doe #15 found out she was scheduled for surgery.

312. At the hospital, Jane Doe #15 did not have the aid of a translator at any point before the surgery. She could not understand anything the medical staff said, and the guards completely ignored her. Out of desperation, she begged one of the guards to help her ask a question using Google Translate, an imperfect tool that can only translate short, simple phrases reliably. Even when Jane Doe #15 used this to ask the staff what the surgery entailed, they only told her that it would take two to three hours and that she would receive anesthesia.

Case 7:22-cv-00144-WLS Document 139-18 Filed 10/12/26 Page 76 of 195

313. Immediately before the surgery began, a nurse handed Jane Doe #15 a piece of paper to sign. The document was entirely in English and Jane Doe #15 could not read any of it. She did not know what it said. She was already undressed and the surgical team was present and ready to begin surgery. Jane Doe #15 felt that she had no choice but to sign, despite not knowing what the surgery was for, what they would do to her body during the surgery, or what wounds or potential side effects she might suffer after the surgery.

314. Jane Doe #15 did not see Defendant Amin, or any medical doctor, at any point during her time in the hospital. She woke up bleeding from the surgery, continued to bleed as Unknown ICDC Officers and/or Unknown ICE Officials brought her back to ICDC, and bled consistently for more than a week thereafter.

315. Officers at ICDC neglected to care for her in any way when she returned from surgery. Jane Doe #15 could not get out of bed on her own without assistance from the other women in her unit. She had to have food brought to her by other women when officers neglected to do so. Her fellow detainees had to help her walk to get her post-surgery medications because the nurses refused to deliver them to her.

316. While Jane Doe #15 recovered, two of her wounds became infected. When she asked the nurses for bandages and rubbing alcohol in order to disinfect them, they provided her with one bandage and nothing to clean the wounds. They gave her no other assistance.

317. In August 2020, Jane Doe #15 was brought to see Defendant Amin by Unknown ICDC Officers and/or Unknown ICE Officials. She had made no request to see Defendant Amin. A nurse was present to translate. Jane Doe #15 immediately asked what surgery he performed on her, but Defendant Amin did not answer the question. Defendant Amin informed her that, despite the surgery, Jane Doe. #15 still had fibroids in her uterus.

Case 7:22-cv-00148-WLS Document 139-18 Filed 10/22/24 Page 77 of 195

With little regard for her distress, he informed her that she would never be able to have children. Jane Doe #15 requested that someone else examine her, but Defendant Amin simply shrugged and told her he would see her again in three months. Jane Doe #15 left the appointment completely devastated, embarrassed, and ashamed.

318. Jane Doe #15 remains in extreme pain to this day. However, she was afraid to tell ICDC officers or ICE officials out of fear she will experience more medical trauma. To this day, she does not know what surgery Defendant Amin performed on her.

319. Jane Doe #15 is committed to ensuring that Defendants, their employees, agents, and/or contractors no longer abuse vulnerable immigrant women who are detained. Jane Doe #15 has spoken with reporters and congressional staffers about the abuse she experienced at ICDC. Simultaneously, she knows that her willingness to speak out about medical abuses at ICDC increases the risk of retaliation against her.

320. If deported to Mexico, it would be impossible for Jane Doe #15 to meaningfully participate in the pending federal investigations and any other investigations that may be opened to expose medical abuses and retaliation against women at ICDC.

**I. Plaintiff Jane Doe #22**

321. Plaintiff Jane Doe #22 is a 40-year-old woman who came to the United States from Senegal over twenty years ago with a tourist visa. She married a U.S. citizen who was very abusive. She has three children who are U.S. citizens. She had a serious leg injury in 2018 that causes her pain and swelling when she walks. She has gained a significant amount of weight in detention, becoming obese. She also suffers from depression.

322. Defendant Amin, Unknown ICDC Officers, Unknown ICE Officials, and their agents, contractors, and/or employees failed to provide adequate treatment to Jane Doe #22 or otherwise accommodate her disabilities.

Case 7:22-cv-00148-WLS-ALS Document 138-2 Filed 07/31/24 Page 78 of 195

323. Unknown ICDC Officers sought approval from ICE Health Service Corps to refer Jane Doe #22 to Defendant Amin. Unknown ICE Officials approved the request and referred Jane Doe #22 to Defendant Amin.

324. Jane Doe #22 was taken to Defendant Amin in September 2020, after news stories about him had already become public. She was not told the name of the doctor she was being taken to see. When she arrived and saw that it was Defendant Amin, she was terrified.

325. Defendant Amin performed a vaginal ultrasound, internal exam with his hand, and pap smear on Jane Doe #22. The vaginal ultrasound and internal exam were done without Jane Doe #22's informed consent. All three of the procedures were rough and painful.

326. Defendant Amin told Jane Doe #22 that she had cysts and said he could put her on birth control for them, but she declined. He then prescribed her antibiotics. Jane Doe #22 did not understand why she was being given antibiotics. When she returned to ICDC, she was still bleeding from the examination that Defendant Amin had performed. She felt violated by the experience.

327. When Jane Doe #22 requested her medical records, they were delayed. She received them only after complaining about ICDC's failure to provide them to her. She states that ICDC Officers and/or ICE Agents prevent detained women from raising awareness about problems with medical care by not providing medical records in a timely way.

328. Jane Doe #22 believes that ICDC retaliates against women by delaying or denying pain medication. One of the reasons she has stopped walking around the yard is because it has been so difficult for her to obtain ibuprofen for her leg.

329. Jane Doe #22 corroborated that Jane Doe #21 was deported to Mexico just days after being subjected to surgery by Defendant Amin. She witnessed Jane Doe #21 being

forced to carry her own bags while she was still in excruciating pain, and Plaintiff Walker further reports that Jane Doe #21 was forced to carry her own mattress out of her housing unit immediately prior to her deportation.

330. Jane Doe #22 further confirms that ICE tried to deport a woman named Alma Bella Bowman who spoke out about Defendant Amin. ICE had to bring her back to ICDC, but she was recently released.

331. Additionally, Jane Doe #22 confirms that ICE deported Plaintiff Floriano Navarro after she spoke out about how women at ICDC are pressured to have surgeries.

332. If Jane Doe #22 is deported to Senegal, it will be impossible for her to meaningfully participate in the pending federal investigations and any other investigations that may be opened to expose medical abuses and retaliation against women at ICDC.

**J. Plaintiff Jaromy Jazmín Floriano Navarro**

333. Plaintiff Jaromy Jazmin Floriano Navarro is from Mexico and a mother of three young daughters, two of whom are United States citizens. She was deported on September 16, 2020, without warning. She currently lives in Mexico, but her two daughters remain in the United States. She has since given birth to her third daughter. Ms. Floriano Navarro is a survivor of sexual assault.

334. Ms. Floriano Navarro was detained in ICDC from October 18, 2019, until her deportation on September 16, 2020.

335. During her detention at ICDC, Ms. Floriano Navarro experienced and witnessed mistreatment, harassment, and abuse at the hands of Unknown ICDC Officers and/of Unknown ICE Officials. Officers withheld food from Ms. Floriano Navarro and others, including when the COVID-19 pandemic first began. One officer would not give them food unless the women would speak English first.

336. Ms. Floriano Navarro experienced escalating sexual harassment and abuse from another detainee. Two women tried to protect her but could not meaningfully do so. Ms. Floriano Navarro was terrified of being sexually assaulted and had no choice but to report her abuser to ICDC staff and/or ICE agents. When Ms. Floriano Navarro tried to speak up, the guards sent Ms. Floriano Navarro to the medical room (which is also used for solitary confinement) for about five days. Ms. Floriano Navarro spent Christmas 2019 in solitary confinement while the abuser was not punished and remained in the company of other women. The solitary confinement room was filthy, the lights always remained on, and officers only permitted her to shower once. Ms. Floriano Navarro describes it as being in a "hellhole." Ms. Floriano Navarro believes she was punished by Defendants for speaking up. Defendants never meaningfully investigated the sexual aggression against Ms. Floriano Navarro. This experience convinced Ms. Floriano Navarro that she should keep her mouth shut to avoid retaliation.

337. Ms. Floriano Navarro also witnessed women being placed in solitary confinement without access to water when they went on a hunger strike to protest their mistreatment and the conditions at ICDC. When the women returned to Ms. Floriano Navarro's housing unit, officers pepper sprayed them and isolated them again. Many of those women were deported as a result of the protest. This terrified Ms. Floriano Navarro and discouraged her from speaking out about her experiences at ICDC.

338. Ms. Floriano Navarro also suffered medical abuse from Defendant Amin. After complaining of heavy menstrual cramps to a nurse in March 2020, the nurse referred her to Defendant Amin. This was the first time Ms. Floriano Navarro saw Defendant Amin. At the appointment, Defendant Amin performed a vaginal ultrasound on Ms. Floriano

Navarro with no warning or explanation. With no understanding of why this was being conducted, Ms. Floriano Navarro felt violated.

339. Defendant Amin then told Ms. Floriano Navarro that she needed to have surgery. He said that she had a cyst that would grow. He did not explain what the cyst was, if it was dangerous, or give her any details whatsoever.

340. At this same appointment, Defendant Amin told Ms. Floriano Navarro that she needed to have a Depo shot to treat the cyst. He did not give her any choice.

341. She experienced vaginal bleeding for a month straight after receiving the Depo shot. This was unusual for her, because, before her detention, when she had been treated with the Depo shot, she had not suffered any side effects.

342. After that first appointment, Ms. Floriano Navarro was brought back to see Defendant Amin regularly through July 2020.

343. Given her history as a survivor of sexual assault, each visit made Ms. Floriano Navarro feel extremely uncomfortable and violated. During her appointments, Defendant Amin rested one hand on her knee while he inspected her vaginal area, and inside her body, without ever explaining why he was doing so. He would switch between inserting his fingers and inserting an ultrasound wand inside her body. Defendant Amin also told her at every appointment that she needed surgery, but he did not tell her why or what kind of surgery was needed. He also did not tell her when the surgery would occur.

344. Then, on July 31, 2020, Ms. Floriano Navarro was scheduled for surgery at the Irwin County Hospital. Another woman, Jane Doe #21, was also scheduled for surgery that day. Ms. Floriano Navarro was told the surgery was to drain her cyst. When an ICDC

Case 7:22-cv-00148-WLS-ALS Document 138-2 Filed 07/12/24 Page 83 of 195

officer named Ms. Vaughn asked Ms. Floriano Navarro what surgery she was having that day, she smirked as Ms. Floriano Navarro stated it was surgery to drain her cyst.

345. At the hospital, a nurse prepped Ms. Floriano Navarro for the surgery, conducted a COVID-19 test, and made her sign a consent form without letting her read it. After Ms. Floriano Navarro was fully prepared for surgery, Ms. Vaughn came in the room and told her that Defendant Amin was actually going to perform a hysterectomy, which would remove her womb. This was the first time any person had mentioned a hysterectomy to Ms. Floriano Navarro.

346. Ms. Floriano Navarro would have been forced to have the hysterectomy, but for the fact that right before the surgery, the results of her COVID-19 test were returned, showing that she had COVID-19 antibodies. Ms. Floriano Navarro was taken back to ICDC, and the hysterectomy surgery was not performed.

347. None of the other women in Ms. Floriano Navarro's housing unit were told about Ms. Floriano Navarro's COVID-19 test results. Ms. Floriano Navarro attempted to inform them as soon as she returned, so they could take necessary precautions, but she was immediately taken to an isolation unit. The officers then lied to the other women and told them that Ms. Floriano Navarro was going home rather than telling them about the test results.

348. Unknown ICDC Officers continued to pressure Ms. Floriano Navarro to get the surgery despite her resistance. For instance, Officer Rabiou, an officer with no medical background, encouraged her to get the surgery before she was deported. ICE Officials William and Mia also encouraged her to get the surgery after she expressed her concerns and informed them of her experiences with Defendant Amin. Despite Ms. Floriano

Case 7:22-cv-00148-WLS-ALS Document 138-18 Filed 01/07/26 Page 83 of 195

Navarro's repeated complaints about her treatment, none of the ICDC officers or ICE officials showed her any concern.

349. Ms. Floriano Navarro saw Defendant Amin one more time before her deportation. On September 15, 2020, the guards took her to see Defendant Amin without warning. Defendant Amin berated her for not getting the surgery. Immediately after the appointment, guards brought Ms. Floriano Navarro to the intake area where she was informed that she would be deported. Ms. Floriano Navarro had never before seen any other woman called to the intake area to be told they would be deported. Ms. Floriano Navarro waited in the intake area for about an hour and a half. While she waited, Defendant Smith confronted her about a whistleblower report on medical abuses at ICDC that was released the day before, on September 14, 2020. Upon being questioned, Ms. Floriano Navarro admitted that she had told a lawyer about her own experiences, and Defendant Smith immediately told other officers nearby. Defendant Smith berated Ms. Floriano Navarro and told her that she should leave for Mexico "fresh and clean," meaning after undergoing surgery. Ms. Floriano Navarro felt terrified and her heart was racing. When she returned to her pod, she was crying and extremely distressed, and other women tried to comfort her.

350. Within 24 hours, Ms. Floriano Navarro was deported. Ms. Floriano Navarro believes that she was deported so that she could not speak out about her experiences and mistreatment at the hands of Defendant Amin and in retaliation for having told her lawyer about Defendant Amin's plan to perform a hysterectomy on her.

Case 7:22-cv-00148-WLS-ALS Document 138-18 Filed 07/02/24 Page 84 of 195

351. Because of Ms. Floriano Navarro's deportation to Mexico, she has never been able to participate in any federal investigation. She actively wants to speak out and assist the authorities in preventing what happened to her in detention from happening to others.

**K. Plaintiff Mbeti Victoria Ndonga**

352. Plaintiff Mbeti Victoria Ndonga is a 38-year-old woman who was brought to the United States when she was two years old. Ms. Ndonga currently lives in Georgia.

353. Ms. Ndonga was detained in ICE custody at ICDC from April 2019 until December 16, 2020. She was detained at ICDC for more than 616 days, including 267 days after receiving a final order of removal. While detained at ICDC, Ms. Ndonga was subjected to non-consensual, invasive, and medically unindicated procedures at the hands of Defendant Amin.

354. Ms. Ndonga suffers from serious mental health disabilities, specifically schizoaffective disorder, a schizophrenia-spectrum disorder. She also has been diagnosed with post-traumatic stress disorder (PTSD). An immigration judge in Atlanta, Georgia adjudicated her mentally incompetent after ICE moved to hold a *Matter of M-A-M-* competency hearing in May 2019. ICE and its employees, contractors, and/or agents were or should have been aware of Ms. Ndonga's mental disabilities since at least that time.

355. Additionally, Ms. Ndonga suffers from hypertension, obesity, and chronic and severe gynecological issues. Specifically, Ms. Ndonga suffers from heavy, irregular bleeding and debilitating menstrual cramps. While in ICE custody, Ms. Ndonga repeatedly sought treatment for her gynecological issues, but never received appropriate treatment.

356. Throughout her detention at ICDC, Ms. Ndonga suffered from severe gynecological problems. Her menstrual cycle was highly irregular and caused her to bleed heavily for prolonged periods of time of up to twenty days in a single stretch. In addition to heavy

bleeding, she suffered immensely from intense cramps that regularly left her bedridden for days. When Ms. Ndonga alerted ICDC staff to her debilitating symptoms in the summer of 2019, she expected to receive a Depo shot to manage her pain and bleeding. This medical treatment successfully helped to manage Ms. Ndonga's gynecological symptoms in the past.

357. On July 31, 2019, Ms. Ndonga had an appointment with Defendant Amin. During the appointment, Ms. Ndonga requested a Depo shot, but Defendant Amin refused to give her that shot. He did not explain the refusal.

358. Instead, Defendant Amin subjected Ms. Ndonga to a medically unindicated, non-consensual transvaginal ultrasound, despite Ms. Ndoga's inability to provide truly informed consent given her known mental health disabilities. After the ultrasound, Defendant Amin told Ms. Ndonga that she needed additional medical procedures. Defendant Amin did not tell Ms. Ndonga what those procedures would be, why they were necessary, what less invasive options might be, or the benefits and risks of the procedures—in direct violation of his professional obligations.

359. Ms. Ndonga saw Defendant Amin for a second time on August 16, 2019. Defendant Amin again subjected Ms. Ndonga to non-consensual and medically unnecessary procedures without obtaining Ms. Ndonga's informed consent. Alarmingly, Defendant Amin performed dilation and curettage, a laparoscopy, and an ovarian cystectomy without Ms. Ndonga's knowledge while Ms. Ndonga was under general anesthesia. After the surgery, Ms. Ndonga woke up with three wounds on her abdomen. She also developed a surgical site infection that lasted for months. In addition to the infection, the

surgery worsened her cramps and bleeding, and left her with a pinching pain in her abdomen that has continued for the past 16 months.

360. Ms. Ndonga did not learn what happened to her during the surgery until she retained counsel in October 2020, almost 15 months later. Throughout that time, Ms. Ndonga was overwhelmed with fear that she had been sterilized and would never be able to bear children.

361. Additionally, given her personal history as a survivor of sexual trauma, Ms. Ndonga found the procedures forced on her by Defendant Amin to be emotionally traumatizing. As a result of her prior sexual abuse, Ms. Ndonga suffers from post-traumatic stress disorder (PTSD). Defendant Amin's non-consensual, invasive, medically unindicated procedures further triggered and exacerbated Ms. Ndonga's PTSD.

362. Ms. Ndonga's horrific experiences motivated her to participate in the federal investigations into the pattern of unnecessary, non-consensual, invasive gynecological procedures performed on women detained at ICDC.

363. On October 27, 2020, Ms. Ndonga completed a one-hour interview with federal investigators from the DOJ, DHS OIG, and FBI. Ms. Ndonga told investigators that she had more information to share, but her fears of deportation and other retaliation made her afraid to do so.

364. A few hours later, on October 27, 2020, ICE informed Ms. Ndonga that it had lifted the hold on her deportation, and that she would be deported imminently. Ms. Ndonga filed two requests for release on October 27 and 28; ICE denied both almost immediately. On October 30, 2020, Defendant Musante informed Ms. Ndonga's counsel that ICE would

Case 7:20-cv-00224-WLS Document 138-98 Filed 01/02/26 Page 87 of 195

deport Ms. Ndonga in early December 2020 and that her flight had already been scheduled.

365. ICE only scheduled Ms. Ndonga's removal after she spoke out against her abusive treatment at ICDC, after Ms. Ndonga informed investigators that she had more information to share and almost 19 months after she was first detained.

366. Ms. Ndonga's deportation fits into a pattern of retaliation she experienced following her efforts to speak out against the poor conditions at ICDC.

367. For example, Ms. Ndonga repeatedly tried to hang a sign on the wall of her cell shortly after she arrived at ICDC. Women generally hang materials on the walls of their cell without incident. Ms. Ndonga used her sign as a way to voice her frustration with her poor medical treatment and ongoing medical neglect. Specifically, Ms. Ndonga's sign read: "Death 2 Prejudiced Healthcare for Black Female Here in GA, USA. Pay, pay, pay. I live with pain every day."

368. Despite Ms. Ndonga's right to display her sign, Unknown ICDC Officers and/or Unknown ICE Officials repeatedly told Ms. Ndonga to take her sign down. When Ms. Ndonga refused and reminded the officers of her right to peacefully protests, the officers removed the sign themselves. However, Ms. Ndonga reprinted her sign and hung it again. Officers continued to remove her new signs, but every time, Ms. Ndonga reprinted and re-hung her sign.

369. Ms. Ndonga has even taken her activism outside the walls of ICDC. Since speaking with federal investigators, Ms. Ndonga has spoken with numerous reporters and has been featured with her full name and photograph in several articles about the pattern of gynecological abuse at ICDC. Ms. Ndonga is also eager to continue her participation in

Case 7:22-cv-00149-WLS-ALS Document 138-2 Filed 07/01/24 Page 88 of 195

the ongoing federal investigations into gynecological abuse at ICDC. Ms. Ndonga is desperate to speak out against the abuse she suffered at the hands of Defendant Amin, even though she knows it heightens the risk that Defendants will retaliate against her.

370. Two experts offered evaluations of Ms. Ndonga. Based on a review of medical records, Dr. Mueller concluded that Ms. Ndonga "underwent inappropriate, overly aggressive evaluation and care by [Defendant] Amin"; "the operation that [Defendant] Amin performed on Ms. Ndonga did not meaningfully contribute to the evaluation or management of her gynecologic condition"; and "[n]one of the care provided by [Defendant] Amin actually addressed Ms. Ndonga's underlying gynecologic complaints." After evaluating Ms. Ndonga by videoconferencing, Dr. Jasdeep Sandhu, M.D., found, "Ms. Ndonga has been personally subjected to physical and psychological harm at the hands of [Defendant] Amin and this has worsened her preexisting PTSD symptoms and jeopardized her progress made in treatment of her mental illness." Dr. Sandhu further concluded, ""[D]ue to her severe mental illness[es] of schizoaffective disorder and PTSD she is more vulnerable to abuse of any kind especially when in a compromised position as in a doctor patient relationship and in detention."

371. If Ms. Ndonga is deported to Kenya, it will be impossible for her to participate in the investigations and to speak to media outlets about the pattern of abuse. Ms. Ndonga does not have anyone to receive her or anywhere to stay in Kenya, and she will likely not have access to appropriate healthcare.

**L. Plaintiff Keynin Jackelin Reyes Ramirez**

372. Plaintiff, Keynin Jackelin Reyes Ramirez, is a 33-year-old woman. Ms. Reyes Ramirez fled to the United States from Honduras more than six years ago in order to escape an abusive ex-partner. Ms. Reyes Ramirez is the mother of three Honduran children

approved for Special Immigrant Juvenile Status on the basis of their father's abuse, and two children who are U.S. citizens. She is the wife of Cristian Alexander Hernandez, a United States citizen, and works hard to support her family as a house cleaner and roofer.

373. Ms. Reyes Ramirez was detained at ICDC from January 30, 2020 until December 11, 2020. During this time, she was subjected to non-consensual, invasive, and medically unnecessary gynecological procedures at the hands of Defendant Amin.

374. On March 9, 2020, Ms. Reyes Ramirez put in a request to receive a birth control injection, as she had historically received them prior to her detention. On June 16, 2020, Ms. Reyes Ramirez complained about an abnormal vaginal pH balance and requested to see an OB/GYN for her yearly checkup. On June 17, 2020, Ms. Reyes Ramirez again requested medical attention due to vaginal pain. Three months after her initial request for gynecological care, she was finally referred to a provider on June 18, 2020.

375. On July 5, 2020, ICDC medical staff noted that Ms. Reyes Ramirez had a bump in the vaginal area that burned and also noted that Ms. Reyes Ramirez requested a birth control injection to regulate her menstruation.

376. Unknown ICDC Officers sought approval from ICE Health Service Corps to refer Ms. Reyes Ramirez to Defendant Amin. Unknown ICE Officials approved the request and referred Ms. Reyes Ramirez to Defendant Amin.

377. Early in the morning on July 9, 2020, Ms. Reyes Ramirez was taken in handcuffs to see Defendant Amin. She was not informed where she was going, and because four months had passed since her initial request to see a provider, she was confused as to where she was being taken.

378. At Defendant Amin's office, Ms. Reyes Ramirez was asked questions about how many children she had, and whether she had any prior C-sections. Ms. Reyes Ramirez signed a sheet of paper, but she was not told what she was signing. Without saying anything to Ms. Reyes Ramirez, Defendant Amin roughly forced her legs apart and inserted a tubular device. An interpreter was present but did not say anything about what Defendant Amin was doing or why he was doing it. Neither Defendant Amin nor the nurse in the room explained to her what was happening either. Defendant Amin then informed Ms. Reyes Ramirez that she had several cysts in her ovary, a diagnosis she had never received from former gynecologists despite attending regular check-ups.

379. Defendant Amin gave Ms. Reyes Ramirez an injection, but did not tell her what it was, only that it would remove cysts. He told Ms. Reyes Ramirez he would have results in two weeks but did not clarify what results he was referring to. When Ms. Reyes Ramirez inquired about the possibility of taking birth control pills rather than the injection, Defendant Amin dismissed her question without explaining why other options were not available. Ms. Reyes Ramirez never received confirmation from Defendant Amin that the injection he gave her was the contraceptive she requested; and if it was a contraceptive, when she would have to return for another injection.

380. When Ms. Reyes Ramirez returned to the detention center after her appointment with Defendant Amin, she experienced significant pain and cramping, a pain she described as similar to childbirth. Ms. Reyes Ramirez was only able to access ibuprofen from the ICDC commissary to manage the intense pain she felt. Ms. Reyes Ramirez also noticed a strong smell from her vagina in the days following her appointment with Defendant Amin.

Case 7:22-cv-00148-WLS-ALS Document 139-18 Filed 10/22/24 Page 91 of 195

381. Ms. Reyes Ramirez was also subjected to non-consensual tooth extractions while detained at ICDC.

382. On September 22, 2020, Ms. Reyes Ramirez requested her medical records. She was provided an incomplete copy of her medical records and told by Deportation Officer Portillo that if she wanted these records because it was "about the doctor" she would need a lawyer in order to obtain the full record.

383. On September 26, 2020, Ms. Reyes Ramirez spoke with congressional representatives who visited ICDC in response to the whistleblower complaint and media reports about abuses by Defendant Amin. Ms. Reyes Ramirez spoke with these representatives despite being told by officials at ICDC that she should "go to bed," "keep quiet" and should not speak with the representatives. Ms. Reyes Ramirez shared with visiting congressional representatives the details of what happened to her at the hands of Defendant Amin.

384. On November 5, 2020, Ms. Reyes Ramirez's name was provided to federal investigators identifying her as a victim of Defendant Amin and potential witness in the investigation.

385. On November 10, 2020, Ms. Reyes Ramirez noticed that her commissary account was "zeroed out," which typically indicates that a deportation will occur within 24-48 hours. The same day, Ms. Reyes Ramirez's counsel notified Defendant Musante, by email and telephone, that Ms. Reyes Ramirez was represented. Ms. Reyes Ramirez's counsel also indicated to Defendant Musante that Ms. Reyes Ramirez was a victim of Defendant Amin, intended to participate in an ongoing DOJ investigation, and that her deportation would violate ICE policy. These claims were reiterated in Ms. Reyes Ramirez's I-246 Stay Request, filed with ICE by email on November 11, 2020, in person on November 13, 2020, and granted on November 17, 2020.

386. Defendants' efforts to deport Ms. Reyes Ramirez immediately followed her name being released to the DOJ, but prior to her having the opportunity to interview with investigators regarding the investigation.

387. On November 16, 2020, Ms. Reyes Ramirez filed a federal habeas petition and motion for a Temporary Restraining Order in the Middle District of Georgia. On November 17, 2020, once again Ms. Reyes Ramirez's commissary account was "zeroed out."

388. Ms. Reyes Ramirez's counsel again contacted Defendant Musante and informed him that Ms. Reyes Ramirez was a victim of Defendant Amin and that she intended to participate in the ongoing investigation regarding his abuse of women at ICDC. Counsel also informed Defendant Musante that on November 16, 2020, Ms. Reyes Ramirez had filed a federal habeas petition and motion for a Temporary Restraining Order in the Middle District of Georgia.

389. Ms. Reyes Ramirez's counsel also notified AUSAs Shannon Statkus and Jason Blanchard that Ms. Reyes Ramirez was at risk of imminent deportation. Later in the day on November 17, 2020, AUSA Statkus informed Ms. Reyes Ramirez's counsel that she had spoken with Deputy Chief Counsel of ICE, Emily Reece, who agreed with Officer Musante not to remove Ms. Reyes Ramirez until the Temporary Restraining Order was resolved and that she would be removed from the flight to Honduras set to occur the following morning.

390. Although Ms. Reyes Ramirez was not deported on November 18, 2020, the timing of Defendants' second attempt to swiftly remove Ms. Reyes Ramirez within a two-week period confirm that Defendants sought to deport Ms. Reyes Ramirez in retaliation for her willingness to participate in the ongoing federal investigations and to prevent her

from testifying in those investigations. Further, Ms. Reyes Ramirez's access to the phone through her commissary account was not reinstated until Friday, November 20, 2020, which limited her ability to contact her legal team, the press, and congressional representatives.

**M. Plaintiff Ana Gabriela Adan Cajigal**

391. Ana Adan Cagijal, is a 25-year-old woman. Ms. Adan Cagijal came to the United States when she was six months old. She lived in the United States with DACA status until 2015 when she took voluntary departure and moved to Mexico at 21-years old.

392. Ms. Adan Cagijal was detained at ICDC from late February 2020 until December 11, 2020. While detained, Ms. Adan Cagijal became a victim of and witness to medically unnecessary and non-consensual gynecological procedures performed on female detainees by Defendant Amin.

393. On May 4, 2020, Ms. Adan Cagijal put in a request for medical assistance because of gynecological concerns.

394. Unknown ICDC Officers sought approval from ICE Health Service Corps to refer Ms. Adan Cagijal to Defendant Amin. Unknown ICE Officials approved the request and referred Ms. Adan Cagijal to Defendant Amin.

395. It was not until September 14, 2020 that Ms. Adan Cagijal was sent to Defendant Amin. Defendant Amin administered a pap smear, then performed a vaginal ultrasound without lubrication and without asking for Ms. Adan Cagijal's consent. He did not explain to her what he was doing or ask for the reasons for her visit. He then inserted the monitor in a "rough" manner and told her that he found a small cyst "the size of a toenail" on her left ovary. He told her that she needed birth control pills, even though she informed him that she had skin irritation and pain in her vaginal area. The visit only lasted five minutes and

Case 7:22-cv-00148-WLS-ALS Document 133-18 Filed 10/12/24 Page 94 of 195

Defendant Amin never explained to her why she may have a cyst or what a cyst was. She experienced lingering pain as a result of the examination Defendant Amin performed on her.

396. A few days later, she heard on the news, and from other women, about the non-consensual gynecological procedures that Defendant Amin had performed on some of the women at ICDC. In order to help those women speak out about their experiences with Defendant Amin, Ms. Adan Cagijal volunteered to translate their medical records and interpret phone calls between them and news reporters. She became concerned that Defendant Amin had misdiagnosed her, and that she could have a condition other than "just a cyst" that might require immediate medical attention. Due to her concerns as well as her continuing symptoms, she requested medical attention and was taken to an OB/GYN clinic in Valdosta, GA on October 27, 2020. There, the doctor performed a complete evaluation and informed her that she did not have a cyst and ran some diagnostic tests.

397. The doctor prescribed medication for Ms. Adan Cajigal that was not given to her by the ICDC officers until more than a month later.

398. Ms. Adan Cagijal also suffers from asthma. She was diagnosed with asthma as a child. Prior to her detention at ICDC, her asthma had been stable, and she had not needed to use her inhaler for two years. However, her asthma began worsening considerably after her detention at ICDC due to the harsh chemicals in the cleaning products used at the facility. She filed several medical requests complaining of chest pain and difficulty breathing. In her requests, she noted that she gets tired quickly, feels like she is lacking air and will pass out, and that the chemicals used at ICDC were causing these symptoms

Case 7:20-cv-00224-WLS-ALS Document 138-18-2 Filed 07/01/24 Page 95 of 195

to worsen. She tested negative for COVID-19 and was prescribed an inhaler. But because she is only able to use the inhaler a limited number of times a day, she continued to experience these symptoms.

399. Ms. Adan Cagijal has experienced significant physical and emotional trauma and was diagnosed with post-traumatic stress disorder (PTSD) at ICDC. She has been prescribed Prazosin, a drug used to reduce nightmares in patients with PTSD, and Escitalopram, a drug used to reduce anxiety and depression. While being held at ICDC, Ms. Adan Cagijal asked to receive mental health therapy on multiple occasions but was unable to receive any therapy.

400. After Ms. Adan Cagijal spoke to FBI investigators, attorneys, and organizations involved in helping victims of Defendant Amin, Unknown ICDC Officers and/or Unknown ICE Officials began harassing and threatening Ms. Adan Cagijal because she had knowledge of incidents involving ICDC officers and/or ICE officials beating some of the women at ICDC. She saw how one of the women began experiencing back problems and trouble with walking and balance after an incident with the officers and/or officials. She also witnessed Unknown ICDC Officers and/or Unknown ICE Officials violently drag an individual out of ICDC. This experience terrified Ms. Adan Cagijal.

401. On September 26, 2020, representatives from Congress visited the detention center and she informed them about the inhumane conditions and experiences that the detainees are facing. However, guards repeatedly attempted to obstruct other detained individuals' ability to speak to the representatives.

402. On October 26, 2020, Ms. Adan Cagijal's attorney submitted her signed declaration about her experiences with Defendant Amin to the DOJ. Her attorney communicated

Case 7:22-cv-00148-WLS-ALS Document 138-2 Filed 07/12/24 Page 96 of 195

Ms. Adan Cagijal's desire to cooperate with the investigation and complete an interview about her experiences with Defendant Amin.

403. On November 2, 2020, attorney Tracie Klinke emailed Defendant Giles, Supervisory Detention and Deportation Officer (SDDO) Alejandro Hernandez, Deportation Officer (DO) Charlene Johnson, and Medical Officer of the Commonwealth (MOC) Hank Johnson, providing them with Ms. Adan Cagijal's record in support of her claim for custody re-determination pursuant to *Fraihat v. ICE*, Case No. 5:19-cv-01546-JGB-SHK, 2020 WL 6541994 (C.D. Cal. Oct. 7, 2020).

404. Ms. Adan Cagijal spoke to investigators from DOJ, FBI and OIG on November 10, 2020 via Zoom with her attorney present.

405. On November 17, 2020, two officers began intimidating Ms. Adan Cagijal by not allowing her to use her phone or communicate with anyone. Ms. Adan Cagijal's mother spoke to Univision 34, a TV channel, about the conditions at ICDC, and connected Univision reporters with Ms. Adan Cagijal to briefly speak about her experiences. The officers then informed Ms. Adan Cagijal that she was "going to be deported tomorrow."

406. On the evening of November 17, 2020, Ms. Adan Cagijal noticed that her commissary was "zeroed out," which typically indicates that a deportion will occur in the next 24-48 hours. On November 17, 2020, multiple congressional offices contacted ICE on Ms. Adan Cagijal behalf to ensure ICE was aware that Ms. Adan Cagijal was a witness in ongoing investigations who wished to testify and had not yet been given an opportunity to testify.

Case 7:20-cv-00224-WLS Document 138-18 Filed 07/12/24 Page 97 of 195

407. At approximately 4:50pm EST on November 17, 2020, Ms. Klinke was informed by Defendant Musante that Ms. Adan Cagijal was scheduled to be deported on November 18, 2020 at 5am.

408. Defendant Musante informed Ms. Klinke that he was aware of her interactions with Defendant Amin and her communications with investigators. However, he said that no law enforcement agency had informed him that her presence was necessary for their investigation. He told Ms. Klinke that Ms. Adan Cagijal had a final order of removal and he had a process to follow. Ms. Klinke informed Defendant Musante that she may be filing a Temporary Restraining Order. Defendant Musante responded by saying that if a federal lawsuit was filed and he received a copy of it before midnight that Ms. Adan Cagijal would not be removed the following day.

409. Defendants' efforts to deport Ms. Adan Cagijal immediately followed her submission of a declaration to the Department of Justice. When ICE notified Ms. Klinke about the scheduled deportation, she immediately began working on filing a Habeas Corpus Petition and a Temporary Restraining Order in the U.S. District Court for the Middle District of Georgia under Case Number 7:20-cv-00237. A Stay of Removal Request was also filed that day to stop the deportation. ICE granted the Stay of Removal Request at 3:45AM, only a little over an hour prior to the scheduled deportation time.

410. Ms. Adan Cagijal was finally released from ICDC on December 11, 2020.

411. If Ms. Adan Cagijal is deported to Mexico, she will be homeless and without access to reliable internet. She will not have the ability to participate in ongoing investigations about non-consensual medical procedures at ICDC.

Case 7:22-cv-00148-WLS Document 133-18 Filed 11/12/24 Page 98 of 195

**N. Plaintiff Pauline Nadege Binam**

412. Plaintiff Pauline Nadege Binam is a 32-year-old woman originally from Cameroon. She has lived in the United States since 1992. She has a 13-year-old daughter who is a U.S. citizen. She was detained in ICE custody from October 13, 2017 until on or about September 19, 2020.

413. While detained, she was subjected to non-consensual, invasive, and/or medically unindicated invasive gynecological procedures by Defendant Amin.

414. Ms. Binam has been diagnosed with chronic post-traumatic stress disorder (PTSD), generalized anxiety disorder, and bipolar disorder II.

415. ICDC failed to provide adequate treatment to Ms. Binam or otherwise accommodate her disabilities.

416. Throughout 2017 and 2018, Ms. Binam experienced painful abdominal cramping.

417. She filed medical complaints about this at ICDC, but was not referred to a provider.

418. Ms. Binam did not insist on seeing a gynecologist because she had been warned about Defendant Amin by other ICDC detainees and women and by ICDC officers. Ms. Binam was told that Defendant Amin "messed [people] up" and heard he subjected women to unnecessary procedures that they did not agree to.

419. But in March 2019, Ms. Binam's abdominal pain became unbearable. She requested gynecological treatment and was referred to Defendant Amin for "menorrhalgia," which means difficult and painful menstruation.

420. Ms. Binam first saw Defendant Amin on April 3, 2019. He performed a pap smear. His records do not indicate that he performed an ultrasound.

421. At that appointment, Defendant Amin told Ms. Binam she had a cyst on her right ovary but did not explain to Ms. Binam if the cyst was causing her abdominal pain.

Case 7:22-cv-00149-WLS-ALS Document 133-3 Filed 07/12/23 Page 99 of 196

422. Defendant Amin told Ms. Binam that he would administer Depo Provera injections over the course of several months to shrink the cyst. He told her if this did not work, she would have to have the cyst removed surgically.

423. Defendant Amin did not advise Ms. Binam of any alternative treatments.

424. At this April 3rd appointment, Ms. Binam received one Depo Provera injection.

425. During two subsequent visits in April and May 2019, Defendant Amin performed pelvic-speculum exams on Ms. Binam.

426. Both times, his demeanor was very cold, and he did not tell Ms. Binam what, if anything, he concluded from these two exams.

427. On June 19, 2019, Ms. Binam went for another follow-up visit. Dr. Amin performed a transvaginal pelvic ultrasound.

428. He was physically rough when inserting the ultrasound wand.

429. According to Defendant Amin's medical records for Ms. Binam, the ultrasound report indicated Ms. Binam's fallopian tubes were normal but indicated follicular cysts on both ovaries, as well as an enlarged uterus.

430. Upon information and belief, a follicular cyst occurs when an ovarian follicle grows an egg but does not release it for ovulation.

431. Upon information and belief, follicular cysts are common in women of child-bearing age and often resolve on their own without surgical intervention.

432. Defendant Amin did not share this or similar information about follicular cysts with Ms. Binam.

433. Ms. Binam also received her second Depo Provera injection at this June 19th visit.

Case 7:22-cv-00148-WLS-ALS Document 139-18 Filed 07/12/24 Page 100 of 195

434. On August 2, 2019, Ms. Binam saw Defendant Amin again, and reported to him that she had been experiencing vaginal bleeding since their last appointment.

435. Defendant Amin performed a pelvic-speculum exam.

436. His records do not indicate that he performed an ultrasound during this visit.

437. Defendant Amin told Ms. Binam that her ovarian cysts had increased in size, and that surgical intervention ("D&C scope") was required.

438. Defendant Amin told Ms. Binam that this was a "simple procedure" where he would cut her cysts, drain them, and scrape them off.

439. Defendant Amin did not explain how the surgery would be performed (i.e., transvaginally or through abdominal incisions), the risks of the surgery, or discuss any alternative options.

440. On August 23, 2019, Ms. Binam was transported to Irwin County Hospital and placed under anesthesia.

441. Defendant Amin performed a laparoscopy that involved making three incisions in her lower abdomen and inserting a small camera.

442. Ms. Binam understood the purpose of the surgery was to remove ovarian cysts.

443. However, unbeknownst to Ms. Binam until after the surgery, Defendant Amin performed a partial salpingectomy, meaning removal, of her right fallopian tube.

444. When Ms. Binam awoke, Defendant Amin told her that during the surgery, he noticed a clog in her fallopian tube so he "cut it out."

445. Ms. Binam asked Defendant Amin to repeat himself, hoping she had misheard. He repeated that he had cut her fallopian tube out.

446. Ms. Binam asked Defendant Amin how her fallopian tubes related to surgery on her ovaries.

447. Defendant Amin told Ms. Binam that he had made a judgment call to remove the blockage.

448. Defendant Amin told Ms. Binam she would no longer be able to conceive without fertility assistance.

449. Ms. Binam started sobbing. She told Defendant Amin that she did not give him permission to remove her fallopian tube.

450. Defendant Amin failed to get Ms. Binam's informed consent to the salpingectomy.

451. Defendant Amin did not engage in mutual decision-making with Ms. Binam about the salpingectomy and her reproductive health.

452. Upon information and belief, the salpingectomy was not medically necessary.

453. Ms. Binam was transported back to ICDC. She was not given proper medical care for her surgical wounds. Other women had to help Ms. Binam change her bandages and bring her food in the dormitory because it was painful for her to walk.

454. On August 28, 2020, Ms. Binam told an ICDC mental health provider that she had gone into the surgery expecting a D&C and was 'bothered' that she had instead had her fallopian tube cut.

455. On September 9, 2019, Ms. Binam had a follow-up appointment at Dr. Amin's office.

456. Ms. Binam noticed that Defendant Amin was in the office and requested to speak with him.

457. She was instead seen by a different provider, a woman, who told her that Defendant Amin was not available.

Case 7:22-cv-00148-WLS Document 138-18 Filed 07/12/24 Page 103 of 195

458. This provider told Ms. Binam that according to her file, Defendant Amin had reattached her fallopian tube.

459. This left Ms. Binam even more confused and distressed since it did not seem to match what Defendant Amin had told her after her surgery.

460. The provider checked Ms. Binam's surgical wounds and had a nurse administer another Depo Provera injection.

461. Back at ICDC, Ms. Binam complained about her non-consensual surgery by Defendant Amin at every opportunity and also told her family and immigration lawyer about what Defendant Amin had done to her.

462. She wrote multiple grievances to ICE officials about her surgery but did not receive any response.

463. Ms. Binam requested the contact information for Defendant Amin's private practice from ICDC Nurse Cole, who told Ms. Binam that she would not give it to her because Defendant Amin was her friend of over 20 years.

464. Ms. Binam repeatedly requested her medical records but Unknown ICDC Officers and/or Unknown ICE Officials did not provide them.

465. Ms. Binam's mother and sister also attempted to request Ms. Binam's medical records, but were unsuccessful.

466. After Ms. Binam began complaining about her surgery and requesting her records, ICDC officers and ICE officials started to treat her worse than they previously had.

467. Her deportation officer refused to meet with her, even though he came to ICDC and was meeting with other women, and ICDC officers avoided her.

468. Ms. Binam's sister's phone number was blocked from making calls to the ICDC facility.

Case 7:22-cv-00148-WLS Document 118-18 Filed 01/12/24 Page 103 of 195

469. Her sister had to buy a disposable phone, with a different number, in order to speak with Ms. Binam.

470. Ms. Binam did not have her period for approximately 22 months after her surgery.

471. Upon information and belief, her ability to naturally conceive and carry a child has been compromised as a result of the nonconsensual surgery that reviewing medical expert Julia Geynisman-Tan, M.D., FACOG, FACS subsequently determined to be neither medically indicated nor medically necessary.

472. On February 24, 2020, with no explanation, Ms. Binam was transferred to the Montgomery Processing Center in Conroe, Texas.

473. For months after she arrived, ICE Deportation Officer Dwight Hunt regularly met with Ms. Binam, telling her she was being deported soon. He even stated at one point that the Cameroonian Government had issued the travel document for Ms. Binam to be removed. He never provided Ms. Binam or her immigration attorney with an expected date of removal.

474. On September 14, 2020, the Whistleblower Complaint regarding medical abuse at ICDC was published.

475. Upon reading the Whistleblower Complaint, Ms. Binam's friend, Reverend Leeann Culbreath of the South Georgia Immigrant Support Network, recognized that Ms. Binam was also a likely victim of this abuse based on what Ms. Binam had told her.

476. Rev. Culbreath reached out to Ms. Binam by phone at the Montgomery Processing Center to request her permission to publicly share Ms. Binam's experience with Defendant Amin. Ms. Binam gave her permission.

Case 7:22-cv-00144-WLS-ALS Document 138-18 Filed 01/26/24 Page 104 of 195

477. On September 15, 2020, Reverend Culbreath, spoke about Ms. Binam's experience with Defendant Amin at a press conference in Atlanta, Georgia regarding the Whistleblower Complaint.

478. By letter dated September 15, 2020, over 100 members of Congress called for the Department of Homeland Security's Office of the Inspector General (DHS OIG) to open an investigation into the Whistleblower Complaint.

479. After Ms. Binam was publicly identified as a possible victim and witness to medical abuse, ICE then tried to accelerate her deportation by removing her from the Montgomery Processing Center. ICE put her on a plane to Chicago O'Hare International Airport, where ICE intended to board her on a commercial flight to Cameroon.

480. While Ms. Binam was in transit and/or waiting at O'Hare airport, ICE received communications from her immigration attorney and, on information and belief, members of Congress, asking that her deportation be halted in light of Ms. Binam's status as a victim of Dr. Amin's medical abuse and a witness in an investigation by DHS OIG.

481. Upon information and belief, United States Representative Sheila Jackson Lee spoke with one or more ICE officials about Ms. Binam, who had now been publicly identified as a survivor of and witness to the medical abuse at ICDC, asking to stay her deportation.

482. Upon information and belief, ICE officials told Rep. Jackson Lee that Ms. Binam was being moved but would not be imminently deported.

483. ICE nonetheless continued to try to board Ms. Binam on the flight to Cameroon and thereby deport her.

484. This was despite continuing requests by Ms. Binam's immigration attorney and, upon information and belief, members of Congress, that ICE refrain from deporting her in light of what had happened to her while detained at ICDC.

485. Upon information and belief, and as reported by the *Los Angeles Times* and *The Intercept*, the commercial airline rejected the travel document that ICE produced for Ms. Binam as invalid.[38]

486. Ms. Binam was returned to the Montgomery Processing Center in Texas.

487. News media *NPR*, *The New York Times*, and *Snopes* published articles naming Ms. Binam as a victim of Dr. Amin.[39] Several other media outlets also published articles shortly thereafter.

488. In response to continuing legal and congressional advocacy, ICE released Ms. Binam from custody on or about September 19, 2020.

489. She remains subject to ICE supervision and annual ICE check-ins.

490. Ms. Binam has given testimony about her treatment by Defendant Amin, and related retaliation, to the DOJ, DHS OIG, FBI, and the United States Senate's Permanent Subcommittee on Investigations.

[38] Molly O'Toole & Andrea Castillo, 'Betrayed' Black asylum seekers say Trump administration is ramping up deportations by force and fraud, Los Angeles Times (Nov. 27, 2020), https://www.latimes.com/politics/story/2020-11-27/black-asylym-seekers-trump-officials-push-deportations (reporting on Binam's invalid travel documents); Joe Penny, Pauline Binam Says She Never Gave ICE Doctor Consent to Remove Her Fallopian Tube, The Intercept (Oct. 2, 2020), https://theintercept.com/2020/10/02/ice-irwin-amin-obgyn-cameroon-women/ (same).

[39] Joel Rose, *ICE Almost Deported Immigrant Woman Who Says She Got Unwanted Surgery While Detained*, NPR (Sept. 16, 2020), https://www.npr.org/2020/09/16/913698689/ice-almost-deported-immigrant-woman-who-says-she-got-unwanted-surgery-while-deta.; Caitlin Dickerson, *Inquiry Ordered Into Claims Immigrants Had Unwanted Gynecology Procedures*, N.Y. Times (Sept. 16, 2020), https://www.nytimes.com/2020/09/16/us/ICE-hysterectomies-whistleblower-georgia.html.

**O. Plaintiff Daniela Chavez Morales (formerly Jane Doe #25)**

491. Daniela Chavez Morales is a 40-year-old woman originally from Mexico who lived in the United States from 2006 to 2019. She was detained in ICE custody at ICDC until her deportation to Mexico on February 4, 2019. While detained at ICDC, she was subjected to non-consensual and/or medically unindicated invasive gynecological procedures at the hands of Defendant Amin.

**Deleted:** Jane Doe #25

492. While detained at ICDC, Ms. Chavez Morales experienced significant medical issues, including asthma and painful gynecological symptoms.

**Deleted:** Jane Doe # 25

493. ICDC failed to provide adequate treatment to Ms. Chavez Morales or otherwise accommodate her disabilities.

**Deleted:** Jane Doe #25

494. On May 16, 2018, Ms. Chavez Morales sought medical assistance after her period lasted for fifteen days. Over the course of the next several weeks, she submitted multiple requests to see a doctor related to the pain she was experiencing.

**Deleted:** Jane Doe # 25

495. On June 13, 2018, she had a transvaginal ultrasound performed on her at Dorminy Medical Center. Results of that ultrasound reflect that Ms. Chavez Morales's right ovary appeared normal, but that her left ovary had a cyst, measuring 2.7 cm. Defendant Amin subsequently prescribed Orthotricyclen, a form of birth control.

**Deleted:** Jane Doe # 25's

496. On July 9, 2018, Ms. Chavez Morales requested to see a doctor, noting that her pain would not stop. Nurse Amber Hughes denied this request because she had recently seen Defendant Amin.

**Deleted:** Jane Doe # 25

497. On or about August 8, 2018, Ms. Chavez Morales had a follow up appointment with Defendant Amin, including a second transvaginal ultrasound. The medical records reflect the ultrasound revealed a benign cyst on her right ovary, measuring 2.4 x 1.8 x 1.8 cm, while her left ovary was found to be normal in appearance.

**Deleted:** Jane Doe # 25

Case 7:20-cv-00224-WLS Document 138-18 Filed 07/12/24 Page 107 of 195

498. On August 13, 2018, she once again requested medical help, noting that "the pain [in] my abdomen doesn't go away." She met with Nurse Hughes that day and begged for help. Nurse Hughes told Ms. Chavez Morales that "no stronger pain meds could be given" and that she "is just a nurse."

499. Ms. Chavez Morales's pain continued to worsen so she contacted Defendant Ciprian, whose contact information was posted on a bulletin board in her dormitory and who speaks Spanish. After speaking with Defendant Ciprian on August 16, 2018, Ms. Chavez was transported to the emergency room at Irwin County Hospital. Because he helped her, Ms. Chavez Morales began to trust Defendant Ciprian.

500. After her hospital visit, Ms. Chavez Morales had follow-up visits with Defendant Amin. She was concerned that Defendant Amin hardly examined her during these visits, seemed to have no knowledge of her prior treatment, and did not always have an interpreter for her. She also distrusted Defendant Amin based on the experiences other women who resided in her dormitory had with him.

501. Because she did not trust that Defendant Amin was providing competent treatment, Ms. Chavez Morales reached out to Defendant Ciprian. In one of their conversations, Defendant Ciprian assured her he would do everything he could to get her a new doctor. Ms. Chavez Morales also tried to talk to the warden, Defendant Paulk, but was never able to because he did not have an interpreter.

502. On August 31, 2018, Nurse Lyons issued an order for a third transvaginal ultrasound, noting an apparent diagnosis of Polycystic Ovary Syndrome.

503. Following a visit to Defendant Amin on October 2, 2018, Ms. Chavez Morales was scheduled for "D & C" and "Laparoscope" procedures. She recalls Defendant Amin

Deleted: Jane Doe # 25

Deleted: Jane Doe # 25's

Deleted: Jane Doe # 25

Deleted: Jane Doe # 25

Deleted: Jane Doe # 25

Deleted: Jane Doe # 25

Deleted: Jane Doe # 25

Deleted: Jane Doe # 25

telling her that she did not have Polycystic Ovary Syndrome but that he would do a vaginal scraping.

504. Ms. Chavez Morales wrote several letters to Defendant Ciprian. In one, written in early October 2018, Ms. Chavez Morales wrote, “The doctor said I do not have polycystic ovarian syndrome, that my uterus is very swollen and in 5 days he would do a scraping.”

**Deleted:** Jane Doe # 25

**Deleted:** Jane Doe # 25

505. She further stated in her letter, “I am very afraid and I do not know what to do. . . . I told the nurse everything that had happened to me but she could not do anything else because she was only a nurse. I am very afraid because the outside doctor is negligent and I do not trust him. . . . I am afraid, very afraid.”

506. Despite notifying Defendant Ciprian of her concerns about Defendant Amin, Ms. Chavez Morales was taken for surgery with Defendant Amin on October 16, 2018.

**Deleted:** Jane Doe # 25

507. After her surgery, she woke up and saw three cuts on her abdomen. An ICDC staff member was present and told Ms. Chavez Morales that Defendant Amin had removed her right ovary. Ms. Chavez Morales was confused and upset. She had been aware from previous medical visits that there was a benign cyst on her left ovary; no one had ever said anything to her about an issue with her right ovary.

**Deleted:** Jane Doe # 25

**Deleted:** Jane Doe #25

508. Moreover, Defendant Amin himself had never even mentioned anything about operating on either of her ovaries. Ms. Chavez Morales’s understanding was that he was just going to do a uterine scraping. She felt betrayed and upset.

**Deleted:** Jane Doe #25’s

509. Operative notes indicate Defendant Amin performed a D&C, operative laparoscopy, lysis of adhesions, electrocoagulation of pelvic endometriosis, and a right ovarian cystectomy.

Case 7:22-cv-00148-WLS-ALS Document 138-2 Filed 07/02/24 Page 110 of 195

510. On October 25, 2018, Ms. Chavez Morales saw Defendant Amin and had a third ultrasound. The results of this ultrasound indicated the presence of a right-sided ovarian follicular cyst, measuring 14 x 11 mm.

Deleted: Jane Doe # 25

511. Ms. Chavez Morales asked Defendant Amin exactly what he had done, through an ICDC guard acting as an interpreter. Defendant Amin asserted that he had removed the cysts from her ovaries and cleaned her endometriosis. He told her that she did not have cancer and could still have children.

Deleted: Jane Doe # 25

512. On December 6, 2018, Ms. Chavez Morales refused to attend a follow up appointment with Defendant Amin.

Deleted: Jane Doe # 25

513. Between December 6, 2018, and February 4, 2019, which is on or about the date that Ms. Chavez Morales was removed from ICDC and deported to Mexico, she frequently requested to be seen by a provider other than Defendant Amin. She made this request at least as late as January 24, 2019.

Deleted: Jane Doe # 25

514. Despite Ms. Chavez Morales's request to see a different doctor, records reflect that ICDC official M. Davis once again submitted an "off-site to [Defendant] Amin" request on January 29, 2019, on Chavez Morales's behalf. Ms. Chavez Morales did not attend that appointment.

Deleted: Jane Doe # 25's

Deleted: Jane Doe #25's

Deleted: Jane Doe # 25

515. Throughout Ms. Chavez Morales's detention at ICDC, she requested her medical records over a dozen times. She specifically requested copies of her ultrasounds and treatments with Defendant Amin but the records she was given included "no reports of [her] menstrual issues."

Deleted: Jane Doe # 25's

516. Ms. Chavez Morales also told friends and family about her concerns over what Defendant Amin did to her and the difficulty she was having in obtaining the records

Deleted: Jane Doe #25

from ICDC officials. She believes officials were listening to her calls, because in the two weeks before she was deported, the line cut out and the call was dropped while she was on a call with two of her friends discussing these issues. The phone system never allowed her to call these friends back.

517. Three days before she was deported, on February 1, 2019, Ms. Chavez Morales filed a motion to reopen her removal proceedings. Her motion was successful and her removal order was reopened on May 15, 2019.

518. After returning to Mexico, Ms. Chavez Morales saw multiple gynecologists for follow-up care and in an effort to determine what had happened to her at ICDC. She eventually was told that Defendant Amin removed more than half of her left ovary and that she has a significantly reduced chance of successfully carrying a future pregnancy to term.

519. Upon information and belief, this surgical procedure was not medically necessary.

520. Ms. Chavez Morales and her husband had hopes and dreams of having and raising a child together, which now may be lost forever due the actions of Defendant Amin.

521. Ms. Chavez Morales also suffered from asthma while at ICDC. She was, at times, denied the medication she needed in order to treat her chronic condition. On one occasion, she had an asthma attack, and it took three hours for an ICDC nurse to aid her as she struggled to breathe. On several occasions, medical personnel injected something in Ms. Chavez Morales's leg. She does not know what was injected and to this day, she experiences shooting and burning pains in her leg.

522. Ms. Chavez Morales also experienced retaliation by ICDC officials for exercising her free speech rights. After submitting a grievance against an ICDC officer, she was

Deleted: Jane Doe # 25

Deleted: The Executive Office of Immigration Review's system indicates that she is scheduled for a new hearing before an immigration judge on July 10, 2023.

Deleted: Since

Deleted: Jane Doe #25 has seen

Deleted: .

Deleted: has been

Deleted: Jane Doe #25

Deleted: Jane Doe #25

Deleted: Jane Doe #25's

Deleted: Jane Doe # 25

Case 7:22-cv-00148-WLS Document 133-18 Filed 06/12/24 Page 111 of 195

locked in her cell for one day. Her access to the outside world was limited for three or four days when a protest was taking place outside ICDC that officials did not want her to observe.

523. Ms. Chavez Morales believes she deserves justice for what she experienced and wants to be involved in the investigations and lawsuits against Defendants. She initially participated in the lawsuit as a Jane Doe witness due to fear of further immigration retaliation and concern for her safety in Chiapas, Mexico. Ms. Chavez Morales was lawfully paroled into the United States on February 23, 2023. Her removal proceedings were dismissed by an immigration judge on September 8, 2023.

**Deleted:** Jane Doe # 25

**Deleted:** Although she faces hardships and numerous practical obstacles due to her deportation to Mexico, she is determined to do everything she can to overcome them and pursue justice on behalf of herself and other women harmed by Defendant Amin.

## XI. Several Putative Class Members Have Suffered the Same Harms

524. **Jane Doe #35** is 33-years old and now lives in Mexico. She was detained at ICDC from about June 4 or 5, 2018 until mid-January 2019.

525. By the time she was transferred to ICDC, Jane Doe #35 was experiencing intense pain that had started after a miscarriage and curettage performed at another detention center months before. The pain had diminished but was still extreme and kept her awake. She tried to tell ICDC medical staff about the pain, but they did not speak Spanish and there were not interpreters.

526. In July 2018, still experiencing severe pain, Jane Doe #35 was sent to Defendant Amin for a transvaginal ultrasound. She knew that other women were afraid of him because he had hurt them. However, she had had an ultrasound before and thought it would be fine.

527. Defendant Amin stuck the instrument into Jane Doe #35 and moved it around roughly. It was so painful that she screamed the only English word she could think of: "PAIN!" Defendant Amin laughed. She was scared, because Defendant Amin did not appear to care at all.

Case 7:22-cv-00149-WLS-ALS Document 133-18 Filed 01/12/24 Page 112 of 195

528. After the appointment, Jane Doe #35 started experiencing vaginal bleeding because of Defendant Amin's and was in even more pain than she had been in before.

529. Although she was afraid, Jane Doe #35 returned to Defendant Amin for the follow up appointment. Again, the ultrasound was rough and painful. Again, Defendant Amin did not appear to care that she was in pain. Jane Doe #35 continued to experience radiating pain in her arms and legs, as well as swelling and fluid discharge, for months.

530. No one ever explained why Jane Doe #35 was getting these ultrasounds. The medical staff did not speak to her in Spanish, so she had no one to ask.

531. Jane Doe #35 told the ICDC staff how horrible Defendant Amin was, using other detained women as interpreters. The ICDC staff told her that he was the only doctor and that they were not going to get another because she did not like him. Jane Doe #35 explained that Defendant Amin was abusing them.

532. From July 2018 to November 2018, Jane Doe #35's immigration lawyers also repeatedly complained to ICE and ICDC staff, including Defendants Paulk and George, about Defendant Amin and what he did to Jane Doe #35. Defendant George indicated to her attorney that they had heard other complaints about Defendant Amin.

533. After she returned to Mexico, Jane Doe #35 went to a clinic to learn what was wrong. She was still in pain. The doctors at the clinic told her she had a serious infection and began medication to treat it. The doctors also told her that her ovaries would get inflamed easily and prescribed medicine that she was told she will have to take for the rest of her life.

534. Jane Doe #35 suffered a great deal of trauma and became depressed while she was at ICDC. The trauma remains with her. Even today, Jane Doe #35 has difficulty sleeping. She wakes up sweating from recurring nightmares about ICDC.

535. **Jane Doe #26** is a 28-year-old woman from Guyana, who was detained in ICE custody at ICDC. While at ICDC, Jane Doe #26 was a victim of horrific medical abuse and of medically unnecessary and non-consensual procedures at the hands of medical staff ICDC and Defendant Amin.

536. When she arrived at ICDC, Jane Doe #26 told the medical staff that she had an IUD that needed to be removed. But despite numerous oral and written requests, she did not receive medical treatment for around nine months and had to live with constant discomfort and sharp pain from the IUD.

537. When the medical staff at ICDC referred her to Defendant Amin, he examined her and told her that she had several cysts on her ovaries, including one that was the size of a golf ball that needed to be drained immediately. He indicated that it would be a simple outpatient procedure.

538. Yet, on the day of what was supposed to be a simple outpatient procedure, Jane Doe #26 was shackled, put into a transport van and taken to Irwin County Hospital. This was when she discovered she was not going to Defendant Amin's office, but was being taken to have surgery. She had not been told prior to this that surgery was necessary. When she arrived at the hospital, the nurse told her that she was having a dilation and curettage procedure, where the doctor would scrape the inside of her uterus with a metal instrument. This was when she learned what surgery she was having that day.

539. Jane Doe #26 told the nurse she wanted time to think about the surgery and discuss it with her attorney and her family. The nurse told her that if she delayed the surgery, she would be putting her health at risk because the cyst could burst at any time and cause her severe pain and complications. The nurse also said there was no telling how long ICE would take to approve another surgery. Jane Doe #26 felt pressured into having the surgery. She did not know what would happen if she did not have the surgery. The nurse then gave her forms to sign. When Jane Doe #26 asked for copies, the nurse only gave her a copy of the hospital policy, not the form about the actual surgery.

540. Jane Doe #26 was confused and concerned about the surgery, and wanted more information, but no one explained what was happening to her or why, despite her requests for documentation about the procedure she was undergoing. Jane Doe #26 advised the nurse that she was allergic to penicillin despite no one asking. The nurse was relieved because she was about to give Jane Doe #26 something that had penicillin in it.

541. When she woke up from general anesthesia, she was shackled to the bed and her stomach was bandaged. At ICDC, she was not given proper post-surgery care. She had to clean and tend to her wounds herself. When she removed her bandages, she saw that her navel had been removed. Instead of having a navel, her stomach was sunken in. She was crying and scared. She developed an infection and still was not given proper care at ICDC. A doctor had prescribed antibiotics, but ICDC staff would not give them to Jane Doe #26.

542. The medical staff at Irwin retaliated against her for speaking up about needing medical care. When she kept speaking up, the medical staff tried to put her in the medical room, which is akin to solitary confinement, in order to silence her.

Case 7:22-cv-00148-WLS Document 138-18 Filed 07/02/24 Page 116 of 196

543. Several doctors reviewed her medical records. From their reports she learned that the dangerous and invasive surgery Defendant Amin performed was not medically necessary because that the cyst would have resolved itself.

544. She has suffered great emotional hardship as a result of her treatment in detention and her time separated from her young children. Although she has been released, she is still fearful about what ICE officials will do to her for speaking out. But she is committed to speaking out about the inhumane treatment at ICDC and has spoken to Congress, the DOJ, the FBI, and the DHS OIG because she does not want anyone to suffer in the same way she did at the hands of Defendant Amin, ICDC officers, ICE officials.

545. **Jane Doe #24** was detained at ICDC for over a year between 2018 and 2019, before she was deported to Nigeria. After around six months at ICDC, Jane Doe #24 noticed that her periods were getting much shorter in length and that the blood was almost black in color. When she requested medical care, the nurse at ICDC acted as if what she was experiencing was normal.

546. When Jane Doe #24 was finally able to obtain an appointment with an outside OB/GYN, it was with Defendant Amin. He performed a transvaginal ultrasound and told her she had a large cyst in her right ovary. He told her she could have surgery or be on birth control for thirty days to see if the cyst shrinks. She elected birth control. She was taken back to see him before the thirty days had passed and he told her that birth control was not working.

547. After performing several transvaginal ultrasounds on Jane Doe #24, Defendant Amin told her that she had to do surgery. He said that it would involve three incisions and take just fifteen minutes. He told Jane Doe #24 that he would scrape out the cysts and she

Case 7:22-cv-00148-WLS Document 138-18 Filed 07/02/24 Page 116 of 195

would be fine. Jane Doe #24 was worried about the surgery because she had not had children yet, but Defendant Amin told her it would be fine.

548. Jane Doe #24 felt very scared because she was having terrible, painful cramping all the time and her periods were not normal. She felt pressured to agree to the surgery right away without having a chance to think about it.

549. She was taken for surgery without any advanced notice. The first time she heard the term "D&C" was at the hospital, where a nurse mentioned it. Jane Doe #24 was confused because she didn't understand how a D&C would take care of her cysts.

550. After the procedure, while she was still experiencing the impact of anesthesia, she was forced up out of bed with no chance to recover from the surgery. As soon as she was up and dressed, she was immediately shackled again and wheeled out.

551. Once she was back at ICDC, she was taken to the medical unit. She could not see anyone and her food was handed to her through a slit in the door. When ICDC needed the space in the medical unit, they forced her to sign a form stating she was voluntarily deciding to leave medical to go back to the dorm. She did not want to sign the form because it was not her choice to leave, but she was pressured to sign it.

552. In the dorm, she was not given proper medical supplies to clean her wounds from the incisions. She had to beg and fight for those medical supplies. Jane Doe #24 also did not receive adequate pain medication after her surgery.

553. Prior to her deportation, Jane Doe #24 did not receive any medication to help prevent infection. When she arrived in Nigeria, she found out that she had a staph infection and a yeast infection.

554. Jane Doe #24 has suffered from severe depression since her detention at ICDC. She attempted suicide after being deported to Nigeria. She also developed colitis after being deported to Nigeria and was very sick for several months. She explains that she became physically ill and lost her will to live because of how she was treated at ICDC. She continues to struggle with severe depression.

555. It is difficult for her to participate in federal investigation of Defendant Amin since being deported.

556. **Jenel Haug** is a 37-year-old citizen of Canada, who was detained at ICDC from approximately October 31, 2019 until March 11, 2020, when she was deported to Canada.

557. Ms. Haug was pregnant when she arrived at ICDC. She had a positive home pregnancy test before being detained. Although she informed Unknown ICDC Officers and Unknown ICE Officials that she was pregnant and had a history of multiple miscarriages and difficult pregnancies, she was denied appropriate care. ICDC officers did not acknowledge that she was pregnant and failed to perform a blood test to check if she was pregnant.

558. Four days after arriving at ICDC, she started spotting and a few days later she started bleeding. She informed medical staff at ICDC that she was having a miscarriage, but they continued to deny that she was ever pregnant. Ms. Haug bled for about two weeks due to the miscarriage and had terrible cramping. After her mother made numerous complaints, she was finally taken to see an OB/GYN, Defendant Amin.

559. Defendant Amin performed a transvaginal ultrasound and internal exam with his hand, which were rough, painful, and forced. Ms. Haug describes it as "the most medical way of being raped you could possibly experience."

560. Defendant Amin told Ms. Haug that she had cysts and endometriosis. Ms. Haug was confused by the diagnosis of endometriosis because she did not have the symptoms described in the information she received about the condition.

561. Defendant Amin initially recommended a Depo shot. Ms. Haug refused the shot, so he prescribed regular birth control pills. ICDC delayed providing Ms. Haug with the prescribed birth control pills.

562. Defendant Amin pressured Ms. Haug to get the Depo shot because he determined that the cysts were not shrinking. Ms. Haug felt she had no choice but to get the shot in order to avoid surgery.

563. During one of the visits, Ms. Haug was bleeding and did not want to have internal procedures done, but Defendant Amin pushed her back on the table and performed them anyway.

564. After two Depo shots, Defendant Amin told Ms. Haug that the cysts had not shrunk and that she needed surgery. He told her she would not have to pay if the surgery was done while she was detained. Although Ms. Haug told him she did not want to have surgery, Defendant Amin told her the next appointment would be for surgery if the cysts did not shrink. Defendant Amin talked about both "D&C" and hysterectomy, saying it would likely be the latter because of the size of the cysts.

565. Ms. Haug was terrified of having a hysterectomy and of not getting enough pain medication after surgery. She had observed other women at ICDC in excruciating pain

after surgeries. She knew that pain medication is typically limited to ibuprofen or Tylenol and is commonly delayed.

566. Ms. Haug was sent back to Canada on March 11, 2020. She stayed in contact with some of the women at ICDC who informed her that she had been scheduled for surgery shortly after she left. Ms. Haug was examined by a doctor in Canada, who told her that he did not see any signs of cysts or endometriosis.

567. Ms. Haug experienced several forms of retaliation for complaining about conditions at ICDC. She was placed in lockdown, supposedly as a form of "protective custody," which resulted in her losing her cleaning job that paid $1/day. Worst of all, her daughter, who was only around 4-months old when Ms. Haug was detained, was put up for adoption after ICDC officers refused to help her make calls to her case manager and children. Defendant George specifically refused to assist her with these calls. Consequently, Child Protective Services decided that she had abandoned her child.

568. When Ms. Haug requested her medical records from ICDC, she received only eight pages. These pages do not include all of the medical appointments.

569. She would like to talk to federal investigators about her experiences at ICDC. She recognizes that cooperating with a federal investigation will be much more difficult now that she has been deported.

570. **<u>Alma Bella Bowman</u>** was detained at ICDC until her release in December 2020. Less than a year before Ms. Bowman's arrival at ICDC, she had been diagnosed with rectocele by two different medical professionals on two separate occasions, both of whom informed her that her condition required surgery. Rectocele is a rectal prolapse into the vagina that can have serious consequences if left untreated.

Case 7:22-cv-00144-WLS Document 118-18 Filed 01/12/24 Page 120 of 195

571. Ms. Bowman's first appointment with Defendant Amin was in May 2018. When she told him about her two previous rectocele diagnoses, one of which occurred only two months prior, he dismissed her completely, telling her that the rectocele was all in her imagination.

572. Despite other health professionals' recommendations for surgery, Defendant Amin provided Ms. Bowman with only a hormonal vaginal cream, which he said would strengthen her vaginal walls. Ms. Bowman used the cream, but her condition did not improve, and the prescription for the cream was never refilled.

573. Ms. Bowman had a second appointment with Defendant Amin a year later in May 2019. During this appointment, she told him that the hormonal cream did not help. Unlike her previous appointment, Defendant Amin this time acknowledged that she had rectocele, but refused to provide her with further treatment.

574. Ms. Bowman became angry with Defendant Amin and began arguing with him while she was still undressed on the examination table. He told her that if she wanted to have sex with her husband, she could "push it down," referring to the bulge that appears in the vaginal wall when an individual has rectocele. Defendant Amin told Ms. Bowman that she did not know what she was talking about and left the room. Defendant Amin then complained about Ms. Bowman to the head nurse at ICDC.

575. After this traumatic experience, Ms. Bowman decided that she would never see Defendant Amin again. She was so distraught by the way that Defendant Amin treated her that she had to see the psychiatrist at ICDC, Dr. Faulk.

576. Ms. Bowman requested her medical records from Defendant Amin's office and was troubled to discover that they were incomplete. Specifically, she noticed that the medical

history forms she completed during her second appointment had been replaced by forms she completed during her first appointment.

577. Ms. Bowman remains very disturbed by her experience with Defendant Amin. He ignored Ms. Bowman's cries for help, refused to provide her with medical treatment, and refuted her diagnosis that has been corroborated by four medical professionals to date—the two professionals she saw before her first appointment with Defendant Amin, and two more since.

578. The two medical professionals Ms. Bowman saw after Defendant Amin both diagnosed her with stage 2-3 rectocele. Defendant Amin's refusal to provide treatment has led to her condition to become even worse.

579. **Jane Doe #28** was detained at ICDC from March 4, 2020 until her release on December 7, 2020. Before she was detained, Jane Doe #28 was diagnosed with a tumor on her uterus. The doctor she saw told Jane Doe #28 that the tumor was not a threat to Jane Doe #28's health, and the doctor advised Jane Doe #28 that the tumor would disappear with menopause.

580. While detained at ICDC, Jane Doe #28 noticed that she had a hard lump on her lower abdomen. She requested medical attention. Jane Doe #28 visited a medical facility and received a CT scan. When Jane Doe #28 returned to ICDC, a nurse informed her that the CT scan revealed that she had a tumor and would need to go to another appointment.

581. Jane Doe #28 was sent to Defendant Amin. A female nurse brought Jane Doe #28 to an exam room. An interpreter was not present in person or over the phone to explain to Jane Doe #28 what was about to happen. The nurse gestured for Jane Doe #28 to

undress, and Jane Doe #28 obliged. The nurse left and Jane Doe #28 waited alone in the room, unsure of what was going to occur during this appointment.

582. Defendant Amin began to examine Jane Doe #28 without an interpreter and without explaining who he was or what he was doing. Defendant Amin turned on a machine and inserted an instrument inside of Jane Doe #28's vagina. Jane Doe #28 was confused about what was happening and was in pain throughout the procedure Defendant Amin performed. Upon information and belief, Defendant Amin performed a transvaginal ultrasound. After the painful procedure ended, Defendant Amin finally used a Mandarin interpreter over the phone. The interpreter told Jane Doe #28 that Defendant Amin discovered a tumor in her uterus and that she needed surgery to remove it.

583. Jane Doe #28 was also provided a form which she could not understand because it was written in English. Jane Doe #28 did not understand what the form was for, but the interpreter told Jane Doe #28 that she needed to sign it so that Defendant Amin could perform surgery. Still unclear of what exactly she was agreeing to, Jane Doe #28 signed the form. After meeting with Defendant Amin, Jane Doe #28 was fearful. Her previous gynecologist told her that the tumor was not dangerous. After meeting with Defendant Amin, Jane Doe #28 was scared that the tumor had turned into cancer. Because Defendant Amin did not explain to Jane Doe #28 why surgery was necessary, Jane Doe #28 felt that the tumor must be life-threatening for him to want to remove it.

584. In June of 2020, around 5:00 am, Jane Doe #28 was taken from ICDC to a medical facility for surgery. No one explained to Jane Doe #28 where she was going or what the surgical procedure would entail. When she arrived at the medical facility, Jane Doe #28 saw Defendant Amin at the reception desk, but was unable to communicate with him

Case 7:20-cv-00224-WLS Document 138-18 Filed 01/12/25 Page 123 of 195

because no interpreter was present. Jane Doe #28 was guided to a room where she was given anesthesia and underwent surgery by Defendant Amin. Jane Doe #28 was not informed by anyone what surgery was done or what symptoms she may experience in the future because of the surgery. Defendant Amin was not present when Jane Doe #28 woke up from surgery.

585. When Jane Doe #28 returned to ICDC after the surgery, she was in pain for three days. She was not prescribed any medicine to deal with the pain besides a general anti-inflammatory medication. Jane Doe #28 noted that after her surgery, the hard lump in her abdomen was not gone. Additionally, Jane Doe #28 continued to have irregular menstrual periods over the next few months. Concerned about the hard lump in her abdomen and her irregular periods, Jane Doe #28 requested medical attention again. Despite making a medical request in the middle of November 2020, Jane Doe #28 did not see a medical professional.

586. **Angela Rojas Fañas** was the victim of and witness to medically unnecessary and non-consensual gynecological procedures at ICDC. Shortly before traveling to the United States from the Dominican Republic, Ms. Rojas Fañas visited her gynecologist. At that time, she was told everything was normal.

587. After Ms. Rojas Fañas, arrived in the United States, she was detained by ICE at ICDC for four months. During that time, Unknown ICDC Officers and/or Unknown ICE Officials took her to Defendant Amin's office twice.

588. The first visit was on August 26, 2020. Ms. Rojas Fañas had been feeling pain in her hip and back, so she submitted a request for medical care to ICDC staff. The staff told her she had kidney problems and had to see an outside provider.

589. An Unknown ICDC Officer took Ms. Rojas Fañas to Defendant Amin's office. Defendant Amin entered the room, put on gloves, and proceeded to penetrate Ms. Rojas Fañas's vagina with his hands in a manner that was rough and made Ms. Rojas Fañas feel very uncomfortable. Ms. Rojas Fañas was humiliated. She felt like Defendant Amin treated her as less than fully human.

590. Defendant Amin then spoke to Ms. Rojas Fañas in English, a language she does not understand. No interpreter was present. Defendant Amin called the nurse who spoke some Spanish back into the room. The nurse told Ms. Rojas Fañas that, according to Defendant Amin, she had fibroids in her uterus as large as avocadoes. The nurse said she needed surgery as soon as possible to remove the fibroids. She told Ms. Rojas Fañas to return for the surgery in a week, on September 1, 2020.

591. Ms. Rojas Fañas was scared and confused. Ms. Rojas Fañas told the nurse she did not want the surgery. The nurse left the room. When she returned, she told Ms. Rojas Fañas that Defendant Amin recommended an injection to reduce inflammation. The nurse said that without the injection, the pain she was feeling would become unbearable.

592. Ms. Rojas Fañas received the injection. No one explained the risks or side effects. Ms. Rojas Fañas did not understand what the injection contained or what it would do to her body.

593. For weeks after the injection, Ms. Rojas Fañas experienced heavy and abnormal vaginal bleeding. She felt weak and she felt sharp pain, especially in her hip area. During this time, she learned of several other women in her unit who were suffering after similar mistreatment. One woman in her unit was recovering from surgery without pain medicine. She had to use sanitary napkins to cover the incisions.

594. Concerned and afraid about the ongoing bleeding she was experiencing, Ms. Rojas Fañas sought out ICDC medical staff several times but to no avail. As her condition persisted and her desperation grew, when Ms. Rojas Fañas visited ICDC medical staff a third time, she was told she would have to see an outside provider.

595. On September 14, 2020, news reports of Defendant Amin's abuses broke. Two days later, Unknown ICDC Officers and/or Unknown ICE Officials told Ms. Rojas Fañas she was being taken to a doctor outside ICDC. Ms. Rojas Fañas feared the officers and/or officials would take her to Defendant Amin. She feared being left alone in a room with Defendant Amin. She feared that Defendant Amin would hurt her again.

596. Unknown ICDC Officers and/or Unknown ICE Officials did, in fact, take her to Defendant Amin, who performed a pelvic ultrasound. The nurse told her she did not have fibroids anymore and did not need surgery. The nurse said the bleeding was normal.

597. After these revelations, Ms. Rojas Fañas talked with several other women who had survived Defendant Amin's abuses and explored speaking out more broadly. She saw two outspoken women removed from her unit, and heard they were placed in solitary confinement. ICDC officers changed the television channel from Spanish-language news to English-language stations. Ms. Rojas Fañas began noticing that the temperature in the unit was lowered to the point that it kept her from sleeping.

598. Ms. Rojas Fañas was deported to the Dominican Republic in late October 2020. In mid-November 2020, she visited a gynecologist who performed an ultrasound and ordered bloodwork. The gynecologist diagnosed Ms. Rojas Fañas with a kidney infection. The doctor said the infection was probably caused by the abnormal bleeding. The doctor said

the abnormal bleeding could have been caused by a birth control injection. The doctor did not detect any large fibroids. Ms. Rojas Fañas is still awaiting the results of a biopsy.

599. **Jane Doe #32** is a 36-year-old woman, who was detained in ICE custody at ICDC before her deportation to Senegal. She has suffered extraordinary mental pain and trauma due to her treatment by Defendant Amin, ICDC officers, and ICE officials.

600. Jane Doe #32's scar from her two C-sections burst while she was at ICDC. She was in tremendous pain, but the medical staff and ICDC officers refused to help her. Despite repeated requests for medical care for the scar, the medical staff at ICDC ignored her. When she spoke up and insisted that she was in pain, the medical staff threatened to put her in solitary confinement and accused her of lying.

601. Unknown ICDC Officers and/or Unknown ICE Officials handcuffed Jane Doe #32 when they finally took her to a gynecologist. The doctor performed an exam, but never told her what was wrong or what he was doing. Although she does not know his name, he had an accent like hers. She asked for her records to find out what the diagnosis was, but the facility refused to give them to her, despite repeated requests.

602. On information and belief, the doctor who performed the exam on Jane Doe #32 was Defendant Amin.

603. Jane Doe #32 is prepared to testify before Congress and to speak with officials investigating these abuses at ICDC.IC She is committed to making her voice heard, to holding ICDC officers and ICE officials accountable for the pain and suffering they caused her and so many other women.

**XII. The Federal Government's Inter-Governmental Agreement with Irwin County and ICE's Detention Standards**

**A. Inter-Governmental Agreement Between Federal Government and Irwin County**

604. In 2007, the United States Marshals Service entered into an Intergovernmental Agreement ("IGA") with Irwin County, Georgia allowing "three (3) Federal Government components, specifically, the United States Marshals Service (USMS) and the Federal Bureau of Prisons (BOP) of the Department of Justice (DOJ); and the United States Immigration and Customs Enforcement (ICE) of the Department of Homeland Security (DHS), to house federal detainees with the Local Government at the Irwin County Detention Center."[40]

605. In exchange for payment on a per-detainee per-diem basis, Irwin County ensures the daily operation of the detention center.

606. The IGA requires Irwin County to, among other things, "accept and provide for the secure custody, safekeeping, housing, subsistence and care of federal detainees in accordance with state and local laws, standards and procedures, or court orders applicable to the operations of the facility, consistent with federal law, policies and regulations."

607. The IGA also requires that "where ICE federal detainees are housed, the ICE federal detainees are to be housed in accordance with ICE standards."

[40] *See* U.S. Gov't Accountability Off., GAO-16-231, Immigration Detention: Additional Actions Needed to Strengthen Management and Oversight of Detainee Medical Care 17–18 (2016), https://www.gao.gov/assets/gao-16-231.pdf.

608. ICE maintains an active supervisory role over the medical care provided to detainees at ICDC under the IGA. The IGA requires Irwin County to allow ICE to inspect the facility for compliance with its National Detention Standards.

609. The IGA requires Irwin County to provide "all medical treatment provided to federal detainees within the facility," but Irwin County must seek approval from ICE for all requests for treatment to be provided outside the facility.

610. The ICE Health Service Corps (IHSC) approves and denies all non-emergency off-site medical care requests for detained individuals, and tracks costs and amounts paid for off-site care. The majority of such requests are adjudicated by IHSC Field Medical Coordinators. In cases involving surgical procedures, such requests are adjudicated by an IHSC Regional Clinical Director or Regional Dentist.[41]

611. The IGA also requires Irwin County to report all medical emergencies to ICE.

612. Irwin County is required under the IGA to obtain the express written consent of the federal government before contracting out the overall management and operation of the facility.

613. On information and belief, Irwin County obtained the requisite approval from the federal government and executed an agreement for the operation of the facility to a private for-profit company, Defendant LaSalle.

614. Defendant ICE contracts with Irwin County, which in turn contracts with Defendant LaSalle, for the operation of the detention facility. Thus, Defendants ICDC, LaSalle, and their employees, agents, contractors, and/or officers are state or local actors and subject

[41] *See* United States Government Accountability Office, Immigration Detention: Additional Actions Needed to Strengthen Management and Oversight of Detainee Medical Care (Feb. 2016), at 17-18, available at https://www.gao.gov/assets/gao-16-231.pdf.

to suit under 42 U.S.C. § 1983,[42] independent of whether they may also be considered federal actors because they are engaging in the core federal function of civil immigration detention.

615. Private physicians, such as Defendant Amin, are subject to liability under § 1983 because they are authorized to provide medical services to detained individuals, and therefore act under color of state law when treating individuals who are detained.[43]

616. As the prison warden, Defendant Paulk can also be held liable under § 1983.[44]

617. Irwin County Defendants, including Irwin County Hospital, are also subject to suit pursuant to 42 U.S.C. § 1983 under a theory of municipal liability.[45] Municipal liability under § 1983 arises where the municipality has undertaken an official policy or custom which causes an unconstitutional deprivation of plaintiffs' rights.[46]

### B. ICE's Performance-Based National Detention Standards and ICE's Oversight Role

618. The Performance-Based National Detention Standards ("PBNDS") apply to all ICE-dedicated civil detention facilities, including ICDC.

619. The PBNDS set forth mandatory requirements for conditions inside detention facilities, including for medical care, to which a facility and ICE are bound.

620. The PBNDS 2008[47] applies to ICDC pursuant to the IGA.

621. Private contractors are also subject to, and required to follow, the PBNDS.

---

[42] *See Richardson v. McKnight*, 521 U.S. 399, 412-13 (1997).
[43] *West v. Atkins*, 487 U.S. 42 (1988).
[44] *Miller v. King*, 384 F.3d 1248 (11th Cir. 2004).
[45] *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694-95 (1978).
[46] *Id.*
[47] *See* Immigr. & Customs Enf't, *ICE/DRO Detention Standard: Medical Care* (2008), https://www.ice.gov/doclib/dro/detention-standards/pdf/medical_care.pdf.

622. Federal Defendants have failed to ensure that Irwin County Defendants follow the PBNDS mandates for providing medical care.

623. The medical care standards require that every facility provide initial medical, mental health and dental screening, medically necessary and appropriate medical, dental and mental health care and pharmaceutical services, comprehensive, routine and preventative health care, as medically indicated, emergency care, specialty health care, timely responses to medical complaints, and hospitalization as needed within the local community.[48] The PBNDS also provide specific instructions for how to meet these requirements.

624. The PBNDS medical care standards specifically provide that "[h]ealth care needs will be met in a timely and efficient manner."[49] Accordingly, "[e]very facility shall directly or contractually provide its detainee population [with] . . . [t]imely responses."[50]

625. More specifically, the PBNDS medical care standards provide that: "Each facility shall have a sick call procedure that allows detainees the unrestricted opportunity to freely request health care services . . . provided by a physician or other qualified medical staff in a clinical setting." "All detainees . . . shall have access to sick call." The sick-call procedures "shall include . . . an established procedure in place to ensure that all sick call requests are received and triaged by appropriate medical personnel within 48 hours after the detainee submits the request. In an urgent situation, the housing unit officer shall notify medical personnel immediately."[51]

[48] *Id.* at 4.
[49] *Id.* at 1.
[50] *Id.* at 4.
[51] *Id.* at 16.

626. The PBNDS further specify that "[a] detainee who needs health care beyond facility resources will be transferred in a timely manner to an appropriate facility where care is available. A written list of referral sources, including emergency and routine care, will be maintained as necessary and updated at minimum annually."[52]

627. Under the PBNDS, "[d]etainees with chronic conditions will receive care and treatment for conditions where non-treatment would result in negative outcomes or permanent disability as determined by the clinical medical authority."[53]

628. The PBNDS requires that detention and medical care personnel are adequately trained and licensed; and has specific requirements for treatment and care of those with suspected or known mental health concerns.

629. The PBNDS also include detailed procedures requiring informed consent for any medical treatment. They explicitly state that "[a]s a rule, medical treatment shall not be administered against a detainee's will." Further, "[i]nvoluntary treatment is a decision made only by medical staff under strict legal restrictions. Prior to any contemplated action involving involuntary medical treatment, DHS/ICE respective Chief Counsel will be consulted."[54]

630. Under the PBNDS, the facility is obligated to provide communication assistance to individuals who are limited in their English proficiency. The standards provide that: "Non-English speaking detainees and/or detainees who are deaf and/or hard of hearing

---

[52] *Id.* at 1.
[53] *Id.* at 2.
[54] *Id.* at 19.

Case 7:22-cv-00144-WLS-ALS Document 138-2 Filed 07/12/24 Page 132 of 195

will be provided interpretation or translation services or other assistance as needed for medical care activities."[55]

631. Finally, the PBNDS requires the designated administrative health authority, who is "authorized and responsible for making decisions about the deployment of health resources and the day-to-day operations of the health services program," to "implement a system of internal review and quality assurance" which includes "[s]ystematic investigation of complaints and grievances."[56]

632. ICE is charged with overseeing ICDC's compliance with the PBNDS. ICE uses various mechanisms to oversee medical care at facilities, including periodic inspections, site visits by Field Medical Coordinators, audits by IHSC, monitoring by on-site ICE Detention Service Managers.[57]

633. Detention Service Managers work with the Field Medical Coordinators at IGA facilities, such as ICDC, to resolve medical-related issues.

634. ICE IHSC is also charged with receiving and investigating complaints from detained individuals regarding medical care. IHSC is "ultimately responsible for addressing medical-care-related complaints" made to ICE.[58]

635. Plaintiffs were subjected to non-consensual, medically unindicated, or invasive gynecological procedures while they were detained in ICE custody at ICDC. Plaintiffs did not receive adequate or timely care as required by the PBNDS.

[55] *Id.* at 3.
[56] *Id.* at 3, 22.
[57] *See* U.S. Gov't Accountability Off., Immigration Detention: Additional Actions Needed to Strengthen Management and Oversight of Detainee Medical Care 21-24 (2016), https://www.gao.gov/assets/gao-16-231.pdf .
[58] *Id.* at 35.

636. Despite their knowledge of Defendant Amin's abuses, Federal Defendants continued to approve off-site medical visits for detained individuals to Defendant Amin.

637. Federal Defendants failed to ensure that Irwin County Defendants provided appropriate medical care as required by the PBNDS.

638. Federal Defendants failed to ensure that ICDC administered medical treatment only with informed consent.

639. Federal Defendants failed to ensure that ICDC provided language accessibility to non-English speakers, including Plaintiff Solodkova and putative class members Xu, Rojas Fañas, and Daniela Chavez Morales (formerly, Jane Doe #25), while receiving medical care.

Deleted: ,

**CLASS ACTION ALLEGATIONS**

640. Plaintiffs bring the First, Second, Third, Fourth, Fifth, Sixth, Eighth, Ninth, Eleventh, Twelfth, Thirteenth, Fourteenth, Sixteenth, Seventeenth, and Twenty-Third Claims for Relief, set forth below, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of themselves and all other persons similarly situated.

641. Plaintiffs Oldaker, Solodkova, Walker, Silas, Floriano Navarro, Ndonga, Ramirez, Cajigal, Binam, Chavez Morales, and Jane Does ## 5, 6, 8, 15, and 22 seek to represent a class of individuals held in ICE custody at ICDC who were subjected to Defendant Amin's medical abuses, as well as (1) a sub-class of individuals who were subjected to gynecological procedures without prior disclosure of their nature, purpose, risks, or alternatives and (2) a subclass of individuals who were subjected to medically unindicated gynecological procedures.

Deleted: 22,

Deleted: 25

642. Plaintiffs Oldaker, Solodkova, Walker, Silas, Floriano Navarro, Ndonga, Ramirez, Cajigal, Binam, and Jane Does ## 5, 6, 8, 15, and 22 seek to represent a class of

individuals who were retaliated against for speaking out against Defendant Amin's abuses, making known they were willing to speak out, and/or being publicly identified as victims and witnesses of the abuses.

643. The proposed "Medical Abuse Class" is defined as:

> All individuals who were subjected to gynecological procedures by Dr. Mahendra Amin after July 13, 2013, while they were in U.S. Immigration and Customs Enforcement custody at the Irwin County Detention Center.

644. The proposed "Consent Sub-Class" is defined as:

> All individuals who were subjected to gynecological procedures by Dr. Mahendra Amin without prior disclosure of their nature, purpose, risks, or alternatives after July 13, 2013, and while they were in U.S. Immigration and Customs Enforcement custody at the Irwin County Detention Center.

645. The proposed "Unnecessary Procedures Sub-Class" is defined as:

> All individuals who were subjected to medically unindicated gynecological procedures by Dr. Mahendra Amin after July 13, 2013, and while they were in U.S. Immigration and Customs Enforcement custody at the Irwin County Detention Center.

646. The proposed "Retaliation Class" is defined as:

> All individuals who were subject to retaliation by Federal and/or ICDC Defendants after speaking out about, protesting, making known they were willing to speak out about, and/or being publicly identified as victims or witnesses of non-consensual and/or medically unindicated gynecological procedures performed by Dr. Mahendra Amin while they were detained in U.S. Immigration and Customs Enforcement custody at the Irwin County Detention Center.

647. The Medical Abuse Class, Consent Sub-Class, Unnecessary Procedures Sub-Class[59], and Retaliation Class are so numerous that joinder of all members is impracticable. There are at least 60 individuals who are members of the Medical Abuse Class, Consent Sub-

[59] The Medical Abuse Class, Consent Sub-Class, and Unnecessary Procedures Sub-Class will at times be referred to collectively as the "Medical Abuse Class and Sub-Classes."

Class, and Unnecessary Procedures Sub-Class.[60] Given the rampant, systematic retaliation against Plaintiffs and putative class members, many of the at least 60 individuals are also members of the Retaliation Class. Several members of the Medical Abuse Class and Sub-Classes and of the Retaliation Class have been deported and are geographically dispersed, and several are subject to imminent deportation. Joinder of class members is impracticable due to their geographic diversity, the instability of their living situations, and limited understanding of English and the laws of the United States.

648. There are questions of law and fact that are common to all members of the Medical Abuse Class, Consent Sub-Class, Unnecessary Procedures Sub-Class, and Retaliation Class. The proposed Medical Abuse Class members allege common harms, including denial of reasonable safety and adequate medical care; exposure to punitive conditions of confinement; and deliberate indifference to their serious medical needs. The proposed Consent Sub-Class members allege the common harm of being subjected to medical procedures without their informed consent. The proposed Unnecessary Procedures Sub-Class members allege the common harm of being subjected to medically unnecessary procedures, resulting in physical and mental pain and suffering.

649. The Retaliation Class members also allege common harms, including deterrence from participation in pending federal proceedings, subjection to imminent removal as a result of speaking out about medical abuses, and retaliation spawned by speaking out about abuses and conditions or their attendance or testimony in federal court. Defendants' actions deterred them from bringing forward credible allegations of that abuse. All proposed Medical Abuse Class, Consent Sub-Class, and Unnecessary Procedures Sub-

[60] John Washington & José Olivares, *Number of Women Alleging Misconduct by ICE Gynecologist Nearly Triples*, The Intercept (Oct. 27, 2020), https://theintercept.com/2020/10/27/ice-irwin-women-hysterectomies-senate/.

Case 7:22-cv-00148-WLS-ALS Document 138-18 Filed 07/12/24 Page 136 of 195

Class members raise the same legal claims under the Due Process Clause of the Fifth and Fourteenth Amendments, and all proposed Retaliation Class members raise the same legal claims under the First Amendment and 42 U.S.C. § 1985(2). The proposed class members' entitlement to these rights is based on a common core of facts. All proposed Medical Abuse Class, Consent Sub-Class, and Unnecessary Procedures Sub-Class members were detained by ICE at ICDC when they were subjected to non-consensual, medically unindicated, or invasive gynecological procedures. Retaliation Class members were subjected to retaliation as a result of coming forward with their stories and experiences of medical abuse at ICDC. Their shared common facts will ensure that judicial findings regarding the legality of the challenged practices will be the same for all class members.

650. Plaintiffs' claims are typical of the claims of the proposed Medical Abuse Class, Consent Sub-Class, Unnecessary Procedures Sub-Class, and Retaliation Class. Plaintiffs and proposed Medical Abuse Class and Subclass members raise common legal claims and are united in their interest and injury. Plaintiffs, like proposed Medical Abuse Class and Subclass members, are currently or were formerly detained at ICDC, where they were subjected to non-consensual, medically unindicated, or invasive gynecological procedures while in ICE custody at ICDC and were unlawfully deprived of their rights under the Due Process Clause of the U.S. Constitution. Plaintiffs, like proposed Retaliation Class members, also raised common legal claims and are united in their interest and injury as they all were also subjected to retaliation by ICE and ICDC Defendants as a result of speaking out about the medical abuses occurring at ICDC and

Case 7:20-cv-00224-WLS Document 133-18 Filed 07/01/24 Page 137 of 195

were unlawfully deprived of their rights under the First Amendment and 42 U.S.C. § 1985(2). As a result, they are all victims of the same, unlawful course of conduct.

651. Plaintiffs Oldaker, Solodkova, Walker, Silas, Floriano Navarro, Ndonga, Ramirez, Cajigal, Binam, Chavez Morales, and Jane Does ## 5, 6, 8, 15, and 22 are adequate class representatives. Plaintiffs seek relief on behalf of the proposed Medical Abuse Class, Consent Sub-Class, Unnecessary Procedures Sub-Class, and Retaliation Class as a whole and have no interests antagonistic to other members of the Medical Abuse Class or Retaliation Class. Plaintiffs' mutual goal is to declare Defendants' actions unlawful and to obtain damages that would cure the harm Defendants have caused. Plaintiffs seek a remedy for the same injuries as the proposed Medical Abuse Class, Consent Sub-Class, Unnecessary Procedures Subclass, and Retaliation Class members, and all share an interest in having their rights vindicated. Thus, the interests of Plaintiffs and the proposed Medical Abuse Class, Consent Sub-Class, Unnecessary Procedures Subclass, and Retaliation Class members are aligned.

Deleted: 22,

Deleted: 25

652. Plaintiffs are represented by attorneys from the National Immigration Project of the National Lawyers Guild, Columbia Law School Immigrants' Rights Clinic, Dreyer Sterling, LLC, and other undersigned counsel. Counsel have a demonstrated commitment to protecting the rights and interests of noncitizens and, together, have considerable experience in handling complex and class action litigation in the immigration field. Counsel have represented numerous classes of immigrants and other victims of government misconduct in actions in which they successfully obtained class relief.

653. The aforementioned common questions of law and fact predominate over questions affecting only individual members. The issues in this action are subject to generalized proof and thus applicable to the proposed Classes as a whole. Plaintiffs and proposed Medical Abuse Class and Sub-Class members were all subjected to the same or similar abusive procedures while in ICE custody at ICDC, and Retaliation Class members were further subjected to unlawful retaliation. While the suit may entail certain individual questions, a single common question overrides any remaining individual question for each of the classes. For the Medical Abuse Class: whether the non-consensual and/or medically unindicated gynecological procedures that Plaintiffs and proposed Medical Abuse Class members were subjected to and the failure to provide them with adequate medical care violated their rights under the Due Process Clause of the Fifth and Fourteenth Amendments. For the Consent Sub-Class: whether Sub-Class Members were effectively informed alternatives to, or the nature, risks, or purpose of, medical treatments given them while detained at ICDC. For the Unnecessary Procedures Sub-Class: whether Sub-Class Members underwent unnecessary medical procedures resulting in harm. And, for the Retaliation Class: whether the subsequent actions by Defendants to deter and retaliate against them for attending or testifying in court or speaking out about the abuse they experienced at ICDC violated their rights under the First Amendment and 42 U.S.C. § 1985(2).

654. For a fair and efficient adjudication of this controversy, a class action is superior to other available methods. Absent a class action, it is unlikely that potential claimants would be afforded relief due to the vulnerable nature of Plaintiffs and proposed class members. Plaintiffs and proposed class members are noncitizens who were formerly detained at

ICDC, are geographically dispersed, have limited understanding of the law, and some have limited English language skills. Proposed class members therefore face numerous barriers to bringing suits. Given the number of individuals who have been subjected to non-consensual, medically unindicated, and/or invasive gynecological procedures at ICDC and the number who have been retaliated against as a result of speaking out about the medical abuse at ICDC, aggregation of Plaintiffs' and proposed class members' claims would promote efficiency, enable faster processing of their claims, and avoid duplication of litigation. Consolidation is preferable to individual actions in this case due to this judicial district's connection to the conduct giving rise to the claims. Because Plaintiffs' common questions of fact and law predominate over individual questions, resolution of the underlying issues in a class action would create fewer management issues than any of the alternatives.

## CLAIMS FOR RELIEF[61]

### FIRST CLAIM FOR RELIEF
### Violation of the First Amendment Against Federal Defendants (Retaliation)

For Declaratory and Injunctive Relief
On Behalf of Plaintiffs Against Federal Defendants in Their Official Capacities

For Damages under *Bivens*
On Behalf of Plaintiffs and Retaliation Class Members Against Defendants Giles, Musante, Ciprian, Rivera, and Unknown ICE Officials ##1-X in Their Individual Capacities

655. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

[61] After the Defendants' respective Motions to Dismiss were fully briefed and decided, the only claims remaining are those asserted under the Federal Tort Claims Act against the United States Government. As defined in the Parties section:
- "FTCA Plaintiffs" refers to Plaintiffs Oldaker, Solodkova, Walker, Silas, Navarro, Ndonga, Ramirez, Cajigal, Binam, Chavez Morales, and Jane Does ## 5, 6, 8, 15 and 22;
- "Federal Defendants" refers to Defendants Jarvis McMiller, Thomas Giles, Tae Johnson, Alejandro Mayorkas, Merrick Garland, ICE, Patrick Musante, Cesar Ciprian, Ada Rivera, and Unknown ICE officials ##1-X;

Deleted: As defined in the Parties section:¶

656. Plaintiffs engaged in constitutionally protected speech and engaged in their constitutionally protected right to petition the government for the redress of grievances related to their medical abuse. When testifying to federal investigators and speaking to the press about their medical abuse, Plaintiffs were engaging in First Amendment protected speech and petitioning.

657. Further, Plaintiffs' speech about the medical abuse they suffered immediately became a matter of prominent public concern. Congress investigated their medical abuse, and the press widely reported on it. It is therefore entitled to the highest level of protection under the First Amendment.

658. Plaintiffs also engaged in their constitutionally protected right to "petition the government for a redress of grievances." *Stallworth v. Wilkins*, 802 F. App'x 435, 440 (11th Cir. 2020) (quoting *Boxer X v. Harris*, 437 F.3d 1107, 1112 (11th Cir. 2006)). The freedom to petition protects detained individuals' rights to file a grievance and a complaint and to participate fully during the duration of a lawsuit. Here, it protects Plaintiffs' participation in the federal investigations.

659. Plaintiffs suffered threats and adverse actions that would likely deter a person of ordinary firmness from engaging in such speech. Specifically, Federal Defendants deported or attempted to deport Plaintiffs. They also used, or threatened to use, force, solitary confinement, and denial of privileges against Plaintiffs. Outside of deportation or attempted deportation, the use of force, solitary confinement, and the denial of

- "ICDC Defendants" refers to Defendants ICDC, LaSalle, David Paulk, Marteka George, Mia Mines, William Rabiou, FNU Hughes, FNU Smith, FNU Coney, FNU Hanes, FNU Faison, FNU Battle, FNU Vaughn, FNU Scott, FNU Slack, and Unknown ICDC Officers ##1-X;
- "Irwin Medical Defendants" refers to Irwin County Hospital and Mahendra Amin;
- "Irwin County Defendants" refers to all ICDC Defendants, Irwin County Hospital, and Mahendra Amin.

Case 7:22-cv-00144-WLS-ALS Document 138-18 Filed 07/12/24 Page 141 of 195

privileges also constitute adverse action under the First Amendment. Not only were these actions likely to deter speech, they actually did.

660. There is a substantial causal connection between Plaintiffs' protected speech and Federal Defendants' adverse actions and threats. Plaintiffs' speech was a substantial or motivating factor for Defendants' retaliatory actions. For example, Federal Defendants deported or attempted to deport several Plaintiffs and putative class members almost immediately following federal investigators' receipt of their names as witnesses. Federal Defendants have also undertaken a broader pattern and practice of retaliatory deportations of other victims and witnesses. Federal Defendants retaliated against Plaintiffs because they are, specifically, victims of and witnesses against the Federal Defendants and will state so accordingly.

661. Federal Defendants' retaliatory actions caused and will continue to cause irreparable harm by chilling Plaintiffs' exercise of their free speech rights.

662. Federal Defendants' retaliatory actions and threats caused actual injury to Plaintiffs, including physical and/or psychological harm.

663. Federal Defendants acted in clear violation of well-settled law, which reasonable persons would have been aware of, with regard to the standards for retaliation in violation of the First Amendment's right to free speech and right to petition.

664. Plaintiffs and Retaliation Class Members seek, and are entitled to, damages against Federal Defendants Giles, Musante, Ciprian, Rivera, and Unknown ICE Officials ##1-X in their individual capacities, pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

665. Plaintiffs seek, and are entitled to, declaratory and injunctive relief against Federal Defendants, finding their actions in violation of the First Amendment and compelling all Federal Defendants to cease retaliating against Plaintiffs for their First Amendment protected conduct.

**SECOND CLAIM FOR RELIEF**
**Violation of the First/Fourteenth Amendment (Retaliation under 42 U.S.C. § 1983)**

For Declaratory Relief
On Behalf of Plaintiffs Against ICDC Defendants in Their Official Capacities

For Damages
On Behalf of Plaintiffs and Retaliation Class Members Against ICDC Defendants in Their Official and Individual Capacities

666. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

667. Because Defendant ICE contracted with Irwin County, which in turn contracted with Defendant LaSalle, for the operation of the detention facility up until October 7, 2021, Defendants ICDC, LaSalle, and their employees, agents, and/or contractors were state or local actors and subject to suit under 42 U.S.C. § 1983, independent of whether they may also be considered federal actors because they had engaged in the core federal function of civil immigration detention.

668. Liability under § 1983 extends to private physicians, including Defendant Amin, who are authorized to provide medical services to prisoners, as well the warden of a state or local detention facility or prison.

669. ICDC deprived Plaintiffs of their federal rights under the First Amendment, which has been incorporated to states and localities by the Fourteenth Amendment's Due Process Clause.

670. Plaintiffs engaged in constitutionally protected speech and engaged in their constitutionally protected right to petition the government for the redress of grievances.

671. When testifying to federal investigators and speaking to the press, Plaintiffs were engaging in First Amendment protected speech and petitioning.

672. Further, Plaintiffs' speech pertains to matters of prominent public concern. It is therefore entitled to the highest level of protection under the First Amendment.

673. Plaintiffs also engaged in their constitutionally protected right to petition the government for a redress of grievances. Specifically, the freedom to petition protects detained individuals' rights to file a grievance complaint and participate fully during the duration of a lawsuit.

674. ICDC Defendants have taken egregious adverse actions against Plaintiffs and Retaliation Class Members sufficient to trigger First Amendment protections.

675. These actions include but are not limited to, placing or threatening to place them in medical units or solitary confinement; placing them on cell restriction; transferring them to other units to separate protestors; physically assaulting them, including while handcuffed; threatening to deprive hunger strikers and protestors of property and commissary; threatening to shut off or ration water; withholding their food; delaying delivery of their prescribed medication; denying them access to the law library; denying them internet access; limiting or denying them phone access; monitoring their phone calls and abruptly ending their calls when discussing hunger strikes, medical treatment, or when speaking with reporters; destroying their letters documenting treatment; refusing to produce individuals at hearings related to Defendant Amin's abuses; refusing

to coordinate with consular officials; and making false claims to congressional investigators.

676. There is a substantial causal connection between Plaintiffs' protected speech and ICDC Defendants' adverse actions and threats. ICDC, LaSalle, their employees, agents, and/or contractors have undertaken a pattern and practice of retaliation against victims and witnesses of Defendant Amin's abuses. This pattern and practice demonstrate that ICDC Defendants retaliated against Plaintiffs because they are, specifically, victims of and witnesses against the ICDC Defendants.

677. ICDC Defendants' retaliatory actions and threats caused actual injury to Plaintiffs, including physical and/or psychological harm.

678. ICDC Defendants' retaliatory actions caused irreparable harm by chilling Plaintiffs' exercise of their free speech rights.

679. ICDC Defendants are also subject to suit pursuant to 42 U.S.C. § 1983 under a theory of municipal liability. Municipal liability under § 1983 arises where the municipality has undertaken an official policy or custom which causes an unconstitutional deprivation of the plaintiff's rights.[62]

680. ICDC had a policy or custom of retaliating against individuals who speak out about the deplorable conditions inside the facility, including medical abuse and neglect, and this policy or custom caused Plaintiffs' and proposed subclass members injury.

681. ICDC Defendants also failed to properly train their employees and staff regarding retaliation against individuals who report unlawful conditions and abuse.

[62] *See Monell*, *supra* note 43.

682. ICDC Defendants are liable to Plaintiffs for declaratory relief resulting from their retaliation and violations of constitutional rights.

683. ICDC Defendants are liable to Plaintiffs and Retaliation Class Members for all damages resulting from their retaliation and violations of constitutional rights.

684. ICDC Defendants, in their individual capacities, were motivated by evil motive or intent and/or acted with callous or reckless indifference to the federally protected rights of Plaintiffs.

685. Plaintiffs and Retaliation Class Members seek, and are entitled to, actual and punitive damages against ICDC Defendants in their official and individual capacities for violations of their First Amendment rights.

686. Plaintiffs seek, and are entitled to, declaratory relief against ICDC Defendants in their official capacities, finding their actions in violation of the First Amendment.

## THIRD CLAIM FOR RELIEF
**Violation of First Amendment (alternative claim under *Bivens*)**

For Declaratory Relief
On Behalf of Plaintiffs Against ICDC Defendants in Their Official Capacities

For Damages under *Bivens*
On Behalf of Plaintiffs and Retaliation Class Members Against Defendants Paulk, Amin, George, Mines, Rabiou, Hughes, Smith, Coney, Hanes, Faison, Battle, Vaughn, Scott, Slack, and Unknown ICDC Officers ##1-X in Their Individual Capacities

687. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

688. This claim is brought in the alternative to Count Three. If the Court finds that the ICDC Defendants were operating solely under color of federal law, ICDC Defendants are liable for declaratory relief under the First Amendment, and Defendants Paulk, Amin, Mines, Rabiou, Hughes, Smith, Coney, Hanes, Faison, Battle, Vaughn, and Unknown

Case 7:22-cv-00144-WLS-ALS Document 138-18 Filed 07/12/24 Page 146 of 195

ICDC Officers ##1-X are liable for damages under the First Amendment. *See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

689. Plaintiffs engaged in constitutionally protected speech and engaged in their constitutionally protected right to petition the government for the redress of grievances. When testifying or offering to testify to federal investigators and speaking to the press, Plaintiffs were engaging in First Amendment protected speech and petitioning.

690. Further, Plaintiffs' speech pertains to matters of prominent public concern. It is therefore entitled to the highest level of protection under the First Amendment.

691. Plaintiffs also engaged in their constitutionally protected right to petition the government for a redress of grievances. Specifically, the freedom to petition protects detained individuals' rights to file a grievance complaint and participate fully during the duration of a lawsuit. Here, it protects Plaintiffs' participation in the federal investigations.

692. ICDC Defendants have taken egregious adverse actions against Plaintiffs and Retaliation Class Members sufficient to trigger First Amendment protections. These actions include but are not limited to placing them in medical units or solitary confinement, or threatening to do so; placing them on cell restriction; transferring them to other units to separate protestors; physically assaulting them, including while handcuffed; threatening to deprive hunger strikers and protestors of property and commissary; threatening to shut off or ration water; withholding their food; delaying delivery of their prescribed medication; denying them access to the law library; denying them internet access; limiting or denying them phone access; monitoring their phone calls and abruptly ending their calls when discussing hunger strikes, medical treatment,

Case 7:22-cv-00148-WLS-ALS Document 131-8 Filed 01/12/24 Page 147 of 195

or when speaking with reporters; destroying their letters documenting treatment; refusing to produce individuals at hearings related to Defendant Amin's abuses; refusing to coordinate with consular officials; and making false claims to congressional investigators.

693. There is a substantial causal connection between Plaintiffs' protected speech and Defendants' adverse actions and threats. ICDC, LaSalle and their employees, agents, and/or contractors have undertaken a pattern and practice of retaliation against victims and witnesses of Defendant Amin's abuses. This pattern and practice demonstrates that ICDC Defendants are retaliating against Plaintiffs because they are, specifically, victims of and witnesses against the ICDC Defendants.

694. ICDC Defendants' adverse actions and threats caused actual injury to Plaintiffs, including physical and/or psychological harm.

695. ICDC Defendants' adverse actions caused and will continue to cause irreparable harm by chilling Plaintiffs' exercise of their free speech rights.

696. ICDC Defendants are liable to Plaintiffs for declaratory relief resulting from their retaliation and violations of constitutional rights.

697. Should this Court hold that ICDC Defendants were acting under color of federal authority, Plaintiffs and proposed Class Members would have no available statutory cause of action which would provide a meaningful remedy. *See Carlson v. Green*, 446 U.S. 14, 23 (1980).

698. Should this Court hold that ICDC Defendants were acting under color of federal authority, Plaintiffs and Retaliation Class Members seek, and would be entitled to, damages against individual ICDC Defendants Paulk, Amin, George, Mines, Rabiou,

Hughes, Smith, Coney, Hanes, Faison, Battle, Vaughn, Scott, Slack, and Unknown ICDC Officers ##1-X in their individual capacities, pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

699. Should this Court hold that ICDC Defendants were acting under color of federal authority, Plaintiffs also seek, and would be entitled to, declaratory relief against ICDC Defendants in their official capacities.

**FOURTH CLAIM FOR RELIEF**
**Violation of the Fifth Amendment (Punitive Conditions of Confinement and Deliberate Indifference against Federal Defendants)**

For Declaratory Relief
On Behalf of Plaintiffs Against Federal Defendants in Their Official Capacities

For Damages under *Bivens*
On Behalf of Plaintiffs, Medical Abuse Class Members, Consent Sub-Class Members, and Unnecessary Procedures Sub-Class Members Against Defendants Giles, Musante, Ciprian, Rivera, and Unknown ICE Officials #1-X in Their Individual Capacities

700. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

701. The Due Process Clause guarantees persons in civil immigration detention the right to reasonable safety and to be free from punitive conditions of confinement. The government violates the right to substantive due process under the Fifth Amendment when it fails to satisfy its affirmative duty to provide conditions of confinement of reasonable health and safety to the people it holds in its custody, and therefore violates the Constitution when it fails to provide for their basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety for those in custody. *See DeShaney v. Winnebago Cty. Dep't. of Soc. Servs.*, 489 U.S. 189, 199-200 (1989); *Helling v. McKinney*, 509 U.S. 25, 32 (1993).

Case 7:22-cv-00148-WLS-ALS Document 138-2 Filed 07/02/24 Page 150 of 195

702. Individuals in civil detention are afforded "more constitutional protection, more considerate treatment, and conditions of confinement" than individuals with criminal convictions "whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982); *see Marsh v. Fla. Dep't of Corr.*, 330 F. App'x 179, 182 (11th Cir. 2009).

703. At a minimum, the Due Process Clause prohibits the government from being deliberately indifferent to a substantial risk of serious harm that would rise to the level of an Eighth Amendment violation. The government violates the right to substantive due process when, acting with deliberate indifference, it subjects those in civil detention to unreasonable risks to their health and safety. *See Hamm v. DeKalb Cty.*, 774 F.2d 1567, 1572-74 (11th Cir. 1985).

704. Plaintiffs, Medical Abuse Class Members, Consent Sub-Class Members, and Unnecessary Procedures Sub-Class Members have been subjected to medical abuse, in many cases amounting to sexual assault, and have serious medical needs, including but not limited to those resulting from non-consensual, medically unindicated, and/or invasive gynecological procedures, while they were detained at ICDC.

705. Federal Defendants, including Giles, Musante, Ciprian, Rivera, and Unknown ICE Officials ##1-X, were aware of the risk of serious harm to Plaintiffs, Medical Abuse Class members, Consent Sub-Class Members, and Unnecessary Procedures Sub-Class Members as a result of ICDC's abuse and medical neglect.

706. Despite knowledge of the risk of serious harm to Plaintiffs and Class Members, Federal Defendants have disregarded that risk by engaging in conduct that amounts to more than negligence.

707. Defendants' deliberate indifference and failure to ensure adequate medical care at ICDC have caused or contributed to the Plaintiffs' and Medical Abuse Class and Subclass Members' ongoing injuries and harms, including physical and/or psychological harm.

708. Defendants' actions in affirmatively subjecting Plaintiffs to medical abuse, in some cases amounting to sexual assault, at the hands of Defendant Amin, caused the Plaintiffs' and Medical Abuse Class and Subclass Members' ongoing injuries and harms.

709. Plaintiffs and Medical Abuse and Class and Sub-Class Members were formerly subjected to punitive conditions of confinement at ICDC which lack a reasonable relation to any legitimate government purpose. Federal Defendants subjected them to repeated medical abuse at the hands of Defendant Amin.

710. Federal Defendants also failed to provide Plaintiffs and Medical Abuse Class and Sub-Class Members with the minimum level of necessities while in ICE custody at ICDC, including safety and medical care, as required under the Due Process Clause.

711. Federal Defendants Giles, Musante, Ciprian, Rivera, and Unknown ICE Officials ##1-X, in their individual capacities, were motivated by evil motive or intent, and/or were callously or recklessly indifferent to Plaintiffs' federally protected rights.

712. Plaintiffs and Medical Abuse Class and Sub-Class Members seek, and are entitled to, compensatory and punitive damages against individual Federal Defendants Giles, Musante, Ciprian, Rivera, and Unknown ICE Officials ##1-X for subjecting them to punitive conditions of confinement and acting with deliberate indifference to serious medical needs, pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

Case 7:22-cv-00148-WLS-ALS Document 138-18 Filed 07/11/24 Page 151 of 195

**FIFTH CLAIM FOR RELIEF**
**Violation of the Fourteenth Amendment (Punitive Conditions of Confinement and Deliberate Indifference pursuant to 42 U.S.C. § 1983)**

For Declaratory Relief
On Behalf of Plaintiffs Against ICDC Defendants in Their Official Capacities

For Damages
On Behalf of Plaintiffs, Medical Abuse Class Members, Consent Sub-Class Members, and Unnecessary Procedures Sub-Class Members Against ICDC Defendants in Their Official and Individual Capacities

713. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

714. Because Defendant ICE contracts with Irwin County, which in turn contracts with Defendant LaSalle, for the operation of the detention facility, Defendants ICDC, LaSalle, and their employees, agents, and officers are state or local actors and subject to suit under 42 U.S.C. § 1983, independent of whether they may also be considered federal actors because they are engaging in the core federal function of civil immigration detention.

715. Liability under § 1983 extends to private physicians, such as Defendant Amin, who are authorized to provide medical services to prisoners, as well as the warden of a state or local detention facility or prison.

716. The Due Process Clause provides persons in civil immigration detention the right to reasonable safety and to be free from punitive conditions of confinement. The government violates the right to substantive due process when it fails to satisfy its affirmative duty to provide conditions of confinement of reasonable health and safety to the people it holds in its custody, and therefore violates the Constitution when it fails to provide for their basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety for those in custody.

717. Individuals in civil detention are afforded "more constitutional protection, more considerate treatment, and conditions of confinement" than individuals with criminal convictions "whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982).

718. At a minimum, the Due Process Clause prohibits the government from being deliberately indifferent to a substantial risk of serious harm that would rise to the level of an Eighth Amendment violation. The government violates the right to substantive due process when, acting with deliberate indifference, it subjects those in civil detention to unreasonable risks to their health and safety.

719. Plaintiffs, Medical Abuse Class Members, Consent Sub-Class Members, and Unnecessary Procedures Sub-Class Members have serious medical needs, including but not limited to those resulting from non-consensual, medically unindicated, and/or invasive gynecological procedures, while they were detained at ICDC.

720. While detained at ICDC, Plaintiffs and proposed Class Members were subjected to non-consensual, medically unindicated, and/or invasive gynecological procedures at the hands of Defendant Amin. ICDC Defendants, acting with deliberate indifference, failed to provide Plaintiffs and proposed Class Members with conditions of reasonable health and safety during the time they were detained at ICDC.

721. ICDC Defendants further acted with deliberate indifference to Plaintiffs' and Medical Abuse Class and Sub-Class Members' serious medical needs. ICDC Defendants were aware of the serious risk of harm posed by medical abuse and neglect at ICDC, including non-consensual, medically unindicated, and/or invasive gynecological procedures.

Case 7:22-cv-00144-WLS-ALS Document 138-8 Filed 07/12/24 Page 153 of 195

722. Despite knowledge of the risk of serious harm to Plaintiffs and Medical Abuse Class and Sub-Class Members, ICDC Defendants disregarded that risk by conduct that is more than negligence. Plaintiffs had their medical needs neglected and ignored, despite their need for urgent medical care. ICDC Defendants failed to provide Plaintiffs and Medical Abuse Class and Sub-Class Members with adequate medical treatment for their medical needs. In so doing, ICDC Defendants acted with deliberate indifference to serious medical needs and caused irreparable harm.

723. ICDC Defendants' failure to provide adequate medical care has contributed to the Plaintiffs' and Medical Abuse Class and Sub-Class Members' ongoing injuries and harms.

724. The right to substantive due process is also violated when the government imposes punitive conditions of confinement to individuals in civil custody.

725. Plaintiffs and Medical Abuse Class and Sub-Class Members were formerly subjected to punitive conditions of confinement at ICDC which lack a reasonable relation to any legitimate government purpose. ICDC Defendants failed to provide Plaintiffs and Medical Abuse Class Members with the minimum level of necessities while in their custody, including safety and medical care, required under the Due Process Clause. By subjecting Plaintiffs to ongoing medical neglect and abuse, ICDC Defendants maintained detention conditions that amounted to punishment and failed to protect Plaintiffs' health and safety in violation of Plaintiffs' substantive due process rights.

726. By subjecting Plaintiffs and Medical Abuse Class and Sub-Class Members to punitive conditions of confinement and acting with deliberate indifference to their serious medical needs, ICDC Defendants violated their rights to substantive due process.

Case 7:22-cv-00148-WLS Document 138-18 Filed 11/22/24 Page 154 of 195

727. ICDC Defendants are also subject to suit pursuant to 42 U.S.C. § 1983 under municipal liability.

728. ICDC had a policy or custom of retaliating against individuals who spoke out about medical abuses suffered at ICDC at the hands of Defendant Amin, and this policy or custom caused Plaintiffs' and proposed Sub-class Members' injury. ICDC Defendants also failed to properly train their employees and staff regarding provision of adequate medical care.

729. A plaintiff may also recover punitive damages "under § 1983 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves callous or reckless indifference to the federally protected rights of others.'" *Wright v. Sheppard*, 919 F.2d 665, 670 (11th Cir. 1990) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). ICDC Defendants, in their individual capacities, have engaged in such conduct here, and Plaintiffs should be awarded punitive damages.

730. Plaintiffs, Medical Abuse Class Members, Consent Sub-Class Members, and Unnecessary Procedures Sub-Class Members seek, and are entitled to, actual damages against ICDC Defendants in their official and individual capacities for all damages resulting from their violations of substantive due process rights.

731. Plaintiffs and Medical Abuse Class and Sub-Class Members seek, and are entitled to, punitive damages against ICDC Defendants in their official and individual capacities for violations of their substantive due process rights.

732. Plaintiffs also seek declaratory and injunctive relief against ICDC Defendants in their official capacities.

**SIXTH CLAIM FOR RELIEF**
**Violation of the Fifth Amendment (Alternative First Amendment claim against ICDC Defendants under *Bivens*)**

For Declaratory Relief
On Behalf of Plaintiffs Against ICDC Defendants in Their Official Capacities

For Damages under *Bivens*
On Behalf of Plaintiffs, Medical Abuse Class Members, Consent Sub-Class Members, and Unnecessary Procedures Sub-Class Members Against Defendants Paulk, Amin, George, Mines, Rabiou, Hughes, Smith, Coney, Hanes, Faison, Battle, Vaughn, Scott, Slack, and Unknown ICDC Officers ##1-X in Their Individual Capacities

733. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

734. In the alternative, should this Court find that the ICDC Defendants were operating solely under color of federal law, ICDC Defendants are liable for declaratory and injunctive relief under the First Amendment, and Defendants Paulk, Amin, George, Mines, Rabiou, Hughes, Smith, Coney, Hanes, Faison, Battle, Vaughn, Scott, Slack, and Unknown ICDC Officers ##1-X are liable for damages under the First Amendment.

735. The Due Process Clause provides persons in civil immigration detention the right to reasonable safety and to be free from punitive conditions of confinement. The government violates the right to substantive due process when it fails to satisfy its affirmative duty to provide conditions of confinement of reasonable health and safety to the people it holds in its custody, and therefore violates the Constitution when it fails to provide for their basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety for those in custody.

736. Individuals in civil detention are afforded "more constitutional protection, more considerate treatment, and conditions of confinement" than individuals with criminal

Case 7:20-cv-00224-WLS Document 138-18 Filed 07/10/26 Page 156 of 195

convictions "whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982).

737. At a minimum, the Due Process Clause prohibits the government from being deliberately indifferent to a substantial risk of serious harm that would rise to the level of an Eighth Amendment violation. The government violates the right to substantive due process when, acting with deliberate indifference, it subjects those in civil detention to unreasonable risks to their health and safety.

738. Plaintiffs, Medical Abuse Class Members, Consent Sub-Class Members, and Unnecessary Procedures Sub-Class Members have serious medical needs, including those resulting from non-consensual, medically unindicated, and/or invasive gynecological procedures, while they were detained at ICDC.

739. While detained at ICDC, Plaintiffs and proposed Class Members were subjected to non-consensual, medically unindicated, and/or invasive gynecological procedures at the hands of Defendant Amin. ICDC Defendants failed to provide Plaintiffs and proposed Class Members with conditions of reasonable health and safety during the time they were detained at ICDC.

740. ICDC Defendants further acted with deliberate indifference to Plaintiffs' and Medical Abuse Class and Sub-Class Members' serious medical needs. ICDC Defendants were aware of the serious risk of harm posed by medical abuse and neglect at ICDC, including non-consensual, medically unindicated, and/or invasive gynecological procedures.

741. Despite knowledge of the risk of serious harm to Plaintiffs and Medical Abuse Class and Sub-Class Members, ICDC Defendants have disregarded that risk by conduct that is

more than negligence. Plaintiffs had their medical needs neglected and ignored, despite their need for urgent medical care. ICDC Defendants failed to provide Plaintiffs and Medical Abuse Class and Sub-Class Members with adequate medical treatment for their medical needs. In so doing, ICDC Defendants acted with deliberate indifference to serious and irreparable harm.

742. ICDC Defendants' failure to provide adequate medical care has contributed to the Plaintiffs' and Medical Abuse Class and Sub-Class Members' ongoing injuries and harms.

743. The right to substantive due process is also violated when the government imposes punitive conditions of confinement to individuals in civil custody.

744. Plaintiffs and Medical Abuse Class Members were formerly subjected to punitive conditions of confinement at ICDC which lack a reasonable relation to any legitimate government purpose. ICDC Defendants failed to provide Plaintiffs and Medical Abuse Class and Sub-Class Members with the minimum level of necessities while in their custody, including safety and medical care, required under the Due Process Clause. By subjecting Plaintiffs to ongoing medical neglect and abuse, ICDC Defendants maintained detention conditions that amounted to punishment and failed to protect Plaintiffs' health and safety in violation of Plaintiffs' substantive due process rights.

745. By subjecting Plaintiffs and Medical Abuse Class and Sub-Class Members to punitive conditions of confinement and acting with deliberate indifference to their serious medical needs, ICDC Defendants violated their rights to substantive due process.

746. ICDC Defendants are liable to Plaintiffs for declaratory relief resulting from their violations of constitutional rights.

747. Because ICDC Defendants acted in clear violation of well-settled law, which reasonable persons would have been aware of, with regard to the standards for punitive conditions of confinement and with deliberate indifference to serious medical needs under the Fifth Amendment, the actions of individual ICDC Defendants Paulk, Amin, George, Mines, Rabiou, Hughes, Smith, Coney, Hanes, Faison, Battle, Vaughn, Scott, Slack, and Unknown ICDC Officers ##1-X give rise to a cause of action for damages against them in their individual capacities on behalf of Plaintiffs and the Retaliation Class members, pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

748. Should this Court hold that ICDC Defendants were acting under color of federal authority, Plaintiffs and proposed Class Members would have no available statutory cause of action which would provide a meaningful remedy.

749. Should this Court hold that ICDC Defendants were acting under color of federal authority, Plaintiffs and Medical Abuse Class and Sub-Class Members seek, and would be entitled to, damages against Defendants Paulk, Amin, George, Mines, Rabiou, Hughes, Smith, Coney, Hanes, Faison, Battle, Vaughn, Scott, Slack, and Unknown ICDC Officers ##1-X in their individual capacities for damages under the First Amendment, pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

750. Should this Court hold that ICDC Defendants were acting under color of federal authority, Plaintiffs seek, and would be entitled to, declaratory relief against ICDC Defendants finding ICDC Defendants' actions in violation of the First Amendment.

**SEVENTH CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act and the Immigration and Nationality Act**
**(Deportation of witnesses and individuals in the midst of legitimate efforts to protect their civil rights or civil liberties)**

On Behalf of Plaintiffs for Declaratory and Injunctive Relief
Against Federal Defendants in Their Official Capacities

751. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

752. The Administrative Procedure Act ("APA") provides that a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

753. Under *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), and related cases, an agency and agency officials are required to follow their own policies. *See Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures.")

754. The Immigration and Nationality Act ("INA") and federal regulations prohibit the departure of any noncitizen from the United States "if his departure would be prejudicial to the interests of the United States." 8 C.F.R. §§ 215.2(a); *see also* 8 U.S.C. § 1185(a)(1) (providing that "it shall be unlawful . . . for any [noncitizen] to depart . . . from . . . the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe"). That includes, *inter alia*, "Any [noncitizen] who is needed in the United States in connection with any investigation or proceeding being, or soon to be, conducted by any official executive, legislative, or judicial agency in the United States or by any governmental committee, board, bureau, commission, or body in the United States, whether national,

state, or local." 8 C.F.R. § 215.3(h); *see also* Control of Aliens Departing from the United States, 45 Fed. Reg. 65,515, 65,515-16 (Oct. 3, 1980) (promulgating into the immigration regulations a copy of the State Department's pre-existing list in 22 C.F.R. Part 46).

755. In addition, both statutes and regulations contemplate the stay of removal and release of individuals who are witnesses in ongoing civil and criminal prosecutions and investigations, irrespective of whether they otherwise have authorization to be or remain in the U.S. by virtue of immigration status. *See, e.g.*, 8 U.S.C. § 1231(c)(2)(a) (authorizing the issuance of a stay and release on bond when "(i) immediate removal is not practicable or proper; or (ii) the [noncitizen] is needed to testify in the prosecution of a person for a violation of a law of the United States or of any State"); 8 C.F.R. § 212.5(b)(4) (permitting parole from detention for "[noncitizens] who will be witnesses in proceedings being, or to be, conducted by judicial, administrative, or legislative bodies in the United States").

756. Defendant ICE has an established policy, ICE Policy Number 10076.1, which explicitly states, "it is . . . against ICE policy to remove individuals in the midst of a legitimate effort to protect their civil rights or civil liberties."

757. Multiple federal agencies are known to be conducting investigations into medical abuse of women at ICDC, including the DOJ, DHS OIG, and FBI. Congressional committees have likewise expressed deep concern about treatment of women at ICDC, including the House Judiciary Committee by letter dated November 7, 2020, and the House Oversight Committee by letter dated November 12, 2020.

758. ICE has already deported or attempted to deport and nearly deported several Plaintiffs shortly after their names and experiences at ICDC were shared with federal investigative agencies.

759. On information and belief, neither the DOJ nor DHS OIG nor the FBI has made any efforts to protect Plaintiffs or follow the procedures outlined in the regulations.

760. By failing to follow their own regulations, Federal Defendants have violated both the INA and the APA. Their actions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), and "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B). A fundamental principle of administrative law is that an "agency must follow its own rules." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 549 (2009); *see also Accardi*, 347 U.S. at 260. Federal Defendants' failure to follow the INA and their own regulations is unlawful agency action.

761. Because Federal Defendants violated the laws and procedures governing its enforcement actions and the rights afforded to individuals facing deportation in their efforts to silence Plaintiffs, Defendants' actions violate their constitutional, statutory, and regulatory rights.

762. Plaintiffs seek, and are entitled to, declaratory and injunctive relief against Federal Defendants in their official capacities to remedy their violations of the APA and INA.

Case 7:22-cv-00214-WLS-ALS Document 138-18 Filed 07/12/24 Page 162 of 195

**EIGHTH CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act (Failure to follow PBNDS)**

On Behalf of Plaintiffs, Medical Abuse Class, Consent Sub-Class, and Unnecessary Procedures Sub-Class for Declaratory Relief
Against Federal Defendants in Their Official Capacities

763. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

764. The Administrative Procedure Act ("APA") provides that a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

765. Under *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), and related cases, an agency and agency officials are required to follow their own policies.*See Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures.")

766. The PBNDS apply at all ICE-dedicated civil detention facilities, including at ICDC.

767. The PBNDS set forth a set of mandatory requirements, including regarding medical care, to which a facility is bound. Failure to comply with the PBNDS can give rise to liability under the APA.

768. ICDC, LaSalle, and any subcontractors, are bound by the 2008 PBNDS pursuant to the IGA.

769. Federal Defendants have failed to ensure that ICDC Defendants followed the PBNDS mandates for providing medical care.

770. Plaintiffs were subjected to non-consensual, medically unindicated, and/or invasive gynecological procedures while they were detained in ICE custody at ICDC. Plaintiffs did not receive the adequate, timely care necessary following those procedures.

771. Federal Defendants failed to ensure that ICDC Defendants provided appropriate medical care to Plaintiffs under the PBNDS.

772. Federal Defendants failed to ensure that ICDC administered medical treatment only with informed consent.

773. Federal Defendants failed to ensure that ICDC provided language accessibility to non-English speakers while receiving medical care.

774. Plaintiffs are prejudiced by Federal Defendants' failure to follow the PBNDS and failure to ensure that the ICDC Defendants follow the PBNDS. Plaintiffs have suffered and will continue to suffer irreparable injury because of this failure to follow the PBNDS.

775. A fundamental principle of administrative law is that an "agency must follow its own rules." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 549 (2009); *see also Accardi*, 347 U.S. at 260. The Federal Defendants' failure to follow the PBNDS and failure to ensure that the ICDC Defendants follow the PBNDS is unlawful agency action.

776. Plaintiffs seek, and are entitled to, declaratory relief that Federal Defendants violated the APA.

Case 7:22-cv-00144-WLS-ALS Document 139-18 Filed 07/12/24 Page 164 of 196

**NINTH CLAIM FOR RELIEF**
**Violation of 42 U.S.C. § 1985(2) – Conspiring to Deter Testimony/Participation in Investigations and Court Proceedings**

For Declaratory and Injunctive Relief
On Behalf of Plaintiffs Against Federal Defendants and ICDC Defendants in Their Official Capacities

For Damages
On Behalf of Plaintiffs and Retaliation Class Members Against Federal Defendants and ICDC Defendants in Their Official and Individual Capacities

777. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

778. 42 U.S.C. § 1985(2), which codifies portions of the Ku Klux Klan Act of 1871, provides a private right of action against persons who engage in a conspiracy to deter any party or witness from attending or testifying in a pending federal court proceeding. It also provides a private right of action against persons who conspire to retaliate against witnesses or participants in federal court proceedings. Section 1985(2) was passed to protect the process of federal courts, and to allow them to proceed without improper outside influence, by preventing intrusions on the rights of parties and witnesses.

779. To assert a deterrence claim under § 1985(2), a plaintiff must allege that (1) two or more people conspired (2) to deter a witness from testifying in a pending federal proceeding (3) which resulted in injury to the plaintiff.

780. To assert a retaliation claim under § 1985(2), a plaintiff must allege (1) a conspiracy, (2) retaliation spawned by the attendance or testimony in federal court, (3) an act in furtherance of the conspiracy, and (4) injury to the plaintiff.” *Aque v. Home Depot U.S.A., Inc.*, 629 F. Supp. 2d 1336, 1343 (N.D. Ga. 2009) (citation omitted).

781. On information and belief and based on ample circumstantial evidence, Federal Defendants and ICDC staff conspired and took action to deter and prevent Plaintiffs

from participating in congressional and federal law enforcement investigations of medical abuse at ICDC.

782. Shortly before a congressional delegation arrived at ICDC, Defendants and their employees, agents, and/or contractors transferred some survivors of medical abuse to the "Golf" pod, which is located behind the main ICDC facility and was not scheduled for inspection by the congressional delegation. Defendants and their employees, agents, and/or contractors ordered women not speak to Congress members and to stay in their beds during the inspection.

783. On information and belief and based on ample circumstantial evidence, Defendants and their employees, agents, and/or contractors, including Unknown ICE Officials, conspired to deter and prevent Plaintiffs from testifying or participating in a pending federal proceeding by expediting the deportation of witnesses who attempted to participate in federal investigations into ICDC.

784. On November 25, 2020, Plaintiff Walker, through counsel, informed government attorneys that she had information relevant to federal investigations and judicial proceedings related to medical abuse at ICDC. Approximately one week later, an ICE official at ICDC took Ms. Walker's fingerprints and informed her that issuance of her travel documents was being expedited, which meant she would soon be deported.

785. On October 28, 2020, Plaintiff Oldaker provided a declaration and list of victims to her lawyers. Her lawyers then shared these materials with federal investigators. Less than four days later, Ms. Oldaker's commissary was "zeroed-out" in preparation for her deportation. Ms. Oldaker was brought to the airport and would have been deported if not for the last-minute intervention of her attorneys and members of Congress.

786. Ms. Oldaker's appeal to the Board of Immigration Appeals was denied on October 7, 2020. Executing orders of removal so soon after the denial of a BIA appeal is extremely unusual.

787. On October 27, 2020, Plaintiff Ndonga spoke with federal investigators about medical abuse at ICDC. During the interview she told federal investigators that she was afraid of retaliation. Only hours after the interview with federal investigators ended, Defendant Hanes informed her that her removal hold had been lifted and she would soon be deported. At the time, Ms. Ndonga had been in immigration detention for over 19 months.

788. On September 15, 2020, Plaintiff Floriano Navarro admitted to ICDC staff and Unknown ICE Agents that she had spoken with reporters about medical abuse at ICDC. She was deported within 24 hours of this admission.

789. Prior to Plaintiff Floriano Navarro's deportation, ICDC employees and Unknown ICE Officials made statements suggesting that she was targeted for expedited deportation because she had helped expose misconduct at ICDC.

790. The close proximity between participation in investigations of misconduct at ICDC and expedited deportation strongly suggests coordination between Defendants to deter and prevent participation in federal investigations and court proceedings.

791. On information and belief and based on ample circumstantial evidence, these and other attempts to expedite the deportation of witnesses of medical abuse at ICDC were part of an ongoing conspiracy to deter and prevent participation and testimony in federal investigations and court proceedings.

792. In addition to this overt conduct, Federal Defendants, ICDC Defendants, and their employees, agents, and/or contractors have made explicit statements suggesting that they knew about and actively participated in a conspiracy. This includes saying that Plaintiffs and other ICDC detainees would have to "pay" for speaking up about their mistreatment.

793. Federal and ICDC Defendants and their employees, agents, and/or contractors also monitored Plaintiffs' phone calls. When Plaintiffs mentioned topics related to the federal investigation, including their abuse, mistreatment, of physical health, Defendants and their employees, agents, and/or contractors cut off the phone connection.

794. By deterring and preventing participation in investigations and court proceedings, Federal and ICDC Defendants and their employees, agents, and/or contractors aimed to shield themselves from accountability.

795. Victims and witnesses who are deported will be unable to effectively participate in federal investigations and court proceedings from abroad. Because of the actions of Federal and ICDC Defendants and their employees, agents, and/or contractors, those witnesses who were not deported are afraid to participate in federal investigations and court proceedings because it may expose them to expedited deportation or other retaliation.

796. Defendants' actions, including threats, intimidation, and deportation of witnesses, are sufficiently grave to constitute deterrence and retaliation under § 1985(2).

797. On information and belief and based on ample circumstantial evidence, Federal and ICDC Defendants and their employees, agents, and/or contractors continue to conspire to deter witnesses to and victims of medical abuse at ICDC from testifying or

Case 7:22-cv-00144-WLS-ALS Document 138-18 Filed 01/02/25 Page 168 of 195

participating in this federal action. If this Court does not intervene, Plaintiffs and crucial fact witnesses are at risk of being deported or otherwise retaliated against before this action is resolved.

798. Plaintiffs and the Retaliation Class Members seek, and are entitled to, damages against all Defendants in their official and individual capacities.

799. Plaintiffs also seek declaratory and injunctive relief against all Federal and ICDC Defendants in their official capacities to remedy their ongoing or future violations of § 1985(2).

**TENTH CLAIM FOR RELIEF**
**Violation of the Right to Due Process Under the Fifth Amendment (Deportation of essential witnesses)**

On Behalf of Plaintiffs for Declaratory and Injunctive Relief
Against Federal Defendants in Their Official Capacities

800. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

801. The deportation of a material witness in a criminal proceeding may establish a violation of the Due Process Clause of the Fifth Amendment. *See United States v. Valenzuela-Bernal*, 458 U.S. 858, 872–73 (1982); *United States v. Schaefer*, 709 F.2d 1383, 1385 (11th Cir. 1983); *United States v. De La Cruz Suarez*, 601 F.3d 1202, 1212–13 (11th Cir. 2010).

802. To show a Due Process violation, a criminal defendant must make a "plausible showing" that the deported witness would have offered testimony that is material, favorable to their defense, and "not merely cumulative to the testimony of available witnesses." *Valenzuela-Bernal*, 458 U.S. at 872-73; *see also United States v. Schlei*, 122 F.3d 944, 983 (11th Cir. 1997). It also requires showing that the government "acted in

bad faith" in repatriating noncitizens. *De La Cruz Suarez*, 601 F.3d at 1213; *see also United States v. McCullough*, 166 F. App'x 469, 472 (11th Cir. 2006).

803. These Due Process protections apply in the civil context where "circumstances warrant certain procedural protections usually reserved for criminal proceedings." *United States v. One 1982 Chevrolet Crew-Cab Truck VIN 1GCHK33M9C143129*, 810 F.2d 178, 183 (8th Cir. 1987).

804. Plaintiffs have material testimony relating to the abuse and medical neglect they have suffered at ICDC. Plaintiffs have all been subjected to non-consensual, medically unindicated, and/or invasive gynecological procedures at the hands of Defendant Amin. Some of these procedures amount to sexual assault. Plaintiffs have expressed an interest and desire in sharing their material testimony in court proceedings and with federal investigators.

805. Plaintiffs' testimony is not merely cumulative to the testimony of available witnesses. While Plaintiffs all experienced medical abuse and neglect at the hands of Defendant Amin, each of their testimonies highlights a broader pattern and practice of medical abuse and neglect at ICDC.

806. Federal Defendants have acted in bad faith by deporting several Plaintiffs within days, and in some cases within hours, of them coming forward and sharing their experiences at ICDC.

807. By deporting or threatening to deport Plaintiffs in this case, Federal Defendants have infringed on the rights of all Plaintiffs to a full and fair hearing on their claims.

Case 7:22-cv-00148-WLS-ALS Document 118-2 Filed 01/12/24 Page 170 of 195

808. Plaintiffs seek declaratory and injunctive relief against Federal Defendants in their official capacities to remedy these violations their Fifth Amendment right to a full and fair hearing.

**ELEVENTH CLAIM FOR RELIEF**
**Breach of IGA Contract**

On Behalf of Plaintiffs, Medical Abuse Class, Consent Sub-Class, and Unnecessary Procedures Sub-Class Against Irwin County Detention Center and LaSalle

809. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

810. ICDC and LaSalle, through Irwin County, are parties to the IGA contract, which requires Defendants to "accept and provide for the secure custody, safekeeping, housing, subsistence and care of federal detainees in accordance with state and local laws, standards and procedures, or court orders applicable to the operations of the facility, consistent with federal law, policies and regulations."

811. The IGA also requires that "where ICE detainees are housed, the ICE federal detainees are to be housed in accordance with ICE standards."

812. Pursuant to the IGA, the PBNDS 2008 applies to ICDC's custody and care for Plaintiffs.

813. ICDC, LaSalle, and their employees, agents, and/or contractors, including all ICDC Defendants, have breached the terms of the IGA, including by failing to abide by the terms of the PBNDS. For example, they have failed to provide appropriate medical care, to administer medical treatment only with informed consent, and to provide language accessibility to non-English speakers while receiving medical care.

814. Plaintiffs and putative members of the Medical Abuse Class, Consent Sub-Class, and Unnecessary Procedures Sub-Class are intended third-party beneficiaries of the IGA, including the IGA's provisions requiring Defendants to abide by the PBNDS. Those

Case 7:22-cv-00148-WLS Document 118-18 Filed 10/12/23 Page 171 of 195

provisions were made directly to benefit the care and treatment of ICE detainees like Plaintiffs. *See, e.g.*, *Melvin v. Cty. of Westchester*, No. 14-CV-2995 (KMK), 2016 WL 1254394, *22 (S.D.N.Y. Mar. 29, 2016); *Zikianda v. Cty. of Albany*, No. 1:12-CV-1194, 2015 WL 5510956, at *37 (N.D.N.Y. Sept. 15, 2015). Therefore, Plaintiffs have standing to enforce Defendants' breach of the terms of the IGA.

815. Plaintiffs and putative class members have been damaged in an amount to be proven at trial by Defendants' breach of the IGA. Plaintiffs have suffered and will continue to suffer irreparable injury and damages because of this breach of the IGA.

816. Plaintiffs and putative class members seek, and are entitled, to enforce the terms of the IGA contract.

817. Plaintiffs and putative class members also seek, and are entitled to, actual damages resulting from breach of the IGA contract.

**TWELFTH CLAIM FOR RELIEF**
**Negligent Hiring or Retention**

On Behalf of Plaintiffs, Medical Abuse Class, Consent Sub-Class, and Unnecessary Procedures Sub-Class for Damages
Against ICDC, LaSalle, and Irwin County Hospital

818. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

819. In order to sustain a claim for negligent hiring or retention, a claimant must show that the employer knew or should have known of the employee's propensity to engage in the conduct that caused the plaintiff's injury. *Piney Grove Baptist Church v. Goss*, 255 Ga. App. 380, 565 S.E.2d 569 (2002).

Case 7:22-cv-00148-WLS Document 138-18 Filed 07/12/24 Page 173 of 195

820. Defendant Amin is affiliated with and a member of the staff of Irwin County Hospital. In this capacity, he was authorized to provide medical services to detained individuals in ICE custody at ICDC, including Plaintiffs and Class Members.

821. At all relevant times, Plaintiffs and putative members of the Medical Abuse Class, Consent Sub-Class, and Unnecessary Procedures Sub-Class were in the care, control, and custody of the Defendants ICDC, LaSalle, and Irwin County Hospital, who owed a duty to them to exercise reasonable and ordinary care, including the duty to obtain informed consent from Plaintiffs for any and all medical and gynecological procedures prior to performing or allowing them to be performed on Plaintiffs.

822. Defendant Amin and agents and/or employees of Irwin County Hospital who performed or assisted Defendant Amin, performed non-consensual, medically unindicated, and/or invasive gynecological procedures on Plaintiffs and class members. As a result, Plaintiffs and class members were injured by Defendant Amin's conduct, including by enduring major surgeries that were unnecessary, suffering medical complications, and mental health issues.

823. ICDC and LaSalle knew or should have known of Defendant Amin's propensity to engage in non-consensual, medically unindicated, and/or invasive gynecological procedures. Several women, including Plaintiffs and putative class members, lodged complaints to ICDC and LaSalle officers against Defendant Amin at least two years before he was confirmed to no longer provide services to women at ICDC.

824. Irwin County Hospital knew or should have known of Defendant Amin's propensity to engage in non-consensual, medically unindicated, and/or invasive gynecological procedures. Complaints to Irwin County hospital staff regarding Defendant Amin's

Case 7:22-cv-00148-WLS-ALS Document 133-18 Filed 10/12/24 Page 173 of 195

conduct were investigated by the DOJ. *See United States v. Hospital Authority of Irwin County*, No. 7:13-cv-00097-HL (M.D. Ga.). In a 2013 lawsuit against Irwin County Hospital and Defendant Amin, the DOJ specifically alleged that Defendant Amin was engaged in “a pattern of medical services that he, ICH, and the on-call doctors know or should know are not medically necessary.”

825. ICDC, LaSalle, and Irwin County Hospital knew that other medical professionals supported Defendant Amin in performing non-consensual, medically unindicated, and/or invasive gynecological procedures.

826. ICDC, LaSalle, and Irwin County Hospital breached their duty to Plaintiffs and putative class members by hiring and retaining Defendant Amin. Since the DOJ lawsuit and Plaintiffs’ and putative class members’ numerous complaints, and even after the whistleblower complaint went public on September 14, 2020, and was reported on by numerous media outlets, Defendant Amin continued to perform non-consensual, medically unindicated, and/or invasive gynecological procedures on women detained at ICDC.

827. The actions by ICDC, LaSalle, and Irwin County Hospital were the direct and proximate cause of damages to Plaintiffs and putative class members. Defendants made conscious decisions to either act or fail to act, causing Plaintiffs and putative class members to suffer grave physical pain, medical complications, and severe emotional distress and anguish.

828. Plaintiffs and putative class members in no way contributed to their own injuries.

Case 7:20-cv-00224-WLS-ALS Document 188-18 Filed 01/12/24 Page 174 of 195

829. ICDC, LaSalle, and Irwin County Hospital are liable to Plaintiffs and putative class members for all damages, in an amount to be proven at trial, resulting from their negligent hiring and retention of Defendant Amin.

830. ICDC, LaSalle, and Irwin County Hospital have shown willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, and ICDC, LaSalle, and Irwin County Hospital are liable to Defendants for punitive damages.

831. Plaintiffs and putative members of the Medical Abuse Class, Consent Sub-Class, and Unnecessary Procedures Sub-Class seek, and are entitled to, actual and punitive damages against ICDC, LaSalle, and Irwin County Hospital for negligent hiring and retention of Defendant Amin.

**THIRTEENTH CLAIM FOR RELIEF**
**Gross Negligence**

On Behalf of Plaintiffs, Medical Abuse Class, Consent Sub-Class, and Unnecessary Procedures Sub-Class for Damages Against Irwin County Defendants

832. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

833. Under O.C.G.A. § 51–1–4, gross negligence is the absence of "slight diligence," which is defined as "that degree of care which every man of common sense, however inattentive he may be, exercises under the same or similar circumstances." O.C.G.A. § 51–1–4.

834. At all relevant times, Plaintiffs and putative members of the Medical Abuse Class were detained in the care, control, and custody of the Irwin County Defendants, who owed a duty to them to exercise reasonable and ordinary care.

835. Irwin County Defendants breached their duty to Plaintiffs and putative members of the Medical Abuse Class, Consent Sub-Class, and Unnecessary Procedures Sub-Class by subjecting them to non-consensual, medically unindicated, and/or invasive gynecological procedures at the hands of Defendant Amin.

836. Irwin County Defendants committed these actions in the absence of slight diligence and with complete disregard for Plaintiffs' and putative class members' safety, health, and wellbeing.

837. The actions of Irwin County Defendants were the direct and proximate cause of the damages that Plaintiffs and putative class members suffered. Irwin County Defendants made conscious decisions to either act or fail to act causing Plaintiffs and putative class members to suffer grave physical pain, medical complications, and severe emotional distress and anguish.

838. Plaintiffs and putative class members in no way contributed to their own injuries.

839. Irwin County Defendants are liable to Plaintiffs and putative class members for the damages resulting from their gross negligence in an amount to be proven at trial.

840. Irwin County Defendants have shown willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, and Irwin County Defendants are liable to Plaintiffs and putative class members for punitive damages.

841. Plaintiffs and putative class members seek actual and punitive damages against Irwin County Defendants for gross negligence.

**FOURTEENTH CLAIM FOR RELIEF**
**Medical Battery**

On Behalf of Plaintiffs, Medical Abuse Class, Consent Sub-Class, and Unnecessary Procedures Sub-Class for Damages Against Defendant Amin and Irwin County Hospital

842. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

843. Under Georgia law, a plaintiff may recover for a medical battery by establishing either: (i) that there was a lack of consent to the procedure performed, *see Joiner v. Lee*, 197 Ga. App. 754, 756, 399 S.E.2d 516, 518 (1990); or (ii) that the treatment was at substantial variance with the consent granted, *see Morton v. Wellstar Health System, Inc.*, 288 Ga. App. 301, 302 (2007) (*citing Sood v. Smeigh*, 259 Ga. App. 490, 495, 578 S.E.2d 158, 162 (2003)).

844. At all relevant times, Plaintiffs and putative members of the Medical Abuse Class, Consent Sub-Class, and Unnecessary Procedures Sub-Class were in the care of Irwin County Hospital and Defendant Amin, who owed a duty to them to exercise reasonable and ordinary care, including the duty to obtain informed consent from Plaintiffs for any and all medical and gynecological procedures prior to performing or allowing them to be performed on Plaintiffs.

845. Through principles of agency and respondeat superior, Defendant Amin, ICDC, and Irwin County Hospital are liable for the acts and omissions of their agents and employees who participated in performance of unnecessary gynecological procedures on Petitioners, including but not limited to, transvaginal procedures such as ultrasounds, Pap tests, and LEEP procedures and administration of drugs such as Depo Provera, which were neither medically necessary nor indicated.

846. Defendant Amin, and/or employees of Irwin County Hospital assisting Defendant Amin, performed gynecological procedures on Plaintiffs and putative class members without obtaining consent for those procedures or performed gynecological procedures on Plaintiffs and putative class members that were at substantial variance with the consent granted.

847. Irwin County Hospital, Defendant Amin, and employees, agents and/or contractors of Irwin County Hospital, individually and collectively breached their duty to Plaintiffs and putative class members by subjecting them to non-consensual, medically unindicated, and/or invasive gynecological procedures.

848. The actions by Irwin County Hospital, Defendant Amin, and employees, agents, and/or contractors of Irwin County Hospital were the direct and proximate cause of the harm that Plaintiffs and putative class members suffered. Irwin County Hospital and Defendant Amin made conscious decisions to either act or fail to act causing Plaintiffs and putative class members to suffer grave physical pain, medical complications, and severe emotional distress and anguish.

849. Plaintiffs and putative class members in no way contributed to their own injuries.

850. Irwin County Hospital, Defendant Amin, and employees, agents and/or contractors of Irwin County Hospital are liable to Plaintiffs and putative class members for all damages resulting from his medical battery.

851. Irwin County Hospital, Defendant Amin, and agents and/or employees of Irwin County Hospital have shown willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences. They are liable to Defendants for punitive damages.

Case 7:22-cv-00148-WLS-ALS Document 138-18 Filed 07/02/24 Page 176 of 195

852. Plaintiffs seek actual and punitive damages against Irwin County Hospital, Defendant Amin, and agents and/or employees of Irwin County Hospital for medical battery.

**FIFTEENTH CLAIM FOR RELIEF**
**Medical Malpractice**

On Behalf of Plaintiffs for Damages Against Defendant Amin, Irwin County Hospital, ICDC, and LaSalle

853. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

854. At all relevant times, Plaintiffs were in the care of the ICDC, LaSalle, Irwin County Hospital, and Defendant Amin, who owed a duty to them to exercise a reasonable degree of care and skill in the medical management and performance of gynecological procedures.

855. The applicable standard of care for the medical management of Plaintiffs by Defendant Amin, ICDC, and Irwin County Hospital, required that they refrain from performing unnecessary gynecological procedures on Plaintiffs, including but not limited to, transvaginal procedures such as ultrasounds, Pap tests, and LEEP procedures and administering drugs such as Depo Provera which were neither medically necessary nor indicated.

856. Through principles of agency and respondeat superior, Defendant Amin, ICDC, and Irwin County Hospital are liable for the acts and omissions of their agents and employees who participated in the performance of unnecessary gynecological procedures on Plaintiffs, including but not limited to, transvaginal procedures such as ultrasounds, Pap tests, and LEEP procedures and administration of drugs such as Depo Provera, which were neither medically necessary nor indicated.

857. ICDC, LaSalle, Irwin County Hospital, Defendant Amin, and their employees, agents, and/or contractors performed gynecological procedures on Plaintiffs without obtaining consent for those procedures or performed gynecological procedures on Plaintiffs that were at substantial variance with the consent granted.

858. ICDC, LaSalle, Irwin County Hospital, Defendant Amin, and their employees, agents, and/or contractors also performed non-consensual, medically unindicated and/or invasive gynecological procedures.

859. ICDC, LaSalle, Irwin County Hospital, Defendant Amin, and their employees, agents, and/or contractors breached their duty to Plaintiffs by subjecting them to non-consensual, medically unindicated and/or invasive gynecological procedures.

860. ICDC, LaSalle, Irwin County Hospital, and Defendant Amin were negligent and failed to comport with a reasonable degree of care and skill in the medical management and performance of gynecological procedures on Plaintiffs.

861. The actions by ICDC, LaSalle, Irwin County Hospital, and Defendant Amin individually and collectively, by and through their employees, agents, and/or contractors, were the direct and proximate cause of the harm that Plaintiffs suffered, causing Plaintiffs to suffer grave physical pain, medical complications, and severe emotional distress and anguish.

862. Plaintiffs in no way contributed to their own injuries.

863. ICDC, LaSalle, Irwin County Hospital, and Defendant Amin are liable individually and collectively to Plaintiffs or all damages resulting from the medical malpractice.

864. ICDC, LaSalle, Irwin County Hospital, and Defendant Amin have shown willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which

would raise the presumption of conscious indifference to consequences, and ICDC, LaSalle, Irwin County Hospital, and Defendant Amin are liable to Plaintiffs for punitive damages.

865. Plaintiffs seek actual and punitive damages against ICDC, LaSalle, Irwin County Hospital, and Defendant Amin, individually and collectively, for medical malpractice.

**SIXTEENTH CLAIM FOR RELIEF**
**Intentional Infliction of Emotional Distress**

On Behalf of Plaintiffs, Medical Abuse Class, Consent Sub-Class, and Unnecessary Procedures Sub-Class for Damages Against Irwin County Defendants

866. Plaintiffs and putative members of the Medical Abuse Class, Consent Sub-Class, and Unnecessary Procedures Sub-Class repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

867. Under Georgia law, "[a] claim for intentional infliction of emotional distress has four elements: (1) intentional or reckless conduct (2) which is extreme and outrageous and (3) caused the emotional distress (4) which is severe." *Pyle v. City of Cedartown*, 240 Ga. App. 445, 447, 524 S.E.2d 7, 9 (1999).

868. At all relevant times, Plaintiffs and putative members of the Medical Abuse Class, Consent Sub-Class, and Unnecessary Procedures Sub-Class were detained in the care, control, and custody of the Irwin County Defendants, who owed a duty to them to exercise reasonable and ordinary care.

869. Irwin County Defendants breached their duty to Plaintiffs and putative class members by subjecting them to non-consensual, medically unindicated, and/or invasive gynecological procedures at the hands of Defendant Amin.

870. Irwin County Defendants' conduct was intentional or reckless. Despite knowing that Defendant Amin was subjecting women to these procedures, Irwin County Defendants continued to refer Plaintiffs and putative class members to Defendant Amin.

871. Irwin County Defendants' conduct was extreme and outrageous.

872. Irwin County Defendants' conduct was the direct and proximate cause of the harm that Plaintiffs and putative class members suffered. Irwin County Defendants made conscious decisions to either act or fail to act, causing Plaintiffs and putative class members to suffer severe emotional distress and anguish.

873. Plaintiffs and putative class members in no way contributed to their own injuries.

874. Irwin County Defendants are liable to Plaintiffs and putative class members for all damages resulting from their intentional infliction of emotional distress in an amount to be proven at trial.

875. Irwin County Defendants have shown willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, and Irwin County Defendants are liable to Defendants for punitive damages.

876. Plaintiffs and putative members of the Medical Abuse Class, Consent Sub-Class, and Unnecessary Procedures Sub-Class seek actual and punitive damages against Irwin County Defendants for intentional infliction of emotional distress.

**SEVENTEENTH CLAIM FOR RELIEF**
**Negligent Infliction of Emotional Distress**

On Behalf of Plaintiffs and Medical Abuse Class for Damages Against Irwin County Defendants

877. Plaintiffs and putative members of the Medical Abuse Class repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

878. Under Georgia law, "three elements are necessary to prevail on a claim for negligent infliction of emotional distress: (1) a physical impact to the plaintiff; (2) the physical impact causes physical injury to the plaintiff; and (3) the physical injury to the plaintiff causes the plaintiff's mental suffering or emotional distress." *Reid v. Waste Industries USA, Inc.*, 345 Ga. App. 236, 244, 812 S.E.2d 582, 590 (2018) (citation omitted).

879. At all relevant times, Plaintiffs and putative class members were detained in the care, control, and custody of the Irwin County Defendants, who owed a duty to them to exercise reasonable and ordinary care.

880. Irwin County Defendants breached their duty to Plaintiffs and putative class members by subjecting them to non-consensual, medically unindicated, and/or invasive gynecological procedures at the hands of Defendant Amin.

881. Irwin County Defendants' conduct caused physical injury to Plaintiffs and putative class members, including medical complications and severe physical pain.

882. Plaintiffs and putative class members suffered emotional distress as a result of being subjected to non-consensual, medically unindicated, and/or invasive gynecological procedures and their resulting physical injuries.

883. Irwin County Defendants' conduct was the direct and proximate cause of the harm that Plaintiffs and putative class members suffered. Irwin County Defendants made

Case 7:22-cv-00148-WLS-ALS Document 138-18 Filed 07/12/24 Page 183 of 195

conscious decisions to either act or fail to act, causing Plaintiffs and putative class members to suffer emotional distress and anguish.

884. Plaintiffs and putative class members in no way contributed to their own injuries.

885. Irwin County Defendants are liable to Plaintiffs and putative class members for all damages resulting from their negligent infliction of emotional distress.

886. Irwin County Defendants have shown willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, and Irwin County Defendants are liable to Defendants for punitive damages.

887. Plaintiffs seek actual and punitive damages against Irwin County Defendants for negligent infliction of emotional distress.

**EIGHTEENTH CLAIM FOR RELIEF**
**Negligence, Gross Negligence, and Recklessness under the Federal Tort Claims Act and Georgia Law**

On Behalf of FTCA Plaintiffs for Damages Against Defendant United States of America

888. FTCA Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

889. At all relevant times, Federal Defendants were officers and/or agents employed by the United States of America operating under the scope of employment.

890. Under Georgia law, to establish negligence, the plaintiff must show: (1) a legal duty, (2) a breach of that duty, (3) a causal connection between the conduct and the resulting injury, and (4) damage to the plaintiff. *See, e.g.*, *Goldstein, Garber & Salama, LLC v. J.B.*, 300 Ga. 840, 841, 797 S.E.2d 87, 89 (2017) (citing *Johnson v. American Nat. Red Cross*, 276 Ga. 270, 272, 578 S.E.2d 106, 108 (2003)).

891. In Georgia, the "absence of [slight diligence] is termed gross negligence." O.C.G.A. § 51–1–4.

892. ICE had a duty to ensure conditions of confinement of reasonable health and safety to the individuals detained at ICDC. ICE also had a duty to ensure that those detained at ICDC received adequate medical care that adhered to standards of gynecological medical care.

893. The acts and omissions alleged herein constitute a breach of that duty of care with respect to the Plaintiffs by ICE employees and/or agents acting in the scope of their employment.

894. ICE employees and/or agents were stationed at ICDC to ensure adherence to binding directives in the Performance Based National Detention Standards, which apply to both federal and private detention facilities.

895. ICE employees and/or agents authorized Defendant Amin to provide non-consensual and medically unnecessary procedures on individuals in ICE custody at ICDC, including the Plaintiffs.

896. ICE employees and/or agents knew or should have known and/or recklessly disregarded ICDC's practice of medical abuse and mistreatment. At least thirteen women brought verbal or written complaints about the unnecessary, non-indicated, and/or non-consensual medical procedures Defendant Amin performed on them.

897. ICE employees and/or agents knew or should have known and/or recklessly disregarded the fact that, from 2013 to 2015, the DOJ investigated and sued Defendant Amin for similar behavior—performing unnecessary medical procedures in violation of the False

Case 7:22-cv-00148-WLS Document 139-18 Filed 01/02/26 Page 185 of 195

Claims Act—as part of the lawsuit *United States v. Hospital Authority of Irwin County*, No. 7:13-cv-00097-HL (M.D. Ga.).

898. ICE employees and/or agents were negligent or grossly negligent in the provision of medical care, and in the provision of safe and sanitary conditions at ICDC.

899. ICE employees and/or agents breached their duty by failing to ensure adequate and appropriate medical care, despite sufficient notice of ongoing, unconsented to, and unnecessary gynecological surgeries at ICDC, and by failing to address repeated reports of inadequate medical care.

900. Plaintiffs suffered significant emotional, physical, and psychological distress under the conditions caused by the negligence, gross negligence and/or recklessness of ICE employees and/or agents acting within the scope of their employment.

901. ICE employees' and/or agents' breach of their duty of care was a direct and proximate cause and a substantial factor in the Plaintiffs' injuries, pain, and suffering. At all relevant times ICE employees and/or agents had the authority to prevent the known incidents of medical abuse at ICDC and yet failed to act to prevent ongoing and future harm. As such, ICE employees' and/or agents' actions proximately and directly caused Plaintiffs' harm.

902. The actions or omissions of ICE employees and/or agents described herein constitute the tort of negligence and/or gross negligence under the laws of the State of Georgia.

903. Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions or omissions.

904. Plaintiffs seek actual and compensatory damages against the United States of America for negligence and/or gross negligence.

Case 7:22-cv-00149-WLS-ALS Document 138-18 Filed 07/12/24 Page 186 of 195

**NINETEENTH CLAIM FOR RELIEF**
**Negligence *per se* under the Federal Tort Claims Act and Georgia Law**

On Behalf of FTCA Plaintiffs for Damages Against Defendant United States of America

905. FTCA Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

906. At all relevant times, Federal Defendants were officers and/or agents employed by the United States of America operating under the scope of employment.

907. Under Georgia law, a plaintiff may recover for negligence *per se* when: (1) the defendant violates a statute, (2) the person harmed falls within the class of persons the legislation was intended to protect, (3) the harm or injury actually suffered was the same harm the statute was intended to guard against, and (4) there is a causal connection between the violation and the damage inflicted. *Groover v. Johnston*, 277 Ga. App. 12, 13, 625 S.E.2d 406, 408 (2005).

908. ICE employees and/or agents have a duty to ensure conditions of confinement of reasonable health and safety to the individuals detained at ICDC. ICE employees and/or agents also have a duty to ensure that those detained at ICDC received adequate medical care adhering to standards of care.

909. ICE's PBNDS provide binding directives for medical care in all facilities housing ICE detainees.

910. By providing uniform standards of care to all ICE detainees, the PBNDS aims to protect detainees from medical abuse or neglect. Plaintiffs thus fall within the class of persons the PBNDS aims to protect.

911. Additionally, by prescribing base standards for medical care, the PBNDS seeks to rectify harms or injuries to detained noncitizens resulting from medical negligence or

Case 7:22-cv-00148-WLS-ALS Document 138-18 Filed 11/12/24 Page 187 of 195

malpractice. Thus, the harm sustained by Plaintiffs—the physical, emotional, and psychological harm of being subjected to medical abuse—is the exact harm the PBNDS seeks to guard against.

912. ICE employees and/or agents breached their duty by failing to ensure adequate and appropriate medical care, despite sufficient notice of ongoing unconsented to and unnecessary gynecological surgeries at ICDC and by failing to address repeated reports of inadequate medical care.

913. ICE employees and/or agents knew or should have known and/or recklessly disregarded the fact that from 2013 to 2015, the DOJ investigated and sued Defendant Amin for similar behavior—performing unnecessary medical procedures in violation of the False Claims Act—as part of the lawsuit *United States v. Hospital Authority of Irwin County*, No. 7:13-cv-00097-HL (M.D. Ga.).

914. ICE employees' and/or agents' acts, omissions, and conduct is the direct and proximate result of Plaintiffs' harm.

915. Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions or omissions.

916. FTCA Plaintiffs seek actual and compensatory damages against the United States of America for negligence, gross negligence, and recklessness.

**TWENTIETH CLAIM FOR RELIEF**
**Negligent Supervision under the Federal Tort Claims Act and Georgia Law**

On Behalf of FTCA Plaintiffs for Damages Against Defendant United States of America

917. FTCA Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

Case 7:22-cv-00148-WLS Document 138-9 Filed 10/12/24 Page 186 of 195

918. At all relevant times, Federal Defendants were officers and/or agents employed by the United States of America operating under the scope of employment.

919. Under Georgia law, an employer may be found liable for negligent supervision of an employee if there is "sufficient evidence to establish that the employer reasonably knew or should have known of an employee's tendencies to engage in certain behavior relevant to the injuries allegedly incurred by the plaintiff." *Novare Group, Inc. v. Sarif*, 290 Ga. 186, 190-91, 718 S.E.2d 304, 309 (2011) (quoting *Leo v. Waffle House, Inc.*, 298 Ga. App. 838, 841, 681 S.E.2d 258, 262 (2009).

920. ICE has a duty to prevent its employees and/or agents from causing physical harm to a third party. ICE has a duty to supervise its employees, agents, and/or contractors and to oversee the treatment of persons in their custody.

921. ICE breached its duty by failing to ensure safe, sanitary, and humane conditions at ICDC, including by failing to carry out adequate management oversight of the provision of medical care at the ICDC.

922. ICE employees and/or agents displayed a tendency of engaging in medical oversight and abuse. At least thirteen women launched verbal or written complaints about the unnecessary, non-indicated, and/or non-consensual medical procedures Defendant Amin performed on them, yet ICE employees and/or agents continued to approve referrals to send Plaintiffs to Defendant Amin.

923. ICE reasonably knew or should have known of its employees', agents', and/or contractors' broad practice of medical oversight and abuse. Beyond the numerous complaints launched, ICE knew or reasonably should have known that from 2013 to 2015, the DOJ investigated and sued Defendant Amin for similar behavior—performing

Case 7:22-cv-00148-WLS-ALS Document 138-2 Filed 07/02/24 Page 189 of 195

unnecessary medical procedures in violation of the False Claims Act—as part of the lawsuit *United States v. Hospital Authority of Irwin County*, No. 7:13-cv-00097-HL (M.D. Ga.). For years, immigrants detained at ICDC reported the lack of access to adequate medical care, including unanswered requests for treatment, failure to provide necessary medication or prenatal care, and long wait times of up to two weeks to see medical staff at ICDC.

924. As a direct and proximate cause of ICE employees and/or agents' acts, omissions, and conduct, Plaintiffs were forced to endure non-consensual, invasive, and unnecessary gynecological procedures.

925. ICE employees' and/or agents' acts, omissions, and conduct caused FTCA Plaintiffs to suffer extreme physical, mental, and emotional pain and distress.

926. Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions or omissions.

927. Plaintiffs seek actual and compensatory damages against the United States of America for negligent supervision.

**TWENTY-FIRST CLAIM FOR RELIEF**
**Intentional Infliction of Emotional Distress under the Federal Tort Claims Act and Georgia Law**

On Behalf of FTCA Plaintiffs for Damages Against Defendant United States

928. FTCA Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

929. At all relevant times, Federal Defendants were officers and/or agents employed by the United States of America operating under the scope of employment.

930. Under Georgia law, "[a] claim for intentional infliction of emotional distress has four elements: (1) intentional or reckless conduct (2) which is extreme and outrageous and

Case 7:22-cv-00148-WLS-ALS Document 118-18 Filed 01/02/25 Page 190 of 195

(3) caused the emotional distress (4) which is severe." *Pyle v. City of Cedartown*, 240 Ga. App. 445, 447, 524 S.E.2d 7, 9 (1999).

931. ICE has a duty to prevent its employees, agents, and/or contractors from causing physical harm to a third party. ICE breached its duty by failing to ensure safe, sanitary, and humane conditions at ICDC, including by failing to carry out adequate management oversight of the provision of medical care at the detention facility.

932. ICE employees' and/or agents' conduct was intentional and/or reckless. Despite knowing that Defendant Amin was subjecting women to unnecessary and physically abusive procedures, ICE employees and/or agents continued to approve referrals to Defendant Amin.

933. ICE employees' and/or agents' conduct was extreme and outrageous. ICE employees' and/or agents' conduct to continue approvals to Defendant Amin despite knowing of Defendant Amin's and ICDC's pattern of medical abuse and mistreatment is beyond the bounds of acceptable societal standards.

934. As a direct and proximate cause of ICE employees' and/or agents' conduct, Plaintiffs suffered extreme physical, emotional, and psychological distress and anguish.

935. Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions or omissions.

936. Plaintiffs seek actual and compensatory damages against the United States of America for intentional infliction of emotional distress.

Case 7:22-cv-00149-WLS-ALS Document 189-1 Filed 07/12/24 Page 191 of 195

**TWENTY-SECOND CLAIM FOR RELIEF**
**Negligent Infliction of Emotional Distress under the Federal Tort Claims Act and Georgia Law**

On Behalf of FTCA Plaintiffs for Damages Against Defendant United States of America

937. FTCA Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

938. At all relevant times, Federal Defendants were officers and/or agents employed by the United States of America operating under the scope of employment.

939. Under Georgia law, "three elements are necessary to prevail on a claim for negligent infliction of emotional distress: (1) a physical impact to the plaintiff; (2) the physical impact causes physical injury to the plaintiff; and (3) the physical injury to the plaintiff causes the plaintiff's mental suffering or emotional distress." *Reid v. Waste Industries USA, Inc.*, 345 Ga. App. 236, 244, 812 S.E.2d 582, 590 (2018) (citation omitted).

940. ICE has a duty to prevent its employees, agents, and/or contractors from causing physical harm to a third party. ICE breached its duty by failing to ensure safe, sanitary, and humane conditions at ICDC, including by failing to carry out adequate management oversight of the provision of medical care at the detention facility.

941. ICE employees and/or agents acted negligently and/or recklessly. ICE employees and/or agents knew or should have known about ICDC's practice of medical abuse and mistreatment. At least thirteen women launched verbal or written complaints about the unnecessary, non-indicated, and/or non-consensual medical procedures Defendant Amin performed on them.

942. ICE employees and/or agents knew or should have known and/or recklessly disregarded the fact that from 2013 to 2015, the DOJ investigated and sued Defendant Amin for similar behavior—performing unnecessary medical procedures in violation of the False

Claims Act—as part of the lawsuit *United States v. Hospital Authority of Irwin County*, No. 7:13-cv-00097-HL (M.D. Ga.).

943. ICE employees' and/or agents' actions, omissions, and conduct caused a physical injury to Plaintiffs, including medical complications and severe physical pain.

944. FTCA Plaintiffs suffered emotional distress as a result of being subjected to non-consensual, medically unindicated, and/or invasive gynecological procedures and their resulting physical injuries.

945. ICE employees' and/or agents' actions, omissions, and conduct were the direct and proximate cause of Plaintiffs' physical, emotional, and psychological pain and suffering.

946. Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions or omissions.

947. Plaintiffs seek actual and compensatory damages against the United States of America for negligent infliction of emotional distress.

**TWENTY-THIRD CLAIM FOR RELIEF**
**Attorneys' Fees And Costs**

On Behalf of Plaintiffs, Medical Abuse Class Members, Consent Sub-Class Members, and Unnecessary Procedures Sub-Class Members for Damages Against Irwin County Defendants

948. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

949. Plaintiffs are entitled to their attorneys' fees and costs against all Defendants that have committed intentional torts.

950. Defendants' actions also constitute conscious indifference to the consequences and have caused Plaintiffs unnecessary trouble and expense within the meaning of O.C.G.A. § 13-6-11.

951. Plaintiffs are entitled to recover their attorneys' fees and costs associated with this action in an amount to be proven at trial.

**PRAYER FOR RELIEF**[63]

WHEREFORE, Plaintiffs pray that this Court grant the following relief:

A. Declare that Defendants' conduct described herein as applied to Plaintiffs violates the First, Fifth, and Fourteenth Amendments to the United States Constitution; the Administrative Procedure Act; and 42 U.S.C. § 1985(2); and is therefore unlawful;

B. Issue an injunction prohibiting Defendants, their subordinates, agents, employees, contractors, and all others acting in concert with them from:

   a. subjecting Plaintiffs to the unconstitutional and unlawful practices described in this Complaint;

   b. retaliating against Plaintiffs for having brought this suit;

   c. retaliating against or otherwise deterring Plaintiffs from testifying in federal court proceedings or otherwise participating in any investigation or legal action related to their detention or abuse, including by expediting the deportation of witnesses and/or Plaintiffs;

   d. removing witnesses needed in connection with an ongoing criminal investigation.

C. Issue an order certifying this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

D. Appoint the undersigned as class counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure;

[63] After the Defendants' respective Motions to Dismiss were fully briefed and decided, the only claims and Defendant remaining in this action are those asserted under the Federal Tort Claims Act against the United States Government.

Case 7:22-cv-00148-WLS-ALS Document 138-1 Filed 07/02/24 Page 194 of 195

E. Award Plaintiffs compensatory and punitive damages;

F. Award Plaintiffs' counsel reasonable attorneys' fees and litigation costs, including but not limited to fees, costs, and disbursements pursuant to 28 U.S.C. § 241242, U.S.C. § 1988(b), and O.C.G.A. 13-6-11; and

G. Grant such other and further relief as the Court deems just and proper.

Respectfully submitted on this ___ day of October 2024,

Deleted: 22d

Deleted: February 2022

/s/
David N. Dreyer
GA Bar No. 411322
**Washington, Dreyer & Associates LLC**
260 Peachtree Street, Suite 1600
Atlanta, GA 30303
Tel: (404) 437-6641
david@washingtondreyer.com

/s/
Elora Mukherjee (admitted *pro hac vice*)
NY Bar No. 4427233
**Morningside Heights Legal Services, Inc.**
435 West 116th Street, Room 831
New York, NY 10027
Tel: (203) 668-2639
emukherjee@law.columbia.edu

/s/
Sarah Sherman-Stokes
(admitted *pro hac vice*)
**Immigrants' Rights and Human Trafficking Program**
**Boston University School of Law**
765 Commonwealth Avenue
Boston, MA 02215
(617) 358-6272
sstokes@bu.edu

/s/
Yulie Landan
California Bar No. 348958
Sirine Shebaya
DC Bar No. 1019748
Matthew S. Vogel+
LA Bar No. 35363
(all admitted *pro hac vice*)
**National Immigration Project of the National Lawyers Guild (NIPNLG)**
1201 Connecticut Ave NW
Suite 531 #896645
Washington, DC 20036
(202) 656-4788
yulie@nipnlg.org
sirine@nipnlg.org
matt@nipnlg.org

/s/
Justin B. Cox
Georgia Bar No. 748945
**National Immigration Project of the National Lawyers Guild (NIPNLG)**
P.O. Box 1106
Hood River OR 97031
(541) 716-1818
jcox@nipnlg.org

Case 7:22-cv-00244-WLS-ALS Document 138-18 Filed 11/12/24 Page 196 of 196

/s/
Clare Norins
Georgia Bar No. 575364
cnorins@uga.edu
**First Amendment Clinic**
**University of Georgia School of Law**
Post Office Box 388
Athens, Georgia 30603
(706) 542-1419
cnorins@uga.edu

s/
Fatma Marouf
Immigrant Rights Clinic
**Texas A&M School of Law**
307 W. 7th St. Suite LL50
Fort Worth, TX 76102
(817) 212-4123
fatma.marouf@law.tamu.edu

/s/
Azadeh Shahshahani
Priyanka Bhatt
**Project South**
9 Gammon Ave SE
Atlanta, Georgia 30315
(404) 622-0602
azadeh@projectsouth.org

/s/
Sabrineh Ardalan
(admitted *pro hac vice*)
**Harvard Immigration and Refugee Clinical Program**
6 Everett Street, WCC 3103
Cambridge, MA 02138
(617) 384-7504
sardalan@law.harvard.edu

/s/
Jason A. Cade
Georgia Bar No. 628870
Kristen E. Shepherd
Georgia Bar No. 789624
**Community Health Law Partnership**
**University of Georgia Law School**
P.O. Box 1761
Athens, Georgia 30603
(706) 227-5333
cadej@uga.edu
shepherdk@uga.edu

+Not admitted in DC; working remotely from and admitted in Louisiana only

**Deleted:** ++Admitted in Maryland; DC bar admission pending¶
+++Not admitted in DC; working remotely from and admitted in California only¶
* *Pro hac vice* application forthcoming