# EXHIBIT 19

did. So I'd like to know what's in that et cetera
that you mentioned last.
A. For instance, on the detainee or the inmate documentation, I looked at the dates of arrest, a number of occurrences of being arrested, housing arrangements, researched to see if I had any files available relative to any of the allegations that were put in place, talked to several staff members that were on location at the time, read over documents provided for my perusal.
Q. And is that all?
A. At this point that's all that I recall, sir.
Q. Okay. And without telling me what you discussed with your attorneys and what they discussed with you, did you consult with them ahead of this deposition?
A. Yes.
Q. Okay. For how long?
A. I did not keep a minute by minute. It was not an excessive amount of time.
Q. It was not a what amount of time? Sorry.
A. It was not an excessive amount of time.
Q. Okay. Do you think it was less than an

hour?

A. Combined, probably more than an hour, sir.

Q. Okay. Do you think it was more than two hours?

A. Between two to -- probably, between one and three hours is the best guess I can give you.

Q. Now, you mentioned some time restraints, I think. You said you looked at the documents you had within the time restraints, correct?

A. Correct.

Q. What time restraints are those?

A. Sir, with the current time as far as expanded period of time going backwards, we're dealing with the pandemic situation with COVID, we've had issues COVID, staff outages, staff deaths recently and also other lawsuits relative to the DOJ and ourselves, relative to the immigration detainees that are ongoing.

Q. Can you tell me about the immigration detainees at the ICDC?

MR. KALB: Objection to form.

A. Could you clarify the information you're looking for?

Q. Who's responsible for the immigration

detainees with the ICDC?
MR. KALB: Objection to form.
A. The Irwin County Detention Center under contract houses these detainees. The immigration staff theirselves are responsible for the detainees. We have full-time immigration staff onsite.
Q. Is that in connection with a Federal agency?
A. Yes.
Q. Which one?
A. I.C.E.
Q. Okay. What -- strike that. Is there a general population at the ICDC?
A. General population is a broad term, sir. Can you be more specific?
Q. Well, let's take a look at a document I sent over, if I can find it. It's basically -- I forget what it's titled, but it's the policies and procedures.
A. Okay. Do you have a question specific to that, sir?
Q. Well, I -- basically that document, if I'm not mistaken, uses the term general population at certain times, does it not?
A. May -- perhaps I could speed this up.

General population refers to a grouping of individuals that are housed together. Of the current situation -- under the current situation and conditions, we also have what are cohorts and we have a general population in cohorts.

In other words, if we have a unit that's on cohort because we have them on 14 days hold time due to COVID, they're in the general population for their dorm but they're not mixed with anybody else insofar as like classification or recreation or et cetera.

Q. Okay.

A. Now, I.C.E., the immigration detainees are a completely separate group, housed in a completely different area of the facility. They do not mix with US, MS or county. I'm assuming that you're talking about US, MS or county.

Q. So I'm talking about in August and September of 2017 when this incident that we're here about today occurred.

A. Okay. Specific to county and US, MS, correct?

Q. Well, just at that time August and September of 2017, was there a particular definition for the term "general population" at the ICDC?

A. General population would be anyone from the US, MS or county whose charges put them in a category where they could be housed with others but they were maintained in a group. Others -- others that did not fall in group would be removed unless they were separated or removed.

Q. Okay. And are the I.C.E. detainees part of that general population?

A. Separate population.

Q. Okay. All right.

MR. MIKELL: And I apologize, I just emailed counsel and Mixon Court Reporting the document I was referring to just a minute ago. Josh, if you could do me a favor and forward that to Mr. Paulk, I would greatly appreciate because I'm going to ask him some questions about it in a little bit. And I agree, I'm happy to abide by reasonable confidentiality restrictions of this document per the request of the corporate Defendant.

MR. KALB: I appreciate that and we are -- I will be happy to forward it to Mr. Paulk, but I have not yet received it. As soon as it comes through, I will forward it on.

MR. MIKELL: Sure.

Q. Now, going back to Plaintiff's Exhibit

Q. I just want to make sure that -- I just want to make sure you agree with me that there has to be reasonable suspicion before a strip search is conducted?

MR. KALB: Objection to form, calls for a legal conclusion, assumes facts not in evidence.

THE WITNESS: Should I answer that question?

MR. KALB: You can answer it to the best of your ability.

A. Reasonable suspicion, if they come in off the street, they are searched. If they're in a unit where there's contraband located or found or a weapon used, that's reasonable suspicion. And if we're searching for contraband that we have word that is in the unit, that's reasonable suspicion.

Q. And I'm not asking what is reasonable suspicion. I'm asking: Before a strip search is performed, does there need to be reasonable suspicion?

MR. KALB: The same objection.

A. From the standpoint of operations of a facility and security of a facility, no.

Q. Okay. Could you do me a favor and look

back at those policies we pulled up?

A. Yes.

Q. And specifically I'm looking at LaSalle 0050.

A. Hold on. Let me get back to it.

Q. Sure. And this is Plaintiff's Exhibit 4.

A. I've got a computer issue. Bear with me.

Q. No sweat.

A. All right, which one are you looking at?

Q. Okay. So I'm on LaSalle 0050. And just let me know when you get there.

A. And this goes back to which heading?

Q. It looks like -- you tell me. It looks like the Post Order No. 1.012 intake officer.

A. I know, but the original, I've got, let's see, LaSalle is not initials, first amended initials document. I'm going back to the original heading that's called off of what I was sent.

MR. KALB: Mr. Paulk, I believe this is the supplemental one that I sent you after the fact, the series of policies that's titled LaSalle 0034 through 54. Is that right, Sam?

MR. MIKELL: Yes.

Q. The second email.
A. All right. Give me the numbers again.
Q. 0034 to 54.
MR. KALB: It's in the email I sent you during the course of this deposition.
A. 34 to 54, okay. All right. What page are you on there are you wanting to look at?
Q. 0050.
A. All right. I'm on 0050.
Q. Okay. And that page is part of Plaintiff's Exhibit 4 and part of the post order intake officer, correct?
A. Yes.
Q. Now, look at paragraph 4-A for me.
A. Yes, sir.
Q. Am I correct that the last sentence of paragraph 4 reads, "No strip searches will be conducted on an I.C.E detainee unless reasonable suspicion has been established and a strip search has been approved by a captain or above in rank"?
A. You are correct.
Q. Okay. Does that apply here?
A. No.
Q. Why not?
A. Because an I.C.E detainee is an

Immigrations Customs Enforcement Federal detainee.

Q. Okay. Why does this policy exist for I.C.E detainees but not other detainees at ICDC?

MR. KALB: Objection to form.

A. It's based on the 2008 PBNDS standards for immigration specific to immigration detainees only.

Q. What does PBNDS stands for?

A. Performance Based National Detention Standards.

Q. Okay. All right. What training is provided to ICDC personnel with regard to making sure that inmates are awarded credit for time served?

A. ICDC is not responsible for credit for time served.

Q. Okay.

A. ICDC training is limited to the intake of the information, the listing of the information and that's it.

Q. So am I correct that there is no training for ICDC personnel with regard to ensuring that inmates are awarded credit for time served?

A. Only if we receive directive from the authorizing authority to put that information in and

to release on that day.

Q. And that's part of the training?

A. For the intake, it is. In other words, they take the information that's provided at the point of detention or at the point of housing.

Q. Okay. And am I correct that a LaSalle entity at the ICDC will do nothing to award an inmate credit for time served unless directed to do so by the authorizing agency?

A. That's correct.

Q. Okay. Assume for me an authorizing agency does direct LaSalle to do something to award an inmate credit for time served. How would that be communicated?

MR. KALB: Object to form.

A. The enforcement office has the same jail management system that we have. So anything that's input into the system from this side can be seen by the enforcement division. They additionally go in and add information for their inmates for the system so that we get it.

In other words, if a city arrest occurs and the city brings that body in and then a warrant is obtained by the city at which point they are then turned over to the custody of the county, then they

will put that into the system so that we move that body from the police department housing to the county housing.

Q. So you said the enforcement office has the same jail management system that we do. Is the enforcement office the same thing as the authorizing authority?

A. That's correct.

Q. Like the law enforcement agency?

A. Correct, the sheriff's department.

Q. Okay. And the same jail management system that we do, who is "we"?

A. LaSalle.

Q. Okay.

A. "We" are the jail.

Q. And so before anybody at LaSalle is going to do anything to award an inmate credit for time served, they have to see something in the jail management system directing that they do so, correct?

MR. KALB: Objection to form.

A. It is either sent in the jail -- the jail record system, primarily it will be by contact where from the sheriff's office giving a directive on what to do with an individual.