**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**VALDOSTA DIVISION**

| | | |
|---|---|---|
| DAWN WOOTEN,<br>Plaintiff,<br>v.<br>LASALLE SOUTHEAST LLC, et al.<br>Defendants. | :<br>:<br>:<br>:<br>: | CASE NO.: 7:22-CV-00148 (WLS) |

**DECLARATION OF DAWN WOOTEN**

I, Dawn Wooten, declare as follows:

1. I am over the age of eighteen and competent to make this declaration. I make it on my own personal knowledge and my recollection of events I witnessed and participated in while employed at the Irwin County Detention Center ("ICDC"), except where I state that a fact is based on information provided to me by others. If called as a witness, I could and would testify competently to the matters stated here.

**I. BACKGROUND AND EMPLOYMENT**

2. I am currently a Registered Nurse. I have been a licensed nurse since 2009, and my first position as a Licensed Practical Nurse ("LPN") was at ICDC. During the events described in this declaration, in 2019 and 2020, I was employed at ICDC as an LPN. Over the course of my career I have worked in many clinical settings, including nursing homes, emergency departments, intensive care, mental health, medical-surgical, pediatrics, gastroenterology, public health, and correctional nursing.

3. My history of employment with ICDC spans approximately ten years. Over the course of that decade I was employed at ICDC during three separate periods, each time being rehired by the facility. I was first employed at ICDC from approximately March to December 2010, when the facility operated under a prior owner. I was rehired as a full-time LPN on June 11, 2014, and my

full-time employment during that period ended in or around 2016, when I left to return to school. LaSalle's records reflect, and I do not dispute, that I signed a PRN (as-needed) offer letter dated May 2, 2016, and I remained on the facility's roster in that as-needed status, picking up shifts from time to time, until in or around 2017. My most recent period of employment began in October 2019, when I returned to ICDC as a full-time LPN, and I held that position until I was reclassified to PRN (as-needed) status on July 2, 2020. During that most recent period I worked full time, approximately 36 to 40 hours per week, typically in twelve-hour shifts from 6:00 a.m. to 6:00 p.m., six times in each two-week pay period.

4. In my entire history at ICDC — spanning approximately ten years and three separate periods of employment — I was never reprimanded, disciplined, demoted, or discharged, and I never received a written reprimand at any time before July 2, 2020. The four written warnings bearing June 2020 occurrence dates, which I describe below, were not provided to me when they were created.

## II. MY SUPERVISORS AND REPORTING STRUCTURE

5. From October 2019 until in or about May 2020, my direct supervisor was Health Services Administrator ("HSA") Marion Cole. After Ms. Cole's death, HSA Lakisha Brown became my supervisor. The Director of Nursing during that period was Shanise Bell.

6. Throughout my employment at ICDC, nurses were expected to report concerns through the chain of command. I followed that procedure by reporting detainee complaints, safety concerns, medical-record issues, COVID-19 concerns, and concerns regarding the medical treatment of detainees to my supervisors, including HSA Lakisha Brown, HSA Marion Cole, and Director of Nursing Shanise Bell.

7. Supervisors met with Warden Paulk regularly, and HR Manager Joan Whitley informed me that complaints reported through HSA Lakisha Brown would be communicated to Warden Paulk.

8. Before I was reclassified on July 2, 2020, I reported concerns regarding COVID-19 conditions, Personal Protective Equipment ("PPE"), the destruction of medical records, and medical treatment concerns raised by female detainees to my supervisors, and I raised certain of these concerns directly with Warden Paulk on the occasions described below.

**III. MY PROTECTED DISCLOSURES**

9. Between March and June 2020, I repeatedly reported unsanitary conditions in the medical unit to HSA Lakisha Brown, HSA Marion Cole, and other supervisors. Among other things, I complained that exam-room tables and floors were rarely cleaned to ICE or CDC standards, that blood was left on the floor, and that dirty, sour-smelling mops were used in the medical unit. When I reported blood on the floor to HSA Brown, she declined to correct the responsible employee and told me she was not there to "babysit" anyone. I also reported the facility's failure to provide detainees with soap and its failure to provide female detainees with menstrual hygiene products.

10. Beginning in the spring of 2020, I repeatedly raised concerns through the chain of command regarding COVID-19 conditions at ICDC. Beginning in March 2020, I questioned HSA Lakisha Brown and Director of Nursing Shanise Bell about the routine refusal to test detainees who exhibited symptoms such as fevers and sore throats; I was told the detainees just "wanted attention." Although ICDC received two rapid-response testing machines in approximately June 2020, they were rarely used because HSA Brown kept the machines and supplies locked in her office and would not train the nurses to use them. I also questioned the practice of prescribing seven days of over-the-counter cold medication to detainees with fevers instead of testing them,

and I raised concerns that staff were told they could work while symptomatic, while awaiting results, or after testing positive, so long as they wore a mask.

11. On various dates from March through May 2020, HSA Marion Cole, and later in May and June 2020, HSA Lakisha Brown, verbally reprimanded me for warning other staff to adhere to CDC-recommended social-distancing guidelines and to use extra precautions when working with someone who had tested positive for COVID-19.

12. I also raised concerns about temperature screening at the facility. Officers at the facility entrance regularly misused the handheld temperature guns, pressing them directly against the foreheads of staff rather than holding them the required distance away, and rarely if ever cleaned or sanitized them. I asked HSA Lakisha Brown why there was not a nurse at the entrance who knew how to use the temperature guns properly. She told me that was not her responsibility.

13. On or about April 13, 2020, detained women at ICDC used a facility tablet to record and post a video on YouTube (available at https://www.youtube.com/watch?v=aQt6QbkWsLI) in which they described the conditions at the facility during the COVID-19 pandemic, including inadequate medical care and their fear for their safety. I was employed at ICDC during this period and personally observed the conditions they described. A transcript of that video, in the original Spanish with an English translation, was marked as Deposition Exhibit 50 (PLT-WVL-050) at the deposition of Warden David Paulk in this action, where Warden Paulk recognized the video under oath and testified that he was familiar with it (Dep. of David Paulk 21:18–24). A true and correct copy of that exhibit (Paulk Deposition Exhibit 50 / PLT-WVL-050) is attached hereto as Exhibit "A," and a true and correct copy of the relevant excerpt of the certified deposition transcript of Warden Paulk recognizing and authenticating the video is attached hereto as Exhibit "B."

14. In approximately June 2020, I raised these COVID-19 concerns directly with Warden Paulk while HSA Lakisha Brown was present. Warden Paulk did not address my concerns and turned away, saying, "Brown, you handle that."

15. In April 2020, I asked HSA Marion Cole why medical employees were wearing surgical masks while facility leadership wore N-95 masks. HSA Cole told me that Warden Paulk had provided only surgical masks to the medical unit. At my prompting, HSA Cole told me that she would raise the issue with Warden Paulk, and she later told me that Warden Paulk had a supply of N-95 masks in his office. The medical unit then received N-95 masks, but each medical employee was issued only one N-95 mask in April, and HSA Cole told us that any replacement mask would have to be purchased at our own expense. I recount HSA Cole's statements to me not to establish what Warden Paulk knew or possessed, but because they are what I was told at the time and because they prompted the questions I raised thereafter. HSA Cole is now deceased.

16. In approximately May or June 2020, I confronted Warden Paulk directly about N-95 masks being withheld from nursing staff during the pandemic. I went to his office to get masks, and I told him that he had over 900 masks up there. I asked him why the nurses did not have those masks, why he was locking them in his office, and why they were not being distributed. The available N-95 masks were reserved for high-ranking staff who had little contact with detainees, while detainees were rarely given even paper masks and some were forced to buy socks from the commissary to tie around their faces. On one occasion, when I distributed N-95 masks to nurses and to an officer whose mask was damaged, HSA Lakisha Brown chastised me and then locked the masks away. In response to my questions, Warden Paulk told me that I did not have the right to question his authority. The nursing staff did not receive those masks.

17. In approximately April 2020, I personally observed HSA Lakisha Brown shredding more than forty-five positive COVID-19 test results of detainees. These were paper medical

records containing handwritten patient information. I checked detainee charts and did not find the documents scanned into the electronic records system, and based on that review I believed patient treatment records were being destroyed. I reported this to Director of Nursing Shanise Bell.

18. I also witnessed an LPN, Amber Strout, shredding detainees' medical request forms in the pharmacy. I reported that it had become common for the sick-call nurse to shred detainees' written requests for examination or treatment — the "blue forms" — and to fabricate records, such as vital signs, without ever seeing the detainee. When I reported the shredding to HSA Lakisha Brown, she dismissed my concerns and told me, "Girl, that's her license," and that raising these issues could cost me my job.

19. ICDC's detainee population included many people who did not speak English. I observed that detainees faced language and other barriers in articulating medical grievances, and that ICDC failed to address those barriers, even though ICE detention standards required the facility to assist detainees with language and other special needs in preparing and pursuing grievances, including medical grievances. I reported these grievance-system problems. I also witnessed staff who spoke out about violations of staff or detainee healthcare rights be reprimanded or ignored.

20. During April and May 2020, before Ms. Cole's passing, multiple female detainees approached me with concerns and questions about gynecological procedures that had been performed on them. They provided their detainee identification numbers, and I reviewed the records available to me. Multiple detainees told me they did not understand the procedures and had not knowingly consented to them. For example, one detainee reported a sterilization procedure done without her consent. I reported this to my supervisor, Marion Cole, and was told to "mind your damn business." Other staff would also instruct me to mind my own business when I raised these issues.

21. This became a regular occurrence — multiple women approaching me wanting to know what procedures had been done to them ("what are these three holes here in my belly for?"), telling me they had not knowingly consented, and I saw that there were no consent forms in their records. I reported these concerns up the chain of command. When I raised them to HSA Lakisha Brown, she responded with comments such as "girl, he's getting that money" (referring to the doctor), "you better leave that alone," and "you must not want your job."

22. In approximately June 2020, I personally raised concerns directly with Warden Paulk regarding female detainees who reported gynecological procedures they did not understand and to which they had not knowingly consented. HSA Lakisha Brown was present. Warden Paulk did not respond to the concerns I raised and walked away.

23. Detainees also complained to me that officers were present during sensitive medical examinations conducted outside the facility. I reported these concerns to my supervisors as well.

24. After I spoke with detainees and reviewed their medical records, I raised their concerns with my supervisors and colleagues, and I repeatedly observed HSA Lakisha Brown meeting with Warden Paulk after I raised concerns regarding detainee medical treatment.

25. As a licensed practical nurse, I was familiar with the health and safety standards that applied to ICDC's operations, including ICE's Performance-Based National Detention Standards and the CDC's guidance for correctional and detention facilities. When I raised the concerns described in this declaration, I believed that the conditions I was reporting violated those standards and the practices required under the facility's federal contract, and that they posed a substantial and specific danger to the health and safety of detainees and staff.

**IV. LACK OF WRITTEN POLICIES AND CONFLICTING INSTRUCTIONS**

26. ICDC did not provide me with a written policy requiring nurses to call in every day of an absence, and my supervisors' instructions regarding call-in procedures changed depending on the circumstances. I relied on the instructions given to me by my supervisors.

**V. THE JUNE 22, 2020 SICK LEAVE**

27. On Monday, June 22, 2020, I was off work to obtain a COVID-19 test before receiving a medically prescribed blood transfusion for my sickle-cell condition. At that time I was experiencing symptoms consistent with COVID-19, including muscle aches, fatigue, and shortness of breath.

28. I expected to quarantine while awaiting my test results. My physician told me that returning to work at ICDC while symptomatic and without a negative test result would violate CDC guidelines. I submitted two notes from medical providers. The first, dated May 22, 2020, states that I had been screened for COVID-19 at Southwell Medical, that my test was pending, and that I was not cleared to return to work and was instructed to self-isolate and quarantine at home for the next ten days. The second, dated June 22, 2020, states that I was seen on June 21, 2020 at the Southwell Express Care Clinic and asks that I be excused from work when I am symptom-free. To my knowledge, those notes were never formally added to my medical records. Attached hereto as Exhibit "C" are true and correct copies of the two notes.

29. Notwithstanding my physician's instruction, ICDC pressed me, over my protests, to return to work while I awaited my results. I remained out sick from June 22, 2020 forward while awaiting those results. I was scheduled to be off Friday through Sunday, June 26–28, 2020.

30. On the evening of Thursday, June 25, 2020, I told HSA Lakisha Brown that I expected my test results on Monday, June 29, 2020. Joan Whitley of ICDC Human Resources then called

me and instructed me that I had to report in "sick" each day, even though ICDC knew I was quarantined while awaiting my results. I spoke with Ms. Brown again, and she told me that because ICDC was fully informed of my situation and my doctor's orders, it made no sense for me to report in sick every day.

31. On Monday, June 29, 2020, I received my negative COVID-19 test results and reported them by telephone to Ms. Whitley the same day. I returned to work on my next scheduled workday, Wednesday, July 1, 2020. I worked my shift on July 1 without incident, and no one raised any concern about my absence that day. The following day, Thursday, July 2, 2020, I was summoned to a meeting and presented with a written reprimand for failing to report to work or call in sick on Saturday, June 27, 2020, as described below.

**VI. BACKDATED CALL-IN DIRECTIVE AND RETROACTIVE DISCIPLINE**

32. On July 1, 2020, when I returned to work, I was informed for the first time of a directive requiring employees to call in every day of an absence. The directive was dated as effective June 18, 2020, but I had not seen it until July 1, 2020.

33. Before July 1, 2020, ICDC did not have a written policy requiring daily call-ins, and I was not informed of any such requirement until July 1. Despite Ms. Brown's instruction that daily call-ins were unnecessary, LaSalle later treated my absence as a violation of the June 18 directive that I did not receive until July 1.

34. I have read the email Warden Paulk wrote on June 12, 2020 concerning whether I had requested one or two days off for my daughter's graduation. In that email, he wrote that if my attendance was an ongoing issue and there was documentation relative to the occurrences, the facility needed to proceed with disciplinary action. To my knowledge, no such documentation existed before that date. Only after this email did staff begin creating a record of my alleged late

clock-ins, all of which were dated June 22, 2020 — the same day I went out sick for COVID-19 symptoms. Attached hereto as Exhibit "D" is a true and correct copy of Warden Paulk's June 12, 2020 email.

35. The four disciplinary write-ups for June 9, 14, 17, and 18, 2020, on which I was allegedly late to work, were all dated June 22, 2020 and signed on June 25, 2020, and were not contemporaneously provided to me. These disciplinary documents were all prepared after I had repeatedly raised the concerns described above. Attached hereto as Exhibit "E" are true and correct copies of these four disciplinary write-ups.

36. I dispute that I had attendance problems during my full-time employment. When I was first shown the June letters of correction at my deposition on April 16, 2026, I disputed each one, and I testified that time-and-attendance entries at the facility could be altered by management.

**VII. JULY 2, 2020 RECLASSIFICATION TO PRN**

37. During my July 2 meeting with Warden Paulk, I asked him why I was being written up, reminding him that I had never had a problem in all three periods I had worked at ICDC. He swiveled around in his chair, leaned toward me, and said: "Because you thought you were black and female enough to challenge authority in this place, you're going to be PRN effective today. I'm done with the conversation."

38. At that July 2 meeting, Warden Paulk did not mention any attendance issue — only that I had "challenged authority."

39. When I was reclassified and given a reprimand form on July 2, the alleged violation was an unexcused absence, even though I had provided doctor's notes for my absence. Only the "reprimand only" box was checked, yet I was reduced from full-time to PRN (as-needed). The form also stated that I had no previous discipline, and it did not mention the four June write-ups.

The form identifies Deputy Warden Frank Albright as the reprimanding authority. Based on my own participation in the proceeding, Director of Nursing Shanise Bell acted as the charging official and HSA Lakisha Brown acted as the investigator, and Ms. Brown stated during the proceeding that she had told me to "call in each day." Attached hereto as Exhibit "F" is a true and correct copy of the reprimand form dated July 2, 2020.

40. On July 10, 2020, I submitted a handwritten grievance letter stating that I was being targeted and treated unfairly. In that letter I gave an example of another nurse during the same period who was out for several days, did not call in every day of her absence, and was not disciplined. That same day, Heather Grigsby, LaSalle's Human Resources Coordinator, responded to me in writing and told me, "I have forwarded your grievance to our HR Director as well as the Director of Operations for review." Ms. Grigsby also sent me LaSalle's grievance policy, employee handbook, and rules of conduct, identified an employee reporting service called SecureLink, stated that she had looked through my grievance, and assured me that my "grievance is not being ignored." Attached hereto as Exhibit "G" is a true and correct copy of my handwritten grievance. Attached hereto as Exhibit "H" is a true and correct copy of my July 10, 2020 email correspondence with Ms. Grigsby.

**VIII. POST-DEMOTION RETALIATION AND WITHHOLDING OF SHIFTS**

41. After I was placed on PRN (as-needed) status, LaSalle would offer me shifts by email and then retract those same shifts by telephone. This happened multiple times. On more than one occasion, I accepted shifts that LaSalle had offered, only to be told afterward that the dates had been changed. Attached hereto as Exhibit "I" are true and correct copies of the emails reflecting these offered and retracted shifts, including emails referencing text-message communications with LaSalle staff about my schedule. Ultimately, I did not work a single shift at ICDC after July 2, 2020.

42. On September 3, 2020, I expressly notified LaSalle that I was available to work in October 2020. In an email I sent that morning to Shanise Bell, the ICDC scheduler, I wrote that I was "available Oct 13, 16, 20, 23. 8 hour shifts if at all possible." Ms. Bell replied to me the same day, writing, "Thank you, I will let you know. As soon as possible." Later that same day I sent a follow-up email revising that availability, stating that I could work October 13, 16, and 20, and that I "might be able to work on Oct 25 or 26." Attached hereto as Exhibit "J" is a true and correct copy of that email correspondence, produced by LaSalle and Bates-numbered LaSalle_00623–LaSalle_00624. I was never assigned any hours in October 2020, even while ICDC advertised open LPN positions.

43. During this same period, I relocated to Atlanta, Georgia, and lived under the protection of a bodyguard because of death threats I received arising from my disclosures. My time in Atlanta was temporary — approximately three months, beginning in or about late September 2020 — and I then returned to my home in Tifton, Georgia. Throughout that period I remained willing and able to work at ICDC: I was willing to commute from Atlanta because I needed the work, and my bodyguard would have accompanied me and waited while I completed my shift.

44. During the period after July 2, 2020, when I was being assigned no shifts, I saw that LaSalle was advertising open nursing positions at the Irwin County Detention Center. I did not apply for those positions because I remained employed by LaSalle as a PRN nurse and understood that I was still part of the workforce, and I expected to be offered the hours I had told LaSalle I was available to work. Attached hereto as Exhibit "K" is a true and correct copy of the relevant excerpt of the certified deposition transcript of Dr. Pamela Hearn, taken on April 20, 2026 as the designated corporate representative of Defendant LaSalle Southeast, LLC, addressing nursing positions posted, advertised, and filled at the Irwin County Detention Center between July 2, 2020 and December 31, 2020.

45. LaSalle never informed me that I had been terminated, suspended, or placed on involuntary leave. I remained listed as an employee in LaSalle's records while being assigned no hours, and I was issued a letter dated June 24, 2021, on the letterhead of LaSalle Management Company, verifying that I was then currently employed. That letter reflected how I was carried in a personnel or payroll record. It did not reflect any offer or assignment of work, and I was in fact assigned no hours and performed no work at any time after July 2, 2020. By December 31, 2020, having received no work assignments since July 2, 2020, I concluded that I was not going to be called back to work at ICDC. Attached hereto as Exhibit "L" is a true and correct copy of that letter.

**IX. POST-DEMOTION PROTECTED DISCLOSURES**

46. After my reclassification, I made and supported disclosures about the conditions at ICDC to authorities outside the facility. On September 8, 2020, my counsel filed a whistleblower complaint on my behalf with the Department of Homeland Security Office of Inspector General ("OIG"), transmitting it through the OIG's online hotline. The complaint as filed consisted of a cover letter from my counsel, a declaration made in my name and dated September 8, 2020, and a notice to LaSalle, which is separately attached as Exhibit "N." I have reviewed the September 8, 2020 declaration filed with the OIG, and the statements in it concerning my employment at ICDC, the conditions I observed there, and the disclosures I made are true and correct to the best of my knowledge. Attached hereto as Exhibit "M" is a true and correct copy of that complaint as filed, together with the record of its submission to the OIG.

47. After filing my OIG complaint, I also caused the disclosures in that complaint to be made to the DHS Office for Civil Rights and Civil Liberties and the ICE Atlanta Field Office.

48. Also on September 8, 2020, my counsel notified Warden David Paulk and Mr. Ryan Horvath, LaSalle's Director of Legal Affairs, in writing, that I had filed that whistleblower complaint. Attached hereto as Exhibit "N" is a true and correct copy of that notice letter.

49. On September 14, 2020, Project South, together with other organizations, filed a complaint that referenced my disclosures regarding the treatment of detainees at ICDC. Attached hereto as Exhibit "O" is a true and correct copy of that complaint.

50. Beginning on September 17, 2020, I made disclosures to both chambers of Congress regarding the conditions at ICDC described in this declaration. Attached hereto as Exhibit "P" is a true and correct copy of my September 17, 2020 whistleblower disclosure to Congress.

51. Beginning in September 2020, I also spoke publicly about the conditions at ICDC described in this declaration. Following the public release of the September 14, 2020 complaint described in Paragraph 49 above, I participated in a news conference in Atlanta, Georgia, and I gave an on-camera interview to Chris Hayes that aired on MSNBC. My disclosures received extensive national newspaper and television coverage. I engaged in this advocacy as a private citizen concerned about the treatment of detainees.

52. I assisted and supported detainee litigation concerning the conditions and medical treatment of detainees at ICDC in the case of Yanira Yesenia Oldaker v. Giles, No. 7:20-cv-00224 (WLS) (M.D. Ga.). In the pleadings in that action, I am identified by name as the ICDC nurse who raised the alarm about unnecessary medical procedures at the facility and as a source of the allegations regarding the medical abuse of detainees. Attached hereto as Exhibit "Q" are true and correct copies of the relevant excerpts of the Proposed Amended Complaint filed in that action on October 22, 2024 (Oldaker Doc. 398-2). The passages identifying me and describing my disclosure appear at paragraphs 69 through 71 of that pleading. I understand that the operative amended

complaint in that action is filed under seal, and that the proposed amended complaint is the publicly available version of that pleading.

**X. HIPAA-RELATED ALLEGATIONS**

53. During my employment, no one informed me that I had violated HIPAA, compromised patient privacy, or engaged in conduct that would result in termination. I was never investigated, disciplined, or warned for any such alleged conduct. To my knowledge, the first time this justification was asserted was years after the events at issue, after this litigation was underway.

54. I raised concerns that neither staff nor detained immigrants were informed of who had tested positive for COVID-19. When I tried to warn officers who were about to be in contact with a detained individual with COVID-19 so that they could use proper precautions, I was reprimanded and told that warning other staff about cases was not my job. ICDC purposefully failed to disclose the truth about individuals who tested positive for COVID-19. I complained that the HSA and other upper-level nurses withheld information about detained individuals testing positive for COVID-19. Assertions that a detainee did not have COVID-19 were made without factual basis, even when they were suspected of being positive. This practice enabled ICDC to conceal infection rates, reduce absenteeism, and avoid public disclosure of accurate information.

55. My immediate supervisor, HSA Lakisha Brown, knew that I had taken forms of three positive COVID-19 test results to have proof that we had the virus inside the facility, and she did not object. I also witnessed Ms. Brown remove medical documentation from the facility, and to my knowledge she was never disciplined for doing so.

**XI. CONCLUSION**

56. Beginning shortly after I was reclassified to PRN (as-needed) status on July 2, 2020, the Government Accountability Project, working in conjunction with Project South, began

debriefing me about the conditions and events at ICDC described in this declaration. I recounted these events to them in 2020 — contemporaneously with the retaliation against me and long before this litigation. The concerns and disclosures described in this declaration are not new or recently manufactured; I raised them at the facility at the time and recounted them to the Government Accountability Project and Project South in 2020.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 27, 2026.

______________________________

Dawn Wooten