# EXHIBIT M

DHS Office of Inspector General Whistleblower Complaint, September 8, 2020

GOVERNMENT ACCOUNTABILITY PROJECT

1612 K Street NW, Suite 1100
Washington, DC 20006
202.457.0034 | www.whistleblower.org

PROJECT SOUTH
Institute for the Elimination of Poverty & Genocide
9 Gammon Ave SE Atlanta, GA 30315
projectsouth.org

September 8, 2020

<u>Via online submission</u>

The Honorable Dr. Joseph V. Cuffari
Inspector General
U.S. Department of Homeland Security, Office of Inspector General

Re: Protected Whistleblower Disclosures by LaSalle Nurse Ms. Dawn Wooten

Dear Dr. Cuffari:

We represent Ms. Dawn Wooten, LPN, currently a LaSalle Corrections nurse employed at the Irwin County Detention Center ("ICDC") in Ocilla, Georgia. We are filing the attached whistleblower complaint on her behalf, where she raises concerns about dangerously unhealthy practices at ICDC, a private prison which houses immigrants detained by U.S. Immigration and Customs Enforcement ("ICE"). ICDC is run by LaSalle Corrections, under contract with DHS/ICE.

Ms. Wooten's complaint alleges violations of laws, rules and regulations, as well as on-going danger to public health and safety, due to mismanagement of COVID-19 issues and other significant matters. She has also shared her concerns internally with ICDC's management. Her complaint includes allegations of retaliation for her whistleblowing.

By virtue of her disclosures Ms. Wooten is a protected whistleblower within the meaning of the federal whistleblower laws. Title 41, section 4712 of the U.S. Code specifically applies to federal contractors, like LaSalle. We have advised LaSalle of Ms. Wooten's OIG disclosures via separate corrpespondence, a copy of which is attached to this filing. We look forward to assisting your investigation of the serious, ongoing breaches of the public trust at ICDC and the retaliatory actions taken against Nurse Wooten.

Please contact us if you have any questions.

Sincerely,

John S. Whitty
JohnW@whistleblower.org, 202.457.0034
Government Accountability Project

Priyanka Bhatt
priyanka@projectsouth.org, 404.622.0602
Project South

# VERIFIED DECLARATION OF DAWN WOOTEN

Pursuant to 28 U.S. Code § 1746, I, Dawn Wooten, hereby declare, under penalty of perjury of the laws of the United States of America, that the following is true and correct.

## INTRODUCTION

1. I submit this Declaration in furtherance of my Disclosure and Retaliation Complaint to the U.S. Department of Homeland Security Office of Inspector General.

2. I am over 21 years of age and a legal resident of the State of Georgia. I live at 1224 Hall Avenue, Tifton, Georgia. I am personally familiar with facts as stated herein and am competent to testify about them. I certify that the facts stated herein are true and correct.

3. I have been a Licensed Practical Nurse ("LPN") since 2009.

4. I was first employed as a LPN at the Irwin County Detention Center ("ICDC") in Ocilla, Georgia in 2010.

5. Since my first period of employment at ICDC beginning in 2010, I have had periods of employment elsewhere, but I have been rehired by ICDC three times, most recently in October 2019.

6. ICDC is operated by LaSalle Corrections under contract to U.S. Immigration and Customs Enforcement ("ICE").

7. Since my most recent rehire at ICDC, I have been employed fulltime, working approximately 36-40 hours per week, including regular shifts from 6 am to 6 pm, six times in every two-week pay period.

8. Prior to July 2, 2020, I had never received a written reprimand at ICDC.

9. My most recent supervisor at ICDC was the Health Services Administrator ("HSA"), Ms. Lakisha Brown.

10. I am African-American woman.

**LASALLE VIOLATED FEDERAL LAWS, RULES, OR REGULATIONS; LASALLE'S ACTIONS POSED A SUBSTANTIAL AND SPECIFIC DANGER TO PUBLIC HEALTH OR SAFETY; AND LASALLE TOOK OR FAILED TO TAKE ACTIONS THAT CAUSED GROSS WASTE, FRAUD, OR MISMANAGEMENT.**

11. In March 2020, detainees in Unit C at ICDC began to report they and their dormmates were experiencing well-recognized symptoms of COVID-19, such as fevers and sore throats. These detainees thus repeatedly requested to be tested for the disease. Ms. Brown and ICDC Director of Nursing, Ms. Shanise Bell routinely rejected these requests. When I questioned Ms. Brown about these denials of COVID-19 testing for detainees exhibiting symptoms, Ms. Brown told me that she would not authorize testing for the detainees because "all they want is attention. … Everybody want [sic] to be tested for COVID."

12. In June 2020, ICDC received two rapid response COVID-19 testing machines. These machines would produce COVID-19 testing results in eight minutes. I understood the machines were to be used for testing the detainees, but I saw the machines in use only twice, once to test an ICDC employee and once for a detainee.

13. From March through July 2020, rather than order a COVID-19 test for detainees seeking medical attention for a fever, I observed ICDC medical staff prescribing a seven-day course of over-the-counter cold medication to those detainees.

14. From October 2019 through July 2020, I observed ICDC medical staff shredding detainees' written requests for exams or treatment and otherwise denying medical care by falsely documenting or reporting exams as performed that actually had not performed. During May and July 2020, I reported this to Ms. Brown, who took no action but told me, "One day they will be caught [shredding the exam requests]."

15. ICE has developed and disseminated its own standards for hygiene, cleanliness, and sanitation for detention facilities like ICDC, which are described ICE's Performance-Based National Detention Standards ("PBNDS"), as revised in 2016. ICE also requires detention facilities like ICDC to comply with relevant hygiene, cleanliness, and sanitation standards established by U.S. Centers for Disease Control and Prevention.

16. Among other things, even before the COVID-19 pandemic hit he U.S., ICE required

(and still requires) that:

"a. All horizontal surfaces shall be damp-dusted daily with an approved germicidal solution used according to the manufacturer's directions" —— ICDC never met this standard, especially not on a "daily" basis

"b. Windows, window frames and windowsills shall be cleaned on a weekly schedule." —— ICDC never met this standard, especially not on a "weekly" basis

"c. Furniture and fixtures shall be cleaned daily." —— ICDC never met this standard, especially not on a "daily" basis

"d. Floors shall be mopped daily and when soiled, using the double-bucket mopping technique and with a hospital disinfectant-detergent solution mixed according to the manufacturer's directions." —— ICDC never met this standards, especially not on a "daily" basis

"e. A clean mop head shall be used each time the floors are mopped." —— ICDC never met this standard

"h. Cubicle curtains shall be laundered monthly or during terminal cleaning following treatment of an infectious patient." —— ICDC never met this standards, especially not on a "monthly" basis.

17. According to the CDC:

"Even if COVID-19 cases have not yet been identified inside the facility or in the surrounding community, begin implementing intensified cleaning and disinfecting procedures according to the recommendations below. These measures may prevent spread of COVID-19 if introduced." This requires detention facilities like ICDC to:

A "Several times per day, clean and disinfect surfaces and objects that are frequently touched, especially in common areas. Such surfaces may include objects/surfaces not ordinarily cleaned daily (e.g., doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment, kiosks, and telephones)." —— ICDC never met this standard

B. "Staff should clean shared equipment several times per day and on

a conclusion of use basis (e.g., radios, service weapons, keys, handcuffs)." —— ICDC never met this standard

C. "Use household cleaners and EPA-registered disinfectants effective against the virus that causes COVID-19 as appropriate for the surface, following label instructions. This may require lifting restrictions on undiluted disinfectants." —— ICDC never met this standard

D. "Ensure adequate supplies to support intensified cleaning and disinfection practices, and have a plan in place to restock rapidly if needed." —— ICDC never met this standard

18. From October 2019 through July 2020, ICDC failed to maintain hygiene, cleanliness, and sanitation standards for medical exam rooms and equipment.

19. I observed exam room tables and floors that were rarely cleaned, wiped down, or mopped, and certainly not to ICE or CDC standards. There was often blood on the floor that had not been cleaned up

20. To give just one example, a detainee's blood lay on the same spot, in the same pattern, an exam room for at least two full months. In other words, it was never mopped up.

21. ICE and the CDC also require minimum standards of personal hygiene for all detainees, such as providing them with personal bars of soap, and providing female detainees with special hygiene products, such as tampons —— ICDC never met these standards.

22. The CDC has very specific standards regarding Personal Protective Equipment ("PPE"), including "Ensur[ing] that sufficient stocks of hygiene supplies, cleaning supplies, PPE, and medical supplies (consistent with the healthcare capabilities of the facility) are on hand and available, and have a plan in place to restock as needed if COVID-19 transmission occurs." —— PPE, of all kinds, always was in very short supply at ICDC. Some things, such as gowns and face shield were rarely if ever provided.

23. From March through July 2020, ICDC constantly failed to provide or unreasonably delayed the provision of adequate quantities of PPE to detainees and lower-level staff

like me.

24. I observed highly effective PPE, such as N-95 face masks, being reserved for high-ranking staff (who rarely had contact with the detainees and staff most likely to be exposed to COVID-19), while the most at-risk individuals were given only inferior paper or cloth masks and were never given new masks to replace old or broken ones. From March through early June 2020, there were no face shields or gowns provided.

25. As just one example, staff like myself were given an N-95 face mask in mid-March. They are supposed to be used one time or to last one day. Ours were never cleaned, repaired, or replaced. When staff complained, ICDC supervisors told us to go to stores and buy our own.

26. Detainees were rarely, if ever, given even paper facemasks (like surgical masks) even when they begged for them. For this reason, detainees were forced to buy socks from the commissary to tie around their noses and mouths as substitute facemasks.

27. The CDC also requires that staff and detainees "trained to correctly don, doff, and dispose of PPE" —— ICDC never trained anyone about how to put on, take off, and dispose of PPE.

28. The CDC requires regular temperature checks for COVID-19, with the frequency of temperature checks depending on the circumstances: immediately after detainees arrive and before they are brought into the general detainee population, once a day for staff as they arrive for work, twice a day for quarantined detainees, and daily "in housing units where COVID-19 cases have been identified." —— ICDC performed temperature check on new detainees and staff entering the facility, but it rarely performed other checks with the frequency the CDC requires.

29. More important, ICDC misused and never properly calibrated the hand-held temperature gun that was used for temperature check.

30. The guns was routinely pressed to the foreheads of staff and detainees, rather than being held 6-12" away, and were rarely, if ever, cleaned and sanitized.

31. The guns also were never calibrated, which necessary to produced accurate readings. For example, the gun frequently reported low temperatures for me, including below 90 degrees. These are the temperatures one gets when testing recently deceased

people, not living and breathing ones!

32. The CDC has established very detailed standards social-distancing, medical isolation, and COVID-19 quarantining of detainees and staff. For example, the CDC requires detention facilities to:

33. "Implement social distancing strategies to increase the physical space between incarcerated/ detained persons (ideally 6 feet between all individuals, regardless of the presence of symptoms)."

34. "Have staff "maintain a distance of feet or more from an individual with respiratory symptoms while interviewing, escorting, or interacting in other ways."

c. As soon as an individual [detainee] develops symptoms of COVID-19, they should wear a face mask (if it does not restrict breathing) and should be immediately placed under medical isolation in a separate environment from other individuals."

d. "Keep the individual's movement outside the medical isolation space to an absolute minimum.

e. "Provide medical care to cases inside the medical isolation space."

f. "Serve meals to cases inside the medical isolation space."

f. "Exclude the individual from all group activities."

g. "Assign the isolated individual a dedicated bathroom when possible."

h. "Ensure that the individual is wearing a face mask at all times when outside of the medical isolation space, and whenever another individual enters. Provide clean masks as needed. Masks should be changed at least daily, and when visibly soiled or wet."

i. "Facilities should make every possible effort to place suspected and confirmed COVID-19 cases under medical isolation individually. Each isolated individual should be assigned their own housing space and bathroom where possible. Cohorting should only be practiced if there are no other available options."

j. "If cohorting is necessary: Only individuals who are laboratory confirmed COVID-19 cases should be placed under medical isolation as a cohort. Do not cohort confirmed cases with suspected cases or case contacts."

k. "Incarcerated/detained persons who are close contacts of a confirmed or suspected COVID-19 case (whether the case is another incarcerated/detained person, staff member, or visitor) should be placed under quarantine for 14 days."

35. ICDC routinely ignored every one of these requirements.

36. From March through July 2020, ICDC adopted inadequate social-distancing policies. ICDC leadership failed to encourage and enforce the CDC's social distancing recommendations. What's worse, ICDC reprimanded staff for practicing social distancing. On various dates from March through May 2020, the former HSA, Ms. Marion Cole, and later in May and June 2020, Ms. Brown verbally reprimanded me for warning other staff to adhere to CDC-recommended distancing guidelines and to use extra precautions when working with someone who has tested positive for COVID-19.

37. For example, from March through July 2020, I observed ICDC unreasonably refuse to isolate, from the general population, both detainees who had tested positive for COVID-19 and those who were COVID-19-symptomatic.

38. From March through June 2020, ICDC routinely failed to inform detainees and staff which persons among the detainee population had tested positive for COVID-19. In June 2020, I had substantial contact with three detainees that, unbeknownst to me, were suspected of having COVID-19 and had submitted COVID-19 test samples. I expressed some concern about this to Ms. Brown and, without telling me the detainees were suspected of having COVID-19 and that they had submitted samples, she assured me the three detainees were negative for COVID-19. Later I learned that the three detainees had in fact tested positive.

39. The CDC also has very strict standards regarding detainee transfers. The CDC says that detention facilities must "restrict transfers of incarcerated/detained persons to and from other jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, or to prevent overcrowding" and "suspend all transfers of incarcerated/detained persons to

and from other jurisdictions and facilities (including work release where relevant), unless necessary for medical evaluation, medical isolation/quarantine, care, extenuating security concerns, or to prevent overcrowding."

40. From March through June 2020, ICDC routinely violated CDC rules regarding detainee transfers.

41. For example, on or about the end of May or early June 2020 ICDC transferred a detainee to the Stewart Detention Center despite ICDC leadership knowing he had tested positive for COVID-19. Other detainees, suspected of having contracted COVID-19 and awaiting their test results, were transferred to other facilities without knowing their test results. ICDC regularly transferred COVID-19-positive detainees to other ICE facilities without informing those facilities that the transferees had tested positive. At the same time, ICDC accepted the transfer of COVID-19-positive detainees from other ICE-related institutions without informing ICDC-housed detainees or ICDC-based staff that the new arrivals were infected with COVID-19. New arrivals were neither tested for COVID-19 nor isolated from other detainees.

42. The CDC states: "It will be especially important for [detention] facilities to coordinate closely with their state, local, tribal, and/or territorial health department when they encounter confirmed or suspected cases among incarcerated/detained persons or staff, in order to ensure effective medical isolation and quarantine, necessary medical evaluation and care, and medical transfer if needed." To the best of my knowledge, ICDC routinely ignored its reporting obligations.

43. For example, from March through May 2020, ICDC violated CDC and Georgia state reporting requirements regarding detainees determined to have or be suspected of having COVID-19 by undercounting and underreporting such cases to both LaSalle corporate and to the State of Georgia.

44. From October 2019 through June 2020, ICDC discriminated against employees and detainees on the basis of race and ethnicity. White nurses who were out sick were not required to report in sick every day, and they were not reprimanded and demoted when they did not report sick every day. In addition, White employees who were out sick with COVID-19 or suspected COVID-19 received "COVID pay," while ICDC did not pay me while I was out sick.

**RETALIATORY REPRIMAND AND DEMOTION.**

45. On Monday, June 22, 2020, I was off work to obtain a COVID-19 test prior to receiving a medically prescribed blood transfusion for my sickle-cell condition. At that time, I was exhibiting symptoms that indicating a potential COVID-19 infection, such as muscle ache, fatigue, and shortness of breath.

46. I expected to quarantine while awaiting the COVID-19 test results, and my physician, Dr. Margaret Richardson Nixon told me I would be in violation of CDC guidelines if I returned to work at ICDC while I was symptomatic. Nevertheless, ICDC required me to return to work and I worked Tuesday, June 23 and Thursday, June 25, 2020. I was scheduled to be off on Friday, Saturday, and Sunday, June 26-28, 2020.

47. I spoke with my supervisor, Ms. Brown. on Thursday evening, June 25, 2020, and told her I expected to receive my test results on Monday, June 29, 2020. An ICDC Human Resources staff-person, Ms. Joan Whitley, then called me and instructed me that I must report in "sick" each day even though ICDC understood I was in quarantine while awaiting the test results. I then spoke with Ms. Brown, who assured me that because ICDC was fully informed of my situation and my doctor's orders and thus it made no sense for me to burden myself and ICDC staff by reporting in sick every day while I was quarantined on doctor's orders.

48. On Monday, June 29, 2020, I received my negative COVID-19 test results and reported them via phone to Ms. Whitley that same day.

49. I returned to work on my next scheduled work-day, Wednesday, July 1, 2020.

50. On the following day, Thursday, July 2, 2020, I was summoned to see Deputy Warden Albright. I was presented with a written reprimand for not reporting to work or reporting in sick on Saturday, June 27, 2020. Ms. Bell was the charging official, Ms. Brown was the investigator, and ICDC Deputy Warden Albright was the reprimanding authority. Ms. Brown falsely indicated on the reprimand form and during the reprimand proceedings that she had informed me that I would have to "call in each day," when, in fact, she had never said that that and actually had said there was no need for me to do that.

51. On or about July 2, 2020, I discussed this matter with ICDC Warden Paulk. I told him of my ten-year history of employment at ICDC and my record of solid performance

and attendance. Warden Paulk expressed anger and frustration and told me that effective immediately he was demoting me. I was no longer to be a fulltime LPN, but instead I would be "PRN" or as needed. This meant that my hours were severely curtailed and I no longer had a regular shift.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 8, 2020, at Tifton,Georgia.

Dawn Wooten

Dawn Wooten

hotline.oig.dhs.gov/#step-1

Official website of the Department of Homeland Security

Office of Inspector General

(*) Required Information

- ○ I am submitting the complaint myself.
- ◉ I am submitting the complaint on behalf of someone else.
- ○ I am submitting this complaint as a DHS internal affairs agency.

**Please Select One***

Complainant wishes to:

○ Option 1: Remain anonymous. It is understood that this may hinder DHS OIG's ability to thoroughly review and/or resolve the allegations in the complaint. Also the information that is provided anonymously may be referred to another agency if DHS OIG determines that action by another agency is warranted under the circumstances.

○ Option 2: Disclose identity to DHS OIG, but request that DHS OIG keep the identity confidential with respect to individuals outside DHS OIG. The selection may hinder DHS OIG's ability to thoroughly review and/or resolve the allegations in the complaint. It is also understood that, despite the request for confidentiality, it may be necessary for DHS OIG to disclose the identity to individuals outside DHS OIG if DHS OIG deems such disclosure (1) necessary during the course of DHS OIG's investigation of the allegations in the complaint, or (2) otherwise required by law.

◉ Option 3: Disclose identity to DHS OIG and authorize DHS OIG to further disclose individuals and/or entities identity outside DHS OIG on a need-to-know basis.

Complainant

Prefix (Mr.,Mrs.,Ms.,etc.) Ms

First name Dawn MI Last name Wooten

Suffix (Jr., Sr., II., etc.)

Address Type: ◉ Home ○ Work

Address: 1224 Hall Avenue

City: Tifton State/Territory: GA Zip: 31794

Country/Region: United States

* Either Phone or E-mail is required

Primary Phone: 229-472-2465 Email: 5070653.dw@gmail.com

Is the complainant a current DHS employee, former DHS employee, or DHS contractor? * ◉ Yes ○ No

Filing Category: DHS Contractor

Employer: nonDHS

Title: Nurse

hotline.oig.dhs.gov/#step-2

Official website of the Department of Homeland Security

Office of Inspector General

# DHS OIG Hotline Complaint Form

1. Complaint Information | 2. Allegation Details | 3. Additional Details | 4. Other Actions | 5. Upload Documents | 6. Certifications

## Part II - Allegation Details

Use this section to clearly describe your complaint. If you would like additional information about filing a reprisal complaint, please click here.
IDENTIFY THE SUBJECT(s) - WHO COMMITTED THE ALLEGED WRONGDOING?

(*) Required Information

**New Subject**

Please click the Save button to save or update the data. If you want to add another Subject, please click the Add Subject button.

Select an option most appropriate for the Subject:* ○ Person ○ DHS Agency or Bureau ◉ Company

Company Name: LaSalle Corrections

Address: 132 Cotton Drive

City: Ocilla State/Territory: GA Zip: 31774

Country/Region: United States

Primary Phone: 229-468-4121 Email Address: ex: email@example.com

Save

Add Subject

IDENTIFY ANY ADDITIONAL INDIVIDUALS RELEVANT TO THE COMPLAINT

Add Victim Add Witness

Previous Next

hotline.oig.dhs.gov/#step-3

Official website of the Department of Homeland Security

Office of Inspector General

# DHS OIG Hotline Complaint Form

1. Complainant Information | 2. Allegation Details | 3. Additional Details | 4. Other Actions | 5. Upload Documents | 6. Certifications

## Part III - Additional Details

(*) Required Information

We can best process your complaint if we receive accurate and complete information. Provide a summary of your complaint, to include an event chronology, if appropriate.

If your complaint involves contractor fraud, provide the name of the primary contractor, subcontractor, type of contract, contract #s, date of contract award, and name(s) of agency official(s) if known.

Allegation Category: Employee Corruption

DHS Affected Agency: ICE - U.S. Immigration and Customs Enforcement

What did the person(s) do or fail to do that was wrong?*

See attached declaration: Violations of laws, rules and regulations, as well as on-going danger to public health and safety, due to mismanagement of COVID-19 issues and other significant matters.

4805 remaining

When did the incident(s) occur?*

October 2019 - July 2020

26 remaining

Where did the incident(s) take place(City/State)?*

Ocilla, Georgia

35 remaining

When were you made aware of the problem(s)?

October 2019 through July 2020

20 remaining

20 remaining

What rule, regulation, or law do you believe to have been violated?

PBNDS and CDC guidelines on infectious diseases.

4952 remaining

Briefly summarize how you believe our office can assist you regarding your matter.

See attached declaration: Investigate the serious, ongoing breaches of the public trust at the Irwin County Detention Center (ICDC) and the retaliatory actions taken against me.

4822 remaining

Previous | Next

hotline.oig.dhs.gov/#step-4

Official website of the Department of Homeland Security

Office of Inspector General

## DHS OIG Hotline Complaint Form

1. Complainant Information | 2. Allegation Details | 3. Additional Details | 4. Other Actions | 5. Upload Documents | 6. Certifications

### Part IV - Other Actions

Please indicate in this section if you have filed your complaint with any other office, to include other Inspector General offices, and your Congressperson. If you have contacted other entities, clearly identify the agency, office, or command, and provide your understanding of the current status of your matter. If you have received any responses from those office(s), provide our office with a copy.

(*) Required Information

Have you reported this matter to any other organizations/agencies? * ○ Yes ◉ No

Previous | Next

hotline.oig.dhs.gov/#step-5

Official website of the Department of Homeland Security

Office of Inspector General

# DHS OIG Hotline Complaint Form

1. Complainant Information | 2. Allegation Details | 3. Additional Details | 4. Other Actions | 5. Upload Documents | 6. Certifications

## Part V – Upload Documents

If you have supporting documentation that you wish to provide with this complaint form, please use the 'Add File' button below. Do not send classified documents using this unclassified internet system. We recommend that you scan your documents together into one electronic file, not to exceed 30 MBs total.

- PDF files only
- You may upload up to 5 files and not to exceed 30 MBs total.

### Browse for files

**GAP and Project South cover letter to OIG obo D. Wooten Sept 8 2020.pdf**

**Declaration of D. Wooten signed Sept 8 2020.pdf**

**GAP and Project South notice of protected activity to LaSalle Corr. obo D. Wooten Sept 8 2020.pdf**

**709.33 Total KB.**

Add File | Remove File

Previous | Next

hotline.oig.dhs.gov/#step-6

Official website of the Department of Homeland Security

Office of Inspector General

## DHS OIG Hotline Complaint Form

1. Complainant Information | 2. Allegation Details | 3. Additional Details | 4. Other Actions | 5. Upload Documents | 6. Certifications

### Part VI - Certifications

(*) Required Information

- [x] * I certify that all of the statements made in this complaint are true, complete, and correct, to the best of my knowledge. I understand that a false statement or concealment of a material fact is a criminal offense (18 U.S.C. ~ 1001; Inspector General Act of 1978, As Amended, §7).
- [x] * I have provided my election concerning my filing status in Part 1 of this form (Release of Identity, Non-Release of Identity, or Anonymous). I understand that if I have elected anonymous status, it may impact the ability of the DHS OIG to either conduct an inquiry, if warranted, and/or to appropriately address my issue(s). I further understand that if I have elected not to release my identity outside of DHS OIG, my complaint will not be disclosed outside DHS OIG for action, unless this action is determined necessary or required by law. My selection not to disclose my identify outside DHS OIG may also prevent further action from being taken on my complaint.
- [x] * I further understand that even if I elect confidential status, my identity may be disclosed, if required by applicable legal authority, or if the DHS OIG, determines that such disclosure is otherwise unavoidable.

Previous | Cancel

Submit

hotline.oig.dhs.gov/Home/Complete

Official website of the Department of Homeland Security

Office of Inspector General

## DHS OIG Hotline Complaint Form

You have successfully submitted your complaint to the DHS OIG. For reference purposes, you have been assigned Reference Number:

**HLCN1599613977377**

Please retain this number for your records.

We will review your complaint and contact you if more information is needed. This receipt is not an indication your complaint will be investigated by the DHS OIG or any other applicable investigating body.

Thank you for contacting the DHS OIG with your concerns.

Click here to return to the DHS OIG home page: http://www.oig.dhs.gov/.