# EXHIBIT Q

Oldaker v. Giles — Proposed Amended Complaint (Cited Excerpts)

# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA

Deleted: David N. Dreyer Sirine Shebaya (admitted *pro hac vice*)¶
GA Bar No. 411322 DC Bar No. 1019748 ¶
**Dreyer Sterling, LLC** **National Immigration Project of the** ¶
437 Memorial Dr., SE, Ste. A-2 **National Lawyers Guild (NIPNLG)** ¶
Atlanta, GA 30312 2201 Wisconsin Ave NW, Suite 200¶
Tel: (404) 234-4447 Washington, DC 20007¶
david@dreyersterling.com Tel: (617) 227-9727¶
sirine@nipnlg.org ¶
Elora Mukherjee (admitted *pro hac vice*) ¶
NY Bar No. 4427233¶
Columbia Law School Immigrants' Rights Clinic¶
**Morningside Heights Legal Services, Inc.**¶
435 West 116th Street, Room 831¶
New York, NY 10027¶
Tel: (203) 668-2639¶
emukherjee@law.columbia.edu¶
¶
*Attorneys for Plaintiffs*¶
*(Additional counsel listed on signature page)*¶
¶

YANIRA YESENIA OLDAKER; TATIANA ALEKSEYEVNA SOLODKOVA; LUZ ADRIANA WALKER; JANE DOE #5; JANE DOE #6; LOURDES TERRAZAS SILAS; JANE DOE #8; JANE DOE #15; JANE DOE #22; DANIELA CHAVEZ MORALES; JAROMY JAZMÍN FLORIANO NAVARRO; MBETI VICTORIA NDONGA; KEYNIN JACQUELIN REYES RAMIREZ; PAULINE BINAM; and ANA GABRIELA ADAN CAJIGAL, on behalf of themselves and others similarly situated,

*Plaintiffs*,

v.

JARVIS MCMILLER, in his official capacity as Acting Director of the Atlanta Field Office of U.S. Immigration and Customs Enforcement; THOMAS P. GILES, in his individual capacity; TAE JOHNSON, in his official capacity as Director of U.S. Immigration and Customs Enforcement; ALEJANDRO MAYORKAS, in his official capacity as Secretary of Homeland Security; MERRICK GARLAND, in his official capacity as Attorney General of the United States; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; PATRICK MUSANTE, in his individual capacity and official capacity as Chief of Staff of the Atlanta Field Office of U.S. Immigration and Customs Enforcement; CESAR CIPRIAN, in his individual capacity and official capacity as Supervisory Detention and Deportation Officer at the ICE Atlanta Field Office; ANA RIVERA, in her individual capacity and official capacity as the Medical Director of

Case No.: 7:20-cv-00224-WLS-MSH

**[PROPOSED]**
**CONSOLIDATED FOURTH AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND FOR DAMAGES**[1]

[1] After the Defendants' respective Motions to Dismiss were fully briefed and decided, the only claims remaining are those asserted under the Federal Tort Claims Act against the United States Government.

## FACTUAL ALLEGATIONS

### I. Widespread and Systematic Abuse by Defendant Amin

65. Plaintiffs were victims of non-consensual, medically unindicated and/or invasive gynecological procedures, including but not limited to unnecessary surgical procedures under general anesthesia, performed by and/or at the direction of Defendant Amin.

66. As detailed below, in many instances, the non-consensual and/or medically unindicated gynecological procedures Defendant Amin performed on Plaintiffs amounted to sexual assault. These procedures were performed in the presence of unknown ICDC officials ##1-X.

67. Since at least 2018, and likely as early as 2013, Defendants knew about the medical abuse women detained at ICDC have suffered at the hands of Defendant Amin. They nonetheless continued a policy or custom of sending women to be mistreated and abused by Defendant Amin until September 22, 2020.

68. The experiences Plaintiffs had at the hands of Defendant Amin form part of a disturbing pattern of inhumane medical abuse and mistreatment at ICDC.

### II. The Whistleblower Complaint

69. On September 14, 2020, a nurse from ICDC, Ms. Dawn Wooten, raised the first alarm about unnecessary medical procedures at ICDC.[4]

70. Ms. Wooten described a general failure to obtain consent for medical procedures and a pattern of performing medically unindicated procedures.[5] She also described long delays

---

[4] Complaint by Project South, Georgia Detention Watch, Georgia Latino Alliance for Human Rights & South Georgia Immigrant Support Network to Joseph V. Cuffari, Cameron Quinn, Thomas P. Giles, & David Paulk, *Re: Lack of Medical Care, Unsafe Work Practices, and Absence of Adequate Protection Against COVID-19 for Detained Immigrants and Employees Alike at the ICDC County Detention Center* (Sept. 14, 2020), https://projectsouth.org/wp-content/uploads/2020/09/OIG-ICDC-Complaint-1.pdf.

[5] *Id.* at 20.

Case 7:20-cv-00224-WLS Document 139-7 Filed 07/22/26 Page 22 of 195

between requests for medical attention and receipt of care, and responses to a broad range of requests for medical care with ibuprofen.

71. This whistleblower complaint corroborates Plaintiffs' experiences throughout their detention at ICDC.

72. ICE continued to send patients from ICDC to Dr. Amin after the whistleblower complaint became public. It was not until on or about September 22, 2020, that ICE announced that Dr. Amin would no longer see ICDC patients. The date on which ICE actually stopped sending any patients to Dr. Amin is unknown but, upon information and belief, was after September 22, 2020, as Plaintiff Jane Doe #22 was sent to him on that date.

## III. Defendants' Knowledge and Disregard of Defendant Amin's Abuses

73. Since at least 2018, women treated by Defendant Amin and their counsel have reported Amin's abusive behavior to certain Defendants and their agents, including unknown ICE agents and ICDC officers, both verbally and in writing.

74. Multiple women detained at ICDC, including several Plaintiffs, complained verbally or in writing to unknown ICE agents and ICDC officers about the painful, unnecessary, non-indicated, and/or non-consensual medical procedures Defendant Amin performed on them.

75. Despite these complaints, Defendants continued a policy or custom of regularly sending women detained at ICDC to be treated by Defendant Amin.

76. Unknown ICE Officials ##1-X and/or ICDC Officials ##1-X accompanied women detained at ICDC, including Plaintiffs, to their appointments with Defendant Amin. They remained in the room as he performed painful non-consensual procedures on them. They witnessed the women crying out in pain and asking Defendant Amin to stop,

Case 7:22-cv-00224-WLS Document 139-7 Filed 07/22/24 Page 23 of 195

which he generally refused to do. They witnessed that Defendant Amin did not obtain consent for many of the procedures he performed on women detained at ICDC. They observed that he did not inform Plaintiffs of less-invasive treatment alternatives to the procedures he performed. They also witnessed that he frequently did not make any attempts or respond to requests to provide interpretation or to speak to each woman in a language she could understand.

77. Federal and ICDC Defendants also knew that from 2013 to 2015, Defendant DOJ investigated Defendant Amin for similar behavior—performing unnecessary medical procedures in violation of the False Claims Act—as part of the lawsuit *United States v. Hospital Authority of Irwin County*, No. 7:13-cv-00097-HL (M.D. Ga.).[6]

78. In *United States v. Hospital Authority of Irwin County*, the DOJ alleged that "Dr. Amin has a standing order at ICH [Irwin County Hospital] which requires that certain tests always be run on pregnant patients, without any medical evaluation and regardless of her condition. For example, no matter what symptoms the patient may be exhibiting, ICH performs an OB ultrasound on every pregnant patient, without consulting [Dr. Amin] or obtaining his or any other doctor's medical opinion for that particular patient. . . . Dr. Amin's standing order for ultrasounds on his patients constitutes a pattern of medical services that he, ICH, and on-call doctors know or should know are not medically necessary."[7]

[6] Press Release, Department of Justice, U.S. Attorney's Office, Middle District of Georgia, Hospital Authority of Irwin County Resolves False Claims Act Investigation for $520,000 (Apr. 29, 2015), https://www.justice.gov/usao-mdga/pr/hospital-authority-irwin-county-resolves-false-claims-act-investigation-520000.

[7] Complaint at 15, 17, *United States v. Hospital Authority of Irwin County*, No. 7:13-cv-00097 (M.D. Ga. July 8, 2013).

92. On information and belief, Defendants ICDC, LaSalle, and Paulk, as individuals and entities in charge of running the day-to-day operations of the facility, were aware of the non-consensual and/or medically unindicated invasive procedures and surgeries performed by Defendant Amin without informed consent.

93. By failing to investigate these abuses or taking immediate action to prevent further harm, Defendants ICDC, LaSalle, and Paulk disregarded the serious risk of harm to individuals sent to Defendant Amin purportedly for gynecological procedures and surgeries.

94. From July to November 2018, counsel for putative class member Jane Doe #35 repeatedly raised concerns about gynecological treatment at ICDC with Defendants ICDC, LaSalle, Paulk, and ICE and its agents. Counsel's efforts included multiple conversations with Defendant George explaining that Dr. Amin had mistreated Jane Doe #35. In late October 2018, Defendant George confirmed to counsel that she was "not surprised to hear this complaint against Dr. Amin." By this time, Defendant George had received "several previous verbal complaints about Dr. Amin."[9]

95. On November 8, 2020, counsel for Jane Doe #35 personally met with Defendant Paulk to express concern about gynecological treatment at ICDC. The following day, counsel wrote to Defendant Paulk documenting the "four months" of "advocacy with ICE and ICDC" to seek care of Jane Doe #35's debilitating pain resulting from gynecological complications. Counsel wrote that despite this debilitating pain, Jane Doe #35 "hesitated

---

[9] Caitlin Dickerson, Seth Freed Wessler & Miriam Jordan, *Immigrants Say They Were Pressured Into Unneeded Surgeries,* N.Y.Times (Sept. 29, 2020), https://www.nytimes.com/2020/09/29/us/ice-hysterectomies-surgeries-georgia.html.

Case 7:22-cv-00224-WLS Document 139-7 Filed 07/22/24 Page 28 of 195

to seek medical attention because her last experience with Dr. Amin was so painful and traumatic that she did not want to be sent back to him."

96. Defendants ICDC and LaSalle had a policy, practice, or custom of referring individuals to Defendant Amin despite their knowledge of his abuses.

97. ICDC officers and medical staff, including Defendants Mines, Rabiou, Hughes, Smith, Doney, Hanes, Faison, Battle, Vaughn, Scott, Slack, and Unknown ICDC Officers ##1-X, were aware of the abuses by Defendant Amin. By failing to report Defendant Amin's abuses or taking immediate action to prevent further harm, ICDC officers and medical staff disregarded the serious risk of harm to individuals sent to Defendant Amin for gynecological procedures and surgeries.

**IV. A Broader Pattern of Medical Abuse or Neglect**

98. The medical abuses Plaintiffs suffered at the hands of Defendants form part of a broader pattern of medical abuse or neglect at ICDC, of which Defendants were fully aware.

99. Immigrants detained at ICDC reported lack of access to adequate medical care for years, including unanswered requests for treatment, failure to provide necessary medication or prenatal care, and long wait times of up to two weeks to see medical staff at the facility.[10]

100. Despite their knowledge of these well-known issues of medical neglect and mistreatment at ICDC, and repeated requests by Plaintiffs and others detained at ICDC for adequate care and reasonable accommodations, Defendants ICDC, LaSalle, and

[10] Project South & Penn State Law Ctr. for Immigrants' Rts. Clinic, *Imprisoned Justice: Inside Two Georgia Immigrant Detention Centers* 48-49 (2017) [hereinafter *Imprisoned Justice*], https://projectsouth.org/wp-content/uploads/2017/06/Imprisoned_Justice_Report-1.pdf; *see also* ACLU-GA, *Prisoners of Profit* 89-90 (2012), *archived at* https://web.archive.org/web/20120530173158/https://acluga.org/Prisoners_of_Profit.pdf (documenting multiple "unreasonable delays in receiving medical care" at Irwin, including failure to provide necessary cancer treatment, x-rays, pain medication, treatment for diabetes and high blood pressure, among other medical neglect and mistreatment).

Unknown ICE agents denied adequate medical care to detained individuals at ICDC and failed to provide reasonable accommodations to individuals who suffered from recorded physical and mental impairments that substantially limited their major life activities.

101. In fact, instead of providing such care and accommodations to individuals in their custody, Defendants ICDC, LaSalle, and Unknown ICE agents retaliated against those who sought medical care, including placement in solitary confinement in response to requests for medical assistance.[11]

102. Even when seen by providers, immigrants detained at ICDC consistently reported cursory exams that failed to respond to health concerns and lack of appropriate medication or treatment, accompanied by an absence of adequate language interpretation.[12] Immigrants detained at ICDC also routinely described lack of mental health screenings and fears of reporting mental health concerns given the practice of inappropriately placing immigrants on suicide watch in solitary confinement.[13]

103. DHS itself documented serious violations of health and safety standards at ICDC, citing, for example, unsanitary conditions in medical unit cells that "needed to be mopped,

[11] *Imprisoned Justice*, *supra*, at 51; *see also* ACLU-GA, *supra*, at 91 (noting that "[o]ver two-thirds of the detainees interviewed expressed fear and concern at the possibility of complaining" due to retaliatory behavior from guards including being placed in solitary: "[I]f you complain, it only gets worse."). Reports have also documented the misuse and overuse of solitary confinement at ICDC in other contexts. Det. Watch Network, *A Toxic Relationship: Private Prisons and U.S. Immigration Detention* 5 (2016), https://www.detentionwatchnetwork.org/sites/default/files/reports/A%20Toxic%20Relationship_DWN.pdf (describing the placement of an 18-year-old girl in solitary after she reported suffering harassment on account of her sexual orientation and the placement of a new arrival at ICDC in segregation due to lack of space in housing units).

[12] *Imprisoned Justice*, *supra*, at 48. *See also* ACLU-GA, *supra*, at 90 (noting that "no staff member of the medical unit is able to provide interpretation for detainees who do not speak English well or at all" and as one interviewee described because "[t]here was no interpreter . . . I had no idea why or what was happening. Even if you go because you're sick they ignore you.").

[13] *Imprisoned Justice*, *supra*, at 48-49. *See also* ACLU-GA, *supra*, at 90-91 ("Many detainees suffer from depression, anxiety, insomnia, and other emotional difficulties" and are "generally afraid to talk about their mental health" for fear of being placed in segregation instead of receiving treatment).

walls wiped down, toilets cleaned, and trash and refuse removed."[14] In a compliance inspection report, DHS cited failures by medical staff at ICDC to complete required trainings, including in CPR and emergency first aid training.[15] Inspectors also documented failures by the medical staff to consistently review intake screening forms to assess priority for treatment and the lack of critical information related to mental health, medical history, and medications in health screenings.[16] Inspectors were unable to validate if an external state physician conducted peer reviews as requested and inspectors documented "examination tables . . . torn beyond repair, making cleaning and decontamination impossible" as well as broken cabinets, drawers and doors "held together with tape."[17]

104. In April 2020, women detained at ICDC released a video pleading for release from detention due to the harmful conditions at ICDC, including the unsanitary conditions and lack of protection against the COVID-19 pandemic.[18]

---

[14] U.S. Dep't of Homeland Sec., Immigr. & Customs Enf't, Office of Pro. Resp., Inspections & Det. Oversight Div., *Compliance Inspection for the Irwin County Detention Center* 6 (2017), https://www.ice.gov/doclib/foia/odo-compliance-inspections/2017IrwinCountyGA.pdf. *See also* ACLU-GA, *supra*, at 81, 85–87, 94 (highlighting other hygiene concerns and concerns about sanitary conditions, food, access to medical care, delays in receiving medications, misuse and overuse of solitary confinement among other "serious and systematic problems with living conditions, medical attention, and treatment of detainees at Irwin"). For examples of lack of adequate or effective medical or dental care at other ICE detention facilities, *see generally* U.S. House of Representatives, Comm. on Homeland Sec., *ICE Detention Facilities: Failing to Meet Basic Standards of Care* 13-20 (Sept. 21, 2020) (describing ongoing abuses committed at facilities owned and operated by LaSalle Corrections, Inc., among others).

[15] U.S. Dep't of Homeland Sec., Immigr. & Customs Enf't, Office of Pro. Resp., Inspections & Det. Oversight Div., *supra*, at 8–9.

[16] *Id.* at 9.

[17] U.S. Dep't of Homeland Sec., Immigr. & Customs Enf't, Office of Pro. Resp., Inspections & Det. Oversight Div., *Compliance Inspection of the Irwin County Detention Center* 15 (2020), https://www.ice.gov/doclib/foia/odo-compliance-inspections/irwinCoDetCntr_OcillaGA_Mar3-5_2020.pdf.

[18] Letter from Sarah H. Paoletti, Director, Transnat'l Legal Clinic, & Azadeh Shahshahani, Legal & Advoc. Director, Project South, to Dubravka Simonovic, UN Special Rapporteur on Violence Against Women, & Elizabeth Broderick, UN Working Grp. On Discrimination Against Women & Girls, (Nov. 19, 2020) (citing Rachel Taber, *Women Detained at Irwin County ICE Processing Center Fight for Their Lives Against COVID-19*, YouTube (Apr. 13, 2020), https://www.youtube.com/watch?v=aQt6QbkWsLI&feature=youtu.be), https://projectsouth.org/wp-content/uploads/2020/11/2020.11.19_UN-Communication-ICDC-Medical-Neglect-and-Abuse.pdf.

Correa, Raul Ruiz, Sheila Jackson Lee, Sylvia Garcia, Hank Johnson, and Pramila Jayapal.[27]

**VI. Independent medical report on practices at ICDC**

112. In October 2020, a team of independent medical professionals reviewed over 3,200 pages of medical records for 19 women detained at ICDC, including some of Plaintiffs' records, and provided their report to Congress.[28]

113. The report by the medical team described an "alarming pattern" of medical abuse, including but not limited to description of widespread practices that corroborated the inhumane practices Plaintiffs describe and exposed them to multiple unnecessary gynecological procedures and surgeries without informed consent by Defendant Amin.[29]

**VII. Defendants' Conspiracy to Execute Removal Orders to Deter, Prevent, and Retaliate for Attempts to Participate in Lawsuits and Investigations**

114. Immediately after Ms. Wooten's whistleblower report was made public, Defendant ICE initiated retaliatory deportations against women detained at ICDC who spoke out about the medical abuse that they had suffered or witnessed.[30] Federal and ICDC Defendants,

---

[27] Press Release, Cong. Hisp. Caucus, Congressional Hispanic Caucus and House Judiciary Committee Lead Congressional Delegation to Investigate Reports of Abuse at the ICE Irwin County Detention Center (Sept. 24, 2020) https://chc.house.gov/media-center/press-releases/media-advisory-congressional-hispanic-caucus-and-house-judiciary.

[28] Molly O'Toole, *supra*; Greg Walters, Carter Sherman, & Neda Toloui-Semnani, *'A Disturbing Pattern': ICE Detainees Were Pressured to Have Gynecological Surgery, Doctors Say*, VICE (Oct. 24, 2020), https://www.vice.com/en/article/88a95x/ice-detainees-were-pressured-to-have-gynecological-surgery-doctors-say.

[29] O'Toole, *supra*; ; Walters et al., *supra*. A week later, the Inter-American Commission on Human Rights expressed its concern over the non-consensual surgeries and sterilizations at ICDC, citing the whistleblower complaint and the medical report. Press Release, Org. of Am. States, IACHR Expresses Its Concern Over Reports of Sterilizations and Surgical Interventions Without Consent in Migrant Detention Centers in the United States (Oct. 30, 2020), https://www.oas.org/en/iachr/media_center/PReleases/2020/262.asp. The IACHR emphasized the serious violations of reproductive and sexual rights at ICDC along with the overall negligent medical care, the lack of protective measures during the COVID-19 pandemic, the lack of interpretation and language barriers to accessing medical care, as well as discriminatory treatment and intimidation of immigrants at ICDC. *Id.*

[30] Gianna Toboni, Ana Sebescen, & Nicole Bozorgmir, *ICE Attempts to Deport Multiple Witnesses in Gynecologic Surgery Scandal*, VICE (Nov. 5, 2020), https://www.vice.com/en/article/jgqq7p/ice-attempts-to-deport-multiple-witnesses-in-gynecologic-surgery-scandal.

Case 7:20-cv-00224-WLS Document 188-1 Filed 07/31/24 Page 14 of 35

including unknown ICE agents and ICDC officers, collectively engaged in a pattern of swiftly deporting victims and witnesses who had complained about their abuse to ICDC and ICE, spoken or attempted to speak to investigators, filed or attempted to file federal lawsuits, or had valuable information to share regarding medical abuses at ICDC.

115. Plaintiffs Floriano Navarro and Jane Doe #31—both of whom were detained at ICDC and subjected to medical abuse during their detention—were deported within a day after they spoke out or confirmed that they had spoken out about medical abuses at ICDC. Federal investigators were unable to interview "at least eight women who were deported after receiving questionable medical diagnoses and treatment at Irwin."[31]

116. On September 15, 2020, after the whistleblower report generated significant public and media attention, officers at ICDC questioned detained women about the identity of the source of information in the whistleblower report. Plaintiff Floriano Navarro was among the women targeted by the guards for this questioning.. During her detention at ICDC, Defendant Amin had subjected her to non-consensual, invasive gynecological procedures and repeatedly pressured her into undergoing a hysterectomy, which she avoided on the day of the scheduled surgery only because she had tested positive for COVID-19.[32] On September 15, 2020, Unknown ICDC Officer #1 specifically asked Ms. Floriano Navarro whether she had spoken up. Ms. Floriano Navarro responded,

[31] Neda Toloui-Semnani, Carter Sherman, & Emily Green, *Women Say They Were Abused and Deported by ICE. Now They Fear Being Silenced.*, VICE (Dec. 11, 2020), https://www.vice.com/en/article/akd73b/women-say-they-were-abused-and-deported-by-ice-now-they-fear-being-silenced.

[32] *"They Wanted to Take My Womb Out": Survivor of Medical Abuse in ICE Jail Deported After Speaking Out*, Democracy Now! (Oct. 26, 2020), https://www.democracynow.org/2020/10/26/ice_irwin_detention_center_invasive_surgeries.

"Yes, it was me. . . . I told a lawyer that you guys were doing illegal surgeries here."[33] Defendants deported Ms. Floriano Navarro the following day.

117. Moreover, Federal and ICDC Defendants attempted to deport Plaintiffs Oldaker, Ndonga, Reyes Ramirez, Binam, and Walker soon after they spoke out about the abuse they suffered, made known that they were willing to speak out, and/or were publically identified as a victim and witness of the abuse. Plaintiff Ndonga, for example, was informed by ICE that it had lifted a hold on her deportation within hours of her speaking with investigators from DOJ, DHS OIG, and FBI.

118. Shortly before the Congressional Delegation arrived at ICDC on September 26, 2020, Defendants ICDC, LaSalle, and their employees, agents, and/or contractors moved several survivors of Defendant Amin's abuse from the "Charlie" pod to the "Golf" pod. The "Golf" pod is in a trailer behind the main ICDC facility. The Congressional delegation did not speak with anyone in the "Golf" pod.

119. Defendants and/or their employees, agents, and/or contractors also actively suppressed and interfered with the ability of women in the "C" Pod cells to speak with the congressional delegation on September 26, 2020. Minutes before the congressional delegation arrived, Defendants ICDC, LaSalle, their employees, agents and/or their contractors ordered the women not to speak to anyone in the congressional delegation and to stay in their beds.

## VIII. Defendants Disregard Congressional Intervention to Halt Retaliatory Deportations

120. On November 7, 2020, the U.S. House of Representatives Committee on the Judiciary submitted a letter to DHS expressing grave concern that ICE was moving forward with

[33] *Id.*

131. In March 2020, women in one unit began a hunger strike in protest of ICDC's failure to provide them with masks, cleaning products, and other necessities to limit the spread of COVID-19. In response, Defendants ICDC, LaSalle and their employees, agents, and/or contractors, including Defendant Battle, cut off participants' WiFi or device access, barring them from contacting their relatives and legal counsel.

132. Defendant Battle told detained individuals that they could not engage in peaceful protest by having signs on the wall. Defendants and their employees, agents, and/or contractors also denied participants access to water and took away participants' commissary funds in retaliation for the strike.

133. On at least one occasion, Defendants and/or their employees, agents, and/or contractors responded to a detained individual's exercise of her First Amendment right of free expression with physical violence.

134. On April 12, 2020, Andrea Manrique Yaruro, a detained individual at ICDC, spoke in a video she and others filmed on ICDC's tablet. In the video, Ms. Manrique Yaruro spoke about the conditions in ICDC, and specifically about the spread of COVID-19 in the facility.

135. Another woman said in the video, "We . . . fear that they'll retaliate against us for speaking out. [We are] afraid they'll put us in solitary confinement and cut off contact with our families because we spoke out. If you don't hear from us again . . . that's what happened." Guards subsequently punished four or five of the women in the video by placing them in solitary confinement. The guards told the women they were being locked down in solitary because they made the video.

163. Following the filing of the instant lawsuit at approximately 6 a.m. on November 9, 2020, the officers transporting Ms. Oldaker to the airport in Columbus, GA informed her that her deportation had been halted.

164. The transporting officers forced Ms. Oldaker to sign two documents. The officers informed Ms. Oldaker that these documents were necessary to effectuate her removal and told her that she would be removed "in three weeks to a month." Ms. Oldaker could not read the documents while she was handcuffed but signed them anyway because she felt that she had no choice. After Ms. Oldaker signed the documents, the officers transported her back to ICDC.

165. After November 9, 2020, Defendants retaliated against Ms. Oldaker because of her willingness to speak out against medical abuses at ICDC.

166. ICE, LaSalle, and ICDC and their employees, agents, and/or contractors denied Ms. Oldaker the medication that she needed. Ms. Oldaker takes daily medication to control her severe and complex PTSD and recurring nightmares, but ICDC staff refused to give Ms. Oldaker her medication for almost a full day and a half after she was returned to ICDC. ICDC staff told Ms. Oldaker that they could not give her the medication because she "was not supposed to be there." As a result, Ms. Oldaker suffered debilitating headaches and could not sleep. Because ICDC had depleted Ms. Oldaker's commissary funds before her attempted deportation, Ms. Oldaker could not purchase ibuprofen to treat her withdrawal headaches.

167. ICDC staff also refused to return Ms. Oldaker's personal hygiene items and personal effects. For almost a day and a half after Ms. Oldaker's return, ICDC staff retained her toothbrush, deodorant, shampoo, clothes, undergarments, pens, and personal and legal

papers. Critically, ICDC staff retained the piece of paper with the phone number of Ms. Oldaker's counsel written on it, and Ms. Oldaker consequently struggled to contact her counsel.

168. Ms. Oldaker finally called her counsel on a monitored line on the evening of November 10 and informed her counsel that ICDC still retained most of her belongings and that she needed medications. Almost immediately after this phone call, ICDC returned Ms. Oldaker's belongings to her. Within about an hour, she was given her medications. This sequence of events strongly suggests that ICDC staff were listening to privileged and confidential attorney-client communications between Ms. Oldaker and her counsel.

169. For weeks after Ms. Oldaker's return to ICDC on November 9, 2020, ICDC denied Ms. Oldaker access to her detention center phone account. Prior to Defendants' attempted deportation of Ms. Oldaker, she had a phone account. On information and belief, all the other people detained at ICDC who wanted phone accounts had their own phone accounts at the time. Ms. Oldaker repeatedly requested access to a phone account. Defendants' decision to deny Ms. Oldaker a phone account was an effort to silence her from speaking out about abuses at ICDC. Defendants' decision to deny Ms. Oldaker a phone account restricted her ability to communicate with her counsel, the media, members of Congress, and the public at a time when there was national and international concern about abuses at ICDC.

170. For weeks, despite making repeated requests to unknown ICDC officers and/or ICE officials, including supervisory officers, Ms. Oldaker did not have a phone account. As a result, she had to rely on the phone accounts of other women detained at ICDC to make phone calls. While Ms. Oldaker had been using other women's phone accounts for calls,

Case 7:20-cv-00224-WLS Document 139-2 Filed 07/22/24 Page 150 of 195

183. ICDC failed to provide adequate health care and treatment to Ms. Solodkova or otherwise accommodate her disabilities.

184. The medical staff and providers who saw Ms. Solodkova often did not use interpreters, so she was unable to communicate her symptoms and medical history to them. The language barriers also meant that she often did not understand diagnoses or proposed treatment plans. She has a family history of cancer and was very fearful that she had cancer too.

185. While detained in ICDC, Ms. Solodkova lived in constant fear of contracting COVID-19 She was at heightened risk from COVID-19 due to her underlying medical conditions. Ms. Solodkova's comorbidities noted above made her particularly afraid of COVID-19, but she was unable to maintain appropriate levels of hygiene because Defendants failed to provide her with sufficient masks or hand sanitizer. Many guards did not wear masks or gloves, and Ms. Solodkova did not have access to regular COVID testing. She was only tested once while she was in detention, despite her health problems, including her breathing and heart concerns.

186. Ms. Solodkova slept poorly, struggled to remember things, and felt hopelessness due to her inability to access adequate medical care.

187. Ms. Solodkova was taken in handcuffs to see Defendant Amin three times over the course of August and September of 2020. No one told her where she was going or why she was going there. Each time, Unknown ICDC Officers and/or ICE officials sought approval from ICE Health Service Corps to refer Ms. Solodkova to Defendant Amin. Unknown ICE Officials then approved the request and referred Ms. Solodkova to Defendant Amin.

Case 7:20-cv-00224-WLS Document 138-7 Filed 07/12/24 Page 181 of 195

188. Defendant Amin performed transvaginal ultrasound exams, a pelvic exam that was very painful, and a pap smear on Ms. Solodkova.

189. Defendant Amin did not explain his actions to Ms. Solodkova and did not show her ultrasound images. She did not understand why he performed these exams and is still confused about her diagnosis. There was no interpreter at these appointments.

190. Defendant Amin indicated that Ms. Solodkova needed to have surgery but did not explain why. Based on Defendant Amin's hand gestures, Ms. Solodkova understood that she would be put under general anesthesia for the surgery. Ms. Solodkova shook her head to demonstrate her lack of consent to the operation.

191. At ICDC, a nurse insisted that Ms. Solodkova sign a document, which she later learned was a form to refuse the surgery with Defendant Amin.

192. Ms. Solodkova repeatedly requested her medical records in order to understand what was wrong with her, but it took multiple requests over months for her to receive them.

193. When ICDC finally produced the medical records, they were incomplete and no Russian translation was provided.

194. While detained, Ms. Soldokova continued to be afraid that something was medically wrong with her and that she needed the surgery Dr. Amin recommended, until she spoke with another doctor and learned that surgery was not needed.

195. Ms. Solodkova never received a diagnosis or treatment for her breathing, heart, kidney, liver, breast, or thyroid-related symptoms while at ICDC.

196. Ms. Solodkova never received any mental health care while at ICDC, which further traumatized her and exacerbated her fears.

Case 7:22-cv-00144-WLS Document 139-1 Filed 07/22/24 Page 198 of 195

depression. Her medical conditions have substantially limited her ability to perform major life tasks. For example, she is unable to sleep at night because of the pain, and sometimes the pain is so severe that she is unable to get out of bed.

229. Defendants failed to provide adequate treatment to Ms. Terrazas Silas or otherwise accommodate her disabilities.

230. Unknown ICDC Officers sought approval from ICE Health Service Corps to refer Ms. Terrazas Silas to Defendant Amin on several occasions. Unknown ICE Officials approved the request and referred Ms. Terrazas Silas to Defendant Amin.

231. Ms. Terrazas Silas first saw Defendant Amin in around March of 2020. Defendant Amin conducted a painful gynecological examination. He then left the room without further comment and ordered his nurses to administer unknown injections. Ms. Terrazas Silas was told by the nurses that the injections were to treat pain, but she experienced lingering side effects of fevers, nausea, vomiting, diarrhea, and cramps. A nurse informed Ms. Terrazas Silas one of the injections was actually a birth control shot. Ms. Terrazas Silas did not consent to any birth control injections.

232. During her second appointment with Defendant Amin, Ms. Terrazas Silas refused a second birth control shot and confronted Defendant Amin about giving her the prior shot. He told her there was nothing more to say after he conducted a second painful gynecological examination.

233. Ms. Terrazas Silas was brought to Defendant Amin a third time after she visited medical for an infection. Defendant Amin asked her why she was there and when she explained she had an infection, he said that had nothing to do with him, but still proceeded to conduct yet another painful gynecological examination. During this appointment,

Defendant Amin told Ms. Terrazas Silas he would have to remove her entire uterus because there was a tumor the size of a coconut. When she requested a second opinion, Defendant Amin negotiated with her, telling her the surgery is expensive and, at least this way, ICE would pay for it. When she continued to refuse the surgery, Defendant Amin said, “If you were in your twenties or thirties I would understand why you don’t want the surgery, but you’re an old woman.”

234. Ms. Terrazas Silas spoke to an ICDC officer on May 9, 2020, who noted “she wants 2nd opinion [illegible] Fibroid – [not] happy . . . how she was explained need for hysterectomy.” Ms. Terrazas Silas also spoke to an Unknown ICE or ICDC official on May 20, 2020, who noted Defendant Amin recommended a hysterectomy and she wanted a second opinion.

235. As word about the COVID-19 pandemic reached ICDC, Ms. Terrazas Silas decided to join a hunger strike in protest of the facility’s lack of cleaning supplies, masks, and inadequate social distancing measures. The women removed their uniforms and made a video that was posted online.

236. In retaliation for their speech, Major Battle placed the women in lockdown, and other Unknown ICDC Officers and/or ICE Officials cut off their Wi-Fi and confiscated the women’s personal supplies, including their food, drinks, and the tablets they used to contact individuals outside of the facility. Defendant Slack threatened to either transfer Ms. Terrazas Silas to a stricter lockdown in the E-4 pod or cut off her access to water if Ms. Terrazas Silas did not resume eating.

237. Given ICDC’s failure to implement adequate safety measures to prevent the spread of COVID-19, Ms. Terrazas Silas was exposed to the virus in July 2020. She was

Case 7:20-cv-00224-WLS   Document 188-2   Filed 07/22/24   Page 67 of 135

Jane Doe #6 could not ask what the black shadow was or what prescription Defendant Amin had given her.

272. Jane Doe #6 also was prescribed medication for a urinary tract infection ("UTI") during the July 2019 visit to Amin's clinic. Yet, after she was returned to ICDC, Jane Doe #6 was given only three of the five-day course of medication for her UTI. This was not the first time the staff at ICDC refused to give Jane Doe #6 medication. She was previously refused medication for a prior UTI when ICDC medical staff told her to drink more water instead of providing her medication.

273. In November 2019, Jane Doe #6 was taken to see Defendant Amin for a third time because she was having irregular periods. Defendant Amin did not explain what he was going to do but conducted a vaginal ultrasound and put his fingers in her vagina. There was no translator present. The ICDC officer who brought Jane Doe #6 to the appointment spoke Spanish, but refused to translate for Jane Doe #6.

274. In early 2020, Jane Doe #6 sought treatment for pain near her navel. She was taken to the hospital, given an X-ray, and told she needed surgery. Despite requests, she has never been shown the medical test results nor has the surgery been scheduled. She wants the suffering to stop but has not gotten any care despite her pleas for medical assistance.

275. Jane Doe #6 faced additional mistreatment at the hands of ICDC employees, agents, and/or contractors. For instance, in 2019, an Unknown ICDC Officer told Jane Doe #6 to wear filthy underwear, soiled with large bloodstains. It was only after Jane Doe #6 begged the officer for clean underwear that he relented and gave her a cleaner pair to wear.

292. At ICDC, the women's phone calls were monitored and recorded. Jane Doe #8 tried to speak about her experience with Defendant Amin over the phone to her mother. When she tried speaking about what happened, the phone call would disconnect. Jane Doe #8 thought her mother hung up, but her mother later informed her that she had not. This happened repeatedly and only when Jane Doe #8 tried to speak with her mother about her experience with Defendant Amin.

293. Jane Doe #8 has requested all of her medical records at ICDC but has only received medical records for the last month of her time at ICDC. These records did not include any of the records from her appointment with Defendant Amin. When Jane Doe #8 asked a guard for her complete medical records, she was told that her request may not be possible.

294. Jane Doe #8 has not been able to receive an independent physical examination. Because of the side effects she experienced from the Depo shot administered by Defendant Amin, she has requested an independent physical examination to understand what happened to her.

295. Jane Doe #8 is committed to ensuring that Defendants, their employees, agents, and/or contractors no longer abuse vulnerable immigrant women who are detained. Jane Doe #8 has spoken with reporters and congressional staffers about the abuse she experienced at ICDC. Simultaneously, she knows that her willingness to speak out about medical abuses at ICDC increases the risk of retaliation against her.

296. If deported to Mexico, it would be impossible for Jane Doe #8 to meaningfully participate in the pending federal investigations and any other investigations that may be opened to expose medical abuses and retaliation against women at ICDC.

313. Immediately before the surgery began, a nurse handed Jane Doe #15 a piece of paper to sign. The document was entirely in English and Jane Doe #15 could not read any of it. She did not know what it said. She was already undressed and the surgical team was present and ready to begin surgery. Jane Doe #15 felt that she had no choice but to sign, despite not knowing what the surgery was for, what they would do to her body during the surgery, or what wounds or potential side effects she might suffer after the surgery.

314. Jane Doe #15 did not see Defendant Amin, or any medical doctor, at any point during her time in the hospital. She woke up bleeding from the surgery, continued to bleed as Unknown ICDC Officers and/or Unknown ICE Officials brought her back to ICDC, and bled consistently for more than a week thereafter.

315. Officers at ICDC neglected to care for her in any way when she returned from surgery. Jane Doe #15 could not get out of bed on her own without assistance from the other women in her unit. She had to have food brought to her by other women when officers neglected to do so. Her fellow detainees had to help her walk to get her post-surgery medications because the nurses refused to deliver them to her.

316. While Jane Doe #15 recovered, two of her wounds became infected. When she asked the nurses for bandages and rubbing alcohol in order to disinfect them, they provided her with one bandage and nothing to clean the wounds. They gave her no other assistance.

317. In August 2020, Jane Doe #15 was brought to see Defendant Amin by Unknown ICDC Officers and/or Unknown ICE Officials. She had made no request to see Defendant Amin. A nurse was present to translate. Jane Doe #15 immediately asked what surgery he performed on her, but Defendant Amin did not answer the question. Defendant Amin informed her that, despite the surgery, Jane Doe. #15 still had fibroids in her uterus.

Case 7:20-cv-00224-WLS Document 1 Filed 10/31/20 Page 24 of 33

With little regard for her distress, he informed her that she would never be able to have children. Jane Doe #15 requested that someone else examine her, but Defendant Amin simply shrugged and told her he would see her again in three months. Jane Doe #15 left the appointment completely devastated, embarrassed, and ashamed.

318. Jane Doe #15 remains in extreme pain to this day. However, she was afraid to tell ICDC officers or ICE officials out of fear she will experience more medical trauma. To this day, she does not know what surgery Defendant Amin performed on her.

319. Jane Doe #15 is committed to ensuring that Defendants, their employees, agents, and/or contractors no longer abuse vulnerable immigrant women who are detained. Jane Doe #15 has spoken with reporters and congressional staffers about the abuse she experienced at ICDC. Simultaneously, she knows that her willingness to speak out about medical abuses at ICDC increases the risk of retaliation against her.

320. If deported to Mexico, it would be impossible for Jane Doe #15 to meaningfully participate in the pending federal investigations and any other investigations that may be opened to expose medical abuses and retaliation against women at ICDC.

**I. Plaintiff Jane Doe #22**

321. Plaintiff Jane Doe #22 is a 40-year-old woman who came to the United States from Senegal over twenty years ago with a tourist visa. She married a U.S. citizen who was very abusive. She has three children who are U.S. citizens. She had a serious leg injury in 2018 that causes her pain and swelling when she walks. She has gained a significant amount of weight in detention, becoming obese. She also suffers from depression.

322. Defendant Amin, Unknown ICDC Officers, Unknown ICE Officials, and their agents, contractors, and/or employees failed to provide adequate treatment to Jane Doe #22 or otherwise accommodate her disabilities.

Case 7:20-cv-00224-WLS Document 189-2 Filed 07/22/24 Page 282 of 395

officer named Ms. Vaughn asked Ms. Floriano Navarro what surgery she was having that day, she smirked as Ms. Floriano Navarro stated it was surgery to drain her cyst.

345. At the hospital, a nurse prepped Ms. Floriano Navarro for the surgery, conducted a COVID-19 test, and made her sign a consent form without letting her read it. After Ms. Floriano Navarro was fully prepared for surgery, Ms. Vaughn came in the room and told her that Defendant Amin was actually going to perform a hysterectomy, which would remove her womb. This was the first time any person had mentioned a hysterectomy to Ms. Floriano Navarro.

346. Ms. Floriano Navarro would have been forced to have the hysterectomy, but for the fact that right before the surgery, the results of her COVID-19 test were returned, showing that she had COVID-19 antibodies. Ms. Floriano Navarro was taken back to ICDC, and the hysterectomy surgery was not performed.

347. None of the other women in Ms. Floriano Navarro's housing unit were told about Ms. Floriano Navarro's COVID-19 test results. Ms. Floriano Navarro attempted to inform them as soon as she returned, so they could take necessary precautions, but she was immediately taken to an isolation unit. The officers then lied to the other women and told them that Ms. Floriano Navarro was going home rather than telling them about the test results.

348. Unknown ICDC Officers continued to pressure Ms. Floriano Navarro to get the surgery despite her resistance. For instance, Officer Rabiou, an officer with no medical background, encouraged her to get the surgery before she was deported. ICE Officials William and Mia also encouraged her to get the surgery after she expressed her concerns and informed them of her experiences with Defendant Amin. Despite Ms. Floriano

Navarro's repeated complaints about her treatment, none of the ICDC officers or ICE officials showed her any concern.

349. Ms. Floriano Navarro saw Defendant Amin one more time before her deportation. On September 15, 2020, the guards took her to see Defendant Amin without warning. Defendant Amin berated her for not getting the surgery. Immediately after the appointment, guards brought Ms. Floriano Navarro to the intake area where she was informed that she would be deported. Ms. Floriano Navarro had never before seen any other woman called to the intake area to be told they would be deported. Ms. Floriano Navarro waited in the intake area for about an hour and a half. While she waited, Defendant Smith confronted her about a whistleblower report on medical abuses at ICDC that was released the day before, on September 14, 2020. Upon being questioned, Ms. Floriano Navarro admitted that she had told a lawyer about her own experiences, and Defendant Smith immediately told other officers nearby. Defendant Smith berated Ms. Floriano Navarro and told her that she should leave for Mexico "fresh and clean," meaning after undergoing surgery. Ms. Floriano Navarro felt terrified and her heart was racing. When she returned to her pod, she was crying and extremely distressed, and other women tried to comfort her.

350. Within 24 hours, Ms. Floriano Navarro was deported. Ms. Floriano Navarro believes that she was deported so that she could not speak out about her experiences and mistreatment at the hands of Defendant Amin and in retaliation for having told her lawyer about Defendant Amin's plan to perform a hysterectomy on her.

351. Because of Ms. Floriano Navarro's deportation to Mexico, she has never been able to participate in any federal investigation. She actively wants to speak out and assist the authorities in preventing what happened to her in detention from happening to others.

**K. Plaintiff Mbeti Victoria Ndonga**

352. Plaintiff Mbeti Victoria Ndonga is a 38-year-old woman who was brought to the United States when she was two years old. Ms. Ndonga currently lives in Georgia.

353. Ms. Ndonga was detained in ICE custody at ICDC from April 2019 until December 16, 2020. She was detained at ICDC for more than 616 days, including 267 days after receiving a final order of removal. While detained at ICDC, Ms. Ndonga was subjected to non-consensual, invasive, and medically unindicated procedures at the hands of Defendant Amin.

354. Ms. Ndonga suffers from serious mental health disabilities, specifically schizoaffective disorder, a schizophrenia-spectrum disorder. She also has been diagnosed with post-traumatic stress disorder (PTSD). An immigration judge in Atlanta, Georgia adjudicated her mentally incompetent after ICE moved to hold a *Matter of M-A-M-* competency hearing in May 2019. ICE and its employees, contractors, and/or agents were or should have been aware of Ms. Ndonga's mental disabilities since at least that time.

355. Additionally, Ms. Ndonga suffers from hypertension, obesity, and chronic and severe gynecological issues. Specifically, Ms. Ndonga suffers from heavy, irregular bleeding and debilitating menstrual cramps. While in ICE custody, Ms. Ndonga repeatedly sought treatment for her gynecological issues, but never received appropriate treatment.

356. Throughout her detention at ICDC, Ms. Ndonga suffered from severe gynecological problems. Her menstrual cycle was highly irregular and caused her to bleed heavily for prolonged periods of time of up to twenty days in a single stretch. In addition to heavy

Case 7:21-cv-00108-WLS Document 138-17 Filed 07/12/24 Page 180 of 195

446. Ms. Binam asked Defendant Amin how her fallopian tubes related to surgery on her ovaries.

447. Defendant Amin told Ms. Binam that he had made a judgment call to remove the blockage.

448. Defendant Amin told Ms. Binam she would no longer be able to conceive without fertility assistance.

449. Ms. Binam started sobbing. She told Defendant Amin that she did not give him permission to remove her fallopian tube.

450. Defendant Amin failed to get Ms. Binam's informed consent to the salpingectomy.

451. Defendant Amin did not engage in mutual decision-making with Ms. Binam about the salpingectomy and her reproductive health.

452. Upon information and belief, the salpingectomy was not medically necessary.

453. Ms. Binam was transported back to ICDC. She was not given proper medical care for her surgical wounds. Other women had to help Ms. Binam change her bandages and bring her food in the dormitory because it was painful for her to walk.

454. On August 28, 2020, Ms. Binam told an ICDC mental health provider that she had gone into the surgery expecting a D&C and was 'bothered' that she had instead had her fallopian tube cut.

455. On September 9, 2019, Ms. Binam had a follow-up appointment at Dr. Amin's office.

456. Ms. Binam noticed that Defendant Amin was in the office and requested to speak with him.

457. She was instead seen by a different provider, a woman, who told her that Defendant Amin was not available.

Case 7:20-cv-00224-WLS Document 139-1 Filed 07/21/24 Page 196 of 195

469. Her sister had to buy a disposable phone, with a different number, in order to speak with Ms. Binam.

470. Ms. Binam did not have her period for approximately 22 months after her surgery.

471. Upon information and belief, her ability to naturally conceive and carry a child has been compromised as a result of the nonconsensual surgery that reviewing medical expert Julia Geynisman-Tan, M.D., FACOG, FACS subsequently determined to be neither medically indicated nor medically necessary.

472. On February 24, 2020, with no explanation, Ms. Binam was transferred to the Montgomery Processing Center in Conroe, Texas.

473. For months after she arrived, ICE Deportation Officer Dwight Hunt regularly met with Ms. Binam, telling her she was being deported soon. He even stated at one point that the Cameroonian Government had issued the travel document for Ms. Binam to be removed. He never provided Ms. Binam or her immigration attorney with an expected date of removal.

474. On September 14, 2020, the Whistleblower Complaint regarding medical abuse at ICDC was published.

475. Upon reading the Whistleblower Complaint, Ms. Binam's friend, Reverend Leeann Culbreath of the South Georgia Immigrant Support Network, recognized that Ms. Binam was also a likely victim of this abuse based on what Ms. Binam had told her.

476. Rev. Culbreath reached out to Ms. Binam by phone at the Montgomery Processing Center to request her permission to publicly share Ms. Binam's experience with Defendant Amin. Ms. Binam gave her permission.

from ICDC officials. She believes officials were listening to her calls, because in the two weeks before she was deported, the line cut out and the call was dropped while she was on a call with two of her friends discussing these issues. The phone system never allowed her to call these friends back.

517. Three days before she was deported, on February 1, 2019, Ms. Chavez Morales filed a motion to reopen her removal proceedings. Her motion was successful and her removal order was reopened on May 15, 2019.

518. After returning to Mexico, Ms. Chavez Morales saw multiple gynecologists for follow-up care and in an effort to determine what had happened to her at ICDC. She eventually was told that Defendant Amin removed more than half of her left ovary and that she has a significantly reduced chance of successfully carrying a future pregnancy to term.

519. Upon information and belief, this surgical procedure was not medically necessary.

520. Ms. Chavez Morales and her husband had hopes and dreams of having and raising a child together, which now may be lost forever due the actions of Defendant Amin.

521. Ms. Chavez Morales also suffered from asthma while at ICDC. She was, at times, denied the medication she needed in order to treat her chronic condition. On one occasion, she had an asthma attack, and it took three hours for an ICDC nurse to aid her as she struggled to breathe. On several occasions, medical personnel injected something in Ms. Chavez Morales's leg. She does not know what was injected and to this day, she experiences shooting and burning pains in her leg.

522. Ms. Chavez Morales also experienced retaliation by ICDC officials for exercising her free speech rights. After submitting a grievance against an ICDC officer, she was

**Deleted:** Jane Doe # 25

**Deleted:** The Executive Office of Immigration Review's system indicates that she is scheduled for a new hearing before an immigration judge on July 10, 2023.

**Deleted:** Since

**Deleted:** Jane Doe #25 has seen

**Deleted:** .

**Deleted:** has been

**Deleted:** Jane Doe #25

**Deleted:** Jane Doe #25

**Deleted:** Jane Doe #25's

**Deleted:** Jane Doe # 25

Case 7:22-cv-00244-WLS Document 139-8-2 Filed 07/22/26 Page 311 6f 33195

559. Defendant Amin performed a transvaginal ultrasound and internal exam with his hand, which were rough, painful, and forced. Ms. Haug describes it as "the most medical way of being raped you could possibly experience."

560. Defendant Amin told Ms. Haug that she had cysts and endometriosis. Ms. Haug was confused by the diagnosis of endometriosis because she did not have the symptoms described in the information she received about the condition.

561. Defendant Amin initially recommended a Depo shot. Ms. Haug refused the shot, so he prescribed regular birth control pills. ICDC delayed providing Ms. Haug with the prescribed birth control pills.

562. Defendant Amin pressured Ms. Haug to get the Depo shot because he determined that the cysts were not shrinking. Ms. Haug felt she had no choice but to get the shot in order to avoid surgery.

563. During one of the visits, Ms. Haug was bleeding and did not want to have internal procedures done, but Defendant Amin pushed her back on the table and performed them anyway.

564. After two Depo shots, Defendant Amin told Ms. Haug that the cysts had not shrunk and that she needed surgery. He told her she would not have to pay if the surgery was done while she was detained. Although Ms. Haug told him she did not want to have surgery, Defendant Amin told her the next appointment would be for surgery if the cysts did not shrink. Defendant Amin talked about both "D&C" and hysterectomy, saying it would likely be the latter because of the size of the cysts.

565. Ms. Haug was terrified of having a hysterectomy and of not getting enough pain medication after surgery. She had observed other women at ICDC in excruciating pain

571. Ms. Bowman's first appointment with Defendant Amin was in May 2018. When she told him about her two previous rectocele diagnoses, one of which occurred only two months prior, he dismissed her completely, telling her that the rectocele was all in her imagination.

572. Despite other health professionals' recommendations for surgery, Defendant Amin provided Ms. Bowman with only a hormonal vaginal cream, which he said would strengthen her vaginal walls. Ms. Bowman used the cream, but her condition did not improve, and the prescription for the cream was never refilled.

573. Ms. Bowman had a second appointment with Defendant Amin a year later in May 2019. During this appointment, she told him that the hormonal cream did not help. Unlike her previous appointment, Defendant Amin this time acknowledged that she had rectocele, but refused to provide her with further treatment.

574. Ms. Bowman became angry with Defendant Amin and began arguing with him while she was still undressed on the examination table. He told her that if she wanted to have sex with her husband, she could "push it down," referring to the bulge that appears in the vaginal wall when an individual has rectocele. Defendant Amin told Ms. Bowman that she did not know what she was talking about and left the room. Defendant Amin then complained about Ms. Bowman to the head nurse at ICDC.

575. After this traumatic experience, Ms. Bowman decided that she would never see Defendant Amin again. She was so distraught by the way that Defendant Amin treated her that she had to see the psychiatrist at ICDC, Dr. Faulk.

576. Ms. Bowman requested her medical records from Defendant Amin's office and was troubled to discover that they were incomplete. Specifically, she noticed that the medical

Case 7:20-cv-00224-WLS Document 139-8-2 Filed 07/21/24 Page 321 of 395

history forms she completed during her second appointment had been replaced by forms she completed during her first appointment.

577. Ms. Bowman remains very disturbed by her experience with Defendant Amin. He ignored Ms. Bowman's cries for help, refused to provide her with medical treatment, and refuted her diagnosis that has been corroborated by four medical professionals to date—the two professionals she saw before her first appointment with Defendant Amin, and two more since.

578. The two medical professionals Ms. Bowman saw after Defendant Amin both diagnosed her with stage 2-3 rectocele. Defendant Amin's refusal to provide treatment has led to her condition to become even worse.

579. **<u>Jane Doe #28</u>** was detained at ICDC from March 4, 2020 until her release on December 7, 2020. Before she was detained, Jane Doe #28 was diagnosed with a tumor on her uterus. The doctor she saw told Jane Doe #28 that the tumor was not a threat to Jane Doe #28's health, and the doctor advised Jane Doe #28 that the tumor would disappear with menopause.

580. While detained at ICDC, Jane Doe #28 noticed that she had a hard lump on her lower abdomen. She requested medical attention. Jane Doe #28 visited a medical facility and received a CT scan. When Jane Doe #28 returned to ICDC, a nurse informed her that the CT scan revealed that she had a tumor and would need to go to another appointment.

581. Jane Doe #28 was sent to Defendant Amin. A female nurse brought Jane Doe #28 to an exam room. An interpreter was not present in person or over the phone to explain to Jane Doe #28 what was about to happen. The nurse gestured for Jane Doe #28 to